BARTLIT BECK HERMAN PALENCHAR &
  SCOTT LLP
Don Scott (don.scott@bartlit-beck.com)
Karma Giulianelli (karma.giulianelli@bartlit-
  beck.com)
Sean Grimsley (sean.grimsley@bartlit-beck.com)
Sundeep K. Addy (rob.addy@bartlit-beck.com)
1899 Wynkoop Street, Suite 800
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140


BARTLIT BECK HERMAN PALENCHAR &
  SCOTT LLP
Chris Lind (chris.lind@bartlit-beck.com)
Andrew Polovin (andrew.polovin@bartlit-beck.com)
Kate Swift (kate.swift@bartlit-beck.com)
54 West Hubbard Street
Chicago, IL 60610
Telephone: (312) 494-4400
Facsimile: (312) 494-4440

CLEARY GOTTLIEB STEEN & HAMILTON LLP
George S. Cary (gcary@cgsh.com)
Steven J. Kaiser (skaiser@cgsh.com)
Larry C. Work-Dembowski (lwork-
  dembowski@cgsh.com)
Kenneth Reinker (kreinker@cgsh.com)
2000 Pennsylvania Ave, NW
Washington, DC 20006
Telephone: (202) 974-1500
Facsimile: (202) 974-1999

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Lev Dassin (ldassin@cgsh.com)
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-2999

*Attorneys for Defendants Sabre Holdings Corp., Sabre Inc., and Sabre Travel Int'l Ltd.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. Airways, Inc.,<br><br>       Plaintiff,<br><br>   v.<br><br>Sabre Holdings Corp., Sabre Inc., and Sabre Travel Int'l Ltd.,<br><br>       Defendants. | **Civ. A. No. 1:11-cv-02725-MGC**<br><br>**ECF Case**<br><br><u>**REDACTED—PUBLIC VERSION**</u><br><br>**Oral Argument Requested** |

## <u>Memorandum in Support of Sabre's Motion to Dismiss Pursuant to Rule 12(b)(6)</u>

# Table of Contents

Table of Contents ................................................................................................................. i

Table of Authorities ............................................................................................................ ii

Introduction ......................................................................................................................... 1

Factual Background ............................................................................................................. 4

Argument ............................................................................................................................. 6

I.   US Air's Section 1 Vertical Claim (Count I) Fails .................................................... 7

    A.   Sabre's Agreements with US Air and Other Airlines Do Not Give Rise to a Section 1 Claim .............................................................................................. 8

        1.   The Disputed Contractual Provisions Are Neither Exclusive Nor Anticompetitive ...................................................................................... 10

        2.   US Air Cannot Challenge Its Own Contract in Any Event ...................... 12

    B.   US Air's Allegations Regarding Sabre's Agreements with Travel Agents Do Not Give Rise to a Section 1 Claim ................................................. 14

        1.   US Air Has Failed to Allege that Sabre's Alleged Incentive Payments, Volume-Based Incentives and "Transaction Ratios" Are Predatory ................................................................................................. 14

    C.   US Air Has Not Alleged Adequate Foreclosure ...................................................... 18

II.  US Air's Monopolization Claims (Counts II & III) Fail .................................................. 20

    A.   US Air's "Sabre-Only" Market Fails As a Matter of Law ...................................... 20

        1.   The "Sabre Travel Agent Market" Is Implausible ...................................... 21

        2.   Sabre's Alleged Negotiating Power Does Not Create a Relevant Market ....................................................................................................... 25

    B.   US Air's Claim for "Monopolization of the Sabre Travel Agent Market" (Count II) Fails Because US Air Has Not Alleged Anticompetitive Conduct ........................................................................................................... 25

    C.   US Air's Claim for "Conspiracy to Monopolize the Sabre Travel Agent Market" (Count III) Fails for Other Reasons As Well Because US Air Has Not Alleged Anticompetitive Conduct or a Conspiracy ....................................... 28

III. US Air's Horizontal Claim (Count IV) Fails ................................................................... 29

    A.   The Complaint Does Not Allege Direct Evidence of an Actual Agreement ......... 30

    B.   The Complaint Does Not Support an Inference of Agreement ............................... 33

        1.   Seeking Full Content Does Not Suggest Conspiracy ................................ 34

        2.   The Assertions of Not Competing Do Not Withstand Scrutiny ............... 36

        3.   US Air's Other Conspiracy Allegations Do Not Support an Inference of Agreement ......................................................................... 38

Conclusion ......................................................................................................................... 40

# Table of Authorities

**Cases**

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
   166 F.3d 772 (5th Cir. 1999) ................................................................................. 23

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
   300 F.3d 620 (5th Cir. 2002) ................................................................................. 21

*ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*,
   137 Fed. Appx. 694 (5th Cir. 2005) ...................................................................... 28

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ..................................................................................... 6, 34

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983) .............................................................................................. 7

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 554 (2007) ..................................................................................... *passim*

*Blackburn v. Sweeney*,
   53 F.3d 825 (7th Cir. 1995) ................................................................................. 13

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
   65 F.3d 1406 (7th Cir. 1995) ............................................................................... 10

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
   140 F.3d 494 (3d Cir. 1998) ................................................................................. 25

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ............................................................................................. 17

*CDC Techs., Inc. v. IDEXX Labs., Inc.*,
   186 F.3d 74 (2d Cir. 1999) ..................................................................................... 8

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ............................................................................. 4, 30

*Chapman v. N.Y. State Div. for Youth*,
   546 F.3d 230 (2d Cir. 2008) ........................................................................... 20, 21

*Columbia Nitrogen Corp. v. Royster Co.*,
   451 F.2d 3 (4th Cir. 1971) ......................................................................... 12, 13, 14

*Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp.*,
   262 F. Supp. 2d 50 (S.D.N.Y. 2003) .................................................................... 22

*Cont'l Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater N.Y.*,
   994 F. Supp. 133 (E.D.N.Y. 1998) ....................................................................... 25

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ................................................................................ 28

*Digital Equip. Corp. v. Uniq Digital Techs., Inc.*,
   73 F.3d 756 (7th Cir. 1996) ................................................................ 23

*E & L Consulting, Ltd. v. Doman Indus., Ltd.*,
   472 F.3d 23 (2d Cir. 2006) .................................................................. 27

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
   504 U.S. 451 (1992) ............................................................................ 22

*Forsyth v. Humana, Inc.*,
   114 F.3d 1467 (9th Cir. 1997) ............................................................ 25

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
   830 F.2d 716 (7th Cir. 1987) .............................................................. 12

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*,
   386 F.3d 485 (2d Cir. 2004) ............................................................... 22

*Hack v. President & Fellows of Yale Coll.*,
   237 F.3d 81 (2d Cir. 2000) ............................................................ 20, 23

*In re "Apollo" Air Passenger Computer Reservation Sys. (CRS)*,
   720 F. Supp. 1068 (S.D.N.Y. 1989) ................................................... 16

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007) ............................................................ 30, 33

*Insignia Sys., Inc. v. News Corp., Ltd.*,
   No. 04-4213JRTFLN, 2005 WL 2063890 (D. Minn. Aug. 25, 2005) ................. 20

*Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*,
   713 F. Supp. 2d 286 (S.D.N.Y. 2010) ................................................ 21

*Isaksen v. Vt. Castings, Inc.*,
   825 F.2d 1158 (7th Cir. 1987) ............................................................ 12

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) ................................................................................ 19

*Kitsap Physicians Serv. v. Wash. Dental Serv.*,
   671 F. Supp. 1267 (W.D. Wash. 1987) .............................................. 11

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991) .......................................................... 31, 40

*LaFlamme v. Societe Air Fr.*,
   702 F. Supp. 2d 136 (E.D.N.Y. 2010) ............................................... 36

*Lee v. Life Ins. Co. of N. Am.*,
   23 F.3d 14 (1st Cir. 1994) .................................................................. 23

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) .............................................................................. 7

*Mathias v. Daily News, L.P.*,
   152 F. Supp. 2d 465 (S.D.N.Y. 2001) ................................................ 21

*Metzler v. Bear Auto. Serv. Equip. Co.*,
  19 F. Supp. 2d 1345 (D. Fla. 1998) ................................................................. 23

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
  364 F.3d 1288 (11th Cir. 2004) ........................................................................ 12

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*,
  883 F.2d 1101 (1st Cir. 1989) ........................................................................... 10

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
  797 F.2d 370 (7th Cir. 1986) ............................................................................. 10

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
  127 F.3d 1157 (9th Cir. 1997) ............................................................................. 8

*Oreck Corp. v. Whirlpool Corp.*,
  563 F.2d 54 (2d Cir. 1977) .................................................................................. 8

*Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*,
  920 F. Supp. 455 (S.D.N.Y. 1996) ..................................................................... 17

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
  392 U.S. 134 (1968) ...................................................................................... 12, 13

*Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n*,
  861 F. Supp. 1498 (D. Or. 1994) ....................................................................... 29

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993) ............................................................................................. 27

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
  104 F.3d 811 (6th Cir. 1997) ............................................................................. 23

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
  615 F.3d 412 (5th Cir. 2010) ............................................................................. 21

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997) ......................................................................... 22, 23

*Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ. Inc.*,
  812 F. Supp. 387 (S.D.N.Y. 1993) ..................................................................... 21

*Rick-Mik Enters. Inc. v. Equilon Enters., LLC*,
  532 F.3d 963 (9th Cir. 2008) ............................................................................. 19

*Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*,
  802 F. Supp. 1544 (S.D. Tex. 1991) .................................................................. 20

*Rohlfing v. Manor Care, Inc.*,
  172 F.R.D. 330 (N.D. Ill. 1997) .................................................................... 21, 23

*Ross v. Bolton*,
  904 F.2d 819 (2d Cir. 1990) .............................................................................. 12

