# Exhibit A

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

US Airways, Inc.
              Plaintiff,

         v.

Sabre Inc.
Sabre Holdings Corp.
Sabre Travel Int'l Ltd.
              Defendants.

**Civ. Action No. 1:11-cv-02725-MGC**
**ECF Case**

---

**Defendant Sabre's First Amended Answer to Plaintiff's First Amended Complaint and Counterclaim**

---

## FIRST AMENDED ANSWER

Introduction

Defendants Sabre Holdings Corp., Sabre Inc., and Sabre Travel Int'l Ltd. (together, "Sabre"), hereby answer and respond to the allegations in the First Amended Complaint ("Complaint") submitted by Plaintiff U.S. Airways, Inc. ("Plaintiff"). To the extent not specifically admitted herein, Sabre denies all of the allegations in the Complaint. In addition, to the extent Plaintiff purports to quote from documents in the Complaint, Sabre refers to the documents themselves for their true and complete content. Sabre has not attempted to verify the accuracy of Plaintiff's quotations or even that the documents exist, and, to the extent the quotations are incomplete, inaccurate, misleading, or the underlying documents do not exist, Sabre denies the allegations therein. Sabre will insist on strict proof of any such statements, assuming such statements are deemed admissible, as to which Sabre reserves its rights.

General Denial

Sabre denies that it has engaged in illegal conduct or that any conduct that it is alleged to have engaged in has harmed Plaintiff, competition, or consumers.

Specific Denials

Sabre specifically responds to the allegations in the Complaint as follows:

1.      The allegations in Paragraph 1 consist of Plaintiff's conclusions of law and characterization of its claims, to which no response is required. To the extent the allegations in Paragraph 1 are deemed to require a response by Sabre, Sabre denies those allegations.

2.      Sabre is not aware of the basis on which Plaintiff alleges Sabre operates the "largest" GDS in the United States and therefore cannot admit or deny the allegation and on that basis denies the allegation. Sabre admits that through its GDS it provides travel agents with,

among other things, information on schedules and fares offered by participating airlines and the ability to book tickets.

3.    Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first two sentences of Paragraph 3 and on this basis denies those allegations. The allegations in the third and fourth sentences of Paragraph 3 consist of Plaintiff's conclusions of law, to which no response is required. To the extent the allegations in the third and fourth sentences are deemed to require a response by Sabre, Sabre denies those allegations. As to sentences five and six of Paragraph 3, Sabre lacks knowledge or information sufficient to form a belief as to why the DOJ made the purported statement 15 years ago and refers to the statement itself for its true and complete content.

4.    Sabre admits that travel agents sometimes do not pay to use the Sabre GDS. Sabre denies the remainder of the allegations in Paragraph 4.

5.    Sabre admits that the Sabre GDS operates in the United States, but Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 5 and on this basis denies those allegations.  Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second and third sentences of Paragraph 5 and on this basis denies those allegations.

6.    To the extent the allegations in Paragraph 6 are directed at Sabre, Sabre denies the allegations in Paragraph 6 in their entirety.  To the extent the allegations in Paragraph 6 are directed at others, Sabre lacks knowledge or information sufficient to form a belief as to their truth and on that basis denies the allegations in their entirety.

7.    Sabre denies the allegations in Paragraph 7.

8.      Sabre denies the allegations in the first, second, and third sentences of Paragraph

8.  Sabre lacks information sufficient to form a belief as to the truth of the allegations in the last

sentence of Paragraph 8 and on this basis denies those allegations.

9.      Sabre denies the allegations in Paragraph 9.

10.     Sabre denies the allegations in Paragraph 10.

11.     Sabre denies the allegations in Paragraph 11.

12.     Sabre denies the allegations in Paragraph 12.

13.     Sabre lacks knowledge or information sufficient to form a belief as to the truth of

the allegations in Paragraph 13 and on this basis denies those allegations.

14.     Sabre admits the allegations in the first sentence of Paragraph 14.  Sabre admits

that Silver Lake Partners and Texas Pacific Group have indirectly owned Sabre Holdings

Corporation since March 2007 and otherwise denies the remaining allegations in Paragraph 14.

15.     Sabre admits the allegations in Paragraph 15.

16.     Sabre admits that the headquarters of Sabre Travel International Limited is at

25/28 North Wall Quay, Dublin 1, Ireland, and that Sabre Travel International Limited's

principal place of business is at 3150 Sabre Drive, Southlake, Texas.  Sabre denies the remaining

allegations in Paragraph 16.

17.     Sabre denies the allegations in Paragraph 17.

18.     The allegations in Paragraph 18 are conclusions of law, to which no response is

required.

19.     The allegations in the first part of the first sentence of Paragraph 18 citing venue

statutes are conclusions of law, to which no response is required.  Sabre admits it transacts

business and is found within this district, does not contest personal jurisdiction in this action, and admits the allegations in the last sentence of Paragraph 19.

20.     Sabre admits the allegations in the second sentence of Paragraph 20.  The allegations in the first and last sentences of Paragraph 20 are conclusions of law, to which no response is required.  To the extent the allegations in the first and last sentences of Paragraph 20 are deemed to require a response by Sabre, Sabre denies those allegations.

21.     Sabre admits the allegation in the first sentence of Paragraph 21.  Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegation in the second sentence of Paragraph 21 and on this basis denies that allegation.

22.     As to the first sentence of Paragraph 22, Sabre admits that some travel agencies book some flights through a GDS.  To the extent that the first sentence is meant to suggest that travel agents only book flights through a GDS, Sabre denies the allegations in the first sentence of Paragraph 22.  Sabre lacks knowledge or information sufficient to form a belief as to the truth of the other allegations in Paragraph 22 and on this basis denies those allegations.  As to the purported quote from the Department of Justice and the Department of Transportation, Sabre refers to the statement itself for its true and complete content.

23.     Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 and on this basis denies those allegations.

24.     Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 and on this basis denies those allegations.  To the extent that Paragraph 24 purports to quote a statement or report of the American Society of Travel Agents, Sabre refers to that statement or report for its true and complete content.

25.     Sabre denies the allegations in Paragraph 25.

26.     Sabre denies the allegations in the first sentence of Paragraph 26.  Sabre denies airlines were "required" to divest their ownership interest in these systems.  Sabre admits the terms "CRS" and "GDS" are sometimes used interchangeably.

27.     To the extent the allegations in Paragraph 27 are directed toward Sabre, Sabre denies the allegations.  To the extent the allegations in Paragraph 27 are directed toward others, Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations and on this basis denies the allegations.

28.     Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 28 and on this basis denies those allegations. Sabre denies the allegations in the second sentence of Paragraph 28.

29.     To the extent the allegations in Paragraph 29 are directed toward Sabre, Sabre denies the allegations.  To the extent the allegations in Paragraph 29 are directed toward others, Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations and on this basis denies the allegations.

30.     Sabre denies the allegations in Paragraph 30, except that, as to the purported quotes attributed to the Department of Transportation, Sabre refers to the quotes themselves for their true and complete content.

31.     Sabre denies the allegations in the first sentence of Paragraph 31.  Sabre admits that some of Sabre's contracts with travel agencies include the opportunity to earn incentives for use of the Sabre GDS.  Sabre denies the allegation that these provisions penalize agencies that use other channels for bookings as alleged in the second half of the second sentence of Paragraph 31. Sabre refers to the report cited in the third sentence of Paragraph 31 for its true and complete content.  Sabre admits that some of Sabre's contracts with travel agencies  may include

agreements as to anticipated volume, but Sabre otherwise denies the allegations in sentences four

and five of Paragraph 31, including the allegation that Sabre imposes "penalties" on travel

agencies.  Sabre refers to the document cited in the sixth sentence of Paragraph 31 for its true

and complete content.  Sabre admits the allegations in the seventh, eighth, and ninth sentences of

Paragraph 31, except that Sabre refers to the cited documents for their true and complete content.

Sabre denies the allegations in the last sentence of Paragraph 31 and all other allegations in

Paragraph 31 that are not specifically addressed above.

     32.    Sabre lacks knowledge or information sufficient to form a belief as to the truth of

the allegations in Paragraph 32 and on this basis denies those allegations.

     33.    Sabre denies the allegations in Paragraph 33.

     34.    Sabre denies that it generally provides equipment to travel agents and denies that

Sabre provides "kickbacks" to travel agents as alleged in the first two sentences of Paragraph 34.

Sabre lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in the first two sentences of Paragraph 34 and on this basis denies those allegations.

Sabre refers to the report cited in the second sentence of Paragraph 34 for its true and complete

content. Sabre denies the allegations in the last sentence of Paragraph 34.

