UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   1/6/15
```

--------------------------------------------------------------X
:
US AIRWAYS, INC.,                                            :
                                        Plaintiff,           :
                                                             :         11 Civ. 2725 (LGS)
                    -against-                                 :         REDACTED
                                                             :         OPINION AND ORDER
SABRE HOLDINGS CORPOPATION, et al.,                          :
                                        Defendants.          :
-------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

        In this antitrust suit, Plaintiff US Airways, Inc. ("US Airways") alleges that Sabre

Holdings Corporation, Sabre Travel International Ltd., and Sabre GLBL Inc. (collectively,

"Sabre") charged US Airways grossly inflated airline booking fees and conspired with Sabre's

competitors to resist an innovative program developed by US Airways, costing the airline

industry and its consumers hundreds of millions of dollars.  US Airways seeks treble money

damages between $317 and $482 million in overcharges and lost profits (before trebling), for

conduct that took place from April 21, 2007, to March 31, 2014, and an injunction against the

future enforcement of contractual provisions that enabled the alleged overcharges.  Before the

Court is Sabre's motion for summary judgment.  For the reasons stated below, the motion is

granted in part and denied in part.  US Airways' potential damages are limited to booking

overcharges for the period from February 23, 2011, through October 30, 2012, estimated by US

Airways to range from $45 million to $73 million (before trebling).

I.      BACKGROUND

        The facts below are taken from the parties' Rule 56.1 statements, expert reports, and

submissions to the Court.  The facts are either undisputed or read in the light most favorable to

the non-moving party, US Airways.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986).

**B.     The GDS Business Model and Market**

1.     *The History of the GDS Business*

Sabre is one of three Global Distribution System ("GDS") operators in the United States. GDSs are computerized networks used by travel agencies to search for and book flights offered by multiple airlines.  Originally, the legacy airlines, such as US Airways, American, United and Delta, developed and ran their respective GDS systems, initially for their own employees and eventually for travel agents as well.

In 1992, federal regulators imposed a "mandatory participation" rule, which required the airlines to offer all GDSs the same flights and fares – referred to in the industry as "content" – available through their own respective GDSs.  Mandatory participation meant that travel agents could use just one GDS to obtain all flight information for multiple airlines, a practice referred to as "single-homing."  Conversely for the airlines, mandatory participation meant that each airline had to participate in multiple GDSs in order to make its fares accessible to all of the travel agencies, since the travel agencies were single-homing.

In response to mandatory participation, the airlines eventually divested themselves of all GDS ownership, a process that was completed by 2003.  In 2004, the Department of Transportation ("DOT") deregulated the GDS industry.  In doing so, the DOT acknowledged that government regulation had given Sabre and the other GDSs market power over the airlines because travel agency single-homing made airline participation in each GDS essential.  The DOT, however, assumed that the Internet and emerging technologies would create sufficient competition in the airline ticket distribution market and thereby erode the market power of the GDSs.

2.     *The GDS Market Today*

The GDS market in the United States today consists of three GDSs.  Sabre is the largest GDS and controls over 50% of the relevant market, defined by US Airways[1] as "GDS services in the U.S. that provide traditional travel agents the ability to search and book air travel on participating airlines by linking the airline and the agent in a manner that informs the agent of the airline's flight availabilities and enables the airline to receive the travel agents' bookings." Between 2006 and 2012, Sabre's market share ranged from 49% to 52%.  The other two GDSs are Travelport, with a market share of about 35%, and Amadeus, with a market share of about 15%.  No new competitors have entered the market since 1984.

All three GDSs derive their income from fees charged to airlines for bookings made by travel agents.  The GDSs are used primarily by "brick and mortar" travel agencies.  Those travel agencies exist almost exclusively to serve companies, which use travel agencies in order to control costs.  Corporate travel is critical to the traditional legacy airlines; in 2011, for example, corporate travel bookings through Sabre made up $4 billion or 38% of US Airways' revenue. Corporate travel is less important to "low-cost carriers," such as Southwest or JetBlue, which rely more on leisure travel.  Leisure travelers, for the most part, no longer use brick and mortar travel agencies and instead use online travel agencies ("OTAs") such as Expedia, Orbitz, or Travelocity (which is owned by Sabre), and Internet-based travel sites that link to airline websites such as Kayak and Google Flights.

Travel agencies frequently single-home with a particular GDS.  To help ensure loyalty, the GDSs pay travel agents "incentive payments" to use their GDS services.  From 2006 to 2012, for example, Sabre paid more than $1.2 billion in incentive payments to the top four brick and

---

[1] Sabre implicitly adopts US Airways' definition for purposes of the motion by basing its arguments on that definition.

mortar travel agencies, which are responsible for almost 89% of air travel bookings for the top 100 corporate travel accounts.  Without the incentive payments, most traditional travel agencies would be unprofitable.

According to US Airways, Sabre has used a variety of unlawful means, primarily contractual, to maintain its market power and to hamper the success of GDS new entrants (referred to in the industry as "GNEs") and airline websites attempting to sell fares directly.  US Airways identifies two potential GNEs, Orbitz's G2 SwitchWorks and ITA Software, which were prepared to charge significantly lower booking fees than Sabre and provide cheaper content.  Both potential GNEs failed.  Evidence adduced by US Airways indicates that Sabre may have played a role in their failure, through Sabre's contracts with the airlines.  Specifically, Sabre established a planning group called "Project Nike" tasked with helping Sabre maintain market share.  Project Nike concluded that the best way for Sabre to maintain its market share was to ensure that Sabre was able to offer the same fares as the lower cost distribution channels.  Documents memorializing Project Nike's discussions state that Sabre's contracts with the airlines were "the tactical vehicle Sabre has chosen to achieve its strategic goals."  US Airways contends that four allegedly anti-competitive provisions in Sabre's contracts with US Airways helped Sabre to maintain market dominance.

### C.    The Challenged Contractual Provisions

The first contract between Sabre and US Airways at issue in this action became effective on January 27, 2006.  That contract was followed without interruption by a second contract, also at issue here, which became effective on February 23, 2011.  The 2011 Agreement has an "initial term" until April 30, 2014, and is thereafter subject to automatic renewal for successive one-year periods until either party provides written notice of termination.

The parties agree that the 2011 Agreement is substantially similar to the 2006 Agreement

4

and that the provisions at issue in this action are included in both Agreements.  The challenged

provisions are the "Full Content" provision,[2] the "No Direct Connections" provision, the "Parity"

provision, and the "No Surcharge" provision, collectively referred to as the "Contractual

Restraints."

- The Full Content provision requires US Airways to provide through the Sabre GDS "all Fares . . . and all information regarding schedules and seat inventory related to Fares" and the parity provision of that clause requires that "in no case will the Fares provided through the Sabre GDS for Bookings in the Sabre GDS by Sabre Subscribers . . . be more expensive or less comprehensive than the Fares offered" by US Airways in any other forum.  According to US Airways, the Full Content provision is the primary contractual mechanism that enables Sabre to retain market share.

- The "No Direct Connections" provision requires US Airways not to "require or induce any [travel agent] to book on [its website]."

- The No Surcharge provision prevents US Airways from charging travel agents more for booking through Sabre.

