UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| US AIRWAYS, INC., | Civil Action No. 1:11-cv-02725 (LGS) |
| Plaintiff, | **THIRD AMENDED COMPLAINT** |
| -against- | **TO BE FILED UNDER SEAL** |
| SABRE HOLDINGS CORPORATION; SABRE GLBL INC.; and SABRE TRAVEL INTERNATIONAL LIMITED, | **[REDACTED]** |
| Defendants. | |

1.      Plaintiff US Airways, Inc., ("US Airways" or "Plaintiff") brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants Sabre Holdings Corporation; Sabre Inc.; and Sabre Travel International Limited (collectively "Sabre") for injuries sustained by US Airways by reason of Sabre's violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.  Plaintiff also seeks equitable relief in the form of an injunction prohibiting the ongoing exclusionary conduct, and unreasonable agreements in restraint of trade entered into, by Sabre.

**INTRODUCTION AND SUMMARY**

2.      Sabre operates the largest Global Distribution System ("GDS") in the United States.  A GDS provides travel agents with information on schedules and fares offered by participating airlines and the ability to book tickets.

3.      Travel agents use GDSs for virtually all of the airfares they book.  Many travelers – including high value business travelers that comprise a significant portion of airline revenues – will only purchase tickets through a particular travel agent, for example the travel agent with which their company has an agreement.  Through a variety of anticompetitive practices and agreements, GDSs lock travel agents into their system, so those travel agents effectively become

unable and unwilling to provide their customers with alternative, more efficient connections to airlines.  In this way, GDSs are the bottleneck between airlines and the travelers that use travel agents, including the high-value business traveler.  As a result, the United States Department of Justice ("DOJ") has recognized:  "Each [GDS] provides access to a large, discrete group of travel agents, and unless a carrier is willing to forego access to those travel agents, it must participate in every [GDS]."  Comments of the Department of Justice to the Notice of Proposed Rulemaking Computer Reservation System Regulations 2 (Sept. 19, 1996).

4.      Travel agents typically do not pay to use GDSs.  In fact, the GDSs often pay travel agents "kickbacks" or "inducements" to use their systems; these payments are generated by "booking fees" the GDSs impose upon the airlines for each booking.  US Airways pays tens of millions of dollars each year for bookings made through the Sabre GDS notwithstanding that it is *US Airways' fare and travel content that allows Sabre to book travel for its subscribers in the first place*.  As the United States Department of Transportation ("DOT") has recognized, GDS fees "exceed competitive levels."  Computer Reservations System Regulations, 69 Fed. Reg. 976, 990 (Jan. 4, 2004).

5.      Three companies – Sabre, Travelport, and Amadeus – control all of the GDSs in the United States.  Sabre is the largest – in fact, over *35%* of US Airways' revenue (amounting to *over $3.5 billion* annually) is booked through Sabre.  As Sabre presumably recognizes, if US Airways lost the revenue booked through Sabre, the airline would likely be forced into bankruptcy.

6.      Rather than compete on the merits, Sabre has used its massive power over airlines such as US Airways to entrench its antiquated and inefficient technological systems, to preserve its supra-competitive booking fees, and to harm competition.  Sabre's technology has hardly changed from your grandfather's distribution system and was long ago left in the dust by new, innovative solutions that are web-based and take advantage of the networked economy.  These

new offerings, however, have been stifled by the GDSs' grasp over travel agencies and the exercise of their market power over airlines.

7.     Sabre's monopoly power was witnessed most recently in its efforts to force US Airways to enter into a new contract with Sabre that contains numerous oppressive and anticompetitive terms designed by Sabre to harm competition and entrench Sabre's dominance. US Airways had no choice but to sign the agreement, which it did under protest, or face a complete shut off from Sabre's network.

8.     The new agreement requires that US Airways provide Sabre "full content" – that is, US Airways must offer all content relating to its airfares through Sabre before it provides that content to the public through any other means.  It also prevents US Airways from providing content through any other means including directly to the public unless it also provides that content to Sabre – even though competition would clearly be enhanced if US Airways could provide this information first to lower cost distribution channels, such as web-based alternatives. Sabre stressed that "full content" was an absolute requirement for any participation in its GDS and the absence of this term in the new agreement would not be tolerated.  The U.S. Department of Transportation previously acknowledged that such heavy-handed tactics raise serious concerns under the antitrust laws:  "a [GDS]'s demand that an airline provide all publicly-available fares as a condition to any participation would be anti-competitive."

9.     Sabre imposed other anticompetitive restrictions on US Airways as described in this complaint, including provisions designed to restrict US Airways' ability to use lower-cost, more-efficient "direct connections" with travel agents.  One such method is through "direct connections" that would allow travel agents to search for, compare, and book tickets directly using each airline's computer system instead of a GDS.  Innovative and low-cost "direct connection" aggregators, such as Farelogix, enable travel agencies to utilize "direct connections" from multiple airlines and compare schedules and fares from across airlines.  With advanced

technological systems and lower pricing, such innovative aggregators have represented and continue to represent the prospect of a better, lower-priced alternative to Sabre's antiquated technology and supra-competitive fees.

10.     The competitive threat posed by these innovative and low-cost nascent competitors has caused Sabre to engage in a wide variety of anticompetitive conduct designed to eliminate this threat and preserve Sabre's monopoly power over US Airways and other airlines.

11.     Sabre's exclusionary conduct includes:

- Entering into *de facto* and *de jure* exclusive agreements with travel agents designed to maintain Sabre's monopoly and undertaking anticompetitive conduct designed to co-opt travel agents into financial dependence on the monopoly rents Sabre extracts from airlines.

- Raising barriers to entry and increasing switching costs faced by travel agents through a variety of conduct, including the bundling of the Sabre GDS with ancillary tools and services.

- Imposing onerous and anticompetitive requirements on airlines, including US Airways, for the purpose of maintaining Sabre's monopoly.

- Entering agreements and engaging in coordinated conduct with other GDSs for the purpose of limiting competition among GDSs and preserving Sabre's monopoly.

- Despite the publication of rack rates, refusing to distribute US Airways airfares at those rates, or indeed at any rate, unless US Airways acquiesced to Sabre's onerous and exclusionary practices that perpetuate Sabre's monopoly power.

12.     The result of Sabre's conduct has been a massive distortion of competition that harms consumer and airline welfare through higher prices, lower quantity, less choice, and reduced innovation relative to what would have existed if Sabre had not foreclosed competition on the merits.  Until Sabre's anticompetitive conduct is halted, Sabre's antiquated and inefficient technological systems will dominate, enabling Sabre to extract exorbitant fees from US Airways and other airlines – fees that have resulted in an increase in the cost of airline travel, to the detriment of all travelers.

## PARTIES

13.     Plaintiff US Airways is a Delaware corporation with its headquarters located at 111 West Rio Salado Parkway, Tempe, Arizona 85281.  US Airways, a major United States air carrier, was formed in 1982 and has grown to employ more than 31,000 employees and to serve approximately 80 million passengers each year.  In 2005, America West Airlines ("America West") and US Airways merged; the resulting combined company operates as US Airways.

14.     Defendant Sabre Holdings Corporation ("Sabre Holdings") is a Delaware corporation with its headquarters located at 3150 Sabre Drive, Southlake, Texas 76092.  In March 2007, Sabre Holdings Corporation was acquired by private equity interests Silver Lake Partners and Texas Pacific Group for approximately $5 billion dollars.  Sabre, with Sabre Holdings in control, operates as a single enterprise for purposes of dealing with US Airways.  In US Airways' dealings with Sabre, Sabre Holdings is responsible for contracting and negotiating and has indicated it likewise corresponds with and negotiates contractual terms with other airlines and others on behalf of all Sabre-owned entities and directs all Sabre-owned entities on their actions related to those arrangements.

15.     Sabre Inc.  is a Delaware corporation with its headquarters located at 3150 Sabre Drive, Southlake, Texas 76092.  On information and belief, Sabre Inc.  is wholly owned by Sabre Holdings and is the principal operating subsidiary and sole direct subsidiary of Sabre Holdings.

16.     Sabre Travel International Limited ("Sabre Travel") is a corporation organized under the laws of Ireland.  On information and belief, Sabre Travel is nominally headquartered at 25/28 North Wall Quay, Dublin 1, Ireland, however, Sabre Travel's principal place of business is located at 3150 Sabre Drive, Southlake, Texas 76092.  On information and belief, Sabre Holdings uses Sabre Travel as a corporate vehicle for holding contracts with airline participants in the Sabre Global Distribution System ("Sabre GDS"), including US Airways.  On information

and belief, Sabre Travel neither owns nor operates the Sabre GDS, and Sabre Inc. in reality performs the services that Sabre Travel is obligated to perform under its contracts with airlines.

17. Various other persons, firms and corporations, not presently named as Defendants, have participated as co-conspirators with Sabre and have performed acts and made statements in furtherance of the illegal actions described below.

## JURISDICTION AND VENUE

18. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, Section 4 of the Sherman Act, 15 U.S.C. § 4, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

19. Venue is proper in this district under 15 U.S.C. §§ 15, 22, and 26, and under 28 U.S.C. § 1391 (b) and (c) because: (1) Sabre transacts business and is found within this district; and (2) Sabre is subject to personal jurisdiction in New York. Moreover, Sabre's agreements with US Airways require suit be brought within this district.

## TRADE AND INTERSTATE COMMERCE

20. During the time period covered by this complaint, Sabre manufactured, sold and/or distributed its products or services in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the state in which the Sabre's products and services originated. Indeed, according to Sabre, over 80 billion dollars in transactions flow through Sabre's systems each year. The illegal activities of Sabre, as described in this complaint, were within the flow of and had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## BACKGROUND FACTS

**A.**  ***Access to Travel Agencies, Which Today Rely on GDSs, is Critical for US Airways' Survival***

21.     US Airways, like other major air carriers, sells tickets to consumers through travel agencies.  Bookings made through travel agents account for over 65% of US Airways' annual revenues.

22.     Travel agencies book flights through a GDS.  In the United States, there are three GDSs:  Sabre, Travelport, and Amadeus.  No new GDS outside of these three (and the entities they own or have acquired) has successfully launched in nearly three decades.  If an airline does not "participate" in a particular GDS, that airline will receive virtually no bookings from the travel agents that subscribe to that particular GDS.  Booking of tickets through the GDSs' platforms, therefore, is essential for the survival of a major air carrier like US Airways.  The Department of Justice and the Department of Transportation have recognized the carriers' dependence upon the GDSs, stating that "[e]ach [GDS] provides access to a large, discrete group of travel agents, and unless a carrier is willing to forego access to those travel agents, it must participate in every [GDS]."

23.     The sheer magnitude of revenue at stake for US Airways if it loses access to Sabre shows just how powerful Sabre is.  Sales by US Airways through Sabre account for over 35% of US Airways' annual revenue.  Over *three and a half billion dollars* of US Airways' revenue flows through Sabre annually.  Without those sales, US Airways will not long survive.

