**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

US Airways, Inc.

         Plaintiff,

   v.

Sabre GLBL Inc.
Sabre Holdings Corp.
Sabre Travel Int'l Ltd.

         Defendants.

Civ. A. No. 1:11-cv-02725-LGS

ECF Case

**REDACTED – PUBLIC VERSION**

**SABRE'S *DAUBERT* MOTION**
**TO EXCLUDE CERTAIN TESTIMONY OF**
**JOSEPH STIGLITZ AND DANIEL MCFADDEN**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION...............................................................................................1

ARGUMENT......................................................................................................5

I.     Expert Testimony Must Meet Standards of Reliability and Relevance.................5

II.    Stiglitz's Opinions on Booking Fees and Harm Are Inadmissible......................8

      A.    Stiglitz's Admission that Other Factors Caused Sabre's Market Power and the Resulting "Supracompetitive" Booking Fee Renders His Opinions about the "Competitive" Booking Fee Irrelevant and Unreliable ...............................................................................8

            i.    Stiglitz's "Competitive" Booking Fees Do Not Reflect the "But-For" World, and Thus Are Irrelevant and Unreliable ...........8

            ii.    Stiglitz's Failure to Disaggregate Harm Caused by Allegedly Unlawful Conduct from Harm Caused by Lawful Factors Renders His Booking Fee Opinions Irrelevant and Unreliable ...............................................................................12

      B.    Stiglitz's Alternative Booking Fees Are Based on an Invalid Benchmark and Rely on an Invalid Analysis by Another US Airways Expert ...............................................................................14

            i.    Stiglitz's Opinion that the "Competitive" Booking Fee Might Be ███ Is Unfounded and Therefore Inadmissible...........14

            ii.    The ███ Booking Fee Also Is Not a Valid Benchmark .............17

            iii.    Reliance on Zimmerman Does Not Save Stiglitz's ███ Opinion ...............................................................................19

III.    McFadden's Damage Calculation Is Inadmissible .............................................22

      A.    McFadden Relies on Unreliable Alternative Booking Fees as Inputs .............................................................................................22

      B.    McFadden's Failure to Consider Additional Costs US Airways Would Face in the But-For World Renders His Damages Calculations Unreliable and Inadmissible ...............................24

            i.    An Admissible Damages Calculation Must Account For Additional Costs in the But-For World.......................................24

            ii.    There Is No Dispute that McFadden Ignored the Additional Costs and Decreased Sales US Airways Would Face in the But-For World ...............................................................................24

            iii.    US Airways Cannot Cure This Flaw by Arguing "Pass On"........27

      C.    McFadden's Damages Calculations Are Simple Arithmetic And Not Helpful to the Jury...............................................................29

      D.    McFadden's "Cross Subsidy" Opinion Should Be Excluded because It Is Irrelevant, Unduly Prejudicial, and Unreliable...................30

CONCLUSION.................................................................................................32

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*American Booksellers Association, Inc. v. Barnes & Noble, Inc.*,
135 F. Supp. 2d 1031 (N.D. Cal. 2001) .......................................................................7

*Amorgianos v. National Railroad Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ..................................................................................5-6

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) ..............................................................................................15

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) ...................................................................................13

*Blue Dane Simmental Corp. v. American Simmental Association*,
178 F.3d 1035 (8th Cir. 1999) ................................................................................13

*Coleman Motor Co. v. Chrysler Corp.*,
525 F.2d 1338 (3d Cir. 1975) .................................................................................13

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ......................................................................7, 13-14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ..........................................................................................1, 5-6

*El Aguila Food Products, Inc. v. Gruma Corp.*,
131 F. App'x 450 (5th Cir. 2005) ............................................................................17

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000) .....................................................................................7

*Federal Trade Commission v. Elders Grain, Inc.*,
868 F.2d 901 (7th Cir. 1989) (Posner, J.) ...............................................................22

*General Electric Co. v. Joiner*,
522 U.S. 136 (1997) ...........................................................................................6, 17

*Group Health Plan, Inc. v. Philip Morris, Inc.*,
   188 F. Supp. 2d 1122 (D. Minn. 2002), *aff'd in relevant part and remanded*
   *sub nom. Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753
   (8th Cir. 2003) ................................................................................................7

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
   392 U.S. 481 (1968) ............................................................... 24, 27-28

*In re Air Disaster at Lockerbie, Scotland*,
   37 F.3d 804 (2d Cir. 1994)................................................................6

*In re Brand Name Prescription Drugs Antitrust Litigation*,
   186 F.3d 781 (7th Cir. 1999)................................................................7

*In re Connolly North America, LLC*,
   398 B.R. 564 (Bankr. E.D. Mich. 2008)................................................29

*In re Fresh Del Monte Pineapples Antitrust Litigation*,
   No. 04-md-1628 (RMB)(MHD), 2009 WL 3241401(S.D.N.Y. Sept. 30,
   2009), *aff'd sub nom. American Banana Co., Inc. v. J. Bonafede Co., Inc.*, 407
   F. App'x 520 (2d Cir. 2010) ................................................................26

*In re Rezulin Products Liability Litigation*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ..................................................23

*Johnson Electric North America Inc. v. Mabuchi Motor America Corp.*,
   103 F. Supp. 2d 268 (S.D.N.Y. 2000) ..................................................7

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) ..........................................................................5-6

*Lewis v. CITGO Petroleum Corp.*,
   561 F.3d 698 (7th Cir. 2009)................................................................7

*Los Angeles Memorial Coliseum Commission v. National Football League*,
   791 F.2d 1356 (9th Cir. 1986)....................................................... 24, 29

*MCI Communications Corp. v. American Telephone & Telegraph Co.*,
   708 F.2d 1081 (7th Cir. 1983)..........................................................12-13

*Minasian v. Standard Chartered Bank, PLC*,
   109 F.3d 1212 (7th Cir. 1997)...................................................... 6, 27

*Murphy Tugboat v. Crowley*,
   658 F.2d 1256 (9th Cir. 1981) .................................................................................. 24

*Name.Space, Inc. v. Network Solutions, Inc.*,
   202 F.3d 573 (2d Cir. 2000) .................................................................................... 10

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005) ............................................................................. 6, 30-31

*Primavera Familienstifung v. Askin*,
   130 F. Supp. 2d 450 (S.D.N.Y. 2001) ............................................................... 6-7, 27

*Rottlund Co. v. Pinnacle Corp.*,
   452 F.3d 726 (8th Cir. 2006) ..................................................................................... 7

*Rx.com Inc. v. Hartford Fire Insurance Co.*,
   426 F. Supp. 2d 546 (S.D. Tex. 2006) .................................................................... 29

*Schwartz v. Fortune Magazine*,
   193 F.R.D. 144 (S.D.N.Y. 2000) ............................................................................. 29

*Solorio v. Asplundh Tree Expert Co.*,
   No. 02 CIV. 8035(RJS), 2009 WL 755362 (S.D.N.Y. Mar. 23, 2009) ....................... 5

*Tyger Construction Co. Inc. v. Pensacola Construction Co.*,
   29 F.3d 137 (4th Cir. 1994) ..................................................................................... 23

*U.S. Football League v. National Football League*,
   842 F.2d 1335 (2d Cir. 1988) ......................................................................... 12-13, 29

*U.S. Football League v. National Football League*,
   No. 84 Civ. 7484 (PKL), 1986 WL 7012 (S.D.N.Y. June 17, 1986) .................... 28-29

*United Air Lines, Inc. v. Civil Aeronautics Bd.*,
   766 F.2d 1107 (7th Cir. 1985) .................................................................................. 10

*United States v. Kwong*,
   69 F.3d 663 (2d Cir. 1995) ....................................................................................... 31

*United States v. Rahman*,
   189 F.3d 88 (2d Cir. 1999) ....................................................................................... 31

*US Airways, Inc. v. Sabre Holdings Corp.*,
   105 F. Supp. 3d 265, 271 (S.D.N.Y. 2015) ..................................................... <u>passim</u>

*Virgin Atlantic Airways Ltd. v. British Airways,*
  PLC, 257 F.3d 256 (2d. Cir. 2001) .................................................................... 10

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*,
  549 U.S. 312 (2007) ........................................................................................... 10

*Williamson Oil Co., Inc. v. Philip Morris USA*,
  346 F.3d 1287 (11th Cir. 2003) .......................................................................... 13

*Zaremba v. General Motors Corp.*,
  360 F.3d 355 (2d Cir. 2004) ............................................................................... 23

**Other Authorities**

Fed. R. Evid. 403 .................................................................................................... 6, 31

Fed. R. Evid. 702 ................................................................................................. <u>passim</u>

## INTRODUCTION

US Airways claims it paid Sabre "supracompetitive" booking fees as a result of the challenged contract provisions.  It seeks damages from the alleged booking fee "overcharge."  In support of these claims, US Airways seeks to offer expert testimony from two economists, Joseph Stiglitz and Daniel McFadden.  Stiglitz identifies two "alternative" booking fees—███ ███—that he opines would have prevailed in a "competitive" world.  He concedes, however, that a host of market conditions other than the challenged contract provisions contributed to the market not being "competitive."  The most Stiglitz can say, therefore, is that the booking fees in the "but-for" world—*i.e.* a hypothetical world without the challenged contract provisions—would "probably come down closer to" his "competitive" fees.  He concedes that he did *not* actually determine the "but-for" booking fee.

