UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| US AIRWAYS, INC.,<br><br>            Plaintiff,<br><br>    -against-<br><br>SABRE HOLDINGS CORPORATION;<br>SABRE GLBL INC.; and SABRE TRAVEL<br>INTERNATIONAL LIMITED,<br><br>          Defendants. | Case No. 1:11-cv-02725 (LGS)<br><br>**REDACTED - PUBLIC VERSION** |

**US AIRWAYS' COMBINED MEMORANDUM OF LAW IN OPPOSITION
TO (1) SABRE'S MOTION *IN LIMINE* TO EXCLUDE CERTAIN TESTIMONY
AND ARGUMENT ABOUT SABRE'S CONTRACTS WITH THIRD PARTIES AND
(2) SABRE'S MOTION *IN LIMINE* TO EXCLUDE "PRIOR BAD ACTS"
EVIDENCE RELATING TO DISPUTES WITH THIRD PARTIES**

O'MELVENY & MYERS LLP
Charles P. Diamond (*pro hac vice*)
Andrew J. Frackman
7 Times Square
New York, New York 10036
Telephone:   (212) 326-2000
Facsimile:   (212) 326-2061

*Counsel for Plaintiff US Airways, Inc.*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 5

    I.     Evidence of Sabre's Relationships with Travel Agents, Software Developers, and Airlines Is Relevant ........................................................ 5

          A.     Sabre's Travel Agent Contracts Are Central to This Case. ....................... 6

          B.     Sabre's Third-Party Developer Contracts Create Entry Barriers and Enhance Its Market Power. ......................................................... 9

          C.     Sabre's Agreements with Other Airlines Are Relevant to Prove US Airways' But-for Price and Sabre's Market Power. ............................... 11

          D.     Evidence of Sabre's Retaliation Against Other Airlines Is Relevant. ...................................................................................... 14

               1.     Evidence of Sabre's Retaliation Against Other Airlines Shows Sabre's Market Power and Rebuts Sabre's Claim That US Airways Had Leverage over Sabre. .............................. 14

               2.     Sabre's Retaliation Against Other Airlines Is Relevant to Show That Sabre Coerced US Airways into Agreeing to the 2011 Contract. ................................................................. 17

    II.    Sabre Has Not Met Its Burden Under Rule 403 of Demonstrating That the Burden and Risk of Prejudice Substantially Outweigh the Probative Value of the Proposed Evidence. ....................................................... 18

          A.     The Evidence Sabre Seeks to Exclude Does Not Create a Risk of Wasteful "Mini-trials." ......................................................... 18

          B.     The Jury Is Capable of Understanding the Rule of Reason Analysis, and Will Not Be Confused by the Issues. ............................... 22

    CONCLUSION ............................................................................................................ 23

# TABLE OF AUTHORITIES

**Page**

## CASES

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962)..................................................................................... 2

*Eastman Kodak Co. v. Image Tech. Servs. Inc.*,
  504 U.S. 451 (1992)..................................................................................... 22

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
  711 F.3d 68 (2d Cir. 2013)........................................................................... 17

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*,
  386 F.3d 485 (2d Cir. 2004)......................................................................... 22

*Gucci Am., Inc. v. Guess?, Inc.*,
  858 F. Supp. 2d 250 (S.D.N.Y. 2012)........................................................... 5

*In re Air Passenger Computer Reservations Sys. Antitrust Litig.*,
  694 F. Supp. 1443 (C.D. Cal. 1988) ........................................................... 15

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  562 F. Supp. 2d 392 (E.D.N.Y. 2008) .................................................... 6, 22

*Lightwave Techs., Inc. v. Corning Glass Works*,
  1991 WL 4737 (S.D.N.Y. Jan. 18, 1991) ................................................... 22

*N. Pac. Ry. Co. v. United States*,
  356 U.S. 1 (1958)......................................................................................... 2

*Nat'l Soc'y of Prof'l Engineers v. United States*,
  *435 U.S. 679 (1978)* ................................................................................ 1, 2

*Perma Life Mufflers v. Int'l Parts Corp.*,
  392 U.S. 134 (1968)..................................................................................... 17

*Perry v. Ethan Allen, Inc.*,
  115 F.3d 143 (2d Cir. 1997).......................................................................... 18

*SCFC ILC, Inc. v. Visa U.S.A. Inc.*,
  819 F. Supp. 956 (D. Utah 1993).................................................................. 5

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997)......................................................................................... 2

*THI-Hawaii, Inc. v. First Commerce Fin. Corp.*,
  627 F.2d 991 (9th Cir. 1980) ....................................................................... 17

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
  142 F.3d 90 (2d Cir. 1998)............................................................................ 5

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
    7 F.3d 986 (11th Cir. 1993) ..................................................................... 12

*United States v Am. Exp. Co.*,
    88 F. Supp. 3d 143 (E.D.N.Y. 2015) ............................................... 2, 22

*United States v. Figueroa*,
    548 F.3d 222 (2d Cir. 2008).................................................................... 7

## **RULES**

Fed. R. Evid. 403 ............................................................................................ 18

## INTRODUCTION

After five years of disputing that it possesses and exercises market power to impose its will on legacy airlines, Sabre now seeks to deprive the jury of critical evidence concerning both the existence of and Sabre's abuse of that power.  Specifically, through its motions *in limine*, Sabre wants to exclude proof of:  (1) an essential source of its market power—the contracts it maintains, and the restrictions it imposes on, travel agents; (2) an essential component of how it retains that market power—contract terms that prevent software developers from introducing competition in the ticket distribution business; (3) the hammer it deploys to preserve that power by preventing the legacy airlines from fostering competition among distribution channels—anti-steering rules in their contracts comparable to those foisted upon US Airways; and (4) real-world examples of how Sabre has exercised that market power—its retaliation against three airlines that had the temerity to challenge its power, two of which Sabre promptly brought to their knees and the third of which has endured enormous losses as a result of Sabre's backlash.[1]

Sabre's motions are nothing less than an attempt to eviscerate US Airways' case.  Both motions are contrary to well-established precedent rejecting attempts, like Sabre's, to sanitize an antitrust defendant's behavior toward market participants to prevent the jury from appreciating how, in the larger context, that defendant has acquired, maintained, and exercised its market power on an industry-wide basis.  As the Supreme Court explained, challenged restraints "can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed."  *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679,

---

[1] In the interest of efficiency, US Airways submits this single brief in opposition to both (i) Sabre's Motion *In Limine* to Exclude Certain Testimony and Argument About Sabre's Contracts With Third Parties ("Third-party Contract Mot.") and (ii) Sabre's Motion *in limine* To Exclude "Prior Bad Acts" Evidence Relating To Disputes With Third Parties ("Prior Disputes Mot.").

