UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                                               :
US AIRWAYS, INC.,                                              :
                                          Plaintiff,           :
                                                               :
                 -against-                                     :
                                                               :
SABRE HOLDINGS CORP., et al.,                                 :
                                          Defendants.          :
                                                               :
---------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/21/2017

11 Civ. 2725 (LGS)

OPINION AND ORDER

LORNA G. SCHOFIELD, District Judge:

US Airways, Inc. ("US Airways") brought antitrust claims against Sabre Holdings Corporation, Sabre Travel International Ltd., and Sabre GLBL Inc. (collectively, "Sabre"), under the Sherman Act, 15 U.S.C. § 1 et seq., which were tried before a jury between October 24 and December 20, 2016.  The jury found in US Airways' favor on one of the two claims tried.  That claim alleges that Sabre unreasonably restrained trade by imposing on US Airways anticompetitive and unlawful contractual provisions that harmed competition and enabled Sabre to charge US Airways higher booking fees than it would have been able to charge in a competitive market.  The jury awarded US Airways $5,098,142, or $15,294,426 after trebling.  Sabre has filed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) on this claim or, in the alternative, for a new trial under Rules 50 and 59 of the Federal Rules of Civil Procedure.  For the reasons that follow, the motion is denied.

I.      BACKGROUND

        A.      The Parties and the Claim

        Defendant Sabre operates a global distribution system, and Sabre itself is referred to as a "GDS."  Sabre is one of three GDSs in the United States.  The GDSs provide computer services

that allow participating airlines and other travel providers to distribute schedule, fare and booking information to travel agents.  The GDSs also provide a means for travel agents to search for, book and manage travel reservations.

Plaintiff US Airways[1] is one of the airlines that participates in the Sabre distribution system.  US Airways and Sabre entered into successive contracts whereby Sabre distributed US Airways' flight and fare information to travel agents through the Sabre distribution system, and US Airways paid Sabre a booking fee for its services whenever a US Airways ticket was sold through Sabre.  At issue is the parties' contract that became effective on February 23, 2011 (the "2011 Contract").

### B.     Summary of Relevant Pre-Trial Procedural History

US Airways commenced this action against Sabre on April 21, 2011, alleging four antitrust violations under the Sherman Act.  After a motion to dismiss, two of these claims survived:  (1) Count I, alleging vertical restraints of trade through contractual agreements with airlines and travel agents containing anticompetitive provisions and (2) Count IV, alleging a horizontal agreement among Sabre and its GDS competitors to limit competition among the GDSs.  Fact and expert discovery proceeded until 2014.

In January 2015, after the case was reassigned to me, Sabre's motion for summary judgment was granted in part.  Among other limitations, US Airways' damages were limited to those suffered between February 23, 2011 -- when the 2011 Contract was signed -- and October 30, 2012 -- when a settlement agreement between the AMR Corporation and Sabre became

---

[1] During the relevant period, US Airways was a stand-alone corporation.  In December 2013, US Airways Group and AMR Corporation, the parent company of American Airlines, Inc., merged to form American Airlines Group, Inc., and US Airways became a wholly owned subsidiary of American Airlines Group, Inc.

effective, barring American and any future merged parties (like US Airways) from suing for harm suffered after that date.

In an effort to obtain a bench trial rather than a jury trial, US Airways filed an amended complaint in July 2015, in effect waiving its estimated damages of $210 million after trebling and seeking only declaratory relief and nominal damages not to exceed $20. Sabre made a timely offer of judgment under Rule 68, agreeing to pay $20 in damages plus reasonable costs and attorneys' fees, and agreeing to entry of judgment without any admission of liability. US Airways rejected the offer. Sabre then sought entry of judgment, arguing that its Rule 68 offer of judgment provided US Airways with complete relief and that the outstanding demand for declaratory judgment was moot. In September 2015, Sabre's motion to dismiss the declaratory judgment demand was granted, but Sabre's motion to enter judgment was denied without prejudice to renewal for technical reasons explained in the Court's opinion.

Faced with the loss of its declaratory judgment claim and the likely recovery of only $20 in damages, US Airways filed a motion to restore the damages it had waived. The motion was granted in December 2015, with the proviso that US Airways reimburse Sabre for its costs, including attorneys' fees, incurred in connection with US Airways' efforts to obtain a bench trial. US Airways fulfilled the condition, paying Sabre over $6 million, and filed its Third Amended Complaint in March 2016.

Trial was set to commence on October 24, 2016. The parties filed seven *Daubert* motions seeking to disqualify or limit the testimony of eight experts, and eleven motions *in limine*. The motions were adjudicated between July and September 22, 2016, with the exception of one motion that was reserved for trial.

On September 26, 2016, the Second Circuit issued its opinion in *United States v. Am.*

*Express Co.*, 838 F.3d 179 (2d Cir. 2016) ("*Amex*"), the Second Circuit's first decision addressing two-sided markets in an antitrust case.  Whether the market was two-sided or one-sided was also a key issue in this action.  Sabre moved for reconsideration of the summary judgment denial in light of *Amex*, arguing that US Airways' claims should be dismissed.  On October 10, 2016, Sabre's motion for reconsideration was denied.  On October 11, 2016, Sabre sought an adjournment of the trial and the opportunity to re-brief the *Daubert* motions in light of *Amex*.  US Airways opposed the adjournment, even though US Airways had prepared its case before *Amex*.  Sabre's application was denied.

A jury trial commenced on October 24, 2016, on the two surviving claims.  The first claim was that certain provisions of the parties' 2011 Contract harmed competition and caused US Airways to pay Sabre a supracompetitive booking fee, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The second claim was that Sabre conspired with its two GDS competitors to limit competition among them for airlines' distribution business, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

After nine weeks of trial, the jury returned a verdict.  On Count I, the contract restraints claim, the jury found that the relevant market was one-sided, that Sabre had unreasonably restrained trade and that US Airways had been injured as a result.  The jury awarded US Airways $5,098,142 in damages, before trebling.  On Count IV, the conspiracy claim, the jury found for Sabre.  In response to hypothetical questions on the verdict form, the jury also found that, even assuming that the market were two-sided, Sabre unreasonably restrained trade, US Airways was injured as a result and US Airways suffered the same damages of $5,098,142.

## II.    LEGAL STANDARDS

### A.    Standards for Judgment as a Matter of Law and for a New Trial

Sabre moves for judgment as a matter of law on Count I under Rule 50(b), Fed. R. Civ. P.

Judgment as a matter of law is appropriate "only if the court, viewing the evidence in the light

most favorable to the non-movant, concludes that a reasonable juror would have been *compelled*

to accept the view of the moving party." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833

F.3d 172, 180 (2d Cir. 2016) (citation omitted).  "The court cannot assess the weight of

conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the

jury." *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015) (internal quotation marks

omitted).  A Rule 50 motion may be granted only if "there exists such a complete absence of

evidence supporting the verdict that the jury's findings could only have been the result of sheer

surmise and conjecture, or the evidence in favor of the movant is so overwhelming that

reasonable and fair minded [persons] could not arrive at a verdict against [it]."  *Warren v. Pataki*,

823 F.3d 125, 139 (2d Cir. 2016) (quoting *S.E.C. v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014)

(alteration in original), *cert. denied sub nom. Brooks v. Pataki*, 137 S. Ct. 380 (2016).

Sabre moves in the alternative for a new trial under Rules 50 and 59(a).  A court may

grant a new trial only where "the court determines, in its independent judgment, that the jury has

reached a seriously erroneous result or [if] its verdict is a miscarriage of justice."  *Crawford v.*

*Tribeca Lending Corp.*, 815 F.3d 121, 128 (2d Cir. 2016) (internal quotation marks omitted).  A

district court may grant a new trial "even if some evidence supports the verdict," *id.*, but

"precedent counsels that trial judges must exercise their ability to weigh credibility with caution

and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility."

*Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012); *accord In re Joint E. & S.*

*Dist. Asbestos Litig.*, 52 F.3d 1124, 1135 (2d Cir. 1995) (it is for the jury to decide between conflicting expert testimony).

      **B.**      **The Legal Framework Governing US Airways' Antitrust Claims**

To protect competition in the marketplace, Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  "To prove a § 1 violation, a plaintiff must demonstrate: (1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade."  *Amex*, 838 F.3d at 193 (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 606 (2d Cir. 2004)).

