N.Y.S.D. Case #
11-cv-2725(LGS)

17-960 (L)
*US Airways, Inc., for American v. Sabre Holdings Corporation*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2018

(Argued: December 13, 2018    Decided: September 11, 2019)

Docket Nos. 17-960, 17-983

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Sep 11 2019
```

---

US AIRWAYS, INC., FOR AMERICAN AIRLINES, INC., AS SUCCESSOR AND REAL PARTY
IN INTEREST,
*Plaintiff-Appellee-Cross-Appellant*,

v.

SABRE HOLDINGS CORPORATION, SABRE TRAVEL INTERNATIONAL LIMITED, SABRE
GLBL INC.,
*Defendants-Appellants-Cross-Appellees*.

---

Before:        SACK, LIVINGSTON, AND CHIN, *Circuit Judges*.

The plaintiff, US Airways, Inc., brought suit against the defendants,

collectively Sabre, in the United States District Court for the Southern District of

New York alleging violations of Sections 1 and 2 of the Sherman Antitrust Act, 15

U.S.C. §§ 1 & 2, with respect to travel technology platforms provided by Sabre

that are used in connection with the purchase and sale of tickets for US Airways

flights.  On the defendants' motion, the district court (Miriam Goldman

CERTIFIED COPY ISSUED ON 09/11/2019

Cedarbaum, *Judge*) dismissed Counts 2 and 3 of the Complaint, which were based on Section 2 of the Act. After discovery, the defendants moved for summary judgment on the remainder of the Complaint, Counts 1 and 4, which were based on Section 1 of the Act. The district court (Lorna G. Schofield, *Judge*) granted the motion in part and denied it in part. A further motion for summary judgment by Sabre as to the surviving claims based on subsequent developments in the case-law of this Circuit was also denied. Between October and December 2016, a jury trial was held on the remaining claims. The jury returned a verdict of $5,098,142, which was automatically trebled. The district court denied Sabre's post-trial motion. Both parties appealed. After the appeal was fully briefed, however, the Supreme Court handed down a decision central to the legal issues in the case—*Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018)—with respect to which we solicited and received supplemental briefing from the parties.

The judgment of the district court is AFFIRMED in part, REVERSED in part, and VACATED in part, and the case is REMANDED to the district court for further proceedings.

> ANTON METLITSKY (Andrew J. Frackman, David K. Lukmire, Yaira Dubin, *on the brief*), O'Melveny & Myers LLP, New York, NY, *for Plaintiff-Appellee-Cross-Appellant.*

Charles P. Diamond, *on the brief*, O'Melveny
& Myers LLP, Los Angeles, CA, *for Plaintiff-
Appellee-Cross-Appellant.*

Jason Zarrow, *on the brief*, O'Melveny &
Myers LLP, Washington, D.C., *for Plaintiff-
Appellee-Cross-Appellant.*

EVAN R. CHESLER (Peter T. Barbur, Kevin J.
Orsini, Rory A. Leraris, *on the brief*),
Cravath, Swaine & Moore LLP, New York,
NY, for *Defendants-Appellants-Cross-
Appellees.*

Chris Lind, *on the brief*, Bartlit Beck Herman
Palenchar & Scott LLP, Chicago, IL, for
*Defendants-Appellants-Cross-Appellees.*

George S. Cary, *on the brief*, Cleary Gottlieb
Steen & Hamilton LLP, Washington, D.C.,
for *Defendants-Appellants-Cross-Appellees.*

SACK, *Circuit Judge*:

The plaintiff, US Airways, Inc. ("US Airways"), brought suit in the United

States District Court for the Southern District of New York against the

defendants, Sabre Holdings Corporation, Sabre Travel International Ltd., and

Sabre GLBL Inc. (collectively "Sabre"). Sabre owns and operates a travel

technology platform known generically as a global distribution system: an

electronic network that travel agents use to search for and book airline flights for

their customers. US Airways alleged that so-called "full content" provisions

contained in two separate contracts between it and Sabre, one executed in 2006 and one in 2011, were unlawful restraints of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and that Sabre also violated Section 2 of the Act, 15 U.S.C. § 2, by monopolizing the distribution of system services to Sabre subscribers.

Following a motion to dismiss and a motion for summary judgment filed by Sabre, two counts of the original complaint were dismissed by the district court; US Airways's damages were also limited by the court to those arising from the 2011 contract. At trial, a jury returned a verdict for US Airways on Count 1 of its complaint only.

Sabre appeals the district court's order declining to grant its post-trial motion for judgment as a matter of law, or in the alternative a new trial, on Count 1 basing its arguments largely on a recent Supreme Court decision, *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018). Sabre therefore seeks judgment as a matter of law in its favor, or in the alternative, a new trial on Count 1.

US Airways cross-appeals, contending that Counts 2 and 3 of its complaint were erroneously dismissed by the district court for failure to state a claim, and

that the district court erred in limiting its damages under the remaining counts to those arising from its 2011 contract with Sabre.

For the reasons set forth below, we affirm the district court's judgment insofar as it limited US Airways's damages; reverse the court's dismissal of Counts 2 and 3 of US Airways's complaint; vacate the jury's verdict on Count 1 of the complaint and the court's order in response to Sabre's post-trial motion; and remand the case for further proceedings consistent with this opinion, including a new trial on Count 1 of US Airways's complaint.

## BACKGROUND[1]

### I. The Parties and the Global Distribution System Industry

Sabre owns and operates a travel technology platform known generically as a global distribution system ("GDS"). A GDS is a computerized network that

---

[1] The defendants-appellants appeal from an opinion and order of the district court denying their post-trial motion for judgment as a matter of law or in the alternative for a new trial under Federal Rules of Civil Procedure 50 and 59, respectively. We view the evidence in the light most favorable to the non-movant; here, the plaintiff-appellee. *See, e.g.*, *Ali v. Kipp*, 891 F.3d 59, 64 (2d Cir. 2018); *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 180 (2d Cir. 2016). In its cross-appeal, the plaintiff-appellee is challenging the district court's dismissal of two counts of their complaint under Federal Rules of Civil Procedure 12(b)(6) and limiting of their damages in response to a motion for summary judgment by the defendants-appellants. As with the post-trial motion under Rules 50 and 59, we view the evidence in the light most favorable to the non-movant; again, the plaintiff-appellee. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556

travel agents, particularly those servicing corporate clients, use to search for and book airline flights for their customers. The plaintiff-appellee is US Airways,[2] which uses Sabre's GDS platform to list available tickets for their flights, which are to be sold to travelers through travel agents.

Airlines began using in-house computerized reservation systems, precursors to the GDSs at issue here, in the 1960s. Some were made available for use by independent travel agents in the mid-1970s. Eager to attract travel agents to their respective reservation platforms, airlines began to offer travel agents the option to book tickets on other airlines' flights in addition to its own, charging those other airlines a fee for each booking made using their system. These arrangements often disadvantaged air travelers by driving up fees.

---

(2007); *Glob. Reinsurance Corp. of Am. v. Century Indemn. Co.*, 843 F.3d 120, 123-24 (2d Cir. 2016).

[2] "During the relevant period, US Airways was a stand-alone corporation," *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 Civ. 2725 (LGS), 2017 WL 1064709, at *1 n.1, 2017 U.S. Dist. LEXIS 40932, at *3 n.1 (S.D.N.Y. Mar. 21, 2017), and the owner and operator of the US Airways airline. "On December 9, 2013, U.S. Airways Group and AMR merged to form American Airlines Group, Inc. U.S. Airways is now a wholly-owned subsidiary of American Airlines Group, Inc." *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 273 (S.D.N.Y. 2015). The change in US Airways's status does not appear to have affected the merits of this appeal. For purposes of relative simplicity, we therefore treat US Airways throughout this opinion as though it has remained an independent entity.

In 1984, federal regulators concluded that this practice was leading to discriminatory pricing in the airline industry. In 1992, the United States Department of Transportation ("DOT") responded by enacting the "mandatory participation" rule. This regulation required every airline to offer the same fares they were offering on its own in-house GDS to every other airline's GDS, which meant that each GDS platform was selling the same content at the same price. Travel agents therefore found it efficient to "single-home," using only one GDS for all their booking needs: They saved nothing by using multiple competing systems, and apparently benefited insofar as it made their operations simpler.

