UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| US AIRWAYS, INC., FOR AMERICAN AIRLINES, INC., AS SUCCESSOR AND REAL PARTY IN INTEREST,<br><br><br>Plaintiff,<br><br>-against-<br><br>SABRE HOLDINGS CORPORATION; SABRE GLBL INC.; and SABRE TRAVEL INTERNATIONAL LIMITED,<br><br>Defendants. | Civil Action No. 1:11-cv-02725 (LGS)<br><br>**REDACTED SIXTH AMENDED**<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

1.     Plaintiff US Airways, Inc., for American Airlines, Inc., as Successor and Real Party in Interest[1] ("Plaintiff"), brings this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants Sabre Holdings Corporation; Sabre GLBL Inc.; and Sabre Travel International Limited (collectively "Sabre") for injuries sustained by Plaintiff by reason of Sabre's violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.  Plaintiff demands a trial by jury.

## INTRODUCTION AND SUMMARY

2.     Sabre operates the largest Global Distribution System ("GDS") in the United States. A GDS provides travel agents with information on schedules and fares offered by participating airlines and the ability to book tickets.

---

[1] "American Airlines" and "American" refer to American Airlines, Inc. as it existed prior to its merger with US Airways.  "US Airways, Inc., for American Airlines, Inc., as Successor and Real Party in Interest" and "American, as Successor to US Airways" refer to the merged American-US Airways entity.

3.      Travel agents use GDSs for virtually all of the airfares they book.  Many travelers – including high-value business travelers that comprise a significant portion of airline revenues – will only purchase tickets through a particular travel agent, for example the travel agent with which their company has an agreement.  Business travelers who are subject to corporate travel policies are generally required to purchase tickets through the large traditional travel agency specializing in managed corporate travel (Travel Management Company, or "TMC") that has been selected by the traveler's employer.  Business travelers generally do not use online travel agencies ("OTAs"), which service almost exclusively leisure travelers.  Through a variety of anticompetitive practices and agreements, GDSs lock travel agents into their system, so those travel agents effectively become unable and unwilling to provide their customers with alternative, more efficient connections to airlines.  In this way, GDSs are the bottleneck between airlines and the travelers that use travel agents, including the high-value business traveler.  As a result, the United States Department of Justice ("DOJ") has recognized:  "Each [GDS] provides access to a large, discrete group of travel agents, and unless a carrier is willing to forego access to those travel agents, it must participate in every [GDS]."  Comments of the Department of Justice to the Notice of Proposed Rulemaking Computer Reservation System Regulations 2 (Sept. 19, 1996).

4.      Traditional travel agencies typically do not pay to use GDSs.  To the contrary, the GDSs often pay travel agents so-called "incentives."  Those payments are "kickbacks" or "inducements" to use a particular GDS and represent sharing by the GDSs of the supracompetitive booking fees they extract from the airlines.  GDSs pay particularly high incentives to the handful of large TMCs that dominate managed corporate travel.

5.      Between 2006 and 2012, Sabre paid the four largest TMCs – American Express GBT, Carlson Wagonlit Travel, Hogg Robinson Group, and BCD Travel – more than $1.2 billion

in incentive payments.  Traditional travel agents greatly benefit from these shared monopoly rents, and as explained below, they work with Sabre to help Sabre preserve its market and monopoly power, so that Sabre can continue to extract its supracompetitive "booking fees" and share a portion of them with the travel agents.

6.      During the period covered by this complaint, US Airways, Inc. ("US Airways") paid tens of millions of dollars each year for bookings made through the Sabre GDS notwithstanding that it was *US Airways' fare and travel content that was booked through the Sabre network in the first place*.  As the United States Department of Transportation ("DOT") has recognized, GDS fees "exceed competitive levels."  Computer Reservations System Regulations, 69 Fed. Reg. 976, 990 (Jan. 4, 2004).

7.      Three companies – Sabre, Travelport, and Amadeus – control all of the GDSs in the United States.  Sabre is the largest.

8.      Because of Sabre's tight grip on access to corporate travelers, airlines that depend on corporate travelers depend on Sabre for a significant portion of their revenues.  For example, from 2010 to 2012, over *35%* of US Airways' revenue (amounting to *over $3.5 billion* annually) was booked through Sabre.  If US Airways had lost the revenue booked through Sabre, the airline would likely have been forced into bankruptcy.  Other airlines are also dependent on Sabre.

9.      Rather than compete on the merits, Sabre has used its leverage over airlines such as US Airways to entrench its antiquated and inefficient technological systems, to preserve its supracompetitive booking fees, and to harm competition.  Sabre's technology has hardly changed from your grandfather's distribution system and was long ago left in the dust by new, innovative solutions that are web-based and take advantage of the networked economy.  Sabre's grasp over

travel agencies and the exercise of their market power and monopoly power over airlines have stifled these new offerings.

10.     Because of its market and monopoly power, Sabre has successfully forced airlines in the United States to accept its contracts with competitive restraints that perpetuate Sabre's anticompetitive business model.  In 2006, and again in 2011, Sabre used its monopoly power to force US Airways to enter into contracts with Sabre that contained numerous oppressive and anticompetitive terms designed by Sabre to harm competition and entrench Sabre's dominance. US Airways had no choice but to sign the agreements, which it did under protest, or face a complete shut off from Sabre's network.

11.     The 2011 agreement (like the 2006 agreement) required that US Airways provide Sabre "full content" – that is, US Airways was required to offer all content relating to its airfares through Sabre before US Airways could provide that content to the public through any other means.  It also prevented US Airways from providing content through any other means including directly to the public unless it also provided that content to Sabre – even though competition would clearly have been enhanced if US Airways could have provided this information first to lower cost distribution channels, such as web-based alternatives.  Sabre stressed that "full content" was an absolute requirement for any participation in its GDS.  The DOT previously acknowledged that such heavy-handed tactics raise serious concerns under the antitrust laws: "a [GDS]'s demand that an airline provide all publicly-available fares as a condition to any participation would be anti-competitive."

12.     Sabre imposed other anticompetitive restrictions on US Airways as described in this complaint, including provisions designed to restrict US Airways' ability to use lower-cost, more-efficient "direct connections" with travel agents.   One such restriction prohibited US

Airways' use of any direct connection with a travel agent. Such a connection would allow travel agents to search for, compare, and book tickets directly using each airline's computer system instead of a GDS, and be much less costly. Innovative and low-cost direct connection aggregators, such as Farelogix, enable travel agencies to utilize direct connections from multiple airlines and compare schedules and fares across airlines. With advanced technological systems and lower pricing, such innovative aggregators have represented the prospect of a better, lower-priced alternative to Sabre's antiquated technology and supracompetitive fees.

13.    Sabre has not permitted airlines to steer customers to lower-cost direct channels or to use Sabre's innovative and low-cost nascent competitors. Instead, Sabre has engaged in a wide variety of anticompetitive conduct designed to eliminate these threats and preserve Sabre's monopoly power over US Airways and other airlines.

14.    As described in more detail throughout this complaint, Sabre's exclusionary conduct has included:

- Imposing onerous and anticompetitive contractual requirements on airlines, including US Airways, for the purpose of maintaining Sabre's monopoly.

- Taking retaliatory actions against airlines that dared to challenge Sabre's anticompetitive model, including working with travel agents to allow the manipulation of their flight displays in a manner that would effectively deny the agent's clients bookings on the offending airline.

- Entering into *de facto* and *de jure* exclusive agreements with travel agents designed to maintain Sabre's monopoly and undertaking anticompetitive conduct designed to co-opt travel agents into financial dependence on the monopoly rents Sabre extracts from airlines.

- Raising barriers to entry for any potential new competitors and quashing or acquiring technology companies that sought to facilitate lower-cost distribution alternatives.

- Imposing unreasonable switching costs faced by travel agents through a variety of conduct, including the bundling of the Sabre GDS with ancillary tools and services.

- Refusing to distribute US Airways airfares at any rate unless US Airways acquiesced to Sabre's onerous and exclusionary practices that perpetuate Sabre's monopoly power.

15.     Since the government deregulated GDSs, Sabre has successfully excluded competition from new entrants and new technologies.

16.     Sabre's conduct has distorted competition, harming consumer and airline welfare through higher prices, lower quantity, less choice, and reduced innovation relative to what would have existed if Sabre had not foreclosed competition on the merits.

17.     Sabre possessed market and monopoly power dating back to before GDS deregulation in 2004.

## **PARTIES**

18.     At times relevant to the allegations in the complaint, original Plaintiff US Airways was a Delaware corporation with its headquarters located at 111 West Rio Salado Parkway, Tempe, Arizona 85281.  US Airways was a major United States air carrier, which was formed in 1982 and grew to employ more than 31,000 employees and to serve approximately 80 million passengers each year.  In 2005, America West Airlines ("America West") and US Airways merged; the resulting combined company operated as US Airways.

19.     On February 13, 2013, US Airways entered into a merger agreement with American Airlines, and until December 30, 2015, it operated as a subsidiary of American Airlines' parent, American Airlines Group.  On December 30, 2015, American Airlines Group formally merged US Airways into American Airlines, Inc., and US Airways' assets and liabilities – including the claims set forth in this complaint – became American's.  On March 22, 2017, this Court recognized the "current legal realities of the relationship between US Airways and American Airlines, Inc." and ordered that the case caption reflect that American is US Airways' Successor and Real Party in Interest.  *US Airways, Inc. v. Sabre Holdings Corp.*, 11-cv-2725 (LGS) (S.D.N.Y.), Mar. 22, 2017 Order, Dkt. No. 884.

