UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

US AIRWAYS, INC.,

    Plaintiff,

  v.

SABRE HOLDINGS CORP.,
SABRE GLBL INC., and
SABRE TRAVEL INT'L LTD.,

    Defendants.

Civil Action No. 1:11-cv-02725-LGS

ECF Case

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE CERTAIN
TESTIMONY OF PROFESSOR JOSEPH STIGLITZ AND DANIEL KASPER**

**TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................................................1

BACKGROUND ............................................................................................................................2

    A.     Prof. Stiglitz's "Snowball" Theory of Causation................................................................2

    B.     Prof. Stiglitz's and Mr. Kasper's Opinions Based on Governmental Agency Statements ..........................................................................................................................4

ARGUMENT ..................................................................................................................................5

    I.     Legal Standard ..................................................................................................................5

    II.     The Court Should Exclude Prof. Stiglitz's "Snowball" Theory of Causation As it Is Devoid of Any Reliable Economic Analysis or Methodology .........................................7

    III.     The Court Should Preclude Prof. Stiglitz And Mr. Kasper From Referring to Erroneous and Unfairly Prejudicial Statements By the CAB, DOT, and DOJ..................10

CONCLUSION.............................................................................................................................10

# **TABLE OF AUTHORITIES**

## **CASES**

*American Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*,
    135 F. Supp. 2d 1031 (N.D. Cal. 2001) ............................................................................. 6

*Amorgianos v. National Railroad Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ........................................................................................... 5, 6

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
    537 F. Supp. 3d 273 (N.D.N.Y. 2021) ................................................................................ 6

*Argus, Inc. v. Eastman Kodak Co.*,
    612 F. Supp. 904 (S.D.N.Y. 1985), *aff'd*, 801 F.2d 38 (2d Cir. 1986) ............................... 2

*Cave v. Saxon Mortgage Services, Inc.*,
    2015 WL 6153754 (E.D. Pa. Oct. 20, 2015) ....................................................................... 7

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ............................................................................................ 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ............................................................................................... 1, 2, 5, 7

*In re Digital Music Antitrust Litigation*,
    321 F.R.D. 64 (S.D.N.Y. 2017) ...................................................................................... 6, 7

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000) ............................................................................................... 5

*Group Health Plan, Inc. v. Philip Morris, Inc.*,
    188 F. Supp. 2d 1122 (D. Minn. 2002), *aff'd in relevant part and remanded*, 344
    F.3d 753 (8th Cir. 2003) ..................................................................................................... 6

*J.B.D.L. Corp. v. Wyeth-Ayerst Laboratories, Inc.*,
    2005 WL 1396940 (S.D. Ohio June 13, 2005), *aff'd*, 485 F.3d 880 (6th Cir. 2007) .......... 6

*Lewis v. CITGO Petroleum Corp.*,
    561 F.3d 698 (7th Cir. 2009) ............................................................................................ 10

*Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007) ................................................................................ 7

*Minasian v. Standard Chartered Bank, PLC*,
    109 F.3d 1212 (7th Cir. 1997) ............................................................................................ 5

*In re Mirena IUD Product Liability Litigation*,
     169 F. Supp. 3d 396 (S.D.N.Y. 2016)..........................................................................6, 9

*Nimely v. City of N.Y.*,
     414 F.3d 381 (2d Cir. 2005).......................................................................................7, 8

*In re Terazosin Hydrochloride Antitrust Litigation*,
     2005 WL 8168757 (S.D. Fla. Feb. 2, 2005) ....................................................................6

*US Airways, Inc. v. Sabre Holdings Corp.*,
     938 F.3d 43 (2d Cir. 2019)........................................................................................5, 10

## RULES

Fed. R. Evid. 403 ................................................................................................................ *passim*

Fed. R. Evid. 702 ................................................................................................................ *passim*

Defendants Sabre Holdings Corporation, Sabre GLBL, Inc., and Sabre Travel International Limited (collectively, "Sabre") respectfully submit this memorandum of law in support of their motion to exclude certain testimony of Plaintiff US Airways, Inc.'s ("USAir") experts Professor Joseph Stiglitz and Daniel Kasper.