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) ................................................................................ 40

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
  28 F.3d 1379 (5th Cir. 1994) ........................................................................................... 8

*Santana Prods., Inc. v. Bobrick Washroom Equip. Inc.*,
  249 F. Supp. 2d 463 (M.D. Pa. 2003) ............................................................................ 29

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010) ................................................................................. 6, 34, 37

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
  373 F.3d 57 (1st Cir. 2004) ............................................................................................ 19

*Sullivan v. Nat'l Football League*,
  34 F.3d 1091 (1st Cir. 1994) ................................................................................... 12, 14

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) .......................................................................................... 8, 18, 19

*THI-Hawaii, Inc. v. First Commerce Fin. Corp.*,
  627 F.2d 991 (9th Cir. 1980) ............................................................................. 12, 13, 14

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) .......................................................................................... 21

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
  964 F.2d 186 (2d Cir. 1992) .......................................................................................... 27

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
  986 F.2d 589 (1st Cir. 1993) .......................................................................................... 19

*United Air Lines, Inc. v. Austin Travel Corp.*,
  681 F. Supp. 176 (S.D.N.Y. 1988) ................................................................................ 16

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919) ........................................................................................................ 26

*United States v. E.I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) ........................................................................................................ 24

*United States v. Yellow Cab Co.*,
  332 U.S. 218 (1947) ........................................................................................................ 28

*Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*,
  184 F. Supp. 2d 947 (D. Ariz. 2001) ............................................................................. 23

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ........................................................................................................ 26

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
  257 F.3d 256 (2d Cir. 2001) ................................................................................. 7, 15, 16

*Walker Process Equip. Inc. v. Food Mach. & Chem. Corp.*,
  382 U.S. 172 (1965) ........................................................................................................ 20

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
  549 U.S. 312 (2007) ........................................................................................................ 17

*Zinser v. Rose*,
    868 F.2d 938 (7th Cir. 1989) ..................................................................................... 9

**Statutes**

15 U.S.C. § 15b................................................................................................................. 33

**Federal Regulations**

Dep't of Transp. Computer Reservations System (CRS) Regulations Final Rule,
    69 Fed. Reg. 976 (Jan. 7, 2004) (codified at 14 C.F.R. § 255)........................................ 4, 5, 15

**Treatises**

2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2007)................................. 22

# Introduction

This case is nothing more than US Airways' attempt to renegotiate the three-year contract it recently signed with Sabre.[1] The new agreement contains nearly identical provisions to the contract US Airways ("US Air") signed in 2006 and operated under for five years without complaint. Under the agreement, Sabre markets and distributes US Air's fares to travel agencies who sell seats on US Air flights through the Sabre GDS.[2] In exchange, US Air pays Sabre a modest per-segment booking fee and promises to provide Sabre, subject to negotiated exceptions, with all of US Air's publically-available fares—*i.e.*, US Air's "full content." Sabre then compiles US Air's fares and other airlines' fares in one convenient computerized system, allowing travel agents and consumers to comparison shop for the best available flight options among competing airlines. US Air likes the revenues it obtains from this distribution arrangement (reportedly 35% of its total), but no longer likes the transparency and price competition that its commitment to provide full content enables.

US Air's allegations do not state a claim under Sections 1 or 2 of the Sherman Act. The antitrust laws are not a vehicle for large corporations to renegotiate the terms of their commercial agreements. US Air tries to do just that, spinning its apparent dissatisfaction with its contract into antitrust claims, primarily by asserting that Sabre's contracts with US Air, other airlines, and travel agents allow Sabre to maintain a "monopoly" over the "Sabre Submarket," a gerrymandered, single-brand product market consisting of Sabre's distribution of travel services

---

[1] "Sabre" collectively refers to the three defendants Sabre Holdings Corp., Sabre Inc. and Sabre Travel International Ltd.

[2] "GDS" stands for global distribution system. GDSs are sophisticated computer reservation systems that allow subscribers such as travel agents to, among other things, comparison shop, book air fares, and support agents' other travel needs, including back office reporting, traveler profiles, and similar services.

to travel agents who subscribe to the Sabre GDS.  Because Sabre competes directly with two

other GDSs in the United States, US Air does not—and cannot—allege that Sabre has

monopolized a broader GDS market, let alone the market for distribution of travel services

(including distribution through the Internet, and directly by the airlines through their websites

and direct connections with their customers).  Instead, it proposes a facially-implausible market

definition where Sabre is and always will be a monopolist by definition—because the entire

alleged market is made up exclusively of Sabre's own customers.  But the courts have long

recognized the implausibility of a market defined to exclude reasonably interchangeable

competitive products.  Without a plausible market definition, US Air's monopolization claims

fail without need for further inquiry.

US Air also does not allege any anticompetitive conduct.  Rather, it alleges principally

that Sabre has required US Air and other airlines to provide Sabre with full content on a non-

discriminatory basis and that Sabre has offered its travel agent subscribers commissions and

other incentives to book flights on the Sabre GDS.  But full content provisions are plainly pro-

competitive.  They promote comparison shopping and price competition among airlines and are

integral to the product that Sabre offers travel agencies.  They are also not exclusive.  Nothing

prohibits US Air or other airlines from providing Sabre's competitors with their full content as

well.  In fact, US Air alleges that many other airlines *do* provide Sabre's competitors with their

full content.  (Compl. ¶¶ 99-102.)

Similarly, the commissions and volume-based incentives Sabre allegedly provides to

travel agencies are pro-competitive price competition and are in no way exclusionary, as any

competitor to Sabre could meet or beat Sabre's incentives.  US Air critically fails to allege that

the incentives or volume discounts are "predatory" (below cost) or that an equally efficient

2

competitor could not match them.  The antitrust laws are designed to encourage, not prohibit, companies to provide their customers with such pricing incentives.

Perhaps because these provisions are not exclusionary, US Air fails to allege the percentage of a properly-defined market that is purportedly foreclosed by the challenged contractual provisions.  The failure to do so is alone fatal to each of USAir's claims, as substantial foreclosure is a necessary element.

In a "Hail Mary" attempt to rescue its deficient claims, US Air finally offers sensational charges of a "conspiracy" among the three domestic GDSs to demand full content from the airlines.  But, upon examination, those assertions reduce to generalized allegations of parallel conduct and mischaracterizations of statements made in news articles and press releases.  It is plainly in each GDS's independent self-interest to offer its subscribers all of an airline's available fare options.  Permitting travel agents and consumers to make intelligent, informed shopping decisions is one of the principal value propositions a GDS provides.  The fact that all three GDSs may have negotiated and advertised full content agreements with airlines does not in any way suggest a conspiracy.

Because this is not a legitimate antitrust suit, but rather an improper attempt by US Air to use the courts to renegotiate its recently-signed contract, Sabre respectfully requests that the Court dismiss US Air's Complaint in its entirety.

## Factual Background[3]

US Air is the nation's fourth largest airline, with approximately $10 billion in annual revenue. US Air has substantial market power, controlling 100% of flights between 220 different cities across the United States.

Like other airlines, US Air has several different channels for marketing and distributing seats on its flights: "direct sales through their reservations agents, sales through 'brick-and-mortar travel agencies, sales through individual airline websites, and sales through on-line travel agencies." Dep't of Transp. ("DOT") Computer Reservations System (CRS) Regulations Final Rule, 69 Fed. Reg. 976, 979 (Jan. 7, 2004) (codified at 14 C.F.R. § 255) ("DOT 2004 Final Rule").[4] Brick-and-mortar travel agencies and on-line travel agents ("OTAs," such as Expedia and Travelocity) typically use global distribution systems ("GDSs") to search for, compare and book flights. *Id.*

Sabre owns and operates a GDS. (Compl. ¶ 2.) The other two GDSs operating in the United States are Travelport and Amadeus. (*Id.* ¶¶ 5, 133.) Each of the three GDSs was originally owned by an airline or group of airlines. (*Id.* ¶¶ 26, 35); DOT 2004 Final Rule, 69 Fed. Reg. at 979. American Airlines created, owned and operated the Sabre GDS until divesting

---

[3] Sabre disagrees with many of the assertions contained in US Air's Complaint. But for purposes of this Motion to Dismiss only, Sabre has assumed the truth of facts alleged by US Air and relies solely on the factual allegations in US Air's Complaint, as well as documents US Air has incorporated in its Complaint by reference.

[4] This is a citation to the Department of Transportation's 2004 Final Rule de-regulating the GDS industry. Because US Air quotes from this rule throughout its Complaint, (see, e.g., Compl. ¶¶ 3, 4, 8, 22, 30, 35, 36, 37, 38, 83 & 143), Sabre may refer to it in its motion to dismiss. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Sabre does not agree, however, that the DOT's seven-year-old statements about relevant markets or market power have any bearing on or give rise to inferences about today's market.

its interest in the company in 2000.  US Air itself owned an interest in a predecessor of Travelport, known as Apollo in the United States.

There are at least two other GDSs—in addition to US Air's own website and call centers—through which US Air distributes its product.  (Compl. ¶¶ 5, 22, 39.)  According to the Complaint, the airlines typically pay Sabre and other GDSs booking fees for each flight segment (leg of a flight) sold and booked on the GDS.  (*Id.* ¶ 4.)  GDSs also typically pay their subscribers (*i.e.* travel agents) commission fees—which US Air derogatorily refers to as "kickbacks" (*see, e.g., id.* ¶¶ 25, 30)—for each flight segment the travel agent books on the GDS.  (*Id.* ¶¶ 25, 29-31.)  The DOT has previously concluded that the fees paid to travel agents are the result of vigorous competition between GDSs:  "Because most travel agencies are free to decide to use one system rather than its competitors, the systems compete vigorously for travel agency customers. . . . [S]ystems usually pay travel agencies for choosing one system rather than another."  DOT 2004 Final Rule, 69 Fed. Reg. at 981.  In other words, the incentive fees paid to travel agents are the product of competition among GDSs.