     35.    Sabre refers to the indicated statements for their true and complete content and

otherwise denies the allegations in Paragraph 35.

     36.    Sabre refers to the indicated statement for its true and complete content and

otherwise denies the allegations in Paragraph 36.

     37.    Sabre refers to the indicated statements for their true and complete content and

otherwise denies the allegations in Paragraph 37.

38.     Sabre denies the first sentence of Paragraph 38 and in particular that Plaintiff has insight into the "hopes and expectations" of the Department of Justice and the Department of Transportation in 2004.  Sabre refers to the indicated statements for their true and complete content and otherwise denies the allegations in Paragraph 38.

39.     Sabre denies the allegations in Paragraph 39.

40.     The allegations in Paragraph 40 are not allegations against Sabre.  To the extent they can be construed as such, Sabre denies the allegations in Paragraph 40.  Otherwise Sabre lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 40 and on this basis denies those allegations.

41.     The allegations in Paragraph 41 are not allegations against Sabre.  To the extent they can be construed as such, Sabre denies the allegations in Paragraph 41.  Otherwise Sabre lacks knowledge or information sufficient to form a belief as to the allegations in Paragraph 41 and on this basis denies those allegations.

42.     Sabre denies the allegations in Paragraph 42.

43.     The allegations in Paragraph 43 are vague and ambiguous and Sabre accordingly denies them.

44.     Sabre denies the allegations in Paragraph 44, except that it refers to the cited document for its true and complete content.

45.     Sabre lacks knowledge and information sufficient to form a belief as to the truth of Plainitiff's or Farelogix's beliefs or statements and on that basis denies the allegations in Paragraph 45.

46.     Sabre lacks knowledge and information sufficient to form a belief as to the truth of Plainitiff's beliefs or statements made by "others in the industry" and on that basis denies the allegations in Paragraph 46.

47.     The allegations in Paragraph 47 are vague and misleading and on that basis Sabre denies the allegations.  To the extent the allegations are directed at parties other than Sabre, Sabre lacks knowledge and information sufficient to form a belief as to their truth, and on this basis denies those allegations.  Sabre further denies that it has engaged in anticompetitive conduct.

48.     Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in the first two sentences of Paragraph 48, and on this basis denies those allegations.  Sabre admits that it has a product called Sabre Red Workspace, but, because the term "similar" is vague and subject to numerous interpretations, Sabre denies that Sabre Red Workspace is necessarily "similar" to the "Travelport product called Universal API."  Sabre denies the allegations in the last sentence of Paragraph 48 as they relate to Sabre.  Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 48 as they relate to other entities and on this basis denies those allegations.

49.     Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 49 and on this basis denies those allegations.

50.     Sabre denies the allegations in Paragraph 50.

51.     Sabre admits that Northwest made an announcement of the nature alleged.  Sabre admits that it sued Northwest for breach of contract and stated it would downgrade the display of Northwest flights, as alleged in the second and third sentences of Paragraph 51.  Sabre denies the allegations of "retaliation" and "misrepresentation" and that it "dramatically increased

Northwest's GDS fees."  Sabre lacks knowledge and information sufficient to form a belief as to what "US Airways' employees believe" and on that basis denies the allegations in the last sentence of Paragraph 51.

52.     Sabre admits that Sabre biased the display of some American Airlines flights in January 2011, as Sabre was entitled to do under the contract negotiated with American Airlines, but Sabre denies that this was "to the detriment" of American Airlines.  Sabre denies the remainder of the allegations in Paragraph 52, except Sabre admits that American Airlines obtained temporary injunctive relief against Sabre.

53.     To the extent that the allegations in Paragraph 53 are based on the public statements of the Department of Justice, Sabre refers to those statements for their true and complete content.  Sabre otherwise denies the allegations in Paragraph 53.

54.     Sabre denies the allegations in Paragraph 54.

55.     Sabre denies the allegations in the first and third sentences of Paragraph 55, except that Sabre admits that America West's GDS booking fees increased twice in 2005 in a manner permitted under America West's contract, but Sabre denies that such rate increases occurred out of "concern[] that travel agents might begin to bypass Sabre" or for "retaliation." Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in the second and fourth sentences of Paragraph 55 and on this basis denies those allegations.

56.     Sabre admits that Galileo and Worldspan combined under a single entity, Travelport.  Sabre denies the allegations in the last sentence of Paragraph 56.  Sabre otherwise lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 56 and on this basis denies those allegations.

57.     Sabre denies the allegations in the first sentence of Paragraph 57.  Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in the second and third sentences of Paragraph 57 and on this basis denies those allegations.  Sabre denies the allegations in the fourth sentence of Paragraph 57.  Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 57 and on this basis denies those allegations, except that Sabre denies the allegations that it has "blocked new technology" and that GDS prices have not fallen over the past 20 years as they relate to Sabre.

58.     Sabre denies the allegations in Paragraph 58.

59.     Sabre denies the allegations in Paragraph 59.

60.     Sabre denies the allegations in Paragraph 60.

61.     Sabre denies the allegations in the first and third sentences of Paragraph 61.  The allegations in the second sentence of Paragraph 61 are vague and ambiguous, and Sabre accordingly denies those allegations, except that Sabre admits that Plaintiff has distributed its services to Sabre subscribers via the Sabre GDS at all times since April 21, 2007.

62.     Sabre admits the allegations in Paragraph 62.

63.     Sabre denies the allegations in Paragraph 63.

64.     Sabre denies the allegations in Paragraph 64.

65.     Paragraph 65 contains Plaintiff's conclusions of law and interpretation of a contract, to which no response is required.  To the extent the allegations in Paragraph 65 are deemed to require a response by Sabre, Sabre denies those allegations, except that Sabre admits that the TMA contains the words quoted in Paragraph 65.  To the extent Paragraph 65 purports to allege that the quoted words completely and accurately reproduce the terms of the contract,

Sabre denies the allegations in Paragraph 65 and refers to the cited document for its true and complete content.

66.     Sabre denies the allegations in the first sentence of Paragraph 66.  As to the second sentence of Paragraph 66, Sabre refers to the cited document for its true and complete content.

67.     Sabre denies the allegations in Paragraph 67, except that Sabre admits that the term "full content" in the TMA is a defined term and refers to the cited document for its true and complete content.

68.     Sabre denies the allegations in Paragraph 68, except that Sabre admits that, while it was in effect, the TMA required Plaintiff to provide Sabre with "full content" (as the term "full content" is defined in the TMA).

69.     Sabre denies the allegation in the first sentence of Paragraph 69. Sabre lacks knowledge and information sufficient to form a belief as to the allegations in the second sentence of Paragraph 69 and on this basis Sabre denies those allegations.  Sabre admits there were discussions with US Airways regarding providing Choice Seats through the Sabre GDS.  Sabre denies the allegations in the fourth and fifth sentences of Paragraph 69.

70.     Sabre denies the allegations in the first sentence of Paragraph 70.  As to the second sentence of Paragraph 70, Sabre refers to the cited document for its true and complete content.

71.     Sabre denies the allegations in Paragraph 71.

72.     As to the first sentence of Paragraph 72, Sabre refers to the TMA for its true and complete content.  Sabre denies all other allegations in Paragraph 72.

73.     Sabre denies the allegations in Paragraph 73.

74.     As to the first sentence of Paragraph 74, Sabre refers to the TMA for its true and complete content.  Sabre denies all other allegations in Paragraph 74.

75.     As to Paragraph 75, Sabre refers to the TMA for its true and complete content.

76.     Sabre denies the allegations in Paragraph 76.

77.     Sabre denies the allegations in Paragraph 77, except that Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 77 as they relate to other entities and on this basis denies those allegations.

78.     Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 78 and on this basis denies those allegations.  Sabre denies the remaining allegations in Paragraph 78.

79.     Sabre admits the allegations in Paragraph 79.

80.     Sabre denies the allegations in Paragraph 80, except that Sabre lacks information as to what Plaintiff "believed" and on this basis denies those allegations.

81.     Sabre refers to the cited document for its true and complete content.  Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence in Paragraph 81 and on this basis denies those allegations.  In all other respects Sabre denies the allegations in Paragraph 81.

82.     Sabre refers to the cited document for its true and complete content.  Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in the last sentence in Paragraph 82 and on this basis denies those allegations.  In all other respects Sabre denies the allegations in Paragraph 82.

83.     Sabre refers to the cited document for its true and complete content.  Sabre otherwise denies the allegations in Paragraph 83.

84.     Sabre refers to the cited document for its true and complete content.  Sabre otherwise denies the allegations in Paragraph 84.

85.     Sabre refers to the cited document for its true and complete content.  Sabre otherwise denies the allegations in Paragraph 85.