- The Parity provision requires US Airways to offer all fares at equivalent prices, and also to provide Sabre GDS subscribers access to the same types, amounts and levels of products, services, functionality, enhancements, and promotional opportunities that are available on other distribution channels on non-discriminatory terms.  US Airways is also prohibited from "endors[ing], recommend[ing], promot[ing], market[ing], or sponsor[ing] any GDS in any manner that is more preferential or beneficial to that GDS" than its endorsement of Sabre.

US Airways asserts that each of these provisions was forced upon it by Sabre.  In

particular, US Airways claims that it asked Sabre to omit the Full Content provision from the

Agreements and that Sabre rejected the request.  Sabre maintains that US Airways readily agreed

to the Contractual Restraints in exchange for a lower booking fee.

### D.    Horizontal Agreements Among the GDSs

The GDSs do not compete for airline content, but instead compete for travel agency

business.  Sabre admits that it chooses not to compete with other GDSs for content because such

---

[2] US Airways refers to this provision as the "No Discount" provision.  For consistency, this Opinion uses the term "Full Content" throughout.

a move would effectuate a "race to the bottom."  The GDSs communicate with each other regularly, and their contracts with the airlines all contain similar provisions to those challenged by US Airways in this action.

In 2010, US Airways sought to introduce "Choice Seats" through the GDSs.  Choice Seats allows customers to pay for the option of selecting a better seat in advance, and before the 24 hour check-in period.  Choice Seats uses a "pull" method, requiring GDSs to "pull" seat pricing from US Airways' website, since the pricing is real-time.  The pull method is a departure from the traditional "push" method, whereby GDSs obtain seat pricing from public databases populated by the airlines.  According to US Airways, the GDSs determined that the pull method would be detrimental to their business.

When US Airways sought to introduce Choice Seats, Sabre, Travelport and Amadeus agreed that they should meet with US Airways at the same time to discuss Choice Seats because, according to one Sabre employee, US Airways was "trying to play [the GDSs] against each other" and the GDSs needed to "kill that."  When US Airways declined to meet with all three GDSs at once, the GDSs pursued "Plan B," which was for each to meet separately with US Airways and then "regroup" to "align on the approach."  As a result, none of the GDSs initially agreed to offer Choice Seats.  Finally, in November 2012, Sabre began to distribute Choice Seats. US Airways claims that it lost significant profits because of the coordinated refusal by the GDSs to offer Choice Seats when it was first conceived.

### E.    The Settlement Agreement

On October 30, 2012, Sabre and AMR Corporation ("AMR"), the parent company of American Airlines, executed an agreement that settled antitrust lawsuits brought by American Airlines against Sabre in state and federal court in Texas (the "Settlement Agreement").  On December 19, 2012, the Settlement Agreement became effective.  Three provisions in the

Settlement Agreement are relevant to Sabre's motion.  First, Section 5.1.4 of the Settlement Agreement prohibits AMR from contesting the legality of the agreement.  Second, Section 5.1.5 bars AMR from seeking relief from Sabre for an antitrust injury suffered after the execution date (October 30, 2012), for a period of seven years after the effective date (December 19, 2012). Third, Section 16 provides that the agreement is binding upon AMR, any reorganized AMR entity, and any entity that "merges or consolidates with, or purchases the assets of" AMR.

On December 9, 2013, US Airways Group and AMR merged to form American Airlines Group, Inc.  US Airways is now a wholly-owned subsidiary of American Airlines Group, Inc.

### F.      Plaintiff's Expert Testimony

#### 1.      *Professor Joseph Stiglitz*

In opposition to the motion, Plaintiff offers a declaration from Professor Joseph Stiglitz regarding the anti-competitive effects of the Contractual Restraints.  Professor Stiglitz opines that the Contractual Restraints restrain trade by disabling the price system in the airline ticket distribution market.  In other words, Sabre – a relatively high cost distribution channel – contractually prevents US Airways from adjusting the price of tickets to reflect the lower or higher cost of a particular distribution channel.  This decreases competition among distribution channels, and inhibits lower distribution costs, lower airfares, efficiencies and innovation that would result in a competitive market.

Specifically, the Full Content provision requires US Airways to offer through Sabre the same fares it offers through any other distribution channel, and thus prevents US Airways from using prices to "steer" travelers and travel agencies to lower cost distribution channels. Conversely, the No Charge provision prohibits US Airways from charging travel agencies or their customers a fee for booking through Sabre, and thus passing on the cost of Sabre's booking fees to Sabre users.  The Parity provision and the No Direct Connection provision also impede US

Airways from steering customers to other distribution channels.  As a result, Professor Stiglitz contends, Sabre is insulated from competition in the relevant market.

Professor Stiglitz further opines that Sabre's market power enables it to force the Contractual Restraints on US Airways and the other legacy carriers.  He illustrates Sabre's market power over the legacy carriers in four ways: insistence, market share, price discrimination and supra-competitive prices.  First, because nearly ninety percent of travel agencies in the United States single-home, GDSs are able to insist that airlines use their services, and accept their contractual terms, lest the airlines lose out on the business of travel agencies that exclusively use a particular GDS.  Second, Sabre has significant market share – about fifty percent of the market for corporate travel bookings, as discussed above.  Third, Sabre engages in price discrimination by charging different fees to different airlines, even though its costs of servicing each airline are not materially different.  Fourth, Sabre imposes supracompetitive fees – in the case of US Airways, Sabre charged ███ per segment in the first half of 2013, although the fee it would need to charge per segment to cover its costs is between ███████ .

Professor Stiglitz contends that the Contractual Restraints, which other GDSs also impose, prevent the airlines from putting competitive pressure on Sabre or passing on reduced ticketing costs to consumers.  As a result, Sabre is able to charge supracompetitive booking fees to US Airways and other airlines, resist innovation, and earn profits in excess of normal economic returns.  Professor Stiglitz hypothesizes that in a competitive world, without the Contractual Restraints, Sabre would have to lower its booking fee in order to avoid a diversion of bookings to lower cost channels.  If the Contractual Restraints were eliminated, Professor Stiglitz testifies that the cost of using Sabre's services would be borne by the travel agencies using those services.  Professor Stiglitz opines that Sabre consumers would benefit, even if the cost of the Sabre booking fee were passed on by them, because competition in the airline industry would cause US

Airways to pass on to consumers its lower distribution costs in the form of lower airfares.

Professor Stiglitz concludes that in a competitive market, US Airways would pay Sabre a booking fee of no more than ███, or alternatively, it would pay a net booking fee of █ per segment, after passing on the cost of Sabre's fees to Sabre users.  In reaching these estimates, Professor Stiglitz relies on booking fees paid by Southwest Airlines, a leisure travel airline over which Sabre does not exert market power.  Southwest pays Sabre ████ per segment, and ██████ ██████████████████████.

### 2.    *Professor Daniel McFadden*

US Airways submits a declaration from Professor Daniel McFadden to support its calculation of each of three categories of damages:  (1) booking fee overcharges for flight segments booked directly on Sabre; (2) booking fee overcharges for segments booked through Travelocity, Sabre's proprietary website; and (3) lost profits due to lost sales of Choice Seats, US Airways' preferred seating product.