24.     This dependence is similarly confirmed by industry studies.  According to the American Society of Travel Agents, as of the end of 2009, 85.7% of travel agents use only one GDS.  Moreover, 94.9% of travel agents using a GDS have made no changes in their GDS provider in the last two years, and a remarkable 86.7% are using the same primary GDS that they used at the time of GDS deregulation, seven years ago.

**B.     *US Airways Has No Alternative Other Than Sabre to Reach Travel Agencies that Subscribe to Sabre's Platform***

25.     US Airways has no effective method to reach most of the corporate travel agencies subscribing to Sabre other than to participate in Sabre – and to pay Sabre's inflated booking fees.  Sabre, individually and in coordination with the other GDSs, has undermined or eliminated altogether the competitive alternatives that US Airways might otherwise utilize to connect to travel agencies.  The GDSs' anticompetitive conduct includes co-opting their subscribers through a system of "kickbacks" or "inducements," eliminating the threat of web-based competition from online travel agencies ("OTAs") (through acquisition or co-option), diminishing the threat of innovative third-party solutions, such as Farelogix, and undermining airlines' own efforts to access travel agents directly through the Internet or otherwise.

### 1.     *Sabre Has Co-Opted Travel Agencies Subscribing to its Booking Platform*

26.     Approximately fifty years ago, airlines began to develop electronic reservations systems that would provide travel agents with access to the airlines' internal reservation systems. The airlines were eventually required to divest their ownership interest in these systems, which were initially known as Computerized Reservation Systems, or CRSs, and are now known as Global Distribution Systems or GDSs.

27.     Most of the important corporate travel agents, which generate the lion's share of airline revenues, are of the "brick and mortar" variety – namely, they grew up under the GDS model and have a cozy relationship with one of the three dominant GDS platforms, including Sabre.  Indeed, over time these travel agents have become fully dependent on one of the GDS platforms and its antiquated technology.  The GDS into which an agency is locked continues to serve as the center of that agency's information technology systems.  In order to prevent those agencies from switching to other distribution technologies or even to other GDSs, each GDS has built or acquired some of the most crucial peripheral systems these travel agents use, including user interfaces, customer service systems, and accounting systems.  In industry terminology, these peripheral systems are often grouped into front-, mid-, and back-office categories.  GDSs

have refused to permit innovative alternative distribution technologies to connect with their peripheral systems. The sheer expense of these peripheral systems – in addition to the GDSs' refusal to permit innovative alternative distribution technologies to connect to these peripheral systems – has resulted in more travel agencies using only one GDS that integrates the travel agency's front-, mid-, and back-office peripheral systems.

28. Accordingly, most travel agencies are "locked in" to a particular GDS. For others, Sabre has admitted to entering into exclusive agreements that preclude the agency using a rival GDS.

29. In addition to the enormous costs a travel agent would face attempting to switch from Sabre to another GDS, there also is no incentive to do so because – contrary to the laws of economics – the GDSs *pay* the travel agencies to book on their platforms. These payments are referred to as "kickbacks" or "inducements." Because of these kickback payments, GDSs and travel agents are aligned in their desire to protect GDSs from competition and thereby to see GDSs maximize the booking fees paid by airlines: the higher the booking fees that GDSs receive from airlines, the more GDSs may be willing to pay to travel agents in kickbacks.

30. The DOT highlighted the perverse competitive incentives created by this kickback scheme: the "incentive payment programs" – i.e., the kickback payments to a travel agency for making most of its bookings through the GDS – "used by the systems encourage travel agencies to choose the system that is the *most expensive* for participating airlines." DOT Computer Reservations System Regulations, 69 Fed. Reg. 976, 989 (Jan. 4, 2004) (emphasis supplied). These fees are ultimately "paid by participating airlines." The DOT correctly observed that the GDSs' "incentive programs" "tended to preserve the systems' market power and denied airlines an opportunity to encourage travel agencies to use alternative electronic means for obtaining information on airline services and making bookings, such as direct links between a travel agency and an airline's own internal reservations system." *Id.* at 981.

31.     Sabre also locks in travel agents by tying the magnitude of these kickbacks to the frequency of the agents' use of Sabre's platform.  Sabre's contracts with many of its travel agencies require either a minimum number of monthly bookings or institute some type of productivity pricing that penalizes agencies that begin using another channel for bookings. American Society of Travel Agents, *Global Distribution System (GDS) Report* 9-12 (May 2010) (noting that over one-third of Sabre subscribers responding to the survey reported having productivity pricing contracts).  For example, on information and belief, Sabre's contracts with travel agencies often impose penalties on travel agencies if they do not meet certain "volume thresholds" for bookings through Sabre.  Sabre's publicly available contracts indicate that Sabre specifically references these "volume thresholds" in contracts with travel agencies.  *See, e.g.*, Sabre Subscriber Agreement effective December 31, 1998.  A Senior Vice President at Sabre has acknowledged that "it is increasingly difficult for agencies to predict their booking volume.  This puts agencies in jeopardy of not meeting segment requirements and facing fines." *Travel Agent Magazine*, Mar. 2004.  This system of penalties and threats deters the agencies from trying to book through new or innovative channels.

32.     This same approach has been utilized with OTAs.  Orbitz Worldwide recently admitted that "we have an agreement with Travelport that covers the GDS services provided by both Galileo and Worldspan.  This agreement contains volume requirements for the number of segments that we must process through Galileo and Worldspan and requires us to make shortfall payments if we do not process the required minimum number of segments for a given year.  As a result, a significant portion of our GDS services are provided by Travelport GDSs."

33.     Furthermore, based on US Airways' employees' experience in the travel industry and publicly available language from Sabre's contracts, US Airways believes that many of Sabre's agreements with travel agents also contain provisions that impose additional charges on an agency if that agency exceeds a preset "transaction ratio" threshold, that is, if it engages in a

high number of "transactions" (broadly defined) on an alternative distribution platform.  *See, e.g.*, Sabre Subscriber Agreement with Global Discount Travel Services; Sabre Subscriber Agreement effective December 31, 1998.

34.     Finally, based on US Airways' employees' experience in the travel industry and a report by the American Society of Travel Agents, US Airways believes that GDSs also provide other kickbacks to travel agents such as free equipment, equipment funds, debt forgiveness, waiver of shortfall penalties, or credit for future shortfalls.  American Society of Travel Agents, *Global Distribution System (GDS) Report* 14 (May 2010) (noting various "incentives" provided by GDSs to travel agents, including financial incentives, debt forgiveness, and equipment).  In this manner, the travel agents cease to act as traditional independent customers of Sabre free to serve the best interests of their own customers, and instead become co-dependent co-conspirators with the GDSs, sharing in the supra-competitive fees Sabre extracts from the airlines in exchange for helping to preserve Sabre's monopoly power and protecting Sabre from lower-cost, more innovative competitors.

### 2.     *Rather than Being Formidable Competitors to Sabre and the GDSs, OTAs have been Acquired or Otherwise Co-Opted*

35.     At the time of deregulation of the GDS industry in 2004, the DOT recognized that GDSs retained market power over airlines.  Specifically, the DOT concluded that "the [GDSs] continue to have market power over airlines . . . and that [GDSs] could engage in practices that could unreasonably preserve their market power."  Computer Reservations System Regulations, 69 Fed. Reg. 976, 986 (Jan. 4, 2004).  Likewise, in comments submitted to DOT, the DOJ recognized that "[t]he airlines' [GDS] divestitures leave unaffected the incentive and ability of [GDSs] to fully exercise their market power in nonstrategic ways."  Reply Comments of the Department of Justice to the Notice of Proposed Rulemaking Computer Reservation System Regulations 21 (June 9, 2003).  Thus, according to *both* agencies, the fact that the airlines no

longer had ownership interests in the GDSs did not eradicate all competitive concerns from the industry.

36.     Nonetheless, the DOT cited four primary reasons to continue with deregulation, notwithstanding its conclusion that the GDSs still had substantial market power.  First, the DOT concluded that the airlines' divestiture of their ownership interests in the GDSs made it less likely an individual GDS would favor one airline over another.  Second, the DOT believed that forthcoming technological changes – including the availability of distribution via the Internet – would operate as a check on the GDSs' significant market power.  Third, the DOT believed that airlines' ability to control access to their content, including webfares – i.e., discount fares offered by an airline through its own website or through selected distribution channels – would reduce the GDSs' market power.  Fourth, the DOT believed that vigorous antitrust enforcement would help ensure competitive markets.  *See* Computer Reservations System Regulations, 69 Fed. Reg. 976 (Jan. 4, 2004).

37.     Indeed, the DOT was hopeful that Internet-based companies, such as OTAs, would begin competing with the GDSs by "developing direct connection technologies which enable bookings to be made directly with an airline's internal reservations systems, bypassing [GDSs]."  Similarly, the DOJ expressed hope that "[a] low-cost distribution channel on the Internet" offered a gathering competitive threat even though such a channel "may not offer the same level of functionality as a [GDS], but may nonetheless be able to attract usage by travel agents if it has preferential access to desirable fares and inventory from a significant number of airlines."  Reply Comments of the Department of Justice to the Notice of Proposed Rulemaking Computer Reservation System Regulations 26 (June 9, 2003).

38.     Contrary to the hopes and expectations of the DOJ and DOT in 2004, the GDS industry remains non-competitive and inefficient, and the structural flaws identified by the DOJ and DOT remain and, in many cases, have flourished.  Virtually every assumption the DOT and

DOJ made about possible new entrants and the ability of airlines to use their content to bargain against the powerful GDSs has been frustrated by the GDSs' conduct.  For example:

- DOT believed that Internet-based companies, such as Orbitz, would enter into competition with the GDSs.  *See* Computer Reservations System Regulations, 69 Fed. Reg. 976, 1001 (Jan. 4, 2004).  But Orbitz is now owned in large part by Travelport, a GDS, and other online travel agencies are owned by, or have become heavily dependent on, the GDSs.

- DOJ envisioned "[a] low-cost distribution channel on the Internet" that "may . . . be able to attract usage by travel agents if it has preferred access to desirable fares and inventory from a significant number of airlines."  Reply Comments of the Department of Justice to the Notice of Proposed Rulemaking Computer Reservation System Regulations 26 (June 9, 2003).  No such system has developed in part because airlines have been unable to provide preferred access to fares due to the fact that GDSs refuse to deal with airlines unless the airlines provide "full content" to the GDSs and unless the airlines agree to other restrictions limiting the ability of airlines to use alternative distribution channels.  The GDSs have also acted to raise switching costs faced by travel agents.

- DOT believed that "airlines' ability to change their participation levels and their control over access to webfares is reducing the systems' market power."  Computer Reservations System Regulations, 69 Fed. Reg. 976, 989 (Jan. 4, 2004).  But Sabre's power has stayed constant and US Airways has been forced to provide access to webfares to Sabre, because Sabre refuses to deal with US Airways unless it provides "full content."

- DOT envisioned airlines being able to "use their control over webfares to win better terms for [GDS] participation."  *Id.* at 1007.  Although US Airways was able to obtain some improvements in segment fees as a result of deregulation, these fees were not (and still are not) at competitive levels and US Airways was left with little choice but to provide full content.  More importantly, as US Airways has experienced, there is currently no option available for "better terms" for providing this content to the GDSs, because the GDSs simply refuse to deal with airlines unless the airlines provide "full content" to the GDSs.