McFadden then calculates the amount Sabre purportedly "overcharged" US Airways using Stiglitz's "competitive" booking fees as the fees US Airways would have paid in the but-for world—despite Stiglitz's admission that his alternative fees do *not* represent the "but-for" fees.  Stiglitz's and McFadden's failure to determine the "but-for" booking fee, or to segregate the various lawful and unchallenged barriers to competition they concede contributed to the allegedly inflated fees, result in unsupported and unreliable opinions that should be excluded.

Sabre does not dispute that Stiglitz and McFadden are credentialed economists.  That a highly-credentialed economist says it is so, however, does not make it so.  Even a qualified expert must support his opinions with reliable methodologies and analysis, and sufficient factual foundation.  The Court, therefore, must ensure that expert testimony arises from "reliable principles and methods" "applied . . . to the facts of the case."  Fed. R. Evid. 702; s*ee also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590-92 (1993).  The Court's "gatekeeper" role is particularly important in this complex antitrust case, where US Airways relies heavily on

these two economists and the risk that jurors would be unduly influenced by their credentials over their analysis is especially high.

Neither Stiglitz nor McFadden should be allowed to testify that the alternative fees that Stiglitz identifies as "competitive fees" are in fact the fees that would have prevailed in the absence of the challenged provisions, nor should they be allowed to present a damages model based on those alternative fees. *First*, Stiglitz concedes that his "competitive" booking fee is *not* the fee that would prevail in his hypothetical world without the challenged contract provisions. Stiglitz concedes that *many* factors—including market conditions that US Airways does not claim violate the antitrust laws—created the claimed "market power" and "barriers to competition" that allegedly enabled Sabre to charge a "supracompetitive" booking fee.  He also concedes that these lawful and unchallenged market conditions—such as the history of GDS regulation, the relationships between Sabre and travel agents, and the investment in technology required to effectively compete in the market—would "exist even in [his] hypothetical market" without the challenged contract provisions.  Decl. Ex. 14, Deposition of Joseph Stiglitz ("Stiglitz Dep.") 331:10-25.  Stiglitz thus acknowledged that, at best, the booking fee that would prevail in the hypothetical "but-for" world "would *probably come down closer* to" his "competitive" fee. *Id.* 254:12-21 (emphasis added).  And he admitted he did not conduct a scientific study to determine the specific booking fee that Sabre and US Airways would agree to in his hypothetical world. *Id.* 262:20-24.  Stiglitz's opinions about his "competitive" booking fee, therefore, should be excluded because they do not establish a valid "but for" booking fee and thus are irrelevant and would only confuse the jury.

*Second*, Stiglitz did nothing to determine what portion (if any) of the alleged "harm" to US Airways—*i.e.*, what portion of the claimed booking fee "overcharge"—was attributable to

the allegedly illegal contract provisions as opposed to the various unchallenged market conditions.  The law, however, requires an antitrust plaintiff to distinguish between harm caused by the alleged antitrust violation and harm caused by other marketplace conditions.  Stiglitz's "but-for" booking fee must be excluded because it fails to make this critical distinction.

*Third*, the methodology Stiglitz used to determine his "competitive" booking fees of either ████████ is flawed because he ignores critical marketplace realities.  For instance, he opines that the "competitive" fee is ████ because Southwest Airlines pays ████ under a contract that does not include such provisions.  But he admittedly ignores the fact that ███████ ████████████████████████████████████████  The Southwest fee, therefore, is not a reliable benchmark.  Similarly, although he concedes US Airways receives value from the services Sabre provides, he assumes US Airways might ████ ████ for those services in a hypothetical "competitive" world.  There is no reliable basis for these assumptions, nor the "methodology" he employs to reach these numbers.[1]

In fact, airlines with similar sets of services but without the challenged contract provisions (*e.g.*, ████) consistently pay a booking fee higher than US Airways pays.  In fact, US Airways paid lower booking fees *because it agreed to the challenged "full content" provisions*.  Thus, Stiglitz's opinion that US Airways would negotiate an even lower booking fee in a hypothetical world where it did *not* agree to provide full content is unsupported by the factual record and inadmissible for this reason as well.

McFadden's damages calculation—based on Stiglitz's assumptions—is equally unreliable.  As discussed above, the booking fee he uses to calculate damages is not the actual fee Stiglitz testified *would have* prevailed absent the challenged contract provisions.  McFadden

---

[1] Stiglitz also claims to rely on a purported "confirmation" of his ████ fee by Professor Zimmerman. Such reliance is unfounded and unreliable for the reasons set forth in Sabre's simultaneously-filed *Daubert* Motion to Exclude the Testimony of Jerold Zimmerman.

calculates damages assuming, with no independent analysis, that US Airways would have paid ███████████████ in the but-for world.  But even Stiglitz could say only that the fee without the challenged contractual provisions would "probably come down closer to" his "competitive" fee of ███.  Thus, McFadden's use of ████████████ is not supported by the very source he claims to have used—Stiglitz.  His garbage in/garbage out methodology, therefore, is inherently flawed and his calculation admittedly does not accurately reflect US Airways' damages.

McFadden's calculation also ignores market realities.  A proper damages methodology must account for all aspects of the but-for world—including those that would make a plaintiff *worse* off.  The calculation must measure the *net* effect of removing the allegedly unlawful conduct.  US Airways' experts concede that US Airways would face additional costs in the but-for world (*e.g.*, the cost of servicing additional customers on its website), but McFadden does not account for such costs in calculating damages.  McFadden thus greatly overstates US Airways' damages, rendering his methodology unreliable and unhelpful to the trier of fact.

McFadden's separate opinion that the challenged provisions force travelers that book tickets directly through US Airways to subsidize travelers that book through a travel agency using Sabre must also be excluded.  McFadden contends this "cross-subsidy" exists because both sets of travelers pay the same fare—which he assumes includes the cost of the Sabre booking fee—even though the direct purchasers did not use Sabre's services.  This opinion should be excluded because it is not based on reliable methodology, analysis, or factual predicate.  McFadden does not provide any factual basis to conclude tickets purchased directly include the cost of GDS booking fees.  McFadden also ignores the benefits direct purchasers gain from US Airways' use of Sabre.  McFadden's failure to account for these offsetting benefits to direct purchasers renders his "cross-subsidization" opinion unreliable.

**ARGUMENT**

I.      **Expert Testimony Must Meet Standards of Reliability and Relevance**

A party offering expert testimony must establish that (1) "the expert's scientific,

technical, or other specialized knowledge will help the trier of fact to understand the evidence or

to determine a fact in issue," (2) "the testimony is based on sufficient facts or data," (3) "the

testimony is the product of reliable principles and methods," and (4) "the expert has reliably

applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; *Solorio v.

Asplundh Tree Expert Co.*, No. 02 CIV. 98035(RJS), 2009 WL, at *4 (S.D.N.Y. Mar. 23, 2009)

(offering party "has the burden of establishing by a preponderance of the evidence that the

admissibility requirements of Rule 702 are satisfied") (citation omitted).

To ensure compliance with Rule 702, the Court must act as the "gatekeeper" to make

certain *all* expert testimony "is the product of reliable principles and methods" "reliably

applied . . . to the facts of the case."  Fed. R. Evid. 702; *Daubert*, 509 U.S. at 590-92; *Kumho

Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (holding that the basic gatekeeping

obligation applies to all expert testimony).  Moreover, to be admissible "it is critical that an

expert's analysis be reliable at every step." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d

256, 267 (2d Cir. 2002).  Therefore, "*any* step that renders the analysis unreliable under the

*Daubert* factors renders the expert's testimony inadmissible."  *Id.* at 267 (quoting *In re Paoli

R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)).  The district court, therefore, "should

undertake a rigorous examination" of the facts and methods an expert used to form his opinions.

*Id.*

In determining the reliability of an expert's analysis, courts consider whether the theory

or technique has been tested, whether it has been subjected to peer review and publication, and

whether it has been generally accepted by the relevant scientific community among other things.

*Daubert*, 509 U.S. at 593-94. And the Court should not admit expert testimony where the only connection between the facts and the opinion is conclusory "*ipse dixit*." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The Court may also exclude even relevant expert testimony if its "probative value is substantially outweighed by the danger of unfair . . . prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Supreme Court and the Second Circuit have "noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." *Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005) (citing *Daubert*, 509 U.S. at 595); *see also In re Air Disaster at Lockerbie, Scot.*, 37 F.3d 804, 825 (2d Cir. 1994) (affirming exclusion of testimony as irrelevant and unhelpful under Rule 702). The Court, therefore, must "ensure the reliability and relevancy of expert testimony" in order to prevent ill-conceived and unfounded opinions from misleading the trier of fact. *Kumho Tire*, 526 U.S. at 152 (1999); *Daubert*, 509 U.S. at 589; *see also Amorgianos*, 303 F.3d at 265 (the district court "is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand'").