692 (1978).[2]  As much as Sabre attempts to recast this as a simple breach of contract case

involving a handful of 2011 contract terms,[3] it is not.  It alleges antitrust violations, which cannot

be fairly litigated without the full measure of proof as to the source of the defendants' power to

engage in, and the effects of, its marketplace misconduct.  *See State Oil Co. v. Khan*, 522 U.S. 3,

10 (1997) (proper analysis of the reasonableness of restraints must include "a variety of factors,

including specific information about the relevant business, its condition before and after the

restraint was imposed, and the restraint's history, nature, and effect").

    Market power does not arise spontaneously or exist in a vacuum.  The jury is entitled to

hear evidence explaining how that market power arose under regulation (prior to 2004) as a

consequence of the reliance by travel agents on a single GDS ("single-homing").  Because of

single homing, in order to be available to all traditional travel agents, and the corporate travel

that they control, airlines have no choice but to participate in each GDS, and thus must distribute

through Sabre.  Though originally the product of government regulation, Sabre has since

cemented single-homing through contracts that make it prohibitively expensive and burdensome

for travel agents to shop and book on any potential competing distribution channel.  Sabre wants

to keep the evidence of those contracts—including the enormous incentives Sabre pays to the

largest corporate travel agents to lock them into the distribution model and align their interests

with its own—from the jury.

---

[2] *Accord United States v. Am. Express Co.,* 88 F. Supp. 3d 143, 168 (E.D.N.Y. 2015) ("The rule of reason, which is the most searching form of antitrust analysis, requires the court in its capacity as factfinder to weigh all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.") (internal citations and quotations omitted throughout unless otherwise noted); *see also N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958) (rule of reason cases require "economic investigation into the entire history of the industry involved, as well as related industries"); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 709–10 (1962) ("[p]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each" and rejecting defendant's argument that "nothing which transpired earlier could be relevant to his suit" because evidence that the anticompetitive scheme affected the industry before plaintiff started his business "was clearly material.").

[3] Third-Party Contract Mot. at 15–16; *see also* Prior Disputes Mot. at 11.

Sabre has also used contracts to neuter software developers who sought to compete with applications that would have facilitated travel agency multi-homing and could have broken the cycle of airlines' dependency on each of the three GDSs.  And, by demanding that anti-steering rules be included in its contracts with each of the legacy airlines to stymie development of alternative means of accessing traditional travel agents, Sabre has prevented new and less expensive distribution channels to gain traction.

Understanding these sources of Sabre's persistent market power is essential to understanding how Sabre has been able to force US Airways and other carriers to surrender their ability to steer travel agents away from Sabre to less expensive distribution channels.  At the end of the day, that is what this case is about.  This evidence is not collateral, as Sabre argues; it is central **_and essential_** to showing the jury the sources of Sabre's market power and how over time Sabre has preserved it.

Sabre also seeks to exclude its extraordinarily aggressive (and effective) retaliation against Northwest, Air Canada, and American Airlines, when those airlines each tried to create incentives and means for travel agents to bypass the Sabre GDS, evidence that also powerfully demonstrates Sabre's market power and is critical to understanding why US Airways acceded to Sabre's contractual demands in 2011.  In each instance, the Sabre assault included biasing those airlines' flights on travel agency screens so agents would book elsewhere.  The Sabre campaign imposed such costs on American and Northwest that they capitulated altogether; the fight with Air Canada (which by law Sabre cannot bias in Canada) continues to this day.  Moreover, the conduct and language of its executives in waging these fights constitutes an admission by Sabre of its overwhelming market power and its ability to exercise it over airlines.  The jury is entitled to know that Sabre's lead airline negotiator concluded after Air Canada withdrew its lowest fares

3

from Sabre that if Air Canada "pulls any more content we will drop the bomb"[4]; that his strategy for dealing with American's attempt to bypass Sabre was to "put a wooden stake in their heart"[5]; and that Sabre's chairman was relishing "spen[ding] the day . . . figuring out how to take AA down."[6]

Only if it hears this evidence of Sabre's exercise of its market power against other airlines, and the testimony from US Airways executives who feared they would be next, will the jury also be able to assess US Airways' decision to sign the 2011 contract. Far from being collateral, the evidence is essential to rebut Sabre's assertion that US Airways **freely** accepted the restraints and, in fact, used them as bargaining chips.[7]

While Sabre would prefer to sanitize the case and have market power and Sabre's use of it politely debated by competing economists, antitrust cases dealing with marketplace abuses cannot be divorced from the dramatic, gritty, real-world conduct of those alleged to have committed them. "Mini-trials" over the lawfulness of Sabre's conduct will not ensue. US Airways **does not** contend that Sabre breached any contract term or other legal duty in retaliating against Northwest, American, or Air Canada, and does not have to in order to prevail on its claim. Consequently, no mini-trial over the legality of those contracts is needed. Nor is the legality of Sabre's contracts with travel agents and software developers at issue. And, contrary to Sabre's motion's title, evidence of Sabre's exercise of its market power is not being offered to show "bad acts" or to imply abstractly that Sabre is a bad actor. US Airways offers all

---

[4] Declaration of David K. Lukmire in Support of US Airways' Memoranda of Law in Opposition to Sabre's *Daubert* Motions (ECF Nos. 412, 413, 414, 415 & 416) and Motions *in Limine* (ECF Nos. 408 & 418) ("Decl.") Ex. 39, Oct. 16, 2007 E-mail from D. Gross to H. Jones (SBR-22014069 at –069).

[5] Decl. Ex. 40, Dec. 29, 2010 E-mail from D. Gross to G. Webb (Dec. 29, 2010) (SUS00096954 at –954).

[6] Decl. Ex. 41, Mar. 4, 2010 E-mail from S. Gilliland to H. Jones (AAUSAIR-007774 at –774).

[7] Decl. Ex. 30, Sabre's Proposed Findings of Fact ("SPFF") ¶¶ 324, 325 ( "The 2011 Contract was the result of hard fought negotiation between the parties . . . US Airways is a sophisticated company that signed the 2011 contract only after careful consideration at the highest levels.").

this evidence to demonstrate Sabre's market power (often in its own words) and Sabre's

willingness to exercise that market power against any airline that threatens its distribution model.

It is those facts that drove US Airways to sign the 2011 contract.  This evidence is not only

appropriate in this rule of reason case, it is essential to a fair trial.