As US Airways does not allege that Sabre's conduct challenged in Count I was illegal *per se*, the claim is appropriately analyzed under the rule of reason.  *Id.* at 193–94.  Under the rule of reason's three-step burden-shifting framework, a plaintiff must show first that a defendant's actions had an adverse effect on competition in the relevant market.  A plaintiff can satisfy this first step by showing that the challenged restraints "had an *actual* adverse effect on competition as a whole in the relevant market."  *Id.* at 194 (quoting *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 546 (2d Cir. 1993)).  Alternatively, a plaintiff can establish anticompetitive effects indirectly by showing that the defendant has "sufficient market power to cause an adverse effect on competition."  *Id.* (quoting *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998)).  "A plaintiff seeking to use market power as a proxy for adverse effect must show market power, plus some other ground for believing that the challenged behavior could harm competition in the market . . . ."  *Id.* at 195 (quoting *Tops Mkts.*, 142 F.3d at 97).  Under either inquiry, the boundaries of the relevant product market and geographic market are critical aspects of proving harm.  Here, the parties agreed that the relevant

geographic market is the United States.

At the second step, the burden shifts to the defendant "to offer evidence of any procompetitive effects of the restraint at issue." *Id.* At the third step, "the burden shifts back to the plaintiff[] to prove that any legitimate competitive benefits offered by defendant[] could have been achieved through less restrictive means." *Id.* (quoting *Geneva Pharms.*, 386 F.3d at 507) (alteration in original). Ultimately, "[t]he overarching standard is whether defendants' actions diminish *overall* competition, and hence consumer welfare." *Id.* at 195 (quoting *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 128 (2d Cir. 1995)).

In addition to showing that a defendant's behavior unreasonably restrained trade, a plaintiff also must prove that a defendant's violation of the antitrust laws caused the plaintiff to suffer injury to its business or property. 15 U.S.C. § 15; *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772–74 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 814 (2017). If a defendant is found to have violated the antitrust laws, the jury must then determine the amount of plaintiff's damages, if any.

## III.   DISCUSSION

### A.      Background

There was sufficient evidence introduced at trial from which the jury could reasonably have found as follows:

#### 1.      The History of the GDS Business

The GDSs use computerized reservation systems that evolved out of those developed by the airlines for their own use beginning in the 1960s. (Tr. 964:23-965:1; 968:13-21.) These systems were first made available to travel agents in the mid-1970s. (*Id.*) The airlines' systems offered not only their own fights and fares, but also those of other carriers in order to attract

users to their platform.  (Tr. 977:21-978:2.)  As the systems became more established, the airlines began to charge other airlines booking fees for bookings made through their platform.  (Tr. 978:16-979:11.)  In 1984, the Department of Justice and the Civil Aeronautics Board concluded that the airlines had engaged in discriminatory pricing and began to regulate the reservation systems.  (Tr. 981:3; 979:7-11; PX-521.)

In 1992, the U.S. Department of Transportation ("DOT") enacted a "mandatory participation" rule, which required the airlines to offer the same flights and fares on other airline reservation systems that they made available on their own systems.  (Tr. 987:2-989:18.)  This rule was the genesis of some of the contractual provisions at issue in this case.  The regulations standardized the information available, thereby encouraging travel agents to search and book through a single airline's reservation system, a practice known as "single homing" that persists today.  (Tr. 989:21-990:9; 995:3-8; 995:23-996:5; 2117:4-2119:17.)

Around the same time as the 1992 rules were issued, airlines began divesting themselves of the reservation systems business, creating GDSs that were independent of the airlines.  (Tr. 990:15-991:4.)  GDSs were also consolidating and the internet was beginning to change the way that airline tickets were bought and sold.  (Tr. 991:5-22.)  In 2004, after 20 years of regulation, the DOT deregulated the GDS industry.  (Tr. 1006:3-8; PX-007.)  The DOT found that each of the GDSs had market power over most airlines because travel agents generally "single-homed" and the airlines were dependent upon the GDSs to reach traditional travel agents.  (PX-007.0013-.0015.)  However, the DOT expected that new technologies would create sufficient competition in the airline ticket distribution market to erode the GDSs market power over time.  (Tr. 997:6-1002:23; 1006:3-8, PX-007.003.)

### 2.      The GDS Business

Sabre is one of only three GDSs in the United States, with Amadeus and Travelport.  (Tr. 448:6-12.)  Sabre is the largest and controls over 50% of the market.  (Tr. 1365:14-1366:1.) Since deregulation, the number of GDS competitors has dropped from four to three.  (Tr. 1004:1-8.)  No new GDS has entered the market since the 1980s.  (Tr. 962:24-963:1, 1006:9-10.)  US Airways estimated that 40% percent of its revenues were booked through Sabre, and another 25% through the other GDSs.  (Tr. 202:15-203:6; PX 1178.0001.)

 "Brick and mortar" travel agencies book almost exclusively through the GDSs.  (Tr. 2034:1-16; 2039:25-2041:4; 2049:3-14.)  These travel agencies' clients are primarily corporate travelers, who are higher value customers for airlines.  (Tr. 202:4-14.)  Travel agencies frequently "single-home" with one GDS.  In 2011, 94% of travel agency locations (i.e. travel agency offices, sometimes within a large multi-office travel agency) used a single GDS.  (PX-1181.)  Because of single-homing, US Airways must participate in each of the GDSs to reach the corporate travelers whose travel agents book through that GDS.  (Tr. 1254:1-20; 2031:2-21; 2059:5-2060:7.)

GDSs earn revenues through booking fees paid by the airlines and other travel providers. (*See* Tr. 443:3-7; 452:21-23; 529:2-530:7; 978:16-19.)  The GDSs do not charge travel agents for GDS services.  Instead, travel agencies *receive* incentive payments from GDSs, as well as commission payments from airlines.  (Tr. 1864:18-25; 2054:17-2057:6.)  From 2006 through 2012, Sabre paid more than $1.2 billion in incentive fees to travel agents.  (Tr. 1272:17-1273:7; 2057:17-2058:25; PX-766.)  US Airways' expert, Professor Joseph Stiglitz, opined that these "incentive payments" serve to keep the travel agents loyal to its chosen GDS, but do not benefit the airlines.  (Tr. 1379:17-23; 1905:17-19; 5518:25-5519:6.)

### 3.      The Challenged Contractual Provisions

Starting in 2006, the US Airways' contract with Sabre included the same or similar provisions at issue here.  Claims based on those provisions in the 2006 contract were dismissed as time barred.  The challenged restraints, collectively referred to as the "full content" provisions (Tr. 5261:15-5262:25), as they appear in the parties' 2011 Contract (PX-006) are:

- A "No Discounts" provision, also referred to as a "parity" provision, prohibiting US Airways from providing lower fares through other, non-Sabre, channels.  The contract specifically required that "in no case will the Fares provided through the Sabre GDS for Bookings in the Sabre GDS . . . be more expensive or less comprehensive than the Fares offered by [US Airways] via any Reservation Outlet."  (PX-006.0013.)

- A "No Surcharge" provision, preventing US Airways from charging or collecting from travel agents a fee or higher prices for booking through Sabre.  The contract stated that US Airways "shall not charge to or collect from any Sabre Subscriber a service fee or any similar charge."  (PX-006.0027.)

- A "No Better Benefits" provision, requiring US Airways to provide Sabre GDS service subscribers access to "the same types, amounts and levels of products, services, functionality, enhancements, promotional opportunities, . . . incentives, commissions, . . . benefits and rights" that US Airways offered to users of any other booking channel.  (PX-006.0003.)

- A "No Direct Connects" provision, preventing US Airways from inducing travel agents, or their customers, from directly connecting their reservation system with the airlines'.  The contract provided, "[US Airways] shall not require or induce

any Sabre Subscriber to book on any Participating Carrier Internet Site."  The

contract further stated, "[US Airways] will not . . . in any other manner

whatsoever require or provide commissions, compensation or other benefits or

rights . . . or otherwise encourage, promote or induce . . . Sabre Subscribers (or

their customers) to circumvent the Sabre GDS."  (PX-006.0004.)