At about the same time that the mandatory participation rule was enacted, airlines began divesting themselves of their in-house reservation systems because they could no longer offer comparatively inexpensive prices for their own flights. Four independent GDS platforms—including Sabre—survived, continuing to serve the same one-stop-shop purpose for travel agents.

In 2004, the DOT deregulated the GDS industry. It acknowledged that deregulation would leave the remaining GDSs with significant market power over many airlines because travel agents practiced single-homing and the airlines depended on the GDSs to reach travel agents. The DOT nevertheless hoped that

new technology would create competition in the industry, which would eventually erode that market power.

That hope was in vain. To the contrary, since 2004, the number of independent GDS platforms has decreased from four to three, while no new competitors have emerged since the 1980s.

Sabre is the largest GDS platform in the country, with a market share of more than half. The remainder of the market is divided between the other two surviving platforms, Travelport and Amadeus.

A GDS obtains its revenue by collecting booking fees from an airline whenever a travel agent uses that GDS to book a ticket on the airline's flights. The GDSs do not charge the travel agents for access to, or use of, their services. To the contrary, the GDSs *pay* the travel agents each time one of them uses the GDS's platform to book a ticket. Sabre structures its contracts with travel agents to include minimum-booking thresholds, which do not allow the travel agents to collect incentive payments unless they use Sabre's GDS platform for a minimum volume of bookings. Most travel agents therefore cannot afford to divide bookings between Sabre and another GDS, even if they would otherwise prefer to do so. From 2006 through 2012, Sabre paid a total of more than $1.2 billion in

such fees to travel agents. In 2011, 94% of travel agency offices were single-homing.

In order to reach a specific single-homing travel agent, and by extension that agent's corporate-traveler customers, then, an airline must engage with the GDS with which the travel agent engages. For example, nearly 40% of US Airways's revenue comes from bookings made by travel agents through Sabre. And as a result of single-homing by those travel agents, US Airways would forgo much or most of that revenue if it opted out of Sabre's platform.

## II.    The Contracts Between the Parties

US Airways signed contracts with Sabre in 2006 and 2011 (the "2006 Contract" and the "2011 Contract," respectively). These contracts were substantially similar in content; both contained four provisions which are central to the claims US Airways makes in this litigation, the "No Better Benefits," "No Discounts," "No Direct Connects," and "No Surcharge" provisions. *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 Civ. 2725 (LGS), 2017 WL 1064709, at *5, 2017 U.S. Dist. LEXIS 40932, at *15-16 (S.D.N.Y. Mar. 21, 2017); *see also* 2011 Contract, PX-6, A718-48. They are generally referred to collectively as the "full content" provisions. Most other major airlines entered into similar contracts with Sabre.

The No Better Benefits provision requires US Airways to provide all available US Airways fares to customers through the Sabre GDS. The No Discounts provision requires any fares offered by US Airways through the Sabre GDS to be no more expensive, and no less comprehensive, than fares offered by US Airways through any other forum. The No Direct Connects provision prohibits US Airways from requiring or inducing any travel agent to book on the US Airways website, or otherwise circumvent the Sabre platform. And the No Surcharge provision prevents US Airways from charging higher fees to travel agents for booking through the Sabre platform than for booking through other means.

In 2005, US Airways attempted to avoid signing a contract with Sabre that contained the full content provisions. It was unsuccessful. As the district court explained, citing trial testimony:

> Ultimately, US Airways had no choice but to accept them in the US Airways-Sabre 2006 contract for fear of being removed from the Sabre GDS or being retaliated against, for example, through "display biasing," which means reordering search results as they appear in the system to disadvantage a particular airline. When the contract came up for renewal in 2011, US Airways again was forced to accept the full content restrictions.

10

*US Airways*, 2017 WL 1064709, at *5, 2017 U.S. Dist. LEXIS 40932, at *16-17

(citations to trial transcript omitted).

## III. The Complaint and a Motion to Dismiss

On April 21, 2011, US Airways filed a complaint against Sabre in the

United States District Court for the Southern District of New York.  It alleged

four violations by Sabre of the Sherman Act, 15 U.S.C. §§ 1 & 2.  It alleged in

Count 1 that Sabre had violated Section 1 of the Sherman Act by using the full

content provisions in its contracts with airlines to create unlawful vertical

restraints on trade.  Complaint ¶¶ 153-59, A151-53.  It alleged in Count 2 that

Sabre violated Section 2 of the Sherman Act by monopolizing the distribution of

GDS services to Sabre subscribers.  Complaint ¶¶ 160-64, A153-54.  It alleged in

Count 3 that Sabre conspired to violate the Sherman Act in the ways alleged in

Count 2.  Complaint ¶¶ 165-68, A154-55.  And it alleged in Count 4 that a

horizontal agreement among Sabre and its GDS competitors violated Section 1 of

the Sherman Act.  Complaint ¶¶ 169-73, A155-56.  US Airways sought treble

money damages, costs, and reasonable attorneys' fees, pursuant to Sections 4 and

16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, and a permanent injunction against

future enforcement of the full content provisions.  Complaint ¶ 174, A156-57.

On August 11, 2011, Sabre filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  On September 12, 2011, the district court (Miriam Goldman Cedarbaum, *Judge*) granted that motion in part, dismissing Counts 2 and 3 of the complaint.  On December 19, 2013, the case was reassigned to Judge Lorna G. Schofield.

### III.    The Motion for Summary Judgment

On April 1, 2014, after discovery was complete, Sabre filed a motion for summary judgment under Federal Rule of Civil Procedure 56.  On January 6, 2015, the district court (Lorna G. Schofield, *Judge*) granted that motion in part. The court declined to dismiss either remaining Count, viz. Count 1 or 4.  It did, however, limit US Airways's damages recovery to those suffered between February 23, 2011, and October 30, 2012, the time between US Airways's entry into its second contract with Sabre in 2011 and the effective date of a 2012 settlement agreement in antitrust litigation that had been instituted by US Airways's parent, AMR Corporation, against Sabre, in state and federal courts in Texas.  *See US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 273, 290 (S.D.N.Y. 2015).

After the district court's order became effective, the claims against Sabre that remained were: Count 1, "that certain provisions of the parties' 2011 Contract harmed competition and caused US Airways to pay Sabre a supracompetitive booking fee, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1," *US Airways*, 2017 WL 1064709, at *2, 2017 U.S. Dist. LEXIS 40932, at *7, and Count 4, that "Sabre conspired with its two GDS competitors to limit competition among them for airlines' distribution business, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2," *id.*

## IV. The Trial and Pre-trial Practice

A jury trial was scheduled to begin on October 24, 2016. The parties filed a total of seven motions under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), regarding prospective expert testimony at trial, and eleven motions *in limine* regarding other prospective evidence. All the motions but one, which was reserved for trial, were adjudicated on or before September 22, 2016.

Just four days later, on September 26, 2016, this Court issued its opinion in *United States v. American Express Co.*, 838 F.3d 179 (2d Cir. 2016) ("*Amex I*"). There, we addressed for the first time an issue that had become central to US Airways's action against Sabre: For purposes of an antitrust case, when the

relevant market is to be considered "two-sided," *i.e.*, when the effects of a

challenged restraint on a market are to be judged by the net impact on customers

on both sides, not either side, of a market. *Id.* at 186, 198-200.[3]  In light of this

development, Sabre filed a motion for reconsideration of the district court's prior

partial denial of summary judgment.

On October 10, 2016, the motion for reconsideration was denied. *US

Airways*, 2017 WL 1064709, at *2, 2017 U.S. Dist. LEXIS 40932, at *6.  The next day,

Sabre filed a motion to adjourn the trial to re-brief its pre-trial motions.  That

motion was also denied by the court. *Id.*

Trial began as scheduled on October 24, 2016.  Nine weeks later, the jury

returned a verdict:  On Count 1, the jury found that the market at issue in this

case "was one-sided, that Sabre had unreasonably restrained trade and that US

Airways had been injured as a result.  The jury awarded US Airways $5,098,142

in damages, before trebling." *US Airways*, 2017 WL 1064709, at *2, 2017 U.S. Dist.