20.     Defendant Sabre Holdings Corporation ("Sabre Holdings") is a Delaware corporation with its headquarters located at 3150 Sabre Drive, Southlake, Texas 76092.  It is the sole subsidiary of Sabre Corporation.  Sabre operated as a single enterprise for purposes of dealing with US Airways.  In US Airways' dealings with Sabre, Sabre Holdings was responsible for contracting and negotiating and has indicated it likewise corresponds with and negotiates contractual terms with other airlines and others on behalf of all Sabre-owned entities and directs all Sabre-owned entities on their actions related to those arrangements.

21.     Sabre GLBL Inc. is a Delaware corporation with its headquarters located at 3150 Sabre Drive, Southlake, Texas 76092.  Sabre GLBL Inc. is wholly owned by Sabre Holdings and is the principal operating subsidiary and sole direct subsidiary of Sabre Holdings.

22.     Sabre Travel International Limited ("Sabre Travel") is a corporation organized under the laws of Ireland.  On information and belief, Sabre Travel is nominally headquartered at 25/28 North Wall Quay, Dublin 1, Ireland, however, Sabre Travel's principal place of business is located at 3150 Sabre Drive, Southlake, Texas 76092.  On information and belief, Sabre Holdings uses Sabre Travel as a corporate vehicle for holding contracts with airline participants in the Sabre Global Distribution System ("Sabre GDS"), including US Airways.  On information and belief, Sabre Travel neither owns nor operates the Sabre GDS, and Sabre GLBL Inc. in reality performs the services that Sabre Travel is obligated to perform under its contracts with airlines.

23.     Various other persons, firms and corporations, not presently named as Defendants, performed acts and made statements in furtherance of the illegal actions described below.

## **JURISDICTION AND VENUE**

24.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, Section 4 of the Sherman Act, 15 U.S.C. § 4, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

25.     Venue is proper in this district under 15 U.S.C. §§ 15 and 22, and under 28 U.S.C. § 1391 (b) and (c) because:  (1) Sabre transacts business and is found within this district; and (2) Sabre is subject to personal jurisdiction in New York.  Moreover, Sabre's agreements with US Airways required that suit be brought within this district.

## TRADE AND INTERSTATE COMMERCE

26.     During the period covered by this complaint, Sabre manufactured, sold and/or distributed its products or services in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the state in which the Sabre's products and services originated.  Indeed, according to Sabre, over $80 billion in transactions flow through Sabre's systems each year.  The illegal activities of Sabre, as described in this complaint, were within the flow of and had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## BACKGROUND FACTS

*A.*     ***Access to Travel Agencies, Which Rely on GDSs, is Critical for US Airways' Survival***

27.     At times relevant to the allegations in the complaint, US Airways, like other major air carriers, sold tickets to consumers through travel agencies.  Bookings made through travel agents accounted for over 65% of US Airways' annual revenues.

28.     Travel agencies book flights through a GDS.  In the United States, there are three GDSs:  Sabre, Travelport, and Amadeus.  No new GDS outside of these three (and the entities they own or have acquired) has successfully launched in more than three decades.  If an airline does not "participate" in a particular GDS, that airline will receive virtually no bookings from the travel agents that subscribe to that particular GDS.  Accordingly, booking of tickets through the GDSs' platforms has been essential for the survival of a major air carrier like US Airways.  The DOJ and the DOT have recognized the carriers' dependence upon the GDSs, stating that "[e]ach [GDS]

provides access to a large, discrete group of travel agents, and unless a carrier is willing to forego access to those travel agents, it must participate in every [GDS]."

29.     The sheer magnitude of revenue that was at stake for US Airways if it had lost access to Sabre shows Sabre's power.  At times relevant to the allegations in the complaint, sales by US Airways through Sabre accounted for over 35% of US Airways' annual revenue.  Over *three and a half billion dollars* of US Airways' revenue flowed through Sabre annually.

30.     Industry studies confirm this dependence.  According to the American Society of Travel Agents' 2011 GDS Report, 76% of all travel agencies use one GDS and two-thirds of agencies have used the same GDS for over 16 years.  The same survey reports that the average length a travel agency maintains its relationship with a GDS is 19 years, and 95% of agencies remained with their primary GDS between 2009 and 2011.  In other words, agencies tend to use one GDS and rarely switch their GDS.

**B.      *US Airways Had No Alternative Other Than Sabre to Reach Travel Agencies that Subscribe to Sabre's Platform***

31.     Like other airlines, US Airways had no effective method to reach the traditional travel agencies subscribing to Sabre, and in particular the Sabre-connected offices of the TMCs that serve the majority of business travelers, other than through participation in Sabre – and payment of its monopoly booking fees.  Sabre has undermined or eliminated the competitive alternatives that US Airways might otherwise utilize to connect to travel agencies.  The GDSs' anticompetitive conduct includes co-opting their subscribers through a system of "kickbacks" or "inducements," eliminating the threat of web-based competition from OTAs (through acquisition or co-option), diminishing the threat of innovative third-party solutions, such as Farelogix, and undermining airlines' own efforts to access travel agents directly through the Internet or otherwise.

### 1.   *Sabre Has Co-Opted Travel Agencies Subscribing to its Booking Platform*

32.     Approximately fifty years ago, airlines began to develop electronic reservations systems that would provide travel agents with access to the airlines' internal reservation systems. The airlines eventually divested their ownership interest in these systems, which were initially known as Computerized Reservation Systems, or CRSs, and are now known as Global Distribution Systems or GDSs.

33.     Most of the important traditional travel agents, which generate the lion's share of airline revenues, grew up under the GDS model and have a cozy relationship with one of the three dominant GDS platforms, including Sabre.  Indeed, over time these travel agents have become fully dependent on one of the GDS platforms and its antiquated technology.  The GDS into which an agency is locked continues to serve as the center of that agency's information technology systems.  In order to prevent those agencies from switching to other distribution technologies or even to other GDSs, each GDS has built or acquired some of the most crucial peripheral systems these travel agents use, including user interfaces, customer service systems, and accounting systems.  In industry terminology, these peripheral systems are often grouped into front-, mid-, and back-office categories.  GDSs have refused to permit innovative alternative distribution technologies to connect with their peripheral systems.  The sheer expense of these peripheral systems – in addition to the GDSs' refusal to permit innovative alternative distribution technologies to connect to these peripheral systems – has resulted in more travel agencies using only one GDS that integrates the travel agency's front-, mid-, and back-office peripheral systems.

34.     Accordingly, most traditional travel agencies are "locked in" to a particular GDS. For others, Sabre has admitted to entering into exclusive agreements that preclude the agency using a rival GDS.

35.     In addition to the enormous costs a travel agent would face attempting to switch from Sabre to another GDS, there also is no incentive to do so because – contrary to the laws of economics – the GDSs *pay* the travel agencies to book on their platforms.  Because of these "kickback" payments, GDSs and travel agents are aligned in their desire to protect GDSs from competition and thereby to see GDSs maximize the booking fees paid by airlines:  the higher the booking fees that GDSs receive from airlines, the more GDSs may be willing to pay to travel agents in kickbacks.

36.     The DOT highlighted the perverse competitive incentives created by this kickback scheme:  the "incentive payment programs" – i.e., the kickback payments to a travel agency for making most of its bookings through the GDS – "used by the systems encourage travel agencies to choose the system that is the *most expensive* for participating airlines."  DOT Computer Reservations System Regulations, 69 Fed. Reg. 976, 989 (Jan. 4, 2004) (emphasis supplied). These fees are ultimately "paid by participating airlines."  The DOT correctly observed that the GDSs' "incentive programs" "tended to preserve the systems' market power and denied airlines an opportunity to encourage travel agencies to use alternative electronic means for obtaining information on airline services and making bookings, such as direct links between a travel agency and an airline's own internal reservations system."  *Id.* at 981.

37.     Sabre also locks in travel agents by tying the magnitude of these kickbacks to the frequency of the agents' use of Sabre's platform.  Sabre's contracts with many of its travel agencies require either a minimum number of monthly bookings or institute some type of productivity pricing that penalizes agencies that begin using another channel for bookings.  American Society of Travel Agents, *Global Distribution System (GDS) Report* 9-12 (May 2010) (noting that over one-third of Sabre subscribers responding to the survey reported having productivity pricing

contracts).  For example, Sabre's contracts with travel agencies often impose penalties on travel agencies if they do not meet certain "volume thresholds" for bookings through Sabre.  Sabre's publicly available contracts indicate that Sabre specifically references these "volume thresholds" in contracts with travel agencies.  *See, e.g.*, Sabre Subscriber Agreement effective December 31, 1998.  A Senior Vice President at Sabre has acknowledged that "it is increasingly difficult for agencies to predict their booking volume.  This puts agencies in jeopardy of not meeting segment requirements and facing fines."  *Travel Agent Magazine*, Mar. 2004.  This system of penalties and threats deters the agencies from trying to book through new or innovative channels.

38.     Furthermore, many of Sabre's agreements with travel agents also contain provisions that impose additional charges on an agency if that agency exceeds a preset "transaction ratio" threshold, that is, if it engages in a high number of "transactions" (broadly defined) on an alternative distribution platform.  *See, e.g.*, Sabre Subscriber Agreement with Global Discount Travel Services; Sabre Subscriber Agreement effective December 31, 1998.