## INTRODUCTION

Prof. Stiglitz is a world-renowned economist. But particularly because of his esteem, the Court must be vigilant in exercising its gatekeeping function to exclude expert testimony that lacks a reliable foundation. That is the case here, where multiple of Prof. Stiglitz's opinions—along with similar opinions by one of USAir's other experts, Mr. Kasper—suffer core methodological (and other) flaws that require exclusion under Federal Rules of Evidence 403 and 702 and under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

*First*, Prof. Stiglitz offers a wholly conjectural opinion that removing certain terms in Sabre's contracts with USAir would have caused a wholesale marketplace revolution, leading to the omission of similar terms (which are ubiquitous in the industry) in countless contracts between Sabre's GDS competitors and USAir's airline competitors. This self-described "snowball" theory rests on no cognizable, much less reliable, methodology—economic or otherwise. Rather than constructing an economic model of the two-sided GDS market, Prof. Stiglitz speculates about hypothetical decisions of industry participants, often in a manner untethered from the factual record. Particularly in view of the weight the jury might accord to the testimony of a Nobel Prize winner, this Court should thus exercise its gatekeeping function to prevent Prof. Stiglitz from offering conjecture in the guise of expertise.

*Second*, both Prof. Stiglitz and Mr. Kasper improperly reference and rely on decades-old statements by government agencies related to Sabre's purported market power plainly made in

the context of a one-sided market definition. But *Daubert* and Rules 702 and 403 preclude these experts from recounting in their testimony agency analyses based on a fundamental premise that already has been squarely rejected by the Second Circuit in this case.

## BACKGROUND

**A.      Prof. Stiglitz's "Snowball" Theory of Causation**

To prove its Sherman Act claims, USAir must establish that Sabre's conduct proximately caused its claimed injury and damages. *See Argus, Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904, 918 (S.D.N.Y. 1985), *aff'd*, 801 F.2d 38 (2d Cir. 1986).  To do so, USAir relies exclusively on Prof. Stiglitz, who opines that certain "Challenged Terms" in the Sabre-USAir contracts prevented USAir from steering customers to lower-cost channels.  (Ex. C, Opening Expert Report of Joseph Stiglitz ¶ 24e (Feb. 23, 2021) ("Stiglitz Opening Report").)[1]  But Prof. Stiglitz does not stop there, opining that revising Sabre's contract with this single airline would set off a chain of events that transforms the entire ecosystem of GDSs and their relationships with airlines and travel agencies.

In particular, Prof. Stiglitz opines that changes to the Sabre-USAir contract would have launched a "snowball" of competition—comprising six separate steps—and would have brought about an entirely new, "more competitive" marketplace.  (Ex. D, Stiglitz Dep. 187:5-188:7 (Aug. 17, 2021) ("Stiglitz 2021 Dep.").)  At Step 1, Prof. Stiglitz opined that the Challenged Terms would be omitted from Sabre's contracts with USAir, giving USAir a "competitive advantage over other airlines." (*Id.* 187:21-22.)  At Step 2, Sabre's contracts with *other airlines*—some many times bigger or smaller than USAir—would have changed, because (in Prof. Stiglitz's view) removing the Challenged Terms in Sabre's contracts with USAir would "induce other

---

[1] Citations of "Ex." are to exhibits to the Declaration of Evan Kreiner in Support of Defendants' *Daubert* Motions.

airlines to begin putting pressure" on Sabre (*id.* 187:23-188:4) to remove similar terms in their contracts, either through negotiation or litigation.  (Ex. C, Reply Expert Report of Joseph Stiglitz ¶ 164 (July 8, 2021) ("Stiglitz Reply Report").)

As a result of removing such provisions from Sabre's contracts with other airlines, at Step 3, contracts between other airlines and ***other GDSs*** (Travelport and Amadeus) would have supposedly been modified.  According to Prof. Stiglitz, each of these airlines would have had "strong incentive to leverage" Travelport and Amadeus to "get[] rid of their constraints" in their contracts, through negotiation or legal or regulatory challenges.  (Ex. D, Stiglitz 2021 Dep. 188:17-189:18; *id.* 191:5-191:25.)