US Air signed an agreement with Sabre in 2006.  ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[5] Citations to "Addy Ex." refer to exhibits attached to the Sealed Declaration of Sundeep K. Addy in Support of Sabre's Motion to Dismiss, which was filed concurrently with this Memorandum.



In 2011, after many months of negotiation, US Air entered into a new agreement with Sabre, renewing each of the terms it now complains about.  Less than two months later, US Air filed this Complaint.

## Argument

To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  This requires "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level.").

Legal conclusions are disregarded in assessing the sufficiency of a plaintiff's allegations.  *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 129 S. Ct. at 1949.  A complaint must make a "'showing,' rather than a blanket assertion, of entitlement to relief" supported by sufficient "factual allegation[s]."  *Twombly*, 550 U.S. at 556 n.3.  In that regard, a plaintiff must provide

"more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555.

Courts routinely reject conclusory antitrust allegations at the pleading stage because antitrust cases impose substantial costs on the judicial process and antitrust defendants.  The trial court has "the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983).

Here, US Air seeks to cloak a normal—albeit strained—commercial relationship in antitrust lingo and conclusory statements about "anticompetitive conduct."  Such generalized assertions do not state a claim.  Accordingly, US Air's Complaint should be dismissed.

## I.      US Air's Section 1 Vertical Claim (Count I) Fails

Count I alleges that Sabre has entered into unlawful agreements with airlines, including US Air, and with travel agents to restrain trade in the GDS market[6] and the narrower single-brand Sabre Submarket.[7]

To state a claim under Section 1 of the Sherman Act, a plaintiff must allege "(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either *per se* or under the rule of reason." *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 263 (2d Cir. 2001) (citation omitted).  Vertical agreements are evaluated under the Rule of Reason. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 898-99 (2007).

---

[6] US Air defines the GDS market as "the distribution of GDS services—including airline fare, flight, and availability information and reservation and ticketing capability—to travel agents." (Compl. ¶ 134.)

[7] As discussed in Section II below, US Air has not adequately pleaded the Sabre Submarket as a relevant market.  Claim I fails regardless of the relevant market chosen.

Because vertical agreements, as here, are not by their nature anticompetitive, courts routinely dismiss antitrust claims based on such arrangements.  Indeed, it is only in the rarest case where a vertical agreement is found to violate the antitrust laws.  "[I]f nothing more is involved than vertical 'confinement' of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the restriction on these facts alone, would not violate the Sherman Act."  *Oreck Corp. v. Whirlpool Corp.*, 563 F.2d 54, 57 (2d Cir. 1977).

Moreover, a plaintiff asserting a vertical claim must, at a minimum, plead facts from which it plausibly could be inferred that the agreements at issue would have a substantial anticompetitive effect.  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328-29 (1961); *CDC Techs., Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 80-81 (2d Cir. 1999).  As discussed below, US Air fails to do that here.  Where, as here, other means to reach consumers exist, there is no claim under Section 1.[8]

### A.      Sabre's Agreements with US Air and Other Airlines Do Not Give Rise to a Section 1 Claim

Sabre's relationship with US Air is one of supplier to distributor.  Sabre sells US Air the service of generating bookings on US Air flights.  (Compl. ¶ 25.)  Sabre charges US Air for bookings made on the Sabre GDS (*id.* ¶ 4), just as any broker charges for selling its customer's

---

[8] *See, e.g., CDC Techs.*, 186 F.3d at 80 ("CDC's effort to cast its claim as one involving 'outlet foreclosure' is defeated by the fact that the distributors, which do not buy or sell the machines, are not outlets.  We agree with the Ninth Circuit's conclusion that 'if competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether [exclusive dealing arrangements with distributors] foreclose from competition *any* part of the relevant market.'") (citing *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997)); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1383 (5th Cir. 1994) ("Where, however, *only* dealers are subject to a tie, competitors do not lose a segment of the tied market if there are genuine alternative paths to consumers.") (emphasis in original).

goods or services.  US Air benefits greatly from this arrangement—allegedly receiving 35% of its total revenue from bookings made through the Sabre GDS.  (*Id.* ¶ 5.)  Travelers benefit as well because Sabre aggregates fare and schedule information (and other travel-related information, like hotels and rental cars) from many sources (*id.* ¶ 2), promoting efficient comparison shopping.

Although US Air concedes that it wants (and allegedly needs) the bookings that Sabre brings it, US Air criticizes Sabre's technology and systems as outdated.  (*Id.* ¶ 6.)  It alleges there are numerous "new, innovative solutions that are web-based and take advantage of the networked economy" (*id.*), but, rather than switch to one or more of those systems, US Air entered into a new contract with Sabre.  It now asks this Court to reform that contract with terms that are more to US Air's liking.  But the antitrust laws do not prohibit hard bargaining.  *See, e.g.*, *Zinser v. Rose*, 868 F.2d 938, 942 (7th Cir. 1989) (affirming dismissal at pleading stage of vertical conspiracy claim and holding that "the antitrust laws do not prohibit a buyer from bargaining for the best deal possible," even "when the buyer has a great deal of market power and the seller relatively little") (citation omitted).  Nor should the antitrust laws be used to change the terms of the resulting contract *post hoc.*

In an attempt to implicate the antitrust laws in these commercial issues, US Air asserts that four provisions in its agreement with Sabre violate Section 1: ████████████████

██████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

██████████████████████████

But these four provisions are unremarkable and do nothing more than ensure that Sabre can make available to its travel-agent customers complete and accurate fare information. They do not violate Section 1.

### 1.     The Disputed Contractual Provisions Are Neither Exclusive Nor Anticompetitive

None of the disputed provisions prevent US Air from dealing with Sabre's competitors. There is no allegation that the "full content" provision prevents US Air from providing full content to Sabre's competitors. On the contrary, US Air affirmatively alleges that many airlines provide Sabre's competitors with full content as well. (Compl. ¶¶ 99-102.) Moreover, requiring Sabre to accept less than full content would in effect require Sabre to hobble its own service in order to facilitate otherwise less attractive competitors. Such a result would turn the Sherman Act—which seeks to promote competition—on its head. Even if Sabre were a "monopolist" (which it is not), there would be no requirement that it enable competitors by providing inferior service. *See, e.g., Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375 (7th Cir. 1986) ("Today it is clear that a firm with lawful monopoly power has no general duty to help its competitors, whether by holding a price umbrella over their heads or by otherwise pulling its competitive punches.").

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

(Compl. ¶¶ 74-75.) Courts have repeatedly held that contractual requirements of equal treatment do not violate the antitrust laws. *See, e.g., Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (rejecting challenge to such clauses); *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1110-11 (1st Cir. 1989) (same); *Kitsap Physicians Serv. v. Wash. Dental Serv.*, 671 F. Supp.

1267, 1269 (W.D. Wash. 1987) (same). 

(Compl. ¶ 77.)[9]

US Air conclusorily asserts that the fourth provision—which US Air refers to as the "no direct connect provision"—

(*Id.* ¶¶ 70-72.) But this assertion fails as well when viewed in light of the actual facts that US Air alleges.

According to the Complaint, US Air secures 65% of its traffic from such alternatives. (Compl. ¶ 5.) The provision therefore could hardly be said to be "exclusive."

There is also nothing anticompetitive about this provision, which addresses an obvious free-rider problem.

[11] Courts have regularly recognized that mechanisms to prevent such free riding do not violate the antitrust laws. *See, e.g., Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295-98 (11th Cir.

---

[9] The only provision of Sabre's contracts with other airlines that US Air identifies is the alleged "full content" provision (Compl. ¶ 100), which, as discussed above, is neither exclusionary nor anticompetitive. US Air's references to contracts with other airlines as supporting its claims (*see, e.g., id.* ¶ 155) are therefore makeweight.

[10]

[11] Sabre is paid only when a booking is made in its GDS.

2004) (holding that antitrust laws did not compel aggregator of information in valuable form to provide it to potential competitor in dissemination of that information); *Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158, 1165 (7th Cir. 1987) (holding that "being prevented from taking a free ride on another dealer's efforts" is not "a form of antitrust injury compensable by a damage award").

### 2.    US Air Cannot Challenge Its Own Contract in Any Event

US Air may not challenge its own contract under the antitrust laws because it is equally responsible for that agreement, and thus barred from recovery. *See, e.g.*, *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 146 (1968) (White, J., concurring) (providing fifth vote for majority permitting the plaintiff to sue in that particular case but articulating the rule that no suit should be permitted "where plaintiff and defendant bear substantially equal responsibility for injury resulting to one of them"); *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1107-09 (1st Cir. 1994); *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 830 F.2d 716, 720-21 (7th Cir. 1987); *THI-Hawaii, Inc. v. First Commerce Fin. Corp.*, 627 F.2d 991, 995-96 (9th Cir. 1980); *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3,15-16 (4th Cir. 1971); *see also Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990) (citing *Perma Life* and applying similar rule to bar certain securities lawsuits). In assessing whether a plaintiff bears equal responsibility, *Perma Life* listed as factors "the relative responsibility for originating, negotiating, and implementing the scheme"; which party "expected to benefit from the provision or conduct" or "ultimately profited"; and whether "one party attempted to terminate the arrangement and encountered resistance." *Perma Life*, 392 U.S. at 146-47 (White, J., concurring).