86.     Sabre refers to the cited document for its true and complete content.

87.     Sabre refers to the cited document for its true and complete content.  Sabre otherwise denies the allegations in Paragraph 87.

88.     Sabre denies the allegations in Paragraph 88.

89.     Sabre denies the allegations in the first and last sentences of Paragraph 89.  Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 89 and on this basis denies those allegations.

90.     Sabre refers to the cited documents for their true and complete content.  Sabre otherwise denies the allegations in Paragraph 90.

91.     Sabre refers to the cited documents for their true and complete content.  Sabre otherwise denies the allegations in Paragraph 91.  Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding what Mr. Nocella or US Airways "understood" and on this basis denies those allegations.

92.     Sabre denies the allegations in Paragraph 92 and refers to the cited contract for its terms.

93.     Sabre refers to the cited document for its true and complete content.  Sabre otherwise denies the allegations in Paragraph 93.

94.     Sabre refers to the cited document for its true and complete content.  Sabre otherwise denies the allegations in Paragraph 94.

95.     Other than admitting that it has received a Civil Investigative Demand from the DOJ, Sabre denies the allegations in Paragraph 95 as they relate to Sabre and lacks knowledge and information sufficient to form a belief as to the truth of the allegations as directed to other parties and on this basis denies those allegations.

96.     Sabre refers to the cited document for its true and complete content.  Sabre otherwise denies the allegations in Paragraph 96, except that it lacks knowledge or information sufficient to form a belief as to Mr. Gustafson's "understandings" and on this basis denies those allegations.

97.     Sabre refers to the cited document for its true and complete content.  Sabre otherwise denies the allegations in Paragraph 97.

98.     Sabre denies the allegations in Paragraph 98 as they relate to Sabre.  Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 98 as they relate to other entities and on this basis denies those allegations.

99.     Sabre denies the allegations in Paragraph 99 as they relate to Sabre.  Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 99 as they relate to other entities and on this basis denies those allegations.

100.     Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 100 and on this basis denies those allegations, except that Sabre admits that it made the announcements about full content (as "full content" is defined in any relevant contract) attributed to Sabre in Paragraph 100 and refers to those announcements for their true and complete content.

101.     Sabre denies the allegations in Paragraph 101.

14

102.     Sabre denies the allegations in Paragraph 102 as they relate to Sabre.  Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 102 as they relate to other entities and on this basis denies those allegations.

103.     Sabre refers to the cited document for its true and complete content.  Sabre otherwise denies the allegations in Paragraph 103.

104.     Sabre denies the allegations in Paragraph 104 as they relate to Sabre.  Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 104 as they relate to other entities and on this basis denies those allegations.

105.     Sabre denies the allegations in Paragraph 105 as they relate to Sabre.  Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 105 as they relate to other entities and on this basis denies those allegations.  Sabre refers to the cited documents for their true and complete content.

106.     Sabre denies the allegations in Paragraph 106 as they relate to Sabre.  Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 106 as they relate to other entities and on this basis denies those allegations.  Sabre refers to the cited documents for their true and complete content.

107.     Sabre denies the allegations in Paragraph 107 as they relate to Sabre.  Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 107 as they relate to other entities and on this basis denies those allegations.

108.     Sabre denies the allegations in Paragraph 108 as they relate to Sabre.  Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 108 as they relate to other entities and on this basis denies those allegations.  Sabre refers to the cited documents for their true and complete content.

109.    Sabre refers to the cited document for its true and complete content.  Sabre otherwise denies the allegations in Paragraph 109.

110.    Sabre denies the allegations in the first sentence of Paragraph 110.  Sabre admits that Sabre announced a deal with Easy Jet and that it characterized it in the manner indicated.  Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 110 and on this basis denies those allegations.

111.    Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111 and on this basis denies those allegations.

112.    Sabre denies the allegations in the first sentence of Paragraph 112 as they relate to Sabre.  Sabre lacks knowledge and information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 112 as they relate to other entities and on this basis denies those allegations.

113.    Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 113 and on this basis denies those allegations.

114.    Sabre admits that Mr. Moore made the statement attributed to him and refers to the cited document for its true and complete content.  Sabre denies the remaining allegations in Paragraph 114 to the extent they are directed at Sabre.  Sabre lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 114 to the extent they are directed at entities other than Sabre or as to Plaintiff's "view" and on this basis denies those allegations.

115.    Sabre admits the allegations in Paragraph 115 directed at Sabre CEO's support for efforts underway at the Department of Transportation to require airlines to stop deceptive

practices with respect to ancillary fees.  Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 115 to the extent they are directed at others.

116.    Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 116 or as to what Plaintiff "understood" and on this basis denies those allegations.

117.    Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 117 or as to what Plainiff "understood" and on this basis denies those allegations.

118.    Sabre admits the allegations in Paragraph 118, except that Sabre refers to the cited document for its true and complete content.

119.    Sabre denies the allegations in Paragraph 119 as they relate to Sabre.  Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 119 as they relate to other entities and on this basis denies those allegations.

120.    Sabre denies the allegations in Paragraph 120 as they relate to Sabre, except that it admits that Mr. Gilliland made the referenced statement and refers to the cited document for its true and complete content.  Sabre lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 120 as they relate to other entities and on this basis denies those allegations.

121.    Sabre denies the allegations in Paragraph 121.

122.    Sabre admits that, to facilitate the provisioning of Choice Seats to as broad an audience as possible, it suggested at this time that US Airways work with several GDSs to develop technical standards for Choice Seats.  Sabre refers to the cited document for its true and complete content.  In all other respects, Sabre denies the allegations in Paragraph 122.

123.    Sabre denies that it "advocated for other GDSs" and refers to the cited document for its true and complete content.  Sabre lacks knowledge or information sufficient to form a belief as to the allegations in the last sentence of Paragraph 123 or as to what Plaintiff's employee "understood" and on this basis denies those allegations.

124.    Sabre refers to the cited document for its true and complete content.  Sabre otherwise denies the allegations in Paragraph 124.

125.    To the extent the allegations in Paragraph 125 are directed at entities other than Sabre, Sabre lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on this basis denies them.  To the extent the allegations in Paragraph 125 are directed at Sabre, Sabre admits that it terminated Farelogix's authorized developer agreement with Sabre when Farelogix breached its obligations under that agreement.  In all other respects, Sabre denies the allegations in Paragraph 125.

126.    Sabre denies the allegations in Paragraph 126 to the extent they are directed at Sabre, except that Sabre admits that it understood that American voluntarily and deliberately terminated its agreement with Orbitz.  Sabre otherwise lacks knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 126 with respect to entities other than Sabre and on this basis denies those allegations.

127.    Sabre denies the allegations in Paragraph 127.

128.    Sabre denies the allegations in Paragraph 128 to the extent they are directed at Sabre.  Sabre otherwise lacks knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 128 with respect to entities other than Sabre or as to what Plaintiff "believes" and on this basis denies those allegations.

129.    Sabre denies the allegations in Paragraph 129, which are a mischaracterization of the cited document and the context within which it was issued.  Sabre refers to the cited document for its true and complete content.

130.    Sabre denies the allegations in Paragraph 130, except that Sabre admits it has said that airline direct connects are costly and unproven and that GDS systems like the Sabre GDS are successful and proven.  Sabre lacks knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 130 with respect to entities other than Sabre or as to what Plaintiff "believes" and on this basis denies those allegations.  Sabre refers to the cited documents for their true and complete content.

131.    The allegations in Paragraph 131 consist of Plaintiff's conclusions of law, to which no response is required. To the extent the allegations in Paragraph 131 are deemed to require a response from Sabre, Sabre denies them.

132.    The allegations in Paragraph 132 consist of Plaintiff's conclusions of law, to which no response is required. To the extent the allegations in Paragraph 132 are deemed to require a response from Sabre, Sabre denies them.

133.    Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 133 and on this basis denies those allegations.

134.    Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 134 and on this basis denies those allegations.  Sabre denies engaging in any anticompetitive conduct.

135.    Sabre denies the allegations in Paragraph 135 to the extent they are directed at Sabre.  Sabre otherwise lacks knowledge or information to form a belief as to the truth of

allegations in Paragraph 135 with respect to entities other than Sabre and on this basis denies those allegations.

136.    The allegations in Paragraph 136 consist of Plaintiff's conclusions of law, to which no response is required. To the extent the allegations in Paragraph 136 are deemed to require a response from Sabre, Sabre denies them.

137.    The allegations in Paragraph 137 consist of Plaintiff's conclusions of law, to which no response is required.  To the extent the allegations in Paragraph 137 are deemed to require a response from Sabre, Sabre denies them.  Sabre also notes that the Court has already dismissed this allegation as a matter of law and with prejudice.