Professor McFadden estimates (1) overcharge damages for the amount US Airways paid for bookings made directly on Sabre by calculating the difference between the amount of the booking fees US Airways actually paid to Sabre, and the booking fee US Airways would have paid in the competitive world hypothesized by Professor Stiglitz ████████████████████ and multiplying that number by the number of segments booked.  Professor McFadden estimates (2) overcharge damages arising from bookings made on Travelocity by multiplying the amount of the Sabre overcharge by the number of segments booked on Travelocity.  Professor McFadden estimates that the overcharges from US Airways bookings on Sabre and Travelocity were as follows:

| DAMAGES PERIOD | ASSUMED US AIRWAYS BOOKING FEE = ■ | ASSUMED US AIRWAYS BOOKING FEE = ■ |
|---|---|---|
| **4/21/07- 2/22/11** UNDER THE 2006 AGREEMENT | $140M | $232M |
| **2/23/11 – 10/31/12[3]** UNDER INITIAL PART OF 2011 AGREEMENT**:** | | |
| **SABRE BOOKINGS** | $ 45M | $ 73M |
| **TRAVELOCITY BOOKINGS** | $ 18M | $ 29M |
| **11/1/12 – 3/31/14** AFTER AMR SETTLEMENT | $ 52M | $ 86M |
| **TOTAL** | **$255M** | **$420M** |

Professor McFadden also estimates that if Sabre had offered Choice Seats, US Airways would have earned $62 million more in profit.

## II.     LEGAL STANDARD

Summary judgment is appropriate where the record before the court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of informing the court of the basis for the summary judgment motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor.  *See In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d Cir. 2008); *Anderson*, 477 U.S. at 255.

---

[3] Professor McFadden estimates damages through October 31, 2012, although the Settlement Agreement became effective on October 30, 2012.  This one day discrepancy is not material to the Court's analysis; at trial, however, US Airways may seek damages only for the period from February 23, 2011, up to and including October 30, 2012.  *See infra* § III.B.

If the non-moving party has the burden of proof on a specific issue, the moving party may satisfy its own initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim.  *See Celotex*, 477 U.S. at 322-23; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).  In other words, summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party carries its initial burden, then the non-moving party bears the burden of demonstrating a genuine issue of material fact.  *See id*.  In satisfying this burden, the non-moving party cannot rely merely on allegations or denials of the factual assertions of the moving party.  *See* Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 324.  Moreover, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).  The non-moving party must present specific evidence in support of its contention that there is a genuine dispute as to the material facts.  *See Celotex*, 477 U.S. at 324.  Furthermore, to demonstrate a genuine dispute as to the material facts, the non-moving party must come forward with sufficient evidence to permit a reasonable jury to return a verdict in its favor.  *See Anderson*, 477 U.S. at 248.

## III.   DISCUSSION

Sabre presents its motion for summary judgment addressing three distinct arguments: (1) statute of limitations; (2) preclusion of claims settled by the Settlement Agreement; and (3) remaining bases for summary judgment.  For the reasons that follow, summary judgment is granted on statute of limitations grounds as to all damages incurred before February 23, 2011; summary judgment is granted on the basis of the Settlement Agreement as to all damages incurred after October 30, 2012; and summary judgment on the remaining claims is granted in

part and denied in part.

### A.    Statute of Limitations

US Airways seeks damages from overcharges on bookings that it paid Sabre in the four years preceding the filing of this action, i.e., since April 21, 2007.  Sabre moves for summary judgment on any damages arising out of the 2006 Agreement – i.e., all damages incurred before February 23, 2011, when the 2011 Agreement became effective.  Sabre argues that those claims are time barred because they accrued when the contract was executed in 2006, more than five years before US Airways commenced this action.  Because the injury alleged by US Airways was fixed by the provisions of the 2006 Agreement, US Airways' cause of action under the 2006 Agreement accrued on the date the Agreement was executed and therefore is untimely.

Because the statute of limitations is an affirmative defense, Sabre carries the burden of showing that US Airways failed to plead timely claims.  *Overall v. Estate of Klotz*, 52 F.3d 398, 403 (2d Cir. 1995).  Under the Sherman Act's statute of limitations, damages are recoverable if a plaintiff files suit within four years after a cause of action accrues.  15 U.S.C. § 15b.  An antitrust cause of action generally "accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).  A plaintiff who timely files suit is entitled to recover damages suffered as of the filing date as well as all future provable damages.  *Id.* at 338-39.

Where the alleged anticompetitive harm arises from a contract, *Zenith*'s general accrual rule dictates that the cause of action accrues on the date the contract takes effect.  *See Rite Aid Corp. v. Am. Express Travel Related Servs. Co., Inc.*, 708 F. Supp. 2d 257, 265 (E.D.N.Y. 2010) ("Under *Zenith's* general accrual rule, any section one cause of action arising out Amex's merchant agreements accrued on the date that Plaintiffs' merchant agreements took effect.").  Two exceptions to *Zenith*'s general accrual rule are the speculative damages exception and the

continuing violation exception.  *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050-57 (5th Cir. 1982).  Neither exception applies here.

First, under the speculative damages exception, where *future* damages are "speculative or unprovable," *Kaiser*, 677 F.2d at 1051, a cause of action accrues "only on the date [those damages] are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted," *Zenith*, 401 U.S. at 339.  US Airways' damages were not "speculative" or "unprovable" during the four years following the execution of the 2006 contract.

Two cases are instructive in determining where this case falls on the spectrum of speculative damages.  In *Rite Aid*, the court found that the amount of the plaintiffs' damages from supracompetitive discount fees paid for purchases of Amex payment services was not reasonably ascertainable on the contract's execution date where the contract did not specify the payment schedule, the quantity of purchases or the size of the purchases, and Amex retained the right to increase the discount fee.  708 F. Supp. 2d at 266-67.  In contrast, in *Kaiser*, the Fifth Circuit affirmed the dismissal of the plaintiff's claims on statute of limitations grounds where the contract terms fixed the price, quantity, and delivery schedule, finding that "[t]he rights and liabilities of both parties were established" when the contract was executed.  677 F.2d at 1051-54.

The facts here more closely resemble those in *Kaiser*:  The 2006 Agreement fixed the booking prices, and provided a projected "volume threshold" for each calendar quarter; any volume sold in excess of the volume threshold for each quarter entitled US Airways to ██ for each booking in excess of the volume.  While the volume was not set in stone, the "threshold volume" indicates that the parties had some expectation of the volume of US Airways tickets that would be purchased using Sabre and used that estimated volume to define their respective rights and obligations.  Indeed, Sabre has adduced evidence that US Airways relied on its future booking volume estimates in agreeing to the 2006 Agreement.  While it was possible that the

volume of bookings would vary from the estimated volume, it cannot be said that US Airways' damages could not be reasonably estimated in 2006.  *Cf. Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406-07 (6th Cir. 1999) ("[A] plaintiff's own projections and experience during its years of operation" can be "sufficient to provide a reasonable basis for calculating damages" where quantity is uncertain).  Moreover, during the four-year limitations period following the effective date of the 2006 Agreement, US Airways accumulated increasing amounts of data concerning actual booking fees it paid to Sabre to replace and adjust its projections.

The second exception to *Zenith*'s general accrual rule, the continuing violation exception, is similarly inapplicable here.  It provides that a cause of action accrues "whenever the defendant commits an overt act in furtherance of an antitrust conspiracy or, in the absence of an antitrust conspiracy, commits an act that by its very nature is a continuing antitrust violation."  *Kaiser*, 677 F.2d at 1051 (citing *Zenith*, 401 U.S. at 338-40).