- The DOT stated that "[v]igorous enforcement of antitrust policy is the discipline by which competition can remain free and markets can operate in a healthy fashion."  *Id.* at 978.  There has been no enforcement of the antitrust laws against the GDSs since deregulation.

39.     The failure of OTAs and other Internet channels to develop into a competitive threat to GDSs has been particularly apparent.   As mentioned above, far from acting as competitors, the GDSs have taken ownership stakes in several of the major OTAs.   Moreover, where the GDSs do not have a significant ownership stake in OTAs (such as Expedia and Hotwire, which are customers of the GDSs), they have co-opted them in much the same manner as they have their other travel-agency subscribers – namely, through kickbacks to these OTAs.   Other Internet companies, such as search engines like Google and so-called travel "meta-search" websites such as Kayak and Tripadvisor are not GDS competitors, but merely direct Internet users to OTAs or airline websites where a user can book a flight.   Likewise, a search technology company like ITA Software does not compete with the GDSs.   ITA Software does not provide booking capabilities.

### 3.    The GDSs Have Successfully Suppressed Nascent More-Efficient, Lower-Cost Threats From Third Parties

40.     One potential source of competition comes from vendors that can allow a travel agent to aggregate travel content from multiple sources in an efficient manner.   These vendors, such as Farelogix, rely upon modernized technologies rather than the antiquated systems still in use by the GDSs.   With their new technologies, aggregators like Farelogix have the capability to replace the GDS at the center of a travel agent's system with a content aggregator that aggregates content feeds from multiple GDSs and/or direct content feeds from airlines.

41.     This possible distribution alternative would allow direct connections from airline booking systems to connect to travel agencies' front-, mid-, and back-office applications parallel to the GDS already in place.   This would allow an airline's content to be searched and booked by the travel agencies without any additional fees to the customer or expense to the agency through a standalone booking tool for non-participating airlines.

-14-

42.     Recognizing the barriers it has created, Sabre has acted to prevent potential rivals from interfacing with Sabre's front-, mid-, and back-office products.   For example, in January 2009, Sabre terminated its authorized-developer agreement with Farelogix, meaning that travel agent customers of Farelogix could no longer retrieve content from Sabre through Farelogix's platform and instead had to go directly through Sabre.

43.     Through authorized-developer agreements, Sabre allows authorized third-party applications developers to obtain access to its application programming interfaces ("APIs").   The Sabre GDS APIs allow applications to interact with the Sabre GDS and Sabre's front-, mid-, and back-office products.

44.     Sabre admitted that it terminated Farelogix's API access because "[i]t became clear to us that they [Farelogix] are actually actively encouraging fragmentation and some new economic models that we don't think were balanced, which is fundamentally different from our philosophy on content."   David Jonas, *AA:   Next Airline-GDS Deals to Center on Optional Services*, Business Travel News, Feb. 19, 2009 (quoting Sabre Travel Network Senior Vice President Chris Kroeger).

45.     Based on Farelogix's public comments, public reports about its complaint to the Department of Justice regarding Sabre's termination, and the Department's subsequent investigation, US Airways believes that Sabre actually terminated Farelogix because it was concerned about the nascent competition Farelogix was providing to Sabre's "economic model." *See* Dennis Schaal, *U.S. Dept. of Justice begins Sabre-Farelogix Inquiry*, Tnooz (Oct. 5, 2009), http://www.tnooz.com/2009/10/05/uncategorized/u-s-dept-of-justice-begins-sabre-farelogix-inquiry/.   As a result, Farelogix has been unable to gain significant adoption, despite the fact that according to Farelogix, its technology costs airlines "about . . . 80%" less than the traditional GDSs.

-15-

46.     Similarly, on information and belief, based on US Airways' employees' experience with Sabre and discussions with other in the industry, US Airways understands that Sabre ended Booking Builder's authorized developer agreement because the Booking Builder tool, which aggregated GDS and non-GDS content, was popular with travel agents that subscribed to Sabre and could ultimately threaten to disintermediate the Sabre GDS.

47.     Direct connection systems, such as those enabled by Farelogix, have existed for years and are proven technologies that have been used by some large airlines, such as Southwest Airlines, to connect with large travel agencies.   Though US Airways has a contractual relationship with Farelogix, that relationship does not provide US Airways with the benefit of Farelogix's full capabilities due to anticompetitive behavior by the GDSs.  Indeed, GDSs such as Sabre and Travelport have technologies that would allow agencies to aggregate direct connections for some information from airlines and begin to develop alternative channels (indeed, direct channels) to connecting passengers to air carriers.

48.     For example, Travelport has agreed with Southwest Airlines to permit Southwest to connect with Travelport agents via a Travelport product called Universal API.  In this manner, certain Southwest data is aggregated with information of other airlines for comparison shopping by travel agents.  Sabre has a similar product, called Sabre Red.  However, GDSs have refused to permit other airlines, including US Airways, to institute direct connections whether through Sabre Red, Universal API, or Farelogix.

49.     Every other new entrant that has attempted to enter the GDS industry in the last twenty-five years has failed.  For example, G2 Switchworks attempted to enter the GDS industry but did not succeed and was eventually acquired by Sabre's private equity owners, who sold the underlying intellectual property to Travelport and liquidated the company.

**4.** ***Sabre and GDSs have Frustrated Airlines' Attempts to Connect Directly With Travel Agencies***

50.    Finally, it is well-documented that the GDSs have successfully thwarted the attempts of the airlines to connect directly with the GDSs' travel-agency subscribers.

51.    In 2004, Northwest Airlines announced an effort to induce travel agents to book directly on Northwest's website instead of through Sabre.  Sabre responded by suing Northwest and publicly announcing that in retaliation for Northwest's efforts, Sabre would begin biasing its GDS display against Northwest.  *Sabre Inc. v. Northwest Airlines, Inc.*, No. 4-04-CV-612-Y (N.D. Tex.); Northwest Airlines Aug. 25, 2004 Press Release.  Based on filings in the Sabre lawsuits with Northwest, industry experience, and public reports, US Airways' employees believe that Sabre also dramatically increased Northwest's GDS fees and began misrepresenting seat availability on some of the most lucrative of Northwest's flights.  Def.'s Mem. of Law in Support of Def.'s Mot. to Stay or in the Alternative to Transfer Venue or to Dismiss, Sabre Inc. v. Northwest Airlines, Inc., No. 4-04-CV-612-Y (N.D. Tex. Sept. 14, 2004), ECF No. 20.

52.    Likewise, in early January 2011, Sabre began biasing the results Sabre displays to travel agents to the detriment of American Airlines.  On information and belief, Sabre biased against American because American was attempting to induce travel agents to bypass GDSs and use a direct connection system involving Farelogix technology.  Pl.'s Amended Original Pet. & App. for TRO & Temporary Injunction at 14-15, American Airlines, Inc. v. Travelport, Inc. et al., No. 067-249214 (Tarrant Cty. Tex. Dist. Ct. Jan. 10, 2011).  Moreover, on information and belief, Sabre carried out its biasing of American despite the fact that Sabre sacrificed profits as a result of this action.  *Id.*  American subsequently obtained injunctive relief against Sabre barring Sabre's conduct.

53.    The DOJ has recognized that "[b]ias is the most objectionable method of exercising market power because it misinforms agents and consumers in a way that other exercises of market power do not."  This is due to the fact that "[i]t is fairly clear that a flight's

sequence in a [GDS] . . . display has a direct effect on the flight's potential sales, with most sales coming from flights that appear on a system's first page."  U.S. Department of Justice, *Comments of the Department of Justice*, Notice of Proposed Rulemaking—Carrier-Owned Computer Reservations Systems, Docket No. 41686 (Apr. 26, 1984); U.S. Department of Justice, *Comments and Proposed Rules of the Department of Justice Before the Civil Aeronautics Board*, Advance Notice of Proposed Rulemaking—Airline Computer Reservations Systems, Docket No. 41686 (Nov. 17, 1983).

54.     The lesson of punishing its bigger airline competitors that decided to try to connect directly with travel agents has not been lost on the smaller, more vulnerable US Airways – attempt to develop or utilize alternative, more efficient technologies at your peril.

55.     Sabre also has engaged in a variety of tactics to undermine US Airways' efforts to connect directly with travel agents in an attempt to bypass Sabre, including express contractual provisions barring direct connections described below.  In 2005, America West attempted to induce travel agents to book via the America West website by providing travel agents with commissions for their direct bookings.  Sabre, concerned that travel agents might begin to bypass Sabre for America West bookings, retaliated by unilaterally imposing two rate increases on America West in a period of three months.  Sabre's price increases made America West's efforts unprofitable and the practice was discontinued.

**C.     *As a Result of Sabre's and the GDSs' Exclusionary Conduct the GDSs Do Not Face Meaningful Competition***

56.     The GDS industry has become more concentrated since 2004 and now two companies, Sabre and Travelport, account for over 90% of United States GDS domestic airfare bookings.  Since deregulation, two formerly independent GDSs – Galileo and Worldspan – combined under a single entity, Travelport.  This drastically increased level of concentration has

served only to increase barriers to new innovations, making them higher and nearly insurmountable.

57.     The fees charged by Sabre have remained high and, on information and belief, US Airways believes based on its employees' experience in the travel industry that Sabre's fees are well above competitive marginal costs for the services.  As a general matter, GDS fees have far outpaced many other technology costs.  For example, according to press reports, in 1991 the cost of data storage per megabyte was approximately $13.00; in 2008 the cost per megabyte was approximately $0.01.  On the other hand, Sabre's fees have remained at artificially inflated levels over the same time period.  Examples abound of dramatic price reductions that have followed improvements in computing and communication technologies, but GDSs, which are just computing and communication systems, stand out uniquely, having been able to use their market power to block new technology from the market and, as a result, to buck the trend of plummeting prices.

58.     The fact that no firm has successfully entered the GDS industry since before regulation began in the early 1980s highlights the lack of competition and the barriers to entry potential entrants now face.

## SABRE'S UNLAWFUL AGREEMENTS HARM US AIRWAYS AND COMPETITION

59.     Sabre's anticompetitive and exclusionary conduct has been made manifest in its agreements with US Airways, resulting in artificially inflated booking fees and inefficient and costly methods by which US Airways must distribute its tickets to travel agencies and travelers. Nowhere is the impact of Sabre's conduct felt more acutely than in high-revenue (and critical) business travel.

60.     The anticompetitive agreements Sabre has entered include (i) Sabre's 2006 agreement with US Airways; (ii) the newly-executed 2011 agreement between Sabre and

US Airways that culminated in the filing of this lawsuit; and (iii) agreements Sabre has entered with other GDSs, other airlines, and travel agents.

**A.**     ***The 2006 Sabre-US Airways Agreement:  Foreclosing Competition and Inflating Booking Fees***

61.     Sabre's anticompetitive and exclusionary conduct, acting individually and jointly with co-conspirators as described in this complaint, has been manifested in its agreements with US Airways.  At all times relevant to this action, US Airways has "participated" in Sabre's GDS platform and related services.  As a result of this participation, US Airways has suffered direct cognizable monetary and other harm as described herein.