Because an expert's testimony may be given substantial weight by a jury, courts must vigilantly exercise this "gatekeeper" role. *Daubert*, 509 U.S. at 595. In performing its gatekeeping function, the court therefore must look behind the expert's analysis to ensure that it is reliable, grounded in fact, and relevant. In doing so, courts must "not be deceived by the assertions of experts who offer credentials rather than analysis." *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997).[2] "A supremely qualified expert

---

[2] *See also, e.g., Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001) (quoting *Minasian,* 109 F.3d at 1216).

cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).  A qualified expert that "does not reveal how he has made use of his extensive qualifications . . . [and] fails to articulate industry customs or standards for consideration by the jury . . . [and] has failed to establish a basis for his opinion[s]" cannot be allowed to present those opinions. *Primavera Familienstifung*, 130 F. Supp. 2d at 529 (excluding such testimony).

Stiglitz's and McFadden's Nobel Prizes do not render them immune from these requirements.  *See, e.g.*, *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 787 (7th Cir. 1999) (holding that testimony of a Nobel Prize winner for economics should be excluded when that testimony is irrelevant to the case).[3]  In fact, the Court's "gatekeeper" role is especially important here given the complex nature of this case, the plaintiff's extensive reliance on expert testimony, and the heightened risk that jurors will place undue weight on these experts' credentials, rather than their analysis.  *See, e.g.*, *Rottlund Co. v. Pinnacle Corp.*, 452 F.3d 726, 733 (8th Cir. 2006) (reversing district court's admission of expert testimony as unduly prejudicial, emphasizing the expert's "aura of reliability and trustworthiness"); *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 n.13 (3d Cir. 2000) (excluding expert testimony because "the opinion of a witness impressed by the court with the label of 'expert' may carry a great deal of weight

---

[3] Courts have exercised this gatekeeping role to exclude testimony of highly-credentialed economists in antitrust cases.  *See, e.g.*, *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1046, 1057 (8th Cir. 2000) (reversing admission of Stanford economics professor's testimony); *Grp. Health Plan, Inc. v. Philip Morris, Inc.*, 188 F. Supp. 2d 1122, 1130-31 (D. Minn. 2002) (excluding testimony of "eminently qualified" Massachusetts Institute of Technology economics professor), *aff'd in relevant part and remanded sub nom. Grp. Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753 (8th Cir. 2003); *Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041-42 (N.D. Cal. 2001) (holding that the econometric damages model of an MIT economics professor and a recipient of the John Bates Clark Medal was "entirely too speculative to support a jury verdict"); *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 287 (S.D.N.Y. 2000) (excluding testimony of California Institute of Technology economics professor).

with a lay jury," particularly with "complex" matters, and thus "[p]ermitting such a witness to offer an opinion unsupported by a sufficient factual foundation would significantly increase the risk of misleading the jury and confusing the issues, the very dangers against which 403 defends").

## II.    Stiglitz's Opinions on Booking Fees and Harm Are Inadmissible

### A.    Stiglitz's Admission that Other Factors Caused Sabre's Market Power and the Resulting "Supracompetitive" Booking Fee Renders His Opinions about the "Competitive" Booking Fee Irrelevant and Unreliable

Stiglitz concedes—in fact, emphasizes—that there are other, lawful and unchallenged market conditions that led to Sabre's alleged market power, and thus, Sabre's ability to charge the allegedly "supracompetitive" booking fee.  Stiglitz acknowledges that even after removing the challenged contract provisions, the myriad other impediments to competition would remain in his "but-for" world.  Stiglitz's failure to account for this fact in his analysis renders his "competitive" booking fees opinion irrelevant and unreliable, and thus inadmissible, for two independent reasons.  First, because removing the challenged contract provision would not eliminate all barriers to competition, Stiglitz concedes his "competitive" booking fee *does not* reflect the booking fee that would prevail in the but-for world.

Second, Stiglitz failed to separate the harm (*i.e.*, the difference between his "competitive" booking fee and the actual booking fee) caused by the allegedly unlawful contract provisions, if any, from the harm caused by other, lawful factors.  The law requires disaggregation of lawful and unlawful causes of harm for such testimony to have any legal relevance.

### i.    Stiglitz's "Competitive" Booking Fees Do Not Reflect the "But-For" World, and Thus Are Irrelevant and Unreliable

US Airways has consistently asserted that "historic" or "natural" barriers to entry that it does not challenge as illegal are a substantial source of the alleged market power that purportedly

enabled Sabre to charge a "supracompetitive" booking fee.  For instance, US Airways' experts attribute Sabre's alleged market power in large part to "the history of regulation" of GDSs, including regulations that required the airlines to provide GDSs with "full content," and the resulting "system of single-homing [*i.e.* using one GDS exclusively] which gives the GDSs enormous market power."  Decl. Ex. 14, Stiglitz Dep. 331:4-25; Decl. Ex. 9, Direct Test. of Joseph Stiglitz ¶¶ 16-19 ("Stiglitz Test."); *see also US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 271 (S.D.N.Y. 2015) (referring to US Airways' allegations that "government regulation had given Sabre and the other GDSs market power").[4]

US Airways also attributes Sabre's alleged market power and its purported ability to charge an inflated booking fee to Sabre's relationship with travel agents.  For instance, US Airways attributes Sabre's market power to its travel-agent subscribers' access to "high value business travelers that comprise a significant portion of airline revenues" who "will only purchase tickets through a particular travel agent."  3d Am. Compl. ¶ 3, ECF No. 378 ("AC"); *see also id.* ¶¶ 26-27 (attributing Sabre's market power to its long-term relationships with travel agencies).  Stiglitz similarly ascribes Sabre's market power to the commission structure Sabre employs—offering volume-based financial incentives to travel agencies—which he contends creates a disincentive for travel agencies to switch to another distribution channel.  *See, e.g.*, Decl. Ex. 14, Stiglitz Dep. 233:9-21; Decl. Ex. 4, Stiglitz Rpt. ¶¶ 92-93.

Stiglitz also attributes Sabre's market power to unchallenged "natural" or "structural" barriers to entry, such as the financial investment in technology required to enter the distribution market and the "switching cost[s]" required to incentivize and train travel agents to adopt and

---

[4] The opinions expressed in Professor Stiglitz's and Professor McFadden's Direct Testimony go beyond the disclosures in their expert reports.  These opinions were not properly disclosed under Federal Rule of Civil Procedure 26.  Therefore, these opinions are not only improper, but are also undisclosed and should be excluded for that reason alone.

integrate a new platform.  Decl. Ex. 4, Stiglitz Report ¶ 89; Decl. Ex. 14, Stiglitz Dep. 331:4-25;

US Airways' Response to Sabre's Statement of Undisputed Material Facts ("SUF Resp."), ECF

No. 261; *see also* AC ¶¶ 27-29 (attributing Sabre's market power to the "sheer expense" of

replicating the systems it has developed and the "enormous costs a travel agent would face

attempting to switch from Sabre").

Importantly, US Airways does not contend that any of these market conditions or other

"natural" barriers to entry are illegal.  For instance, Stiglitz acknowledges these conditions are

the byproduct of prior government regulation.  *See, e.g.*, Decl. Ex. 14, Stiglitz Dep. 331:4-25.

And US Airways cannot, and does not, assert that the government's GDS regulations were illegal

or that Sabre somehow violated the antitrust laws by complying with such regulations.  *See*

*Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 583-84 (2d Cir. 2000) (no antitrust

violation where conduct resulted from government regulation); *see also United Air Lines, Inc. v.*

*Civil Aeronautics Bd.*, 766 F.2d 1107, 1122 (7th Cir. 1985) (upholding regulation of airline-

owned computer reservation systems by Department of Transportation).

US Airways likewise does not challenge as illegal Sabre's volume-based incentive

payments to travel agents.[5]  Nor could it.  The Second Circuit has specifically addressed similar

incentive payments (by airlines to travel agencies), and held they do not violate the antitrust laws

unless they constitute "below cost" pricing.  *Virgin Atlantic Airways Ltd. v. British Airways*,

PLC, 257 F.3d 256, 261, 265, 269 (2d. Cir. 2001); *see also Weyerhaeuser Co. v. Ross-Simmons*

*Hardwood Lumber Co., Inc.*, 549 U.S. 312, 323-25 (2007) (paying a higher price for inputs is

---

[5] *See* SUF Resp. ¶ 12 (listing contract terms challenged by US Airways, and not including travel agency contracts); Letter from C. Diamond to Court, May 13, 2015, ECF No. 291 (outlining proposed declaratory relief relating only to *airline* contractual terms); Decl. Ex. 28, US Airways' Resp. and Objs. to Sabre's Second Set of Interrogatories, Interrogatory 1 at 6-10 (not including Sabre's travel agency agreements among those alleged to "have unreasonably restrained trade"); *accord US Airways*, 105 F. Supp. 3d at 271 (defining challenged contract provisions as only relating to the US Airways/Sabre contract).

actionable only where the payments exceed the revenue generated from those inputs).  But there is no basis to assert that Sabre pays more in incentives than it receives in booking fees, such that the incentives would be unprofitable (i.e., "below cost"), or that an equally efficient competitor would lose money if it tried to match Sabre's incentive payments.  In fact, US Airways and Stiglitz admit that Sabre's incentive payments are not "below cost."  SUF Resp. ¶ 49 (admitting incentive payments are not greater than booking fees); Decl. Ex. 14, Stiglitz Dep. 312:6-12.