## ARGUMENT

### I.  Evidence of Sabre's Relationships with Travel Agents, Software Developers, and Airlines Is Relevant.

"A court will exclude evidence on a motion *in limine* only if the evidence is clearly

inadmissible on all potential grounds."  *Gucci Am., Inc. v. Guess?, Inc.*, 858 F. Supp. 2d 250, 253

(S.D.N.Y. 2012).  The evidence Sabre seeks to exclude is directly relevant to this case.  Although

Sabre repeatedly tries to recast this antitrust case as a "contract-based claim" that "relates solely

to the agreement *between Sabre and US Airways*,"[8] it admits (as it must) that "[m]arket power is

an essential element for a Section 1 claim challenging a vertical agreement," and "[w]ithout

market power, there is no claim."[9]  And the evidence that Sabre seeks to exclude goes directly to

its market power, which requires an examination of Sabre's behavior in the broader marketplace,

including its dealings with travel agents, developers, and other airlines.  *See SCFC ILC, Inc. v.

Visa U.S.A. Inc.*, 819 F. Supp. 956, 989 (D. Utah 1993) ("***All evidence*** of anticompetitive effect

is relevant to the Rule of Reason examination.") (emphasis added).

---

[8] Third-Party Contract Mot. at 1.

[9] Decl. Ex. 31, Sabre's Proposed Conclusions of Law ("SPCL") ¶ 2.  Sabre is incorrect that US Airways *must* prove market power, but US Airways intends to prove that it exists. *See Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) ("plaintiffs have "two independent means by which to satisfy the [initial] adverse-effect requirement").

A.     **Sabre's Travel Agent Contracts Are Central to This Case.**

Sabre's travel agent contracts are central to this case because they are a source of Sabre's continued market power and are relevant to show the bias of the travel agent witnesses whom Sabre intends to call to support its procompetitive defense.

***Sabre's travel agent contracts form entry barriers and are an essential source of its market power.***  Sabre's market power stems in large measure from its contracting practices with travel agents.  US Airways, like all legacy airlines, depends on corporate bookings to stay viable, and corporate customers prefer to use traditional travel agents to help them manage their travel programs.  GDSs, and Sabre in particular, understand the importance of corporate revenue to an airline like US Airways, and Sabre uses its contracts with travel agents to become the exclusive link to these agents.  As a result of contracts that encourage single-homing by these travel agents, Sabre essentially guarantees that any airline seeking to access this distribution channel will be forced to use Sabre.  The most important of these agents are known as travel management companies ("TMCs").  Under its TMC contracts, Sabre pays huge incentives to the agencies,[10] which align the interests of the TMCs and Sabre against the airlines.  The contracts also contain prohibitive switching costs, which, coupled with the incentives, increase barriers to entry for any new GDS competitors.[11]  Indeed, Sabre executives admit that "[m]aintaining GDS incentives to agencies creates a barrier . . . for new entrants."[12]

While Sabre may try to contest the effect of its travel agent contracts, including whether the incentives really are barriers to entry, or whether they cause "single-homing," any such

---

[10] *See* Decl. Ex. 34, "Chart of Agency Incentives" (SBR-40004102 at –102) (indicating that from 2006–2011, Sabre paid more than $███████ in incentive payments to the top four TMCs); Decl. Ex. 11, Direct Testimony of Andrew W. Menkes ("Menkes Direct") ¶ 20 (noting that "in 2011 Sabre spent more than $███████ on incentive payments").

[11] *See* Decl. Ex. 11, Menkes Direct ¶¶ 22–26; 35–36.

[12] Decl. Ex. 42, Mar. 18, 2005 E-mail from T. Gonsalves to T. Klein, et al. with attachment (US Dep. Ex. 73) (SBR-25612863 at –863, –869).

dispute is for the jury to resolve.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 402 (E.D.N.Y. 2008) (barriers to entry are probative of market power).

   ***Sabre's travel agent contracts are relevant to Sabre's proffered procompetitive justifications for its conduct.***  The contracts between Sabre and travel agents are also relevant to assessing Sabre's defense that its contracts actually are procompetitive.  In its proposed findings of fact filed when this case was to be tried to this Court, Sabre included over 100 references to travel agents and dozens of paragraphs arguing the procompetitive effects of Sabre's travel agent contracts.  For instance, Sabre claimed that the incentive payments featured in travel agent contracts "benefit the consumer[] because they enable the travel agents to charge customers less," (Decl. Ex. 30, SPFF ¶ 132), and promote inter-GDS competition because travel agents may threaten to switch to a rival GDS that pays higher incentives (*see id.* ¶¶ 130, 269–70, 418).  *See also* Decl. Ex. 24, Direct Testimony of Professor Kevin Murphy ("Murphy Direct") ¶ 103 ("Because agencies have the ability to shift their business among GDSs, competitive forces lead GDSs (all of which seek business from the same travel agencies) to pay incentives to those agencies to attract their business.").

   ***Sabre's travel agent contracts are relevant to show bias and interest.***  The contracts are also relevant because Sabre has represented that it intends to call as trial witnesses TMC representatives to testify about the purported procompetitive benefits of Sabre's "full-content" and the absence of any competitive alternatives to the GDSs.  *See* June 30, 2015 Hr'g. Tr. 30:7–11 ("We are bringing in the travel agents . . . ."); *id.* at 31:6–8 ("[I]t's important . . . that the four global [largest travel agents] all support, in very important and strong ways, the principles behind our case.").  US Airways must have the right to challenge the credibility of these witnesses on

the basis that Sabre lavishly buys TMC loyalty with ███████████ of incentives.  *See United States v. Figueroa*, 548 F.3d 222, 230 (2d Cir. 2008) ("Proof of bias is almost always relevant."). To exclude a discussion of the incentives paid to these witnesses under their Sabre contracts would deprive US Airways of legitimate grounds for impeachment.

*Sabre's attacks on Professor Stiglitz's testimony are baseless.*  Sabre tries to justify excluding travel agent contract evidence because, it argues, Professor Stiglitz's economic testimony relying on this evidence is somehow flawed.  (*See* Third-Party Contract Mot. at 8–10 ("Stiglitz cannot be permitted to testify that the travel agent contracts are anticompetitive when he has not done the analysis required under the law to offer that opinion"); (Professor Stiglitz does nothing "to establish that Sabre's incentive payments are somehow predatory"); (Professor Stiglitz "did no analysis at all to show that an equally efficient competitor could not compete by simply meeting or beating the incentive that Sabre pays").)

But Sabre's unwarranted and unfounded criticisms of Professor Stiglitz do not provide a basis for excluding relevant factual evidence.  Professor Stiglitz will not testify that Sabre's travel agent contracts are themselves anticompetitive, but rather he will show that they create barriers to entry and help Sabre retain its market power, which in turn enabled Sabre to impose the anticompetitive terms included in the US Airways contract.[13]  There is no need to prove that the incentive payments are predatory; this is not a predatory pricing case.  US Airways does not challenge Sabre's travel agent contracts as "predatory," nor does it need to.