After US Airways merged with America West Airlines in 2005, the airline tried

unsuccessfully to avoid the challenged restraints.  (Tr. 186:21-189:4.)  Ultimately, US Airways

had no choice but to accept them in the US Airways-Sabre 2006 contract for fear of being

removed from the Sabre GDS or being retaliated against, for example, through "display biasing,"

which means reordering search results as they appear in the system to disadvantage a particular

airline.  (Tr. 190:19-193:3.)  When the contract came up for renewal in 2011, US Airways again

was forced to accept the full content restrictions.  (Tr. 523:8-13; 818:15-819:10; 840:5-9.)

The 2011 Contract requires US Airways to pay Sabre a booking fee of at least $3.41 per

flight segment booked through Sabre.  (Tr. 1241:11-12; 1351:6-7; PX-006.0010.)

## B.     The Relevant Market

"[M]arket definition is a deeply fact-intensive inquiry," *Todd v. Exxon Corp.*, 275 F.3d

191, 199 (2d Cir. 2001) (Sotomayor, J.), which requires consideration of the "commercial

realities" of competition.  *Amex*, 838 F.3d at 197.  Products or services are in the same relevant

product market if they are "reasonably interchangeable by consumers for the same purposes."

*Id.* at 196 (quoting *Geneva Pharms.*, 386 F.3d at 496).  The purpose of market definition is "to

identify the market participants and competitive pressures that restrain an individual firm's

ability to raise prices or restrict output."  *Geneva Pharms.*, 386 F.3d at 496.  The jury found that

Sabre had harmed competition "in the relevant market" and that the relevant market was a one-

sided market.

### 1.    Product Market for GDS Services

US Airways presented sufficient evidence for a reasonable jury to conclude that the relevant product market is the market for GDS services linking airlines with traditional travel agents that serve the vast majority of business travelers, but that the relevant market does not include other means of distributing airline tickets, such as airline websites and online travel agencies (e.g. Expedia, Travelocity), among others, because consumers do not view them as reasonable substitutes for GDS services.  (*E.g.*, Tr. 1361:8-1365:12.)

Sabre does not challenge the sufficiency of the evidence.  Sabre argues instead that US Airways' market definition is improper as a matter of law because US Airways explicitly assumed the existence of the challenged contractual restraints in the relevant market analysis.  (*E.g.*, Tr. 1365:1-8.)  Sabre relies primarily on the *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997), line of cases to argue that the relevant market must be defined without reference to the challenged contractual restraints.  *See also Smugglers Notch Homeowners' Ass'n. Inc. v. Smugglers' Notch Mgmt. Co.*, 414 F. App'x 372, 376–77 (2d Cir. 2011) (summary order).  These cases are factually distinguishable and do not render Plaintiff's proposed relevant market deficient as a matter of law.

In *Queen City*, the Third Circuit affirmed the dismissal of antitrust claims because the plaintiffs had failed to allege a valid relevant market.  The plaintiffs were a group of Domino's Pizza franchisees who challenged contractual terms in the franchise agreement requiring them to buy only Domino's-approved ingredients and supplies.  *Queen City Pizza*, 124 F.3d at 442–43.  The plaintiffs asserted monopoly and illegal tying claims, among others, alleging that the relevant market was the market for ingredients and supplies used in Domino's restaurants.  *Id.* at

435.  The Third Circuit rejected this narrow market definition, reasoning that pizza ingredients and supplies from Domino's and other suppliers are reasonably interchangeable, and that "[a] court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general."  *Id.* at 438.

Critical to the Third Circuit's analysis was that the plaintiff franchisees voluntarily accepted the contractual restraints and were not forced to accept them as a consequence of the defendant's market power.  *Id.* at 441.  The Third Circuit observed, "Plaintiffs need not have become Domino's franchisees" and could have selected a different franchisor with different or fewer contractual restrictions.  *Id.*  In other words, competition in the market for franchise agreements constrained Domino's ability to abuse its contractual power.  *Queen City* thus prohibits a market definition narrowed by contractual restraints that a counterparty willingly assumes in a competitive market.  *See id.* at 440; *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008) ("[T]he law prohibits an antitrust claimant from resting on market *power* that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant (as in *Queen City Pizza . . .* ).").

This case is factually distinguishable from *Queen City*.  Here, Plaintiff presented ample evidence that it had no choice but to accept Sabre's contractual terms because of Sabre's economic market power.  (Tr. 218:19-219:16; 474:9-18; 523:6-9; 1251:11-25.)  Unlike *Queen City*, where the court found that market power arose *solely* from the contracts, here, Plaintiff presented evidence that market power arose from Sabre's economic power and US Airways was forced to accept the challenged contractual terms:

- Sabre had over 50% of the bookings made in the GDS market, impacting a

13

significant portion of corporate travel bookings (*see* PX-751);

- Corporate travel bookings represented the most lucrative segment of US Airways' business and most travel agency locations 'single-homed' with a single GDS.  (Tr. 202:4-14; 1277:1-13.)

- In total, about 40% of US Airways' revenue was booked through Sabre.  (Tr. 202:1-2; 474:17-18; PX-1178.)

- Consequently, US Airways determined that removal of their flights from the Sabre system would have jeopardized 15 to 20% of their revenue and the future of the company.  (Tr. 202:15-203:6; 219:7-16; 1279:6-17; 1280:18-23.)

- US Airways had no choice but to accept Sabre's terms.  (Tr. 212:17-24; 218:19-219:16; 474:9-18; 523:6-9; 591:2-4.)

This evidence removes the present case from the ambit of the *Queen City* rule on which Sabre relies.  *See Meredith Corp. v. SESAC, LLC*, No. 09 Civ. 9177, 2011 WL 856266, at *7–8 (S.D.N.Y. Mar. 9, 2011) (distinguishing *Queen City* as a "contract power" case where defendant's market power arose solely from contractual rights and on grounds that there was competition in market for restaurant franchise opportunities); *Newcal Indus., Inc.*, 513 F.3d at 1049 (rejecting defendant's argument that the facts were similar to *Queen City* because the market power at issue did not rest solely on contractual power).

Sabre also argues that US Airways' product market definition is inconsistent with its theory of injury and causation, which depended on non-GDS competitors being available to travel agents and travelers.  At trial, US Airways argued that its damages should be measured with reference to a competitive market, in which competition from channels outside of the market for GDS services (e.g. purchases directly from airlines or from GDS alternatives) would

drive down the price (booking fee) for GDS distribution services.  Sabre's argument is incorrect.

In defining the relevant market, "[t]he basic principle is that the relevant market definition must

encompass the *realities* of competition."  *Amex*, 838 F.3d at 197 (emphasis added) (quoting

*Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994)).  In contrast, the inquiry at the injury and

damages stage is whether US Airways suffered injury as a result of Sabre's unlawful restraint of

trade, which requires examining what would have happened in the hypothetical "but for

competitive world" had the unlawful restraint not existed.  *See* 2A Phillip E. Areeda et al.,

*Antitrust Law* ¶ 392b, at 379 (4th ed. 2014) (When measuring damages, "[t]he guiding principle

is that the antitrust victim should recover the difference between its actual economic condition

and its 'but for' condition.").  Because each stage of analysis requires a distinct inquiry,

assuming the contractual restraints apply at one stage and not at the other is neither illogical nor

inconsistent.

### 2.   One-Sided Market

At trial, the evidence was sufficient for a reasonable jury to conclude -- as it did -- that

the relevant market for purposes of Count I was one-sided, even though Sabre and the other

GDSs are two-sided platforms.  In other words, the evidence was sufficient for the jury to

conclude that the relevant product market was not two-sided and interdependent, such that

benefits to the travel agent side of the market had to be considered in assessing harm to

competition.  This issue was the basis for US Airways' argument that Sabre's supracompetitive

prices, which are the measure of US Airways' harm, should be measured without subtracting

Sabre's incentive payments to travel agents.[2]  (*See* Tr. 1883:2-17; 1884:9-13; 5519:19-25;

---

[2] US Airways presented evidence that, without considering travel agent incentives, Sabre charged supracompetitive prices, and therefore US Airways had damages, ranging from $44.5

5532:19-5533:23.)