LEXIS 40932, at *7.  The jury also found that even if the market were two-sided,

"Sabre unreasonably restrained trade, US Airways was injured as a result and US

---

[3] In *Amex*, the two sides of the market were American Express cardholders who used
the cards for purchases from merchants and the merchants who honored the use of the
American Express cards for purchases by those cardholders.

Airways suffered the same damages of $5,098,142," again, before trebling. *Id.* On Count 4, in which US Airways alleged that a horizontal agreement among Sabre and its GDS competitors violated Section 1 of the Sherman Act, the jury found for Sabre. *Id.*

## V.    After Trial

Following trial, Sabre filed a motion for judgment as a matter of law on Count 1, or in the alternative a new trial on Count 1, pursuant to Federal Rules of Civil Procedure 50 and 59.  On March 21, 2017, the district court denied the motion in its entirety.  *US Airways*, 2017 WL 1064709, at *19, 2017 U.S. Dist. LEXIS 40932, at *55.  On April 5, 2017, Sabre filed a notice of appeal; US Airways filed a notice of cross-appeal the next day.

By March 2018, the parties' briefing in this appeal had been completed.  On June 25, 2018, however, the Supreme Court decided *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018) ("*Amex II*"), in which the Court affirmed our decision in *Amex I*, although to a significant extent on other grounds.  We solicited and received supplemental briefing from the parties addressing the impact of *Amex II* on this appeal.

## DISCUSSION

Sabre contends on appeal that the district court erred by allowing the jury to determine, as a matter of fact, that the relevant market was one-sided; and by issuing erroneous instructions to the jury as to whether the GDS market was required to be treated as two-sided, and the consequences if indeed it was. Sabre argues that under *Amex II,* its GDS platform is a transaction platform, and therefore, as a matter of law, the relevant market in this case must include both sides of the Sabre platform, *i.e.,* the analysis by the jury of the challenged restraints' impact on competition in the GDS market was required to include the combination of its impact on both airlines and travel agents using Sabre. It argues that this error was not harmless because the jury's verdict was based on the jury's analysis of the challenged restraint's impact on the airlines side of the Sabre platform only, ignoring the travel-agents side. It urges us therefore to reverse the judgment of the district court, and to remand the matter with instructions to the district court to enter judgment in its favor on Count 1; or failing that, for us to remand to the district court for a new trial on Count 1.

In its cross-appeal, US Airways contends that the district court erred in any event by concluding that US Airways had not pleaded a legally cognizable

submarket in Counts 2 and 3 of its complaint and therefore by dismissing those counts under Rule 12(b)(6). US Airways further argues that the district court erred by concluding that US Airways's claim for damages arising out of its 2006 contract with Sabre was barred by the applicable four-year statute of limitations.

## SABRE'S APPEAL

### I.    Standard of Review

We review a district court's denial of a Rule 50 motion for judgment as a matter of law *de novo. Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010). Judgment as a matter of law may be granted following a jury verdict "only if the court, viewing the evidence in the light most favorable to the non-movant, concludes that a reasonable juror would have been *compelled* to accept the view of the moving party." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 180 (2d Cir. 2016) (internal quotation marks omitted; emphasis in original).

We review a district court's denial of a Rule 59 motion for a new trial for abuse of discretion, viewing the evidence "in the light most favorable to the nonmoving party." *Ali v. Kipp*, 891 F.3d 59, 64 (2d Cir. 2018) (quoting *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir. 1998)). "[W]e will reverse a judgment only if the district court (1) based its decision on an error of law, (2) made a

clearly erroneous factual finding, or (3) otherwise rendered a decision that cannot be located within the range of permissible decisions." *Id.* (internal quotation marks omitted).

We review a district court's jury instructions *de novo*. *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 176 (2d Cir. 2004). "An erroneous instruction requires a new trial unless the error is harmless. An error is harmless only if the court is convinced that the error did not influence the jury's verdict." *Id.* (internal quotation marks omitted). "If an instruction improperly directs the jury on whether the plaintiff has satisfied her burden of proof, it is not harmless error because it goes directly to the plaintiff's claim, and a new trial is warranted." *Id.* (internal quotation marks omitted).

## II.     Background: Legal Framework for Claims Under Section 1 of the Sherman Act

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. "In restraint of trade" has been read by

the Supreme Court to be limited to "unreasonable restraints" that are prohibited. *See, e.g., State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).[4]

Some restraints are *per se* unreasonable, *i.e.*, under no circumstance will they be held to be lawful. "Resort to *per se* rules is confined to restraints . . . that would always or almost always tend to restrict competition and decrease output[,]" "have manifestly anticompetitive effects," and lack "any redeeming virtue." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (citations and internal quotation marks omitted). They include most prominently "horizontal" agreements among competitors to fix prices for their goods or services. *See, e.g., Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Neither party contends that the restraints at issue in this case—Sabre's "full content provisions"—are *per se* unreasonable.

If a restraint is not *per se* unreasonable, it is analyzed under the "rule of reason," which is a fact-specific analysis designed to "distinguish[] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest."

---

[4] All agreements affecting trade restrain trade to some extent; all such agreements are of course not therefore unlawful. *See, e.g.*, Federal Trade Commission, "The Antitrust Laws," https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/antitrust-laws (last visited August 19, 2019).

*Leegin,* 551 U.S. at 886. Application of the rule of reason involves a three-step burden-shifting analysis. "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Amex II,* 138 S. Ct. at 2284. "If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* "If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*

The first step of the rule of reason analysis, then, requires the identification of the "consumers in the relevant market," *Amex II*, 138 S. Ct. at 2284, *i.e.*, the market in which the anticompetitive effects of the challenged restraint are to be measured, *id.* at 2285. The relevant market is broadly defined as "the area of effective competition," which is typically "the arena within which significant substitution in consumption or production occurs." *Id.* (internal quotation marks omitted). Market definition is ordinarily "a deeply fact-intensive inquiry." *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001). Courts "combine different products or services into a single market when that combination reflects

commercial realities." *Amex II*, 138 S. Ct. at 2285 (internal quotation marks and

brackets omitted).

### III.    *Amex I* and *Amex II*

In October 2010, the litigation that resulted in the *Amex I* opinion in this

Court and the *Amex II* opinion in the Supreme Court was initiated in the United

States District Court for the Eastern District of New York.  *See Amex II*, 138 S. Ct.

at 2283.  The suit was brought by the United States and several individual states

against American Express Company and American Express Travel Related

Services Company (collectively "Amex").  *See id*. at 2279, 2283.  The plaintiffs

challenged "anti-steering provisions" in Amex's contracts with merchants who

honored the card.  These provisions "prohibit[ed] merchants from implying a

preference for non-Amex cards; dissuading customers from using Amex cards;

persuading customers to use other cards; imposing any special restrictions,

conditions, disadvantages, or fees on Amex cards; or promoting other cards more

than Amex." *Id*. at 2283.  The district court identified the credit card market for

purposes of analysis as two separate markets: one engaged in by merchants and

the other by cardholders.  *United States v. American Express Co*., 88 F. Supp. 3d

143, 171-73 (E.D.N.Y. 2015).  The district court concluded, following a bench trial,

that the provisions imposed by American Express constituted an unreasonable restraint of trade in the merchant-market, thereby violating Section 1 of the Sherman Act. *Id.* at 150-52, 224, 238.

We reversed the district court's judgments. *Amex I*, 838 F.3d at 206-07. We concluded that the credit card market at issue was properly defined not as two separate markets, but as a single, two-sided market, which included both the merchants on one side and the cardholders on the other. *Id.* We instructed the district court to enter judgment for American Express on remand because the plaintiffs had failed to meet their burden to prove that the challenged restraints caused substantial anticompetitive effects in such a two-sided market: They only introduced evidence which would serve to meet that burden in a one-sided market. *Id.*

In *Amex II*, the Supreme Court affirmed our judgment. 138 S. Ct. at 2283. The central holding of *Amex II,* though, differs from the conclusion we had reached: It was that in a case brought under the Sherman Act that involves a "two-sided *transaction* platform," the relevant market must *always* include both sides of the platform. *Id.* at 2287 (emphasis added).