39.     Finally, GDSs also provide other kickbacks to travel agents such as free equipment, equipment funds, debt forgiveness, waiver of shortfall penalties, or credit for future shortfalls.  American Society of Travel Agents, *Global Distribution System (GDS) Report* 14 (May 2010) (noting various "incentives" provided by GDSs to travel agents, including financial incentives, debt forgiveness, and equipment).  In this manner, the travel agents cease to act as traditional independent customers of Sabre free to serve the best interests of their own customers, and instead become co-dependent with the GDSs, sharing in the supracompetitive fees Sabre extracts from the airlines in exchange for helping to preserve Sabre's monopoly power and protecting Sabre from lower-cost, more innovative competitors.

    **2.**     ***Rather Than Being Formidable Competitors to Sabre and the GDSs, OTAs Have Been Acquired or Otherwise Co-Opted***

    40.     At the time of deregulation of the GDS industry in 2004, the DOT recognized that GDSs retained market power over airlines. Specifically, the DOT concluded that "the [GDSs] continue to have market power over airlines … and that [GDSs] could engage in practices that could unreasonably preserve their market power." Computer Reservations System Regulations, 69 Fed. Reg. 976, 986 (Jan. 4, 2004). Likewise, in comments submitted to DOT, the DOJ recognized that "[t]he airlines' [GDS] divestitures leave unaffected the incentive and ability of [GDSs] to fully exercise their market power in nonstrategic ways." Reply Comments of the Department of Justice to the Notice of Proposed Rulemaking Computer Reservation System Regulations 21 (June 9, 2003). Thus, according to *both* agencies, the fact that the airlines no longer had ownership interests in the GDSs did not eradicate all competitive concerns from the industry.

    41.     Nonetheless, the DOT cited four primary reasons to continue with deregulation. First, the DOT concluded that the airlines' divestiture of their ownership interests in the GDSs made it less likely an individual GDS would favor one airline over another. Second, the DOT believed that forthcoming technological changes – including the availability of distribution via the Internet – would operate as a check on the GDSs' significant market power. Third, the DOT believed that airlines' ability to control access to their content, including webfares – i.e., discount fares offered by an airline through its own website or through selected distribution channels – would reduce the GDSs' market power. Fourth, the DOT believed that vigorous antitrust enforcement would help ensure competitive markets. *See* Computer Reservations System Regulations, 69 Fed. Reg. 976 (Jan. 4, 2004).

    42.     Indeed, the DOT was hopeful that Internet-based companies, such as OTAs, would begin competing with the GDSs by "developing direct connection technologies which enable

bookings to be made directly with an airline's internal reservations systems, bypassing [GDSs]." Similarly, the DOJ expressed hope that "[a] low-cost distribution channel on the Internet" offered a gathering competitive threat even though such a channel "may not offer the same level of functionality as a [GDS], but may nonetheless be able to attract usage by travel agents if it has preferential access to desirable fares and inventory from a significant number of airlines." Reply Comments of the Department of Justice to the Notice of Proposed Rulemaking Computer Reservation System Regulations 26 (June 9, 2003).

43.     Contrary to the hopes and expectations of the DOJ and DOT in 2004, the GDS industry remains non-competitive and inefficient, and the structural flaws identified by the DOJ and DOT remain and, in many cases, have flourished. The GDSs have frustrated virtually every assumption the DOT and DOJ made about possible new entrants and the ability of airlines to use their content to bargain against the powerful GDSs. For example:

- DOT believed that Internet-based companies, such as Orbitz, would enter into competition with the GDSs. *See* Computer Reservations System Regulations, 69 Fed. Reg. 976, 1001 (Jan. 4, 2004). But Orbitz is now owned in large part by Travelport, a GDS, and other online travel agencies are owned by, or have become heavily dependent on, the GDSs.

- DOJ envisioned "[a] low-cost distribution channel on the Internet" that "may … be able to attract usage by travel agents if it has preferred access to desirable fares and inventory from a significant number of airlines." Reply Comments of the Department of Justice to the Notice of Proposed Rulemaking Computer Reservation System Regulations 26 (June 9, 2003). No such system has developed in part because airlines have been unable to provide preferred access to fares due to the fact that GDSs refuse to deal with airlines unless the airlines provide "full content" to the GDSs and unless the airlines agree to other restrictions limiting the ability of airlines to use alternative distribution channels. The GDSs have also acted to raise switching costs faced by travel agents.

- DOT believed that "airlines' ability to change their participation levels and their control over access to webfares is reducing the systems' market power." Computer Reservations System Regulations, 69 Fed. Reg. 976, 989 (Jan. 4, 2004). But Sabre's power has stayed constant and US Airways was forced to provide access to webfares to Sabre, because Sabre refused to deal with US Airways unless it provided "full content."

- DOT envisioned airlines being able to "use their control over webfares to win better terms for [GDS] participation." *Id.* at 1007. Although US Airways was able to obtain some improvements in segment fees as a result of deregulation, these fees were not at competitive levels and US Airways was left with little choice but to provide full content. More importantly, as US Airways experienced, there was, and continues to be, no option available for "better terms" for providing this content to the GDSs, because the GDSs simply refuse to deal with airlines unless the airlines provide "full content" to the GDSs.

- The DOT stated that "[v]igorous enforcement of antitrust policy is the discipline by which competition can remain free and markets can operate in a healthy fashion." *Id.* at 978. Airlines need the antitrust laws enforced against the GDSs to foster competition and innovation.

44.     The failure of OTAs and other Internet channels to develop into a competitive threat to GDSs has been particularly apparent. As mentioned above, far from acting as competitors, the GDSs have taken ownership stakes in several of the major OTAs. Moreover, where the GDSs do not have a significant ownership stake in OTAs (such as Expedia and Hotwire, which are customers of the GDSs), they have co-opted them in much the same manner as they have their other travel-agency subscribers. Other Internet companies, such as search engines like Google and so-called travel "meta-search" websites such as Kayak and Tripadvisor are not GDS competitors, but merely direct Internet users to OTAs or airline websites where a user can book a flight. Likewise, a search technology company like ITA Software does not compete with the GDSs. ITA Software does not provide booking capabilities.

45.     Further, OTAs do not provide a pathway for airlines to connect to most high-value business travelers, who overwhelmingly must book through traditional travel agencies, and in particular a few large TMCs. Unlike traditional travel agencies (and TMCs in particular), OTAs primarily serve leisure travelers, not business travelers.

### 3. Sabre Has Successfully Suppressed Nascent More-Efficient, Lower-Cost Competition From Third Parties

46.     One potential source of competition comes from vendors that can allow a travel agent to aggregate travel content from multiple sources in an efficient manner.  These vendors, such as Farelogix, rely upon modernized technologies rather than the antiquated systems still in use by the GDSs.  With their new technologies, aggregators like Farelogix have the capability to replace the GDS at the center of a travel agent's system with a content aggregator that aggregates content feeds from multiple GDSs and/or direct content feeds from airlines.

47.     This possible distribution alternative would allow direct connections from airline booking systems to connect to travel agencies' front-, mid-, and back-office applications parallel to the GDS already in place.  This would allow an airline's content to be searched and booked by the travel agencies without any additional fees to the customer or expense to the agency through a standalone booking tool.

48.     Sabre has acted to prevent potential rivals from interfacing with Sabre's front-, mid-, and back-office products.   For example, in January 2009, Sabre terminated its authorized-developer agreement with Farelogix, meaning that travel agent customers of Farelogix could no longer retrieve content from Sabre through Farelogix's platform and instead had to go directly through Sabre.

49.     Through authorized-developer agreements, Sabre allows authorized third-party applications developers to obtain access to its application programming interfaces ("APIs").  The Sabre GDS APIs allow applications to interact with the Sabre GDS and Sabre's front-, mid-, and back-office products.

50.     Sabre admitted that it terminated Farelogix's API access because "[i]t became clear to us that they [Farelogix] are actually actively encouraging fragmentation and some new

economic models that we don't think were balanced, which is fundamentally different from our philosophy on content." David Jonas, *AA: Next Airline-GDS Deals to Center on Optional Services*, Business Travel News, Feb. 19, 2009 (quoting Sabre Travel Network Senior Vice President Chris Kroeger).

51.     Sabre terminated Farelogix because it was concerned about the nascent competition Farelogix was providing to Sabre's "economic model." *See* Dennis Schaal, *U.S. Dept. of Justice begins Sabre-Farelogix Inquiry*, Tnooz (Oct. 5, 2009), http://www.tnooz.com/2009/10/05/uncategorized/u-s-dept-of-justice-begins-sabre-farelogix-inquiry/. As a result, Farelogix has been unable to gain significant adoption, despite the fact that according to Farelogix, its technology costs airlines "about … 80%" less than the traditional GDSs.

52.     Similarly, Sabre ended Booking Builder's authorized developer agreement because the Booking Builder tool, which aggregated GDS and non-GDS content, was popular with travel agents that subscribed to Sabre and could ultimately threaten to disintermediate the Sabre GDS.

53.     Sabre's policies further raise barriers to entry by making it very difficult and uneconomic for Sabre-subscribing travel agents to book airfares through alternative distribution platforms. Sabre charges exorbitant "passive segment fees" for merging bookings made through other distribution platforms into the Sabre system, deterring travel agents from booking outside Sabre. Further, Sabre uses "Like Fare" provisions to require travel agents to book fares through Sabre rather than alternative distribution platforms unless the fare on the alternative distribution platform is significantly cheaper than the fare available through Sabre. A distributor that offers modestly cheaper fares than Sabre likely will not be able to gain a foothold with Sabre subscribers due to these provisions.