Next, at Step 4, Prof. Stiglitz asserts that ***new competitors*** would have entered the purported GDS market.  Specifically, Prof. Stiglitz testified that, absent these provisions, airlines would have "encourage[d] customers to use" lower cost distribution channels "in part by offering differentiated content" (e.g., lower fares) in those channels, enabling the emergence of "entrants that would have been successful at offering competition to GDSs."  (Ex. C, Stiglitz Opening Report ¶¶ 260, 263.)  And, following this new entry, Prof. Stiglitz opined that, at Step 5, Sabre would have changed its contracts ***with travel agencies***, because the availability of lower fares outside the GDS would have prompted travel agents to "demand that Sabre unwind" contract terms that disincentivize "booking outside the Sabre system."  (*Id.* ¶ 263.)

Only after each of these five steps does Prof. Stiglitz's snowball chain of causation reach its conclusion, where at Step 6, Prof. Stiglitz opined that Sabre would have reduced its booking fees in its contracts with USAir.  (Ex. C, Stiglitz Reply Report ¶¶ 167-169.)

In short, Prof. Stiglitz offers an opinion on how countless participants in the two-sided GDS marketplace—other airlines, Travelport, Amadeus, and travel agencies—would have

reacted to a hypothetical change to a single contract between Sabre and that single airline. Prof. Stiglitz did not ground these opinions directly in the record: None of these industry players are parties to this case, and Prof. Stiglitz fails to adequately support his opinion with evidence from any of them. Nor did Prof. Stiglitz: (i) anchor his opinions to an economic or statistical model of how other GDSs and other airlines negotiate their contracts or react to contracts of others; or (ii) conduct interviews of those industry participants on their anticipated reactions to changes in—or even their understanding of—the Sabre-USAir relationship at issue in this case. (*See* Ex. C, Stiglitz Opening Report ¶¶ 263-265; Stiglitz Reply Report ¶¶ 164-169.)

B.  **Prof. Stiglitz's and Mr. Kasper's Opinions Based on Governmental Agency Statements**

Prof. Stiglitz and Mr. Kasper also offer opinions that rely on statements made decades ago by certain government agencies in the course of rulemaking directed to the GDS industry. For example, to support his opinion that Sabre has market power, Prof. Stiglitz's post-remand report cites statements made by the Department of Transportation ("DOT")[2] in 2004 asserting that, among other things: (i) at that time, each GDS purportedly "possessed market power over airlines;" and (ii) each GDS operated in a market limited to its own subscribers. (Ex. C, Stiglitz Opening Report ¶¶ 152, 154.) Similarly, in his expert report, Mr. Kasper extensively summarizes the DOT's findings, including to show that GDSs possess market power. (*See, e.g.*, Ex. F, Expert Report of Daniel Kasper ¶ 48 (Sept. 13, 2013).) As set forth more fully in Sabre's accompanying Motion *in Limine* to Exclude Statements Made During Certain Regulatory Proceedings, the government agency analyses on which Prof. Stiglitz and Mr. Kasper rely were

---

[2] As explained in Sabre's accompanying Motion *in Limine* to Exclude Statements Made During Certain Regulatory Proceedings, the Civil Aeronautics Board ("CAB") was succeeded by the DOT, which—aided by comments from the Department of Justice ("DOJ")—evaluated competitive conditions facing GDSs in several rounds of rulemaking.

4

based on a one-sided view of the purported GDS market—an approach that has since been rejected by the Second Circuit in this case. *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 58 (2d Cir. 2019).