The allegations in US Air's Complaint establish that US Air indisputably bears equal responsibility for its agreements with Sabre. First, US Air's allegations show that it is a large company with approximately $10 billion in annual revenues and over 30,000 employees, and that its agreements with Sabre were subject to extensive, arms-length bargaining. (Compl. ¶¶ 5,

13, 80-92).  Unlike in *Perma Life*, which involved franchisees suing a franchisor over their contract terms, US Air's allegations demonstrate that no such difference in bargaining power exists here.  392 U.S. at 135-37; *id.* at 147-48 (Fortas, J., concurring) (emphasizing the unequal posture of the parties); *see Blackburn v. Sweeney*, 53 F.3d 825, 829 (7th Cir. 1995) (barring suit between horizontal conspirators stating "[t]his was not an agreement between a franchisee and franchisor where there is a clear asymmetry in bargaining power"); *THI-Hawaii*, 627 F.2d at 996 (barring a suit between lessor and lessee where "the record reflects an arm's length bargaining process"); *Columbia Nitrogen*, 451 F.2d at 15-16 (barring suit between parties to a reciprocal dealing and stating that *Perma Life* "involved opponents of decidedly unequal strength" and that "[w]e think it plain . . . that a party, who voluntarily formulates and equally participates in a non-coercive agreement . . . cannot maintain an action under §1 of the Sherman Act against its trading partner").

Second, US Air's allegations show it clearly benefited from the bargain it struck with Sabre:  US Air obtains more than $3.5 billion in sales annually through bookings on the Sabre GDS, accounting for over 35% of US Air's revenue.  (Compl. ¶ 5).  *See Blackburn*, 53 F.3d at 829 (noting that the plaintiffs "had no reason to enter the Agreement at all unless they found that on balance the terms were to their benefit"); *THI-Hawaii*, 627 F.2d at 996 (barring suit where the plaintiff "continues to enjoy a substantial gain" from the lease it challenged); *see also Perma Life*, 392 U.S. at 150 (Marshall, J., concurring) (stating plaintiffs "should be barred from seeking damages" if they are "trading off anticompetitive restraints on their own freedom of action . . . for anticompetitive restraints intended for their benefit").

Third, US Air fails to allege that it ever complained that any of the provisions it is now challenging were anticompetitive. ██████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ *See Sullivan*, 34 F.3d at 1108

(reversing jury verdict due to lower court's failure to give equal responsibility instruction and

explaining "[t]here is no evidence that [the plaintiff] ever opposed or objected to the ownership

policy [being challenged] prior to the circumstances surrounding this case"); *THI-Hawaii*, 627

F.2d at 996 (noting "this is not a case of a party who has vigorously protested the inclusion of an

illegal provision" and that the plaintiff "raised no objection to the exclusive until [the defendants]

began insisting upon its observance"); *Columbia Nitrogen*, 451 F.2d at 16 (barring suit where the

plaintiff participated "until a declining market [made] its purchases unprofitable"). ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ These

allegations hardly show serious opposition by US Air beyond the back-and-forth inherent in

commercial negotiations.

Here, US Air does not even seek to have the contract it entered into nullified. Instead, it

would like the benefit of the contract (and the Sabre distribution channel), without those

provisions it does not desire. But US Air cannot use the antitrust laws to challenge certain

portions of the contract it negotiated and entered into, leaving only what it likes of that contract

in place.

**B.    US Air's Allegations Regarding Sabre's Agreements with Travel Agents Do Not Give Rise to a Section 1 Claim**

**1.    US Air Has Failed to Allege that Sabre's Alleged Incentive Payments, Volume-Based Incentives and "Transaction Ratios" Are Predatory**

US Air conclusorily asserts that Sabre's agreements with travel agents are "exclusive."

But, upon examination of US Air's actual allegations, it is clear that the agreements are not.

14

According to US Air's specific allegations, Sabre incentivizes travel agents through commissions (what US Air calls "kickbacks"), volume discounts (what US Air characterizes as "penalties" for failure to meet certain levels) and by providing other services. (Compl. ¶¶ 27, 29-31.) None of these allegations provide a basis for an antitrust suit.

Travel agents generate business for Sabre, and Sabre compensates them for doing so.[12] There is nothing "contrary to the laws of economics" (*id.* ¶ 29), about such arrangements, which are commonplace in distribution agreements. As the DOT has found, such payments to travel agency customers reflect price competition among GDSs who "compete vigorously" for those customers. DOT 2004 Final Rule, 69 Fed. Reg. at 981. Indeed, in *Virgin Atlantic*, the Second Circuit considered and rejected the very sort of claims that US Air brings here. In *Virgin Atlantic*, British Airways was accused of "the use of incentive agreements entered into with travel agencies and corporate customers." 257 F.3d at 261. These included "commissions or discounts [that were] awarded when specified thresholds of sales are reached, [without any] set mandatory minimum." *Id.* The Second Circuit held that these sorts of incentive arrangements do not violate Section 1, concluding that the "efficiency argument in favor of incentive agreements . . . is obvious" because they "allow firms to reward their most loyal customers [which] promotes competition on the merits." *Id.* at 265. Here the pro-competitive nature of Sabre's arrangements is even more obvious in light of US Air's allegations that Sabre provides infrastructure support to travel agents in the form of equipment and other capital goods. (Compl.

---

[12] The practice of compensating travel agents for utilizing the GDS began when airlines, including US Air, owned and controlled the GDS systems. Such revenue has become even more important to travel agents as airlines have ceased paying travel agents base commission payments. DOT 2004 Final Rule, 69 Fed. Reg. at 981.

¶ 27.)  Sabre has a legitimate interest in encouraging its subscribers to generate sufficient business to Sabre to enable Sabre to recoup those investments.

US Air seeks to characterize Sabre's relationship with travel agents as "de facto" exclusive because of this commission structure. [13]  Courts have considered and rejected the argument that travel agencies are beholden to a particular GDS before.  *See, e.g., In re "Apollo" Air Passenger Computer Reservation Sys. (CRS)*, 720 F. Supp. 1068, 1074, 1076-77 (S.D.N.Y. 1989) (discussing competition among GDSs to secure travel agent contracts and holding that the "minimum use clause," under which travel agent was required to use GDS for 50% of its bookings based on the first six months of contract, was not anticompetitive); *United Air Lines, Inc. v. Austin Travel Corp.*, 681 F. Supp. 176, 184 (S.D.N.Y. 1988) (rejecting argument that provisions in GDS contract amounted to exclusivity).  Here US Air alleges simply that adding a second GDS or even switching from one GDS to another would be disruptive to certain travel agents, not that it would be cost prohibitive or otherwise impossible.  That is not exclusive dealing, as the courts in *In re Apollo CRS* and *Austin Travel* readily concluded.  Where nothing more is alleged than that a firm has offered its customers a better deal, acceptance of that offer to the "exclusion" of competing offers does not violate Section 1.  *See, e.g., Virgin Atl.*, 257 F.3d at 263-65.

At bottom, US Air's Complaint is that Sabre competed too aggressively by paying its subscribers "too much" for bookings, and thereby has made it difficult for another GDS or booking channel to compete for those bookings.  In several recent decisions, the Supreme Court

---

[13] US Air's vague allegation that "Sabre has admitted to entering into exclusive agreements that preclude the agency using a rival GDS" (Compl. ¶ 28) and "has certain explicit exclusive arrangements with travel agents" should be disregarded as conclusory.  The purported agreements US Air actually relies upon are those discussed herein.

has made clear that, to avoid deterring pro-competitive conduct like price cutting and competitive bidding, antitrust claims based on "charging too little" or "paying too much" must be limited to situations where the pricing is predatory—*i.e.*, below cost and with a high probability of recoupment resulting from the destruction of competition. *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 325-26 (2007) (predatory buying); *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-24 (1993) (predatory selling).

In *Weyerhaeuser*, the Supreme Court held that "paying too much" is actionable under the antitrust laws only where the allegedly high input costs (which in this case would be the commissions and incentives) exceed the price of the output (which in this case would be the booking fees Sabre receives from the airlines) and where there is a dangerous probability that the defendant (Sabre) will recoup the near-term losses generated thereby after driving its competitors out of the market. 549 U.S. at 325-26. US Air does not allege that Sabre's commissions for bookings to travel agents (and other services that are provided) exceed what Sabre makes from those bookings.[14] Rather, it simply alleges that Sabre shares with travel agents some of that commission and thereby gives them an incentive to use the Sabre GDS rather than booking through other means. This is normal competition that is encouraged, not condemned, by the antitrust laws.

---

[14] US Air's invocation of the term "bundling" (Compl. ¶ 158) amounts to little else than misuse of an antitrust "buzzword." US Air does not allege that anything that Sabre offers travel agents is provided below cost, whether viewed as individual components or the bundle as a whole. *See, e.g., Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455, 469-70 (S.D.N.Y. 1996) (describing limited circumstances where bundled pricing could be anticompetitive).

### C.     US Air Has Not Alleged Adequate Foreclosure

Even if US Air could allege exclusivity, it would still have to allege facts establishing

that Sabre's contracts foreclosed a "substantial share of the relevant market" to competitors.

*Tampa Elec. Co.*, 365 U.S. at 328.   US Air fails on this count, too, as it does not allege sufficient

foreclosure—either as a result of the contract it entered or because of Sabre's travel agency

contracts—in a relevant market.

US Air's allegations about its own contract fail because US Air does not allege that it

represents a substantial portion of any alleged market.   US Air does not allege what percentage

of domestic airline bookings, GDS bookings generally (the alleged GDS market), or even Sabre

bookings specifically (the alleged Sabre Submarket), for which US Air accounts.   US Air merely

alleges that Sabre bookings account for 35% of US Air's revenue.   (Compl. ¶ 5.)   But that is

beside the point.[15]   The relevant market is *not* alleged to be US Air bookings.   It is *all* airline

bookings made through either the GDSs (the GDS Market) or the Sabre GDS (the Sabre

Submarket).   Indeed, US Air states that it is a "smaller, more vulnerable" airline (*id.* ¶ 54),

establishing that US Air bookings do not constitute a substantial percentage of all airline

bookings.[16]

Likewise, US Air does not allege how much of the alleged GDS market or "Sabre"

submarket are affected by Sabre's alleged volume-based incentives, "penalties" or "transaction

ratio" requirements with travel agents.   Instead, US Air vaguely alleges that, "on information and

---

[15] US Air admits that it generates 65% of its revenues through other booking channels.
(*See* Compl. ¶ 5.)   This admission undermines US Air's own market definition—showing that a
vast majority of its bookings have nothing to do with Sabre, the alleged monopolist.