138.    Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 138 and on this basis denies those allegations.

139.    Sabre denies the allegations in Paragraph 139.

140.    Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 140, except that Sabre refers to the cited document for its true and complete content and notes that the court at issue in that case ultimately dismissed the proposed relevant market as a matter of law, as has this Court, with prejudice.

141.    Sabre lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 141 and on this basis denies those allegations, except that Sabre refers to the cited document for its true and complete content.

142.    Sabre denies the allegations in Paragraph 142.

143.    Sabre denies the allegations in Paragraph 143, except that Sabre admits that alternative distribution systems, such as Farelogix, might attempt to free ride anticompetitively on the "scale and functionality of a GDS."  Sabre lacks knowledge or information sufficient to

form a belief as to the truth of allegations in Paragraph 143 with respect to entities other than Sabre and on that basis denies them.

144.    Sabre denies the allegations in Paragraph 144.

145.    Sabre denies the allegations in Paragraph 145, except that Sabre admits that Sabre's agreement with Plaintiff includes terms related to the rest of the world as well as the United States.

146.    Sabre denies the allegations in Paragraph 146.

147.    Sabre denies the allegations in Paragraph 147.

148.    Sabre denies the allegations in Paragraph 148.

149.    Sabre denies the allegations in Paragraph 149.

150.    Sabre denies the allegations in Paragraph 150.

151.    Sabre incorporates by reference the responses contained in the previous paragraphs of this Answer as if fully rewritten herein.

152.    The allegations in Paragraph 152 consist of Plaintiff's conclusions of law, to which no response is required. To the extent the allegations in Paragraph 132 are deemed to require a response from Sabre, Sabre denies them.  Sabre notes that the Court has already dismissed with prejudice any claim, including Claim I, to the extent it is based on the so-called "Sabre Submarket."

153.    Sabre denies the allegations in Paragraph 153.

154.    Sabre denies the allegations in Paragraph 154.

155.    Sabre denies the allegations in Paragraph 155.

156.    Sabre denies the allegations in Paragraph 156.

157.    Sabre denies the allegations in Paragraph 157.

158.     Sabre incorporates by reference the responses contained in the previous paragraphs of this Answer as if fully rewritten herein.  Sabre also notes that the Court has dismissed Claim II in its entirety and with prejudice.

159.     Because the Court has dismissed Claim II in its entirety and with prejudice, no response is required.  To the extent the allegations in Paragraph 159 are deemed to require a response from Sabre, Sabre denies them.

160.     Because the Court has dismissed Claim II in its entirety and with prejudice, no response is required.  To the extent the allegations in Paragraph 160 are deemed to require a response from Sabre, Sabre denies them.

161.     Because the Court has dismissed Claim II in its entirety and with prejudice, no response is required.  To the extent the allegations in Paragraph 161 are deemed to require a response from Sabre, Sabre denies them.

162.     Because the Court has dismissed Claim II in its entirety and with prejudice, no response is required.  To the extent the allegations in Paragraph 162 are deemed to require a response from Sabre, Sabre denies them.

163.     Sabre incorporates by reference the responses contained in the previous paragraphs of this Answer as if fully rewritten herein.  Sabre also notes that the Court has dismissed Claim III in its entirety and with prejudice.

164.     Because the Court has dismissed Claim III in its entirety and with prejudice, no response is required.  To the extent the allegations in Paragraph 164 are deemed to require a response from Sabre, Sabre denies them.

165.     Because the Court has dismissed Claim III in its entirety and with prejudice, no response is required.  To the extent the allegations in Paragraph 165 are deemed to require a

response from Sabre, Sabre denies them, except that Sabre admits that some of its agreements with travel agencies may include agreements as to anticipated volume and agreements regarding ratios between data processing transactions and bookings.

166.   Because the Court has dismissed Claim III in its entirety and with prejudice, no response is required.  To the extent the allegations in Paragraph 166 are deemed to require a response from Sabre, Sabre denies them.

167.   Sabre incorporates by reference the responses contained in the previous paragraphs of this Answer as if fully rewritten herein.

168.   Sabre denies the allegations in Paragraph 168.

169.   The allegations in Paragraph 169 consist of Plaintiff's conclusions of law, to which no response is required. To the extent the allegations in Paragraph 169 are deemed to require a response from Sabre, Sabre denies them.

170.   Sabre denies the allegations in Paragraph 170.

171.   Sabre denies the allegations in Paragraph 171.

172.   Paragraph 172 consists of Plaintiff's jury demand, to which no response is required.

<u>Affirmative or Alternative Defenses</u>

In addition to the reasons stated above, Plaintiff is not entitled to relief, and Sabre is entitled to judgment in its favor and against Plaintiff, on the basis of the following Affirmative or Alternative Defenses, pleaded in the alternative to the extent they may be found to be inconsistent.  In asserting these defenses, Sabre does not assume the burden of proof on any issue that would otherwise rest on Plaintiff.  Sabre incorporates all of the factual allegations made herein and below.

1.   The Complaint fails to state a claim upon which relief can be granted.

2.      Plaintiff's claims are barred, in whole or in part, by the statute of limitations.

3.      Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

4.      Plaintiff's claims are barred, in whole or in part, because Plaintiff lacks standing.

5.      Plaintiff's claims are barred, in whole or in part, because Plaintiff did not suffer antitrust injury.

6.      Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

7.      Plaintiff's claims are barred, in whole or in part, by the doctrine of *in pari delicto*.

8.      Plaintiff's claims are barred, in whole or in part, because the alleged damages, if any, are speculative and because of the impossibility of ascertaining and allocating those alleged damages.

9.      Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel.

10.     Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver.

11.     Plaintiff is barred, in whole or in part, from recovery of any damages because of and to the extent of its failure to mitigate damages.

12.     Plaintiff's causes of action are barred, in whole or in part, by the *Noerr-Pennington* doctrine.

13.     Any injuries or damages Plaintiff may have suffered were caused solely and proximately by the acts and omissions of others.

Reservation of Defenses

Defendants reserve the right to assert additional defenses when it determines the particulars of Plaintiff's claims, which are not apparent on the face of the Complaint.

Conclusion

WHEREFORE, Defendants pray as follows:

24

1.      That the Plaintiff take nothing by way of the Complaint, and the action be dismissed with prejudice;

2.      That judgment be entered in favor of Defendants and against Plaintiff with respect to all causes of action in the Complaint;

3.      That the Court award Defendants their attorneys' fees and all other costs reasonably incurred in defense of this action; and

4.      That the Court award Defendants such other relief as it may deem just and proper.

## COUNTERCLAIM

## NATURE OF ACTION

1.      This is an antitrust action against US Airways, Inc. ("US Airways"), for damages and injunctive relief to stop it and its co-conspirators—including other airlines and a third-party technology firm called Farelogix—from colluding with one another on the terms on which they will deal with independent global distribution systems ("GDSs"), including Sabre.

2.      Historically, US Airways and its co-conspirator airlines have distributed air travel to travelers through the GDSs by publicly filing their available air travel options and negotiating with the GDSs about what "content"—which includes airline tickets and ancillary products such as assigned seats, preferred boarding, and bag fees—the GDS can offer to travel agents. Sabre and other GDSs operate computer systems that aggregate this publicly filed information from multiple airlines and allow efficient searching across it so that travel agents can compare options across airlines and book the flights that best suit their customers' needs.

3.      Because GDSs facilitate comparison shopping, they increase competition between the airlines and drive down ticket prices for consumers.

4.      Over the past few years, US Airways and its co-conspirator airlines have conspired to boycott Sabre and other GDSs by numerous means. Most prominently, they have agreed to withhold content from, or to provide it only on certain terms to, Sabre and other GDSs. They have entered into agreements on the technological means by which they will deal with Sabre and other GDSs, including abandoning the current system of public, non-discriminatory fare filings in favor of discriminatory fares available only to certain travelers. They have agreed on the price terms that they will pursue from the GDSs and have coordinated their negotiation strategies. These horizontal conspiracies and boycotts violate the antitrust laws.

5.      The airlines often refer to the end goal of the conspiracy as "flipping the model." By this they mean that the airlines would no longer pay GDSs for distribution services and would even require travel agents to pay the airlines to access content and make bookings, even though those bookings benefit the airlines.

6.      US Airways and its co-conspirators organized and implemented the conspiracy through regular communications, including emails, telephone calls, and meetings held under the guise of a variety of alliances, advisory committees, consortiums, and trade associations, such as the Star Alliance, a group called "PAAC" set-up by a third-party technology company called Farelogix, the so-called "Consortium" established by a consulting firm called Boston Consulting Group ("BCG"), and a trade association called the International Air Transport Association ("IATA").