Courts in this Circuit differ as to whether and when the performance of a contract constitutes an overt act.  In *Rite Aid*, for example, the court concluded that "[p]erformance during the limitations period pursuant to an illegal prelimitations contract can constitute an overt act if resulting damages were speculative, within the meaning of *Zenith,* when the plaintiff executed the challenged contract."  708 F. Supp. 2d at 266.  In contrast, in *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, the court adopted a categorical rule that "the performance of an allegedly anticompetitive, pre-existing contract is not a new predicate act."  261 F. Supp. 2d 188, 229 (E.D.N.Y. 2003); *accord Grand Rapids Plastics*, 188 F.3d at 406 ("[E]ven if the payment agreement constituted a continuing violation . . . the individual payments . . . were only a manifestation of the previous agreement.  The individual payments therefore do not constitute a 'new and independent act,' as required to restart the statute of limitations."); *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) (same).  The distinction made by the *Rite Aid* court

seems to render the speculative damages exception redundant.  Accordingly, the latter view espoused by the *Ciprofloxacin* court is more persuasive.  Here, US Airways' continued payments of alleged overcharges under the 2006 Agreement were not new or independent acts.  Accordingly, the continuing violation exception is not applicable.

In asserting that its claim under the 2006 Agreement is timely, US Airways' principal argument is that the Second Circuit's holding in *Berkey Photo, Inc. v. Eastman Kodak Co.* is applicable to the facts of this case.  In *Berkey*, which involved a Section 2 monopoly claim, the Second Circuit held that a cause of action by a purchaser forced to pay overcharges as a result of a monopolist's conduct accrues on the date the overcharges are paid.  *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979).  The court reasoned that while a competitor may suffer injury at the time of the anticompetitive conduct, "a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price."  *Id.*

The purchaser-competitor distinction is logical in the case of a monopoly, where the purchaser suffers no harm until "the monopolist actually sets an inflated price and its customers determine the amount of their purchases."  *Id.*  The reasoning is less persuasive when the purchaser was a counterparty to an allegedly illegal contract, who knew when the contract was executed the allegedly inflated price it was required to pay and the allegedly anticompetitive effects of the contract.  The two non-binding cases US Airways cites do not alter this analysis.  While the courts in both cases applied *Berkey* in the context of a Section 1 claim, neither case was brought by a purchaser alleging that its own contract was anticompetitive.  Rather, both were brought by direct consumers of the allegedly anticompetitively priced products.  *See In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 380 (S.D.N.Y. 2002) (holding that Section 1 claims of direct purchasers of buspirone products were not barred by the statute of limitations);

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08 Civ. 42, 2011 WL

7053807, at *47 (E.D.N.Y. Jan. 4, 2011) (concluding that Section 1 claims of consumers who

purchased freight forwarding services were not barred by the statute of limitations).  The

analogue to those cases would be the application of *Berkey* in a case brought by the travel

agencies using Sabre to purchase US Airways tickets, and having no reason to know of the

contractual terms fixing the allegedly anticompetitive prices.  In such a case, it may be that

*Berkey*'s rule would logically extend to the travel agency purchasers' claim, although that

question is not at issue here.

Accordingly, US Airways' claims for damages arising out of the 2006 Agreement are

barred.  The claims arising out of the 2011 Agreement – that is, claims for damages arising on or

after February 23, 2011, the date the 2011 Agreement became effective, are timely.

### B.    Settlement Agreement

Sabre moves for summary judgment on US Airways' claims arising out of conduct that

occurred after October 30, 2012, the date the litigation bar in the Settlement Agreement became

effective.  Sabre and AMR's agreement contained a non-contestability clause and a covenant not

to sue for harm suffered after October 30, 2012, and also bound any future merged entities.  US

Airways, in an effort not to run afoul of the non-contestability clause, argues that public policy

concerns might prevent enforcement of the Settlement Agreement and asks the Court to delay

adjudication of the issue until after trial.  Because US Airways is bound by the Settlement

Agreement and public policy does not preclude its enforcement, summary judgment is granted to

Sabre for any alleged harm suffered after October 30, 2012. [4]

---

[4] US Airways also seeks an injunction barring Sabre from enforcing the Contractual Restraints in
the 2011 Agreement, which remains in force.  Sabre argues that the doctrine of laches bars US
Airways' request to enjoin Sabre from enforcing the 2011 Agreement.  Because Sabre's motion
for summary judgment precluding injunctive relief is granted on account of the Settlement

There is an unquestioned public interest in the private enforcement of the antitrust laws. On the other hand, "[r]epose is especially valuable in antitrust, where tests of legality are often rather vague, where many business practices can be simultaneously efficient and beneficial to consumers but also challengeable as antitrust violations . . . ." *Xerox Corp. v. Media Scis., Inc.*, 609 F. Supp. 2d 319, 326 (S.D.N.Y. 2009) (quoting II Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 320a, at 282 (3d ed. 2007)).

Weighing these competing concerns, and analyzing them in the unique factual circumstances of this case, the Settlement Agreement here does not violate public policy.  AMR and Sabre sought to resolve their dispute in light of an ongoing business relationship.  *Accord Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (construing the agreement "in light of the business purposes sought to be achieved").  AMR did not release antitrust claims against Sabre for all conduct into eternity but for a limited period of time.  *Cf. Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322 (1955) (declining to enforce an agreement which extinguished forever the plaintiffs' antitrust claims arising out of uncontemplated conduct).

Sabre's motion for summary judgment precluding injunctive relief and damages arising out of conduct after October 30, 2012, accordingly is granted.

### C.    Remaining Claims

US Airways' remaining claims are for harm suffered as a result of vertical restraints, which are restraints between firms in different segments of a market, pleaded in Count One of the Complaint ("Count One Claim"), and horizontal restraints, pleaded in Count Four of the Complaint ("Count Four Claim").  Sabre moves for summary judgment on the remaining claims, asserting that: (i) US Airways fails to establish that the Contractual Restraints operate as a restraint on trade in violation of the Sherman Act; (ii) US Airways lacks antitrust standing; and

---

Agreement, the laches argument is moot.

(iii) US Airways fails to show a triable issue of fact as to the existence of a horizontal conspiracy among the GDSs.  Summary judgment on both the Count One Claim and the Count Four Claim is granted in part and denied in part.  In light of the rulings above, potential damages flowing from US Airways' surviving claims are limited to the period from February 23, 2011, the date the 2011 Agreement became effective, through October 30, 2012, the date the litigation bar in the Settlement Agreement became effective.