62.     US Airways entered into a Travel Marketing Amendment ("TMA") with Sabre that became effective January 27, 2006.  The term of the TMA was extended at least through January 27, 2011, although it would automatically renew for successive one-year periods unless at least 90 days written notice was provided by either party.

63.     Several provisions of the TMA are relevant to Sabre's willingness and ability to foreclose competition and, specifically, to undermine US Airways' ability to connect directly with travel agents or otherwise reduce costs associated with distribution.  The primary provisions that restrict competition and some of their implications are discussed directly below.  They are grouped loosely as addressing:  (1) "Full Content" provisions; (2) the "No Direct Connections" provision; (3) "Parity" provisions; and (4) the "No Surcharge" provision.

**1.**     ***Full Content Provisions***

64.     The "Full Content" provision in the TMA has been used by Sabre as a shield to blunt – and in many cases as a hammer to eliminate – US Airways' ability to deliver its content to innovative and lower-cost, alternative distribution platforms such as Farelogix.

65.     Section 3(a) of the TMA contained a "Full Content" clause that required US Airways to ███████████████████████████████████████████████████

████████████████████████████████████████████ "Full Content" is defined in relevant part as: "████████████████████████████████████████ The TMA also expressly states that ████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████

66.    Thus, Sabre ensures that it has identical content to any "Reservation Outlet," that is ████████████████████████████████████████████████████████████

███████████████████████████████ Notably, the TMA provides that ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

67.    Sabre has utilized the "Full Content" provisions set forth in part above to raise barriers to entry and to forestall nascent competitive threats by broadly interpreting "full content" to encompass all manner of content, far beyond fares alone.  Sabre blocks US Airways' ability to provide more favorable low-cost fares to Sabre's rivals because Sabre requires that it be provided all fare information.  By requiring US to provide Sabre "full content," Sabre is able to foreclose US Airways from offering an attractive, differentiated commercial deal to potential entrants.

68.    The TMA also requires US Airways to provide Sabre with "full content" regardless of whether Sabre, as a technological matter, could make any use of the data.

69.    Thus, Sabre demands "full content" regardless of whether it can use the content and regardless of its benefit to travel agents or travelers that use Sabre's system.  In 2010, US Airways launched its "Choice Seats" program, which enabled travelers to select and reserve the most desirable seats on a US Airways flight in exchange for an additional fee.  US Airways offered to provide Sabre with content as part of US Airways' "Choice Seats" initiative.  Sabre was (and is) unable to utilize this information in its antiquated system.  Worse than that,

however, Sabre has attempted to block US Airways from distributing Choice Seats (and thus keeping the offering away from the thousands of travelers that have benefited from it), by making threats about US Airways' compliance with the "full content" provisions of the TMA.

### 2. *No Direct Connection Provision*

70.     The TMA also bars US Airways from bypassing Sabre and using a less expensive method of facilitating bookings with travel agents.  In particular, the TMA contains the following "No Direct Connection" provision:



TMA § 4(c).

71.     Much like the "Full Content" provision, the "No Direct Connection" provision in effect prohibits US Airways from getting travel agents and their passengers to bypass Sabre and book airfare at significantly lower cost.  For example, the Direct Connection provision bars US Airways from working with Farelogix to enable direct connections that in turn could offer a competitive alternative to Sabre.

72.     Likewise, with limited exceptions, the TMA states that US Airways ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ TMA § 4(c).
Again, this provision prohibits US Airways from encouraging travel agents and their passengers to use a more efficient method of booking air tickets.

### 3.     *Parity Provisions*

73.     The TMA also includes numerous "parity" provisions that discourage US Airways from forging new relationships with potential rivals to Sabre's dominant platform.

74.     For example, the TMA requires that US Airways ██████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████ and ████████████████████ ██████████████████████████ TMA § 3(b).  As discussed above, Sabre has defined "Reservation Outlet" █████████████████████████████████████ ██████████

75.     Likewise, the TMA requires US Airways to:



TMA § 3(b)

76.     These provisions, which heavily favor a dominant incumbent company (like Sabre) have long been disfavored in the law and by regulators.  The Department of Justice specifically called out these provisions in the 2004 rulemaking and, very recently, has expressed the view that it disfavors parity and other provisions imposed by a firm with market power, like Sabre.

### 4.     No Surcharge Provision

77.     The TMA also prohibits US Airways from passing on the booking fees Sabre charges US Airways to travel agents in the form of a surcharge or other fee.  Were US Airways able to expose travel agents to the supra-competitive GDS fees by disclosing them as a separate line item on bills, travel agents would be less eager to use Sabre and Sabre would be forced to compete on price to the benefit of consumers.  Much like the Full Content provision above, the express prohibition on surcharging travel agents serves to prevent the establishment of a lower cost rival to Sabre.  TMA, Attachment C, § 3.

### B.     The 2011 Agreement:  Sabre Extends its Anticompetitive and Exclusionary Provisions with US Airways by Threat of Full Shut-Off to Sabre's Travel-Agency Subscribers

78.     In 2010 and 2011, Sabre flexed its monopoly power by forcing US Airways to acquiesce to new anticompetitive terms.  *Sabre realized termination likely would drive US Airways into bankruptcy, and thus repeatedly threatened to terminate US Airways if it did not acquiesce to Sabre's anticompetitive terms on Sabre's short-fuse timeline.*  Indeed, recognizing the adverse financial effect on US Airways if travel agents were to anticipate that US Airways might no longer be distributed by Sabre, Sabre used threats of notifying travel agents that US Airways' agreement with Sabre would end in order to bludgeon US Airways into accepting the exclusionary and unfavorable restrictions so critical to the survival of Sabre's monopoly.  To avoid the obvious financial wreckage US Airways would incur by being shut off from Sabre's platform (and the travel agencies reachable only via Sabre), US Airways signed new terms under protest.

79.     On or about October 15, 2010, pursuant to the notice provisions in the TMA, Sabre notified US Airways that Sabre was terminating the TMA as of January 27, 2011.

80.     Since that time, Sabre made clear through a series of ultimatums and unveiled threats that it would cut off US Airways' access to Sabre's critical network of travel agencies if

US Airways did not agree to Sabre's terms, including a "Full Content" provision as well as the restrictions on direct connections and travel agency surcharges.  These ultimatums and threats were made even though US Airways indicated several times that it did not want to enter another agreement with these restrictive terms.  On several occasions, as discussed below, US Airways indicated it was willing to pay a higher booking fee to Sabre, so long as it was without Sabre's exclusionary conditions.  US Airways believed that decoupling its business from Sabre's exclusionary terms, among other things, would lower its distribution costs and facilitate the growth and adoption of alternatives to Sabre.  Time and again, Sabre responded that these restrictions were non-negotiable conditions to US Airways' continued participation.  In other words, Sabre refused even to quote a price at which it would distribute US Airways products without the anticompetitive restrictions of which US Airways was complaining.

81.     For example, on December 10, 2010, a Sabre Vice President of North American Airline Sales stated that "[c]ontinued participation would be contingent upon a) US Airways [sic] not adversely changing its participation in Sabre (e.g. pulling content, imposing a surcharge, pulling travel agency plates, etc.)."  12/10/2010 E-mail from Chris Wilding to John Gustafson.  Mr. Gustafson, based on this exchange, his industry experience, and his relationship with Sabre, understood this to mean that if US Airways wanted to access Sabre subscribers, US Airways had to provide full content to Sabre and agree to Sabre's other restrictive terms.

82.     Likewise, on December 20, 2010, Sabre stated that "[w]e have . . . thought more about the conditions under which Sabre would consider distributing US Airways content beyond the expiration date without a signed Sabre agreement," however, Sabre confirmed that "one of Sabre's requirements in all of these scenarios is a full content commitment from Us [sic] Airways."  12/20/2010 E-mail from Chris Wilding to John Gustafson.  Sabre expressly stated it "will not extend beyond termination date (Jan 28)" on other terms.  Again, Mr. Gustafson understood this to mean that US Airways' only option was to provide full content to Sabre.

83.    Sabre's demand of "Full Content" is diametrically opposed to the DOT's and DOJ's view in 2004 as to the how the GDS industry would (and should) evolve:

> By denying an airline any opportunity to choose different levels of participation in competing systems, a system's [Full Content clause] makes it more difficult for other firms to enter the [GDS] business and undermines the airline's ability to offer higher-level information and booking capabilities to travel agencies through direct connections.  Computer Reservations System Regulations, 69 Fed. Reg. 976, 999 (Jan. 4, 2004).

84.    US Airways also inquired about obtaining a standard "rack rate" that does not include demands for full content, prohibitions on charges to travel agents, and other requisites that fall outside charging a booking fee for Sabre's "services."  On December 20, 2010, although Sabre referred US Airways to its published "rack rate," Sabre indicated that the "rack rate" (which was a higher rate) was conditioned on US Airways' agreement to a full content provision as well as other objectionable terms, including limitations on direct connections and the ability to surcharge travel agents for the cost of booking through Sabre.  12/20/2010 E-mail from Chris Wilding to John Gustafson.

85.    Sabre's refusal to relent on full content is made plain in communications between the parties.  On January 14, 2011, US Airways sent an e-mail to Sabre stating:   "We are interested in knowing what rate US would have to pay to get distribution through Sabre without a commitment to Travelocity and no obligation to provide Sabre full content (including no restriction on GDS surcharges, direct connects, etc.).  In other words, can we get your published rack rates on a non-temporary basis?" 01/14/2011 E-mail from Andrew Nocella to David Gross.

86.    Approximately nine minutes later, Sabre responded, stating "We should talk.  Sabre has no offer that does not involve full content.  Our deal will expire.  We have an offer on the table for full content and no [Travelocity] deal--that is rack rate as we discussed.  If US will not commit to full content we should talk about how we have an orderly termination of our

distribution relationship on Jan 27.  I am sorry, but I must be clear that full content is an absolute requirement for US participation in Sabre."  01/14/2011 E-mail from David Gross to Andrew Nocella.

87.     Shortly after this email was sent, a different Sabre employee forwarded the email again and added:  "We are out of time.  If I don't have a full content proposal from you which is consistent with one of the options Sabre presented, then I don't know that we have anything to discuss this afternoon."  01/14/2011 E-mail from Chris Wilding to John Gustafson. Mr. Gustafson, based on this exchange, his industry experience, and his relationship with Sabre, understood this to mean that Sabre would not accept anything but full content from US Airways, and Sabre would prefer to have no agreement with US Airways rather than an agreement with less than full content.  These ultimatums reflect a monopolist's high level of comfort that it holds the ultimate trump card – denial of a critical piece of its customer's business even where such a denial results in the sacrifice of profit.  Here, it is the denial by Sabre of US Airways' access to travel agents on Sabre's dominant platform.