Moreover, Stiglitz admits he did no analysis to show that an equally efficient competitor could not compete by simply meeting or beating the incentives that Sabre pays.  *Id.* 327:15-23; 323:16-324:17; 326:1-10; 332:1-5.  He agreed that "to do a meaningful calculation" of whether Sabre's travel agency agreements create barriers to entry that would preclude an equally efficient competitor from profitably competing with Sabre, "one would have to do a travel agent by travel agent" analysis, which he conceded he did not do.  *Id.* 323:16-324:7.[6]

Stiglitz also acknowledged that these unchallenged market conditions would "exist even in [his] hypothetical market . . . ."  Decl. Ex. 14, Stiglitz Dep. 331:21-25.  He concedes "[t]he[se] natural or structural barriers to entry would exist regardless whether Sabre took away all these complained of contract provisions."  *Id.* 331:10-20; *see also* SUF Resp. ¶ 72 (recognizing this concession as "undisputed").  Stiglitz thus contends only that the absence of the challenged provisions would have, at most, reduced market power, not eliminated it to the "competitive" state on which his "competitive" booking fee is based.  *See, e.g.*, Decl. Ex. 9, Stiglitz Test. ¶ 133 (removing direct connect provision would have "imped[ed] Sabre's market power"); *id.* ¶ 134 (without restraints, prices would have been "more reflective" of Sabre's costs).

---

[6] Because Stiglitz did not perform the necessary analysis, he should also be precluded from testifying that Sabre's travel agency agreements are anticompetitive or create anticompetitive "barriers to entry."  *See also* Sabre's Motion *in Limine* to Exclude Certain Testimony and Argument About Sabre's Contracts with Third Parties.

Therefore, the most Stiglitz can say is that in the but-for world—without the challenged contract provisions but with the other barriers to competition he concedes would remain—the booking fee "would probably come down closer to the competitive benchmark I described in my report ███████████." Decl. Ex. 14, Stiglitz Dep. 254:12-21 (emphasis added).  In fact, he concedes he did not actually determine the "but-for" booking fee that would prevail in the hypothetical world.  *See id.* 262:20-24 (admitting he "didn't do a scientific study to determine the specific booking fee that Sabre and US Airways would agree to in [his] hypothetical world").

Because Stiglitz's alternative booking fees admittedly do not represent the prices that would prevail absent the challenged provisions—but in the face of the remaining barriers to entry—his booking-fee opinions are irrelevant and unreliable, and would only confuse the jury.

> ### ii.  Stiglitz's Failure to Disaggregate Harm Caused by Allegedly Unlawful Conduct from Harm Caused by Lawful Factors Renders His Booking Fee Opinions Irrelevant and Unreliable

Stiglitz's analysis also fails to establish what harm, if any, was caused *by the challenged contract provisions* because he failed to segregate such harm from harm caused by the other, lawful market conditions described above.  Accordingly, Stiglitz's opinions regarding his alternative booking fees and alleged "harm" to US Airways from the challenged provisions should be excluded for this independent reason.

An "antitrust plaintiff must prove that [its] damages were caused by the *unlawful* acts of the defendant. . . . This is the essence of 'antitrust injury' as set forth by the Supreme Court . . . ." *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) (emphasis in original); *see also, e.g.*, *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378-79 (2d Cir. 1988) (plaintiff must separate from the impact of unlawful conduct "the amount of its losses caused by other factors, such as management problems, a general recession or lawful

factors"); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1352-53 (3d Cir. 1975) (setting aside plaintiff's jury verdict because expert was improperly permitted to provide a damages opinion that did not differentiate "the amount of losses resulting from unlawful, as opposed to lawful, competition").  Specifically, "a purchaser may recover only for the price increment that 'flows from' the distortion of the market caused by the monopolist's anticompetitive conduct." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979); *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055-57 (8th Cir. 2000) (reversing jury verdict on antitrust claims in plaintiff's favor because expert testimony on which verdict rested "did not separate lawful from unlawful conduct").

Where alternative explanations for the allegedly "supracompetitive" price exist—*i.e.*, market conditions not challenged as illegal—an expert's opinion about the "but-for" price that does not account for and segregate such factors is not admissible.  *See, e.g.*, *Concord Boat*, 207 F.3d at 1055-57.[7]  Here, Stiglitz concedes he did not segregate the portion of the alleged overcharge (*i.e.*, the difference between his "competitive" booking fee and the actual booking fee) due to allegedly *unlawful* contract provisions from the portion due to the *lawful*, *unchallenged* barriers to competition.  His opinions about alternative booking fees, even were they correct, cannot support an assessment of whether US Airways suffered harm.  They are, therefore, irrelevant, unreliable, and inadmissible.  *See, e.g.*, *U.S. Football League*, 842 F.2d at 1378-79; *Berkey Photo*, 603 F.2d at 297-98.

---

[7] *See also Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1323 (11th Cir. 2003) (affirming exclusion of expert testimony where expert did not differentiate between legal and illegal pricing behavior so the testimony could not have aided the trier of fact in determining whether defendants' behavior was illegal); *Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1039-40 (8th Cir. 1999) (affirming exclusion of expert opinion where expert "neglected to consider any variables other than [defendant's allegedly illegal conduct]"); *MCI Commc'ns*, 708 F.2d at 1163 ("[Plaintiffs'] lost profits study does not establish any variation in the outcome depending on which acts of [defendant] were held to be legal and which illegal . . . . [T]he jury was left with no way to adjust the amount of damages to reflect lawful competition from [defendant]").

The alternative booking fee opinions Stiglitz offers are precisely the sort of expert opinions courts exclude.  For example, in *Concord Boat*, the district court allowed the expert to testify—as Stiglitz proposes to testify here—that the defendant's market power gave the defendant the ability to avoid competition.  The expert did not, however, "account for market events that both sides agreed were not related to any anticompetitive conduct."  *Concord Boat*, 207 F.3d at 1056.  These included, for example, the defendant's high market share before the alleged anticompetitive conduct and difficulties other suppliers had, such as product recalls.  *Id.* at 1056-57.  The Eighth Circuit reversed a verdict for the plaintiff and ordered judgment in favor of the defendant, holding that the "expert opinion should not have been admitted because it did not incorporate all aspects of the economic reality of the [market at issue] and because it did not separate lawful from unlawful conduct."  *Id.* at 1057.[8]  Stiglitz's testimony similarly should be precluded here.

### B. Stiglitz's Alternative Booking Fees Are Based on an Invalid Benchmark and Rely on an Invalid Analysis by Another US Airways Expert

Not only do Stiglitz's ██████████ alternative booking fees fail to represent valid "but-for" fees, but they also lack sufficient factual foundation and are not based on a reliable methodology or analysis.

#### i. Stiglitz's Opinion that the "Competitive" Booking Fee Might Be ██████ Is Unfounded and Therefore Inadmissible

Stiglitz's ██████ booking fee opinion is based on the premise that absent the challenged contract provisions, US Airways would shift the cost of using the Sabre GDS onto travelers. Decl. Ex. 14, Stiglitz Dep. 251:1-19; *see* Decl. Ex. 4, Stiglitz Rpt. ¶ 116 (describing basis for his alternative booking fees as "the travel agency or the traveler would pay").  In other words, even

---

[8] *See also supra* note 7 (collecting similar cases).

in Stiglitz's but-for world, there would be costs associated with using the Sabre system; he just assumes others would pay those costs. Decl. Ex. 14, Stiglitz Dep. 251:1-19; SUF Resp. ¶ 61. As a matter of law, however, US Airways' inability to shift costs to customers is not antitrust injury and thus cannot be a basis for damages or a conclusion that US Airways suffered harm. *See, e.g.*, *MCI Commc'ns*, 708 F.3d at 1161; *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 337-38 (1990) (holding that a plaintiff's inability to raise prices "is not antitrust injury") (emphasis in original). A ▮▮▮ booking fee, therefore, is invalid as a matter of law and Stiglitz's opinion that ▮▮ is a possible but-for booking fee should be excluded.