---

[13] Decl. Ex. 13, Direct Testimony of Joseph E. Stiglitz, Ph.D. ("Stiglitz Direct") ¶ 11 ("The provisions in the 2006 TMA and 2011 TMA create a substantial barrier to entry, reducing the scope for competition for new GDSs."); ¶ 91 (noting that Sabre's market share "give[s] rise to concerns of market power . . . in this case, especially because of the restrictions in Sabre's contracts"); ¶¶ 105–107 ("One reason why Sabre has been able to maintain its market power is that it has been protected against competition from new entrants by barriers to entry, both structural and artificial. . . . Sabre's anti-competitive contracts with its travel agents have created an artificial barrier.").

B.      **Sabre's Third-Party Developer Contracts Create Entry Barriers and
        Enhance Its Market Power.**

Evidence concerning Sabre's contracts with and restrictions on software developers is

similarly relevant because it explains how Sabre ensured the failure of new entrants and retarded

the entry of potential competitors, thereby preserving its market power from deregulation to

2011.  As this Court observed:

> Even if US Airways were required to show substantial foreclosure of the market
> or identify actual excluded competitors, *it has satisfied its burden by adducing
> evidence that no competitors have entered the market in the past 30 years, in
> spite of the attempts of several entrants, including G2 Switchworks and ITA*.
> Sabre argues that those companies would have failed for competitive reasons, but
> *that is a factual argument for the jury*.  Moreover, Sabre's argument that
> US Airways needs to point to a specific "dead body" in order to show that barriers
> to entry exist is incorrect, and equivalent to saying that a firm will be immune
> from antitrust scrutiny if it can erect sufficiently high barriers to entry.[14]

US Airways will show that Sabre's "Authorized Developer Program," a menu of

restrictions Sabre imposes on software developers and travel agents that want to interoperate

with Sabre's GDS, was a key component of Sabre's strategy to preserve its market power

through contractual prohibitions.  To become "authorized," software developers must (among

other things) agree to not develop products that would do ████████████████."  (*See*

Decl. Ex. 33, Aug. 16, 2007 "Sabre Development Agreement" between Sabre and ████████)

(████████████).  Sabre crafted its Authorized Developer Program with the express aim

of "establish[ing] fences to ensure full participation in Sabre [full content] remains attractive to

[airlines]."[15]  Sabre used these fences to prevent new entrants from competing by offering

airlines another way to connect with travel agents.  One such way is through "aggregation"

technology, software that allows flights and fares available through a non-GDS channel to be

displayed on an agent's desktop alongside flights and fares delivered by the GDS.  Because

---

[14] Jan. 6, 2015 Mot. Summ. J. Op. at 21–22 (Dkt. No. 242) (emphasis added).

[15] Decl. Ex. 35, "Driving Our Future, TN Vision 2008" (US Dep. Ex. 208) (SBR-25432018 at –037).

Sabre's travel agent contracts prohibit the connection of "unauthorized" software to its system,
Sabre's refusal to approve aggregation technology ensured Sabre would not have to compete
with nascent entrants, even if such entrants were able to offer travelers and travel agents better
technology or fares on some airlines by charging those airlines less.[16]

The evidence shows that Sabre has actually wielded the Authorized Developer Program
to put potential new entrants out of business.  In 2004, having concluded "███ ha[d] a credible
technical platform" and was "likely to overcome technical and operational barriers to entry,"
Sabre denied ███ the Sabre developer license it sought, instead informing travel agencies with
interest in ███ multi-source desktop that "Sabre cannot enable ███."[17]  As Sabre conceded in
2007, "███████ had a content advantage which was nullified by our contracts."[18]  In
2009, Sabre banished ██████ from the Sabre ecosystem by refusing to authorize the
company's ██████ multi-source agent desktop and then revoked its authorized Sabre developer
status, thereby preventing Sabre travel agents from using *any* ██████ product.[19]  Sabre's
express purpose in terminating ██████ authorized developer status was to insulate itself from
competition, explaining that "[t]he whole idea is to freeze ██████ where they are today."[20]

Sabre's restrictions on the use of alternative technologies also are key to rebutting
Sabre's claim that its success stems from delivering what no non-GDS channel can provide:

---

[16] Multi-source aggregation is particularly important for new entrants to catch up with incumbents, as new entrants
are unlikely to be able to offer travel agents on "day one" connections to all of the 141 airlines Sabre and the other
existing GDSs have connected with during their fifty years in the business.

[17] Decl. Ex. 36, "Project Nike Steering Committee Meeting Work-In-Progress Update" (SBR-21932197 at –198,
–203); Decl. Ex. 43, Dec. 14, 2007 E-mail from G. Moore-Murray to J. Ondrus, et al. (SBR-20221008 at –008).

[18] Decl. Ex. 37, "2007 TN Strategy Workshop" (US Dep. Ex. 138) (SBR-23686135 at –135).

[19] Decl. Ex. 12, Direct Testimony of Steve Reynolds ¶ 63; Decl. Ex. 51, ████████████████████
████████████████████████████████████████████

[20] Decl. Ex. 44, Feb. 10, 2009 E-mail from D. Gross to R. Winkler, et al. (US Dep. Ex.56) (SBR-20065952 at –953).

one-stop shopping and booking.[21]   Aggregators have the potential to offer travel agents much more robust one-stop shopping than Sabre since they can deliver flights and fares that are not available in Sabre's system.  But Sabre's contracts make it impractical for airlines to support this technology.  By imposing a $█ "convenience fee" that eliminates any incentive the airline could have to steer away from Sabre.[22]   Furthermore, most Sabre developer contracts prohibit the display of *any* non-Sabre fare unless it is at least $█ cheaper than what is available on the Sabre system, making it impossible for an aggregator to compete.  By making uneconomic the use of any alternatives, Sabre has by contract monopolized one-stop shopping, which it in turn uses to justify the continuation of its restraints.

C.   **Sabre's Agreements with Other Airlines Are Relevant to Prove US Airways' But-for Price and Sabre's Market Power.**

Sabre's contracts with other airlines are highly relevant to this case.  Sabre concedes as much because it does not seek to exclude the evidence altogether, but only to bar US Airways from referring to the contracts as "anticompetitive."[23]   Sabre's contracts with discount airlines over which it possesses little market power are perhaps most obviously relevant since they show Sabre's pricing in the absence of the market power it wielded against US Airways.  For example, Sabre's contract with Southwest Airlines and its much lower booking fee provides a benchmark for what a US Airways booking fee would be in a competitive market where Sabre lacked market

---

[21] Sabre's challenge to US Airways' technology expert, Steve Reynolds (Third-Party Mot. at 6–8), is misplaced in this motion *in limine*, is redundant of its arguments in its *Daubert* motion directed to Reynolds.  The response to challenges to Mr. Reynolds' testimony are dealt with in US Airways' opposition to that motion.  And whether an expert can render an opinion involving the challenged testimony is not a basis for excluding the evidence itself.