The concept of two-sidedness in economics is relatively new and complex. *See Amex*, 838 F.3d at 185 n.3 ("Two-sided markets were first clearly identified in the early 2000s by economists Jean-Charles Rochet and Jean Tirole . . . ."). Simply put, "[a] two-sided platform provides goods or services to two distinct groups of customers who need each other in some way and who rely on the platform to intermediate transactions between them." ABA Section of Antitrust Law, *Market Definition in Antitrust: Theory and Case Studies*, 439–40 (2012) ("ABA, *Market Definition*"). "Two-sided platforms minimize transactions costs between entities that can benefit from getting together, permitting value-creating exchanges to take place that would not occur otherwise." *Id.* at 440 (internal quotation marks omitted). Websites like eBay, which connect buyers and sellers of goods in online auctions, or credit cards that provide a way to link merchants and customers, are two-sided platforms. GDSs likewise are two-sided platforms. They provide an avenue for airlines selling tickets and travel agents purchasing tickets to do business with each other.

Economists define a two-sided market as one in which a "platform can affect the volume of transactions by charging more to one side of the market and reducing the price paid by the other side by an equal amount; in other words, the price structure matters, and platforms must design it so as to bring both sides on board." *Amex*, 838 F.3d at 185 n.3 (quoting Jean-Charles Rochet & Jean Tirole, *Two-Sided Markets: A Progress Report*, 37 Rand J. Econ. 645, 664–65

---

million to $73.2 million, depending on whether a $1.35 or $0 booking fee benchmark is used. (PX-1184.) US Airways' experts also explained that, even accounting for travel agency incentives in a two-sided market, Sabre had lower but still supracompetitive prices. (Tr. 2361:20-2362:25; 2453:24-2454:5; 2514:8-20.) Although the jury found that the relevant market was one-sided, it also hypothetically found damages of approximately $5 million if the market were two-sided.

(2006) ("Rochet & Tirole, *Two-Sided Markets*")).  Profit-maximizing prices of two-sided

platforms may require charging one side of the platform less than the marginal cost of serving

that set of customers.  David S. Evans & Michael Noel, *Defining Antitrust Markets when Firms*

*Operate Two-Sided Platforms*, 2005 Colum. Bus. L. R. 667, 668 (2005).

The economic concept of two-sided platforms or markets is not the same as the legal

concept of the *relevant market* in antitrust law, a distinction that economists and lawyers alike

recognize.  *See, e.g.*, David S. Evans & Richard Schmalensee, *The Industrial Organization of*

*Markets with Two-Sided Platforms*, 3 Competition Policy Int'l 151, 153 n.5 (2007) (commenting

on the Rochet and Tirole definition, "[n]ote that the word market is being used in the loose

manner that is the custom among economists and not in the antitrust sense.  The Rochet-Tirole

definition would be more precise if it said 'A two-sided platform business exists if . . . .'"); ABA,

*Market Definition* at 447.  The basic difference is that "[t]wo-sided platforms serve two distinct

sets of customers who receive different but related products or services.  Market definition [for

antitrust purposes] must consider whether both sides of the platform should be combined in one

market or whether separate markets should be defined for each side."  *Id.* (citation omitted).  The

relevant market for purposes of antitrust analysis may not be two-sided even though the

defendant operates a two-sided platform.  *See, e.g.*, *Amex*, 838 F.3d at 197–98 (differentiating

between the relevant market defined in *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir.

2003), and in *Amex*, both of which involve credit card platforms).

The vocabulary of two-sidedness is new, but courts have long addressed claims and

developed case law involving businesses now recognized as two-sided platforms by closely

examining the competitive realities of the market.  *See, e.g.*, *Times-Picayune Pub. Co. v. United*

*States*, 345 U.S. 594, 610 (1953) (recognizing -- without using the language of two-sidedness --

that "every newspaper is a dual trader in separate though interdependent markets; it sells the

paper's news and advertising content to its readers; in effect that readership is in turn sold to the

buyers of advertising space").  The relevant market is not two-sided merely because it involves a

platform with customers on both sides.  If that were the case, the relevant market for every

business with a middleman would be two-sided as a matter of law.  The ultimate goal of defining

the relevant market remains "to identify the market participants and competitive pressures that

restrain an individual firm's ability to raise prices or restrict output."  *Geneva Pharm.*, 386 F.3d

at 496.

Amex clarified that the relevant market is considered two-sided where "interdependency

that causes price changes on one side can result in demand changes on the other side."  838 F.3d

at 186.  Where this interdependency exists, it would be error to separate the two sides of the

market in defining the relevant market because it would "allow[] legitimate competitive activities

[on one side of the market] to be penalized no matter how output-expanding such activities may

be."  *Id.* at 198.  In *Amex*, the Second Circuit rejected the district court's separation of the two

sides of the market because "[s]eparating the two markets . . . -- analyzing the effect of Amex's

vertical restraints on the market for network services while ignoring their effect on the market for

general purpose cards -- ignores the two markets' interdependence."  *Id.*[3]

---

[3] The jury in the present case was instructed:

> A second dispute, which you must also decide, is whether the market is one-sided or two-sided.  US Airways contends that the market is one-sided and that you should consider only the impact on the airline side when you evaluate the issue of harm to competition.  Sabre contends that the market is two-sided and that you should consider the net competitive impact of the restraints both on the airline side and on the travel agent side when you are assessing harm to competition.
>
> Two-sidedness is a special concept in antitrust economics.  In a two-sided

Here, Plaintiff presented sufficient evidence to support the jury's conclusion that the relevant market is one-sided.  As discussed above, US Airways defined the relevant product market as the market for GDS services linking airlines with traditional travel agents that serve the vast majority of business travelers.  At trial, US Airways expert, Stiglitz, testified in sum that the relevant market is one-sided because the GDS services market lacks interdependence where benefits to one side depend on the number of people or usage on the other side.  (Tr. 1369:10-1371:20.)

Stiglitz's conclusion was based on the unique nature of the GDS services market, as explained by Plaintiff's fact and expert witnesses.  These facts include the following:

- There are only three GDSs.  (Tr. 448:6-12.)  The airlines that rely on corporate travelers, including Plaintiff, subscribe to all of the GDSs.  (*See* Tr. 2059:1-2060:7.)  The large traditional travel agencies -- so-called "brick and mortar" travel agencies versus online travel agents like Expedia -- book most corporate travel in the United States and use the GDSs to make their bookings.  (Tr. 2030:10-16.)  Traditional travel agents at a particular location, including those at large travel agencies with multiple locations, mostly engage in "single homing," meaning that they rely on one GDS to book their travel.  (Tr. 2030:13-17; 2045:10-2049:14.)  Accordingly, all, or almost all, traditional travel agents are already linked to the airlines through a GDS, and vice versa.  (Tr. 1375:23-

---

market, a firm sells two different products or services to two different groups of consumers, and demand from one group of consumers depends on the demand from the other group.  However, a market is not two-sided merely because there are customers on both sides, such as buyers and sellers brought together by an intermediary.  The market in this case is considered two-sided if the two sides are interdependent such that a change in price on one side of the market affects demand on the other side.  (Tr. 5626:4-22.)

1376:1; 1878:23-24.)

- Sabre charges the airlines booking fees, which fund incentive payments that Sabre pays to travel agencies.  (Tr. 452:21-23; 454:5-7; 2054:17-21.)  Travel agents do not pay for GDS services.  (*See* Tr. 1272:22-1273:4; 1296:25-1297:8; 2054:17-2057:6.)  This payment structure shifts to the airline side of the platform the cost of both travel agents and airlines using GDS services.  (*See* Tr. 1296:25-1297:8.)

- Because all or almost all travel agents are already users of a GDS platform, these incentives serve only to keep travel agents loyal to a particular GDS.  (Tr. 1379:17-23; 1905:17-19; 5518:25-5519:6.)  GDS payments to travel agents do not increase demand for GDS services and do not expand the market.  (Tr. 1377:10-14.)  GDS incentive payments to travel agents also fail to benefit the airlines because these payments do not incentivize travelers to book a particular airline.  (Tr. 1905:17-19.)  Once the potential consumers on both sides of the platform have joined, it no longer promotes competition, or benefits both sides of the platform, for one side of the platform (the airlines) to pay another set of customers (the travel agents) to join the platform.  Doing so no longer grows the market.  (Tr. 1372:3-1375:21.)