The Supreme Court defined a two-sided platform—a category of which a two-sided transaction platform is a subset—as a business that "offers different products or services to two different groups who both depend on the platform to intermediate between them." *Amex II*, 138 S. Ct. at 2280. These platforms are distinct from other businesses because "the value of the services that a two-sided platform provides increases as the number of participants on both sides of the platform increases." *Id.* at 2281. A credit-card platform, such as the Amex platform with which the Court was dealing, becomes more valuable to merchants when there are more cardholders who will use that card to pay them, and more valuable to cardholders when more merchants accept the card. *Id.*

"To ensure sufficient participation, two-sided platforms must be sensitive to the prices that they charge each side" of the platform to avoid the phenomenon of "[r]aising the price on side A . . . [and] losing participation on that side, which decreases the value of the platform to side B," which in turn risks losing participation on side B—and so on. *Amex II*, 138 S. Ct. at 2281. Two-sided platforms therefore often "cannot raise prices on one side without risking a feedback loop of declining demand." *Id.* at 2285. Economists call this phenomenon "indirect network effects." *Id.* at 2280-81.

As a result of these indirect network effects, "[p]rice increases on one side of the platform . . . do not suggest anticompetitive effects without some evidence that they have increased the overall cost of the platform's services." *Amex II*, 138 S. Ct. at 2285-86. Therefore, in many or most cases involving two-sided platforms, "courts must include both sides of the platform" in their definition of the relevant market. *Id.* at 2286.

"To be sure, it is not always necessary to consider both sides of a two-sided platform." *Amex II*, 138 S. Ct. at 2286. "[W]hen the impacts of indirect network effects and relative pricing in the market are minor," the market "should be treated as one-sided." *Id.* For example, if network effects run in only one direction, a court may consider only one side of a platform. *Id.* The Court gave as an example: a newspaper. Arguably, it provides a two-sided platform inasmuch as it connects the market for advertising to the market for readers. But the network effects run primarily in one direction: Advertisers care how many readers there are, but readers do not ordinarily care how much advertising there is. *See id.* The relevant market for the newspaper platform likely should therefore include just the advertiser side, and not the readers' side. *See id.*

But, according to the Court, there is a subset of two-sided platforms that must *always* receive two-sided treatment: transaction platforms. A transaction platform is a two-sided platform where the business "cannot make a sale to one side of the platform without simultaneously making a sale to the other." *Amex II*, 138 S. Ct. at 2280. Indeed, transaction platforms are "better understood as supplying only one product—transactions," rather than as supplying two separate products, one to each side of the platform. *See id.* at 2286 (internal quotation marks and brackets omitted). These platforms inherently "exhibit more pronounced indirect network effects and interconnected pricing and demand" than other types of two-sided platforms, because transaction platforms require that "both sides of the platform simultaneously agree to use their services." *Id.* As a result, "[e]valuating both sides of a two-sided transaction platform is . . . necessary to accurately assess competition." *Id.* at 2287. In other words: In cases involving two-sided *transaction* platforms, the relevant market must, as a matter of law, include both sides of the platform.

## IV.   Asserted Errors at Trial

### a.  *The Primary and Alternative Verdicts*

As noted, as to Count 1, the jury found that the market at issue in this case "was one-sided, that Sabre had unreasonably restrained trade and that US Airways had been injured as a result.  The jury awarded US Airways $5,098,142 in damages, before trebling."  *US Airways*, 2017 WL 1064709, at *2, 2017 U.S. Dist. LEXIS 40932, at *7.  The jury also found that even if the market were two-sided, "Sabre unreasonably restrained trade, US Airways was injured as a result and US Airways suffered the same damages of $5,098,142."  *Id.*

The jury's latter conclusion— that even in a two-sided market US Airways had proven competitive harm—was prompted by the district court's decision in response to *Amex I, sua sponte*, to place hypothetical questions on the verdict form.

> [I]f you found for the contract claim that the market was one-sided, then you should assume for these questions that the market is two-sided.  On the other hand, if you found that the relevant market was two-sided, then you should assume that it is one-sided for these questions.  And the questions are basically the same questions, just with a different assumption as to whether the market is one-sided or two-sided.

Trial Tr. 5795-96, A705.[5]  The court further instructed the jury to decide "with the

same diligence and seriousness [as it did with respect to the questions that

resulted in its primary verdict], even though these last questions are hypothetical

questions."  *Id.*  The jury was told that its answers to the hypothetical questions

were "very important, just as important as [its] prior answers."  *Id.*

       *b.  The Primary Verdict Was Erroneous*

      The jury's primary verdict was based on its finding that the relevant

market was one-sided.  In light of the subsequent Supreme Court opinion in

*Amex II*, that conclusion was erroneous because the Sabre GDS is a transaction

platform, and the relevant market for such a platform must as a matter of law

include both sides.  As Justice Breyer, writing in dissent, explained, the *Amex II*

majority concluded for the Court that a business is a transaction platform if it

"(1) offer[s] different products or services, (2) to different groups of customers,

(3) whom the 'platform' connects, (4) in simultaneous transactions."  *Amex II*, 138

S. Ct. at 2298 (Breyer, *J.*, dissenting).  GDSs, including Sabre, meet all four

---

[5] From time to time, we rely on and cite to the trial transcript.  It is part of the record on appeal.  *See* Federal Rule of Appellate Procedure 10(a) ("Composition of the Record on Appeal.  The following items constitute the record on appeal: (1) the original papers and exhibits filed in the district court; [and] (2) the transcript of proceedings, if any . . . .").  Such citations are to both the trial transcript, "Trial Tr.," and the district court docket, "Dkt."  Citations to the appendix on appeal are denominated "A[xxx]."

requirements: They offer different services to different groups of customers—to airlines, access to travel agents; to travel agents, flight and pricing information—and they connect travel agents to airlines in simultaneous transactions. The jury verdict must therefore be vacated.

### c. *We Cannot Rely on the Alternative Verdict on Appeal*

US Airways argues that "[e]ven if Sabre were correct that the relevant market is two-sided as a matter of law, it would not matter because the jury concluded [in its alternative verdict in response to the hypothetical questions] that US Airways proved two-sided harm." US Airways Br. 34. US Airways thus asks us to allow the jury's alternative verdict to stand.

The district court faced a predicament which it addressed by obtaining the alternative verdict. *Amex I* was decided shortly before trial. A petition for *en banc* rehearing in that case had been filed with us, with a petition for *certiorari* to the Supreme Court likely to be filed if the *en banc* petition failed. The district court, having completed a nine-week jury trial in the matter, was obviously and understandably eager to "avoid a retrial if possible." Trial Tr. 5769, A703. So, "in the interest of judicial efficiency, [and] in the hopes that the answers [would] be helpful should the law change on two-sided markets," the court included the

hypothetical questions on the verdict form. *Id.* We nonetheless cannot affirm the judgment based on the jury's alternative verdict because the case was tried in a manner that was fundamentally at odds with that contemplated by the later Supreme Court decision in *Amex II*. After *Amex II*, in a case whose subject is a transaction platform like Sabre, the jury *must* be instructed to consider both sides of the platform being evaluated; the relevant market for such platforms must, *as a matter of law*, always include both sides. That is not a jury question.

But at the time the jury engaged in its deliberations, before *Amex II* was decided, the jury was not so instructed. Instead, it was asked to decide for itself whether the platform was one-sided or two-sided. And the district court's failure to so instruct the jury allowed—indeed apparently encouraged—US Airways to spend considerable time at trial presenting an incorrect conception of two-sidedness.

Thus, for example, contrary to what the Supreme Court thereafter decided, one of US Airways's expert witnesses, Professor Joseph Stiglitz, testified that the Sabre platform was one-sided because it lacked interdependence, *see* Trial Tr. 1374-79, Dkt. 753, or what the *Amex II* court later referred to as indirect network effects, 138 S. Ct. at 2285-86. Professor Stiglitz based that opinion on the "market

maturity" theory, which posits that "mature markets"—those in which virtually all potential customers are already participants—do not experience indirect network effects because changing prices on one side of a platform will not affect demand in the market as a whole. *See* Trial Tr. 1374-77, Dkt. 753.

During its summation and its rebuttal, US Airways urged the jury to adopt this approach. *See* Trial Tr. 5689, A696 (summation) ("Two-sided markets mean you grow the whole pie [of] the market, not a platform. And Sabre does nothing to grow the market. Everybody who could be reached has been reached."); Trial Tr. 5782, Dkt. 793 (rebuttal) ("Sabre doesn't grow any pie for US Airways."). And the district court appeared to adopt US Airways's erroneous conception of transaction platform interdependency, instructing that "[t]he market in this case is considered two-sided if the two sides are interdependent *such that a change in price on one side of the market affects demand on the other side*." Trial Tr. 5626, A685 (emphasis added). Stiglitz's theory, urged upon the jury by counsel for US Airways and buttressed by the district court's instructions, is wrong as a matter of law in light of *Amex II*.