54.     Direct connection systems, such as those enabled by Farelogix, have existed for years and are proven technologies that have been used by some large airlines, such as Southwest Airlines, to connect directly with large travel agencies.  Sabre has prevented competition from direct-connection alternatives through its anticompetitive contractual restraints and other actions directed at potential competitors.  Sabre thus prevented US Airways and other airlines from taking advantage of distribution alternatives that were cheaper and more technologically advanced than the antiquated Sabre GDS.

55.     In December 2010, Sabre made public statements decrying airline direct connects as "costly and unproven" in contrast to the supposedly "successful and proven system" of the legacy GDSs.  Michele McDonald, *Industry Groups:  AA's Direct-Connect Strategy Is Costly and Unproven*, Travel Market Report, Dec. 27, 2010 (quoting Sabre Senior Vice President Chris Kroeger).  Sabre has been fearful of the nascent competitive threats presented by direct connections and Farelogix that it refers to as "one-off connections" that "disrupt" the GDS platform irrespective of the obvious benefits this alternative channel delivers to consumers and to travel agencies.  Sabre has been and remains concerned about the disruptive effect the "direct connection" efforts could have on the anticompetitive and monopolistic profits that Sabre has enjoyed over the years.

56.     Every other new entrant that has attempted to enter the GDS industry in more than three decades has failed.  For example, G2 Switchworks attempted to enter the GDS industry but did not succeed and was eventually acquired by Sabre's private equity owners, who sold the underlying intellectual property to Travelport and liquidated the company.

### 4.     *Sabre Has Successfully Maintained its Market and Monopoly Power by Exclusionary Retaliation Against Any Airline that Challenged It*

57.     When faced with airlines attempting to disrupt Sabre's anticompetitive model, Sabre retaliated against those airlines through a variety of techniques including "biasing."  Biasing

refers to the practice of manipulating the position of fare and flight availability on the Sabre GDS display viewed by travel agents.  The DOJ has recognized that "[b]ias is the most objectionable method of exercising market power because it misinforms agents and consumers in a way that other exercises of market power do not."  This is due to the fact that "[i]t is fairly clear that a flight's sequence in a [GDS] … display has a direct effect on the flight's potential sales, with most sales coming from flights that appear on a system's first page."  U.S. Department of Justice, *Comments of the Department of Justice*, Notice of Proposed Rulemaking—Carrier-Owned Computer Reservations Systems, Docket No. 41686 (Apr. 26, 1984); U.S. Department of Justice, *Comments and Proposed Rules of the Department of Justice Before the Civil Aeronautics Board*, Advance Notice of Proposed Rulemaking—Airline Computer Reservations Systems, Docket No. 41686 (Nov. 17, 1983).  Examples of Sabre's  exclusionary biasing and other retaliatory actions to preserve its monopoly power include:

58.     ***Northwest Airlines***.  In 2004, Northwest Airlines announced an effort to induce travel agents to book directly on Northwest's website by introducing a fee to offset some of the greater cost incurred with GDS bookings.  Sabre responded by suing Northwest and publicly announcing that in retaliation for Northwest's efforts, Sabre would begin biasing its GDS display against Northwest.  *Sabre Inc. v. Northwest Airlines, Inc.*, No. 4-04-CV-612-Y (N.D. Tex.); Northwest Airlines Aug. 25, 2004 Press Release.  Al Lenza, Northwest's former Distribution Director, testified in the *US Airways v. Sabre* trial in this Court that Sabre carried out this threat by coordinating a campaign of commercial retaliation with its travel agents to pressure Northwest to lift the new fee that Northwest had announced.  Former Sabre software developer Madeline Gray testified at trial that Sabre's biasing techniques against Northwest included manipulating the order in which Northwest flights appeared on the GDS screen used by travel agents to book through

Sabre so that travel agents were less likely to book Northwest flights.  She explained that Sabre directed its employees to ratchet up their use of biasing techniques against Northwest to produce greater Northwest revenue declines.

59.     Sabre's successful biasing campaign included blocking travel agents from booking Northwest's lucrative international seats through Sabre.  Specifically, Sabre biased Northwest such that "anybody using Sabre [to book on Northwest] would think their flights were full."  As a result of the first week of Sabre's biasing, Northwest estimated it lost "nearly $50 million in revenue just for that week."  *US Airways, Inc. v. Sabre Holdings Corp.*, 11-cv-2725 (LGS), Trial Tr. 5202:9.  Northwest then cancelled its announced fee only one day after it had been implemented and eight days after it was announced.

60.     ***American***:  During its 2006 negotiations with American, Sabre viewed American as a threat to Sabre's business model, ████████████████████████████████████ ████████████████████████████████████  As a result, Sabre executives felt that ████████████████████████████████████ ████████████████████████  Sabre hatched a plan to make American relent, ████ ████████████████████████████████████████ ████████████████████████  During the 2006 negotiations American announced a surcharge to shift the booking fee cost.  Sabre retaliated ██████████████ ████████████████████████████████████████ ████████████████████████████████████████ Shortly after ████████████, Sabre and American signed a new distribution contract ████████ ████████████████████████████████████████ ██████

61.     Following the renewal of the American/Sabre agreement in 2006, ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████

62.     During the 2011 contract negotiations, Sabre responded to American's attempt to sell fares directly to travel agents by biasing American's fares in the GDS.  Sabre biased against American because American was attempting to induce travel agents to bypass GDSs and use a direct connection system involving Farelogix technology.  Pl.'s Amended Original Pet. & App. for TRO & Temporary Injunction at 14-15, *American Airlines, Inc. v. Travelport, Inc. et al.*, No. 067-249214 (Tarrant Cty. Tex. Dist. Ct. Jan. 10, 2011).  Moreover, Sabre carried out its biasing of American despite the fact that Sabre sacrificed profits as a result of this action. *Id.*  After just six days of biasing between January 5 and January 10, American had lost roughly $4.3 million in revenues, or $262 million on an annualized basis.  Having little choice, American surrendered, accepting Sabre's demands in a new distribution agreement that included price increases, full content, and parity and destroyed American's direct distribution channel.

63.     *Air Canada*.  Sabre also engaged in exclusionary retaliation against Air Canada when Air Canada became dissatisfied with the technological limitations of Sabre's service and stopped selling its lowest cost fares through the Sabre GDS.  Sabre retaliated by biasing Air Canada's lucrative trans-border first-class fares, imposing on Air Canada what Sabre itself estimated were ████████████ of dollars in passenger revenue losses.  Sabre then increased

Air Canada's booking fees year after year, ultimately raising them more than 80 percent.  Sabre later boasted that its sanctions forced Air Canada to report its Sabre-inflicted losses to investors: "[s]anctions hurt enough to make it to earnings call."

64.     *United*.  Gavin Molloy, formerly United's Manager of Strategic Sourcing, testified at trial in this action that when faced with a Sabre contract renewal, Sabre offered United two choices: (i) a contract with Sabre's key "full content" provision (described in more detail throughout this complaint) or (ii) a contract with full rack rates (i.e., exorbitant booking fees) and biasing.  Faced with this untenable choice, United relented:  "we would never put our revenue at risk by allowing a third party like Sabre to essentially manage the revenue on our behalf, through biasing.  And second of all, from a fiduciary responsibility and a cost management responsibility, we never would have agreed to rack rates at double teams per segment.  It just wouldn't have made any sense."  *US Airways, Inc. v. Sabre Holdings Corp.*, 11-cv-2725 (LGS), Trial Tr. 5153:15-5154:3.

65.     The lesson Sabre taught by punishing even large airlines that decided to challenge Sabre's high cost distribution model was not lost on the smaller, more vulnerable US Airways: develop or utilize alternative, more efficient technologies at your peril.  As explained in more detail below, US Airways experienced Sabre's exclusionary tactics first-hand in the course of its Sabre contract negotiation.

**C.     Sabre Worked with the Travel Agents to Maintain Sabre's Model and its Monopoly Power**

66.     Sabre used its power over the travel agents and agreements with the travel agents to entrench Sabre's anticompetitive hold over the airlines.  The travel agents have an obvious motive to help to preserve Sabre's market and monopoly power: kickbacks.  The greater Sabre's power over the airlines, the greater its ability to extract supracompetitive booking fees; and the

greater the booking fees, the greater the bounty Sabre can share with the travel agents. Sabre and the travel agents intimidated airlines from seeking more efficient distribution and foreclosing any opportunity the airlines may have had to lessen Sabre's market and monopoly power.

### 1. Sabre and the Travel Agents Entered into Agreements to Maintain Sabre's Monopoly and Market Power

67.     Sabre and the travel agents entered several written and oral agreements to preserve Sabre's monopoly power. First, Sabre has entered into agreements with travel agents (including OTAs) that require the agents' *de facto* or *de jure* exclusivity. For example, Sabre's agreements with travel agents contain terms relating to "volume thresholds," "transaction ratios," or similar terms. These agreements are intended to (and do) preserve Sabre's monopoly power by locking travel agents into Sabre and disincentivizing their use of other distribution channels, regardless of the benefits. By agreeing to these volume thresholds, travel agents are able to secure kickbacks and other benefits that Sabre pays out of the monopoly rents it extracts from airlines such as US Airways.

68.     In addition, throughout the time period relevant to this litigation, Sabre and the travel agents have entered into oral agreements to discourage airlines' challenges to Sabre's market dominance, and have taken overt acts in furtherance of those agreements. For example:

- In 2005, Sabre organized a coalition of travel agents to retaliate against America West and US Airways, both of which had contemplated implementing direct connects. ███████████████████████████████████████████████

- In 2006, Sabre again organized the travel agents against American Airlines,



- In 2007,



- In 2009, Sabre again used the travel agents to maintain its market power and monopoly power at the expense of American.