## ARGUMENT

Portions of Prof. Stiglitz's and Mr. Kasper's proffered testimony fail to meet the requirements for expert testimony under Rules 403, 702, and *Daubert*. ***First***, Prof. Stiglitz may not opine about his "snowball" theory of causation, because that theory is not based on any reliable analysis or methodology, but is instead the product of impermissible conjecture about potential decisions of industry participants. ***Second***, Prof. Stiglitz and Mr. Kasper may not recount—or support their opinions with—the government agencies' analyses because they were premised on a one-sided GDS market definition that cannot be reconciled with the Second Circuit's intervening decision on appeal in this case.

### I.     Legal Standard

Under Rule 702, a district court serves as the "gatekeep[er]" that ensures that expert evidence "rests on a reliable foundation." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. at 597). In performing this gatekeeping function, courts must "not be deceived by the assertions of experts who offer credentials rather than analysis," *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997), particularly in view of the risk that a "lay jury" may place "a great deal of weight" on unsupported assertions due to an expert's credentials. *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 n.13 (3d Cir. 2000). Thus, in assessing the admissibility of expert testimony, courts must consider the "indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles

and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos*, 303 F.3d at 265.

When, as here, a plaintiff seeks to rely on the testimony of an economist, the economist's opinions must be based on the "specialized economic analysis" that qualifies them as an expert, or else the testimony "adds nothing" to the evidence that "cannot be elicited from fact witnesses." *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 334 (N.D.N.Y. 2021) (excluding causation opinion) (citation omitted).  In the absence of "substantive discussion" of how economic principles are applied to a particular market, an expert's opinion amounts to unreliable "*ipse dixit*" that a court "need not accept," even where the expert purports to base that opinion on "basic economic theory." *J.B.D.L. Corp. v. Wyeth-Ayerst Labs, Inc.*, 2005 WL 1396940, at *20 (S.D. Ohio June 13, 2005), *aff'd*, 485 F.3d 880 (6th Cir. 2007).  Absent a reliable foundation, Rule 702 thus precludes the admission of opinions—including those purporting to predict the behavior of actors in the but-for world—by even highly qualified economists, among others.[3]  For similar reasons, Rule 702 also precludes the admission of opinions that do not fit the facts of the case because they are based on assumptions that are "contradicted by" the evidence, *In re Digital Music Antitrust Litigation*, 321 F.R.D. 64, 77

---

[3] *See id.*; *In re Terazosin Hydrochloride Antitrust Litig.*, 2005 WL 8168757, at *2 (S.D. Fla. Feb. 2, 2005) (excluding as "unreliable" opinion of pharmaceutical expert who simply "speculat[ed]" as to what supposedly "rational . . . companies would have done" in but-for world "without conducting any independent analysis," including conducting any "research," studying relevant "decisions of other similarly situated" companies, or assessing particular factors relevant to a company's decision-making); *Grp. Health Plan, Inc. v. Philip Morris, Inc.*, 188 F. Supp. 2d 1122, 1132-34 (D. Minn. 2002) (excluding as "unreliable" testimony of economics professor regarding events in the "counterfactual world" where the basis for his testimony was "notably absent from his expert report" and lacking "citation or basis"), *aff'd in relevant part and remanded*, 344 F.3d 753 (8th Cir. 2003); *Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041-42 (N.D. Cal. 2001) (holding that econometric model of MIT economics professor and John Bates Clark Medal recipient "contain[ed] entirely too many assumptions and simplifications that [were] not supported by real-world evidence," rendering analysis "entirely too speculative" to show causation); *see also In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 466 (S.D.N.Y. 2016) (excluding opinion as to what "the FDA would or would not have ultimately" done in different circumstances because such testimony amounts to "impermissible speculation as to the state of mind" of another, which has "no basis in any relevant body of knowledge or expertise" (citation omitted)).

(S.D.N.Y. 2017), and opinions that are "contrary to law." *Cave v. Saxon Mortg. Servs., Inc.*, 2015 WL 6153754, at *9 (E.D. Pa. Oct. 20, 2015) (collecting cases).

Expert testimony may also be excluded under Rule 403 when its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury. *See* Fed. R. Evid. 403. Rule 403 plays a "uniquely important role" in scrutinizing expert testimony "given the unique weight such evidence may have in a jury's deliberations." *Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005) (citing *Daubert*, 509 U.S. at 595). As with Rule 702, expert testimony that "does not 'fit' with the substantive law" is inadmissible under Rule 403. *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 573 (S.D.N.Y. 2007).