[16] As discussed above, the alleged "full content" provisions with other airlines are neither
anticompetitive nor exclusionary and therefore are irrelevant to the issue of foreclosure.   Even
were it otherwise, however, US Air again fails to allege what percentage of any relevant market
such provisions cover.

belief," "many" agents have such provisions, and that the contracts "often" include "penalties."

(Compl. ¶ 33, 31). That is fatal to US Air's claim. US Air must allege facts from which it could

plausibly be inferred that the distribution outlets foreclosed represent a "substantial share of the

relevant market." *Tampa Elec. Co.*, 365 U.S. at 328. *Tampa Electric* requires a determination of

"the probable effect of the [exclusive] contract on the relevant area of effective competition,

taking into account . . . [various factors including] the probable immediate and future effects

which pre-emption of that share of the market might have on effective competition therein." *Id.*

at 329; *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J.,

concurring) ("Exclusive dealing is an unreasonable restraint of trade only when a significant

fraction of buyers or sellers are frozen out of a market by an exclusive deal."); *Stop & Shop*

*Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) ("For

exclusive dealing, foreclosure levels are unlikely to be of concern where they are less than 30 or

40 percent."); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 596 (1st Cir. 1993) (holding

that explicit exclusivity provisions—whereby physicians participating in an HMO agreed not to

serve as participating members in any other HMO in return for certain incentive payments—did not

violate Section 1 because there was no showing that such provisions effected "foreclosure of

substantial dimensions.").

   US Air thus fails to allege facts that would allow an assessment of the impact on

competition, as required by *Tampa Electric*, and therefore Count I should be dismissed on these

grounds alone. *See, e.g., Rick-Mik Enters. Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 972 (9th Cir.

2008) (affirming dismissal under Rule 12(b)(6) because, *inter alia*, "[t]he complaint alleges nothing

about, for example, what percentage of gasoline franchises are [defendant's] as compared to other

franchises . . . . There are no factual allegations regarding the amount of power or control that

[defendant] has over prospective franchises."); *Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*, 802

F. Supp. 1544, 1550 (S.D. Tex. 1991) (granting 12(b)(6) motion because plaintiff "failed to allege any facts which would indicate the degree of commerce that may have been foreclosed"); *see also Insignia Sys., Inc. v. News Corp., Ltd.*, No. 04-4213JRTFLN, 2005 WL 2063890, at *3 (D. Minn. Aug. 25, 2005) (dismissing exclusive dealing claim under Rule 12(b)(6) because "absent some indication of the percentage of the local, regional, or national markets that the [facilities] allegedly under exclusive contract constitute, it is impossible to evaluate the percentage of the market with which [the plaintiff] and other competitors are prevented from doing business, let alone determine that [the plaintiff] and other competitors are prevented from dealing with a significant number of retailers.").

## II.      US Air's Monopolization Claims (Counts II & III) Fail

In addition to its total failure to allege anticompetitive conduct, as demonstrated above, Counts II and III for monopolization and conspiracy to monopolize the so-called Sabre Submarket also fail because they lack a plausible relevant market definition.

### A.      US Air's "Sabre-Only" Market Fails As a Matter of Law

Each of US Air's claims depends on evaluating the competitive effects that Sabre's alleged conduct had within the alleged relevant market. *See, e.g., Walker Process Equip. Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) ("Without a definition of that [relevant] market, there is no way to measure [a defendant's] ability to lessen or destroy competition."). As the Second Circuit has emphasized, where that market is implausibly conceived, antitrust claims relating to that market must be dismissed. *See, e.g., Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (affirming dismissal because the plaintiff's proposed market definition was "too narrow" and "[did] not encompass all interchangeable substitute products"); *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir. 2000) ("To survive a motion

20

to dismiss, however, the alleged tying product market must be plausible, and we agree with the district court that the market alleged here is not.") (citations omitted).

### 1. The "Sabre Travel Agent Market" Is Implausible

Because Sabre does not have a monopoly in any proper relevant market by any traditional measure, US Air conjures a "submarket" in which Sabre has a 100% share by definition—the Sabre Submarket. That market—"the distribution of GDS services . . . to Sabre subscribers" (Compl. ¶ 139)—is a classic "single supplier" market that is almost never viable under the antitrust laws.

"'[T]o survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes— analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Chapman*, 546 F.3d at 237 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001)).

Single-brand markets are inherently implausible. *See, e.g.*, *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) (affirming dismissal of claims based on single-brand market); *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 633 (5th Cir. 2002) (affirming dismissal for failure to plead plausible market when plaintiff defined market around sales to a single customer); *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 346-47 (N.D. Ill. 1997) (dismissing single-brand market on pleadings because no alleged lock-in for aftermarket purchases). Hence, "[c]ourts in this district have consistently held that a single-brand name product cannot define a relevant market." *Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 298-299 (S.D.N.Y. 2010) (citing *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 482 (S.D.N.Y. 2001); *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ. Inc.*, 812 F. Supp. 387, 391 (S.D.N.Y. 1993)); *see also Commercial Data Servers,*

21

*Inc. v. Int'l Bus. Machs. Corp.*, 262 F. Supp. 2d 50, 66 (S.D.N.Y. 2003) ("courts generally conclude that single brands do not constitute separate markets").[17]  Here, US Air affirmatively alleges that there are at least two other GDSs.  It alleges that tickets can also be purchased directly from an airline through its own website, its reservations center (and via online "metasearch" sites such as Kayak or TripAdvisor).  (Compl. ¶¶ 36, 39.)  These alternatives require dismissal of claims based on the Sabre-only market.

On the rare occasions where a single-product market has been upheld, it has been in circumstances not present here, where consumers are "locked in" to purchasing a particular aftermarket product—such as ink cartridges for a particular brand of printer.  *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 471-76 (1992) (holding that it is conceivable to have power *in a derivative aftermarket* where there was substantial upfront information and switching costs causing lock-in and preventing customers from assessing lifecycle pricing at the point of initial sale).  And, even there, such markets are only upheld where the lock-in is not merely contractual and could not have been anticipated at the time it occurred.  *See, e.g.*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 439-41 (3d Cir. 1997).  A long line of cases holds that, to have a viable single-product market, a plaintiff

---

[17] The fact that US Air has referred to the relevant market as a "submarket" is irrelevant. *See, e.g.*, *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) ("The term 'submarket' is somewhat of a misnomer, since the 'submarket' analysis simply clarifies whether two products are in fact 'reasonable' substitutes and are therefore part of the same market."); *see also* 2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶533c (3d ed. 2007) ("Speaking of submarkets is both superfluous and confusing in an antitrust case, where the courts correctly search for a 'relevant market'—that is, a market relevant to the particular legal issue being litigated.").

must allege and prove that the defendant exploited locked-in customers by either changing its

policies after its customers were locked in or by concealing its policies at the time of purchase.[18]

US Air alleges nothing of the sort here. Rather, as between GDSs, it simply rehashes its

contractual allegations relating to commissions. As the Second Circuit has held, "[e]conomic

power derived from contractual arrangements affecting a distinct class of consumers *cannot*

*serve as a basis for a monopolization claim*." *Hack*, 237 F.3d at 85 (2d Cir. 2000) (citing *Queen*

*City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997); *Rohlfing v. Manor*

*Care, Inc.*, 172 F.R.D. 330, 345 (N.D. Ill. 1997)) (emphasis added).

US Air's single-product market definition is made even more untenable because it

focuses solely on travel agents, not travelers. The alleged harm US Air asserts could result only

---

[18] *See PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 819-20, 822 (6th Cir. 1997) ("We likewise agree that the change in policy in *Kodak* was the crucial factor in the Court's decision. By changing its policy after its customers were 'locked in,' Kodak took advantage of the fact that its customers lacked the information to anticipate this change. Therefore, it was Kodak's own actions that increased its customers' information costs."); *Lee v. Life Ins. Co. of N. Am.*, 23 F.3d 14, 20 (1st Cir. 1994) ("[T]he timing of the 'lock in' at issue in *Kodak* was central to the Supreme Court's decision . . . . Had previous customers known, at the time they bought their Kodak copiers, . . . Kodak's 'market power' . . . could only have been as significant as its [market power] in the *copier market*") (emphasis in original); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 783 (5th Cir. 1999) (adopting the Sixth Circuit's holding in *PSI* requiring a change in policy after locking in customers, and upholding reversal of antitrust claims for failure to establish substantial information and switching costs in aftermarket); *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996) ("The Court did not doubt in *Kodak* that if spare parts had been bundled with Kodak's copiers from the outset, or Kodak had informed customers about its policies before they bought its machines, purchasers could have shopped around for competitive lifecycle prices. The material dispute that called for a trial was whether the change in policy enabled Kodak to extract supra-competitive prices from customers who had already purchased its machines."); *Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1358 (D. Fla. 1998) ("Without a showing of a change in business policy, or other coercive practice which concealed the true cost of parts and repairs, the exception to the general rule—that the relevant market is the primary equipment market—cannot apply."); *Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*, 184 F. Supp. 2d 947, 955 (D. Ariz. 2001) (holding that four separate factors must exist in order to find *Kodak* lock-in, including an ability to exploit ignorant customers), *aff'd*, 52 Fed. Appx. 897 (9th Cir. 2002).

from losing access to travelers (*i.e.*, those who actually use US Air's services). US Air, however, alleges no significant barriers that travelers face to booking through travel agents who do not subscribe to Sabre (rather than travel agents who do), or by means other than a travel agent, for example, via a website or reservation call center.