7.      One effect of these agreements will be to reduce competition among airlines on the terms on which they provide airline content for distribution.  Absent the conspiracy, US Airways and its co-conspirators would compete with each other on the content they distribute through Sabre and other GDSs and on the booking fees that they pay the GDSs to distribute that content.  In general, the more content that an airline provides to a particular GDS, the more attractive are the financial terms the airline pays for the GDS's distribution services.

8.      In addition, withholding content from Sabre and other GDSs, including by not filing content publicly, will make comparison shopping more difficult, reducing transparency and facilitating price discrimination in airline ticket pricing, resulting in decreased competition between the airlines in providing air travel and higher prices for travelers.

## THE PARTIES

9.    Counterclaim-Plaintiff Sabre, Inc., is a Delaware corporation with its principal place of business and headquarters at 3150 Sabre Drive, Southlake, Texas 76092.

10.    Counterclaim-Plaintiff Sabre Travel International Ltd. is an Irish corporation with its principal place of business at 3150 Sabre Drive, Southlake, Texas 76092.

11.    Counterclaim-Defendant US Airways, Inc., is a Delaware corporation with its headquarters located at 111 West Rio Salado Parkway, Tempe, Arizona 85281.  US Airways is a major U.S. airline that was formed in 1982 and has grown to have more than 31,000 employees and to serve approximately 80 million passengers each year.

## JURISDICTION AND VENUE

12.    The Court has subject matter jurisdiction over all claims asserted against Counterclaim-Defendant US Airways pursuant to 28 U.S.C. §§ 1331, 1337(a), and 15 U.S.C. §§ 4, 15, 26.

13.    Venue is proper in this District under 28 U.S.C. §§ 1391 (b) and (c).  For venue purposes, Counterclaim-Defendant US Airways can be found in and transacts business in this District.

## INTERSTATE COMMERCE

14.    US Airways and its co-conspirators provide air travel in interstate commerce, for example selling tickets to passengers in other states and moving passengers from one state to another.  Sabre provides its GDS services to travel agents in interstate commerce, for example providing its services to travel agents located in multiple states.  The provision of airline content by US Airways and its co-conspirators to Sabre and other GDSs likewise occurs in interstate commerce.  The illegal activities of US Airways and its co-conspirators described herein had a

28

direct, substantial, and reasonably foreseeable effect on interstate commerce.

## US AIRWAYS' ANTICOMPETITIVE CONDUCT

### I.     The Current Distribution System

15.     Airlines sell their content through many channels.  The travelling public purchases airline tickets and ancillary fares directly through websites such as USAirways.com, ticket counters, call centers, and other direct channels.  They also purchase content from the airlines indirectly through travel agents, who often use a GDS.

16.     GDSs are computer systems that, among other things, efficiently aggregate information from thousands of travel suppliers (including airlines, hotels, and rental car companies) and provide travel agents (including online travel agencies, like Expedia, that travelers can access directly through the Internet) with the ability to search across travel options and book travel.  Millions of airfares are available at any one time depending on the carrier, route, time of day, connections, and other factors.  One reason GDSs are valuable to travel agents and consumers is that they reduce the search costs that travel agents and consumers would otherwise bear and allow travel agents and consumers to efficiently identify and book the best flight options at the lowest available price.

17.     To serve their travel agent customers, the GDSs negotiate with individual airlines to obtain as much content as they can to give consumers as much choice as possible.

18.     Historically, airlines have publicly filed information about their flights and fares with an entity called the Airline Tariff Publishing Company ("ATPCO") and information about their schedules with entities called OAG and Innovata.  Sabre and the other GDSs in turn obtain the information from these companies and store the information on their computer systems.

When a travel agent wants to search for a flight, it queries the GDS system, which efficiently

responds to the travel agent's request in sub-second time.

19.    US Airways and other airlines authorize Sabre to facilitate, via a travel agent, the

sale of airline tickets (and, in some instances, other content) under distribution agreements.

These agreements specify what content Sabre is authorized to facilitate the sale of and on what

terms.  Sabre competes with other GDSs and other means of distribution to obtain content from

airlines.  This competition is contentious and fierce.  Because of this competition, Sabre often

discounts the price it charges for its distribution services to obtain more content from the airlines.

20.    Sabre also competes with other GDSs and other means of distribution for travel

agent business.  Sabre and its rivals compete for this business on price by, among other things,

paying incentives to travel agents for bookings made on their systems.  For example, Sabre

might offer a travel agent $1 for each booking made on the Sabre GDS, and other rivals might

compete for that business by offering a higher incentive per booking (e.g., $1.50).  (Similarly,

airlines pay commissions to travel agents to encourage the agents to book on their flights and

"move share" to their airline rather than booking on a competing airline.)

21.    This price competition benefits travel agents and consumers.  Travel agents use

the incentives to offset their costs of operation, allowing travel agents to provide their services to

consumers at a lower cost than would otherwise be possible.

22.    Sabre and its rivals also compete for travel agent business on the amount of

content available, the quality and efficiency of the searching and other technology that they offer,

and other dimensions.  Part of the value of Sabre and other GDSs is the ability to guarantee to

travel agents that they will have access to most or all content from most or all airlines.

Therefore, Sabre competes with other GDSs and with other means of distribution to provide the

most relevant content to travel agencies.  For example, an airline withholding content from Sabre would put Sabre at a competitive disadvantage relative to other means of distribution.  This competition to offer more content and a higher quality product benefits travel agents and consumers.

23.   Because a GDS allows travel agents to efficiently search across all available flight options, airlines acting in their own independent interest, as opposed to conspiring with one another, have strong incentives to have all of their content displayed on the GDS and to offer the best price and quality to win bookings, knowing that their offerings will be compared against competing airlines' offerings.

24.   The airline industry has acknowledged that the comparison shopping facilitated by the GDSs benefits consumers.  For example, in testimony before the Senate Judiciary Subcommittee on Antitrust, Competition Policy & Consumer Rights about the Delta-Northwest merger, Northwest CEO Douglas Steenland explained how online travel agents ("OTAs") that use GDSs have "provided enormous benefits to consumers."  He testified:

> Over the past several years, online sites such as Orbitz, Expedia, and Travelocity have been created to enable customers to compare airline offerings directly. . . . These tools have provided enormous benefits to consumers and have increased the price-competitiveness of the airline industry.  In fact, there are few businesses in which there is as much pricing transparency.

25.   Similarly, on August 8, 2008, NPR reported:

> Dave Castelveter, of the Air Transport Association, says consumers share in the responsibility for the airline crisis.  He says airlines have to keep airfares below their market price in order to remain competitive online.  When consumers visit a travel Web site like Expedia or Travelocity, they often view flights by clicking on a button that says 'list flights by lowest fare.'
>
> While airline executives would like to make a profit, they're busy trying to stay on the first page of those search results—and they can't do that if they hike their fares. This is part of the reason they've begun adding

'hidden' costs for checked luggage and aisle seats, for example.

26.    The airlines do not like the efficient comparison shopping and lower air travel prices that GDSs bring and have thus sought to eliminate the transparency that GDSs offer by entering into the illegal conspiracy and boycott described below.

## II.    The Airline Conspiracy

27.    US Airways and its co-conspirator airlines conspired on the terms on which they would deal with Sabre and other GDSs.  Most prominently, they agreed to withhold content from, or to provide it only on certain terms to, Sabre and other GDSs.  They have entered into agreements on the technological means by which they will deal with Sabre and other GDSs, including abandoning the current system of public, non-discriminatory fare filings in favor of discriminatory fares available only to certain travelers.  They have also agreed on the price terms they will pursue from the GDSs and have coordinated their negotiation strategies.  These agreements are horizontal agreements to boycott Sabre and other GDSs in whole or in part and to agree on the terms on which otherwise competing buyers will purchase distribution services from the GDSs.  These horizontal agreements are per se violation of the antitrust laws.

28.    US Airways and its co-conspirators effected this conspiracy through a variety of meetings under the guise of several different organizations.  These organizations include (1) the Star Alliance, an airline alliance with a ▮▮▮▮▮▮▮▮▮▮▮ that US Airways participated in with competitors such as United and Continental; (2) various groups set-up by a third-party technology company called Farelogix; (3) a "Consortium" established by a consulting firm called Boston Consulting Group ("BCG") that US Airways participated in with American Airlines, United, and Delta; and (4) the International Air Transport Association ("IATA"), a trade association that US Airways participates in with other U.S. and non-U.S. airlines.