### i.        Count One Claim – Vertical Restraints on Trade

Sabre moves for summary judgment on the Count One Claim, asserting that the Contractual Restraints do not impose unreasonable vertical restraints on trade.  Sabre's motion for summary judgment is denied because US Airways has presented evidence from which a reasonable jury could conclude that the Contractual Restraints place an unreasonable restraint on trade that has damaged US Airways.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  The Supreme Court "has not taken a literal approach to this language," but instead "has long recognized that Congress intended to outlaw only *unreasonable* restraints."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 315 (2d Cir. 2008) (citing *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (emphasis in *Dagher*)).  The "Court presumptively applies rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful."  *Id.*

"Under the rule of reason, the plaintiffs bear an initial burden to demonstrate the defendants' challenged behavior had an actual adverse effect on competition as a whole in the relevant market."  *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506-07 (2d Cir. 2004) (internal quotation marks and citations omitted).  "Because the antitrust laws protect

competition as a whole, evidence that plaintiffs have been harmed as individual competitors will not suffice." *Id.* "If the plaintiffs satisfy their initial burden, the burden shifts to the defendants to offer evidence of the pro-competitive effects of their agreement." *Id.* "Assuming defendants can provide such proof, the burden shifts back to the plaintiffs to prove that any legitimate competitive benefits offered by defendants could have been achieved through less restrictive means." *Id.* "Ultimately, the factfinder must engage in a careful weighing of the competitive effects of the agreement – both pro and con – to determine if the effects of the challenged restraint tend to promote or destroy competition." *Id.* at 507.  In other words, on a summary judgment motion, if each party sustains its respective burden on the three prongs of the rule of reason analysis, the motion should be denied and the finder of fact should decide whether the defendant has engaged in an unreasonable restraint on trade.  *See, e.g.*, *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 221 (S.D.N.Y. 2014).

### 1. *Actual Adverse Effect on Competition as a Whole in the Relevant Market*

Plaintiff has met its initial burden to show an actual adverse effect on competition as a whole in the relevant market.  A plaintiff may show an actual adverse effect on competition by showing increased prices, reduced quality, or reduced outputs.  *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001) (citing *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998); *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993)).  Alternatively, a plaintiff can show an adverse effect "indirectly," by establishing that a defendant had "market power" plus "some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior . . . ."  *Tops Mkts. Inc.*, 142 F.3d at 96-97 (citing *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 128 (2d Cir. 1995)).  "Market power" is "the ability of a single seller to raise price[s] and restrict output."  *Eastman*

*Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 464 (1992) (internal quotation marks and citations omitted).

US Airways has adduced evidence that the Contractual Restraints eliminate competition in the relevant market and enable Sabre to charge supracompetitive booking fees, causing an actual adverse effect on competition as a whole in the relevant market. US Airways' evidence of supracompetitive prices consists of the following: (1) Sabre charges a much lower booking fee to Southwest, a "leisure" airline, which is outside the relevant market and over which Sabre does not exercise market power; (2) Sabre's prices result in "economic profits," or returns after compensating the firm's owners for the cost of capital, in excess of 35%, sometimes exceeding 75%; whereas in an efficient market they allegedly should be 0%; (3) the booking fee Sabre charges US Airways has consistently increased since 2006, even while Sabre's cost per transaction has decreased due at least in part to advances in technology; and (4) Sabre's marginal cost is about ███ per segment, but it charges US Airways ███ per segment, resulting in an operating margin of more than 670%. *Cf. In re ATM Fee Antitrust Litig.*, No. 04 Civ. 2676, 2010 WL 2557519, *9 (N.D. Cal. June 21, 2010) (considering evidence of declining costs and simultaneous increase in fee as evidence of market power). This evidence is sufficient to demonstrate that Sabre's prices are higher than they would be in a competitive market and that the Contractual Restraints thereby have an actual adverse effect on competition.

US Airways also satisfies the alternative means for showing an adverse effect on competition with evidence that Sabre has "market power" plus "some other ground for believing that the challenged behavior could harm competition in the market." Sabre does not contest its market power in the relevant market. In addition, US Airways has submitted Professor Stiglitz's testimony, which provides an ample theoretical basis to conclude that the Contractual Restraints could have an adverse effect on competition.

Sabre makes three principal arguments disputing that the Contractual Restraints have an actual adverse effect on competition.  These arguments merit serious consideration, but do not alter the conclusion that US Airways has met its initial burden to show an adverse effect on competition.  Sabre's arguments are appropriate for the jury, but do not dispose of the vertical restraint claim on summary judgment.

First, Sabre argues that US Airways cannot show "substantial foreclosure of the market" and has failed to identify actual excluded competitors.  While such factors may be indicia of an actual adverse effect on competition, they are not the only indicia.  An adverse effect also may be shown by evidence of increased prices, as US Airways has done.  Nor does the case law selectively quoted by Sabre support its argument.  As one example, Sabre quotes *Jefferson Parish* for the proposition that "'there can be no adverse effect on competition' when 'no portion of the market which would otherwise have been available to other sellers has been foreclosed.'"  The quoted discussion involves application of the per se rule to an illegal tying arrangement, and states in dicta that "when a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed."  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984).

Even if US Airways were required to show substantial foreclosure of the market or identify actual excluded competitors, it has satisfied its burden by adducing evidence that no competitors have entered the market in the past 30 years, in spite of the attempts of several entrants, including G2 Switchworks and ITA.  Sabre argues that those companies would have failed for competitive reasons, but that is a factual argument for the jury.  Moreover, Sabre's argument that US Airways needs to point to a specific "dead body" in order to show that barriers to entry exist is incorrect, and equivalent to saying that a firm will be immune from antitrust

scrutiny if it can erect sufficiently high barriers to entry.

In addition, substantial evidence, including statements from Sabre's own CEO, shows that Sabre believed the Contractual Restraints were responsible for preventing the entry of competitors and for helping it maintain market power.  For example, internal presentations from the "Nike" team tasked with maintaining Sabre's market position specifically identify Full Content as a contractual means to insulate Sabre from competitors, noting that Full Content "increases GDS value" because "[t]he more agencies obtain content outside of the GDS, the less reliant agencies are upon GDS."

Second, Sabre argues that US Airways' "steering theory" fails because (i) the Contractual Restraints do not prevent US Airways from steering bookings to GDS competitors and (ii) US Airways has failed to produce "non-speculative evidence" from which a reasonable jury could conclude that costs to consumers would decrease if US Airways were able to steer travel agents away from booking through Sabre.  Sabre thus takes issue with the analyses and opinions of US Airways' experts, Professors Stiglitz and McFadden.  This challenge to expert testimony is for the jury, provided the proffered experts' opinions are reasonable and factually based.  Here, Professor Stiglitz reasonably explained the basis for his testimony that Sabre's fees in a competitive market would fall towards ███ the price it charges Southwest for its services.  He also opined that competition among airlines would cause the airlines to pass on their savings to consumers.  Sabre will have the opportunity, at trial, to convince the fact finder that these expert opinions are erroneous and that in US Airways' but-for world, prices would increase, but these are not issues to be resolved on this motion.

Finally, Sabre argues that the Contractual Restraints cannot have been anticompetitive because US Airways paid lower booking fees in exchange for agreeing to them.  US Airways disputes, however, that a contract without the challenged provisions, including Full Content, was

on the table during the contract negotiations. Moreover, the mere fact that Plaintiff "ma[d]e the best of a bad situation" and "accepted many of these restraints solely because their acquiescence was necessary to obtain an otherwise attractive business opportunity . . . does not give the supplier immunity if the arrangement is one of those schemes condemned by the antitrust laws." *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139-140 (1968) *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) (internal quotation marks and citation omitted). Plaintiff has met its burden of showing that the Contractual Restraints harmed competition even if US Airways may have received some reduction in Sabre's supracompetitive price for agreeing to the Contractual Restraints.