88.     Communications between the parties leave no doubt that Sabre would cut off access to its critical platform if US Airways continued to refuse to accede to Sabre's demands. Lack of access would threaten US Airways' survival because over 35% of the company's revenue is generated from bookings on Sabre's dominant platform.   Because travel agents typically use only one GDS, US Airways would not be able to replace sales made using Sabre's system with sales made using another system.  If US Airways flights were unavailable to those agents through Sabre, then they would likely book flights on US Airways' competitors.

89.     Sabre also threatened to notify travel agents that US Airways might not reach an agreement with Sabre.  Were Sabre to inform the travel agents using the Sabre GDS that US Airways might not be offered on Sabre in the future, these (and other) travel agents would be

less likely to book on US Airways.  This plainly was part of Sabre's efforts to force US Airways to sign an agreement containing the objectionable provisions.

90.      Sabre has also used its monopoly power to force US Airways to enter an agreement with terms favorable to Sabre's subsidiary, Travelocity.   For example, on December 10, 2010, Sabre stated that it would only deal with US Airways if US Airways continued to participate in Travelocity, Sabre's OTA.  12/10/2010 E-mail from Chris Wilding to John Gustafson.  On December 20, 2010, Sabre stated that it "has reconsider [sic] providing a proposal which is independent [o]f US Airways completing a Travelocity agreement" and outlined the only scenario under which Sabre would deal with US Airways in the absence of a US Airways agreement with Travelocity.  That scenario involved higher GDSs fees until "Sabre and Travelocity contracts are signed.  Sabre will not rebate any amounts billed prior to Sabre and Travelocity contract signature."  12/20/2010 E-mail from Chris Wilding to John Gustafson.

91.      Sabre later clarified "Sabre's pricing increases to Rack Rate in the event US chooses not to renew its agreement with Travelocity.  Our hope is that US can agree to a market deal with Travelocity prior to January 28, but if not, the GDS pricing would be impacted." 12/20/2010 E-mail from David Gross to Andrew Nocella.  On information and belief, based on his years of industry experience, Mr. Nocella understood "rack rate" to mean a booking fee much higher than the current booking fees US Airways pays (as explained above, Sabre refused to provide even the higher rack rate without US Airways' commitment to full content and related restrictions).  On January 14, 2011, Sabre reiterated that "no TVL [Travelocity] deal" meant booking fees would increase to "rack rate as we discussed."  01/14/2011 E-mail from David Gross to Andrew Nocella.  Mr. Nocella, based on this exchange, his industry experience, and his relationship with Sabre, understood this to mean that booking fees would increase to rack rates if US Airways did not sign a Travelocity agreement, but that Sabre would not alter its position demanding full content.  Sabre's plan to extend its monopoly pricing through Travelocity (and

other OTAs) was made complete with its unwavering threats to deny US Airways access to Sabre subscribers and the revenue US Airways relies upon to survive.

92.     Sabre continued to threaten US Airways with termination throughout the period leading up to the signing of a new agreement on February 22, 2011.  This agreement includes all of the anticompetitive and exclusionary terms Sabre required – accomplished, as the foregoing communications make plain – through a "my way or the highway" ultimatum.  Specifically, the new agreement includes a "full content" obligation identical to the TMA, identical "No Surcharge" and "Parity" provisions, and a similar "No Direct Connections" provision that severely restrict the development of alternative methods for distributing US Airways' content.

93.     On February 22, 2011, Sabre admitted that the absence of these restrictions – and presumably the competition that would ensue – "would have jeopardized Sabre's long term business interests."  02/22/2011 E-mail from David Gross to Andrew Nocella.  Sabre acted to forestall competition by imposing anticompetitive restrictions on one of its supposed "best customers," US Airways, and it did so while sacrificing the profits it could have obtained by entertaining US Airways' request for an agreement at higher "rack rates" without the anticompetitive provisions of which US Airways complained.

94.     Sabre continued its bullying into March 2011, when Sabre issued a press release touting its full content agreement with US Airways in which Sabre wrongly stated that "US Airways recognizes the value of the Sabre global distribution system and our innovative leadership."  03/02/2011 Sabre Press Release.  Contrary to this statement and as described in this complaint, US Airways "recognizes" that Sabre has acted to suppress innovation and that Sabre's "value" is primarily due to its own anticompetitive conduct.

**C.**     ***Individually and in Coordination, the GDSs' Agreements Ensure the Profitability and Survival of their Anticompetitive and Exclusionary Business Model***

95.     Realizing the power each GDS wields over airlines desiring to reach travel agencies locked into their dominant platforms, each GDS has ensured through various coordinated conduct, including outright agreement and signaling through public statements, that competition among them would be (and is easily) avoided.  As explained in this Complaint, the GDSs have also agreed amongst themselves to engage in a joint campaign to exclude potential new entrants.  The GDS conspirators have been very successful:  no new GDS has successfully entered the market in over 25 years.  In fact, the Department of Justice ("DOJ") is currently investigating Sabre and the other GDSs for violating the antitrust laws, including for "horizontal and vertical restraints of trade by global distribution systems."   05/19/2011 Letter from Department of Justice to US Airways (emphasis supplied).  Sabre has admitted to US Airways that Sabre received a Civil Investigative Demand from the U.S. Department of Justice in relation to this investigation.

96.     The GDSs agreed with each other because, as Sabre recently (and brazenly) stated in an email to US Airways, the GDSs would all be better off if "[w]e will not have to compete for [airlines'] attention."   07/16/2010 E-mail from Kyle Moore to John Gustafson. Mr. Gustafson, based on this exchange, his industry experience, and his relationship with and prior interactions with Sabre and Mr. Moore, understood Mr. Moore to be referring to all the GDS companies when Mr. Moore stated that "[w]e will not have to compete for your attention." By not having "to compete" for US Airways' "attention," the GDSs would thereby eliminate the possibility of any one of them getting ahead of its rivals in adopting and introducing to the marketplace US Airways' new and innovative offerings.  This desire not to compete is consistent with the fact that the GDSs have not competed for airline attention for years.  Based on this background, US Airways did not understand Mr. Moore to be part of any standard setting organization.  Instead, US Airways understood Mr. Moore to be proposing an approach that is inconsistent with Sabre's unilateral interests.  Namely, Mr. Moore was indicating an intent not to

become the first GDS to devise a technological solution to the inability of its antiquated system to incorporate US Airways' Choice Seats content and thereby to avoid the opportunity to market itself to travel agents as such.  Instead of acting in its unilateral interest, Sabre was merely seeking to maintain parity among the antiquated technological systems of the GDSs.  This conduct is not only contrary to Sabre's unilateral self-interest, but it is consistent with promoting, and acting in, the joint interest of all the GDS conspirators.

97.    On approximately March 7, 2006, Sabre entered an express agreement with rival GDS Amadeus to eliminate competition between them and to ensure that both obtained identical content from airlines.  In fact, Sabre issued a press release stating that "the agreement enables Sabre Travel Network to provide its travel agents with the ability to complete bookings on an airline that might not participate in the Sabre global distribution system (GDS).  Sabre will offer the same back-up for Amadeus."  03/07/2006 Sabre Press Release.  Thus through collusion, Sabre acted to remove the ability of airlines to differentiate between Amadeus and Sabre on content.  This express agreement between two supposed competitors eliminates the incentive for Amadeus and Sabre to compete for airline content and severely limits incentives travel agents might have to switch between the two GDSs.  It is indicative of the broader conspiracy among the three GDSs to promote the collective interests of the GDSs as opposed to Sabre's unilateral interests.

98.    The pattern of agreement is also seen – quite transparently – through the GDSs' insistence upon "full content" provisions in their separate agreements with each airline.  In particular, on information and belief, the GDSs have acted to prevent US Airways or any major carrier to be able to utilize the provision of information about fares – i.e., "content" – to foster competitive alternatives to the dominant GDS platforms or to replace GDSs with more sophisticated and less costly alternatives.  As set forth in detail below, the GDSs publicly announce their activities, including terms of business relationships with the airlines, through

press releases and public statements.  The experience of American Airlines, as detailed in its lawsuits against Travelport and Sabre, is consistent with the GDSs' treatment of US Airways. The fact of each GDS's insistence on "full content" provisions is beyond mere similarity and is alarming.

99.    Notably, none of the GDSs sought to distinguish themselves from one another based on unique content.  Instead, each GDS merely sought the same content as the others.

100.    The GDSs repeatedly issued press releases and publicly noted each of their deals for each major airline and whether that deal contained a "full content" provision.  For example:

- *American Airlines:*  On March 30, 2006, Worldspan announced that it entered a new agreement with American Airlines that includes "access [to] American Airlines' comprehensive published fares, inventory, and availability.  This includes all published fares that the airline sells through AA.com, any third party website or other distribution system, as well as private fares, where applicable." On May 7, 2006, Galileo announced a deal with similar terms that includes "continued access to full airline content."  Sabre followed on September 1, 2006, with a contract that "provides for full American Airlines content."   On October 19, 2006, Amadeus announced a contract with American Airlines, which included "[a]ccess to full content without the imposition of surcharges."

- *Delta Airlines:*  On April 21, 2006, Sabre announced a contract with Delta that included "long-term full content."   Likewise, on May 17, 2006, Galileo announced a contract with Delta that included "access to all fares offered by Delta." Similarly, Worldspan announced on September 29, 2006, a contract with Delta that included "access [to] all of Delta's published fares and related inventory, including those offered through other GDSs."

- *United Airlines:*  On April 10, 2006, Galileo announced a contract with United that included "access to the full content offered by United Airlines."  On April 13, 2006, Worldspan announced a contract with United that included "critical content on a long-term basis."   On April 21, 2006, Sabre followed, by announcing a contract with United that included "all United published fares and inventory."

- *Continental Airlines:*   On April 3, 2006, Continental signed a full content agreement with Worldspan.  On May 15, 2006, Sabre announced a contract with Continental that includes "full access to all fare information."  On June 6, 2006, Continental signed a full content agreement with Galileo.  On January 3, 2007,

Amadeus announced a contract with Continental that included "integrated access to full content."

- *Northwest Airlines:*  On January 24, 2006, Sabre announced a five year contract with Northwest that included access to "full content." On May 12, 2006, Northwest Airlines signed a full content deal with Worldspan.  On July 12, 2006, Northwest Airlines signed a full content deal with Galileo.  On November 30, 2006, Amadeus announced a contract with Northwest that included "the carrier's full content."

101.   The similarity of contract provisions, as reflected in public announcements, confirms that the GDSs did not seek to differentiate on content, but only sought to force air carriers to provide identical "full content."  As discussed above, this approach – particularly if jointly adopted by each of the dominant GDSs – served as the death knell to any efforts by third parties (such as Farelogix) or the air carriers (through direct connections) to move forward with alternative channels of distribution for travel agencies and passengers.

102.   In addition to seeking nearly identical provisions, the GDSs began publicly stressing the importance and exact nature of the full content provisions, thereby signaling to each other the meaning of full content and the necessity of obtaining similar full content provisions in GDS-airline contracts.