Sitglitz's ▮▮▮ booking fee opinion is inadmissible for another reason as well: it unreasonably assumes that US Airways receives ▮▮▮ from Sabre's services. According to Stiglitz, a party that benefits from a particular service would pay for the cost of the service in a competitive market. *See, e.g.*, Decl. Ex. 14, Stiglitz Dep. 220:6-25. The assumption that US Airways would ▮▮▮▮▮ for its distribution services, therefore, hinges on the false premise that US Airways receives ▮▮▮ from those services. But this premise is directly contradicted by Stiglitz himself, as well as by US Airways' other experts.

Stiglitz's own calculation proves the significant value that US Airways derives from participation in the Sabre GDS. His calculation shows that the value to US Airways of a booking through Sabre was ▮▮▮, which is not only ▮▮▮▮, but is in fact ▮▮▮▮ ▮▮▮ booking fee US Airways negotiated with Sabre in 2011.[9] This calculation alone shows that the assumption that US Airways would pay Sabre ▮▮▮ (for services it values at ▮▮▮ per booking) is absurd.

---

[9] Decl. Ex. 9, Stiglitz Test. ¶ 95. According to Stiglitz's calculation, in 2011 US Airways paid Sabre ▮▮ ▮▮▮▮▮▮▮ even though US Airways would be willing to pay Sabre up to ▮▮▮▮▮▮; Decl. Ex. 20, Murphy Test. ¶ 272.

In addition, US Airways' purported industry expert, Andrew Menkes, concedes that US Airways "benefits by having its flights sold through the Sabre GDS." Decl. Ex. 13, Menkes Dep. 127:12-17; *see also* Decl. Ex. 14, Stiglitz Dep. 255:10-257:9 (acknowledging the value of various features US Airways received from the Sabre GDS). Likewise, even Professor Zimmerman's calculations of what he calls a "'normal profit' fee"—upon which Stiglitz relies—results in a hypothetical "normal profit" fee much higher than ▮. Decl. Ex. 4, Stiglitz Rpt. ¶¶ 70-72. Zimmerman concedes that the fee would "not fall below ▮." Decl. Ex. 15, Dep. of Jerold Zimmerman, Ph.D. 251:9-11 ("Zimmerman Dep."); *see also* Decl. Ex. 10, Direct Test. of Jerold Zimmerman, Ph.D. ¶ 4 ("Zimmerman Test.") (calculating the "normal profit booking fee" to be at least ▮). Moreover, setting aside Sabre's dispute with Zimmerman's methodology, Stiglitz's endorsement of a cost-based methodology (*see* Decl. Ex. 9, Stiglitz Test. ¶ 73) concedes that Sabre incurs costs in distributing US Airways' content and therefore a ▮ booking fee is not appropriate.

Finally, in the real-life instances where US Airways does not pay any booking fee to Sabre (*e.g.*, the "wholesale model"), it pays additional compensation to the travel agencies. Thus, there is no basis to assume a ▮ booking fee would decrease US Airways' overall costs or reflect its damages. For bookings made under the "wholesale model" of compensation, US Airways does not pay Sabre any booking fee. Instead, the travel agency pays Sabre and US Airways pays incremental commissions to the travel agency beyond what it pays under the traditional model. SUF Resp. ¶ 7. Bookings made under the wholesale model account for over 50% of all US Airways bookings through the Sabre GDS. *Id.* ¶ 6. Stiglitz admits this wholesale model is "competitive." Decl. Ex. 9, Stiglitz Test. ¶¶ 32-33. But in positing a ▮ booking fee as a basis for calculating damages, Stiglitz ignores the fact that in this actual, real-world situation

where US Airways ███████████████████████, the booking-fee savings are offset by additional commissions that US Airways pays directly to travel agents.  A booking fee of ███, therefore, cannot reliably be used to determine whether US Airways suffered harm or to calculate damages.

ii.     The ███ Booking Fee Also Is Not a Valid Benchmark

Stiglitz's opinion regarding a ███ booking fee is inadmissible as well.  Stiglitz bases his ███ fee on the booking fee Southwest pays Sabre—which he contends is an appropriate benchmark because Southwest's contract with Sabre does not include the challenged contract provisions.  Benchmarking, however, is not a valid methodology unless the expert, at a minimum, reliably justifies the choice of the benchmark.  *See, e.g.*, *El Aguila Food Prods., Inc. v. Gruma Corp.*, 131 F. App'x 450, 453 (5th Cir. 2005) (affirming exclusion of an expert for failure "to demonstrate the reasonable similarity of the plaintiffs' firms and the businesses . . . he relied on as a benchmark").  Otherwise, the benchmark is mere *ipse dixit* and should not be admitted.  *See Joiner*, 522 U.S. at 146.

For several reasons, Southwest's booking fee is not a valid benchmark for the booking fee US Airways would have paid without the challenged "full content" provisions.  As an initial matter, US Airways ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████  Decl. Ex. 14, Stiglitz Dep. 255:18-257:9.

In addition, as the Court recognized in its summary judgment opinion, distribution through Sabre is simply more valuable to US Airways than it is to Southwest because the airlines have chosen different business models.  *See US Airways*, 105 F. Supp. at 271; Decl. Ex. 9,

Stiglitz Test. ¶ 140 (acknowledging differences between the business models).  Southwest targets "leisure" travelers, which, according to US Airways, are much less likely to use travel agents to book their tickets and are much more willing to use the airlines' websites.  *US Airways*, 105 F. Supp. 3d at 271; Decl. Ex. 14, Stiglitz Dep. 90:18-22; 275:22-276:10.  In contrast, US Airways targets business travelers that are more likely to use travel agents than use Sabre.  *See* AC ¶ 3. Also, according to US Airways, bookings made through travel agents tend to be more profitable for airlines than bookings made through other channels.  *See, e.g.*, Decl. Ex. 9, Stiglitz Test. ¶ 26; Decl. Ex. 8, Menkes Test. ¶ 6.  Thus, by US Airways' own admission, it derives more value from Sabre than does Southwest.  As a result, applying Stiglitz's own theory—that the party receiving value from a service should pay for that value—leads to the conclusion that US Airways should pay more than Southwest for distribution through Sabre.

The fact that Southwest values Sabre less than US Airways does is driven by business decisions, not anything unlawful or anticompetitive.  Stiglitz acknowledges that US Airways values distribution through the Sabre GDS due to US Airways' historical desire to access business travelers, who book primarily through travel agents that use a GDS.  *See* Decl. Ex. 14, Stiglitz Dep. 275:7-276:24 (Southwest and US Airways chose different mixes of business and leisure travelers); Decl. Ex. 9, Stiglitz Test. ¶¶ 136-37 (Southwest did not focus on GDS channel).  By contrast, as Stiglitz emphasizes, "Southwest has a different business model that does not rely on selling tickets to travelers who purchase through travel agents."  Decl. Ex. 17, Stiglitz Reply Report ¶ 116. Southwest's historic focus on direct sales compared to US Airways' focus on the GDS channel is a "salient difference between Southwest and US Airways."  *Id.*; *see* SUF Resp. ¶ 156 ("The majority of Southwest's tickets are sold directly from its website . . . ."); Decl. Ex. 14, Stiglitz Dep. 275:22-276:4 (Southwest has a "very different customer base").

A proper benchmark might be an airline that, unlike Southwest, relies on travel agents and a similar set of Sabre services but chose not to agree to the challenged full content provisions.  One example is ███████████████████ ██████████████████████████████████████ ███████████████████████████████████  ██████ ████████████████████████████████████ SUF Resp. ¶ 85 (citing ECF Nos. 258, 259-3).  Stiglitz did not even consider the Air Canada contract or booking fee in forming his opinions.  *See* Decl. Ex. 14, Stiglitz Dep. 278:5-280:16 (admitting he did not consider Air Canada).

Another potential benchmark would be the booking fees US Airways, or a comparable airline, paid Sabre *before* the challenged contract provisions were put into place.  Booking fees paid in those circumstances were *higher* than what US Airways paid under the 2011 contract.  Decl. Ex. 21, Direct Test. of Keith R. Ugone ¶ 12 ("Ugone Test.").  Stiglitz ignored these more appropriate benchmarks without any rationale for rejecting them.

### iii.    Reliance on Zimmerman Does Not Save Stiglitz's ██████ Opinion

Stiglitz also asserts that he "confirmed" his alternative █████ "competitive" fee by reference to a "normal profit booking fee" calculation done by Zimmerman.  Zimmerman's calculation, however, does not support Stiglitz's proposed █████ booking fee either.  As set forth in detail in Sabre's *Daubert* Motion to Exclude the Testimony of Jerold Zimmerman ("Zimmerman Daubert Mot."), which Sabre incorporates herein, Zimmerman's calculation is unreliable and based on unaccepted methodologies, in part due to invalid assumptions *Stiglitz told him to make*.  Thus, Stiglitz cannot "confirm" his opinion by relying on an unreliable calculation based on unreliable assumptions he developed.