[22] For example, Sabre charges software developers a $█ "convenience fee" for bookings made outside of the Sabre system and imported into that system as a "passive segment."  That fee is then passed on to travel agents.  That means an airline would have to offer more than a $█ fare discount to drive an agent to an aggregator.  But for most airlines, including US Airways, that █ Sabre charge exceeds what they might save in booking fees.

[23] Third-Party Contracts Mot. at 10.

power over it.[24]  Similarly, Sabre's contract with Spirit Airlines, another discount carrier over which Sabre has little market power, offers another convincing contrast in that Spirit was able to negotiate for the right to price by channel in a way Sabre does not permit legacy carriers to do.

Sabre's contracts with other legacy airlines—*e.g.*, United, Continental, Delta, Northwest—are also essential elements of US Airways' proof of Sabre's possession and exercise of market power.  As each of those airlines is dependent on business travel like US Airways, the surrender of its right to price differently according to distribution channels bears witness to the power Sabre wields, even over airlines much larger than US Airways.  Beyond that, Sabre's insistence on the inclusion of anti-steering rules in all of its legacy airline contracts explains its success in suppressing the emergence of lower-cost distribution channels:  if airlines in general cannot steer to lower-cost channels by offering lower fares or other inducements (or to steer away from Sabre by charging back to its customers the cost of distribution), no new entrant can take root.  While Sabre is sure to offer more benign and self-congratulatory explanations for its dominance in the market, that only makes it all the more important for US Airways to have its full measure of proof.

Sabre's contracts with other airlines further prove Sabre's ability to price discriminate— another indicium of market power.[25]  For example, although Sabre charges Southwest a per-segment booking fee of only $██, it charges US Airways ████, United $███, and American Airlines $███—even though Sabre's per-segment costs are identical or virtually identical for

---

[24] *See* Jan. 6, 2015 Mot. Summ. J. Op. at 22 (Dkt. No. 242) ("Here, Professor Stiglitz reasonably explained the basis for his testimony that Sabre's fees in a competitive market would fall towards $██, the price it charges Southwest for its services."); *id.* at 20 (the fact that "Sabre charges a much lower booking fee to Southwest, a 'leisure' airline, which is outside the relevant market and over which Sabre does not exercise market power" is part of "US Airways' evidence of supracompetitive prices."); Decl. Ex. 13, Stiglitz Direct ¶ 140 ("Sabre's $██ Southwest booking fee is evidence of what Sabre can offer and receive for a booking from a carrier over which it exercises no (or very little) market power.").

[25] *See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 998 (11th Cir. 1993) ("[T]he ability to discriminate against a distinct group of customers by charging higher prices for otherwise similar products demonstrates the existence of market power with respect to that group.").

each of those airlines.[26]  To make the price discrimination discussion complete, US Airways

must be allowed to establish the uniformity of anti-steering terms, lest the jury believe that the

price comparison is "apples to oranges."[27]

Finally, Sabre's request that US Airways should be precluded "from referring to other

airline contracts as anticompetitive," Third-Party Contract Mot. at 10, should be rejected.

Professor Stiglitz does not challenge and does not need to establish that the other airlines'

contracts are unlawful (so there is no need for a full rule of reason inquiry as to each, as Sabre

suggests).  Rather, he confirms that Sabre's industry-wide use of the contractual restraints has

suppressed the development of competition and sustained Sabre's market power, thereby

(a) preserving a distribution model where the users of GDS services (travel agents and their

customers) do not pay for or otherwise confront their cost (Decl. Ex. 13, Stiglitz Direct ¶ 74);

and (b) causing US Airways and the other legacy airlines to agree to contractual restraints that

limit their ability to price differentially by channel and, ultimately, to pay excessive booking fees

(*id.* ¶¶ 100–04, 132, 134).  Professor Stiglitz also opines that without these restraints in the

legacy airlines' contracts, the market would have flipped and a user-pay model would have come

into existence before 2011 (*id.* ¶ 151).  Sabre is free to challenge these opinions on cross-

examination, but the opinions about the nature of competition in the relevant market are surely

---

[26] *See* Decl. Ex. 13, Stiglitz Direct ¶¶ 100, 139 (testimony regarding price discrimination and showing that the difference in average data processing costs for Southwest segments and US Airways segments was ▮▮▮ per booking); *see also* Decl. Ex. 56, Aug. 24, 2009 E-mail from C. Tibor to G. Webb, et al. with attachment (SBR-22908414).

[27] Sabre can hardly plead the irrelevancy of price terms in other airline contracts because its own expert, Kevin Murphy, relies on them.  *See, e.g.*, Decl. Ex. 21, Rebuttal Expert Report of Kevin M. Murphy ¶ 77 & n.69 (challenging Stiglitz's conclusion "that US Airways' gross booking fee is 'supracompetitive'" by noting that "Sabre's U.S. booking fees to major carriers . . . ▮▮▮▮▮▮▮▮▮▮ *id.* ¶ 102 (discussing the "2003 DCA-3 agreements that Sabre signed with U.S. network carriers (including US Airways)," including the requirement that participating airlines provide Sabre "[f]ull [c]ontent"); *id.* ¶ 118 n.119 ("I understand that the direct connect restriction in US Airways TMAs and Sabre's agreements with other airlines is intended in part to prevent this type of conduct [free-riding]."); *id.* at Ex. 7 (listing the booking fees for "Major U.S. Carriers," including the legacy airlines).

relevant in this rule of reason case.  Notably, Sabre has not challenged these opinions directly in the *Daubert* motion directed to Professor Stiglitz, but instead seeks to exclude some of the key evidence on which he relies.

>    **D.   Evidence of Sabre's Retaliation Against Other Airlines Is Relevant.**

Sabre mischaracterizes the evidence of its retaliation against Northwest, Air Canada, and American Airlines as evidence of "bad acts," as if it only goes to its character and not the core issue of Sabre's market power.  US Airways is entitled to prove Sabre's market power with actual examples of retaliation against Northwest and American Airlines, and its success in driving up Air Canada's costs.  Moreover, the actual facts concerning the marketplace directly refute Sabre's experts' argument that the 2010–11 negotiations with US Airways were arm's-length negotiations and that US Airways was not forced to agree to the anticompetitive restraints.