- In economics terminology, the GDS services market is a mature market.[4]  (Tr.

---

[4] *See* Oz Shy, *A Short Survey of Network Economics*, 38 Review of Indus. Org. 119, 136 (2011) ("The example of payment cards highlights the limitation of the two-sided market theory, because under full capacity no new spillovers between buyers and merchants can be created. More precisely, no additional network effects can be generated once most buyers already use payment cards and most merchants accept merchant cards.  Therefore, *policy conclusions of two-sided market models should be confined to immature markets.*") (emphasis added); Alan Frankel and Allan L. Shampine, *The Economic Effects of Interchange Fees*, 73 Antitrust L. J. 627, 655 (2006) ("By its nature, a network externality is likely to become less important . . . as a network matures.").

1375:23-1376:4; 5514:5-11; 5516:8-9.)  When the market becomes mature, it ceases to be interdependent and two-sided in the economic sense.  (Tr. 1375:17-21; 1880:6-9.)

Based on evidence of these facts, a reasonable jury could conclude that changing the price on one side of the platform (increasing or decreasing the booking fee paid by the airlines) does not change demand on the travel agent side.  Thus, Plaintiff presented evidence that the GDS platform does not provide value (or cause indirect network effects) in the ways that two-sided markets typically do:  (1) The GDS platform does not provide a matchmaking function by making it easier for both sides to find each other, because the travel agents (and their customers) already know who the airlines are, and the airlines know who the corporate travel agents are; (2) the GDS platforms do not build audiences by attracting more airlines and more travel agents, creating a thicker market and increasing the likelihood that each side will find a suitable match, again, because the large corporate travel agents already use a GDS and the airlines already use all three GDSs; and (3) because of the contractual restraints, the GDS platform does not reduce the costs of both sides doing business with each other.  *See* ABA, *Market Definition* at 441 (citing David S. Evans & Richard Schmalensee, *Catalyst Code: The Strategies Behind the World's Most Dynamic Companies* 7 (2007)).

Sabre incorrectly argues that the jury's finding based on market maturity is foreclosed as a matter of law by *Amex*.  The Court of Appeal's finding of a two-sided market, after a bench trial in *Amex*, does not invalidate the jury's finding of a one-sided market here, in a different industry and with very different facts.  As noted above, market definition is deeply fact intensive and requires examining the competitive realities.  *Todd*, 275 F.3d at 199; *Amex*, 838 F.3d at 196–97.  *Amex* is one of the few cases that explicitly addresses two-sided markets, and the opinion

does not address or appear to consider market maturity, which was not a factual consideration in that case.

Sabre also asserts that Stiglitz's mature market theory is barred as a matter of law by *Amex,* arguing that under *Amex,* the theory of a two-sided market is about making a particular platform larger, not the market *overall*.  Sabre's argument is incorrect.  First, Sabre's argument might carry weight if the relevant market were the Sabre platform, but neither US Airways nor Sabre argued at trial that the relevant market was limited to *Sabre's* GDS services.  Similarly, *Amex* did not hold that the relevant market was the market for American Express card network services.  Rather it held that the relevant market was the entire credit card network services market, including both cardholders and merchants, and analyzed the effect on competition accordingly.  *See Amex*, 838 F.3d at 205–06.  Second, the federal antitrust laws do not serve to protect a particular competitor; they protect competition.  *Id.* at 193 (quoting *Tops Mkts.*, 142 F.3d at 96); *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).

The relevant holding of *Amex* for purposes of this case is that, where the two sides of a platform are interdependent, excluding one side from the relevant market would be improper.  838 F.3d at 186, 198 ("The interdependency that causes price changes on one side can result in demand changes on the other side.").  Whether the two sides of a platform are interdependent such that the relevant market is two-sided is a factual, not a legal, issue.  The jury's factual determination of the relevant market should not be lightly disturbed.  *See Brown Shoe*, 370 U.S. at 336 ("Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one."); *Amex*, 838 F.3d at 196 ("[M]arket definition is a deeply fact-intensive inquiry.") (alteration in original) (quoting *Todd*, 275 F.3d at 199).  For the reasons outlined above, the Court declines to do so here.

### C.      Unreasonable Restraint on Trade (Rule of Reason)

The evidence at trial was sufficient to support the jury's finding that "Sabre unreasonably restrained trade by means of the challenged contract provisions."  To analyze whether the challenged restraints were "unreasonable" restraints on trade, courts employ the burden-shifting analysis outlined above and known as the rule of reason.

### 1.      Adverse Effect on Competition

Under the first step of the rule of reason, US Airways had the burden of proving the anticompetitive effect of the challenged restraints.  "A plaintiff may satisfy this requirement in either of two ways[,]" directly or indirectly.  *MacDermid*, 833 F.3d at 182.  "First, a plaintiff may offer direct evidence of harm to competition by proving higher prices, reduced output, or lower quality in the market as a whole."  *Id.*  Absent a showing of direct harm, a plaintiff must show "an adverse effect indirectly by establishing that the [defendants] had sufficient 'market power' to cause an adverse effect, 'plus some other ground for believing that the challenged behavior' has harmed competition."  *Id.* (quoting *Tops Mkts.*, 142 F.3d at 97).  A plaintiff can meet its initial burden under the rule of reason by showing adverse effect through either method.  US Airways presented evidence using both methods.  Either would have been sufficient.

### a)      Direct Evidence

US Airways adduced direct evidence at trial from which a reasonable jury could conclude that the challenged restraints had an adverse effect on the market as a whole for GDS services -- through supracompetitive pricing or lower quality.  A showing of either of these harms is sufficient for US Airways to show an *actual* adverse effect on competition and satisfy the first step of the three-part rule of reason analysis.

At trial, Stiglitz opined and presented data showing that Sabre had charged US Airways

and the other legacy airlines,[5] over whom Sabre exercised market power, significantly higher booking fees than would have been charged in a competitive market. (Tr. 1351:8-15; PX-006.) Stiglitz testified that the magnitude of the excess profit was so large that he "fe[lt] confident that it's robust to any slight alteration in the [supporting] data." (Tr. 1979:6-10.)

Regarding lower quality, the jury heard from both fact and expert witnesses that the contractual restraints made entry into the marketplace "extraordinarily difficult" (Tr. 1999:25), reduced the quality of options available in the marketplace and led to technological stagnation. Several witnesses -- US Airways' technology expert as well as the respective founders of two unsuccessful GDS competitors -- described in detail how the GDS's tools were technologically inefficient and outdated. (*See, e.g.,* PX-810.0003-.0004; PX-813.0005-.0006; Tr. 2749:17 – 2769:17.)

Sabre challenges the causal link between the challenged restraints and technological stagnation, arguing that US Airways does not present evidence of causation. Sabre ignores explicit testimony about the link from a would-be GDS competitor, G2, that the full content suite of provisions, first in the legacy airlines' 2006 contracts with Sabre, and then in the 2011 contracts, foreclosed the airlines' ability to negotiate differentiated content with G2. (*See* PX-813.0001, .0005.) In combination with the testimony cited above, the evidence was sufficient for the jury to conclude that the challenged restraints brought about technological stagnation and reduced quality in the marketplace.

Consequently, the evidence was sufficient to show actual harm to competition in the form

---

[5] The "legacy" carriers refers to the older airline carriers that existed prior to deregulation of the airline industry -- American, Continental, Delta, Northwest, United and US Airways. (Tr. 993:13-22.)

of either supracompetitive pricing or lower quality.[6]

### b) Indirect Evidence

In the alternative, US Airways presented evidence sufficient to support the jury's finding that the contract restraints had an anticompetitive effect in the market for GDS services used by airlines, using the indirect method -- proof of market power "plus some other ground for believing that the challenged behavior could harm competition in the market."[7] *Amex*, 838 F.3d at 195 (citation omitted).