Moreover, the jury returned identical damage amounts in both its primary verdict based on its conclusion that the GDS market was one-sided and its

alternative verdict based on an assumption that the market was two-sided: $5,098,142, before trebling. *US Airways*, 2017 WL 1064709, at *2, 2017 U.S. Dist. LEXIS 40932, at *7.

At trial, US Airways's theory of damages was that because of the challenged restraints contained in the 2011 contract, it had been charged supracompetitive fees by Sabre ($3.49 per booking) and that it was entitled to damages in an amount by which the supracompetitive fees paid by it exceeded the fees that it asserted would have been charged in a competitive market ($1.35 per booking). Trial Tr. 5693-94, A697. In a market that took into account both sides of the Sabre platform, the prices would be supracompetitive only to the extent that the net prices charged to travel agents (here, -$0.85 per booking on average) and airlines (here, $3.49 per booking) *combined* exceeded the prices that would have been charged in a competitive market. *Id.* at 5695, A698; *see also Amex II*, 138 S. Ct. at 2287 ("focus[ing] on only one side of the two-sided credit-card market . . . misses the mark because . . . [e]vidence of a price increase on one side of a two-sided transaction platform cannot by itself demonstrate an anticompetitive exercise of market power").

In a market encompassing both sides of the platform, then, if prices charged to travel agents are less—or incentive payments made are greater—than those that would be observed in a competitive market, then that difference must be accounted for in determining US Airways's damages, if any. US Airways conceded as much in its summation, *see* Trial Tr. 5695, A698, and the jury was instructed on this distinction by the district court, *see* Trial Tr. 5627, A686. In a market encompassing only one side of the platform, the jury cannot take prices charged to the travel agents into account in its damages calculation, which is based on the airlines side of the platform only. Again, Sabre pays travel agents to use its platform, and US Airways's experts themselves testified that in a competitive market, those payments would not exist. *See* Trial Tr. 2352, Dkt. 764. In a two-sided platform, the payments made by Sabre to travel agents would therefore necessarily reduce any damages US Airways might receive: Two-sided damages must, in this case, then, be lower than one-sided damages would have been.

It would thus appear to have been impossible for the jury to have followed the district court's instructions but to have concluded that the compensable damages if the platform were one-sided, as the jury found it to be,

were identical in amount to compensable damages if the platform were two-

sided, as the jury was required to assume for purposes of the hypothetical

questions. Perhaps the jury was confused by the evidence erroneously admitted,

arguments impermissibly made, and instructions improperly given on the theory

that the platform could have been one-sided, contrary to *Amex II*'s subsequent

holding. Perhaps the jury misunderstood or glossed over the hypothetical

questions it was given with respect to the alternative verdict. But in any event,

its conclusion that the damages were identical in a one-sided and two-sided

market casts serious doubt on the reliability of the alternative verdict. At least,

we cannot say that the mistakes committed at trial were, under the

circumstances, harmless. *See United States v. Grunberger*, 431 F.2d 1062, 1069 (2d

Cir. 1970) ("Each case must be scrutinized on its particular facts to determine

whether a trial error is harmless error or prejudicial error when viewed in the

light of the trial record as a whole . . . ."); *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d

111, 116 (2d Cir. 2000) ("An [erroneous instruction] is harmless only if the court is

convinced that the error did not influence the jury's verdict.").[6]

---

[6] As far as we are aware, we have not previously addressed a verdict based on
hypothetical questions or an alternative verdict on appeal. We cannot, need not, and do
not, in resolving this appeal, rule out the possibility that under some combination of

V. **Judgment as a Matter of Law or a New Trial?**

*a. Summary*

Sabre urges that in light of *Amex II* and the unreliability of the alternative

verdict in the district court, we must reverse the judgment of the district court,

and remand with instructions to the court to enter judgment in Sabre's favor on

Count 1. We conclude, however, that a new trial on Count 1 is appropriate

instead.

Judgment as a matter of law may be entered "only if the court, viewing the

evidence in the light most favorable to the non-movant, concludes that a

reasonable juror would have been *compelled* to accept the view of the moving

party." *MacDermid Printing Sols.*, 833 F.3d at 180 (internal quotation marks

---

circumstances we would affirm such a judgment. We do harbor some general doubt, however, as to the wisdom of basing a judgment on a jury verdict that the jury understands is unlikely to be the basis of such a judgment. Courts in other jurisdictions cast jaundiced eyes on the practice. *See, e.g., Romer v. Baldwin*, 317 F.2d 919, 923 (3d Cir. 1963) (declining to credit the jury's answers to alternative hypothetical questions because "the jury must have approached the question of damages as merely an intellectual exercise in the theoretical evaluation of a claim"); *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1560-61 (11th Cir. 1988) (having vacated the district court's judgment notwithstanding the verdict, the court of appeals declined to credit the award of liquidated damages by the district court conditioned on such vacatur because such award was merely a "conditional" ruling, which, though "designed to promote judicial economy," is "an impermissible means to a noble end"). But, of course, these decisions are not binding on us, and they would not require us to decide an appeal based on an alternative verdict or hypothetical question one way or another even if they were.

omitted; emphasis in original). That is not the case here. According to the evidence presented at trial so considered, no new competitors have entered the technologically stagnant GDS market in some thirty years despite a return on investment to the participants in that market that is strikingly high, even after accounting for the incentive payments to the travel agents using Sabre's platform to book flights as required in analyzing harm in a two-sided platform.

We therefore conclude that it would have been reasonable for jurors to have concluded that US Airways had met its burden to "prove that[, even considering the relevant market to be two-sided,] the challenged restraint ha[d] a substantial anticompetitive effect that harm[ed] consumers." *Amex II*, 138 S. Ct. at 2284. If the case were tried in accordance with the later-decided *Amex II*, a reasonable juror would not have been compelled to accept the view of the moving party, Sabre. The jury could have reasonably concluded instead that when considering both sides of the platform, Sabre did violate Section 1 of the Sherman Act by implementing the challenged full content provisions.

### b. The Evidence

US Airways presented evidence at trial of supracompetitive net pricing through the testimony of two expert witnesses, Professors Jerold L. Zimmerman and Joseph E. Stiglitz.

Professor Zimmerman has been for decades an accounting professor at the University of Rochester's Simon School of Business. Trial Tr. 2304, Dkt. 764. Zimmerman testified that Sabre was consistently more profitable than comparable companies. *Id.* at 2309-10. To make this determination, Zimmerman calculated Sabre's economic profit and compared it to other comparable companies' profits. *Id.* at 2325-31. He concluded that it is "very, very, very high; much, much higher than the comparable companies[,]" "between 7 and 11 times larger than these comparable companies." *Id.* at 2332. He said that he had "never seen a case like this in [his] 40 years of teaching." *Id.*

And Zimmerman did include travel agency incentive payments as costs when he calculated Sabre's economic profits. Trial Tr. 2318, 2320, Dkt. 764 ("The expenses I again took right out of a Sabre Book of Numbers document, and that was $1.44 billion.; Q. Did the costs that are reflected in the Book of Numbers also include things like travel agent incentive costs? A. Yes."). His conclusions in

this regard could therefore properly have been relied upon by the jury in assessing market harm in a two-sided Sabre GDS platform.

Professor Zimmerman also testified that Sabre was charging US Airways "almost three times what it would have [charged] in a competitive market," Trial Tr. 2348, Dkt. 764, based on a comparison of "the actual booking fees that Sabre charged US Airways" and the fees that "Sabre would have had to charge in order to earn a reasonable profit," *id.* at 2360. This "reasonable profit booking fee" was a function of all Sabre's costs in a hypothetical competitive market, plus a reasonable return on investment. *Id.* at 2349. When Zimmerman calculated Sabre's costs in a competitive market, however, he "took [travel agency incentive payments] out of the operating expenses." *Id.* at 2352. He was relying "on Professor Stiglitz's expert opinion that those customer incentives would not be there" in a competitive market. *Id.* As a result, this portion of Zimmerman's testimony could only have been used as evidence of harm on one side of the platform.