- In 2010, when Sabre terminated its contract with US Airways, Sabre developed an arrangement with some of the largest travel agents in the country to "call US and say that they will stop booking US for travel … and will start moving existing bookings to other airlines …" Sabre anticipated the resulting pressure would give US Airways no choice but to agree to yet another contract containing Sabre's anticompetitive full content restraints, which would only further entrench Sabre's market power and monopoly power.

- In 2010 and 2011, Sabre organized the travel agents again to sabotage American and entrench Sabre's hold over the market with a plan to book away from American and sow discontent about American's direct connect strategy.



### 2.   *Sabre and the Travel Agents Were Motivated to Maintain Sabre's Monopoly*

69.     Both Sabre and the travel agents had ample reason to keep Sabre entrenched as a monopolist.  Sabre obviously has a strong incentive to preserve its market and monopoly power, which allows it to extract supra-competitive booking fees from airlines.  And the travel agents benefit from those booking fees because Sabre shares a portion of them with the travel agents. Between 2006 and 2012, Sabre paid the biggest four travel agents at the time – AMEX, Carlson Wagonlit, BCD Travel, and Hogg Robinson Group – more than $1.2 billion in so-called "incentive fees."  As explained above, travel agents benefit from and are dependent on these kickbacks, which represent Sabre's sharing of its monopoly rents.

70.     The travel agents have acknowledged their financial dependence on Sabre and common interest with Sabre. ██████████████████████████████████████████ ██████████████████████████████████████████ This financial carrot motivates travel agents to help reinforce Sabre's model.

71.     Together, Sabre and its TMCs, in 2006, and again in 2010 and 2011, successfully deterred the airlines from challenging the Sabre monopoly and forced the US Airways and American Airlines, among others, to agree to Sabre's anticompetitive, full content contractual terms.

72.     Sabre and the travel agents worked to maintain Sabre's power over the airlines and to maintain the cycle of monopoly booking fees and shared monopoly rents.

**D.**     ***As a Result of Sabre's Exclusionary Conduct It Does Not Face Meaningful Competition***

73.     The GDS industry has become more concentrated since 2004 and now only three companies, Sabre, Travelport, and Amadeus, account for all of the GDS bookings in the United States.  Since deregulation, two formerly independent GDSs – Galileo and Worldspan – combined under a single entity, Travelport.  This drastically increased level of concentration has served only to increase barriers to new innovations, making them higher and nearly insurmountable.

74.     Sabre's fees have remained high, well above competitive marginal costs for the services.  GDS fees have far outpaced many other technology costs.  For example, according to press reports, in 1991 the cost of data storage per megabyte was approximately $13.00; in 2008 the cost per megabyte was approximately $0.01.  On the other hand, Sabre's fees have remained at artificially inflated levels over the same period.  Examples abound of dramatic price reductions that have followed improvements in computing and communication technologies, but GDSs, which are just computing and communication systems, stand out uniquely, having been able to use their market and monopoly power to block new technology from the market and, as a result, to buck the trend of plummeting prices.

75.     The fact that no firm has successfully entered the GDS industry since before regulation began in the early 1980s highlights the lack of competition and the barriers to entry potential entrants now face.

**SABRE'S UNLAWFUL AGREEMENTS
HARM US AIRWAYS AND COMPETITION**

76.     Sabre's anticompetitive and exclusionary conduct has artificially inflated US Airways' booking fees and has forced US Airways to use inefficient and costly methods to

distribute its tickets to travel agencies and travelers.  Nowhere is the impact of Sabre's conduct felt more acutely than in high-revenue (and critical) business travel.

77.     The anticompetitive agreements to which Sabre is party include (i) Sabre's 2006 agreement with US Airways; (ii) the 2011 agreement between Sabre and US Airways that culminated in the filing of this lawsuit; and (iii) agreements Sabre has entered with other airlines and travel agents.

## A.     The 2006 Sabre-US Airways Agreement:  Foreclosing Competition and Inflating Booking Fees

78.     US Airways entered into a Travel Marketing Amendment ("TMA") with Sabre that became effective January 27, 2006.  As extended, the term of the TMA ran at least through January 27, 2011, although it would automatically renew for successive one-year periods unless at least 90 days' written notice was provided by either party.

79.     Several provisions of the TMA are relevant to Sabre's foreclosure of competition and, specifically, to its undermining of US Airways' ability to connect directly with travel agents or otherwise reduce costs associated with distribution.  The primary provisions that restrict competition and some of their implications are discussed directly below.  They are grouped generally as addressing:  (1) "Full Content" provisions; (2) the "No Direct Connections" provision; (3) "Parity" provisions; and (4) the "No Surcharge" provision.

### 1.     Full Content Provisions

80.     Sabre used the "Full Content" provision in the TMA as a shield to blunt competition, and in many cases, as a hammer to eliminate it.  In particular, it foreclosed US Airways' ability to effectively deliver its content to innovative and lower-cost, alternative distribution platforms such as Farelogix, or to offer lower fares on its web site that reflected its distribution cost savings.

81.     Section 3(a) of the TMA contained a "Full Content" clause that required US Airways to "provide through the Sabre GDS to all Sabre Subscribers … access to Full Content, including the ability to view and book Full Content."  "Full Content" is defined in relevant part as: "all Fares … and all information regarding schedules and seat inventory."  The TMA also expressly states that "in no case will the Fares provided through the Sabre GDS … be more expensive or less comprehensive than the Fares offered by [US Airways] via any Reservations Outlet" including usairways.com.

82.     Thus, Sabre ensures that it has identical access as to the entire inventory of all US Airways fares (i.e., any "Reservation Outlet").  The TMA broadly defines "Reservation Outlet" to include "any GDS, [US Airways'] reservation system or sales personnel or agents, or any internet site or direct connection."  Notably, it goes on to provide that "[t]he term 'GDS' includes without limitation existing and future new entrants, including without limitation G2 Switchworks, ITA Software, Farelogix and Navitaire … as well as established companies such as Sabre, Amadeus, Galileo and Worldspan."

83.     Sabre utilized the "Full Content" provisions set forth in part above to raise barriers to entry and to forestall nascent competitive threats by broadly interpreting "full content" to encompass all manner of content, far beyond fares alone.  By requiring US to provide Sabre "full content," as defined in the TMA, Sabre was able to foreclose US Airways from offering an attractive, differentiated commercial deal to potential entrants.

84.     The TMA also required US Airways to provide Sabre with "full content" regardless of whether Sabre, as a technological matter, could make any use of the data.  In 2010, US Airways launched its "Choice Seats" program, which enabled travelers to select and reserve the most desirable seats on a US Airways flight in exchange for an additional fee.  US Airways offered to

provide Sabre with content as part of US Airways' "Choice Seats" initiative.  Sabre was unable to utilize this information in its antiquated system.  Worse than that, however, Sabre attempted to block US Airways from distributing Choice Seats on its website (and thus keeping the offering away from the thousands of travelers that would have benefited from it), by making threats as to US Airways' compliance with the "full content" provisions of the TMA.

### 2.      No Direct Connection Provision

85.     The TMA also barred US Airways from bypassing Sabre and using a less expensive method of facilitating bookings with travel agents via direct connection.  In particular, the TMA contained the following "No Direct Connection" provision:

> [US Airways] will not:  (1) in any other manner whatsoever require or provide (or withhold) commissions, compensation or other benefits or rights to (or from), or otherwise encourage, promote or induce, one or more Sabre Subscribers (or their customers) to circumvent the Sabre GDS, including via any form or method of direct connection with [US Airways'] reservations system (other than via the Sabre GDS); or (2) accept or implement any such circumvention of the Sabre GDS, including any such direct connection, offered or proposed by any Sabre Subscriber (or their customer).

TMA § 4(c).

86.     Much like the "Full Content" provision, the "No Direct Connection" provision effectively prohibited US Airways from inducing travel agents and their passengers to bypass Sabre and book airfares at significantly lower overall cost.  For example, the Direct Connection provision barred US Airways from working with Farelogix to enable direct connections that in turn could have offered a competitive alternative to Sabre.

87.     Likewise, with limited exceptions, the TMA stated that US Airways "will not require or induce any Sabre Subscriber to book on any [US Airways] Internet site."  TMA § 4(c).

Again, this provision prohibited US Airways from providing travel agents and their passengers any benefit to induce their use of its more efficient and less costly web site.

### 3.    *Parity Provisions*

88.    The TMA required US Airways to:

> provide Sabre Subscribers … in connection with … use of the Sabre GDS to access its services or make Bookings … , the same types, amounts and levels of products, services, functionality, enhancements, promotional opportunities, waivers and favors, incentives, commissions, compensation, benefits, and rights in whatever form and however calculated, including but not limited to all aspects of [US Airways'] frequent traveler programs and corporate traveler programs (collectively, 'Benefits'), that [US Airways] offers to … any material user of any Reservations Outlet … ; such Benefits will be provided by [US Airways] to Sabre Subscribers on non-discriminatory terms and conditions as compared to the terms and conditions on which such Benefits are made available to similarly situated users … of other Reservation Outlets.

TMA § 3(b).

89.    Similarly, the TMA required that US Airways "not close its flights to Sabre Subscribers … for access through and booking in the Sabre GDS on a less favorable basis than it uses to close flights to users of any Reservation Outlet."  And, as heretofore illustrated, Sabre has defined "Reservation Outlet" to include nascent, more efficient, and less costly competitors such as Farelogix.