## II. The Court Should Exclude Prof. Stiglitz's "Snowball" Theory of Causation As it Is Devoid of Any Reliable Economic Analysis or Methodology

The Court should exclude testimony regarding Prof. Stiglitz's six-step "snowball" chain of causation because, contrary to the rigorous analysis required by *Daubert* and Rule 702, at multiple steps in this causal chain, Prof. Stiglitz: (i) fails to conduct any specialized economic analysis to determine how decision-makers would act in his but-for world, much less analysis that contains the requisite "indicia of reliability"; and (ii) offers opinions that do not fit the facts of the case because they are contrary to record evidence. These flaws at various steps require exclusion of Prof. Stiglitz's entire causation opinion.

For example, following Step 1—at which point USAir's contracts with Sabre omit the Challenged Terms—Prof. Stiglitz supposes that at Step 2, other airlines would have sought to force Sabre to remove similar provisions from their contracts, either by successful renegotiation or suing to invalidate them. But in proffering this opinion, Prof. Stiglitz does not rely on any economic model of airline incentives or airline-Sabre negotiations—nor any quantitative, financial or statistical analysis—to inform his opinion as to airline behavior in reaction to

7

changes in the Sabre-USAir contract. Nor does he rely on any relevant documents, testimony, or airline-instituted litigation to support his opinion. Instead, Prof. Stiglitz relies solely on his say-so regarding the hypothetical decisions of airlines, including those with vastly different scales and differing distribution strategies. Moreover, Prof. Stiglitz, who is not a lawyer or a legal expert, is also not qualified to opine that airlines could successfully sue to invalidate their contracts with Sabre. On its own, Prof. Stiglitz's failure to anchor his Step 2 opinions to any reliable methodology requires exclusion of his entire "snowball" theory of causation.

Prof. Stiglitz's failure to apply any reliable methodology continues between Steps 2 and 3, where he conjectures that travel agents would not have shifted bookings from Sabre to Travelport or Amadeus, even though those GDSs would have offered airlines' full content and Sabre would not. As with Step 2, these opinions are not based on any economic modeling or quantitative analysis, and are not grounded in any expert analysis of the record evidence. To the contrary, the record evidence belies Prof. Stiglitz's conclusions, which do not fit the facts of this case, because witnesses from some of the largest travel agencies confirmed that had a GDS lacked full content (like Sabre in Prof. Stiglitz's hypothetical) they would have shifted transactions to a GDS that did have full content (like Travelport and Amadeus, here).[4] Confronted with such testimony, Prof. Stiglitz made the remarkable claim that travel agents "may not fully, accurately characterize what is going on." (Ex. D, Stiglitz 2021 Dep. 68:9-69:17.) But only the jury can assess a witness's credibility. *See Nimely*, 414 F.3d at 398. And Prof. Stiglitz's claim that he knows better than travel agents how they would have responded had

---

[4] HRG's Bill Brindle testified that HRG would shift bookings away from a booking channel that lacked "content from an airline." (Ex. A, Brindle (HRG) Dep. 114:10-14 (June 19, 2013).) Amex's Michael Qualantone likewise testified that Amex has the "flexibility to move [its business]" if "any GDS has inferior content." (Ex. B, Qualantone 30(b)(6) (Amex) Dep. 209:17-25 (May 29, 2013).)

8

Sabre lacked full content only confirms that his theory has no reliable methodological basis and is unmoored from the factual record. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (holding that the district court erred in admitting economist's model, explaining that "actual behavior of customers [is] more important than [a party's] self-serving testimony" (citation omitted)).  Exclusion of his entire causation opinion is thus warranted.