US Air seeks to avoid this fatal infirmity by asserting that US Air cannot reach certain travelers that use Sabre-subscribing travel agents. (Compl. ¶ 22.) But merely positing that "[m]any travelers—including high value business travelers that comprise a significant portion of airline revenues will only purchase tickets through a particular travel agent, for example the travel agent with which their company has an agreement" is insufficient. (*Id.* ¶ 3.)[19] The Court is left to guess what number or percentage of travelers will "only book through a particular travel agent" or why that is so, besides the simplistic assertion that some (unknown percentage) work for companies that have undefined "agreements" with a particular travel agent. US Air does not allege that any such "agreements" are exclusive. And, in any event, this is the same flawed reliance on contracts to define a market that is incorrect as a matter of law.

In short, US Air does not allege that Sabre GDS-using travel agents provide any different service to customers than non-Sabre GDS-using travel agents or are not otherwise reasonably interchangeable with them. *See, e.g.*, *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) (holding that the relevant market includes all products that are "reasonably interchangeable by consumers for the same purposes.").

---

[19] The only other thing that US Air says on the subject is that "[t]he travel agencies that are critical to airlines—in particular, the relatively few agencies serving the vast majority of business travelers—work primarily through GDSs." (Compl. ¶ 135.)

### 2.    Sabre's Alleged Negotiating Power Does Not Create a Relevant Market

US Air emphasizes what it perceives as Sabre's power over US Air in negotiations arising from certain travelers' choosing to use certain travel agents as support for its single-product market. (*See, e.g.*, Compl. ¶¶ 78-94.)  But holding that such allegations suffice to define a relevant market would mean that any distribution channel—such as, say, a grocery store chain—has "market power" because there is a certain group of customers who prefer to shop at that chain.  For example, the makers of Rice Krispies could challenge its distribution agreement with A&P because there are many customers who shop only at A&P, regardless of whether A&P carries Rice Krispies or not.  As here, the cereal maker would argue that it is "forced" to distribute through all supermarket chains to avoid losing significant sales.

Such common marketplace characteristics would not transform each supermarket chain into a market onto itself, as numerous courts have held in rejecting similar allegations as insufficient to state a single-supplier market.  *See, e.g.*, *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 510, 514 (3d Cir. 1998) (rejecting argument that insurer was its own product market because it gave access to thousands of potential pharmacy customers and that those customers constituted a significant portion of the plaintiff pharmacy's customer base); *Cont'l Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater N.Y.*, 994 F. Supp. 133, 141 (E.D.N.Y. 1998) (rejecting single-brand health insurer market); *see also Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997) ("We reject the plaintiffs' attempt to limit the relevant market to acute care hospitals used by Humana insureds.").

### B.    US Air's Claim for "Monopolization of the Sabre Travel Agent Market" (Count II) Fails Because US Air Has Not Alleged Anticompetitive Conduct

To state a claim for monopoly maintenance, US Air must plead that Sabre:  (1) has monopoly power in a properly-defined market; and (2) has maintained that power by the use of

exclusionary conduct. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). US Air fails to do so.

Because US Air's market definition allegations fail as a matter of law, US Air has not adequately pled that Sabre has monopoly power in any properly-defined market. Even if US Air could overcome that fatal deficiency, however, US Air does not allege exclusionary conduct. The only purported anticompetitive conduct that US Air points to comprise its allegations that Sabre has entered into unlawful vertical agreements with airlines and travel agents. (Compl. ¶¶ 162-163.) As discussed above, US Air has failed adequately to allege that those agreements are anticompetitive, exclusionary, or foreclose a substantial amount of a relevant market and (in the case of the travel agent incentives) that they are predatory.

US Air provides no allegations to support any claim based on Sabre's unilateral conduct (conduct that does not involve a vertical agreement), either. US Air relies primarily on the allegation that Sabre failed to assist Farelogix to compete against it. (Compl. ¶¶ 40-49.) As the Supreme Court has made clear, however, parties have no duty to assist their competitors. *See, e.g.*, *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) (holding that one party may unilaterally decide the terms on which it will deal with another without implicating the antitrust laws); *see also Trinko, LLP*, 540 U.S. at 408 (holding that "as a general matter, the Sherman Act does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal").

US Air does not allege (nor could it) that Sabre lacked a legitimate business justification for termination of Farelogix's access to Sabre's proprietary application programming interfaces ("APIs"). To the contrary, US Air admits that Sabre terminated Farelogix because Farelogix

was "actively encouraging fragmentation" (Compl. ¶ 42) of the Sabre system.  Sabre obviously

has a legitimate interest in ensuring that its licensees do not take steps to harm the value of

Sabre's own product by actively encouraging content fragmentation.  Because there is a

legitimate justification, Sabre's alleged conduct cannot support a claim under the antitrust laws.

*See, e.g.*, *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188-92 (2d Cir. 1992) ("A

business may properly seek to maintain the image of its products by controlling where those

products are sold, even if profit maximization is its ultimate objective.").

Moreover, US Air does not allege (nor could it) that Farelogix's access to the Sabre

GDS's "content" would enable it to compete with the Sabre GDS in any way that could

advantage US Air.  According to the Complaint, such access would, at most, merely enable

Farelogix to "retrieve content from Sabre through Farelogix's platform" (Compl. ¶ 42), not

create a way for travel agents or airline customers to complete bookings through other, non-

Sabre channels.  Any such bookings would still be through the Sabre GDS at the same cost to US

Air.  Because the alleged conduct could not injure US Air, it cannot support US Air's antitrust

claims.  *See, e.g.*, *E & L Consulting, Ltd. v. Doman Indus., Ltd.*, 472 F.3d 23, 28 n.3 (2d Cir.

2006) ("An antitrust plaintiff must show . . . injury-in-fact") (internal quotations and citation

omitted).

US Air also cites Sabre's litigation against Northwest in 2004 as anticompetitive (Compl.

¶¶ 50-51) but does not allege that the lawsuit was objectively baseless.  Even were the lawsuit

within the statute of limitations period (which it is not) it could not provide any basis for a

monopolization claim.  *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508

U.S. 49, 60 (1993) (holding that litigation that is not "objectively baseless in the sense that no

reasonable litigant" could "conclude that the suit is reasonably calculated to elicit a favorable

outcome" is constitutionally protected and cannot provide a basis for antitrust claim).[20]  Nor does US Air provide any allegations from which it could be inferred that Sabre's alleged biasing of search results against American Airlines for a brief time in 2011 (Compl. ¶ 52) preserved Sabre's alleged "monopoly power" over travel agents.  US Air's allegations about Sabre's raising prices to America West's prices in 2005 (Compl. ¶55), are similarly out of time and, in any event, irrelevant.  *See, e.g., ASAP Paging Inc. v. CenturyTel of San Marcos Inc.*, 137 Fed. Appx. 694, 698-99 (5th Cir. 2005) (holding that complaint alleging that defendant began charging higher prices to harm competitor failed to state antitrust claim).

### C.   US Air's Claim for "Conspiracy to Monopolize the Sabre Travel Agent Market" (Count III) Fails for Other Reasons As Well Because US Air Has Not Alleged Anticompetitive Conduct or a Conspiracy

The elements of a "consp[iracy] to monopolize" claim are (1) the existence of a combination or conspiracy; (2) an overt act in furtherance of the conspiracy; and (3) specific intent to monopolize.  *United States v. Yellow Cab Co.*, 332 U.S. 218, 225-27 (1947).  There is no claim, however, where the conduct, if successful, would not amount to illegal monopolization.  *See, e.g., Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002).

This claim accordingly fails for the same reasons as US Air's monopoly maintenance claim (Count II):  US Air fails to allege a plausible relevant market.  Even if it did, US Air does not allege actionable anticompetitive conduct.

US Air cannot save Count III by reference to its allegations of a horizontal conspiracy with other GDSs.  In addition to there being no basis to infer such a conspiracy (*see infra* Section III), the alleged conspiracy does not by its terms involve monopolization of the Sabre Submarket.

---

[20] Sabre's alleged conduct against America West in 2005 is also well outside the statute of limitations.

*See, e.g.*, *Santana Prods., Inc. v. Bobrick Washroom Equip. Inc.*, 249 F. Supp. 2d 463, 519-20 (M.D. Pa. 2003) (claim that is no more than a "claim of conspiracy among competitors to restrain trade" does not state a claim for conspiracy to monopolize), *aff'd in part and rev'd in part on other grounds*, 401 F.3d 123 (3d Cir. 2005); *Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n*, 861 F. Supp. 1498, 1502 (D. Or. 1994) (holding that, because shared monopoly does not violate Section 2, neither would a conspiracy to create a shared monopoly).  US Air offers no allegation that the other GDSs have agreed, or would ever agree, to help Sabre monopolize the market comprising service to Sabre's own customers.  That is the precise market for which the GDSs compete.

## III.     US Air's Horizontal Claim (Count IV) Fails

Count IV alleges a horizontal agreement between Sabre and other GDSs "to maintain the current industry structure." (Compl. ¶ 172.)  It should be dismissed because the Complaint fails to adequately allege facts from which the existence of such an agreement could be inferred.  US Air's Complaint fails to provide what the Supreme Court required in *Twombly*—"allegations plausibly suggesting (not merely consistent with) agreement [to restrain trade.]"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  The "crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement[.]"  *Id.* at 553 (quotation and citation omitted).  To survive a motion to dismiss, a plaintiff must allege, at a minimum, "enough factual matter (taken as true) to suggest that an agreement was made."  *Id.* at 556.