29.    The conspirators have also had other contacts.  Recently, US Airways has had continued contacts with American Airlines through their ongoing discussions about a potential merger, giving them ample additional opportunity to conspire.  (Moreover, a merger with American Airlines would be another way for US Airways to eliminate competition with a rival and could, among other things, raise the costs of travel for consumers who will no longer have a choice between competing airlines.)

30.    US Airways and its co-conspirators needed to conspire to withhold content from the GDSs.  Without a conspiracy, each airline's individual interest to maximize revenue would be to distribute its content through as many channels as possible, including through Sabre and each of the other GDSs.  If one airline withheld content from Sabre and other GDSs on its own, that airline would lose sales to other airlines that did not withhold content.  By agreeing with one another jointly to withhold content from Sabre and other GDSs, including by not filing content publicly, US Airways and its co-conspirator airlines reduce the risk of losing sales.

31.    In addition, the conspiracy eliminates the transparency and price competition in air travel that GDSs create.  When the airlines conspire to withhold content from the GDSs, they eliminate much of the competition between themselves in providing air travel as well.

32.    Airline insiders have recognized the benefits from and the need to conspire.  For example, in a January 2011 discussion between ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ Similarly, █

████████████████████████████████████████████████████████

████████████████████████████████████████████

A.     **US Airways and Its Co-Conspirators Conspired Via the Star Alliance**

33.    US Airways is part of an airline alliance called the "Star Alliance."  Other members of the Star Alliance include U.S. airlines United and Continental (which has now been acquired by United) and foreign airlines Air Canada, Lufthansa, and many others.  US Airways and the other airlines in the Star Alliance distribute their content through the GDSs and other channels.  The members of the Star Alliance are also direct competitors in providing air travel in, from, and to the United States.

34.    The Star Alliance and its members, including US Airways, ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

35.    In March 2007, US Airways attended a meeting of the Star Alliance ███████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████

36.    In December 2007, US Airways attended a ████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

34

█████████████████████████████████████████████████████

███████████████████████████████████████████

37.   In a May 2010 meeting ██████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

██████████   (The Participating Airlines Advisory Council, or PAAC, was another vehicle US Airways used to conspire with its co-conspirator airlines, as described below.)

38.   In April 2011, █████████████████████████████████████

█████████████████████████████████████████████

39.   Through these meetings, US Airways and its co-conspirator airlines furthered their conspiracy.

40.   The Department of Transportation has granted antitrust immunity to limited activities of some Star Alliance airlines, but US Airways does not have immunity for its participation in Star Alliance and immunity applies only to certain conduct related to certain international routes.  The challenged conduct is outside the scope of any immunity.

**B.   US Airways and Its Co-Conspirators Conspired Via Farelogix Consortiums**

41.   Farelogix is a third-party technology company that purportedly seeks to replace the GDSs so that it can provide technology to support the distribution of airline tickets and other content.  It therefore stands to profit from the airline conspiracy described here.

35

42.   Farelogix has served as one "hub" of the conspiracy between US Airways and other airlines.  For example, in October 2010, Jim Davidson, Farleogix's CEO, ███████████

███████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████ In response, Davison sought to reinforce the conspiracy: █████████████████████████████

█████████████████████████████████ Despite having this explicit opportunity to walk away, US Airways and its co-conspirator airlines did not do so.

43.   Farelogix also set-up organizations that US Airways and its co-conspirator airlines used to reach agreements to further their conspiracy.

**1.     US Airways and Co-Conspirators Conspired Through the Participating Airlines Advisory Council ("PAAC")**

44.    In 2009, Farelogix created the Participating Airlines Advisory Council ("PAAC") and invited airlines to join.  US Airways and its co-conspirators either joined PAAC or attended PAAC meetings.

45.   An April 2, 2009, document entitled ████████████████████

████████████████████████████████████████

███████████████████████████████ In a May 2009 presentation, Farelogix noted that ███████████████

███████████████████████████████████████████████

███████████████████████████████████████

46.   ████████████████████████████████████

███████████████████████████████████████████████

████████████████ (A "direct connect" is a non-GDS, airline-controlled distribution method.) American Airlines recognized ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████ Similarly, in a February 2010 e-mail, American Airlines explained that █████████████

███████████████████████████████████████████

████████████████████████████████████████

████████ "Merchandising" is another term for ancillary content that airlines have started to charge for separately, such as assigned seats, preferred boarding, or checked bags.  American Airlines went on to note that ██████████████████████████████████

████████████████████████████████████

47.   PAAC held quarterly meetings.  At these meetings, the airlines discussed and agreed on the terms, such as content and price, upon which they would deal with the GDSs and travel agents.  For instance, a draft agenda for the May 2010 PAAC meeting stated that █████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████ In short, through

PAAC the airlines repeatedly met to devise and implement their conspiracy to withhold content and otherwise fix the terms on which they would deal with Sabre and other GDSs.

48.    The conspirators realized that these statements were incriminating and that they needed to take steps to try to keep them secret because, if they became known to the GDSs, they would provide the basis for antitrust claims like the ones at issue here.  In May 2009, ███████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

### 2.    US Airways and its Co-Conspirators Conspired Through Open AXIS

49.    In summer 2010, Farelogix formed another organization of airlines, this one called "Open AXIS."  US Airways, American Airlines, Delta, United, Continental, and Air Canada all participate in Open AXIS.  Open AXIS is ostensibly a trade association to promote the use of an electronic messaging structure called XML to distribute content.  Instead, US Airways and its co-conspirators used Open AXIS to advance their conspiracy.

50.    According to Farelogix's Jim Davidson, the purpose of Open AXIS was to ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Davidson explained that with Open AXIS the airlines could avoid ██████████████

██████████████████—that is, by conspiring to collectively withhold content from the GDSs, the airlines could prevent travel agent and consumer efforts from using the GDSs to

comparison shop across competing offerings from multiple airlines. Davidson further explained

that, if successful, Open AXIS would ███████████████████████████████████████

51.   Open AXIS recognized that the airlines needed to agree and act collectively.

Farelogix's Davidson, for example, stated that ████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████   Davidson further stated that Open AXIS ████████████████

████████████████████████████████████   refers to the conspiracy's

goal of collectively withholding content from the GDSs so as to discriminate against certain

customers by making certain fares or other options only available to certain other customers.

52.   Open AXIS is not merely a standard setting organization.  By its own admission,

Open AXIS's purpose was to reach agreement on the terms on which airlines would or would not

deal with the GDSs, not to develop or implement technology.  Moreover, Open AXIS limits "full

membership" and voting rights only to airlines, while a standard setting organization would have

welcomed greater involvement of non-airlines.  (Sabre asked for full membership, but was

rebuffed.)  That Open AXIS was an instrument of the conspiracy, not a legitimate undertaking, is

illustrated by an e-mail that US Airways' ███████████████████████████████████████

██████████████████████████████████████████████

53.   Nor was Open AXIS needed to develop a technical standard.  Before Open AXIS

was created, XML had been used by Sabre and other GDSs for years.  Other airline-controlled

enterprises, including ATPCO and the Airline Reporting Corporation ("ARC"), had developed or

were completing new technical standards for distributing airline content, including ancillary

products.  In addition, before Open AXIS was created, Open Travel Alliance was developing

standards for XML with the participation of a broad range of industry participants, including

airlines, car rental companies, hotel companies, GDSs, and travel agents.

**C.      US Airways and Its Co-Conspirators Conspired through the "Consortium"**

54.     In 2010, American Airlines and the consulting firm BCG created a group known

as the "Consortium" and invited US Airways and other co-conspirator airlines to join.  Through

the Consortium and to further their prior agreements, the conspiring airlines discussed potential

terms of dealing with the GDSs and withholding certain content from the GDSs.

55.     On August 8, 2010, American Airlines and BCG plotted about getting other

airlines to join the "Consortium" and discussed how the Consortium could affect the other

airlines' negotiations with Sabre.  ███████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████████████████████████████

56.     Before the August 18, 2010, meeting between American Airlines and Delta, US

Airways' John Gustafson ██████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

█████████████████████████

57.     US Airways, American Airlines, Delta, and United met with BCG on September

23, 2010.  Afterward, BCG wrote ████████████████████████

████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

58.    US Airways, American Airlines, United, and Delta again met with BCG on November 2, 2010 in Chicago.  According to a BCG presentation given at the meeting, the airlines discussed ██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████ Specifically, the airlines agreed to explore ███

███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

59.    As part of the conspiracy to withhold content from the GDSs, the airlines

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

In other words, the airlines conspired to withhold content from the GDSs and sought to jointly affect the "commercial terms" of their agreements with the GDSs to distribute content.