### 2.  *Procompetitive Effects of the Agreement*

Under the rule of reason burden shifting analysis, once a plaintiff meets its burden of showing an actual adverse effect on competition, the defendant must offer evidence that the contract had pro-competitive effects. Sabre has met its burden.

First, Sabre argues that the Full Content provisions are procompetitive because they ensure that all consumers are able to see the lowest-price fares across all networks. It is undisputed that providing access to all fares is procompetitive, because consumers can more easily find the best flight for their needs and can comparison shop more easily. Sabre also contends, and supports with evidence from travel agents, that Full Content is procompetitive because it enables efficient searching by travel agents and reduces the time spent to make and change reservations. Contract provisions that result in a better or more efficient product to meet consumer demand are procompetitive. *See Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54-55 (1977).

Sabre further contends that the other Contractual Restraints are procompetitive. The Parity and No Surcharge provisions, Sabre argues, ensure that US Airways is unable to

undermine Full Content by charging Sabre customers more for booking through Sabre, increasing the price of tickets and depriving Sabre of Full Content.  Finally, Sabre argues that the Parity and No Surcharge provisions deter free-riding on their service, because without them travel agents could search for flights on Sabre's portal before booking the flights through other, lower-cost means.  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890-91 (2007) (explaining that restrictions on discounting retailers to prevent free riding are procompetitive).  These asserted procompetitive effects serve to shift the burden back to US Airways.

### 3.  *Legitimate Competitive Benefits, Less Restrictive Means and Balancing*

The "burden shifts back to the [plaintiff] to prove that any legitimate competitive benefits offered by [the defendant] could have been achieved through less restrictive means."  *Geneva Pharm. Tech. Corp.*, 386 F.3d at 507.  US Airways presents evidence that Sabre's stated goals could have been achieved through less restrictive means and that the stated goals are not legitimate.  Because US Airways has met its burden, it has raised a genuine issue of material fact regarding the competitive impact of the Contractual Restraints, and summary judgment is denied.

First, US Airways notes that "comparison" shopping is easily achieved without the Contractual Restraints.  US Airways publishes all of its fares online, makes them available to Kayak and Google Flights, and has no motive to withhold them from the GDSs.[5]

Second, US Airways argues that Sabre's anti-freeriding justification could be achieved through less restrictive means; Sabre could charge per-search rather than per booking in order to deter free riding in a less restrictive manner.  It is not for the Court to resolve this debate.  The weighing of these contentions is properly left for the jury at trial.  *See Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 220-21 (S.D.N.Y. 2014).

───────────────────

[5] US Airways concedes, however, that comparison *booking* cannot be as easily achieved without the "one stop booking" that Sabre offers.  It argues that the absence of software enabling "one stop booking" is a result of Sabre's own "stym[ing] [of] the deployment" of such software.

In sum, US Airways has adduced evidence upon which a reasonable jury could find that the Contractual Restraints constitute an unlawful restraint in trade, in violation of Section 1 of the Sherman Act.  Summary judgment is denied, and the portion of Count One that is not foreclosed by the above disposition based on statute of limitations and the Settlement Agreement may proceed to trial, except to the extent summary judgment is granted below as to US Airways' claims for certain categories of damages resulting from the alleged unlawful vertical restraint in trade.

### ii.    US Airways' Antitrust Standing

Sabre moves for summary judgment on the ground that US Airways lacks antitrust standing.  The Second Circuit applies a two-prong test to assess antitrust standing: "a plaintiff must show (1) antitrust injury, which is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful,' and (2) that he is a proper plaintiff in light of four 'efficient enforcer' factors: [i] the directness or indirectness of the asserted injury; [ii] the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; [iii] the speculativeness of the alleged injury; and [iv] the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries."  *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (internal citations omitted and alterations added).  Sabre challenges the antitrust injury prong, as well as the first and third "efficient enforcer" factors.[6]  Summary judgment for lack of standing is granted in part and denied in part.

_____

[6] Sabre does not address causation or speculative damages within the rubric of standing.  Because analysis of both factors is part of a standing analysis, the Court considers both factors in its discussion of standing.

*1. Antitrust Injury*

Sabre contends that two of the injuries asserted by US Airways – booking fee overcharges, and lost profits from Sabre's initial refusal to implement Choice Seats – do not constitute antitrust injury.  US Airways has satisfied its burden in respect of the overcharges, but has not satisfied its burden in connection with lost profits from Choice Seats.  Therefore, summary judgment is granted on Plaintiff's claim to the extent it is based on Sabre's failure to implement Choice Seats and denied with respect to booking fees.

"The requirement that plaintiffs demonstrate antitrust injury when bringing a private antitrust action 'ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place.'"  *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990)).  Courts in the Second Circuit employ a "three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury."  *Id.*  "First, the party asserting that it has been injured by an illegal anticompetitive practice must identify the practice complained of and the reasons such a practice is or might be anticompetitive."  *Id.* (internal quotation marks and alteration omitted).  Second, courts "identify the actual injury the plaintiff alleges" and look to "the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct."  *Id.* (internal quotation marks omitted).  Third, courts compare the "anticompetitive effect of the specific practice at issue" to "the actual injury the plaintiff alleges."  *Id.* (internal quotation marks omitted).  "It is not enough for the actual injury to be causally linked" to the asserted violation, but instead, "in order to establish antitrust injury, the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful."  *Id.* (internal quotation marks omitted).

#### A.   Booking Fee Overcharges

US Airways has standing to pursue its claim for booking fee overcharges.  The practice complained of – the imposition of the Contractual Restraints – is anticompetitive because it allegedly restricts price competition in the market for GDS services, thus forcing US Airways to pay above-market prices, and possibly increasing ticket prices across the board.  The supracompetitive fees complained of are classic "overcharge" damages.  *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968) ("when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage.").  Overcharge claims fall squarely within the Sherman Act's purpose – "to assure customers the benefits of price competition."  *Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983) ("*AGC*").

Sabre counters with two arguments, neither of which is persuasive.  First, Sabre asserts that there is no "overcharge," because US Airways merely seeks to pass on the cost of the Sabre booking fee to travel agencies, and ultimately, to consumers, and has not shown that the fee would be any less in the but-for competitive world contemplated by Professor Stiglitz.  This argument ignores US Airways' contention that but for the Contractual Restraints, Sabre's booking fee would be lower because of competitive forces, regardless of who paid that fee.

Second, and relatedly, Sabre argues that US Airways' inability to surcharge parties for using Sabre is not an antitrust injury because preventing a surcharge is a "proconsumer" device.  In making this argument, Sabre relies on *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 90 (6th Cir. 1989), which is factually distinguishable.  In that case, a credit card network prevented truck stops from imposing on credit card users a surcharge of more than 105% of the price it charged consumers paying cash.  *Id.* at 87.  The Sixth Circuit held that the surcharge cap

was not an anticompetitive injury because the cap reduced costs to consumers, rather than increasing them. *Id.* at 90. In that case, the surcharge cap was not an anti-steering device, but rather was an anti-gouging device. In other words, the surcharge enabled the defendant to steer, and the cap prevented truck stops from charging excessive prices in doing so. In contrast here, the Contractual Restraints are unquestionably an anti-steering device, and therefore anti-competitive for purposes of antitrust standing.