103.   For example, in November 2006, the Chief Marketing officer of Sabre has stated that "[a]ctive participation in industry groups such as . . . the Business Travel Coalition and its new Full Content Commission . . . . formed . . . for the express purpose of ensuring the industry realizes maximum value from the new airline agreements. . . . By staying actively engaged and continually making it clear that you demand efficient access to full content, you can help pave the way for continued clarity around full-content access beyond the terms of the current deals." Gregg Webb, *Op-Ed:  Deals Ensuring Full-Content Access Driven by Buyers*, Business Travel News, Nov. 6, 2006. US Airways understands this statement to be a part of the understanding among the GDSs and that this message would be subsequently reiterated by travel agents to Sabre's supposed rivals.

104.    On information and belief, based on its employees' experiences in the industry, discussions with others in the travel industry, Sabre's statements outlined above, and the Full Content Commission statements detailed below, US Airways believes the so-called "Full Content Commission" served as one of many methods through which the GDSs communicated their plans to each other and collectively sought to promote the interests of GDSs at the expense of potential competitors.  The risk of communicating their conspiracy more openly and directly was too great.

105.    The titular head of the Full Content Commission explained its purpose was – contrary to DOT and DOJ expectations – to ensure no change to "distribution economics":  "[o]f course, it is critical for travel managers and TMCs to remain vigilant – wherever and whenever content is withheld or other attempts are made to undermine distribution economics and managed travel programs.   To that end, the Business Travel Coalition is sponsoring a new initiative called the *Full Content Commission*."  11/12/2006 Letter from Kevin Mitchell to Travel Industry Colleagues.  Not surprisingly, the head of the Full Content Commission explained that the "response" from the established "industry" has been "most encouraging."   He stated that "[t]he *Commission* will be a watchdog group that will have bark as well as bite."  This "bite" would come from the coordinated demands by the GDSs in airline contracting.   Apparently referring to GDSs, the head of the Full Content Commission stated that "[c]orporations [will] see the tangible benefits, if need be, they can be counted on to contribute financially.  They will all benefit."  Dennis Schaal, *Do GDSs offer full content? Advocacy group intends to track it*, Travel Weekly, at 80, Oct. 9, 2006 (quoting Kevin Mitchell, head of the Full Content Commission). US Airways, based on its experience in the industry, understands this to mean that the GDSs would work together, through the proxy of the Full Content Commission, to ensure that each GDS pursued the same full content provisions with the airlines rather than compete with each other on these contractual terms.

106. Likewise, on information and belief, the Full Content Commission was intended to provide a method for the GDSs to police equal access to the airlines' "full content." As explained by Travel Weekly, "[t]he commission would give awards to airlines that made . . . promotions widely available to agents and corporations, and it would cite airlines that don't." Dennis Schaal, *Do GDSs offer full content? Advocacy group intends to track it*, Travel Weekly, at 80, Oct. 9, 2006. US Airways understands this to mean that the GDSs would use the Full Content Commission as a way to keep one another informed of which airlines were not offering full content and of actions being taken against those airlines.

107. The timing of the GDSs' public pronouncements regarding full content is also consistent with their jointly agreed upon approach to ensuring each air carrier would be forced to disclose full content to each GDS. Indeed, as the next round of airline-GDS agreements approached, the GDSs increased the frequency of their comments to ensure each GDS was on the same page and would not seek unique airline content.

108. In February 2009, a Sabre Senior Vice President stated "any kind of fragmentation is a bad thing, and the surcharge model is not a model we like or that we feel is the right model for the industry." Jay Campbell, *Protests Continue Against Lufthansa; BCD Eyes Sabre Talks*, Business Travel News, Feb. 25, 2009 (quoting Sabre Senior Vice President Martin Cowley). On information and belief, based on its industry experience, US Airways understands the term "surcharge model" as used by the Sabre Senior Vice President to mean a situation where airlines would be permitted to decide whether to pass on Sabre's exorbitant booking fees to Sabre subscribers.

109. Sabre has made clear in its public pronouncements why it does not like a so-called "surcharge" model: "It's sad to say the surcharge issue has incited or caused people to consider alternatives." Jay Campbell, *Protests Continue Against Lufthansa; BCD Eyes Sabre Talks*, Business Travel News, Feb. 25, 2009 (quoting Sabre Senior Vice President Martin Cowley).

110.    Throughout 2009, the GDSs were plainly in synch, as witnessed by their public announcements and, more importantly, by their coordinated acts.  In 2009, Sabre announced a deal with a small European carrier (easyJet) that Sabre asserted "is consistent with those made with other GDSs."  Jay Campbell, *Protests Continue Against Lufthansa; BCD Eyes Sabre Talks*, Business Travel News, Feb. 25, 2009 (quoting Sabre announcement).  US Airways understood this to mean Sabre, Amadeus and Travelport each had signed a full content agreement with easyJet.

111.    In November 2009, a Travelport Vice President boasted in a press release of Travelport's "strong track record of reaching full content agreements with flag carriers across the globe."  11/12/2009 Travelport Press Release.

112.    The coordinated public comments and coordinated acts continued into 2010.  On July 8, 2010, Travelport announced that Worldspan and Galileo had a contract with Continental that includes access to Continental Airlines' "published fares and related seat inventory, including Web fares available on its own site, reservation offices and through third parties . . . ." 07/08/2010 Travelport Press Release.

113.    On August 4, 2010, Travelport announced that Worldspan and Galileo had a new contract with United Airlines that included "access to the full content offered by United Airlines."  08/04/2010 Travelport Press Release.

114.    In August 2010, Sabre's Vice-President of Marketing clarified that ancillary fees should be covered by Full Content provisions:  "Our view would be that our contracts already govern this content and that we would simply need to figure out the appropriate technological way to introduce it to our booking path."  Jay Boehmer, *Airlines, GDSs In Contention Over Full Content Definition*, Business Travel News, Aug. 10, 2010 (quoting Sabre Vice-President of Marketing Kyle Moore).  Based on its experience with Sabre, US Airways viewed this statement as Sabre's confirmation of the GDSs' understanding regarding the definition of "full content."

-36-

115.    At around the same time, Sabre's CEO called upon attendees at the National Business Travel Association International Convention and Exposition to rally around the cause of ancillary fee "transparency."   The CEO of Travelport and the CEO of Amadeus were both present and spoke at this conference.   By "transparency," Sabre meant that the attendees at the conference should seek "full access to ancillary fees" through GDSs.

116.    Likewise, in August 2010, the head of airline distribution marketing at Amadeus stated:   "Whenever we negotiate full content agreements, we include ancillary services as well. That was the case in the past, and for Amadeus, we believe the full content definition we have covers ancillary services, and we've made even more clarification in the past year when we underwent negotiations."   Jay Boehmer, *Airlines, GDSs In Contention Over Full Content Definition*, Business Travel News, Aug. 10, 2010 (quoting Amadeus head of marketing Cyril Tetaz).   US Airways understood this statement to mean that Amadeus intentionally took the same approach as Sabre to ancillary offerings.

117.    In September 2010, the CEO of Travelport publicly stated "As new products and services are provided, it should go into the distribution.   This is not a contractual issue."   Jay Boehmer, *Face to Face with Travelport CEO Jeff Clarke*, Business Travel News, Sept. 16, 2010 (quoting Travelport CEO Jeff Clarke).   US Airways understood this statement to mean that Travelport intentionally took the same approach as Sabre and Amadeus to ancillary offerings.

118.    In November of 2010, a Sabre Senior Vice President publicly stated:   "When we negotiate our distribution agreements with airlines we negotiate for full content and this will inevitably include the ways airlines choose to include these ancillaries – either bundled or unbundled."   *Sabre gets to grips with ancillary fees*, Business Travel Magazine, Nov./Dec. 2010, at 48 (quoting Sabre Senior Vice President Martin Cowley).

119.   Public statements such as the foregoing were intended to make sure all GDSs were on the same page and avoided competition away from full content with any particular airline.

120.   On information and belief, the GDSs also met frequently throughout this period. Indeed, Sam Gilliland, Sabre's CEO, referring to other GDSs, told Travel Weekly in an article published November 2, 2009: "As a normal course of business, we meet.  In fact, we have other GDSs in-house today.  I suppose it's viewed as odd, but our systems have been interconnected for decades, on the back end.  We serve up information on the world's airlines to each other.  It's the nature of our business."

121.   The pattern and frequency of communications, along with in-person meetings and coordinated conduct leave little room for any conclusion other than the GDSs expressly communicated with one another to ensure that none would break ranks on "full content" or other terms that could provide a glimmer of hope for building alternative distribution channels.

122.   Indeed, Sabre also sought to bring in other GDSs to its discussions with US Airways over Choice Seats.  Sabre stated that it wanted "to have a face-to-face meeting with US where we also include the other GDSs, with whom we've been working, to discuss how US Airways enables this for ALL GDS companies . . . ."  07/16/2010 E-mail from Kyle Moore to John Gustafson.

123.   When corresponding with US Airways, Sabre advocated for other GDSs, stating that a joint meeting including other GDSs "would go a long way to convincing us collectively that you're really out to solve the problem technically.  This is how we want to engage your team, as we really believe it will help us run faster for both US and the GDS companies." 07/16/2010 E-mail from Kyle Moore to John Gustafson.  Mr. Gustafson understood this to mean that Sabre was primarily interested in foregoing any opportunity to further Sabre's unilateral

interest in being the first GDS to bring Choice Seats to travel agents and instead ensuring that none of the GDSs got ahead of the others in adopting US Airways' new offerings.

124.   Sabre admitted that it wanted to avoid competition with other GDSs, stating that the GDSs would all be better off if "[w]e will not have to compete for your attention" and "[w]e will be able to think through it together (all of us) and be smarter about it."   07/16/2010 E-mail from Kyle Moore to John Gustafson.   There is no plausible procompetitive basis for the GDSs to coordinate on content-related issues.   Rather, staying on message was a key component to preventing competition from invading the GDSs anticompetitive business model.

125.   Moreover, on information and belief, the GDSs have collectively refused to permit major airlines or nascent competitors from accessing their APIs to enable beneficial direct connections through innovative, lower cost alternatives like Farelogix.   For example, on information and belief, Travelport eliminated Farelogix's API access to Travelport and stated to American Airlines that because American helped create the GDS "beast," it should "continue to live with it."   Pl.'s Amended Original Pet. & App. for TRO & Temporary Injunction at 10-11, American Airlines, Inc. v. Travelport, Inc. et al., No. 067-249214 (Tarrant Cty. Tex. Dist. Ct. Jan. 10, 2011).   Sabre also eliminated Farelogix's API access to Sabre.   The GDSs' joint refusal to allow direct connections, Farelogix, and other nascent threats interoperability with their systems and their willingness to allow established GDSs interoperability is evidence that the GDSs' goal is to thwart nascent competitive threats.