19

Zimmerman's calculation of Sabre's profit (to support his "normal profit booking fee"), for instance, ignores the biggest component of Sabre's costs—the commissions it pays to travel agents. Zimmerman ignored these payments because Stiglitz instructed him to. Decl. Ex. 10, Zimmerman Test. ¶ 47; Decl. Ex. 14, Stiglitz Dep. 42:15-24. Ignoring a company's largest cost obviously overstates its profits, and thus understates the booking fee it would need to charge to make a profit.

Stiglitz told Zimmerman to ignore Sabre's largest cost because Stiglitz believes that, in a hypothetical world of perfect competition, Sabre would not make any incentive payments to travel agents. *See, e.g.*, Decl. Ex. 14, Stiglitz Dep. 42:5-14. However, US Airways' own experts acknowledge that Sabre pays financial incentives specifically to compete for the travel agencies' business, and thus incentives would not simply disappear in a "competitive" world.[10] These payments are a true cost of competing, and there is no evidence that Sabre could successfully maintain the same volume of bookings through agencies—as Zimmerman's calculations assume—without paying those incentives. In fact, the uncontroverted testimony shows that Sabre would *lose* bookings were it not to pay competitive incentives.[11] It is also undisputed that if Sabre lost bookings, Zimmerman's "normal profit booking fee" would increase. Decl. Ex. 15, Zimmerman Dep. 220:23-221:9.

But Zimmerman did not even attempt to determine whether Sabre would lose bookings in his hypothetical world in which it would not pay any incentives to travel agents. *Id.* 222:25-

---

[10] *See* Decl. Ex. 13, Menkes Dep. 179:11-14 ("Q. One way that you have seen competition between the GDSs take place[ ] in the marketplace[ ] [is] through the payment of incentives. A. Yes."); Decl. Ex. 11, Kasper Dep. 78:1-11, ECF No. 259-4 (agreeing that "[t]he GDSs use incentives to compete with each other for travel agency business").

[11] Decl. Ex. 14, Stiglitz Dep. 310:2-19 ("Q. The travel agents themselves actually use the switching between GDSs, or at least the threat of switching between GDSs as a credible strategy to gain leverage in their negotiations with the GDSs; correct? A. That's right."); *see also* SUF Resp. ¶ 10 ("Travel agents use the threat of switching bookings to rival GDSs to demand and obtain higher incentives.").

223:6 (admitting he "did not do any analysis of what would happen in that but for world"). Instead, he simply assumes booking volumes would remain constant. *Id.* 221:20-24; 212:22-213:1. Any calculation based on the assumption that travel agencies would continue to deliver the same volume of bookings without being paid incentives is not based in reality and thus unreliable.

Zimmerman's exclusion of the incentive payments also does not comply with generally accepted accounting methodology. Zimmerman calculated his hypothetical booking fee by purporting to apply the accounting concept of a "break even" analysis, which, as he admitted, requires determining the booking fee at which Sabre would cover *all* of its costs—including customer acquisition costs. *See id.* 199:15-200:13 (the analysis involves considering "all costs that the company incurs"); *id.* 202:3-16 (the calculation purports to cover all costs). Yet he excluded the incentive payments, even though incentive payments to travel agents are Sabre's largest cost. *See* Decl. Ex. 13, Menkes Dep. 181:22-182:7 (acknowledging that incentive payments are Sabre's "single highest cost"). Excluding them (and other costs) from a calculation that purports to be an accounting-based "break even" analysis violates basic accounting principles, and Zimmerman admitted as much. *See* Decl. Ex. 15, Zimmerman Dep. 211:4-16 (conceding his method would not be allowed under Generally Accepted Accounting Principles ("GAAP")); *see also* Zimmerman Daubert Mot., at 12.[12]

Finally, Zimmerman's "normal profit booking fee" is misleading and—like Stiglitz's "competitive" fees of ▮▮▮▮▮▮—irrelevant, because it assumes a perfectly competitive world in which Sabre would "break even" and earn "zero economic profits." Decl. Ex. 15,

---

[12] Zimmerman also concedes that he, like Stiglitz, did not separate the effects of the challenged contract provisions from the effects of the other marketplace factors "unrelated to the challenged provisions." Decl. Ex. 18, Reply Expert Report of Jerold Zimmerman, ¶ 71 ("I was never asked to perform the analysis . . .").

Zimmerman Dep. 34:23-35:3 (agreeing that zero economic profits are characterized by perfect competition); *id.* 202:3-16 (Stiglitz asked Zimmerman to calculate a "normal profit fee" to reflect an input of "zero economic profits" which would occur with "perfect competition."). Even were that the result in a hypothetical world of "perfect competition," Stiglitz concedes the but-for world here would not involve "perfect competition."[13] Decl. Ex. 14, Stiglitz Dep. 254:12-21; *see also* Decl. Ex. 15, Zimmerman Dep. 202:25-204:23 (admitting that in real life, companies charge prices that allow them to earn economic profits). For this reason alone, Stiglitz's reliance on Zimmerman's perfectly competitive "normal profit fee" to support the booking fee in the "but for" world—in which Stiglitz admits there would not be perfect competition—is unfounded. *See* Zimmerman Daubert Mot., at 11.

## III.  McFadden's Damage Calculation Is Inadmissible

McFadden's damages opinion is equally unreliable. US Airways offers McFadden to perform basic arithmetic to calculate the amount US Airways claims it was "overcharged" by Sabre. His calculation consists of simply multiplying the number of US Airways' bookings made through Sabre (which is not in dispute) by the difference between the actual booking fee US Airways paid (also not in dispute) and a "competitive" booking fee provided by Stiglitz. Putting aside the fact that McFadden's calculation does not offer any special expertise to aid the jury, it should be excluded because it is based on inherently flawed inputs and ignores undisputed facts about the "but-for" world.

### A.  McFadden Relies on Unreliable Alternative Booking Fees as Inputs

McFadden simply plugs Stiglitz's alternative booking fees (███████████) into his calculation as the assumed hypothetical booking fees US Airways would have paid in the but-for

---

[13] Indeed, Stiglitz concedes that perfectly competitive markets are rare. Decl. Ex. 14, Stiglitz Dep. 46:11-20. *Accord, e.g., Fed. Trade Comm'n v. Elders Grain, Inc.*, 868 F.2d 901, 907 (7th Cir. 1989) (Posner, J.) ("No market fits the economist's model of perfect competition.").

world.  McFadden performed no independent analysis to substantiate Stiglitz's alternative booking fees.[14]  Instead, McFadden bases his damages calculation on the assumption that the but-for booking fee would *in fact* have been either ███████████.  This alone renders McFadden's methodology unreliable, as Stiglitz's ███████████ alternative booking fees are unsupported and admittedly do *not* represent the fees US Airways would have paid in the but-for world.  *See* Section II.A.i *supra*.

Any calculation premised on these alternative booking fees, therefore, should be excluded.  *See, e.g.*, *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142-45 (4th Cir. 1994) (concluding lower court abused discretion in admitting expert testimony unsupported by the factual record because "[w]hen the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 565-66 (S.D.N.Y. 2004) (excluding opinion as not based on sufficient data where it depended on an interpretation of doctor's notes that had been undermined by that doctor's own testimony); *see also* Fed. R. Evid. 702(b) (expert testimony must be "based on sufficient facts or data").  That McFadden relied on Stiglitz for his invalid inputs does not save his opinion.  *See, e.g.*, *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004) (affirming exclusion of a second expert who depended on the inadmissible testimony of the first expert).[15]

---

[14] McFadden confirmed that he performed no independent analysis to determine that the but-for booking fee would have been ███████████.  Decl. Ex. 12, McFadden Dep. 63:20-25; Decl. Ex. 2, McFadden Rep. at ¶¶ 23-24.
[15] McFadden's use of two alternative booking fees should also be excluded because he does not provide a reasonable basis upon which to determine *which* of the two alternatives is the proper but-for booking fee. Neither Stiglitz nor McFadden provide any basis for the jury to decide whether ███████████ is the correct booking fee to use in calculating damages.

**B.      McFadden's Failure to Consider Additional Costs US Airways Would Face in the But-For World Renders His Damages Calculations Unreliable and Inadmissible**

      **i.      An Admissible Damages Calculation Must Account For Additional Costs in the But-For World**

A damages calculation must account for any additional costs the plaintiff would incur in the but-for world that it did not incur in the actual world.  *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 503-04 (1968) (requiring the damages model in an overcharge case to account for additional expenses that the plaintiff would have incurred in the but-for world).  In other words, a plaintiff may not cherry-pick the positive features of the but-for world without accounting for any of the negative features.  *Id.*; *see also Murphy Tugboat v. Crowley*, 658 F.2d 1256, 1262 (9th Cir. 1981) (rejecting expert damage model of a but-for world that did not take into account competitor responses in the but-for world).  "[T]he ultimate relief awarded must take into account any benefits which would not have been received by plaintiff 'but for' the defendant's anticompetitive conduct, or amounts a plaintiff would have expended in the absence of the violation."  *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986) (vacating antitrust damage recovery because the district court failed to account for additional costs that the plaintiff would have incurred in the but-for world).  Thus, "[a]n antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct."  *Id.*

      **ii.      There Is No Dispute that McFadden Ignored the Additional Costs and Decreased Sales US Airways Would Face in the But-For World**

McFadden does not dispute that US Airways would incur additional costs in the but-for world.  Nor does he dispute that he did not account for these costs (or even attempt to account for

them).  Rather, he says he ignored these costs because US Airways told him to.  Decl. Ex. 16, McFadden Reply Rep. ¶ 3 (reciting instructions of counsel).