>    **1.   Evidence of Sabre's Retaliation Against Other Airlines Shows Sabre's Market Power and Rebuts Sabre's Claim That US Airways Had Leverage over Sabre.**

Sabre asserts that it lacks market power because:

- "[F]ollowing de-regulation, the airlines used imposition of, or the threat of ***imposition of a surcharge*** to obtain discounted booking fees and other concessions from the GDSs during contract negotiations."[28]

- "In their contract negotiations with Sabre, airlines have negotiated lower booking fees by ***threatening to withhold their content from Sabre*** (or impose higher costs on Sabre users) to drive customers to other channels, such as direct booking on airline.com, direct connect, other existing GDSs or new GDS entrants."[29]

- "[A]irlines, including US Airways, us[e] the threat of ***developing and encouraging the use of a direct connect*** to extract lower booking fees from Sabre."[30]

---

[28] Decl. Ex. 30, SPFF ¶ 192 (emphasis added).

[29] Decl. Ex. 24, Murphy Direct ¶ 283 (emphasis added).

[30] Decl. Ex. 30, SPFF ¶ 195 (emphasis added).

- US Airways has tools at its disposal to negotiate with Sabre, "including ***threatening to withdraw from the Sabre GDS***, ***promoting alternative distribution channels*** (such as GDS New Entrants and Direct Connects) to access US Airways' content, ***introducing surcharges*** on certain distribution channels, and conditioning access directly on Sabre reducing its booking fees."[31]

With these contentions, Sabre and its experts have put its contracts with other airlines directly at issue.  And US Airways is entitled to show that the facts are otherwise: that when an airline actually attempts to implement these purported checks on Sabre's market power, Sabre and travel agencies band together to bias against the airline.  Evidence of biasing is directly relevant to the issue of Sabre's market power.  *In re Air Passenger Computer Reservations Sys. Antitrust Litig.*, 694 F. Supp. 1443, 1473 (C.D. Cal. 1988) ("[T]he economic feasibility of biasing, and the degree of bias in the system are functions of defendant's market power. . . . If defendant has monopoly power in the [GDS] market then it will have the power to engage in substantial display bias.").  The notion that Sabre should be allowed to advance its theory of competition in the marketplace through its economic expert, but US Airways cannot respond with actual facts is preposterous.

The relevant evidence is quite limited in scope.  US Airways intends to call only three witnesses (and introduce a dozen and a half exhibits) to support its position:[32]

- Al Lenza, Northwest's former Distribution Director, will testify that in August 2004, Northwest announced it would charge travel agents a fee for booking on a GDS channel, including those travel agents who were using Sabre.  Sabre responded to Northwest's "threat of imposition of a surcharge"[33] by coordinating a campaign of commercial retaliation with its travel agents to pressure Northwest to lift the fee.  Sabre successfully biased Northwest's fares in the Sabre GDS and

---

[31] *Id.* ¶ 390 (emphasis added).

[32] Notably, Sabre has not identified the additional exhibits that it contends it would have to introduce in response.

[33] Decl. Ex. 30, SPFF ¶ 192.

blocked travel agents from booking Northwest's lucrative international business class fares through Sabre, causing ███████ of dollars in losses.[34]

- Graham Wareham, Air Canada's former Distribution Director, will testify that when Air Canada became dissatisfied with Sabre's service, it stopped selling its lowest cost fare in the Sabre GDS. In response, Sabre biased Air Canada's lucrative trans-border first-class fares, imposing what Sabre itself estimated were ███████████ of dollars in passenger revenue losses.[35] Sabre then *increased* Air Canada's booking fees year after year, ultimately raising them more than 80 percent. Sabre even noted that its sanctions forced Air Canada to report its losses to investors: "[s]anctions hurt enough to make it to earnings call."[36]

- Derek DeCross, American Airlines' former Vice President of Marketing, will testify that starting in late 2010, Sabre responded to American's attempt to sell fares directly to Sabre's travel agents by biasing American's fares in the GDS. Sabre secretly coordinated its response to American with scores of Sabre's largest travel agencies and instructed them that "all agencies need to act in concert to send [American] the strongest [message] possible."[37] Sabre warned that if "agencies and corporations allow AA to succeed, other airlines will follow and the negative ramifications would be staggering."[38] After just six days of biasing between January 5 and January 10, American had lost roughly $4.3 million in revenues, or $262 million on an annualized basis. Having little choice, American surrendered, accepting Sabre's demands in a new distribution agreement that included price increases, full content, and parity and destroyed American's direct distribution channel.

    This compelling evidence shows that airlines like US Airways cannot negotiate "lower booking fees by threatening to withhold their content from Sabre," as Sabre's Professor Murphy

---

[34] *See* Decl. Ex. 55, Deposition Transcript of Al Lenza, dated August 28, 2013, at 37:22–38:18 (noting that Sabre's biasing of Northwest Airlines' flights "happened immediately after the announcement [of the shared GDS fee], but a week before implementation" and "lasted roughly eight [or] nine days"); Decl. Ex. 52, Sabre News Release, Sabre Implements New Policy for Airlines in DCA 3 Distribution Agreements (Aug. 24, 2004) (SBR-20253191 at –191) (indicating that Sabre would be biasing Northwest's flights "in response to its announcement . . . imposing new ticketing fees on all domestic tickets" booked using a GDS); *see also* Decl. Ex. 53, Affidavit of David A. Schwarte ¶¶ 6–8, *Zurich Am. Ins. Co. v. Sabre Inc.*, Case No. 48-216456-06 (Tarrant Cnty., Tex. 48th Dist. Sept. 4, 2007) (SBR-24948146 at –148–150) (discussing actions Sabre took in response to Northwest Airlines' announcement of the shared GDS fee).

[35] Decl. Ex. 45, May 25, 2007 E-mail from J. Toothman to H. Jones with attachment Air Canada Strategy (SBR-23091641 at –646, 662).

[36] Decl. Ex. 46, Nov. 10, 2006 E-mail from H. Jones to D. Gross (SBR-24377550 at –550).

[37] Decl. Ex. 47, Jan. 4, 2011 E-mail from J. Jones to G. Moore-Murray and S. Frederick (US Dep. Ex. 363) (SUS00158642 at –644).

[38] Decl. Ex. 48, June 18, 2010 E-mail from T. Shelly to C. Wilding, et al. (SBR-22653325 at 328); *see also* Decl. Ex. 49, Aug. 20, 2010 E-mail from T. Klein to B. Vinod and G. Webb (SBR-23304218 at 219); Decl. Ex. 50, Oct. 12, 2010 E-mail from C. Wilding to J. Toothman, et al. with attachment (SBR-23430687); Decl. Ex. 47, Jan. 4, 2011 E-mail from J. Jones to G. Moore-Murray and S. Frederick (US Dep. Ex. 363) (SUS00158642 at –644).

contends (*see* Decl. Ex. 24, Murphy Direct ¶ 283) because travel agents align with Sabre and do not move business away from Sabre to access legacy airline bookings when they are unavailable on Sabre.