---

[6] When asked to assume hypothetically that the relevant market was two-sided, the jury also determined that US Airways "proved, by a preponderance of the evidence, that Sabre unreasonably restrained trade in the relevant market by means of the challenged contract provisions." The evidence was sufficient to support this finding as well. US Airways presented evidence to show that even in a two-sided market, taking into account incentives paid to the travel agents, Sabre's net prices were supracompetitive. *See supra* note 2, at 15-16; (Tr. 1903:11-18; 5486:3-5487:12; PX-777.) US Airways' evidence regarding reduced quality and technological stagnation in the market is unaffected by a determination that the market is one-sided or two-sided. *See supra* at 24. US Airways also presented indirect evidence of harm in the two-sided market, by showing Sabre's market power plus lack of innovation and technological stagnation, which harmed both sides of the market. *See infra* at 27-29.

[7] Sabre disputes the "*could* harm competition" aspect of this statement of the law, which was also reflected in the Court's jury instruction. Sabre asserts that *MacDermid* raised the standard for the indirect method by requiring "some evidence that the challenged action has *already* had an adverse effect on competition." 833 F.3d at 182. Sabre misunderstands *MacDermid*. *MacDermid* was primarily concerned with what "plus factors" would be sufficient under the indirect test. The difference in language between *MacDermid* and the Second Circuit's other cases outlining the indirect test is not substantive. *See, e.g.*, *Amex*, 838 F.3d at 195 ("could harm competition"); *Tops Mkts.*, 142 F.3d at 96 ("sufficient market power to cause an adverse effect on competition") (citation omitted); *Capital Imaging Assocs.*, 996 F.2d at 546 ("potential for genuine adverse effects on competition"); *K.M.B. Warehouse Distribs.*, 61 F.3d at 129 ("will harm competition market-wide"). The indirect test is a "proxy" for showing through direct evidence that an adverse effect has already occurred. *Tops Mkts.*, 142 F.3d at 97. "[D]espite the differences in phrasing, our cases have always required, as a practical matter, some evidence that the challenged action has *already* had an adverse effect on competition . . . ." *MacDermid*, 833 F.3d at 182. The indirect test is a method of testing for adverse effect "even if consumers have not yet felt that effect." *Id.* An effect not yet felt by consumers may be difficult to prove empirically, but may be proved indirectly and circumstantially, with proof of market power plus some basis to believe that the challenged behavior could harm competition. *See id.* at 182–83 ("How 'actual harm' is shown [i.e. directly or indirectly] determines whether proof of market power is also required.").

Market power may be evidenced by the "power to control prices." *Visa*, 344 F.3d at 239 (citation omitted). Controlling prices means "the ability to raise prices above those that would be charged in a competitive market," *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984), or the "ability to raise price significantly above the competitive level without losing all of one's business." *K.M.B. Warehouse Distribs.*, 61 F.3d at 129 (citation omitted). "Market power is [also] the power to force a purchaser to do something that he would not do in a competitive market." *Amex*, 838 F.3d at 200 (citation omitted).

"Market power may be shown by evidence of specific conduct indicating the defendant's power to control prices or exclude competition." *K.M.B. Warehouse Distribs.*, 61 F.3d at 129 (internal quotation marks omitted). For example, higher profits than would be earned in a competitive market may be indicative of market power. *See FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2236 (2013) (recognizing that "presence of higher-than-competitive profits" is "a strong indication of market power"). Other indicia that may be relevant include:

- a large market share in the relevant market, *K.M.B. Warehouse Distribs.*, 61 F.3d at 129;

- few or insignificant competitors in the market, *In re Ciprofoxacin Hydochloride Antitrust Litig.*, 363 F. Supp. 2d 514, 535 (E.D.N.Y. 2005) ("Antitrust law looks at entry into the market as one mechanism to limit and deter exploitation of market power by those who may temporarily possess it.") (quoting *Andrx. Pharma., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 814 (D.C. Cir. 2001));

- the ability to exclude competitors, *Visa*, 344 F.3d at 239;

- high barriers to entry making it difficult for new competitors to enter the relevant market, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562

26

F. Supp. 2d 392, 402 (E.D.N.Y. 2008); and

- the lack of new entrants in a profitable industry, *see Visa*, 344 F.3d at 240; 2B
  Phillip E. Areeda et al., Antitrust Law ¶ 501, at 109 (4th ed. 2014) ("If the firms
  [in a competitive market] are making excess profits at the going market price,
  additional capacity will be drawn into the industry . . . .").

To show harm to competition indirectly, a plaintiff must show, in addition to market power, some basis to believe that the challenged behavior could harm competition. The plus factors necessarily depend on the nature of the challenged behavior but could include "the inherently anticompetitive nature of a defendant's behavior," actions that reduce consumer choice or behaviors that significantly restrict a competitor's ability to enter the relevant market. *MacDermid*, 833 F.3d at 183–84 (quoting *K.M.B. Warehouse Distribs.*, 61 F.3d at 129).

At trial, US Airways presented evidence that Sabre had market power based on: (a) Sabre's 50% market share in the three-competitor GDS market (Tr. 1365:14-1366:8); (b) the lack of new entrants (i.e. competitors) into the GDS industry despite high returns that typically would attract new entrants (Tr. 1252:5-1253:21); (c) Sabre's ability to charge significantly more than would be expected in a competitive market, calculated as cost plus a reasonable return (Tr. 1241:7-17; 2361:14-19; PX-109A); (d) economic profits of 76% over a reasonable return (Tr. 1250:21-1251:17; 2332:10-2333:10); (e) Sabre's ability to price discriminate, for example, by charging US Airways significantly more than Southwest Airlines[8] (Tr. 1245:25-1246:25); and (f)

---

[8] At trial, US Airways presented evidence that Sabre did not have market power over Southwest Airlines and, therefore, that Southwest's booking fee of $1.35 represented a reasonably competitive booking fee. (Tr. 1351:8-15.) Stiglitz explained that Southwest was not subject to the same contractual restraints as the legacy airlines and had a different business model than the legacy carriers. Southwest relies less on business travelers who book through corporate travel agents and in turn through the GDSs, and relies more on the Southwest website to connect directly to travelers. (Tr. 1301:18-1302:12; 1306:13-1307:9.)

Sabre's power over customers to force them to do things they would not do in a competitive market, such as signing contracts with terms they would not otherwise accept (Tr. 1251:16-25; 212:17-24; 474:6-10; 523:6-10; 835:9-15).

US Airways also introduced evidence that the contractual restraints raised barriers to entry and reduced consumer choice. US Airways presented evidence that the full content provisions introduced in 2006 were in response to new competitors. (Tr. 3311:3-11.) In addition to the G2 testimony summarized above, US Airways presented testimony from another would-be GDS competitor, Farelogix, that efforts to attract airlines to Farelogix's direct connect product were unsuccessful despite charging significantly lower prices to airlines because of the full content agreements that the airlines had with Sabre and the other GDSs. (Tr. 2569:1-2571:23; 2577:21-2580:11.) A reasonable jury could have concluded that the full content provisions were anticompetitive by preventing the airlines from steering travel agents away from the GDSs to lower cost distribution channels (like Farelogix) with inducements of lower fares or greater benefits to reflect the airlines' lower distribution costs. The full content provisions precluded this result and reduced consumer choice by requiring that the same fares and benefits available anywhere be available on the GDS platform. The provisions also kept GDS competitors, like G2 and Farelogix, from establishing themselves in the market by preventing new entrants from competing with better content or price. (*See, e.g.*, PX-128.0011; Tr. 2577:12-2580:11; PX-813.0005.) Thus, US Airways presented evidence at trial from which a reasonable jury could conclude, on the basis of indirect evidence, that the contested restraints caused antitrust harm.

In response, Sabre first argues that the challenged provisions are not anticompetitive because "they did not prevent an equally efficient competitor from competing against Sabre" and simply put Sabre on a "level playing field" with other competitors. Sabre applies an incorrect,

heightened legal standard, for which it cites no authority.  US Airways is not required to show that the barriers to entry would prevent an "equally efficient competitor" from entering the marketplace.  Showing market power plus that the challenged behavior "heightened existing barriers or created new ones" would be sufficient to show harm to competition.  *MacDermid*, 833 F.3d at 186 n.56.  As described above, a reasonable jury could have concluded that US Airways' evidence met this standard.

Next, Sabre argues that the antitrust laws do not impose a duty to agree to contract terms that "degrade its product and place it at a competitive disadvantage."  But the law does not permit Sabre to use contractual restraints to give it an unfair and unlawful competitive advantage.  Additionally, the authorities Sabre cites deal with the supposed procompetitive effects of the restraints at issue, which are relevant at the second step of the rule of reason, not this first step.  *See Amex*, 838 F.3d at 194–95.