But US Airways addressed this deficiency during its direct examination of Professor Stiglitz, a professor of economics at Columbia University and a Nobel laureate in economics. Trial Tr. 1216, 1219, Dkt. 753. Stiglitz gave expert opinion

on a variety of topics, including—as mentioned above—whether the market

should be considered one-sided or two-sided.  Stiglitz ultimately testified

(wrongly as a matter of law, it turns out, according to the later decision in *Amex

II*) that the GDS market should be treated as one-sided.  He was asked by counsel

nonetheless to assume for purposes of argument that the market was two-sided,

and opine as to whether it was, in that event, competitive.  *Id.* at 1380 ("Q.  Have

you looked at the question of whether the GDS services market . . . is a

competitive market even if it is considered two sided?  A.  Yes, I have.").

Stiglitz's opinion as to two-sided market harm—not market definition—

took travel agency incentives into account by reinserting the incentive payment

costs into Zimmerman's reasonable profit booking fee.  And US Airways took

pains to make that clear to the jury.  *See* Trial Tr. 1381-82, Dkt. 753 ("Q.  So,

treating GDS services as a two-sided market, what adjustments would you

[Stiglitz] make to [Zimmerman's] analysis to take into account the beneficial

effects to travel agents?"  "A.  So you would add on the incentive payments, and

that is what I have [done] . . . I have just added . . . on to Dr. Zimmerman's

[reasonable profit booking fee] the incentive payment to the travel agencies.").

After adjusting Zimmerman's opinion for a two-sided market analysis, Stiglitz

concluded that if the GDS market is two-sided "it is noncompetitive, a highly

noncompetitive two-sided market, [] the returns are considerably in excess of

normal market returns." *Id.* at 1382-83.

US Airways also introduced evidence of market harms beyond

supracompetitive pricing. When the district court ruled against Sabre on its

motion for judgment as a matter of law, it explained that "the jury heard from

both fact and expert witnesses that the contractual restraints made entry into the

marketplace 'extraordinarily difficult[,]' . . . reduced the quality of options

available in the marketplace and led to technological stagnation." *US Airways,*

2017 WL 1064709, at *11, 2017 U.S. Dist. LEXIS 40932, at *35-36 (quoting the trial

transcript). These are all types of harm that are cognizable when analyzing both

sides of a two-sided platform. *See Amex II*, 138 S. Ct. at 2284 ("Direct evidence of

anticompetitive effects would be proof of actual detrimental effects on

competition, such as reduced output, increased prices, or *decreased quality in the*

*relevant market.*" (internal quotation marks and brackets omitted) (emphasis

added)).

There was abundant evidence of such reduced quality in the GDS

platform. For example, US Airways presented testimony by James Davidson,

who is president and CEO of a software company, Farelogix.  Trial Tr. 2549, Dkt.

766.  Davidson testified about his attempts and those of other potential

competitors to enter the GDS market with innovative technologies.  He detailed

how, despite the fact that those technologies were far more efficient and

convenient for these purposes than the antiquated technology still used by Sabre,

the anticompetitive barriers to entry in the GDS market—specifically the full

content provisions challenged by US Airways—prevented him and others from

introducing such decidedly improved competitive technology into the market.

*See id.* at 2550-76.

US Airways also elicited testimony of Madeline Gray who, beginning in

the late 1980s, worked as a reservations agent for American Airlines, assisting

prospective travelers in booking directly with the airline.  Trial Tr. 1666, 1671,

Dkt. 757.  She testified that the technology used by travel agents when booking

tickets on Sabre's platform today is virtually identical to that in use when she

was a reservations agent more than thirty years ago.  *Id.* at 1673.  Later, in the

1990's, Gray was employed by Sabre in a supervisory role.  *Id.* at 1667.  She

testified that as of the date of her testimony, Sabre continued to rely on outdated

technology, which requires use of multiple viewing screens rather than a single

one by agents to find airline bookings. *Id.* at 1672-73. The reason according to Gray? It enables Sabre to retain market power over the airlines: If an airline is doing something Sabre thinks contrary to its interests, Sabre can in effect punish the airline by moving its flights from the first to the second or third screen, to which the booking agents would rarely refer. *Id.* at 1677, 1680-91. Again, this has an impact on both the travel-agent side of the platform and the airline side.

And US Airways presented testimony from Stephen Reynolds, the founder and CEO of a software company named TRPBAM. Trial Tr. 2727, Dkt. 767. He has been an engineer and entrepreneur in the travel technology and software industry for some thirty years. *Id.* at 2726-27. He testified that Sabre's technology flatly failed to keep pace with new technology as it became available, that better technology has been available "for decades" that Sabre nonetheless does not use, and that Sabre's "policy, agreements, contracts and such . . . have just really slowed down the pace of innovation rather dramatically." *Id.* at 2745.

Notwithstanding this apparent mountain of evidence, Sabre argues that it is nonetheless "entitled to judgment because [*Amex II*] made clear that the type of price evidence presented by US Airways—evidence of higher prices unconnected to reduced output—fails as a matter of law to prove harm to competition." Sabre

Letter Br. 9.  Sabre contends that in *Amex II*, the Supreme Court concluded that "[p]rice increases only matter if they demonstrate that the defendant is able to raise prices profitably *by restricting output*."  *Id.* (emphasis in original).  It asserts that in *Amex II*, "the government failed to meet its burden because there was no evidence Amex had restricted output."  *Id.*  We disagree.

First, the *Amex II* Court made clear that "[t]he plaintiffs [in the case before it] did not offer *any* evidence that the price of credit-card transactions was higher than the price one would expect to find in a competitive market."  *Amex II*, 138 S. Ct. at 2288 (emphasis added).  That is in stark contrast to the evidence here that the fees charged by Sabre to airlines were indeed greater than a competitive market would have provided, even after discounting the travel agent incentive payments.

Second, the Court said that "[t]o demonstrate anticompetitive effects on the two-sided credit-card market as a whole, the plaintiffs must prove that Amex's antisteering provisions increased the cost of credit-card transactions above a competitive level, reduced the number of credit-card transactions, *or* otherwise stifled competition in the credit-card market," *Amex II*, 138 S. Ct. at 2287 (emphasis added), and that "[t]his Court will not infer competitive injury from

price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level," *id.* at 2288 (internal quotation marks omitted). The use of the disjunctive—"or"—in these statements of law by the Supreme Court contradicts Sabre's assertion that all of those elements had to be established in order for liability under the Sherman Act to arise under *Amex II*.

We therefore are of the view that in contrast to *Amex II*, the jury here had substantial evidence on which it might have determined that the challenged restraint caused anticompetitive effects in a market encompassing both sides of the platform. We therefore conclude that the jury's verdict as to US Airways's Section 1 claim in Count 1 of its complaint must be vacated. We remand to the district court for further proceedings, including but not necessarily limited to a new trial on Count 1.

## US AIRWAYS'S CROSS-APPEAL

### I.     Standard of Review

We review *de novo* the district court's dismissal of Counts 2 and 3 of US Airways's complaint pursuant to Rule 12(b)(6). In conducting our review, we look to see whether the complaint pleaded "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

We also review *de novo* the district court's partial grant of Sabre's motion for summary judgment limiting US Airways's damages recovery. *See Woodford v. Cmty. Action of Greene Cty., Inc.*, 268 F.3d 51, 54 (2d Cir. 2001). We "will affirm [the district court's grant of summary judgment] if viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact." *Glob. Reinsurance Corp. of Am. v. Century Indemn. Co.*, 843 F.3d 120, 123-24 (2d Cir. 2016) (internal quotation marks omitted).

## II. Did the District Court Err by Dismissing Counts 2 and 3 of US Airways's Complaint?

In its original complaint, US Airways alleged that Sabre violated Section 2 of the Sherman Act by monopolizing the Sabre travel agent sub-market, which it defined as "the distribution of GDS services to Sabre subscribers" (Count 2), Complaint ¶ 139, A146, and by conspiring to monopolize it (Count 3), *id.* at ¶¶ 167-68, A154-55. The district court judge then presiding over these proceedings—the late Judge Miriam G. Cedarbaum—dismissed these claims under Rule 12(b)(6). The court concluded that a claim that a defendant has monopolized a market which is limited to a defendant's product or service is not viable. *See* Sept. 8, 2011 Conference Tr. 33, Dkt. 63, SPA 34 ("[T]hat Sabre is a monopoly in its own market, has a monopoly of its own customers

essentially[;] . . . I don't think that is what the antitrust statute means by

monopoly").