90.    These provisions, which heavily favor a dominant incumbent company (like Sabre) have long been disfavored in the law and by regulators.  The Department of Justice specifically called out these provisions in the 2004 rulemaking and has expressed the view that it disfavors parity and other provisions imposed by a firm with market power, like Sabre.

### 4. *No Surcharge Provision*

91.     The TMA also prohibited US Airways from passing on to travel agents the booking fees Sabre charges US Airways.   Were US Airways able to expose travel agents to the supracompetitive GDS fees by disclosing them as a separate line item on bills, travel agents would have been less eager to use Sabre and Sabre would have been forced to compete on price to the benefit of consumers overall in an amount greater than the surcharge.  Much like the Full Content provision, the express prohibition on surcharging travel agents served to prevent the establishment of a lower cost rival to Sabre.

92.     In February 2009, a Sabre Senior Vice President stated "any kind of fragmentation is a bad thing, and the surcharge model is not a model we like or that we feel is the right model for the industry."   Jay Campbell, *Protests Continue Against Lufthansa; BCD Eyes Sabre Talks*, Business Travel News, Feb. 25, 2009 (quoting Sabre Senior Vice President Martin Cowley).

93.     Sabre has made clear in its public pronouncements why it does not like a so-called "surcharge" model:  "It's sad to say the surcharge issue has incited or caused people to consider alternatives."   Jay Campbell, *Protests Continue Against Lufthansa; BCD Eyes Sabre Talks*, Business Travel News, Feb. 25, 2009 (quoting Sabre Senior Vice President Martin Cowley). Sabre's previously described retaliation against Northwest illustrates Sabre's hostility to surcharges and the lengths to which Sabre will go to quash any disruption of Sabre's model.

### B. *The 2011 Agreement:  Sabre Extended its Anticompetitive and Exclusionary Provisions with US Airways by Threat of Full Shut-Off to Sabre's Travel-Agency Subscribers*

94.     In 2010 and 2011, Sabre flexed its monopoly power by forcing US Airways to acquiesce to new anticompetitive terms.   Sabre realized termination likely would drive US Airways into bankruptcy, and thus repeatedly threatened to terminate US Airways if it did not

acquiesce to Sabre's anticompetitive terms within Sabre's short-fuse timeline.  Indeed, recognizing the adverse financial effect on US Airways if travel agents anticipated that US Airways might no longer be distributed by Sabre, Sabre used threats of so notifying travel agents to coerce US Airways into prompt acceptance of Sabre's anticompetitive terms.

95.     On or about October 15, 2010, pursuant to the notice provisions in the TMA, Sabre notified US Airways that Sabre was terminating the TMA as of January 27, 2011.

96.     Since that time, Sabre made clear through a series of ultimatums and unveiled threats that it would cut off US Airways' access to Sabre's critical network of travel agencies if US Airways did not agree to Sabre's anticompetitive terms.  These ultimatums and threats were made even though US Airways indicated several times that it did not want to enter another agreement with these restrictive terms.  On several occasions, as discussed below, US Airways indicated it was willing to pay a higher booking fee to Sabre, so long as it was without Sabre's exclusionary conditions.  US Airways believed that decoupling its business from Sabre's exclusionary terms, among other things, would lower its distribution costs and facilitate the growth and adoption of alternatives to Sabre.  Time and again, Sabre responded that these restrictions were non-negotiable conditions to US Airways' continued participation.  Sabre refused even to quote a price at which it would distribute US Airways products without the anticompetitive restrictions of which US Airways was complaining.

97.     On December 10, 2010, a Sabre Vice President of North American Airline Sales stated that "[c]ontinued participation would be contingent upon a) US [A]irways not adversely changing its participation in Sabre (e.g. pulling content, imposing a surcharge, pulling travel agency plates, etc.)."  12/10/2010 E-mail from Chris Wilding to John Gustafson.  Mr. Gustafson, based on this advice, his industry experience, and his relationship with Sabre, understood this to

mean that if US Airways wanted to access Sabre subscribers, US Airways had to provide full content to Sabre and agree to Sabre's other restrictive terms.

98.     Likewise, on December 20, 2010, Sabre stated that "[w]e have … thought more about the conditions under which Sabre would consider distributing US Airways content beyond the expiration date without a signed Sabre agreement," and that "one of Sabre's requirements in all of these scenarios is a full content commitment from U[S] Airways."  12/20/2010 E-mail from Chris Wilding to John Gustafson.  Sabre expressly stated it "will not extend beyond termination date (Jan 28)" on other terms.  Again, Mr. Gustafson understood this to mean that US Airways' only option was to provide full content to Sabre.

99.     Sabre's demand of "Full Content" is diametrically opposed to the DOT's and DOJ's 2004 view as to the how the GDS industry would (and should) evolve:

> By denying an airline any opportunity to choose different levels of participation in competing systems, a system's [Full Content clause] makes it more difficult for other firms to enter the [GDS] business and undermines the airline's ability to offer higher-level information and booking capabilities to travel agencies through direct connections.

Computer Reservations System Regulations, 69 Fed. Reg. 976, 999 (Jan. 4, 2004).

100.    US Airways also inquired about obtaining a standard "rack rate" that does not include requirements for full content, prohibitions on charges to travel agents, and other restrictions that fall beyond Sabre charging a booking fee for its "services."  On December 20, 2010, although Sabre referred US Airways to its published "rack rate," Sabre indicated that even its higher "rack rate" was conditioned on US Airways' agreement to a full content provision as well as other objectionable terms, including limitations on direct connections and the ability to surcharge travel agents for the cost of booking through Sabre.  12/20/2010 E-mail from Chris Wilding to John Gustafson.

101.    Sabre's refusal to relent on full content is made plain in further communications between the parties.  On January 14, 2011, US Airways sent an e-mail to Sabre stating:  "We are interested in knowing what rate US would have to pay to get distribution through Sabre without a commitment to Travelocity and no obligation to provide Sabre full content (including no restriction on GDS surcharges, direct connects, etc.).  In other words, can we get your published rack rates on a non-temporary basis?" 01/14/2011 E-mail from Andrew Nocella to David Gross.

102.    Approximately nine minutes later, Sabre responded, stating "We should talk.  Sabre has no offer that does not involve full content.  Our deal will expire.  We have an offer on the table for full content and no [Travelocity] deal--that is rack rate as we discussed.  If US will not commit to full content we should talk about how we have an orderly termination of our distribution relationship on Jan 27.  I am sorry, but I must be clear that full content is an absolute requirement for US participation in Sabre."  01/14/2011 E-mail from David Gross to Andrew Nocella.

103.    Shortly after this email was sent, a different Sabre employee forwarded the email again and added:  "We are out of time.  If I don't have a full content proposal from you which is consistent with one of the options Sabre presented, then I don't know that we have anything to discuss this afternoon." 01/14/2011 E-mail from Chris Wilding to John Gustafson.  Mr. Gustafson, based on this exchange, his industry experience, and his relationship with Sabre, understood this to mean that Sabre would not accept anything but full content from US Airways, and Sabre would prefer to have no agreement with US Airways rather than an agreement with less than full content. These ultimatums reflect a monopolist's high level of comfort that it holds the ultimate trump card – foreclosure of an essential piece of its customer's business.  Even where such a foreclosure results in a short-term sacrifice of Sabre profit, it will ultimately bring the customer to its knees.

104.     Communications between the parties leave no doubt that Sabre would have cut off access to its critical platform if US Airways continued to refuse to accede to Sabre's demands. Such termination threatened US Airways' survival because over 35% of the company's revenue was generated from bookings on Sabre's dominant platform.   If US Airways flights were unavailable on Sabre's system, its agent subscribers would largely move its customers to other airlines' flights.

105.     Sabre also used its GDS monopoly power to force US Airways to enter an agreement with terms favorable to Sabre's OTA subsidiary, Travelocity.  On December 10, 2010, Sabre stated that it would only deal with US Airways if US Airways continued to participate in Travelocity.  12/10/2010 E-mail from Chris Wilding to John Gustafson.  On December 20, 2010, Sabre stated that it "has reconsider[ed] providing a proposal which is independent [o]f US Airways completing a Travelocity agreement" and outlined the only scenario under which Sabre would deal with US Airways in the absence of a US Airways agreement with Travelocity.   That scenario involved higher GDSs fees until "Sabre and Travelocity contracts are signed.  Sabre will not rebate any amounts billed prior to Sabre and Travelocity contract signature."  12/20/2010 E-mail from Chris Wilding to John Gustafson.

106.     Sabre later clarified its position: "Sabre's pricing increases to Rack Rate in the event US chooses not to renew its agreement with Travelocity.  Our hope is that US can agree to a market deal with Travelocity prior to January 28, but if not, the GDS pricing would be impacted." 12/20/2010 E-mail from David Gross to Andrew Nocella.   Based on his years of industry experience, Mr. Nocella understood "rack rate" to mean a booking fee much higher than the current booking fees US Airways paid under the TMA. On January 14, 2011, Sabre reiterated that "no TVL [Travelocity] deal" meant booking fees would increase to "rack rate as we discussed."

01/14/2011 E-mail from David Gross to Andrew Nocella. Mr. Nocella, based on this exchange, his industry experience, and his relationship with Sabre, understood this to mean that booking fees would increase to rack rates if US Airways did not sign a Travelocity agreement. Sabre's conduct in using its GDS monopoly power to require US Airways to do business with Sabre's OTA further illustrates the extent of its monopoly power.