These defects continue at Step 3, where Prof. Stiglitz surmises that numerous airlines in Sabre's network would have caused both Travelport and Amadeus to "get[] rid of" provisions analogous to the Challenged Terms in their contracts with airlines, either through renegotiation or successful legal or regulatory challenges.  (Ex. D, Stiglitz 2021 Dep. 188:17-189:18.)  But again, he fails to support that hypothesis with any economic modeling, quantitative or statistical analysis, or evidence from airlines or other GDSs about their potential decisions in reaction to the removal of similar terms in Sabre's contracts with USAir.  Prof. Stiglitz's conjecture as to the potential legal decisions of "regulatory agencies"—i.e. the DOJ or the Federal Trade Commission—is equally inadmissible, as it lacks "[any] basis in any relevant body of knowledge or expertise." *Mirena*, 169 F. Supp. 3d at 466.  Nor, as stated above, is Prof. Stiglitz qualified to opine about the probable outcome of any litigation or enforcement action.  Step 3—and every other one in Prof. Stiglitz's lengthy causal chain—thus lacks foundation in economic analysis or record evidence.

To be sure, Prof. Stiglitz is an economist of extraordinary renown.  But that does not render admissible his every pronouncement about how a business might react to a hypothetical stimulus.  Nor does his Nobel Prize exempt him from supporting his opinions with recognized economic methodology and record evidence, for even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some

recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Because USAir cannot establish that each step of Prof. Stiglitz's "snowball" opinion is reliable, the Court should exclude his conjecture that removing the Challenged Terms in the Sabre-USAir contract would have transformed the two-sided GDS marketplace through a six-step "snowball" of hypothetical reactions by other GDSs, other airlines, and travel agencies.

### III. The Court Should Preclude Prof. Stiglitz And Mr. Kasper From Referring to Erroneous and Unfairly Prejudicial Statements By the CAB, DOT, and DOJ

The Court should also preclude Prof. Stiglitz and Mr. Kasper from relying on or referencing statements made by government agencies when they developed rules directed to the GDS industry. As set forth more fully in Sabre's concurrently filed Motion *in Limine* to Exclude Statements Made During Certain Regulatory Proceedings, the agencies' statements, such as those about the presence or absence of market power, are irrelevant to the issues in this case and are unfairly prejudicial to Sabre for multiple reasons, including because they were premised on a one-sided market definition that cannot apply to Sabre's GDS following the Second Circuit's decision on appeal. (*Id*. Part I.) As the Second Circuit made clear, applying a one-sided market definition to Sabre's GDS constitutes a "fundamental[ ]" legal error that required reversal of the jury verdict because it tainted the jury's assessment of competitive conditions in the GDS industry. *US Airways*, 938 F.3d at 58. Rules 702 and 403 thus preclude USAir from using Prof. Stiglitz and Mr. Kasper as a back-door means of presenting the jury with statements from government agencies premised on the same one-sided market definition.

### CONCLUSION

For the above reasons, Sabre respectfully requests that the Court preclude the above-referenced portions of testimony by Prof. Stiglitz and Mr. Kasper.

| | |
|---|---|
| DATED: February 18, 2022<br>Chicago, Illinois | Respectfully submitted,<br><br>/s/ *Patrick Fitzgerald*<br>Patrick Fitzgerald<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>155 North Wacker Drive<br>Chicago, Illinois 60606<br>Phone: (312) 407-0508<br>patrick.fitzgerald@skadden.com<br><br>Steven C. Sunshine<br>Tara L. Reinhart (admitted *pro hac vice*)<br>Julia K. York (admitted *pro hac vice*)<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>1440 New York Avenue, N.W.<br>Washington, DC 20005<br>Phone: (202) 371-7860<br>steve.sunshine@skadden.com<br>tara.reinhart@skadden.com<br>julia.york@skadden.com<br><br>Boris Bershteyn<br>Evan R. Kreiner<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>One Manhattan West<br>New York, NY 10001<br>Phone: (212) 735-3000<br>boris.bershteyn@skadden.com<br>evan.kreiner@skadden.com<br><br>*Counsel for Sabre Holdings Corporation, Sabre GLBL Inc., and Sabre Travel International Ltd.* |