US Air's Complaint fails these requirements.  US Air's allegations are at least as consistent with independent action as with coordinated conduct.  Indeed, as discussed below, US Air itself alleges facts affirmatively showing that Sabre had a rational, independent business reason for all of its actions.

### A.      The Complaint Does Not Allege Direct Evidence of an Actual Agreement

The Complaint contains no factual allegations of an actual agreement between the GDSs to maintain the current industry structure, to cease competing with one another, or to act together to eliminate competition.  Instead, it alleges, in conclusory terms only, that "each GDS has ensured through various coordinated conduct, including outright agreement and signaling through public statements, that competition among them would be (and is easily) avoided." (Compl. ¶ 95.)

As the Second Circuit has made clear, "conclusory allegation[s] of agreement at some unidentified point do[ ] not supply facts adequate to show illegality." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. at 570, and dismissing complaint that listed conspiratorial activity "without any specification of any particular activities by any particular defendant").  US Air's Complaint is rife with conclusory allegations of agreement, but devoid of factual support.  Nowhere does US Air allege evidentiary facts showing "outright agreement" between the GDSs that "competition among them would be . . . avoided."  (Compl. ¶ 95).

US Air's allegations in Paragraphs 103 to 106 regarding the "Full Content Commission" comes closest to alleging an express agreement between GDSs to either boycott or jointly negotiate with the airlines.  However, US Air expressly bases those allegations on snippets of press articles and other public statements that, when considered in their entirety, make clear that no inference of such an agreement is warranted.[21]

---

[21] Documents relied on by Plaintiff in framing its Complaint may be considered on a Rule 12(b)(6) motion. *See, e.g., Chambers*, 282 F.3d at 152-53. "Were courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure.  Foreclosing resort to such documents might lead to complaints filed solely to extract

(Continued . . .)

According to the article quoted in Paragraph 106 of the Complaint, the Business Travel Coalition (an association of corporate travel managers)[22] established the "Full Content Commission" to ensure that airlines provide the Coalition's members with all of an airline's available fares. (*See* Work-Dembowski Ex.[23] 1, Dennis Schaal, Op-Ed, *Do GDSs offer full content?  Advocacy group intends to track it*, Travel Weekly, Oct. 9, 2006, at 80.)  The Coalition's members were concerned they would lose credibility with their customers if, for example, the customer found a lower available fare on an airline's website than was provided by the corporate travel manager.  *Id.*  The article makes clear that the purpose of the Commission was to ensure that *travel agents* have equal access to an airline's content.  It was not, as US Air suggests, to provide *the GDSs* a means for ensuring equal access to full content.  (Compl. ¶ 106.) Nowhere does the referenced article say or even imply that the Commission was established or agreed to by the GDSs to police equal access for the GDSs to the airlines' full content.

Nor do the other documents cited in Paragraphs 103 through 106 support US Air's conclusory assertion that the GDSs agreed to use the Commission to coordinate their demands for full content.  For example, US Air quotes a letter from the Chair of the Business Travel Coalition, Kevin Mitchell, saying that the "[t]he *Commission* will be a watchdog group that will have bark as well as bite."  (*Id.* ¶ 105 (emphasis added).)  US Air alleges that the "bite" would come from "coordinated demands from the GDSs in airline contracting."  *Id.*  But here again there is nothing in the letter that implies—let alone states—that the "bite" would come from

---

nuisance settlements."  *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

[22] Corporate travel managers are essentially in-house travel agencies for corporations.

[23] Citations to "Work-Dembowski Ex." refer to exhibits attached to the Declaration of Larry C. Work-Demborski in Support of Sabre's Motion to Dismiss, filed concurrently with this Memorandum.

GDSs coordinating with one another.  As the full letter (attached here in its entirety) makes clear, the "bite" was to come from corporate travel managers.  (Work-Dembowski Ex. 2, Letter from K. Mitchell, Nov. 12, 2006.)[24]

US Air's only other allegation of express agreement comes in Paragraph 97 of its Complaint, where it alleges that "Sabre entered an express agreement with rival GDS Amadeus to eliminate competition between them."  (Compl. ¶ 97.)  But again, the actual press release—incorporated into US Air's Complaint by reference—says no such thing.  Rather, it recounts that Sabre Travel Network and Amadeus entered into a vertical agreement "to provide their respective travel agents with uninterrupted access to airline inventory" by ensuring that each GDS provides the other GDS's subscribers access to content the other GDS lacks.  (Work-Dembowski Ex. 4, Press Release, Sabre Announces Agreement with Amadeus to Provide Access to Airline Inventory to Benefit Travel Agents, Travelers, Mar. 7, 2006.)  Sabre would do so by providing "travel agents with the ability to complete bookings on an airline that might not participate in the Sabre global distribution system (GDS)."  (*Id.*)  The "agreement [was] designed

---

[24] US Air's gloss on the document quoted in Paragraph 103 is even more creative.  US Air alleges that Sabre's Chief Marketing Officer in a November 2010 Op-Ed urged *the GDSs* to band together to demand access to full content:

> 103.  For example, in November 2006, the Chief Marketing [O]fficer of Sabre has stated that "[a]ctive participation in industry groups such as . . . the Business Travel Coalition and its new Full Content Commission . . . formed . . . for the express purpose of ensuring the industry realizes maximum value from the new airline agreements . . . .  By staying actively engaged and continually making it clear that you demand efficient access to full content, you can help pave the way for continued clarity around full-content access beyond the terms of the current deals."

(Compl. ¶ 103.)  US Air's heavy editing of the quotation and liberal use of ellipses obscures the fact that Sabre's Chief Marketing Officer was in fact referring to "active participation in industry groups" by airline *customers* (*i.e*, corporations and corporate travel managers), *not* GDSs.  (Work-Dembowski Ex. 3, Greg Webb, Op-Ed, *Deals Ensuring Full-Content Access Driven by Buyers*, Business Travel News, Nov 6, 2006, at 4 (cited in Compl. ¶ 103).)

to benefit the tens of thousands of Sabre GDS subscribers as well as the traveling public by ensuring their travel agents have content access to offer a broad choice of airlines." (*Id.*)  The press release, which Sabre attaches to this motion in its entirety, says nothing about the GDSs agreeing not to compete with one another. (*Id.*)[25]

Obviously, a plaintiff cannot satisfy its obligation under *Twombly* to plead actual facts in support of an inference of unlawful agreement by mischaracterizing and quoting deceptively from documents and then demanding that the court "assume the allegations to be true."  Where a plaintiff bases its allegations of unlawful agreement on documents incorporated by reference into a complaint, those allegations are not "plausible" and cannot satisfy *Twombly* where they are inconsistent with, and in fact contradicted by, the actual documents themselves.  Such allegations are worse than conclusory; they are fabrications.

### B.  The Complaint Does Not Support an Inference of Agreement

Having failed to allege direct evidence of an actionable agreement, US Air's horizontal conspiracy claim rests solely on circumstantial allegations.  In order to give rise to an inference of agreement, a plaintiff's allegations must assert more than conduct that is merely consistent with an unlawful agreement.

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d at 50 (internal citation omitted) (dismissing complaint for

---

[25] In any event, this joint marketing agreement falls outside of the four-year statute of limitations, 15 U.S.C. § 15b, as it was entered into on March 7, 2006. (Compl. ¶ 97.)  Further, the joint agreement could not have affected US Air.  It was announced on March 7, 2006.  US Air's contract (called the "TMA") had already become effective over two months earlier on January 27, 2006. (Compl. ¶¶ 62, 97.)  Nowhere does US Air allege that the joint marketing agreement remained in effect or in any way impacted the contract terms US Air agreed to in 2011, when US Air signed its new agreement with Sabre.

failure to allege plausible inference of agreement); *see also Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).  In other words, "allegation[s] of parallel conduct 'must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'"  *Starr*, 592 F.3d at 322 (citation omitted).

### 1.    Seeking Full Content Does Not Suggest Conspiracy

US Air's theory of horizontal conspiracy is that the GDSs have agreed with each other to each seek full content from the airlines.  The alleged "evidence" from which US Air asks this Court to infer such an agreement is: (1) that each GDS sought and in many cases received full content guarantees from the airlines, (*e.g.*, Compl. ¶¶ 98, 101); and (2) that no GDS sought to distinguish itself from its competitors—apparently by negotiating for something *less* than full content (*id.* ¶¶ 99, 101).

This theory fails *Twombly* and *Starr*.  The fact that each GDS may have negotiated to obtain full content "could 'just as well be independent action'" and does not "plausibly contravene each defendant's self-interest 'in the absence of similar behavior by rivals.'"  *Starr*, 592 F.3d. at 327 (citations omitted).  As US Air itself alleges, a GDS "provides travel agents with information on schedules and fares," and travel agents desire to "compare schedules and fares from across airlines."  (Compl. ¶¶ 2, 9.)  By definition, a GDS is more valuable to its travel agent customers if it can offer full content.  A GDS that does not have the full range of schedules and fares will not be as useful to a travel agent that wants to "compare schedules and fares from across airlines."

It is self-evident that any distributor of airline ticket information whose revenues depend on bookings entered through its system would have a compelling self-interest in having the ability to offer the full range of available ticketing options, including the lowest-cost fares.  It would be nonsensical to expect GDSs to distinguish themselves by negotiating for and

advertising that they offer something less than the full range of content.  That would be like a bookstore slashing its inventory and then touting the fact that it had fewer available titles than its competitors.  Yet that is apparently what US Air believes Sabre and the other GDSs would have done absent a conspiracy.  (*See, e.g.*, Compl. ¶ 99.)