60.    ██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

61.    In follow-up e-mails to BCG on November 16 and 17, 2010, US Airways' John Gustafson stated that ██████████████████████████████████████████

████████████████████████████████████████████████

████████████    Thus, US Airways and its co-conspirators would try to jointly force GDSs and travel agents to pay for content.  Gustafson went on to state that ████████████████████

██████████████████████████████████████████

██████████████████████████    In other words, beyond simply agreeing to withhold *some* content from the GDS, US Airways proposed to its co-conspirators that they agree to provide content to the GDSs only collectively and on price-fixed terms.

62.    In a November 18, 2010 presentation, BCG further emphasized that ████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

Once again, the airlines jointly conspired as to what content they would or would not provide to the GDSs and on what terms, a plain violation of the antitrust laws.

D.    **US Airways and Its Co-Conspirators Conspired through IATA**

63.    US Airways and its co-conspirators have further continued the conspiracy through a trade association called the International Air Transportation Association ("IATA").  US

Airways, the other major U.S. airlines, and Air Canada are members, among others.

64.    On June 6-8, 2010, IATA held its annual general meeting in Berlin, Germany. Executives from US Airways and many co-conspirators attended the meeting.  The Director General of IATA, Giovanni Bisignani, gave a PowerPoint presentation to IATA members about the airline industry that lamented airlines having too much capacity today, that the airline industry is too fragmented, and that barriers to entry for airlines are too low.  This presentation was a call to the airlines to agree to act together to address these claimed problems.

65.    The presentation included a segment called the "Wall of Shame" attacking various government regulators and other travel industry participants for the claimed problems of the airline industry.  It included a section on GDSs, beginning with the following slide:



Bisignani compared the GDSs to "leeches," naming Sabre expressly, and complained that airlines paid too much to GDSs to distribute content through the GDSs, a clear call to the airlines to agree to attack the GDSs by colluding on the terms of dealing with the GDSs.

66.    US Airways and its co-conspirator airlines, through IATA, continued their conspiracy against the GDS throughout at least the summer and fall of 2012.

67.    US Airways and its co-conspirator airlines followed through with Bisignani's call

43

to action and agreed on the terms on which they will deal with the GDSs with an initiative called

the "New Distribution Capability" ("NDC").  Although NDC is ostensibly a technical standard,

in fact NDC is an agreement among the airlines to withhold content by not publicly filing their

content.  Moreover, IATA has insisted that NDC does not need to be backward compatible with

existing distribution standards, meaning that GDSs will not be able to aggregate content that will

come through NDC with content that will come from other sources.

68.    In an internal IATA document from December 2011, IATA executives proposed

that IATA help 

IATA recognized that a proposal like this for airlines

to conspire on their terms of dealing with Sabre and other GDSs could

In other words, IATA mistakenly believed that antitrust violations done

under the auspices of a trade association would go undetected or unchallenged.

69.    Then, during a series of meetings under the guise of IATA (including a meeting in

July 2012), the airlines committed to one another to all use the NDC standard to distribute

"enhanced content."  The airlines jointly agreed that they would not file "enhanced content"

publicly, but would instead decide what content to offer in response to specific requests from a

specific travel agent or traveler.  In October 2012, the airlines voted to adopt so-called

"Resolution 787."  US Airways and its co-conspirator airlines agreed to adopt this resolution.  In

it, each airline agreed that if it distributed "enhanced content," it "shall" distribute that content

only in a response to specific requests.  Thus, the airlines have agreed not to distribute "enhanced

content" any other way (for example, by publicly filing the enhanced content for distribution

through Sabre).  "Resolutions" like 787 are nothing but agreements among competitors, with no

privileged status under the antitrust laws.

70.    In addition, through NDC, the airlines agreed that they would obtain sensitive,

highly personal information from travelers, including age, marital status, national origin, place of

residence, and shopping and purchase history.  Only after getting this information would an

airline decide what offers to make to the travelers.  This information makes it easier for airlines

to increase ticket prices by price discriminating against specific travelers based on the personal

characteristics of that traveler.  Achieving these goals could only be accomplished by agreeing

on the terms by which the airlines would deal with GDSs.

**E.    US Airways Devises a Plan to** ▓▓▓▓▓▓▓▓

71.    US Airways' involvement in the conspiracy directly affected US Airways'

negotiations with Sabre.  In 2010, US Airways and Sabre were negotiating a new distribution

contract.  In October 2010, US Airways sent Sabre a proposed "term sheet."  Significantly, this

document proposed that US Airways' content commitments would remain the same in the new

contract as in its prior contract.  In other words, as of that time, US Airways told Sabre that it

wanted its existing content obligations, including "Full Content," not to change.

72.    At the same time, however, US Airways was conspiring with other airlines and

Farelogix, as described above, including through Open AXIS and the BCG Consortium.  After

the Consortium meetings in November 2010, US Airways reversed itself with Sabre.  Despite

having proposed to Sabre that the content provisions of its contract would remain unchanged, US

Airways began to object to these provisions following those conspiratorial meetings.

73.    As discovery has now made clear, US Airways' belated objections were an

attempt to set Sabre up for a lawsuit.  Rather than negotiate in good faith, US Airways sought to

gather "evidence" from the negotiations with Sabre for the sole purpose of suing Sabre after the

contract was signed.  Unbeknownst to Sabre, prior to signing the agreement, US Airways had

internal meetings to discuss suing Sabre after signing.  US Airways' executives memorialized

this ███████████ strategy ████████████████   Its own documents show that ████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████████   After formulating this strategy, US Airways sent self-serving emails

to Sabre with new "protests" about terms that had been under discussion for some time.  When

Sabre detailed its responsive negotiating position, rather than further negotiate the terms in

earnest, US Airways was content to use the existing terms of the proposed agreement to set up a

lawsuit.  Referring to Sabre's proposal, US Airways' executive Brett Berman wrote in an internal

email █████████████████████████████████████████████████████████████████████████

███████████████████████

74.    Then, on *the very day* in February 2011 that US Airways signed the contract with

Sabre, US Airways discussed bringing an antitrust lawsuit to attack the core terms of the new

contract.  Specifically, █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████

75.    Even though US Airways specifically intended to challenge the very contract it

signed as anticompetitive, it did not reveal to Sabre its intent, or inform Sabre that it would take

the position that the contract's terms were anticompetitive or illegal.  Instead, US Airways wrote

Sabre self-serving emails complaining that it did not like terms of the negotiated agreement that

discovery has now revealed were part of the plan to set-up Sabre.  US Airways did not reveal its

intent to agree to the new contract and then sue to challenge it.  Instead, US Airways deliberately concealed the fact that US Airways intended to sue to undermine the contract rather than perform under the contract after signing.

76.     US Airways and Sabre entered into their agreement effective as of February 23, 2011.  US Airways filed suit just two months later.  US Airways acted maliciously and in bad faith, deliberately intending to invalidate the core terms of the agreement that it voluntarily signed so as to deprive Sabre of the benefits of the contract, rather than performing that contract in good faith.  By doing so, US Airways has called into question its intent to abide by its contractual commitment to provide its content to Sabre throughout the contract term, a commitment that is of great value to Sabre.  Part of the value that Sabre derived from the agreement was a cooperative three-year relationship that assured its travel agent subscribers that US Airways content would be available to them if they contracted with Sabre.

77.     This ███████ plan was pursuant to the overall conspiracy to withhold content from the GDSs.   Soon after generating these secret documents showing that US Airways planned to ██████ US Airways discussed ██████████████ with its competitor airlines.  American Airlines around the same time embarked on a similar litigation strategy against Sabre, with a specific plan to ████████████████ ██████ American then filed antitrust claims against Sabre soon after US Airways.

## F.     Other Conspiratorial Conduct

78.     US Airways and its co-conspirators have contacted each other directly to further the conspiracy.  For example, American Airlines and Air Canada began meeting as early as 2008 to discuss ██████████████████ ██████████████████ US Airways was sometimes

included in discussions between American Airlines and Air Canada.

79.    Further, as noted above, US Airways has recently continued contacts with American Airlines through their discussions about a potential merger, giving them ample additional opportunity to conspire.

**G.    US Airways and Co-Conspirator Actions in Furtherance of the Conspiracy**

80.    Sabre was and is able and willing to distribute content that US Airways and its co-conspirators airlines withheld pursuant to the conspiracy, including ancillary content.

81.    One example of withheld content was American Airlines' refusal, beginning in June 2010, to allow Sabre to sell a product called the "Boarding and Flexibility" package. Travelers purchasing this product can board early, fly confirmed standby, and avoid certain charges for flight changes.  American Airlines for some time distributed this product only through its website and its direct connect product.  American Airlines has since introduced other ancillary content, such as charging for seat assignments, that it has refused to provide to Sabre and instead distributed only through its website and its direct connect product.