## B. Lost Profits from Choice Seats

In contrast with the overcharges, the lost profits from Choice Seats do not constitute antitrust injury. The lost profits result from Sabre's alleged refusal to offer Choice Seats between 2010 and November 2012. US Airways argues that its lost profits from Choice Seats resulted from Sabre's anti-competitive conduct in two ways: First, the Contractual Restraints promoted and preserved Sabre's market power, which enabled it to refuse to innovate as it would have had to do in a competitive market. And second, the GDSs engaged in a horizontal boycott of Choice Seats until November 2012, when Sabre began to offer the program. Because US Airways has failed to show that the Choice Seats damages constitute antitrust injury, summary judgment is granted on the Choice Seats claim.[7]

US Airways' first argument is that competition was harmed because Sabre obstructed a particular innovation – Choice Seats. A firm's decision to adopt or not to adopt a new product, however, is ordinarily a business decision within the province of the firm, and (at least in the Section 2 context) has been uniformly rejected as a basis for antitrust liability. *See Oahu Gas Serv., Inc. v. Pac. Res. Inc.*, 838 F.2d 360, 369 (9th Cir. 1988) ("A line of 'product innovation' cases has consistently rejected antitrust liability for a monopolist's decision about when or

---

[7] Because US Airways does not have standing to pursue the Choice Seats claim, Sabre's alternative arguments for summary judgment on this claim are not addressed.

whether to market new products.") (citing cases); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 925 n.7 (3d Cir. 1999) ("Without more, it is not unlawful for any competitor in any market to delay the introduction of a new product or an entire line of new products until, as [plaintiff] alleged in this case, the competition forces such introduction."); *GAF Corp. v. Eastman Kodak Co.*, 519 F. Supp. 1203, 1231 (S.D.N.Y. 1981) ("Ordinarily, a firm may market new products if and when it chooses. . . . To create the possibility that treble damages might be awarded on the basis of a finding (made with the benefit of hindsight) that a firm's failure to introduce a product was anticompetitive would impose a significant chilling effect on innovation and research not envisioned by [section two]."). Here, Sabre may have had any number of legitimate business reasons for not implementing Choice Seats, and its refusal to do so does not, on its own, establish a basis for antitrust liability or cause an injury that the antitrust laws were intended to remedy.

Similar logic applies to US Airways' horizontal conspiracy argument; the antitrust laws do not enable US Airways to foist a particular product on the GDSs. A collective decision among competitors to refuse a particular product or innovation could run afoul of the antitrust laws, if a plaintiff were able to show that the collective decision harmed competition, for example, by reducing output or restricting prices. *Cf. Steamfitters*, 171 F.3d at 925 n.7 ("[I]t is at least unclear whether . . . an agreement [among competitors to delay introduction of a product] would constitute an antitrust violation absent allegations that the delayed introduction of the product involved an attempt to artificially raise prices for existing products, exclude non-conspiring competitors from a market, or accomplish some other conventional anticompetitive effect."). But that is not US Airways' contention here.

In arguing that the Choice Seats lost profits constitute antitrust injury, US Airways relies on *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 241 (2d Cir. 2003), which does not compel a

different conclusion.  That case did not address antitrust standing.  Rather, the Second Circuit there affirmed the district court's holding that the "exclusivity rules" of two card payment networks, Visa and MasterCard, violated the antitrust laws.  The exclusivity rules prohibited banks that were members of either Visa or MasterCard from issuing credit cards for the other two major card payment networks, Amex and Discover.  The Second Circuit ruled that the "most persuasive evidence of harm to competition" was the "total exclusion of American Express and Discover from a segment of the market for network services."  *Id.* at 240.  This exclusion, in turn, harmed competition because "price and product competition is necessarily limited."  *Id.*  Here, in contrast, US Airways has not argued that the refusal to implement Choice Seats reduced or limited competition in any way.  Accordingly, US Airways lacks standing to pursue the Choice Seats damages.

### 2.  *The Directness or Indirectness of US Airways' Injuries*

Sabre contends that the Contractual Restraints were not a material cause of the booking fee overcharges and the Travelocity damages.  A sufficient causal connection exists for the overcharges, but does not exist for the Travelocity damages, and summary judgment is therefore granted on the Travelocity damages.

### A.  *Overcharges*

Plaintiff has shown a sufficient causal connection between the Contractual Restraints and the overcharges.  The expert testimony of Professor Stiglitz, discussed in detail above, is evidence from which a reasonable jury could conclude that but for the Contractual Restraints, price competition would be unrestricted, and the Sabre fee would decrease as a result of market forces.  Accordingly, Sabre's argument is unpersuasive and summary judgment is denied.

### B.  *Travelocity Damages*

US Airways has not shown that the Travelocity damages are sufficiently linked to the

challenged conduct – the Contractual Restraints.  US Airways did not pay Travelocity fees to Sabre, nor were they paid under the 2011 Agreement.  Instead, US Airways paid Travelocity directly under a separate agreement negotiated with Travelocity.[8]  Further, Travelocity operates in the OTA market, and this action pertains specifically to the market defined by Plaintiff's own expert, Professor Stiglitz, as domestic airline ticket bookings made by traditional travel agents via a GDS.

US Airways attempts to show a causal connection by arguing that the Travelocity damages were a result of the leverage Sabre asserted in the relevant market.  Specifically, US Airways claims that Sabre conditioned execution of the 2011 Agreement on US Airways' continued participation in Travelocity and acquiescence to certain terms in the Travelocity agreement.  Even accepting US Airways' evidence on this point, as required on Sabre's summary judgment motion, the relationship is too attenuated and indirect between the Contractual Restraints and Sabre's alleged resulting market power in the GDS market, on the one hand, and Travelocity's ability to charge allegedly inflated prices in the separate OTA market on the other hand.  Because the causal link between the Contractual Restraints and the Travelocity damages is insufficient, US Airways' claim for Travelocity damages fails.  *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 402 (S.D.N.Y. 2011) (failure to assert direct link "between the price of Internet Music, the market where the alleged misconduct occurred, and the price of CDs, which could be affected by totally distinct market forces or costs of production" disposed of claim).  Further, even if US Airways were able to show causation, Plaintiff fails to present evidence from which a reasonable jury could conclude that the fees paid to Travelocity are supracompetitive, or that Travelocity fees are unconstrained by competition with other OTAs

---

[8] US Airways disputes that the Travelocity fees were paid under a separate agreement.  It is undisputed, however, that the Travelocity fees are not addressed in the 2011 Agreement at issue here.

such as Orbitz and Expedia.

Plaintiff relies on two inapposite cases to support its alleged Travelocity damages.  In *Loeb Indus., Inc. v. Sumitomo Corp.*, the defendants allegedly fixed prices in the copper futures market.  Claims by purchasers of physical copper were permitted because "the price of physical copper . . . is directly linked to the . . . price for copper futures."  306 F.3d 469, 476 (7th Cir. 2002).  *In re Linerboard Antitrust Litigation* involved vertically integrated producers restricting production of linerboard, which was a component of the end product, corrugated packaging.  305 F.3d 145, 159 (3d Cir. 2002).  Purchasers of corrugated materials had antitrust standing because restricting linerboard output *necessarily* increased the price of the corrugated packaging, as it was a required component.  Here, the OTA market is subject to its own competitive forces, and there is no necessary link between the fee for those bookings and the fee for GDS travel bookings.