126.   On information and belief, Sabre and other GDSs have also coordinated retaliatory punishments against airlines that attempt to disturb the GDSs' supracompetitive profits.   For example, in November 2010, American Airlines gave notice to Orbitz that American would terminate certain agreements with Orbitz.   On information and belief, Travelport retaliated (Travelport has a large ownership stake in Orbitz) by, among other things, suing American, biasing the results Travelport displays to travel agents to the detriment of American, and

doubling the booking fees charged to American.  Michele McDonald, *Travelport Kicks Back, Will Display AA Surcharges on GDS*, Travel Market Report, Dec. 20, 2010; Verified Compl. for Decl. Judgment, Travelport, LP v. American Airlines, Inc., No. 10-CH-48028 (Cook Cty. Circ. Ct. Nov. 5, 2010).  Travelport has also begun paying Orbitz to resist direct connections from American.  In late December, 2010, after American defeated a preliminary injunction motion sought by Travelport, American terminated the Orbitz agreements at issue.  Pl.'s Amended Original Pet. & App. for TRO & Temporary Injunction at 9-10, American Airlines, Inc. v. Travelport, Inc. et al., No. 067-249214 (Tarrant Cty. Tex. Dist. Ct. Jan. 10, 2011).

127.   On information and belief, in early January 2011, Sabre, in apparent retaliation against American and in support of Travelport, doubled the booking fees it charged to American and also began biasing the results Sabre displays to travel agents to the detriment of American. Pl.'s Amended Original Pet. & App. for TRO & Temporary Injunction at 14-15, American Airlines, Inc. v. Travelport, Inc. et al., No. 067-249214 (Tarrant Cty. Tex. Dist. Ct. Jan. 10, 2011); Michele McDonald, *American Wins Restraining Order Against Sabre, Hints at GDS Collusion*, Travel Market Report, Jan. 13, 2011.  Notably, rather than seek to compete against Travelport by stressing that it provided unbiased results, Sabre followed Travelport's lead. Indeed, Sabre apparently biased against American despite the fact that it would have been more profitable for Sabre not to bias against American, but continue to offer less biased results to travel agents and collect the doubled booking fees.

128.   On information and belief, based on the nature and timing of this conduct, US Airways' employees' experiences in the industry, and discussions with others in the travel industry, US Airways believes that Sabre and Travelport undertook these retaliatory actions in coordination with one another in order to preserve their supra-competitive profits, and to send a message to other airlines – such as US Airways – not to attempt to upset the GDS industry structure.

129.    In light of this retaliatory conduct, the DOT recently warned Sabre against bias, stating in a February 2011 letter that bias could steer consumers to "relatively inferior flights." DOT Letter, Feb. 1, 2011, *available at* http://airconsumer.dot.gov/rules/OTAGDSDisplayBias Warning.pdf

130.    On information and belief, Sabre and other GDSs have also agreed to engage in a misleading public relations campaign against direct connection systems in order to protect the GDSs.    For example, in November 2010, Travelport began circulating a memo on "myth-busting" the virtues of direct connection systems.    Travelport, *Single-Carrier Direct Connect:   Myth vs. Fact*.   Similarly, in December 2010, Sabre made public statements decrying airline direct connects as "costly and unproven" in contrast to the supposedly "successful and proven system" of the legacy GDSs.    Michele McDonald, *Industry Groups:    AA's Direct-Connect Strategy Is Costly and Unproven*, Travel Market Report, Dec. 27, 2010 (quoting Sabre Senior Vice President Chris Kroeger).   More recently, Sabre has attempted to minimize direct connections and Farelogix by labeling these nascent threats as "one-off connections" that "disrupt" the GDS platform irrespective of the obvious benefits this alternative channel delivers to consumers and to travel agencies.    On information and belief, based on Sabre's conduct described in this complaint, the public reports noted above, and the industry experience of US Airways' employees, US Airways believes that Sabre is actually concerned about the disruptive effect the "direct connection" efforts could have on the anticompetitive and monopolistic profits that Sabre has enjoyed over the years.

### *The Relevant Markets:  The GDS Market and the Sabre Submarket*

131.    The relevant markets at issue in this lawsuit include, first, a broader market that encompasses the dominant GDSs (Sabre, Travelport, and Amadeus).   This market, which Sabre, Travelport, and Amadeus have successfully shielded from competition through their individual and joint actions, is defined below as the "GDS Market."   Within the GDS Market, Sabre enjoys

an anticompetitive island unto itself – a submarket defined below as the "Sabre Submarket."  In particular, in order to obtain access to most of the travel agencies in the Sabre Submarket, US Airways must deal with Sabre – not even the other GDSs are available to it.  The costs for many travel agencies of switching to another GDS are prohibitive and, equally as important, the kickbacks the travel agencies obtain from Sabre eliminate their incentive to venture elsewhere.

**A.      *The GDS Market***

132.    The distribution of GDS services – including airline fare, flight, and availability information and reservation and ticketing capability – to travel agents is a relevant market (the "GDS Market").

133.    The travel agencies that are critical to airlines – in particular, the relatively few agencies serving the vast majority of business travelers – work primarily through GDSs.  Due to the additional services offered by travel agencies and corporate policies, travel agency customers (especially the high-value business traveler) do not view other methods of purchasing tickets to be reasonable substitutes for purchases through travel agencies.  Accordingly, airlines do not view other distribution channels as reasonable alternatives.

134.    Although direct connections and use of direct connection aggregators such as Farelogix are technologically feasible, bookings from this method of distribution have not developed into a reasonable alternative for airlines due to the anticompetitive conduct described in this complaint.

135.    GDS booking fees are not meaningfully constrained by the price of non-GDS distribution methods.  Were US Airways to face an increase in booking fees by the GDSs, it would have no ability to shift distribution to a non-GDS method of distribution without experiencing a catastrophic business interruption.  GDSs, on the other hand, are able profitably to increase the fees charged to airlines.

-42-

136.     The geographic scope of the GDS Market is the United States.  GDS services tend to be localized by country due to differences in language and geography and other country-specific factors, including varied national regulations relating to GDSs and the provision of the underlying air transportation routes by foreign and domestic air carriers.  On information and belief, many airlines therefore enter agreements with GDSs on the basis of country.

**B.     *The Sabre Submarket***

137.     Within the market for distribution of GDS Services, a narrower market definition – or submarket – is the distribution of GDS services to Sabre subscribers (the "Sabre Submarket").  The geographic scope of the Sabre Submarket is the United States.

138.     On information and belief, a large share of travel agencies (and their high-value business travelers) in the United States use Sabre's GDS services exclusively and do not view other distribution methods to be adequate substitutes.  American Society of Travel Agents, *Global Distribution System (GDS) Report* 7 (May 2010) (finding 86% of responding travel agents used only one GDS).  Thus, if US Airways wants to sell tickets to travelers who rely on travel agents that subscribe to Sabre, US Airways has no alternative but to participate in Sabre or risk losing those sales.  On information and belief, other airlines do not view other GDSs as reasonably interchangeable with Sabre for similar reasons.

139.     Because airlines – such as US Airways – cannot switch bookings from Sabre to another GDS (or non-GDS platform), the cross-elasticity of demand for Sabre GDS services and any potential alternative is at or near zero.  Accordingly, Sabre is able to impose profitably a small but significant price increase on its airline customers.

140.     Courts and regulators have also recognized that each GDS constitutes a relevant market for antitrust purposes.  For example, after reviewing evidence presented by Sabre and parties to litigation against Sabre, a federal court concluded that:

> *The evidence*, interpreted in a light most favorable to plaintiff, *could permit a reasonable jury to conclude that SABRE is a separate service market* because there is evidence that airlines view each [GDS] as offering a unique service:  access to a particular set of travel agents.  A reasonable jury may conclude from the evidence that SABRE automated agents are locked into SABRE (through contractual provisions) and that [SABRE] is free to extract supracompetitive booking fees from participating airlines, although the fees are not high enough to justify abandoning the system.

*In re Air Passenger Computer Reservations Systems Antitrust Litigation,* 694 F. Supp. 1443, 1460 (C.D. Cal. 1988) (emphasis supplied), *aff'd on other grounds, sub nom., Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991).

141.     Both the DOJ and the DOT have concluded – after review of an extensive factual record – that distribution through Sabre constitutes a separate relevant antitrust market.  Indeed, in 2004, the DOT roundly rejected Sabre's claim that the relevant antitrust market was broader, finding instead that "Sabre has failed to show that the relevant market is not each system, but the broader market of providing travel information to consumers, or airline ticket distribution."  "As a practical matter, airlines wishing to electronically provide information and booking capabilities to travel agencies currently have no effective substitute for participation in each system. . . . Each system is a separate market insofar as airlines are concerned."  Computer Reservations System Regulations, 69 Fed. Reg. 976, 988 (Jan. 4, 2004).

## BARRIERS TO ENTRY

142.     The relevant markets defined in this complaint have significant and lasting barriers to entry that serve to protect the monopoly power of the established GDSs, including Sabre.  For example, Sabre has acted to reinforce and raise the high switching costs that must be overcome before a travel agency acts to connect to an airline through a channel of distribution other than the dominant GDSs.  Specifically, as discussed above, Sabre locked in travel agents

through kickback payments and the use of peripheral systems that inhibited the ability of travel agents to switch away from Sabre.  As a result of the barriers to entry and Sabre's conduct and agreements, no new GDS has achieved success in the United States in more than twenty-five years.  As discussed in this complaint, Sabre has acted to raise and reinforce the barriers to entry in order to protect its monopoly from entry by potential competitors.  In particular, Sabre has acted through its exclusionary conduct and anticompetitive agreements to erect substantial barriers to entry by more efficient and less expensive alternatives such as Farelogix.

143.    Indeed, the GDSs have themselves acknowledged the significant barriers to entry. Sabre has stated that alternative distribution systems are unable to offer a competitive alternative because such "systems often must rely on the scale and functionality of a GDS such as our Sabre system for a complete travel distribution solution for suppliers and travel agencies. . . . They require the integration of a new, stand alone system into most existing agency or corporate booking tool workflows."  Travelport has admitted that "[i]n order to become a successful participant in the GDS industry, a new market entrant would face several barriers to entry, including . . . the costs and length of time required to establish relationships and negotiate agreements with travel agencies, which are generally operating under multi-year contracts with existing GDSs and which incur costs in converting to a new GDS."

### SABRE'S MONOPOLY POWER OVER US AIRWAYS

144.    The GDS Market is extremely concentrated in the United States, with only three market participants.  Sabre possesses significant market power in the GDS Market in the United States.   Sabre also possesses monopoly power in the Sabre Submarket and holds an overwhelmingly dominant market share in that submarket.

145.    Sabre has consistently acted as a "price maker" – the hallmark of a monopoly – in deciding what price to charge airlines such as US Airways and how to structure those relationships.  The abilities to impose financial penalties and significant price increases without

threat of competition from other methods of distribution are attributes of price-making.   As discussed above, Sabre threatened financial penalties if US Airways did not quickly come to terms – Sabre's terms – on a new "agreement."   The new agreement – like the old agreement – not only included terms related to Sabre's distribution of US Airways' fares in the United States, but also to the rest of the world as well.   Sabre's ability to set price in the United States and abroad is a function of its monopoly power in the United States.   Likewise, Sabre has imposed price increases on US Airways in the past, and US Airways had no ability to shift bookings to another method of distribution.   Moreover, on information and belief, Sabre has recently doubled the fees it charges to American Airlines and American was unable to shift bookings to another distribution method.   Pl.'s Amended Original Pet. & App. for TRO & Temporary Injunction at 14-15, American Airlines, Inc. v. Travelport, Inc. et al., No. 067-249214 (Tarrant Cty. Tex. Dist. Ct. Jan. 10, 2011).   The fact that Sabre has rejected US Airways' offers to pay *increased* booking fees in exchange for a relaxation of Sabre's restrictive terms is also direct evidence that Sabre can impose a *de facto* price increase on airlines such as US Airways.