Consideration of these costs, however, may have required him to conclude that US Airways in fact suffered no harm, or at least significantly less harm.  There are many such costs. For instance, Stiglitz and McFadden both speculate that in the "but-for" world, US Airways would have sold more discounted seats because it would have been able to offer lower fares through its website.[16]  But they did no analysis to show that US Airways would have been as profitable selling less expensive tickets.[17]  Nor did they do any analysis of the increased costs US Airways would incur providing the additional travelers who booked through its website the services that Sabre provided in the real world, despite Stiglitz's admission that US Airways would in fact incur such additional costs.[18]

McFadden also ignored other indisputable costs, such as increased advertising costs to attract travelers to the US Airways' website—costs that were born by Sabre in the real world— despite the record evidence that the airline model US Airways contends it would have mimicked in the but-for world (Southwest) spends ████████████████████ on advertising to attract

---

[16] *See* Decl. Ex. 16, McFadden Reply Rep. ¶ 23 ("The primary impact of Sabre's full content restriction is to prevent airlines from *discounting* seats sold through lower cost channels such as their own websites.") (emphasis in original); Decl. Ex. 4, Stiglitz Rep. ¶¶ 46, 51 (claiming full content provision prevents US Airways from offering less expensive fares on non-Sabre channels such as its website); Decl. Ex. 17, Stiglitz Reply Rep. ¶ 113 (discussing the "but-for" world and noting that Southwest offers lower fares on its websites and through direct channels).

[17] Any claim that US Airways would have sold enough additional tickets to offset the price reductions that Stiglitz claims would have occurred would be speculative.  Neither Stiglitz nor McFadden performed any analysis to make such a showing.

[18] *See* Decl. Ex. 14, Stiglitz Dep. 214:23-215:4 (no analysis done of costs to US Airways for provision of "GDS services"); *id.* 221:1-7 (same); *id.* 217:21-218:6 (acknowledging that US Airways would incur additional costs in order to provide services similar to those offered by a GDS); *id.* 219:1-220:5 (same).

travelers to its website.[19]  These costs, too, must be considered and applied as an offset in any

reliable damages calculation.

McFadden also failed to account for the likelihood that US Airways would lose revenue

as a result of having fewer bookings in the but-for world.  The lower booking fees Stiglitz

hypothesizes would prevail in the but-for world would limit Sabre's ability to pay incentives to

travel agents for booking flights on US Airways.  In fact, as discussed above, Stiglitz assumes

Sabre would not pay any travel agency incentives in the but-for world.  Were these incentives to

disappear, at least some agents would likely reduce or eliminate their bookings on US Airways.

*See, e.g.*, Decl. Ex. 13, Menkes Dep. 205:12-206:8; Decl. Ex. 21, Ugone Test. ¶ 34; Decl. Ex. 20,

Murphy Test. ¶ 96.  Yet McFadden fails to account for the possibility that in the but-for world

US Airways would either (1) lose revenues due to loss of market share to other airlines whose

booking fees would support the payment of incentives for booking on those airlines, or (2) face

additional costs due to the airline itself having to pay increased incentives to the travel agents to

induce them to book on US Airways.  Decl. Ex. 20, Murphy Test. ¶¶ 95-96.

In failing to consider both the increased costs that US Airways would incur in securing

the same level of sales in the but-for world and the lost revenue that would result from fewer

sales, McFadden ignored the unfavorable facts of the but-for world and improperly used only the

facts most favorable to US Airways.  Such "selective use of facts fails to satisfy the scientific

method and *Daubert*."  *In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-md-1628

(RMB)(MHD), 2009 WL 3241401, at *8 (S.D.N.Y. Sept. 30, 2009), *aff'd sub nom. Am. Banana*

*Co., Inc. v. J. Bonafede Co., Inc.*, 407 F. App'x 520 (2d Cir. 2010) (internal quotation mark

omitted).  In fact, McFadden acknowledged his failure to perform any scientific analysis when he

---

[19] *See* Decl. Ex. 16, McFadden Reply Rep. ¶ 30 (acknowledging that Southwest spends ████████
████████████████████████████   ████   ███████████████████████████████████████████

described his calculation as "simply the difference between the actual booking fees paid to Sabre and ███ multiplied by the number of Sabre overcharge segments."  Decl. Ex. 2, McFadden Rep. ¶ 24; *see also* Decl. Ex. 12, McFadden Dep. 67:3-10 (admitting "all [he] did was calculate the difference between the current booking fee and ███ and multiply that by the number of segments").[20]

Had McFadden evaluated the increased costs US Airways would incur in the but-for world—including costs relating to technological investments, advertising expenditures, and other customer acquisition costs—he could have found that such costs approach, or even exceed, the alleged booking fee overcharges.  But without having done the analysis to compare the alleged overcharge amount with the increased costs in the but-for world, McFadden's overcharge calculation does not demonstrate that US Airways suffered any harm, much less reliably prove the amount of that harm.  For this reason alone, McFadden's damages opinion should be excluded.

### iii.    US Airways Cannot Cure This Flaw by Arguing "Pass On"

In its summary judgment briefing, US Airways sought to sidestep this flaw in McFadden's model by characterizing Sabre's argument as an impermissible "pass-on" defense. US Airways is wrong.  In a pass-on defense, an antitrust defendant argues that the plaintiff was not harmed *in the actual world* by supracompetitive pricing because that plaintiff was able to "pass on" the extra cost to its downstream customers.  *See Hanover Shoe*, 392 U.S. at 492.  In this case, a pass-on defense would involve Sabre arguing that US Airways was not harmed

---

[20] The potential prejudice and confusion from allowing McFadden to testify about a simple calculation not grounded in sound scientific analysis is especially acute because of his status as a Nobel Prize recipient. *See Minasian*, 109 F.3d at 1216 (noting "how vital it is that judges not be deceived by the assertions of experts who offer credentials rather than analysis").  Because McFadden "does not reveal how he has made use of his extensive qualifications . . . [and] fails to articulate industry customs or standards for consideration by the jury . . . [and] has failed to establish a basis for his opinion," his calculation should be excluded. *Primavera Familienstiftung*, 130 F. Supp. 2d at 529 (excluding such testimony).

because it "passed on" the allegedly supracompetitive booking fee to its customers.  That is not Sabre's argument.

Rather, the issue here is that McFadden failed to account for additional features of the *but-for world* that would have reduced damages by making US Airways less profitable in the but-for world than his simplistic methodology would suggest.  The Supreme Court in *Hanover Shoe* squarely addressed this distinction between a "pass-on" defense and a proper accounting of costs in holding that antitrust damage calculations must account for the additional costs that would have been borne by the plaintiff in the but-for world as offsets against any overcharge damages.  *See Hanover Shoe*, 392 U.S. at 503-04 (concluding that costs in the but-for world, including cost of capital that would have been deployed in the but-for world, must be included in the damages model).

In light of *Hanover Shoe*, courts have rejected similar attempts to cloak the failure to take into account increased costs as a "pass-on" defense.  For example, in *U.S. Football League v. Nat'l Football League*, the USFL contended that the NFL had prevented the USFL from moving its competition season from the spring to the fall and thereby caused the USFL to lose substantial television and other revenues.  No. 84 Civ. 7484 (PKL), 1986 WL 7012 (S.D.N.Y. June 17, 1986).  The NFL argued that the USFL was required to offset the increased costs of player salaries that it would have incurred had it been able to switch seasons.  Like US Airways here, the USFL "argue[d] that the NFL's theory of increased player costs is the functional equivalent of an invalid 'pass-on' defense."  *Id.* at *1.

The court rejected that argument, holding that "it is beyond dispute that an antitrust plaintiff is entitled to recover only lost net profits, rather than gross profits or revenues."  *Id.* at *2.  The court held that *Hanover Shoe* did not "bar defendants from arguing that an antitrust

28

plaintiff, had he not been injured, would have incurred additional expenses as well as gained

additional revenues." *Id.* at *1. The Second Circuit affirmed. *U.S. Football League*, 842 F.2d at

1350, 1375, 1377; *accord L.A. Mem'l Coliseum Comm'n*, 791 F.2d at 1367-68 (describing as

"aptly illustrated by the case of *Hanover Shoe*" the principle that "the ultimate relief awarded

must take into account any benefits which would not have been received by plaintiff 'but for' the

defendant's anticompetitive conduct, or amounts a plaintiff would have expended in the absence

of the violation"). McFadden's failure to account for the additional costs associated with the but-

for world similarly disqualifies his damages opinion.