**2.      Sabre's Retaliation Against Other Airlines Is Relevant to Show That Sabre Coerced US Airways into Agreeing to the 2011 Contract.**

The airline retaliation evidence is also relevant to the negotiation of the 2011 contract because US Airways was well aware of Sabre's prior retaliatory acts against Northwest, Air Canada, and American.  Sabre contends that the 2010–11 negotiations with US Airways were arm's-length negotiations between evenly matched businesses.[39]  It has also advanced an *in pari delicto* affirmative defense, arguing that US Airways is barred from asserting its rule of reason claim because it was equally at fault in entering into the 2011 agreement.[40]  While the *in pari delicto* defense has never been applied in private antitrust cases in the Second Circuit, and US Airways disputes that it applies here,[41] to the extent Sabre is permitted to argue that US Airways should be denied relief because it willingly entered into its contract with Sabre or suggest that the 2011 contract was the outcome of a competitive negotiation, evidence of Sabre's retaliation toward other airlines is relevant to rebut these defenses.[42]

The US Airways negotiators will testify that they had to take Sabre's threats seriously because of the public examples Sabre had made of Northwest, Air Canada, and American.  In

---

[39] *See* Decl. Ex. 30, SPFF ¶ 324 ("The 2011 Contract was the result of a hard fought negotiation between the parties in which both sides had to compromise.").

[40] *See* Decl. Ex. 31, SPCL ¶ 59 (citing *THI-Hawaii, Inc. v. First Commerce Fin. Corp.*, 627 F.2d 991, 996 (9th Cir. 1980) (barring a suit in a contract case where "the record reflects an arm's length bargaining process")).

[41] *See* US Airways' Mem. of Law in Supp. of Mot. *in Limine* No. 4 to Preclude at Trial Evidence and Argument Regarding Bargaining Over Contractual Terms Other Than The Challenged Contractual Restraints (Dkt. No. 396).

[42] Sabre intends to argue that the *in pari delicto* defense applies "where (1) the plaintiff is an active and willing participant in the illegal activity, and (2) dismissing the suit does not significantly interfere with the policy goals underlying the act."  *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 84–85 (2d Cir. 2013) (Wesley, J., concurring).  The defense does not apply if US Airways' participation was, as US Airways contends here, "not voluntary in any meaningful sense" and the allegedly unlawful contract was the result of having been "forced" to accept the terms.  *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968).

17

2005, Sabre's Tom Klein threatened to bias and remove US Airways' flights from the GDS,
organize a travel agent boycott, and charge US Airways higher booking fees than other airlines.
US Airways' Scott Kirby will testify that he had to take these threats seriously because of what
Sabre had done to Northwest in 2004.  In 2011, US Airways' head of distribution John Gustafson
knew about the forces Sabre had unleashed against Northwest, Air Canada, and American in
response to their challenges to Sabre's power.  The jury is entitled to know why US Airways was
forced to capitulate to Sabre's demands in 2011.  This evidence does not go to Sabre's corporate
"character"; it is about Sabre's actual conduct in the marketplace, and goes to core elements of
the case.

## II.  Sabre Has Not Met Its Burden Under Rule 403 of Demonstrating That the Burden and Risk of Prejudice Substantially Outweigh the Probative Value of the Proposed Evidence.

To prevail on its motion, Sabre would have to demonstrate that the evidence it seeks to
exclude is entirely unrelated to US Airways' theory of the case,[43] which as shown above it
cannot, or that US Airways' presentation of this evidence would be so time-consuming and
prejudicial as to "*substantially* outweigh[]" its probative value.  *See* Fed. R. Evid. 403 (emphasis
added); *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 151 (2d Cir. 1997) ("imbalance must be
substantial").  Sabre cannot meet the requirements of Rule 403 either.

### A.  The Evidence Sabre Seeks to Exclude Does Not Create a Risk of Wasteful "Mini-trials."

Like for any other relevant factual issue, witnesses and documents will establish Sabre's
third-party contracts and its retaliation against Northwest, Air Canada, and American.  Sabre
may dispute certain facts or US Airways' argument about them, but this evidence will not require

---

[43] *See Kwiatkowski v. Bear Stearns & Co.*, 2000 WL 502856, at *7 (S.D.N.Y. Apr. 26, 2000) (holding that any extra time required to explore evidence of plaintiff's later trading would not be wasteful or unduly burdensome where evidence was "directly relevant to the theory of [the] case as advanced in the arguments by both sides").

"mini-trials" on issues that otherwise would not need to be tried.  *See, e.g.*, *Kwiatkowski*, 2000 WL 502856, at *6–7 (rejecting argument that introducing evidence of "directly relevant," yet separate, commodities trading than that at issue would create a risk of wasteful mini-trials).

 ***Travel agency agreements.***  Sabre is just wrong in asserting that US Airways' travel agency contract evidence will require it to disprove that the contracts violate the Sherman Act by introducing evidence "showing that the provisions are not unreasonable restraints of trade under the rule of reason."[44]  US Airways' evidence goes not to the contracts' legality but simply to their *effects*—namely how they locked travel agents into Sabre's GDS and how they preserved Sabre's market power by erecting insurmountable barriers to entry by alternative distributors. With those agreements in place, US Airways had no alternative but to reach business travelers through Sabre.  US Airways cannot pry agents loose from Sabre's grip given the lavish incentives Sabre pays, and it cannot bypass Sabre by offering lower fares to agents who book directly using alternative technologies because Sabre's contracts prevent the creation of such technologies.

 Nor will Sabre's counterarguments require "complicated economic testimony showing that equally-efficient competitors can profitably compete and move bookings away from Sabre . . . ."[45]  Without conducting a complicated analysis, Sabre's economist, Professor Kevin Murphy, has already opined that "Sabre's travel agent contracts do not create a barrier to entry." *See, e.g.*, Decl. Ex. 24, Murphy Direct ¶¶ 168–174.

 ***Authorized developer contracts.***  US Airways' authorized developer contract evidence will not require the jury to endure a repetitive recitation of dozens of contracts, as Sabre claims,

---

[44] Third-Party Contract Mot. at 12.

[45] *Id.*

since the competition-restricting language is part of Sabre's standard contract terms.[46]  For

example, Sabre's $███ "convenience fee" for interoperating with Sabre's system and $███ like-

fare provision are set forth in the same clause in each of Sabre's software developer agreements.