Sabre also argues that full content requirements are common industry practice and, therefore, not inherently anticompetitive.  Sabre ignores the Second Circuit's suggestion that "actions that reduce consumer choice are inherently anticompetitive."  *MacDermid*, 833 F.3d at 183 (citing *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 223–24 (2d Cir. 2008)).  As described above, US Airways adduced sufficient evidence for a reasonable jury to conclude that the challenged restraints created barriers to entry and reduced consumer choice by keeping competitors from establishing a toehold in the market.

Sabre also argues that a jury finding of market power was foreclosed as a matter of law by *Amex* because the Second Circuit rejected Stiglitz's so-called "insistence" theory -- which Sabre describes as the argument that Sabre had market power because travel agencies "insist" on using Sabre.  *See Amex*, 838 F.3d at 202.  First, Stiglitz did not present nor did US Airways rely

on a so-called "insistence" theory at trial.  Second, Sabre ignores the ample evidence of Sabre's market power that US Airways did present, as discussed above.

Finally, Sabre attempts to forestall any argument of market power based on evidence that Sabre forced US Airways to do something -- agree to the full content provisions -- that it would not do in a competitive market.  This was just one of many ways that US Airways argued for, and presented indirect evidence of, market power in addition to its direct evidence of harm to competition.

In summary, US Airways presented evidence of harm to competition, through both the direct and indirect method, either of which would have been sufficient.  To show harm directly, it presented evidence of increased prices and lower quality services.  To show harm indirectly, Plaintiff adduced evidence of several indicia of market power (Sabre's market share, pricing practices, economic profits, technological stagnation and lack of entry into the marketplace, price discrimination and leverage over customers) as well as several "plus factors," (increased barriers to entry and reduced consumer choice) when only one was needed.  Sabre's arguments do not undermine the sufficiency of the evidence to support the jury's finding.

## 2.     Competitive Benefits

After US Airways satisfies the first step in the rule of reason by showing that the challenged restraint had an anticompetitive effect, the burden shifts to Sabre "to offer evidence of any procompetitive effects of the restraint at issue." *Amex*, 838 F.3d at 195.  The question at this stage is whether "there [is] strong evidence that the challenged practice creates substantial efficiencies by reducing participants' costs or improving product or service quality[.]"  7 Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law* ¶ 1507a, at 426 (3rd ed. 2010) [hereinafter

"Areeda (2010)"].[9]

Sabre presented evidence that the full content provisions led to increased competition among airlines by enabling travel agents to shop efficiently among multiple airlines and compare fares to get the lowest fare.  (*See, e.g.*, Tr. 4813:8-4816:16.)  Although the evidence was sufficient for Sabre to meet its burden, the jury as factfinder was entitled not to credit Sabre's witnesses or arguments and conclude that the procompetitive benefits were not substantial or would have existed even without the restraints at issue.  *See Tolbert v. Queens Coll.*, 242 F.3d 58, 70–71 (2d Cir. 2001) (jury not required to credit testimony of witnesses).  If the jury determined that Sabre did not meet its burden of proving a procompetitive effect, the inquiry under the rule of reason would have ceased at this step, supporting the jury's finding that the challenged restraints caused harm in the relevant market.  The Court assumes only for the purpose of completing the sufficiency of the evidence analysis under rule of reason that the jury credited Sabre's evidence and found that the full content provisions created substantial procompetitive efficiencies.[10]

### 3. Reasonably Available Less Restrictive Alternative and Weighing the Competitive Harm

Assuming the jury found that Sabre met its burden at step two of the rule of reason, the burden then shifts back to US Airways to "prove that any legitimate competitive benefits offered

---

[9] At the time of this Opinion's issuance, volumes 6 to 14 of Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law*, have not been released in the Fourth edition.

[10] Contrary to Sabre's assertion, the Court did not rule "as a matter of law" that Sabre had met its burden regarding the existence of procompetitive effects.  The sentence that Sabre cites appears in the Court's summary judgment opinion in the middle of a paragraph listing the arguments Sabre made about the procompetitive effects of the agreement.  *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 283 (S.D.N.Y. 2015).  The only conclusion was that Sabre's assertions regarding procompetitive effects were sufficient to meet its burden to offer evidence that the contract had procompetitive effects in step two of the rule of reason for purposes of summary judgment.  *Id.*

by defendant[] could have been achieved through less restrictive means." *Amex*, 838 F.3d at 915

(citation omitted).  If the same efficiencies -- in this case, efficient comparison shopping and

booking -- could be achieved by "reasonably available alternatives that have less potential to

harm competition," Areeda (2010), ¶1507a, at 426, then US Airways has proved that the terms

unreasonably restrained trade.  US Airways adduced evidence at trial of reasonably available

alternatives.  Having done so, the Court's evaluation of the sufficiency of the evidence of harm

to competition is finished, as the weighing of those alternatives against the challenged restraints

and the determination of which is less restrictive to competition is solely a question for the jury.

US Airways introduced evidence of several potentially less restrictive alternatives for

travel agents to compare and book airline tickets efficiently without the full content provisions.

US Airways' witnesses testified that alternatives included: allowing the airlines to impose a

surcharge on tickets booked through Sabre to reflect the higher cost of the booking channel (Tr.

1347:20-1348:13; 1542:17-23; 5191:11-5193:11); or Sabre charging separately for searching and

booking (Tr. 1336:16-18; 1337:5-1338:4).  A surcharge would permit the airline to recoup some

of the higher cost of booking through Sabre and lower prices to travelers who book through

lower cost channels.  Sabre could address its concern with free-riding by simply charging

separately for searching and booking on its platform.  These alternatives would allow for greater

competition by allowing airlines to pass on savings from lower booking fees to their customers

and permitting competitors to differentiate their products by cost.  This in turn could spur greater

technological innovation and quality.

In the alternative, if the jury found that these alternatives were not less restrictive or

reasonably available -- as Sabre argued -- they would become part of the jury's ultimate

weighing of the competitive harms and benefits of the challenged behavior.  *Visa*, 344 F.3d at

238 ("The principal question in a rule of reason case is often whether the anticompetitive effects of a restraint are outweighed by some procompetitive justification.").  "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203 n.10 (2010) (quoting *Bd. of Trade of Chi. v. United States*, 246 U.S. 231, 238 (1918) (Brandeis, J.)).

The weighing of the evidence at this final stage lies solely with the factfinder.  *See Amex*, 838 F.3d at 195 ("Ultimately, it remains for the factfinder to weigh the harms and benefits of the challenged behavior.") (citation omitted).  Through the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."  *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (citation omitted).  Thus it was for the jury to weigh the harms and benefits, and not for the Court to substitute its judgment.

The jury, after eight weeks of testimony, found on its verdict form that "US Airways proved, by a preponderance of the evidence, that Sabre unreasonably restrained trade by means of the challenged contract provisions."  Sabre has not met its burden of showing that, viewing the evidence in the light most favorable to US Airways, a reasonable juror would have been *compelled* to accept Sabre's view that the restraints did not harm competition.

## D.    Antitrust Injury

The evidence was sufficient to support the jury's finding that US Airways "was injured as a result of Sabre's unreasonable restraint of trade."  A plaintiff claiming antitrust injury must prove "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Brunswick Corp. v. Pueblo Bow-O-Mat, Inc.*, 429 U.S.

33

477, 489 (1977).  Stated differently, "an antitrust plaintiff must prove that its injury was, in fact, caused by the defendant's violation of the antitrust laws."  *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1377 (2d Cir. 1988).  However, "[i]t is enough that the illegality is shown to be a material cause of the [antitrust] injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling [its] burden of proving compensable injury."  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 66 (2d Cir. 2012) (citation omitted) (alteration in original).  "[A]n antitrust defendant's unlawful conduct need not be the *sole* cause of the plaintiffs' alleged injuries; to prove a 'causal connection' . . . the plaintiff need only 'demonstrate the [the defendant's] conduct was a substantial or materially contributing factor' in producing that injury."  *Id.* (citation omitted).