US Airways argues that this was error. It contends that "the law permits

an antitrust claimant to restrict the relevant market to a single brand of the

product at issue," and that its complaint properly pleaded the existence of such a

market. US Airways Br. 64 (quoting *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d

1038, 1048 (9th Cir. 2008)). We agree.

The relevant market must be a market for particular products or services,

the "outer boundaries" of which "are determined by the reasonable

interchangeability of use or the cross-elasticity of demand between the product

itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325

(1962). The relevant market includes the product or service at issue as well as its

substitutes. *Id.* "However, within this broad market, well-defined submarkets

may exist which, in themselves, constitute product markets for antitrust

purposes." *Id.* The submarket's boundaries "may be determined by examining

such practical indicia as industry or public recognition of the submarket as a

separate economic entity, the product's peculiar characteristics and uses, unique

production facilities, distinct customers, distinct prices, sensitivity to price

changes, and specialized vendors." *Id.*

While "market definition is a deeply fact-intensive inquiry [and] courts

[therefore] hesitate to grant motions to dismiss for failure to plead a relevant . . .

market," "[w]here the plaintiff fails to define its proposed relevant market with

reference to the rule of reasonable interchangeability and cross-elasticity of

demand, or alleges a proposed relevant market that clearly does not encompass

all interchangeable substitute products," "the relevant market is legally

insufficient and a motion to dismiss may be granted." *Chapman v. New York State*

*Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (brackets in original) (citations and

internal quotation marks omitted). In the case at bar, then, we must examine

whether the market alleged by US Airways, "the distribution of GDS services to

Sabre subscribers," Complaint ¶ 139, A146, is a legally cognizable submarket in

light of the facts as plausibly pleaded in the complaint.

The complaint contains at least four allegations relevant to establishing a

submarket that is limited to Sabre services only. First, the complaint alleged that

alternative distribution services to Sabre, including Amadeus and Travelport, are

not "reasonably interchangeable with Sabre," Complaint ¶ 140, A146, and that

"the cross-elasticity of demand for Sabre GDS services and any potential alternative is at or near zero," *id.* at ¶ 141, A147.[7]  Second, the complaint alleges that travel agents that use Sabre almost all use *only* Sabre services, and that they rarely, if ever, switch to another GDS.  *Id.* at ¶ 24, A115.  Third, the complaint alleges that Sabre designed its GDS system to make it (1) time-consuming for travel agents to learn to use the system, (2) incompatible with, and unable to connect to, other distribution systems, and (3) expensive to switch to other systems.  *Id.* at ¶¶ 11, 27-29, 141, A111, A116-17, A147.  Finally, the complaint alleges that Sabre's payment structure of travel agency incentives further entrenches travel agent loyalty by setting a threshold number of required bookings and tying the magnitude of incentives to the volume of travel agents' activity on Sabre's platform, including "requir[ing] either a minimum number of monthly bookings or institut[ing] some type of productivity pricing that penalizes agencies that begin using another channel for bookings."  *Id.* at ¶¶ 29-31, 33, A116-18.

---

[7] US Airways further asserts that "[b]oth the [Department of Justice] and [Department of Transportation] have concluded—after review of an extensive factual record—that distribution through Sabre constitutes a separate relevant antitrust market."  Complaint ¶ 143, A147.

To support its argument that it alleged a legally cognizable submarket, US

Airways relies on *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451

(1992).  There, the Supreme Court considered, *inter alia*, whether, if ever, a single

brand of a product or service can be considered a relevant market for purposes of

the Sherman Act, and if so, when.

The plaintiffs in *Kodak* were independent service organizations (ISOs) that

entered or attempted to enter the business of servicing Kodak equipment, selling

parts for Kodak equipment, and selling used Kodak equipment.  504 U.S. at 457.

These ISOs were established beginning in the early 1980s.  They were able

profitably to repair Kodak equipment at lower prices than Kodak itself could,

and according to some customers, more effectively.  *Id.*  Kodak responded to the

rise of these ISOs by implementing a policy of not selling Kodak parts to ISOs,

but only to customers who repaired their own machines or used Kodak service to

repair their machines.  "Kodak also pressured Kodak equipment owners and

independent parts distributors not to sell Kodak parts to ISOs."  *Id.* at 458.  "In

1987, the ISOs filed [suit] . . . , alleging, *inter alia*, that Kodak had . . . unlawfully

monopolized and attempted to monopolize the sale of service for Kodak

machines, in violation of § 2 of [the Sherman] Act."  *Id*. at 459.  On Kodak's

motion for summary judgment, "[a]s to the § 2 claim, the District Court

concluded that although Kodak had a natural monopoly over the market for

parts it sells under its name, a unilateral refusal to sell those parts to ISOs did not

violate § 2." *Id.* (internal quotation marks omitted). The Ninth Circuit affirmed

in relevant part.

Before the Supreme Court, Kodak argued that as a matter of law, a single

brand of a product or service can never be a relevant market under the Sherman

Act. *Kodak*, 504 U.S. at 481. The Supreme Court disagreed, concluding that the

relevant market was properly determined by the choices available to Kodak

equipment owners. It concluded that "a single brand of a product or service"

may "be a relevant market under the Sherman Act" if no substitute exists for that

brand's products or services. *Id.* at 482 (citing "prior [Supreme Court] cases

support[ing] the proposition that in some instances one brand of a product can

constitute a separate market"). The Court reasoned that because "service and

parts for Kodak equipment are not interchangeable with other manufacturers'

service and parts, the relevant market from the Kodak equipment owner's

perspective is composed of only those companies that service Kodak machines."

*Id.*[8]

Likewise, when we look to the choices available to travel agents using Sabre—assuming US Airways's allegations are true, as we must—we conclude that US Airways sufficiently pleaded that there are no viable substitutes available to the travel agents who use Sabre's services. US Airways alleged that travel agents are locked into the Sabre platform because of the prohibitively high costs of switching to alternative booking channels and incentive payment structures. US Airways therefore successfully alleged that the Sabre platform is not interchangeable with other booking alternatives as, in *Kodak*, the ISOs alleged that Kodak equipment was not interchangeable with other manufacturers'.

---

[8] Sabre argues that *Kodak* is narrower than US Airways contends and is inapplicable to this case. It contends that *Kodak* should only apply when a defendant "exploited customers by either (1) changing its policies after its customers were locked in or (2) concealing its policies at the time of purchase." Sabre Reply 52. Sabre cites cases from the First, Fifth, Sixth and Seventh Circuits in support. *See Lee v. Life Ins. Co. of N. Am.*, 23 F.3d 14, 20 (1st Cir. 1994); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 783 (5th Cir. 1999); *PSI Repair Servs., Inc. v. Honeywell Inc.*, 104 F. 3d 811, 819 (6th Cir. 1997); *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996). But those cases do not purport to apply any such rule to a plaintiff's attempt to allege a single-brand market when no alleged aftermarket or tying arrangement is involved, such as in this case, nor can we read *Kodak* to have done so.

There is thus no "cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co.*, 370 U.S. at 325.

We emphasize that the only question before us on appeal is whether US Airways, in pleading a Sabre-only market, pleaded a market that is capable of being monopolized under Section 2 of the Sherman Act. We are persuaded for the foregoing reasons that, under *Kodak*, and contrary to the conclusion of the district court, US Airways did not fail as a matter of law to do so.[9] We need not, and do not, decide whether US Airways plausibly alleged that Sabre "monopolized" that market. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) ("The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business

---

[9] A district court in the Northern District of Texas came to the same conclusion in a virtually identical case in which US Airways's parent corporation, AMR, sued Sabre and other GDSs for the same alleged violations of Section 2. *See Am. Airlines, Inc. v. Travelport Ltd.*, No. 4:11-CV-244-Y, 2011 WL 13047291, at *6 (N.D. Tex. Nov. 21, 2011), *order vacated in part on other grounds on reconsideration*, No. 4:11-CV-244-Y, 2012 WL 12507645, 2012 U.S. Dist. LEXIS 191140 (N.D. Tex. Feb. 28, 2012). The case was eventually settled, and that settlement, as noted above, was the basis for a limitation of recoverable damages in the case at bar. *See US Airways*, 105 F. Supp. 3d at 273, 290.