107.    Sabre continued to threaten US Airways with termination throughout the period leading up to the signing of an agreement on February 22, 2011. This agreement includes all of the anticompetitive and exclusionary terms Sabre demanded. Specifically, the agreement includes "Full Content," "No Surcharge," "Parity," and "No Direct Connections" provisions, all as dictated by Sabre.

108.    On the same day as such signing, Sabre admitted that the absence of these restrictions – and presumably the competition that would unleash – "would have jeopardized Sabre's long term business interests." 02/22/2011 E-mail from David Gross to Andrew Nocella.

109.    Sabre continued its bullying of US Airways into March 2011, when it issued a press release touting its full content agreement with US Airways which wrongly stated that "US Airways recognizes the value of the Sabre global distribution system and our innovative leadership." 03/02/2011 Sabre Press Release. Contrary to this statement, and as described in this complaint, US Airways "recognize[d]" that Sabre had acted to suppress innovation and that Sabre's "value" is in major part the product of its relentless suppression of competition.

## THE RELEVANT MARKETS

110.    There are two relevant markets at issue in this lawsuit. One market is a broader market "for GDS services linking airlines with traditional travel agents that serve the vast majority of business travelers…" *US Airways, Inc. v. Sabre Holdings Corp.*, 11-cv-2725 (LGS), 2017 WL

1064709, at *6 (S.D.N.Y. Mar. 21, 2017). This market is defined below as the "GDS Services Market." Within the GDS Services Market, Sabre enjoys an anticompetitive island unto itself – a submarket defined below as the "Sabre Submarket." To obtain economically meaningful access to Sabre-subscribed travel agencies in the Sabre Submarket, US Airways must deal with Sabre – not even the other GDSs are available substitutes. The costs for many travel agencies of switching to another GDS are prohibitive and, equally as important, the monopoly rents Sabre shares with them eliminate their incentive to venture elsewhere.

## A.     *The GDS Services Market*

111.     The distribution to traditional travel agents of GDS services – including airline fare, flight, and availability information together with reservation and ticketing capability – is a relevant market (the "GDS Services Market").

112.     The travel agencies that are critical to airlines – in particular, the relatively few TMCs serving the vast majority of business travelers – book almost entirely through GDSs. Because of corporate policies and the additional services offered by travel agencies, travel agency customers (especially the high-value business traveler) do not view other methods of purchasing tickets to be reasonable substitutes for purchases through travel agencies. Accordingly, so long as traditional travel agencies remained locked in to the GDSs, other distribution channels are not reasonable alternatives.

113.     Although direct connections and use of direct connection aggregators such as Farelogix are technologically feasible substitutes, bookings from such methods of distribution have not developed into a reasonable alternative for airlines due to the anticompetitive conduct described in this complaint.

114.     GDS booking fees are not meaningfully constrained by the price of alternative distribution methods.  Were US Airways to face an increase in booking fees by the GDSs, it would have no ability to shift distribution to an alternative method of distribution without experiencing a catastrophic business interruption.  GDSs, on the other hand, are able profitably to increase the fees charged to airlines.

115.     The geographic scope of the GDS Services Market is the United States.  GDS services tend to be localized by country due to differences in language and geography and other country-specific factors, including varied national regulations relating to GDSs and the provision of the underlying air transportation routes by foreign and domestic air carriers.  Many airlines therefore enter agreements with GDSs on the basis of country.

**B.      The Sabre Submarket**

116.     Within the market for distribution of GDS Services, a narrower market definition – or submarket – is the distribution of GDS services to Sabre subscribers (the "Sabre Submarket"). The geographic scope of the Sabre Submarket is the United States.

117.     A large share of travel agency offices (and the high-value business travelers who book through them) use Sabre's GDS services exclusively and do not view other distribution methods to be adequate substitutes.  American Society of Travel Agents, *Global Distribution System (GDS) Report* 7 (May 2010) (finding 86% of responding travel agents used only one GDS). Thus, if US Airways wanted to sell tickets to travelers who rely on travel agents that subscribe to Sabre, US Airways had no alternative but to participate in Sabre or risk losing those sales.  Other airlines do not view other GDSs as reasonably interchangeable with Sabre for similar reasons.

118.     Because airlines – such as US Airways – could not switch bookings from Sabre to another GDS (or alternative distribution platform), the cross-elasticity of demand for Sabre GDS

services and any potential alternative is at or near zero.  Accordingly, Sabre is able to impose and

profitably maintain a supracompetitive net fee by charging its airline customers an amount that

sustains Sabre's competitively excessive profit even after sharing some of its overcharge with its

travel agencies.

119.    Courts and regulators have recognized that each GDS constitutes a relevant market

for antitrust purposes.  For example, after reviewing evidence presented by Sabre and parties to

litigation against Sabre, a federal court concluded that:

> *The evidence*, interpreted in a light most favorable to plaintiff, *could*
> *permit a reasonable jury to conclude that SABRE is a separate*
> *service market* because there is evidence that airlines view each
> [GDS] as offering a unique service:  access to a particular set of
> travel agents.  A reasonable jury may conclude from the evidence
> that SABRE automated agents are locked into SABRE (through
> contractual provisions) and that [SABRE] is free to extract
> supracompetitive booking fees from participating airlines, although
> the fees are not high enough to justify abandoning the system.

*In re Air Passenger Computer Reservations Systems Antitrust Litigation,* 694 F. Supp. 1443, 1460

(C.D. Cal. 1988) (emphasis supplied), *aff'd on other grounds, sub nom.*, *Alaska Airlines, Inc. v.*

*United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991).

120.    In its reversal of this Court's initial dismissal of US Airways' Sherman Act Section

2 claims, the Second Circuit held that "the distribution of GDS services to Sabre subscribers … is

a legally cognizable submarket", and US Airways had plausibly pled that a Sabre-only market "is

capable of being monopolized under Section 2 of the Sherman Act."  *US Airways v. Sabre*

*Holdings Corp.*, 938 F.3d 43, 65, 66 (2d Cir. 2019).

121.    Both the DOJ and the DOT have concluded – after review of an extensive factual

record – that distribution through Sabre constitutes a separate relevant antitrust market.  Indeed, in

2004, the DOT roundly rejected Sabre's claim that the relevant antitrust market was broader,

finding instead that "Sabre has failed to show that the relevant market is not each system, but the

broader market of providing travel information to consumers, or airline ticket distribution." "As a practical matter, airlines wishing to electronically provide information and booking capabilities to travel agencies currently have no effective substitute for participation in each system. . . . Each system is a separate market insofar as airlines are concerned." Computer Reservations System Regulations, 69 Fed. Reg. 976, 988 (Jan. 4, 2004).

### BARRIERS TO ENTRY

122.    The relevant markets defined in this complaint have significant and lasting barriers to entry that serve to protect the monopoly power of the established GDSs, including Sabre. For example, Sabre has acted to reinforce and raise the high switching costs that must be overcome before a travel agency acts to connect to an airline through a channel of distribution other than the dominant GDSs. Specifically, as discussed above, Sabre locked in travel agents through kickback payments and the use of peripheral systems that inhibited the ability of travel agents to switch away from Sabre. As a result of the barriers to entry and Sabre's conduct and agreements, no new GDS has successfully entered the United States market since Sabre became an independent entity in 1996. As discussed in this complaint, Sabre has acted to raise and reinforce the barriers to entry in order to protect its monopoly from entry by potential competitors. In particular, Sabre has acted through its exclusionary conduct and anticompetitive agreements to erect substantial barriers to entry by more efficient and less expensive alternatives such as Farelogix.

123.    Indeed, the GDSs have themselves acknowledged the significant barriers to entry. Sabre has stated that alternative distribution systems are unable to offer a competitive alternative because such "systems often must rely on the scale and functionality of a GDS such as our Sabre system for a complete travel distribution solution for suppliers and travel agencies. . . . They require the integration of a new, stand-alone system into most existing agency or corporate booking tool

workflows."  Travelport has admitted that "[i]n order to become a successful participant in the GDS industry, a new market entrant would face several barriers to entry, including … the costs and length of time required to establish relationships and negotiate agreements with travel agencies, which are generally operating under multi-year contracts with existing GDSs and which incur costs in converting to a new GDS."

### SABRE'S MONOPOLY POWER OVER PLAINTIFF

124.    The GDS Services Market is highly concentrated in the United States, with only three market participants.  Sabre possesses market power in the GDS Services Market in the United States.  Sabre also possesses monopoly power in the Sabre Submarket.

125.    Sabre has consistently acted as a "price maker" – the hallmark of a monopoly – in deciding what price to charge airlines such as US Airways and how to structure those relationships. The abilities to impose financial penalties and significant price increases without threat of competition from other methods of distribution are attributes of price-making.  As discussed above, Sabre threatened financial penalties if US Airways did not quickly come to terms – Sabre's terms – on a new "agreement."  The 2011 agreement – like the 2006 agreement – not only included terms related to Sabre's distribution of US Airways' fares in the United States, but to the rest of the world as well.  Sabre's ability to set price in the United States and abroad is a function of its monopoly power in the United States.   Likewise, Sabre threatened and imposed price increases on US Airways in the past, and US Airways had no ability to shift bookings to another method of distribution.  Moreover, Sabre doubled the fees it charged to American Airlines and American was unable to shift bookings to another distribution method.  Pl.'s Amended Original Pet. & App. for TRO & Temporary Injunction at 14-15, *American Airlines, Inc. v. Travelport, Inc. et al.*, No. 067-249214 (Tarrant Cty. Tex. Dist. Ct. Jan. 10, 2011).   The fact that Sabre rejected

US Airways' offers to pay *increased* booking fees in exchange for a relaxation of Sabre's restrictive terms is also direct evidence that Sabre can impose a *de facto* price increase on airlines such as US Airways.