Such considerations are relevant at the motion to dismiss stage, because the court must examine any "obvious alternative explanation[s]" for defendants' parallel behavior.  *Twombly*, 550 U.S. at 567.  The question of whether a complaint sufficiently alleges agreement "turns on the suggestions raised by [the alleged] conduct when viewed in light of common economic experience."  *Id.* at 565.

And in fact, one of the documents US Air itself cites makes clear that obtaining access to airlines' full content is a *business necessity* for a GDS.  The Business Travel Coalition stated: "[a]s the paying customers of airline and GDS services, we [corporate travel managers and travel management companies] demanded full content" during the negotiations between the airlines and the GDSs.  (Work-Dembowski Ex. 2, Letter from K. Mitchell, Nov. 12, 2006 (incorporated by reference in Compl. ¶105).)  Sabre's Chief Marketing Officer made the same point in the Op Ed US Air cites in Paragraph 103:

> [I]n the end, customers spoke, and the airlines and we listened.  *You said content fragmentation and the associated inefficiencies and costs it brings are simply not acceptable.*  You said you wouldn't let a supplier dictate your choice of technology or the technology used by the corporate travel management company that serves you.  The suppliers listened.
>
> You told us that the benefits and protections we sought were critical to the efficient operation of your managed travel programs, and that we should hold firm in seeking nondiscriminatory access to clearly defined full content.  *Your voice came through loud and clear*.

(Work-Dembowski Ex. 3, Greg Webb, Op-Ed, *Deals Ensuring Full Content Access Driven by Buyers*, Business Travel News, Nov 6, 2006, at 3-4 (emphasis added)); *cf. LaFlamme v. Societe*

*Air Fr.*, 702 F. Supp. 2d 136, 152-154 (E.D.N.Y. 2010) (dismissing conspiracy claim based on allegations of parallel conduct where the defendants were rationally responding to "common external stimuli," thereby failing to create the factual context necessary to give rise to an inference of unlawful agreement).

As further "evidence" that the GDSs agreed to demand full content from the airlines, US Air alleges that the GDSs have been "signaling" one another by issuing press releases when each signs a full content deal with one of the airlines. (*See* Compl. ¶¶ 100, 107-120.) But it would be in each GDS's independent economic interest to advertise the fact that it had negotiated a full content arrangement with an airline in order to advertise its services and to assure its customers of continued access to all of an airline's fares—a feature that is important to those customers. Indeed, many of the airlines providing full content supplied quotes for the press releases to take advantage of the appeal to Sabre's travel agent customers.

### 2. The Assertions of Not Competing Do Not Withstand Scrutiny

US Air's assertion that GDSs have refrained from competing with one another in circumstances where they would normally compete likewise does not withstand scrutiny. Each of the episodes that US Air identifies is either consistent with independent action or has been misrepresented by US Air.

For example, in its attempt to show that the GDSs agreed not to break ranks on "full content," US Air alleges in Paragraph 124 that "Sabre also sought to bring in other GDSs to its discussions with US Air over Choice Seats."[26] (Compl. ¶ 124.) US Air quotes selectively from

---

[26] "Choice Seats" refers to a program whereby US Air "allows" passengers to pay extra to purchase seats nearer to the front of the plane. *See* http://www.usairways.com/en-US/traveltools/intheair/choiceseats.html (last visited June 28, 2011).

an email chain between Sabre and US Air employees to imply that Sabre did not want to compete with other GDSs for US Air's Choice Seats business.  (*Id.* ¶¶ 124-26.)



As the actual email exchange makes clear, it cannot plausibly be inferred that Sabre and the other GDSs intended to use this standard-setting exercise—in which *US Air was to be included*—to exclude rivals or to avoid inter-GDS competition on commercial terms.  Nor does US Air allege any facts supporting an inference that the standard setting "would plausibly contravene each defendant's self-interest 'in the absence of similar behavior by rivals.'"  *Starr*, 592 F.3d at 327.  To the contrary, as the Complaint itself states, the GDS's computer systems "have been interconnected for decades."  (Compl. ¶ 122.)  Sabre never in the referenced email chain comes close to "admitt[ing]," as US Air alleges, that Sabre "wanted to avoid competition with the other GDSs."  (*Id.* ¶ 126.)  Finally, US Air does not even allege that the proposed meeting ever took place.

### 3.   US Air's Other Conspiracy Allegations Do Not Support an Inference of Agreement

At the end of the section on alleged coordinated conduct, US Air for good measure throws in a hodge-podge of disparate allegations purportedly demonstrating a GDS conspiracy. None suffice to tip the scales in favor of an inference of agreement.

Thus, US Air alleges that Sabre has had frequent meetings and communications with other GDSs. (Compl. ¶¶ 122-23.) But such meetings and communications are commonplace in many industries and are particularly unexceptional here in light of the historically-interconnected nature of the GDSs' computer systems. The Supreme Court in *Twombly* dismissed similar allegations as inconsequential. 550 U.S. at 567 n.12.

US Air alleges that Travelport and Sabre both withdrew Farelogix's access to their APIs[27] in order to prevent Farelogix from becoming an effective competitor. (Compl. ¶ 127.) But such withdrawal is consistent with independent action. US Air acknowledges that Farelogix is a "nascent competitive threat" to Sabre. (*Id.*) Nowhere does US Air allege that refusing to give Farelogix access to Sabre's APIs—which in effect would enable Farelogix to free ride off of Sabre's system—would not be sensible or effective in the absence of a conspiracy.

US Air then asserts that Sabre and the other GDSs have engaged in a coordinated and misleading public relations campaign denigrating the technological capabilities of potential nascent GDS competitors such as Farelogix. (*Id.* ¶ 132.) But US Air once again does not allege anything to imply coordination. It never even alleges that any of the GDSs' statements have been false. Nor does US Air ever explain why it would not be in each GDS's independent self interest to advertise and market against potential competitors.

---

[27] APIs are "Application Programming Interfaces" that allow one software program to connect to another software platform, so that it can run "on top" of that platform.

Finally, US Air alleges that the GDSs "have coordinated retaliatory punishments against airlines that attempt to disturb the GDSs' supracompetitive profits." (*Id.* ¶ 128.) It asserts that Travelport in December 2010 retaliated against American Airlines ("AA") by biasing its display results against AA flights and increasing AA's booking fees in response to AA's threat to withdraw its fares from on-line travel agency Orbitz (which uses the Travelport GDS). (*Id.* ¶ 128.) But Travelport's decision to take action against AA *after* AA threatened to pull its fares from Orbitz is unremarkable and entirely consistent with Travelport's independent business interests and independent conduct. As the Complaint itself acknowledges, "*Travelport has a large ownership stake in Orbitz.*" (*Id.* ¶ 128 (emphasis added).)

US Air then alleges "*[o]n information and belief,* in early January 2011, Sabre, in *apparent* retaliation against American and in support of Travelport, doubled the booking fees it charged to American and also began biasing the results Sabre displays to travel agents to the detriment of American." (*Id.* ¶ 129 (emphasis added).) But US Air does not allege that Sabre's actions were in fact retaliatory, using the qualifier "apparent." The best US Air can say is that "it would have been more profitable for Sabre not to bias against American, but to continue to offer unbiased results to travel agents and collect the doubled booking fees." (*Id.*)

Again, these allegations are rife with speculation and devoid of facts—such as the fact that Sabre itself was involved in a lawsuit with AA regarding a dispute about whether AA breached certain terms of its contract, ███████████████████████████ ███████████████████████████ (Work-Dembowski Ex. 5, Second Am. Pet., *Am. Airline, Inc. v. Sabre Inc.*, Case No. 067-249214-10, 67th Judicial Dist. Ct., Tarrant Cnty., Tex., June 23, 2011.) This lawsuit alone—the fact of which the court may take judicial notice on

a motion to dismiss[28]—would explain Sabre's independent self-interested reasons for its actions against AA.  It does not support an inference of any agreement between Sabre and Travelport.

## Conclusion

For the reasons provided herein, Sabre respectfully requests that the Court dismiss US Air's Complaint in its entirety.

DATED:  August 11, 2011                      Respectfully submitted,


                                             /s/ Lev Dassin
                                             _____
                                             Lev Dassin
                                             CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                             One Liberty Plaza
                                             New York, NY 10006
                                             Phone:  (212) 225-2000
                                             Fax:  (212) 225-2999
                                             ldassin@cgsh.com

                                             Donald E. Scott
                                             Karma M. Giulianelli
                                             Sean C. Grimsley
                                             Sundeep K. (Rob) Addy
                                             BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
                                             1899 Wynkoop Street, 8th Floor
                                             Denver, Colorado  80202
                                             Phone:  (303) 592-3100
                                             Fax:  (303) 592-3140
                                             donald.scott@bartlit-beck.com
                                             karma.giulianelli@bartlit-beck.com
                                             sean.grimsley@bartlit-beck.com
                                             rob.addy@bartlit-beck.com

                                             Andrew K. Polovin

---

[28] "[C]ourts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer*, 937 F.2d at 774 (2d Cir. 1991); *Rothman v. Gregor*, 220 F.3d 81, 91-92 (2d Cir. 2000) (taking judicial notice on a motion to dismiss of filed complaint as a public record).

Chris Lind
Katherine M. Swift
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
Courthouse Place
54 West Hubbard
Chicago, IL  60654
Phone:  (312) 494-4400
Fax:  (312) 494-4440
andrew.polovin@bartlit-beck.com
chris.lind@bartlit-beck.com
kate.swift@bartlit-beck.com

George S. Cary
Steven J. Kaiser
Larry C. Work-Dembowski
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
Phone:  (202) 974-1500
Fax:  (202) 974-1999
gcary@cgsh.com
skaiser@cgsh.com
lwork-dembowski@cgsh.com

*Attorneys for Sabre Inc., Sabre Holdings
Corporation, and Sabre Travel Int'l Ltd. d/b/a
Sabre Travel Network*