82.    Other airlines have also withheld content from Sabre.  For example, Delta has not made its pay-for-seats product available through Sabre.

ANTICOMPETITIVE EFFECTS

## I.   Relevant Markets

83.    The horizontal conspiracy and boycott described above is a per se violation of the antitrust laws, and therefore allegations about the relevant market are not required.

84.    To the extent such allegations are deemed to be required, the relevant product market is for the provision of airline content for distribution.  The relevant geographic market is content relating to flights to, from, or within the United States and Canada and relevant submarkets therein.  US Airways and its co-conspirator airlines control a majority of the airline content in the relevant market.  They collectively have market power in it.

## II.   The Conspiracy Has Harmed and Will Continue to Harm Sabre and Competition

### A.   Anticompetitive Harm

85.    By conspiring on their terms of dealing with the GDSs, including conspiring to withhold content from the GDSs, US Airways and its co-conspirator airlines have and will harm competition, consumers, and Sabre.  The conspiracy has, and, unless restrained, will continue to, harm competition in the relevant market.

86.    US Airways and its co-conspirators airlines engaged in a purposefully anticompetitive scheme targeted at Sabre and other GDSs.  Instead of individually negotiating terms with GDSs as they would in a competitive market, the conspirators have agreed to fix the terms on which they will deal with GDSs, including as to content and price.  Sabre competes with other GDSs and distribution channels to provide travel agents with the ability to search for and book air travel and ancillary services.  The conspiracy described herein has, and, unless restrained, will continue to, impair Sabre's ability to compete for travel agent business.

87.    Further, the purposefully anticompetitive scheme described herein injured consumers that purchase air travel.  The anticompetitive injury to Sabre is inextricably

intertwined with this harm to consumers.  Absent the conspiracy described herein, consumers

would more fully benefit from competition among airlines because of the efficient comparison

shopping GDSs facilitate.  Prior to the conspiracy described herein, travel agents and consumers

could use GDSs to search across all or almost all content offered by all or almost all airlines.  But

the conspiracy to withhold content from the GDSs and, moreover, to offer a particular travel

agent or consumer only particular flights and fares, makes consumers pay higher prices and

choose worse flights.  The conspiracy against Sabre and other GDSs was the means by which the

airlines achieved these anticompetitive ends and, indeed, was a necessary step in doing so.

88.    The National Business Travel Association ("NBTA," recently renamed the

"Global Business Travel Association" or "GBTA" for short)—which represents over 5000

corporate members in 30 nations—warned that "Business travel buyers will ultimately foot the

bill for marketplace fragmentation caused by airline initiatives that push the travel distribution

marketplace in the wrong direction—away from transparency and competitiveness toward

confusion and higher costs."  Similarly, an NBTA survey of "business travel buyers" that was

announced in January 2011showed that 89% "expect an increase in travel costs" if the industry

moved away from GDSs and toward an airline-controlled distribution system, and 72% believed

such a system would "have a negative impact on the business travel industry."

89.    The Business Travel Coalition ("BTC")—which represents corporate officials

responsible for travel procurement across the United States and elsewhere—stated that "The

stakes in this conflict are clear: either an improved airline industry and distribution marketplace

centered around the consumer, or one that subordinates consumer interests to the self-serving

motivations of individual airlines endeavoring to shift costs and impose their wills on consumers

and the other participants in the travel industry."  A BTC survey indicated that 98% do not

support an airline-controlled distribution system and that 94% indicated that access to all content is either "indispensably important" or "very important" for their business travelers.

90.    The Consumer Travel Alliance—a non-profit organization that promotes consumer interests in travel—similarly issued the following statement about a dispute between American Airlines and Orbitz, a major online travel agent: "American appears to have no idea why we fly.  We fly to get from point A to point B in the most convenient and cost-effective manner possible.  We don't fly to be manipulated by proprietary airline reservation systems that limit our choices, prevent comparison shopping, and hide the real cost of travel."

### B.    The Conspiracy Has Harmed and Will Harm Sabre

91.    By reducing the content that Sabre can make available to travel agents, fixing the price terms on which Sabre can access it, and reducing the efficiency of offering that content, the conspiracy described herein has injured, and, unless restrained, will continue to injure Sabre.

92.    In particular, had US Airways and it co-conspirators distributed their content through Sabre, Sabre would have been able to sell that content to travelers.  The additional content would have made travel agents more likely to use Sabre, and those additional bookings would have increased Sabre's revenue.  Likewise, the additional content would have made travelers more likely to book travel through Sabre, again increasing Sabre's revenues.

93.    Beyond losing bookings, Sabre has also been harmed in competing for travel agent business generally because the withheld content makes its product less attractive to travel agents.  Similarly, the withheld content and other actions taken by US Airways and its co-conspirators have damaged Sabre's reputation as a reliable provider of content.

## CLAIM FOR RELIEF

## COUNT I—CONSPIRACY IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

94.   Sabre alleges and incorporates all prior paragraphs as though set forth fully herein.

95.   At least as early as 2007 and continuing through today, US Airways and its co-conspirators agreed on the terms on which they would deal with Sabre, which has and, unless restrained, will continue to reduce competition in the relevant market and harm Sabre.

96.   The conscious commitment to a common scheme, as described herein, constitutes a contract, combination, or conspiracy that unreasonably restrains trade and is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Alternatively, it is anticompetitive under the rule of reason and violates Section 1 of the Sherman Act.

97.   US Airways' and its co-conspirators' conduct has no lawful justification.  The conspiracy is not legitimate standard setting or a legitimate joint venture.

98.   US Airways' and its co-conspirators' conduct has caused and presents a real threat of causing significant injury to competition, consumers, and Sabre's business.

99.   Consumers have suffered and will continue to suffer injury from this reduced competition, including in the form of reduced price competition on incentive payments to travel agents and reduced competition on content, technology, and other dimensions.

100.  As a direct result of this conspiracy, Sabre has suffered and, unless restrained, will continue to suffer, injury, including monetary damages, and loss of reputation and goodwill.

101.  Under Section 4 of the Clayton Act, 15 U.S.C. § 15, Sabre is entitled to recover treble damages and the cost of suit, including a reasonable attorney's fee.

102.  Sabre now sues for actual damages, interest, costs of suit, injunctive relief, and reasonable attorney's fees.

## PRAYER FOR RELIEF

Accordingly, Sabre prays for entry of judgment in their favor as follows:

a.    A decree that US Airways has violated, and threatens to continue violating, the Sherman Act;

b.    A permanent injunction prohibiting US Airways and its agents, servants, employees, affiliates, divisions, and subsidiaries, and those in association with them, from agreeing or conspiring with other airlines on the terms on which they will deal with Sabre, including the content they will provide to Sabre (including withholding such content) or the monetary terms they will accept;

c.    A permanent injunction prohibiting US Airways and its agents, servants, employees, affiliates, divisions, and subsidiaries, and those in association with them from exchanging information about their  distribution plans or strategy, any terms of their agreements with Sabre, or their negotiations with Sabre;

d.    An award of three times its actual damages for the antitrust violation;

e.    An award of all costs in this action, including attorneys' fees and pre- and post-judgment interest; and

f.    Such other relief as this Court deems proper.

**JURY TRIAL DEMANDED ON ALL CLAIMS AND COUNTERCLAIMS**

DATED:  January 17, 2013                    Respectfully submitted,

_____

George S. Cary
Steven J. Kaiser
Larry C. Work-Dembowski
Kenneth Reinker
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
Phone:  (202) 974-1500
Fax:  (202) 974-1999
gcary@cgsh.com
skaiser@cgsh.com
lwork-dembowski@cgsh.com
kreinker@cgsh.com

Lev Dassin
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Phone:  (212) 225-2000
Fax:  (212) 225-2999
ldassin@cgsh.com

Karma M. Giulianelli
Sean C. Grimsley
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
1899 Wynkoop Street, 8th Floor
Denver, Colorado  80202
Phone:  (303) 592-3100
Fax:  (303) 592-3140
karma.giulianelli@bartlit-beck.com
sean.grimsley@bartlit-beck.com

Chris Lind
Andrew C. MacNally
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
Courthouse Place

54

54 West Hubbard
Chicago, IL  60654
Phone:  (312) 494-4400
Fax:  (312) 494-4440
chris.lind@bartlit-beck.com
andrew.macnally@bartlit-beck.com

*Attorneys for Sabre Inc., Sabre Holdings Corporation,*
*and Sabre Travel Int'l Ltd. d/b/a Sabre Travel Network*