Because the Travelocity damages do not flow directly from the challenged conduct, and because there is no evidence from which a reasonable jury could conclude that Travelocity prices and Sabre prices are directly linked, summary judgment is granted on Travelocity damages.

### 3.  *Speculative Damages*

Sabre challenges the booking fee overcharge, the Travelocity overcharges and the Choice Seats damages, alleging that they are too speculative.  Because summary judgment is granted on the Choice Seats and Travelocity claims, only the booking fee overcharge claim is addressed.  On that claim, US Airways has made a showing that its damages are sufficiently quantifiable.

Whether an injury is speculative in the antitrust standing context requires inquiry into the calculation of damages.  *E.g.*, *AGC*, 459 U.S. 519.  Where damages are indirect or independent factors contribute to the alleged injury, damages may be too speculative for antitrust standing.  *Id.* at 542.  Neither circumstance exists here.

US Airways is a direct purchaser of Sabre's services, which undermines the argument that

independent factors contributed to US Airways' payment of overcharges.  *Cf. Ill. Brick Co. v.*

*Illinois,* 431 U.S. 720 (1977) (only direct purchasers have standing to bring antitrust claims).

Plaintiff's overcharge damages are also reasonably measurable, as demonstrated by Professor

McFadden, who quantifies booking fee overcharges by comparing the fees actually charged to the

hypothetical booking fees that would exist in a competitive market.  The hypothetical booking

fee, in turn, is based on reliable indicia, including Sabre's marginal costs of operation, and the

comparative fee paid by an airline that is not subject to the Contractual Restraints, Southwest.

This calculation provides a reasonably reliable method of measuring the overcharges.

### iii.   Horizontal Restraints in Trade

US Airways alleges that Sabre and the other GDSs engaged in a horizontal agreement to

restrain trade, in violation of Section 1 of the Sherman Act.  Specifically, US Airways contends

that the three GDSs agreed to limit competition among themselves, and expressly agreed not to

compete on "content" (i.e., fares and amenities offered by the airlines), thereby entrenching their

collective dominance in the relevant market.  Sabre moves for summary judgment, arguing that

US Airways has not proffered evidence of any agreement beyond parallel behavior, which is

insufficient evidence of an antitrust conspiracy.  Because US Airways offers evidence of

numerous "plus" factors in addition to evidence of parallel behavior, Sabre's motion for summary

judgment is denied.

"To survive a motion for summary judgment . . . a plaintiff seeking damages for a

violation of § 1 must present evidence that tends to exclude the possibility that the alleged

conspirators acted independently."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 588 (1986) (internal quotation marks and citation omitted).  "[T]he antitrust plaintiff

should present direct or circumstantial evidence that reasonably tends to prove that the

manufacturer and others 'had a conscious commitment to a common scheme designed to achieve

an unlawful objective.'"  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)

(quoting *Edward J. Sweeney & Sons, Inc. v. Texaco Inc.*, 637 F.2d 105, 111 (3d Cir. 1980)); *see*

*also Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946) ("Where the circumstances are

such as to warrant a jury in finding that the conspirators had a unity of purpose or a common

design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that

a conspiracy is established is justified.").

     While parallel behavior "is admissible circumstantial evidence from which the fact finder

may infer agreement," it does not itself constitute a violation of the Sherman Act, because it is

"consistent with conspiracy, but just as much in line with a wide swath of rational and

competitive business strategy unilaterally prompted by common perceptions of the market."  *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 553–54 (2007).  Therefore, "courts have held that a plaintiff

must show the existence of additional circumstances, often referred to as 'plus' factors, which,

when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a

conspiracy."  *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987).  These plus factors

include: "a common motive to conspire; evidence that the parallel acts were against the apparent

economic self-interest of the individual alleged conspirators; or evidence of a high level of

interfirm communications."  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 62 (2d Cir. 2012).

     US Airways points to sufficient evidence from which a reasonable jury could find a

conspiracy among Sabre and the other GDSs to restrain trade.  Evidence that each GDS requires

Full Content provisions in their contracts with the airlines is evidence of parallel conduct.  The

plus factors include: (1) that the GDSs acted against what should have been their apparent self-

interest in seeking distinctive airline content by insisting on Full Content provisions, which

prevent the airlines from providing favorable terms or fares to any of the GDSs; (2) the GDSs

have a strong motive to collude – by offering the same content, they seek to assure that their

travel agency clients will continue single-homing, and that airlines cannot play one GDS off against another (in the words of one Sabre employee "[i]ts hard enough competing with [other] GDSs for [travel] agencies, [we] don't need to drive more competitive framework into [the] airline . . . side of the business"); and (3) US Airways has proffered evidence of a high degree of communication among the GDSs.  Construing the evidence in a light most favorable to US Airways, a reasonable jury could conclude that the GDSs conspired to limit competition among themselves for airline "content" that would be offered to travel agencies.

Sabre argues that the parallel conduct here is not evidence of an agreement to impede competition because each GDS has an interest in obtaining the full array of available airline fares in order to offer the best possible product, and avoid being disadvantaged by another GDS with better offerings.  Sabre also cites one instance when it acted out of step with the other GDSs, in creating a customized Choice Seats distribution system for US Airways when the other GDSs did not.  On the other hand, US Airways proffers evidence that the GDSs refused to compete with each other in obtaining more or better fares from the airlines, even when given the opportunity to do so.  This competing evidence is sufficient to create a question of fact for the jury as to whether the GDSs agreed to engage in anticompetitive conduct in violation of the Sherman Act.

## IV.   CONCLUSION

For the reasons stated above, the motion is granted in part and denied in part as follows:

- Sabre's motion for summary judgment on damages under the 2006 Agreement for lack of timeliness is GRANTED.  US Airways will not be permitted to seek damages for conduct that occurred prior to February 23, 2011, the date the 2011 Agreement became effective;

- Sabre's motion for summary judgment on damages incurred after the date of the Settlement Agreement and injunctive relief enjoining future conduct is GRANTED.  US Airways will not be permitted to seek damages or other relief for conduct that occurred or will occur after October 30, 2012, the date of the Settlement Agreement;

- Sabre's motion for summary judgment on the remaining claims is GRANTED IN PART and DENIED IN PART as follows:

- o (1) summary judgment on US Airways' claim under Count One for overcharges is DENIED, except to the extent dismissed on Sabre's motion for summary judgment on the basis of the statute of limitations and the Settlement Agreement; and US Airways may seek damages for booking fee overcharges incurred from February 23, 2011 through October 30, 2012;

- o (2) summary judgment on US Airways' claim under Count One for lost profits resulting from Sabre's initial refusal to implement Choice Seats is GRANTED, and US Airways will not be permitted to seek damages for Choice Seats lost profits;

- o (3) summary judgment on US Airways' claim under Count One for Travelocity damages is GRANTED, and US Airways will not be permitted to seek Travelocity damages; and

- o (4) summary judgment on US Airways' claim under Count Four for harm due to an alleged horizontal restraint of trade is DENIED, except to the extent that US Airways seeks lost profits from the alleged conspiracy to resist implementation of Choice Seats.

A separate order will be issued to schedule a pretrial conference to set a trial date.

The Clerk of Court is directed to close the motions at Docket Nos. 194, 195 and 196.

Dated: January 6, 2015
New York, New York


LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

36