146.    Sabre's ability to keep its booking fees high over an extended period while the cost of many of its inputs – e.g., computing technology – has spiraled severely downward over that period is direct evidence of the ability to act as a price maker, rather than a price taker – i.e., direct evidence of monopoly power.

147.    Sabre has also succeeded, as the foregoing allegations plainly show, at utilizing its monopolistic heft in contracting to exclude and/or keep at bay potential rivals – e.g., Farelogix. This, too, is direct evidence of monopoly power, as is the impact on air carriers like US Airways (in the way of higher booking fees and the other harm set forth in this complaint) of Sabre's exclusionary terms in its agreements.

148.    Sabre's ability to exclude airlines from distributing tickets to travel agencies through display bias and other means is also direct evidence of its monopoly power.   Finally,

Sabre's ability to erect new barriers to entry and to enhance existing barriers to entry is also evidence of its monopoly power.

## ANTITRUST IMPACT AND DAMAGES

149.     The unlawful agreements and acts described in this complaint have had at least the following effects:

      a)    Competition in the relevant market and submarket was restrained, suppressed and eliminated in the United States;

      b)    Prices charged by Sabre to US Airways (and other airlines) whether through OTA wholesale agreements or otherwise were artificially raised, stabilized and maintained at artificially high and non-competitive levels in the United States and abroad;

      c)    Reliance on Sabre's antiquated and inefficient technology systems by US Airways (and other airlines) has been maintained and increased; and

      d)    As a direct and proximate result of the illegal conduct described in this complaint, US Airways has been injured and financially damaged in its respective businesses and property, in amounts that are presently undetermined.

150.     The precise amount of damages that US Airways is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.  In addition, Sabre's violations of the law are ongoing wrongs causing incalculable and irreparable injury for which there is no adequate remedy at law.

## COUNT I

### *Vertical Agreements By Sabre in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1*

151.     Plaintiff repeats the allegations above as if fully set forth herein.

-47-

152.    The relevant market for this count is both the Sabre Submarket and the GDS Market.

153.    As described in this complaint, Sabre has entered into a series of agreements with airlines and travel agents that, taken separately and/or together, unreasonably restrain competition in the markets at issue.  These restrictions diminish and eliminate any competitive threat to Sabre's monopoly position in the Sabre Submarket and they similarly hold at bay threats to the market power of the three dominant GDSs in the GDS Market.

154.    Through the agreements with airlines, Sabre has restricted the ability of airlines to support new, more efficient distribution channels by preventing airlines from providing content to support such new alternative channels of distribution.  In the absence of Sabre's restraints, and faced with Sabre's high GDS fees, many airlines would encourage customers to use the lowest-cost alternative by ensuring attractive fares could be made available to those distributors. By imposing its restraints on US Airways and airlines that cause full content to pass through its own platform, Sabre has insulated itself from competition with other GDS and non-GDS distribution methods.  The restraints imposed by Sabre are amplified by the fact that other GDSs have very similar provisions, thereby eliminating any realistic possibility of distributing content in more efficient, cheaper methods.

155.    The restraints also reduce incentives for Sabre and other GDSs to offer airlines improved distribution services that would benefit consumers, because airlines such as US Airways cannot encourage customers to use any improved options without violating Sabre's contractual restraints.  Sabre thus can maintain high prices and restrictive terms for its services with confidence that no competitor will take away significant volume through competition in the form of better content or significantly better pricing that would ultimately benefit consumers. Sabre's price for distribution services to airlines is higher than it would be without the restraints.

Through these agreements, Sabre avoids enhanced competition in the relevant markets and the loss of its anticompetitive rents.

156.   In addition to Sabre's contractual restraints vis-à-vis the airlines, Sabre's agreements with many travel agents are exclusionary.  For example, as discussed above, on information and belief, Sabre makes payments directly to travel agents, in effect buying the agents' *de facto* exclusivity.  In addition, the peripheral ancillary services and computer tools Sabre agrees to provide to travel agents are bundled with Sabre's GDS and include restrictive APIs, which increase switching costs for the travel agents.  Moreover, Sabre's agreements on "volume thresholds" and "transaction ratios" reduce any incentive for those travel agents to contract with any nascent or established alternative.  In addition, Sabre has certain explicit exclusive arrangements with travel agents.  These, and other arrangements described in this complaint, form a web of agreements that foreclose competition on the merits.  Competition is harmed in the GDS Market as new entrants are foreclosed from offering alternative distribution platforms to those of the dominant GDSs.  Similarly, competition is harmed in the Sabre Submarket where US Airways is forced to deal with Sabre in order to reach travel agents locked into Sabre's platform.

157.   As a result of these illegal contracts, combinations, and agreements, competition in each relevant market has been unreasonably restrained in violation of Section One of the Sherman Act, 15 U.S.C. § 1.  US Airways has been injured in its business property by reason of these illegal contracts, combinations, and agreements and is therefore entitled to damages under Section Four of the Clayton Act, 15 U.S.C. § 15, and an injunction under Section Sixteen of the Clayton Act, 15 U.S.C. § 26.

## COUNT II

### *Monopolization of the Sabre Travel Agent Market*
### *in Violation of Section 2 of the Sherman Act,* 15 U.S.C. § 2

158.    Plaintiff repeats the allegations above as if fully set forth herein.

159.    Sabre possesses monopoly power in the Sabre Submarket.  Through the anticompetitive conduct described herein, Sabre has willfully maintained, and unless restrained by the Court will continue willfully to maintain, that power by anticompetitive and unreasonably exclusionary conduct.

160.    With its nearly 100% share of the Sabre Travel Agent Market – a market with high barriers to entry both through unlawful contracts and other conduct described herein – Sabre possesses monopoly power.  In addition, Sabre's monopoly power is demonstrated directly by its strong-armed negotiating tactics and apparent willingness to forego US Airways' business, by its actual exercise of power over price and related contractual terms, and by its actual exclusion of nascent, more-efficient, less-expensive competitors from the market.  Finally, Sabre's monopoly power in the Sabre Submarket is further enhanced by the strength of its position in the GDS Market, where it enjoys market power along with the other GDSs.

161.    The exclusionary agreements and related conduct described in this complaint illegally entrench and maintain Sabre's monopoly.  In addition, Sabre's actions to raise and maintain barriers to entry, to exclude nascent competition, and to impose the oppressive contractual terms discussed above on US Airways are exclusionary and serve to maintain Sabre's monopoly.

162.    Sabre has acted with an intent to maintain its monopoly power illegally in the Sabre Submarket, and its illegal conduct has enabled it do so, in violation of Section 2 of the Sherman Act.  US Airways has been injured in its business property by reason of this conduct

and is therefore entitled to damages under Section Four of the Clayton Act, 15 U.S.C. § 15, and an injunction under Section Sixteen of the Clayton Act, 15 U.S.C. § 26.

**COUNT III**

***Conspiracy to Monopolize the Sabre Travel Agent Market
in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2***

163.    Plaintiff repeats the allegations above as if fully set forth herein.

164.    Sabre has monopoly power in the Sabre Submarket.

165.    Sabre, Sabre subscribers, and others have entered into agreements, contracts, combinations, or conspiracies with one another and have engaged in concerted activities to harm competition, with the specific intent of preserving Sabre's monopoly power.   In particular, as described above, Sabre has entered into agreements with travel agents (including OTAs) that require the agents' *de facto* or *de jure* exclusivity.   For example, Sabre has entered into agreements with travel agents that contain terms relating to "volume thresholds," "transaction ratios," or similar terms.   These agreements are intended to (and do) preserve Sabre's monopoly power.   Travel agents are thereby able to secure kickbacks and other benefits paid out of the monopoly rents extracted by Sabre from airlines such as US Airways.   Sabre's exclusionary agreements described in this complaint have unreasonably restrained competition and harmed consumers, and they have directly and proximately caused injury to US Airways' business and property.   Specifically, US Airways is and will be forced to continue paying monopoly prices, efficient technology alternatives will be stunted, and competition among GDSs on the merits will be impeded.

166.    US Airways has been injured in its business property by reason of this conduct and is therefore entitled to damages under Section Four of the Clayton Act, 15 U.S.C. § 15, and an injunction under Section Sixteen of the Clayton Act, 15 U.S.C. § 26.

-51-

## COUNT IV

### *Horizontal Agreement among Sabre and other GDSs*
### *in Violation of Section 1 of the Sherman Act,* **15 U.S.C. § 1**

167.    Plaintiff repeats the allegations above as if fully set forth herein.

168.    Sabre, Travelport, and Amadeus have entered into a reciprocal agreement, contract, combination, or conspiracy, the purpose and result of which is to entrench the dominance of each GDS and to impede competition on the merits.

169.    This agreement is per se unlawful, and in the alternative violates the rule of reason by restricting trade in the GDS Market.

170.    In furtherance of this agreement to maintain the current industry structure, Sabre has agreed and engaged in conduct intended to limit competition among the GDSs.  Among other things described in this complaint, Sabre has agreed with other GDSs to limit competition for airline content by entering into an explicit agreement with Amadeus to not compete on content, agreeing with other GDSs on the meaning of terms such as "full content," seeking virtually identical content provisions, seeking joint negotiations with individual airlines on content, and engaging in joint retaliation against airlines that sought lower cost, more efficient alternatives. Through these arrangements, Sabre intended to and has in fact entrenched the industry structure and avoided the diminishment of its lucrative GDS.

171.    As a result of these illegal contracts, combinations, and agreements, competition in each relevant market has been restrained in violation of Section One of the Sherman Act, 15 U.S.C. § 1.  US Airways has been injured in its business property by reason of these illegal contracts, combinations, and agreements and is therefore entitled to damages under Section Four of the Clayton Act, 15 U.S.C. § 15, and an injunction under Section Sixteen of the Clayton Act, 15 U.S.C. § 26.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays as follows:

a.    That Sabre's conduct specified in this complaint be declared by the Court to violate Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

b.    That judgment be entered for Plaintiff against Sabre for three times the amount of damages sustained by Plaintiff as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Section 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

e.    That Plaintiff be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law;

f.    That equitable relief be issued in the form of a permanent injunction prohibiting the ongoing exclusionary conduct, and unreasonable agreements entered into, by Defendant; and

g.    That Plaintiff have such other, further or different relief as the case may require and the Court deems just and proper under the circumstances.

Dated:  March 9, 2016

Respectfully Submitted,

Charles P. Diamond (*pro hac vice*)
 cdiamond@omm.com
Andrew J. Frackman
 afrackman@omm.com
Katrina M. Robson (*pro hac vice*)
 krobson@omm.com
Madhu Pocha (*pro hac vice*)
 mpocha@omm.com
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036
Telephone:     (212) 326-2000
Facsimile:     (212) 326-2061

-54-