### C.    McFadden's Damages Calculations Are Simple Arithmetic And Not Helpful to the Jury

A court should exclude expert testimony as "unhelpful" where it "was not generated

based on any specialized knowledge, but rather involved basic calculations." *Schwartz v.

Fortune Magazine*, 193 F.R.D. 144, 147 (S.D.N.Y. 2000) (holding that testimony consisting of

reporting on the results of "basic calculations" was inadmissible); *see also Rx.com Inc. v.

Hartford Fire Ins. Co.*, 426 F. Supp. 2d 546, 553-54 (S.D. Tex. 2006) (granting motion to strike

affidavit of an expert who purported to perform interest calculations because "an expert is not

necessary at any stage to perform the arithmetic calculations he performs"); *In re Connolly N.

Am., LLC*, 398 B.R. 564, 576 (Bankr. E.D. Mich. 2008) (excluding testimony because "[s]imple

addition and division does not qualify as 'scientific, technical, or other specialized knowledge'").

Here, even if the simplistic "plug and play" multiplication exercise McFadden performed

were a reliable method of calculating damages (it is not), his calculation should be excluded

because it is not based on any particular expertise. McFadden described his calculation as

"simply the difference between the actual booking fees paid to Sabre and ███ multiplied by the

number of Sabre overcharge segments." Decl. Ex. 2, McFadden Rep. ¶ 24. He admitted that "all

[he] did" was "calculate the difference between the current booking fee and ▮▮▮▮ and multiply that by the number of segments." Decl. Ex. 12, McFadden Dep. 67:3-10.  In other words, he subtracted a number Stiglitz gave him from the undisputed actual booking fee, multiplied that difference by another undisputed number, and then reported the product.  McFadden's damages calculation, therefore, does not pass the first test of Rule 702 because it is not based on "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue."

On the other hand, the potential prejudice to Sabre of allowing McFadden (and his Nobel Prize) to sponsor US Airways' damages calculation, despite not providing any true expertise, is substantial.  Because McFadden's calculation does not rely on any particularized expertise and the prejudice to Sabre of allowing this expert to sponsor it substantially outweighs any probative value, it should be excluded.  *See, e.g.*, *Nimely*, 414 F.3d at 397 (holding that expert testimony may be excluded "if its probative value is substantially outweighed by the danger of" *inter alia,* "unfair prejudice") (citing Fed. R. Evid. 403).

> **D.** **McFadden's "Cross Subsidy" Opinion Should Be Excluded because It Is Irrelevant, Unduly Prejudicial, and Unreliable**

McFadden also opines that travelers that purchase tickets through non-GDS channels (*e.g.*, directly through US Airways' website) "subsidize" travelers that book through the GDS channel (*e.g.*, through a travel agency using Sabre) because both sets of travelers pay the same price, which he assumes incorporates the GDS booking fee.  *See* Decl. Ex. 2, McFadden Rep. ¶¶ 35-37.  McFadden's separate opinion regarding a "cross-subsidy" from non-GDS passengers to GDS passengers should be excluded as irrelevant and not based on a proper methodology or analysis.  *Id.* ¶¶ 36-37.

The existence of a "cross-subsidy" is irrelevant to this case and has no bearing on whether US Airways suffered harm or the amount of any purported harm.  McFadden does not assert otherwise.  *See, e.g.*, Decl. Ex. 12, McFadden Dep. 138:10-23 (explaining the calculation).  In fact, McFadden admits that he does not know what the relevance of the calculation is (if there is one).  *Id.* 138:24-139:6.  And US Airways has never articulated the relevance of the opinion, either.  The opinion should be excluded on that basis alone.  *See, e.g.*, *Nimely*, 414 F.3d at 397 (citing *Daubert*, 509 U.S. at 595) (noting that proposed expert testimony must be examined for relevance, as well as reliability);  *United States v. Rahman*, 189 F.3d 88, 135-36 (2d Cir. 1999) (affirming exclusion of marginally relevant evidence); *United States v. Kwong*, 69 F.3d 663, 668 (2d Cir. 1995) (affirming exclusion of evidence under Rule 403 that might pass "muster" under Rule 702); *see also* Fed. R. Evid. 403.

Relevance aside, McFadden failed to put forth a reliable methodology to determine whether a cross-subsidy existed, much less the amount of the cross-subsidy.  McFadden's conclusion that a cross-subsidy exists depends on the assumption that the ticket prices paid by direct bookers include the cost of the GDS booking fees paid for tickets booked through Sabre.  But US Airways' own Vice President of Revenue Management testified that US Airways does not take into account distribution costs (*e.g.*, GDS fees) when pricing its tickets.[21]  Thus, there is no basis to conclude that the prices for tickets purchased directly from US Airways (*e.g.*, through the US Airways website and not using a GDS) have any connection to GDS fees.  Without such a connection, there is no basis to claim a cross-subsidy exists, much less calculate it.

McFadden likewise did not take into account the benefit to direct bookers from US Airways' ability to sell tickets through the Sabre GDS.  Those benefits include the fact that such

---

[21] Decl. Ex. 22, Dep. of Tom Trenga (US Airways) 41:8-14; *see also id.* 39:19-40:10 (describing types of variable costs, including costs such as distribution costs and whether or not the customer pays with a credit card).

sales increase the total volume of US Airways' sales and therefore help US Airways fill its seats, cover its costs, and maintain scheduled flights to a large number of cities at various times.  Decl. Ex. 21, Ugone Test. ¶ 60.  Without US Airways' participation in the Sabre GDS, direct bookers would also incur costs, in the form of higher prices or fewer choices.  *Id.*  Nor did McFadden account for the benefits that come to travelers that book directly in the form of lower ticket prices that result from the transparency and comparison shopping that the Sabre GDS facilitates. *Id.* ¶ 59.  McFadden's calculation of the claimed "cross-subsidy" did not account for all these benefits received by direct bookers, and thus he did not show that any cross-subsidization actually occurred.[22]

Finally, McFadden purports to calculate the cross subsidy for the February 1, 2006 to April 30, 2013 time period, McFadden Test. ¶ 31, which is not the relevant time period in light of the Court's summary judgment ruling.  *See US Airways*, 105 F. Supp. at 279 (excluding damages allegedly relating to the 2006 contract).  The cross subsidy calculation should be excluded as irrelevant and misleading for that reason alone.

## CONCLUSION

For the foregoing reasons, the Court should exclude the following opinions and testimony:

Professor Stiglitz

(1)     any opinions or testimony concerning any purported alternative or "competitive" booking fees that he contends would have prevailed but for the challenged contract provisions;

---

[22] Decl. Ex. 21, Ugone Test. ¶ 59.  Dr. Ugone explained that if US Airways' GDS participation leads to even a minor benefit of less than 1% of the fares paid by direct bookers, then the benefits to direct bookers in terms of reduced fares would outweigh the claimed cost of the GDS to direct bookers, negating the claimed cross-subsidy.  *Id.* ¶ 61.

(2)      any opinions or testimony concerning any alleged market power based on such alternative booking fees in comparison to the actual booking fees; and

(3)      any opinions or testimony that US Airways suffered "harm" as a result of the challenged contract provisions or Sabre's alleged market power; and

(4)      any opinions or testimony that Sabre's travel agency contracts are anticompetitive, create anticompetitive "barriers to entry," or harm competition.

<u>Professor McFadden</u>

(1)      any opinions or testimony concerning alleged harm or damages allegedly suffered by US Airways, or the alleged amount of such damages; and

(2)      any opinions or testimony concerning alleged "cross-subsidization."

May 13, 2016

Chris Lind
Andrew MacNally
Rebecca T. Horwitz
BARTLIT BECK HERMAN PALENCHAR &
   SCOTT LLP
Courthouse Place
54 West Hubbard
Chicago, IL 60654
Phone: (312) 494-4400
Fax: (312) 494-4440
chris.lind@bartlit-beck.com
andrew.macnally@bartlit-beck.com
rebecca.horwitz@bartlit-beck.com


Karma M. Giulianelli
Sean C. Grimsley
Jason C. Murray
BARTLIT BECK HERMAN PALENCHAR &
   SCOTT LLP
1899 Wynkoop Street, 8th Floor
Denver, Colorado 80202
Phone: (303) 592-3100
Fax: (303) 592-3140
karma.giulianelli@bartlit-beck.com
sean.grimsley@bartlit-beck.com
jason.murray@bartlit-beck.com

Respectfully submitted,

George S. Cary
Steven J. Kaiser
Kenneth Reinker
Bradley Justus
Carl Lawrence Malm
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
Phone: (202) 974-1500
Fax: (202) 974-1999
gcary@cgsh.com
skaiser@cgsh.com
kreinker@cgsh.com
bjustus@cgsh.com
lmalm@cgsh.com


Lev Dassin
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Phone: (212) 225-2000
Fax: (212) 225-2999
ldassin@cgsh.com