Beyond hearing about those provisions once, the jury will simply receive from a US Airways'

expert a short description of how they affect competition in the ticket distribution marketplace

and an explanation from a software developer of how they frustrated his establishment of an

alternative distribution channel.

  ***Other airlines' contracts.***  Nor will reference to terms in other legacy airline contracts

bog down the presentation of evidence or unnecessarily inject issues that would not have to be

tried.  Other than two witnesses (by deposition) from Southwest and Spirit—since US Airways

holds them up as examples of the contract terms that airlines can achieve in the absence of

Sabre's market power—a single witness (Professor Stiglitz) will testify about the inclusion of the

contractual restraints in the other four legacy airlines' contracts—a fact that is not disputed—and

the effects of their inclusion.  As noted above, he must do so in order to explain why no

alternative distributive channels to discipline Sabre's pricing have arisen since deregulation.

Thus, US Airways' presentation on other airlines' contracts will not involve numerous additional

witnesses or documents or mini-trials on each negotiation.  Of course, Sabre is free to cross-

examine Professor Stiglitz about his assumptions concerning, and use of, the other airlines'

contracts in his expert opinions.  Sabre is even free to offer responsive evidence to refute any

inference that the other airlines, like US Airways, agreed to those terms as a result of Sabre's

market power and would not have agreed to them in the "but-for" competitive world.  But Sabre

has known about this argument for years and has identified *no* additional witnesses that it would

---

[46] Sabre's Charles Loop testified that the $███ "convenience fee" is a standard provision in its authorized developer contracts.  (Decl. Ex. 55, Deposition Transcript of Charles Loop, dated May 1, 2013, at 15:2–28:15.)

call from these other airlines to support its contention.  So, the notion of burdensome mini-trials is utterly illusory.  The fact that disagreement about an assumption underlying an expert's opinion may require some rebuttal evidence is hardly grounds to bar relevant foundational evidence of this sort.

*Airline retaliation evidence.*  As noted earlier, receiving evidence of Sabre's retaliation against Northwest, Air Canada, and American—which will amount to three witnesses testifying for what will likely be less than a day—will not require a "mini-trial" in order for Sabre to establish the lawfulness of its biasing.[47]  US Airways does not contend that Sabre breached any contract or violated any statute.  The point is only that Sabre did bias them, did cause them to forego plans to steer travel agents away from Sabre, and did inflict serious economic damage that US Airways in 2011 decided it could not endure.

Sabre's final argument, that its settlement agreement with American precludes offering retaliation evidence,[48] is wrong on many counts.  First, by introducing retaliation evidence, US Airways is not "seeking relief" under the antitrust laws in favor of American.  Second, no US Airways witness will assert that Sabre's biasing against American violated the antitrust laws or breached any contract or any other duty.  Third, nothing in Sabre's settlement with American bars this lawsuit (the agreement appears to have been carefully crafted not to) so it should not be construed to limit US Airways' proof in a way that would create a bar.

---

[47] Prior Disputes Mot. at 1.  Moreover, Sabre fails to identify a single witness it would need to call who is not already slated to testify.  Those executives who will defend its practices were also architects of its airline retaliation.  These include Sabre's CEO Tom Klein, Senior Vice President of Global Distribution David Gross, and Vice President of North American Airline Sales Chris Wilding, all of whom can explain Sabre's biasing.  Decl. Ex. 55, Deposition Transcript of Tom Klein, dated July 10, 2013, at 24:14–18 (Tom Klein testifying that he "was in the discussions on how we would respond" to Northwest's surcharge program); Decl. Ex. 55, Deposition Transcript of Christopher A. Wilding, dated Jan. 17, 2013, at 255:9–19 (explaining that "Tom [Klein] was very much involved in the project" to bias American); *id.* at 232:22–236:10 (explaining American's contract with Sabre and Sabre's basis for introducing bias against American); Decl. Ex. 55, Deposition Transcript of David Gross, dated Jan. 8, 2013, at 252:23–253:6 (explaining Air Canada's contract with Sabre and Sabre's basis for introducing bias against Air Canada).

[48] Prior Disputes Mot. at 19–20.

**B.    The Jury Is Capable of Understanding the Rule of Reason Analysis, and Will Not Be Confused by the Issues.**

Sabre finally seeks to gut this case by arguing that evidence US Airways intends to offer is prejudicial and "may lead the jury to the mistaken belief that the trial is about Sabre's conduct towards the airline industry as a whole."[49]  But rule of reason cases alleging an abuse of dominance or market power necessarily implicate a defendant's ***conduct toward the industry as a whole***.  Market power rarely arises (or is preserved) by conduct the defendant directs only at a single market participant.  *See In re Payment Card*, 562 F. Supp. 2d at 402 (analyzing market-wide "conduct [that] neutralized the ability of market forces to correct supra-competitive pricing").  Moreover, the jury must weigh the market-wide effects of conduct that restrains competition.  *See Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506 (2d Cir. 2004) (plaintiffs must demonstrate adverse competitive effects "***as a whole*** in the relevant market") (emphasis added).

A jury is perfectly capable of understanding that evidence of Sabre's conduct toward other market participants is being offered to show that Sabre is able to exert a high degree of "uncommon leverage" over its customers, *American Express Co.*, 88 F. Supp. 3d 143, and to force "a purchaser to do something that he would not do in a competitive market," *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 464 (1992).  To the extent the purpose is not self-evident, the Court can deliver appropriate instructions.  *Lightwave Techs., Inc. v. Corning Glass Works*, 1991 WL 4737, at *4 (S.D.N.Y. Jan. 18, 1991) (finding that "prior adjudications [against plaintiff] were . . . properly admitted . . . with cautionary instructions to the jury to limit their prejudicial impact" in complex, five-week patent trial, and noting that the court "assume[s], as [it] must, that the jury heeded these instructions").  The only risk of

---

[49] Prior Disputes Mot. at 11.

prejudice here is one Sabre seeks to sow:  preventing US Airways from having the full measure of its proof and being given the opportunity to establish the elements of the antitrust violation it alleges.

## CONCLUSION

For the foregoing reasons, the Court should deny Sabre's (i) Motion *in Limine* to Exclude Certain Testimony and Argument About Sabre's Contracts With Third Parties and (ii) Motion *in Limine* to Exclude "Prior Bad Acts" Evidence Relating to Disputes With Third Parties.

Dated:  June 10, 2016

O'MELVENY & MYERS LLP

By: _____

Charles P. Diamond (*pro hac vice*)
cdiamond@omm.com
Andrew J. Frackman
afrackman@omm.com

7 Times Square
New York, New York  10036
Telephone:   (212) 326-2000
Facsimile:    (212) 326-2061

*Attorneys for Plaintiff US Airways, Inc.*