At trial, US Airways presented evidence supporting its theory of causation and from which a reasonable jury could conclude that, as a result of the challenged full content provisions, US Airways was forced to pay supracompetitive prices, thereby suffering an antitrust injury.  As discussed above, US Airways presented evidence that Sabre had market power when the GDS industry was deregulated and that Sabre used that power to impose the full-content contractual terms in the 2006 US Airways agreement, which further ingrained its market power and enabled it to charge US Airways supracompetitive booking fees and continue to impose the challenged contractual terms in the parties' 2011 Contract.  US Airways presented evidence, that by preventing airlines from differentiating content or fares (i.e. offering more services or lower fares), steering customers to lower cost booking channels or recouping some of the cost through surcharges, Sabre was able to charge supracompetitive prices and raise barriers to entry to exclude new competitors, which in turn led to stagnated technology and less consumer choice.

Sabre relies on overly formalistic reasoning to argue that US Airways could not have

proved injury because "the allegedly supra-competitive prices were negotiated and fixed *before* the challenged terms in the 2011 Contract took effect," thereby making it impossible for the terms of the contract to have caused the supracompetitive prices. Sabre's argument is that, as a matter of logic, the full-content provisions in the 2011 Contract (when they were not yet in effect) could not have caused Sabre to impose the supracompetitive booking fee contained in the same contract. Sabre's argument ignores weeks of trial testimony, the factual context in which the 2011 agreement arose, US Airways actual argument (Tr. 48:13-24; 50:7-25; 63:2-66:21; 5653:8-5677:20), the Court's causation instruction (Tr. 5630:21-5633:2) and the well-worn legal principle that jury instructions are to be "taken as a whole." *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 390 (2d Cir. 2006). Sabre made the same argument to the jury (Tr. 5752:12-5754:12), which the jury rejected. Sabre has presented no reason to overturn the jury's finding.[11]

Sabre also attempts to argue that US Airways' theory of causation based on both the 2006 and 2011 contracts would require illogical and impermissible speculation. Sabre's arguments are too restrictive. For example, Sabre argues that, because US Airways also had full content agreements with other outlets, Sabre's contractual restraints did not prevent US Airways from

---

[11] The fallacy of Sabre's argument is illustrated by the factual context. The parties entered into the 2011 Contract on February 23, 2011. US Airways promptly filed this action on April 21, 2011, challenging the full content provisions in the 2006 contract and its successor, the 2011 Contract. On Sabre's motion for summary judgment, the Court accepted Sabre's argument that US Airways' claim for damages arising out of the 2006 agreement was outside the 4-year statute of limitations, in part, because the claims accrued on the date that the 5-year contract took effect, and rejected US Airways' argument that the cause of action accrues on the date the overcharges are paid. *See US Airways*, 105 F. Supp. 3d at 277–78. The Court accordingly limited the damages period to damages incurred under the 2011 Contract. *Id.* at 279. Sabre implies that if US Airways believed that it was charged supracompetitive prices under the 2011 Contract, it should have alleged that they were caused by the 2006 contractual restraints (which were extended in the 2011 contract). Sabre's argument would mean that, no matter how many times the parties extended their 5-year contract, US Airways would never have a timely claim -- overpayments on any given contract would necessarily occur more than 4 years after the inception of the preceding contract.

offering lower fares on its website or from providing exclusive content to others, even though this is precisely what the challenged full content provisions required. However, US Airways needs to show only that Sabre's actions were a material cause of its injury. That other competition-reducing restraints may also be present in the marketplace does not excuse a defendant's anti-competitive behavior. Sabre's additional arguments, although framed as arguments about "causal links," veer into weighing conflicting evidence, which is a function that properly lies with the jury. US Airways evidence was sufficient to support the jury's finding that Sabre's anti-competitive behavior caused US Airways' injury.

### E.    Damages

The jury's damages award of $5,098,142 to US Airways was proper and entirely within its purview. "[O]nce proof of injury causation has been established, courts have allowed antitrust plaintiffs considerable latitude in proving the amount of damages. Proof of amount of damages thus need not conform to a particular theory or model, and exact proof of the amount of damages is not required." *U.S. Football League*, 842 F.2d at 1378 (citations omitted). A plaintiff's proof of amount of damages "must be traced to some degree to unlawful acts." *Id.* "An antitrust plaintiff must thus provide only sufficient evidence to support a just and reasonable estimate of damages." *Id.* (internal quotation marks omitted).

US Airways offered multiple benchmarks for a reasonable booking fee at trial from which overcharges could be calculated, including: (i) the $1.35 booking fee that Southwest pays, an airline over which Stiglitz testified Sabre did not have market power (Tr. 1351:8-15; 1301:24-1302:7; PX-1184); (ii) Professor Jerold Zimmerman's reasonable profit booking fee of $1.18 (Tr. 1351:4-5); (iii) an $0.80 plus a search fee based on the fee Expedia paid to Sabre (Tr. 1351:23-25); and (iv) a zero-dollar booking fee that Stiglitz testified would prevail in a but-for world and

36

is based on Spirit airline's agreement with Sabre.  (Tr. 1353:23-1354:2.)  These benchmarks

yield damages ranging from $44.5 million to $73.2 million.  (PX-1184.)

Sabre argues that no reasonable jury could have concluded that US Airways provided a

non-speculative method to assess damages.  Sabre attempts to undercut each benchmark, arguing

that it is non-comparable or otherwise analytically flawed.  Sabre made these arguments to the

jury -- implicitly through cross-examination or through their own witnesses -- and the jury

rejected them.  Sabre also argues that *Amex* forecloses US Airways' zero-booking-fee model.

Sabre contends that the zero model assumes that costs would be shifted from US Airways to

travel agencies, and under *Amex*, 838 F.3d at 205, Plaintiffs have to show that the challenged

provisions made consumers on both sides of the platform worse off.  Sabre argues that Plaintiff's

burden to show net harm applies, as opposed to harm to one side of the market, whether the

market is one-sided or two-sided.  However, Sabre's argument relies on their own expert's

opinion that the incentive payments must be taken into account regardless of whether the market

is one-sided or two-sided, an opinion with which Stiglitz disagreed.  (*See* Tr. 4856:24-4858:6.)

*Amex* does not mandate a showing of net harm in a one-sided market.  Sabre's central argument,

however, is that the quantum of the jury's award of $5.1 million shows that the jury "plainly

rejected" Stiglitz's and Professor Daniel McFadden's models.  Sabre's arguments are

unpersuasive.

Sabre cross-examined US Airways' damages experts at length.  Sabre's conclusion that

the jury's award shows that the jury rejected the award models is but one inference that can be

drawn from the quantum of the award.  The award of only a portion of the damages requested

could also mean that Sabre's arguments about the appropriateness of the benchmarks were

credited to some extent by the jury.  *See State of New York v. Hendrickson Bros.*, 840 F.2d 1065,

1078 (2d Cir. 1988) ("Given the adequacy of the proof that the [plaintiff] suffered some injury, the jury was not required to deny all recovery simply because it determined that the [plaintiff] was not entitled to the entire amount requested.").  Also, "damage issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts."  *State of New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88 (2d Cir. 2000) (citation omitted).  "One of the limitations involved in proving antitrust damages is establishing what the market price of the commodity or service would have been in an unmanipulated market. Where, however, there is a dearth of market information unaffected by the [anticompetitive] action of the defendants, the plaintiff's burden of proving damages, is, to an extent, lightened." *Id.* (internal quotation marks omitted).  Even if damages experts attempt to quantify a precise amount of damages, the jury is not required to accept and award the amount or reject it and award zero.  The Second Circuit has long recognized that the "calculation of damages is the province of the jury" and "considerable deference" should be given to the jury's award.  *Restivo v. Hessemann*, 846 F.3d 547, 587 (2d Cir. 2017).  That deference dictates upholding the jury's award.

## IV.    CONCLUSION

For the foregoing reasons,[12] Sabre's motion for judgment as a matter of law, or in the alternative for a new trial, on Count I pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure is DENIED.

SO ORDERED.

Dated: March 21, 2017
New York, New York

LORNA G. SCHOFIELD
**UNITED STATES DISTRICT JUDGE**

---

[12] Any of Sabre's many arguments that were not addressed herein have been considered and rejected.