acumen, or historic accident.").  Neither do we suggest a view on our part as to

whether it has.

We therefore conclude that the district court erred by prematurely

dismissing Counts 2 and 3 of US Airways's complaint based on its conclusion

that a market which is limited to a defendant's product or service cannot be

viable.  The judgment of the district court is reversed and the case is remanded

for further proceedings with respect to those claims.[10]

### III. Did the District Court Err by Limiting US Airways's Damages to Those, If Any, Suffered After February 14, 2011?

In the district court's opinion and order ruling on Sabre's motion for

summary judgment, the court concluded that US Airways's claims for damages

arising out of its 2006 contract with Sabre were barred by the applicable four-

year antitrust statute of limitations.  *US Airways*, 105 F. Supp. 3d at 279.

On appeal, US Airways argues that this was error because the district

court failed to properly apply the "continuing-violation rule" from *Hanover Shoe,*

---

[10]  In doing so, we recognize the possibility that any damages alleged under the Section 2 claims in Counts 2 and 3 might be duplicative of damages alleged under Section 1 in Count 1, which we are also remanding for further proceedings.  "A plaintiff seeking compensation for the same injury under different legal theories is . . . only entitled to one recovery."  *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1995).

*Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968). It provides that the

statute of limitations does not only run from a defendant's initial act—for

example, the execution of an anticompetitive contract—if the defendant engages

in "conduct which constitute[s] a continuing violation of the Sherman Act and

which inflict[s] continuing and accumulating harm." *Id.* at 502 n.15. US Airways

contends that under *Hanover Shoe*, "an antitrust plaintiff may recover damages

suffered during the limitations period as the result of an anticompetitive

contract, regardless when that contract first took effect, because conduct or

forbearance from conduct pursuant to the terms of an anticompetitive contract is

itself a continuing violation." US Airways Br. 68-69. We disagree.

"The basic rule is that damages are recoverable under the federal antitrust

acts only if suit therefor is commenced within four years after the cause of action

accrued." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)

(internal quotation marks omitted). But "[a]ntitrust law provides that, in the case

of a 'continuing violation,' say, a price–fixing conspiracy that brings about a

series of unlawfully high priced sales over a period of years, 'each overt act that

is part of the violation and that injures the plaintiff,' *e.g.*, each sale to the plaintiff,

'starts the statutory period running again, regardless of the plaintiff's knowledge

of the alleged illegality at much earlier times.'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (first quoting 2 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 338b (rev. ed. 1995); then citing *Zenith*, 401 U.S. at 338; *Hanover Shoe*, 392 U.S. at 502 n.15; *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996)).

The question we face here, then, is whether a defendant commits an "overt act" each time a plaintiff pays a defendant a supracompetitive price pursuant to a contract that violates the Sherman Act?

*Hanover Shoe* does not answer this question. There, the plaintiff was asserting that the defendant had monopolized the shoe-making machinery market in violation of Section 2 of the Sherman Act. The plaintiff claimed that the defendant was therefore able to damage the plaintiff by refusing to sell certain categories of machinery to the plaintiff, demanding that the plaintiff continue to lease machinery instead. 392 U.S. at 483-85. The Supreme Court concluded that because the defendant's conduct "constituted a continuing violation," damages arising from its refusal to sell shoe-machinery to the plaintiff within the four years prior to the suit was not barred by the statute of limitations even though "the earliest impact on [the plaintiff] of [the defendant's] lease only

policy occurred in 1912." *Id.* at 502 n.15.  Each refusal to sell was a new

actionable act.

In the case at bar, by contrast, each allegedly supracompetitive price that

Sabre charged US Airways was pursuant to either the 2006 or 2011 contract—

agreements binding the parties.  US Airways has failed to identify, and we are

not otherwise aware of, authority to support the proposition that each act taken

in performance of a contract necessarily constitutes an overt act for purposes of

the continuing-violation rule.  As the district court acknowledged, "[c]ourts in

this Circuit differ as to whether and when the performance of a contract

constitutes an overt act." *US Airways*, 105 F. Supp. 3d at 278.  One court has

concluded that "[p]erformance during the limitations period pursuant to an

illegal prelimitations contract can constitute an overt act if resulting damages

were speculative" at the time of contracting.  *Rite Aid Corp. v. Am. Express Travel*

*Related Servs. Co., Inc.*, 708 F. Supp. 2d 257, 269 (E.D.N.Y. 2010).  Another has

adopted a more categorical rule concluding that "the performance of an allegedly

anticompetitive, pre-existing contract is not a new predicate act." *In re*

*Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 229 (E.D.N.Y.

2003). Under neither approach, however, do all sales pursuant to a contract constitute new potentially actionable acts.

The Sixth, Eighth, and Ninth Circuits have adopted something akin to the more categorical rule articulated in *Ciprofloxacin*. The Sixth Circuit has concluded that "[a]n overt act that restarts the statute of limitations is characterized by two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff." *DXS, Inc.*, 100 F.3d at 467 (internal quotation marks omitted); *see also Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999) ("[E]ven if the payment agreement constituted a continuing violation . . . the individual payments . . . were only a manifestation of the previous agreement. The individual payments therefore do not constitute a 'new and independent act,' as required to restart the statute of limitations."); *Varner v. Peterson Farms*, 371 F.3d 1011, 1019-20 (8th Cir. 2004) ("Performance of the alleged anticompetitive contracts during the limitations period is not sufficient to restart the period." (citations omitted)); *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) ("[T]he passive receipt of profits from an illegal contract by an antitrust defendant is not an overt act of enforcement which will

restart the statute of limitations.").  We agree.  A contract is a vehicle for

determining at the time of contracting what should happen at some time

thereafter.  So, like the Sixth, Eighth, and Ninth Circuits, we think of the

performance of a contract as a manifestation of the "overt act," the decision to

enter the contract, rather than an independent overt act of its own.

We thus conclude that each supracompetitive price charged to US Airways

by Sabre pursuant to the 2006 contract was not an overt act of its own, but a

manifestation of the prior overt act of entering into the 2006 contract.  That act,

which began the running of the statute of limitations, was performed more than

four years prior to the filing of this action.  We therefore affirm the district court's

decision to limit US Airways's damages to those arising out of US Airways's 2011

contract with Sabre and prior to the execution of the 2012 settlement agreement

with US Airways's parent corporation, which contained a non-contestability

clause and a covenant not to sue for seven years.  *US Airways*, 105 F. Supp. 3d at

273, 279.

## CONCLUSION

The district court did not—as *Amex II* now requires in cases involving two-

sided transaction platforms like Sabre—instruct the jury that the relevant market

must include both sides of the platform as a matter of law. We therefore cannot

affirm the judgment of the district court based on the pre-*Amex II* verdict of the

jury. But we also conclude, based on the evidence that *was* before the jury at the

time it rendered its verdict, that under instructions consistent with *Amex II*, the

jury could have rendered (not would have been required to render) a proper

verdict in favor of US Airways on Count 1. We also conclude that the district

court was correct in its limitation of US Airways's damages following Sabre's

motion for summary judgment, but incorrect in its judgment to dismiss Counts 2

and 3 of US Airways's complaint.

Finally, we are, as always, aware that any remand on our part after trial,

verdict, and judgment may make previous efforts in the district court seem in

retrospect to have been painfully wasteful. Rarely is that more so than in this

case in light of the extraordinary efforts of the district court seeking to navigate

particularly vexing, shifting legal winds in the face of complex facts and a

challenging jurisprudence. So too the immense efforts and expense of counsel,

and fact and expert witnesses, on both sides. For the foregoing reasons, though,

we think ourselves bound to AFFIRM in part, but REVERSE in part, VACATE in

part, and REMAND to the district court for further proceedings consistent with

this decision.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

59