126.    Sabre's ability to keep its booking fees high over an extended period while the cost of many of its inputs – e.g., computing technology – has spiraled severely downward over that period is direct evidence of its ability to act as a price maker, rather than a price taker – i.e., direct evidence of monopoly power.

127.    Sabre has also succeeded, as the foregoing allegations plainly show, at utilizing its monopolistic heft in contracting to exclude and/or keep at bay potential rivals – e.g., Farelogix. This, too, is direct evidence of monopoly power, as is such exclusion's impact on air carriers like US Airways in the way of higher booking fees and the other harm set forth in this complaint.

128.    Sabre's ability to employ display bias and other intervention to exclude airline ticket distribution to travel agents is also direct evidence of its monopoly power.  Finally, Sabre's ability to erect new barriers to entry and to enhance existing barriers to entry is further evidence of its monopoly power.

## ANTITRUST IMPACT AND DAMAGES

129.    The unlawful agreements and acts described in this complaint have had at least the following effects:

- Restraining, suppressing, and eliminating competition in the relevant markets;

- Artificially raising, stabilizing, and maintaining at artificially high and supracompetitive levels prices charged by Sabre to US Airways (and other airlines), whether directly or indirectly through OTA wholesale agreements;

- Maintaining and increasing US Airways' (and other airlines') dependency on Sabre's antiquated and inefficient technology systems; and

- Directly and proximately injuring and financially damaging US Airways in its businesses and property, in amounts to be proved at trial.

130.    It has been 16 years since deregulation and there have been no new entrants, no new competition, and Sabre has successfully prevented the competition and efficiencies in distribution channels that DOT and DOJ anticipated.

131.    The precise amount of damages that US Airways is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

## COUNT I

### Vertical Agreements By Sabre in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

132.    Plaintiff repeats the allegations above as if fully set forth herein.

133.    The relevant market for this count is the GDS Services Market.

134.    As described in this complaint, Sabre has entered into a series of agreements with airlines and travel agents that, taken separately and/or together, unreasonably restrain competition in that market.  These restrictions diminish and eliminate any competitive threat to Sabre's market power in the GDS Services Market.

135.    Through the agreements with airlines, Sabre has restricted the ability of airlines to support new, more efficient distribution channels by preventing airlines from providing content to support such new alternative channels of distribution.  In the absence of Sabre's restraints, and faced with Sabre's high GDS fees, many airlines would encourage customers to use lower-cost alternatives by ensuring that more attractive fares or benefits were made available to those distributors.  By imposing its restraints on US Airways and other airlines, Sabre has insulated itself from competition with other GDS and non-GDS distribution methods.  The anticompetitive effects of the restraints imposed by Sabre are amplified by the fact that other GDSs have very similar provisions, thereby eliminating any realistic possibility of airline distribution to travel agents by means of more efficient, cheaper methods.

136.     The restraints also reduce incentives for Sabre and other GDSs to offer airlines improved distribution services that would benefit consumers, because Sabre's contracts with airlines such as US Airways could not support the entry of competition that would require the GDSs to compete.  Sabre thus can maintain high prices and restrictive terms for its services with confidence that no viable competitor will emerge.  Sabre's price for distribution services to airlines has thus remained higher than it would be without the restraints, even accounting for incentive payments to travel agents.

137.     In addition to Sabre's contractual restraints vis-à-vis the airlines, Sabre's agreements with many travel agents are exclusionary.  For example, as discussed above, Sabre makes payments directly to travel agents based on their meeting high volume goals, in effect buying the agents' *de facto* exclusivity.  In addition, the peripheral ancillary services and computer tools Sabre agrees to provide to travel agents are bundled with Sabre's GDS and include restrictive APIs, which increase switching costs for the travel agents.  Moreover, Sabre's agreements on "volume thresholds" and "transaction ratios" reduce any incentive for those travel agents to contract with any nascent or established alternative.  In addition, Sabre has certain explicit exclusive arrangements with travel agents.  These, and other arrangements described in this complaint, form a web of agreements that foreclose competition on the merits.  Competition is harmed in the GDS Services Market as Sabre's restraints inhibit new and potential entrants from offering alternative distribution platforms to those of the dominant GDSs.

138.     As a result of these illegal contracts, combinations, and agreements, competition in the GDS Services Market has been unreasonably restrained in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  US Airways has been injured in its business and property by reason

of these illegal contracts, combinations, and agreements and is therefore entitled to damages under

Section 4 of the Clayton Act, 15 U.S.C. § 15.

## COUNT II

### *Monopolization of the Sabre Travel Agent Market in Violation of Section 2 of the Sherman Act,* **15 U.S.C. § 2**

139.    Plaintiff repeats the allegations above as if fully set forth herein.

140.    Sabre possesses monopoly power in both the Sabre Submarket and the GDS

Services Market.   Through the anticompetitive conduct described herein, Sabre has willfully

maintained that power by anticompetitive and unnecessarily exclusionary means.

141.    With its nearly 100% share of the Sabre Travel Agent Market – a market with high

barriers to entry both through unlawful contracts and other conduct described herein – Sabre

possesses monopoly power.  In addition, Sabre's monopoly power is demonstrated directly by its

strong-armed negotiating tactics and apparent willingness to forego US Airways' business, by its

actual exercise of power over price and related contractual terms, and by its actual exclusion of

nascent, more-efficient, less-expensive competitors from the market.  Finally, Sabre's monopoly

power in the Sabre Submarket is further enhanced by the strength of its position in the GDS

Services Market, where it enjoys monopoly power along with the other GDSs.

142.    As described above, according to DOJ, Sabre continues to dominate that broader

market:

> Sabre controls over 50 percent of bookings through traditional travel
> agencies in the United States, so airlines must sell tickets through
> Sabre to reach a broad set of U.S. travelers.  Sabre has even greater
> control over airline bookings through travel management companies
> in the United States.  For instance, on August 1, 2019, Sabre
> reported to investors that it has 'over 80% share within large travel
> management companies' in North America.

*United States v. Sabre Corp. et al.*, 19-cv-1548 (LPS) (D. Del.), Aug. 20, 2019 Complaint, Dkt. No. 1.

143.    The exclusionary agreements and related conduct described in this complaint illegally entrench and maintain Sabre's monopoly.  As enumerated in greater detail above, Sabre's exclusionary conduct and agreements impair competition in an unnecessarily restrictive way that does not further competition on the merits.  It has repeatedly attempted and succeeded in excluding rivals and potential rivals on a basis other than efficiency, through numerous instrumentalities including:

- Contractual restraints that insulate its monopoly power by expressly forbidding entry or raising potential rivals' costs of entry to the point of non-viability.

- Agreements between Sabre and travel agents that lock the latter into the Sabre platform and raise the costs of switching to an existing or potential competitor;

- Terminating an authorized developer agreement with, and then attempting to acquire, a nascent competitor whose innovative technology threatened to unravel its monopoly power;

- Retaliation against airlines that attempted to bypass Sabre and sell directly to travel agents, including coordination with travel agents to bias search results, as well as other conduct that raised the cost to airlines of competing with Sabre for bookings; and

- Entering into agreements with travel agents that reinforced Sabre's ability to extract monopoly rents from airlines, and stifled airlines' attempts to compete with Sabre to offer booking services directly to travel agents.

144.    Sabre's actions to raise and maintain barriers to entry, to exclude nascent competition, to retard technological development, and to impose on US Airways the oppressive contractual terms discussed above are exclusionary and serve to maintain Sabre's monopoly.  Its conduct enabled it to charge supracompetitive prices for its booking services – even accounting for incentive payments that it would have made to travel agents had it not stifled competition – stymie technological development, and fence out actual and potential rivals.  Those are classic

harms to competition, and they indicate that Sabre's practices were and are reasonably capable of contributing materially to Sabre's maintenance of monopoly power in the GDS Services Market and the Sabre Submarket.

145.    Sabre has acted with an intent to maintain its monopoly power illegally in the Sabre Submarket and the GDS Services Market, and its unlawful conduct has enabled it do so, in violation of Section 2 of the Sherman Act.  As Sabre intended, US Airways has been injured in its business property by reason of this conduct and is therefore entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  US Airways has suffered injury-in-fact as a result of Sabre's exclusionary conduct: it paid supracompetitive prices for booking services, lost out on efficiencies from available technological innovations that Sabre sidelined, and could not offer booking services to travel agents directly.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

a.      That Sabre's conduct specified in this complaint be declared by the Court to violate Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

b.      That judgment be entered for Plaintiff against Sabre for three times the amount of damages sustained by Plaintiff as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

c.      That Plaintiff be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law; and

d.      That Plaintiff have such other, further or different relief as the case may require and

the Court deems just and proper under the circumstances.

Dated:  September 15, 2021                     Respectfully Submitted,
New York, New York


Andrew J. Frackman
afrackman@omm.com
Edward N. Moss
emoss@omm.com
Mia N. Gonzalez
mgonzalez@omm.com
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061

Ian Simmons (admitted *pro hac vice*)
isimmons@omm.com
Katrina M. Robson (admitted *pro hac vice*)
krobson@omm.com
1625 Eye Street, NW
Washington, DC 20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414

R. Paul Yetter (*admitted pro hac vice*)
pyetter@yettercoleman.com
Bryce L. Callahan (*admitted pro hac vice*)
bcallahan@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas  77002
Telephone:  (713) 632-8000
Facsimile:  (713) 632-8002