Exhibit  A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

US AIRWAYS, INC.,

       Plaintiff,

  v.

SABRE HOLDINGS CORP.,
SABRE GLBL INC., and
SABRE TRAVEL INT'L LTD.,

       Defendants.

Civil Action No. 1:11-cv-02725-LGS

ECF Case

**<u>US AIRWAYS' PROPOSED JURY INSTRUCTIONS</u>**

## **TABLE OF CONTENTS**

I.  INTRODUCTION ..................................................................................................1

II.  THE SHERMAN ACT [Instruction 1] ...............................................................2

III.  FIRST CLAIM: MONOPOLIZATION CLAIM [Instruction 2].........................4

    A.  Elements of the First Claim [Instruction 3] ..............................................6

    B.  First Element – Relevant Market [Instruction 4] ......................................7

    C.  Second Element – Monopoly Power [Instruction 5]................................11

        1.  Existence of Monopoly Power—Direct Proof [Instruction 6].................12

        2.  Existence of Monopoly Power—Indirect Proof [Instruction 7] ..............15

    D.  Third Element - Willful Maintenance Of Monopoly Power Through Exclusionary or Anticompetitive Conduct [Instruction 8]........................18

IV.  SECOND CLAIM: CONTRACTUAL RESTRAINT CLAIM ..........................22

    A.  Elements of the Second Claim [Instruction 9]......................................22

    B.  First and Third Elements (Contract and Interstate Commerce) Undisputed [Instruction 10]........................................................................................23

    C.  Second Element - Unreasonable Restraint of Trade ...............................24

        1.  Unreasonable Restraint of Trade: Overview [Instruction 11]...................24

        2.  Unreasonable Restraint of Trade: (Step One) Adverse Effect on Competition in a Relevant Market [Instruction 12]...................................26

            a.  "Relevant Market" [Instruction 13] ..............................................27

            b.  "Adverse Effect on Competition" Through Direct Proof or Indirect Proof and Market Power [Instruction 14]........................28

        3.  Unreasonable Restraint of Trade: (Step 2) Evidence of Competitive Benefits [Instruction 15] ...........................................................................31

i

4.      Unreasonable Restraint of Trade: (Step 3) Whether Contract Restraints Were Reasonably Necessary to Achieve the Competitive Benefits [Instruction 16] ...................................................................32

5.      Unreasonable Restraint of Trade: Balancing Benefits and Harm [Instruction 17].....................................................................................33

V.      ANTITRUST INJURY AND CAUSATION ....................................................34

A.      Fourth Element - Antitrust Injury and Causation [Instruction 18] ........34

VI.     ANTITRUST DAMAGES................................................................................37

A.      Introduction and Purpose [Instruction 19] .............................................37

B.      Measure of Damages [Instruction 20]....................................................38

C.      Causation and Disaggregation of Damages [Instruction 21] .................40

VII.    CLOSING ARGUMENTS ..............................................................................41

**SUBSTANTIVE JURY INSTRUCTIONS BEFORE CLOSING**

**I.     INTRODUCTION**

Members of the jury, I am now going to tell you about the law that you will have to apply to the facts as you find them.  At the beginning of the trial, I gave you preliminary instructions on the law.  Now I will give you the final instructions.  If there are any differences between the preliminary instructions that I gave at the beginning of the trial and these final instructions, the final instructions are controlling, meaning the final instructions are the ones you must follow in your deliberations.

**II.      THE SHERMAN ACT [Instruction 1]**

As you have heard, the plaintiff, US Airways, asserts two claims against the defendants, Sabre, under a federal antitrust law known as the Sherman Act.  The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality goods and services, and the greatest material progress.  To protect free and unfettered competition in the marketplace, the Sherman Act prohibits unreasonable restraints or monopolization of any business or industry.[1]

First, under Section 2 of the Sherman Act, US Airways contends that Sabre possesses monopoly power in the market for GDS services to traditional travel agents that subscribed to Sabre, and that Sabre has willfully maintained that power through exclusionary conduct including

1.      distribution agreements that imposed certain contractual restraints, including *the No Discounts, No Benefits, No Surcharges, and No Direct Connect provisions*, on US Airways and other airlines,

2.      retaliation against airlines that attempted to bypass its platform,

3.      contracts with travel agents that lock them into the Sabre platform *and raise the cost of shifting business to rival distribution platforms*, and

4.      other actions to impair rival platforms' opportunities to become viable alternatives to Sabre.

---

[1] The parties dispute the order in which the claims should be presented in the verdict form and jury instructions. US Airways, as plaintiff, intends to present its monopolization claim as the primary claim in this case, which should be reflected in the jury instructions and verdict form to avoid jury confusion.

2

This conduct, US Airways contends, harmed competition, enabled Sabre to charge *higher-than-competitive prices for its booking services, and caused US Airways to suffer damages*.  Sabre *disagrees and contends that it is not a monopolist in any properly defined market because Sabre competes with other GDSs in its efforts to attract travel agencies to use its platforms, and for individual transactions among travel agencies that subscribe to multiple GDSs, as well as other options for booking airfare that have constrained Sabre's net fees.  Sabre also contends that its actions have not excluded competition, and that its actions in fact benefit competition and consumers.*

Second, under Section 1 of the Sherman Act, US Airways contends that certain provisions of the 2011 Sabre-US Airways distribution contract excluded or reduced competition in the market for the distribution of airline flights and fares to traditional travel agents, permitting Sabre to charge *higher-than-competitive prices for its booking services*, causing US Airways to pay more than it would have for distribution of its fares under competitive conditions, and causing US Airways to suffer damages.  Defendant Sabre disagrees and contends that the terms of its 2011 contract with US Airways were the result of a negotiated, bargained-for exchange between US Airways and Sabre, which resulted in US Airways paying a lower booking fee in exchange for providing Sabre with access to a greater amount of its flights and fares, that the terms of the contracts have not excluded competition, and that those terms have otherwise benefited competition and consumers.

### III.   FIRST CLAIM: MONOPOLIZATION CLAIM [Instruction 2]

I will now instruct you on US Airways' first claim, its "monopolization claim."

US Airways' *first* claim is that Sabre willfully maintained *its monopoly power*[2] in the market for GDS services to traditional travel agencies that subscribe to Sabre's GDS (which I will refer to as the *"Sabre GDS services market"*).  US Airways contends that Sabre willfully maintained monopoly power in *the Sabre GDS services market* through exclusionary conduct, including

1.  retaliation against airlines that attempted to bypass its platform;

2.  contracts with travel agents that lock them into the Sabre platform *and raise the cost of shifting business to rival distribution platforms*;

3.  other actions to impair rival platforms' opportunities to become viable alternatives to Sabre; and

4.  *certain contractual restraints, including the No Discounts, No Benefits, No Surcharges, and No Direct Connect provisions on US Airways and other airlines.*

Sabre disagrees and contends that it is not a monopolist in *any* properly defined market because Sabre competes with other GDSs in its efforts to attract travel agencies to use its platforms.  *In addition, according to Sabre,* it is not a monopolist in *any properly defined market* because it competes with other *GDSs for individual transactions by travel agencies that use multiple GDSs.*  Finally, Sabre *asserts that it is not a monopolist in any properly defined market because other options for searching and booking airfare have constrained its booking fee.  Sabre*

---

[2] A monopolization claim requires proof the defendant maintained "monopoly power," not that it maintained "a monopoly." Model Jury Instr. In Civ. Antitrust Cases (Am. Bar Ass'n 2016), A-102 (hereinafter "ABA Model Instr.").

4

*also contends that its actions have not harmed competition, but have instead benefited*

*competition and consumers.*

**A.      Elements of the First Claim [Instruction 3]**

*US Airways alleges that it was injured by Sabre's unlawful monopolization of the Sabre GDS services market*.[3]  To prevail against Sabre on this claim, US Airways must prove each of the following elements by a preponderance of the evidence:

First, that the alleged market is a valid antitrust market.

Second, that Sabre possessed monopoly power in the relevant market.

Third, that Sabre willfully maintained that monopoly power in the relevant market by engaging in exclusionary conduct.

Fourth, that Sabre's conduct occurred in or affected interstate commerce.

Fifth, that US Airways was actually injured in its business or property because of Sabre's alleged anticompetitive conduct.

For this claim, the parties agree that the fourth element is satisfied.  If you find that US Airways has failed to prove any of the other elements, then you must find for Sabre and against US Airways on this claim.  If you find that US Airways has proved each of these elements by a preponderance of the evidence, then you must find for US Airways and against Sabre on this claim.[4]

---

[3] ABA Model Instr. A-102.
[4] ABA Model Instr. A-102.

6

### B.      First Element – Relevant Market [Instruction 4]

The parties agree that the relevant geographic market is the United States. However, the parties dispute, and you must decide, how to define the relevant product market. Products or services are in the same relevant market if they are reasonable substitutes for each other from the consumer's point of view; that is, the products or services compete with each other.

Let me pause here briefly to explain what I mean by "consumers" when I say that products are in the same relevant market if they compete with each other from the "consumer's" point of view. This case involves a "two-sided transaction platform."[5] Two-sided transaction platforms connect different groups of consumers to facilitate single, simultaneous transactions between them, and thus are best understood as supplying one product: transactions.[6] In this case, Sabre's GDS is a two-sided transaction platform that brings together airlines on one side of the platform and travel agents on the other side of the platform in order to facilitate a single, simultaneous transaction for booking airline tickets. Thus, to determine the relevant product market, you need to evaluate what substitutes exist for booking transactions via Sabre's GDS. To make this evaluation, you should consider what participants on both sides of Sabre's GDS, meaning airlines selling flights and fares and travel agents purchasing those flights and fares, consider as reasonable substitutes for transactions via Sabre's GDS.[7]

A relevant market must consist of all products or services that are reasonably interchangeable by consumers for the same purposes. Products or services need not be identical

---

[5] *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 58 (2d Cir. 2019) ("[T]he Sabre GDS is a transaction platform, and the relevant market for such a platform must as a matter of law include both sides.").
[6] *Id.*
[7] *See US Airways, Inc. v. Sabre Holdings Corp.*, No. 11-cv-2725 (LGS), 2022 WL 874945, at *8 (S.D.N.Y. Mar. 24, 2022) (ECF No. 1129) (assessing interchangeability from the perspective of both airlines and travel agents).

or precisely interchangeable as long as they are reasonable substitutes.  This is a practical test taking into account actual behavior of buyers and marketing efforts of sellers.  It looks to the practical realities of substitution, not theoretical substitution.  Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of packaging material -- such as aluminum foil, plastic wrap, or even plastic containers -- to be reasonable alternatives, then all those products would be in the same relevant market.

The purpose of market definition is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output.[8]  To determine whether products or services are reasonable substitutes for each other, you may consider the following:

- whether a small but significant (e.g. 5%) permanent increase in the price of one product or service would result in a substantial number of consumers switching from that product or service to another;

- whether those consumers who actually use the product or service view the other products or services as interchangeable;

- the relationship between the price of one product or service and sales of another;

- the presence or absence of specialized vendors;

- the perceptions in the industry or the public as to whether the products or services are in separate markets;

---

[8] *Geneva Pharma. Tech. Corp. v. Barr Labs, Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (purpose of market definition is "to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output").

- the views of US Airways and Sabre regarding who their respective competitors are;

- the existence or absence of different customer groups or distribution channels;

- whether the product has distinct characteristics and uses from other products;

- whether, as a matter of practical fact and the actual behavior of buyers, the products are reasonable substitutes for the buyer's needs;

- whether the product has distinct customers from other products; and

- other evidence of how a product's pricing is constrained by other products.[9]

As I already explained, US Airways' proposed market for purposes of its monopolization claim is the Sabre GDS services market.

US Airways' proposed *Sabre GDS services market* is commonly labeled a "single brand market," in which one company's product faces no actual or potential competition from any other company's product.  Within a broader market, there may exist well-defined submarkets which, in themselves, constitute product markets for antitrust purposes.[10]  *A single brand of a product or service may be a relevant market under the Sherman Act if* no practical substitute exists for that brand's products or services or a substantial group of customers can be significantly exploited via price discrimination.[11]

US Airways contends that the *Sabre GDS services market* is a distinct market because from the perspective of both airlines and travel agents, Sabre's platform is not interchangeable.

---

[9] *Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962); Trial Tr. 5624:20-5625:16; Modern Federal Jury Instr. 80-5.

[10] *US Airways v. Sabre*, 938 F.3d 43, 64–66 (2d Cir. 2019) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 482 (1992)).

[11] *Id.*; P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 563d (4th ed. 2020 supp.).

9

Travel agents are "locked in" to using only Sabre's GDS because, among other reasons, they have long-term contracts with Sabre, receive volume-based incentives that encourage use of only one GDS, and the costs of switching to an alternative distribution channel—including, for example, training agents to use a new system—are prohibitively high.  Because the *vast* majority of travel agents who use Sabre do not use another GDS, US Airways has no reasonable alternative to access Sabre-subscribing travel agents.  *And no viable substitutes are available to the travel agents who use Sabre's services because they are locked into the Sabre platform.*

Sabre contends that the proposed Sabre GDS services market is too narrow because Sabre faces vigorous competition from other GDSs, such as Travelport and Amadeus, including head-to-head competition to obtain multi-year contracts with travel agencies, which causes Sabre to pay higher incentives and thus charge a lower net fee.  Sabre also contends that it competes with other GDSs for individual bookings by the travel agencies that subscribe to *more than one GDS, which include some of the largest travel agencies in the world*.  Sabre also contends that that the relevant market is not limited to just GDSs linking airlines with traditional travel agents and their customers, but also includes other means of booking airline travel, such as airline websites, online travel agencies (*e.g.*, Expedia, Travelocity, Orbitz and Priceline), and websites such as Kayak.com.

### C.     Second Element – Monopoly Power [Instruction 5]

If you find that US Airways has met its burden to prove, by a preponderance of evidence, *its proposed relevant market*, the second element of a monopolization claim that US Airways must prove by a preponderance of the evidence is that Sabre possessed monopoly power in the *relevant* market.

Monopoly power is the power to control prices, *restrict output*, or exclude competition in a relevant antitrust market.[12]  However, possession of monopoly power, in and of itself, is not unlawful.

US Airways may prove that Sabre possessed monopoly power in the relevant market through either direct or indirect evidence.[13]  However, if you find, after considering the direct and indirect evidence, that Sabre could not control prices nor exclude competition, then you must conclude that Sabre did not have monopoly power.

---

[12] ABA Model Instr. A-104 ("Monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market").
[13] *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006) (quoting *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97–98 (2d Cir. 1998)).

11

### 1.  Existence of Monopoly Power—Direct Proof [Instruction 6]

As I instructed you earlier, monopoly power is the power to control prices, *restrict output*, or exclude competition in a relevant antitrust market.[14]

One way to prove that a firm is a monopolist is if the firm can profitably raise prices substantially above the competitive level for a significant period of time.[15]  Under that approach, US Airways has the burden of proving that Sabre has the ability to raise or maintain the prices that it charges in the relevant market above competitive levels.[16]  Supracompetitive pricing means setting prices higher than competitive levels within the relevant market.[17]  In considering whether Sabre charged supracompetitive prices, you must consider whether the net price— booking fees Sabre charged minus incentives it paid—exceeded the net prices that Sabre would have charged in a competitive market.[18]  US Airways must prove that Sabre by itself has the power to raise or maintain the combined net price that it charges—that is, without the assistance of, and despite competition from, any existing or potential competitors.[19]

An ability to sell at higher net prices or earn higher profit margins than its competitors for similar goods or services over a long period of time may be evidence of monopoly power.[20]  If Sabre attempted to maintain net prices above competitive levels, but would lose so much

---

[14] ABA Model Instr. A-104 ("Monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market"); *Geneva Pharma. Tech. Corp. v. Barr Labs, Inc.*, 386 F.3d 485, 500 (2d Cir. 2004).

[15] ABA Model Instr. A-104.

[16] *See* ABA Model Instr. A-121.

[17] *United States v. Am. Express Co.*, 838 F.3d 179, 206 (2d Cir. 2016) (hereinafter "*Amex I*").

[18] *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 59 (2d Cir. 2019) ("In a market that took into account both sides of the Sabre platform, the prices would be supracompetitive only to the extent that the net prices charged to travel agents (here, -$ 0.85 per booking on average) and airlines (here, $ 3.49 per booking) combined exceeded the prices that would have been charged in a competitive market.").

[19] ABA Model Instr. A-121.

[20] *Id.*

business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then Sabre does not have monopoly power.[21]  Moreover, the ability to earn high profit margins or a high rate of return on the net transaction price does not necessarily mean that Sabre has monopoly power.[22]  Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors.  Such other factors include having superior products or services, low costs, or superior advertising or marketing.[23]  Evidence that Sabre would lose a substantial amount of sales if it raised net prices, or that Sabre's profit margins were *low* compared to its competitors, or that Sabre's margins go up and down or are steadily decreasing, might be evidence that Sabre does not have monopoly power.[24]

Monopoly power may also be proven by showing that Sabre has the ability to exclude competition.[25]  The power to exclude competition means the power of Sabre to dominate the relevant market by eliminating existing competition from that market or by preventing new competition from entering that market.  In other words, the power to exclude competition is the power to place major barriers in the way of other companies trying to remain in or enter the particular arena of trade and compete for customers.  It may be shown by evidence of Sabre's reducing or restricting the share of the market held by competitors by means other than the normal process of competition.[26]  However, if Sabre attempted to maintain prices above competitive levels, but new competitors could enter the relevant market or existing competitors

---

[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002) ("direct evidence of monopoly power" is "'the power to control prices or exclude competition'" (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)).
[26] Modern Federal Instr. 80-4.

could react in a way that would make the price increase unprofitable, then Sabre does not have monopoly power.[27]

---

[27] ABA Model Instr. A-121.

### 2.      Existence of Monopoly Power—Indirect Proof [Instruction 7]

If you find that US Airways has proven its *proposed relevant market*, and proceed to determine whether Sabre has monopoly power in that market, you may also consider indirect evidence of monopoly power.  In considering indirect evidence of monopoly power, you may consider whether evidence regarding the structure of the relevant market permits, or does not permit, an inference that Sabre has the power to control price or exclude competition in the relevant market.[28]  Structural factors include the following:

Market Share.  One factor you should consider is Sabre's share of the relevant market. While market share is not the equivalent of monopoly power, it is highly relevant to your determination of whether US Airways has proved monopoly power.[29]  The higher the company's share, the higher the likelihood that a company has monopoly power.[30]  *A market share of 85% or higher is strong evidence of the existence of monopoly power.[31]  You must consider Sabre's market share in conjunction with other characteristics of the market—including the factors I will discuss next—to determine whether Sabre has the ability to control prices or exclude competition.[32]*

Market Share Trends.  The trend in Sabre's market share is something you may consider. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show

---

[28] *See* ABA Model Instr. A-115; *Tops Markets*, 142 F.3d at 98 ("A court will draw an inference of monopoly power only after full consideration of the relationship between market share and other relevant market characteristics.").
[29] *See Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) ("While market share is not the functional equivalent of monopoly power, it nevertheless is highly relevant to the determination of monopoly power.").
[30] ABA Model Instr. A-115.
[31] Modern Federal Instr. 80-6.
[32] *Geneva Pharms.*, 386 F.3d at 496.

that a company does not have monopoly power.[33] *If market shares are high and stable over time, that durability of market share can be evidence of monopoly power.[34]*

    <u>Number and Size of Competitors</u>.  You may also consider whether Sabre's competitors are capable of effectively competing.[35]  In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on Sabre's ability to price its products.[36]  If Sabre's competitors are vigorous or have sizeable market shares, this is evidence that Sabre likely lacks monopoly power.[37]  On the other hand, if you determine that Sabre's competitors are weak or have small or declining market shares, this may support an inference that Sabre has monopoly power.[38]

    <u>Barriers to Entry</u>.  You may also consider whether there are barriers to entry into the relevant market.  Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way.[39]  Barriers to entry might include, *but are not limited to, high switching costs that make it difficult for potential customers to switch from the incumbent to the entrant,[40]* intellectual property rights (such as patents or trade secrets), the large financial investment required to build a plant or satisfy governmental regulations, specialized marketing practices, the reputation of the companies already participating in the market or the brand name

---

[33] ABA Model Instr. A-115.

[34] *US Airways v. Sabre*, No. 11-cv-2725 (LGS), 2022 WL 874945, at *9 (S.D.N.Y. Mar. 24, 2022) (ECF No. 1129) ("maintenance of a high, stable market share while selling obsolete technology" supports finding of monopoly power).

[35] ABA Model Instr. A-115.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *See FTC v. Facebook, Inc.*, 2022 WL 103308, at *9 (D.D.C. Jan. 11, 2022) ("Off the bat, there can be little doubt that . . . switching costs are commonly recognized types of barriers to entry."); *Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 476–77 (1992) (discussing switching costs).

recognition of their products, *and any other factor making entry difficult.*[41]  Evidence of low or no entry barriers may be evidence that Sabre does not have monopoly power, regardless of Sabre's market share, because new competitors could enter easily if Sabre attempted to raise prices for a substantial period of time.[42]  By contrast, evidence of high barriers to entry along with high market share may support an inference that Sabre has monopoly power.[43]

<u>Entry or Exit by Other Companies</u>.  The history of entry and exit in the relevant market may be helpful to consider.  Entry of new competitors or expansion of existing competitors may be evidence that Sabre lacks monopoly power.  On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that Sabre has monopoly power.[44]

If you find that Sabre has monopoly power in the relevant market, then you must consider the remaining elements of this claim under Section 2 of the Sherman Act.  If you find that US Airways has not proven that Sabre has monopoly power in the relevant market, then you must find for Sabre and against US Airways on this claim.

---

[41] *See* ABA Model Instr. A-115.
[42] *Id.*
[43] *Id.* .
[44] *Id.*

### D.      Third Element - Willful Maintenance Of Monopoly Power Through Exclusionary or Anticompetitive Conduct [Instruction 8]

If you find that US Airways has met its burden of proving the first two elements of monopolization—that is, that US Airways has proven a relevant market and that Sabre possessed monopoly power in this same relevant market—then you must turn to the third element.  The third element that US Airways must prove by a preponderance of the evidence is that Sabre willfully maintained monopoly power in a relevant market through exclusionary *or anticompetitive* conduct.

Exclusionary conduct is conduct, *other than competition on the merits, that is reasonably capable* of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market.[45]  *Put another way, exclusionary conduct is conduct that tends to impair the opportunities of rivals, and either does not further competition on the merits or does so in an unnecessarily restrictive way.*[46]  To be exclusionary, such conduct need not be unlawful in and of itself, so long as it is reasonably capable of maintaining Sabre's monopoly power.[47]

*Some examples of harm to competition include increased prices, decreased production levels, and reduced quality and innovation.*[48]  However, it is important to remember that not all behavior that injures competitors is "exclusionary."  Every business has the right to increase its

---

[45] ABA Model Instr. A-123; Model Federal Instr. 80-12; P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 563d (4th ed. 2020 supp.) ("We define monopolistic conduct as acts that (1) are reasonably capable of creating, enlarging or prolonging monopoly power by impairing the opportunities of rivals; and (2) either (2a) do not benefit consumers at all, or (2b) are unnecessary for the particular consumer benefits claimed for them, or (2c) produce harms disproportionate to any resulting benefits.").

[46] *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188–89 (2d Cir. 1992) (quoting *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1359 (2d Cir. 1988); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985)).

[47] Model Federal Instr. 80-12.

[48] ABA Model Instr. A-123.

success by using legitimate good business practices, such as increasing efficiency or offering a superior product.  A monopoly maintained as a result of such legitimate good business practices is not unlawful.[49]

It can sometimes be difficult to determine whether an act is a good business practice or an exclusionary action.  Some conduct may both help customers and hurt competitors.  If this seems to be the case to you, you must ask yourselves whether the conduct hurts competitors precisely because it appeals to customers.  That is, you must ask yourselves whether the harm to competitors was caused by customers' preference for Sabre's products.  If it was, then the conduct involved is not exclusionary because the goal of the antitrust laws is to protect competition itself rather than any particular competitor's right to succeed.[50]

So, if a business does poorly because it is faced with legitimate, vigorous competition, this is not unlawful.  However, if the harm to competitors is caused by something other than Sabre's success in competing on the merits of its products and operations—in other words, if the harm is caused mainly by the defendant's deliberate efforts to injure or block competition—then you may find that the conduct was exclusionary.[51]

In order to prove that Sabre maintained its monopoly through exclusionary conduct, US Airways does not have to show that the monopoly was maintained solely by exclusionary conduct.  US Airways may meet its burden by proving, by a preponderance of the evidence, that the exclusionary conduct played a significant or substantial role in maintaining the monopoly.[52]

---

[49] Modern Federal Instr. 80-12.
[50] *Id*.
[51] *Id*.
[52] Model Federal Instr. 80-13.

In other words, an isolated or trivial anticompetitive episode will not make Sabre liable for monopolization if any monopoly power that Sabre possessed was otherwise gained, retained and used in a "good business" fashion.  On the other hand, US Airways is not required to prove every one of its specific allegations of exclusionary behavior.  Once again, you have a problem which requires your exercise of judgment and a thorough and sensitive weighing of the evidence. In the end, you must decide whether the US Airways has carried its burden of proving not merely an isolated or occasional exclusionary act, but that Sabre engaged in a substantial or significant amount of exclusionary conduct.[53]  *You should consider the alleged exclusionary conduct in aggregate, not in isolation, to determine whether as a whole Sabre's conduct played a significant or substantial role in maintaining its monopoly.[54]*

Sabre may not be found to have willfully maintained monopoly power if it has maintained that power solely through the exercise of superior foresight and skill; or because of natural advantages; or because of economic or technological efficiency, including efficiency resulting from scientific research; or by *obtaining a lawful patent*.  The acts or practices that result in monopoly power must represent something more than the conduct of business that is part of the normal competitive process.[55]

*If you find that US Airways has satisfied its burden to show Sabre has maintained monopoly power in either of the relevant markets through anticompetitive conduct, then you*

---

[53] *Id.*

[54] *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 925-26 (2d Cir. 1981) (whether the defendant liable under Section 2 is based on a "qualitativ[e]" assessment of whether there was a "synergistic effect" of conduct); *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each").

[55] Modern Federal Instr. 80-15.

*must consider the remaining elements of this claim, including antitrust injury, causation, and damages, which I will discuss later.* If you find that US Airways failed to meet its burden, then you must find for Sabre and against US Airways on this claim.[56]

---

[56] Sabre's proposed instructions include an instruction on whether Sabre had a duty to deal with other companies. US Airways objects to this instruction as irrelevant and inconsistent with Second Circuit law. If the Court decides to charge the jury on whether Sabre's refusal to deal with a third party was exclusionary conduct, US Airways requests the following charge: "Ordinarily, a company may deal or refuse to deal with whomever it pleases, as long as it acts independently. Even a company with monopoly power in a relevant market has no general duty to cooperate with its business rivals and ordinarily may refuse to deal with them. A refusal to deal is exclusionary, however, where the company terminates a voluntary course of dealing with a competitor under circumstances evincing an intent to willfully maintain monopoly power." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 134–35 (2d Cir. 2014), as corrected (June 19, 2014); ABA Model Instr. B-129 at 2.

**IV.    SECOND CLAIM: CONTRACTUAL RESTRAINT CLAIM**

**A.    Elements of the Second Claim [Instruction 9]**

To establish its *second* claim under Section 1 of the Sherman Act, US Airways must

prove the following, by a preponderance of the evidence:

First, the existence of a contract, combination, or conspiracy between or among at least

two separate entities; for this claim, the 2011 contract between Sabre and US Airways;

Second, that the contract unreasonably restrained trade;

Third, that the contract affects interstate or foreign commerce; and

Fourth, that the contract caused US Airways to suffer injury to its business or property.

**B.**     **First and Third Elements (Contract and Interstate Commerce) Undisputed [Instruction 10]**

For US Airways' claim under Section 1 of the Sherman Act, there is no dispute about the first element of that claim; the parties agree that US Airways and Sabre entered into the 2011 contract, which is the subject of this claim.  There is also no dispute about the third element, because the parties agree that their contract affects interstate commerce.

Therefore, when you consider US Airways' first claim—the 2011 contract restraints claim—you need to decide only two of the four elements:  the second element—whether the 2011 contract unreasonably restrained trade; and the fourth element—whether any challenged restraint caused US Airways to suffer injury to its business or property.

### C.       Second Element - Unreasonable Restraint of Trade

### 1.       Unreasonable Restraint of Trade: Overview [Instruction 11]

The parties agree that the challenged provisions in the 2011 contract are restraints on trade.  Under Section 1 of the Sherman Act, a restraint of trade is illegal only if it is found to be <u>unreasonable</u>.  You must therefore determine whether the challenged contractual provisions in the 2011 Sabre-US Airways distribution agreement as a whole unreasonably restrained trade. US Airways bears the burden of proof on this element.  This means that US Airways must prove by a preponderance of the evidence that the challenged provisions of the 2011 contract with Sabre unreasonably restrained trade.  In determining whether those contractual terms are unreasonable, you must go through several steps.

First, you must determine whether US Airways has proved by a preponderance of the evidence that the challenged contract terms have caused an actual adverse effect on competition as a whole in the relevant market.[57]

If so, then second, you must consider whether Sabre has offered evidence that the challenged contract terms produce countervailing competitive benefits in the relevant market.  If so, then at the third step you must determine whether US Airways has proved by a

---

[57] *Ohio v. American Express*, 138 S. Ct. 2274, 2283-84 (2018) (hereinafter "*Amex II*"); *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) ("A plaintiff seeking to prove an antitrust violation under the rule of reason must initially show that the challenged action adversely affected competition in the relevant market."); *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506–07 (2d Cir. 2004) ("Under the rule of reason, the plaintiffs bear an initial burden to demonstrate the defendants' challenged behavior had an *actual* adverse effect on competition as a whole in the relevant market." (emphasis in original; internal quotation marks omitted)); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) ("[P]laintiff initially must show that the challenged action had an *actual* adverse effect on competition as a whole in the relevant market . . . ." (emphasis in original; internal quotation marks omitted)).

preponderance of the evidence that any legitimate competitive benefits offered by Sabre could have been achieved through reasonably available alternative means that create substantially less harm to competition.[58]

Ultimately, you must balance the competitive harm against the competitive benefit.  The challenged restraint is illegal under Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs the competitive benefit.[59]

I will now address each of these steps in detail.

---

[58]  *Capital Imaging Associates, P.C. v. Mohawk Valley Med. Associates, Inc.*, 996 F.2d 537, 543 (2d Cir. 1993).
[59]  *See Capital Imaging*, 996 F.2d at 543; *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995); Trial Tr. 5630:3-7.

### 2.   Unreasonable Restraint of Trade: (Step One) Adverse Effect on Competition in a Relevant Market [Instruction 12]

To decide whether Sabre has unreasonably restrained trade in this case, you must first determine whether US Airways has proved by a preponderance of the evidence that the challenged restraints in the 2011 contract between US Airways and Sabre caused an "adverse effect on competition" in a "relevant product and geographic market."

Although it may be relevant, harm that occurs merely to US Airways' individual business is not enough by itself to demonstrate harm to competition. "Harm to competition" means a reduction in competition that results in the loss of some of the benefits of competition, for example, lower prices, increased output and higher product quality. The harm must be to competition as a whole and not just to the plaintiff or a single competitor. The question for you is not whether any particular challenged contract term in the 2011 Sabre-US Airways distribution agreement adversely affected competition, but whether the contract restraints as a whole did so.

26

### a.    "Relevant Market" [Instruction 13]

*Please refer to Instruction 4 for guidance on what evidence is relevant to defining a relevant product market.*

US Airways contends that the relevant market for *its second* claim is *the broader* GDS services market—*the* market for GDS services linking airlines with traditional travel agents that serve *the vast majority of* business travelers.  Sabre asserts that the relevant market is not limited to GDS services, but also includes other means of booking airline travel, such as airline websites, on-line travel agencies (*e.g.*, Expedia, Travelocity, Orbitz and Priceline), websites such as Kayak.com, *and airline reservation agents*.

**b.** **"Adverse Effect on Competition" Through Direct Proof or Indirect Proof and Market Power [Instruction 14]**

*Once you have determined the scope of the* relevant market, then you must also determine whether US Airways has proved that the challenged restraints had *an* adverse effect on competition as a whole in the relevant market.[60]  Because Sabre is a two-sided transaction platform, you must consider whether US Airways demonstrated *an* adverse effect on competition "as a whole" in the relevant market encompassing airlines on one side and travel agencies on the other.[61]

To demonstrate that a restraint has resulted in *an* adverse effect on competition, US Airways may rely on either direct or indirect proof.[62]

US Airways may rely on direct evidence of *an* actual adverse effect on competition by proving, for example, that the challenged 2011 contractual restraints resulted in higher net prices, fewer transactions, lesser quality, or reduced innovation in the relevant market.[63]

Instead of relying on direct evidence, US Airways may show an adverse effect on competition indirectly.  US Airways may establish anticompetitive effects with indirect evidence by proving both that Sabre had sufficient "market power" and thus the capacity to inhibit

---

[60] *See* ABA Model Instr. C-5 ("If you find that plaintiff has proven the existence of a relevant market, then you must determine whether plaintiff also has proven that the challenged restraint has [or is likely to have] a substantial harmful effect on competition in the market."); *Capital Imaging*, 996 F.2d at 543 ("[P]laintiff bears the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market."); Trial Tr. 5626:23-5627:4.

[61] *Amex II*, 138 S. Ct. at 2287 (explaining that "competition cannot be accurately assessed by looking at only one side of the platform in isolation"); *US Airways Inc.*, 938 F.3d at 64.

[62] Trial Tr. 5627:8-9.

[63] Trial Tr. 5627:11-15.

competition market-wide,[64] <u>plus</u> some other ground for believing that the challenged contract terms had the capacity to harm competition market-wide.

Market power has been defined as the ability to profitably raise prices for a sustained period of time above those that would be charged in a competitive market,[65] or to exclude competition,[66] or to force a purchaser to do something it would not do in a competitive market.[67] In other words, market power is the "power to control prices or exclude competition."[68]  Market power *requires a lesser degree of power in the relevant market than monopoly power, which I discussed earlier.*[69]

Some factors that might indicate market power are

- a defendant having a large share of the relevant market;

- the defendant's ability to raise prices without losing customers or market share;

- high barriers that new firms have to overcome to enter the market;

- few or no competitors have entered the market;

- few or insignificant competitors in the market; and

- a defendant earning higher profits than it would earn in a competitive market.

---

[64] *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d at 129 ("However, 'where the plaintiff is unable to demonstrate such actual effects'—as KMB is unable to do here—'it must at least establish that defendants possess the requisite market power' and thus the capacity to inhibit competition market-wide." (quoting *Capital Imaging,* 996 F.2d at 546)).

[65] *See* ABA Model Instr. C-5; *K.M.B. Warehouse*, 61 F.3d at 129.

[66] *Tops Markets*, 142 F.3d at 97-98 ("[M]arket power, is 'the power to control prices or exclude competition.'") (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)).

[67] *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464(1992) (quoting *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984)).

[68] *United States v. Visa U.S.A., Inc.,* 344 F.3d 229, 239 (2d Cir. 2003) (hereinafter "*Visa II*") (quoting *du Pont*, 351 U.S. at 391).

[69] *Eastman Kodak Co.*, 504 U.S. at 481 ("Monopoly power under § 2 requires, of course, something greater than market power under § 1.").

The ability to charge higher prices for better products or services is not market power and does not prove harm to competition.[70]

---

[70] Trial Tr. 5629:2-4.

**3.    Unreasonable Restraint of Trade: (Step 2) Evidence of Competitive Benefits [Instruction 15]**

We have just talked about the first step in deciding whether the challenged contract terms unreasonably restrain trade in the relevant market.  If you find that US Airways has proved this element by a preponderance of the evidence then you must go on to the second step and consider whether Sabre has offered evidence that the challenged contract terms also produce countervailing <u>benefits to</u> competition in other ways.[71]

As with the first step, you must consider both the airline side and travel agent of the relevant market when determining whether Sabre has offered evidence that the challenged contract terms in the parties' 2011 contract benefit competition.

---

[71] *See* ABA Model Instr. C-8; Trial Tr. 5629:6-13.

### 4. Unreasonable Restraint of Trade: (Step 3) Whether Contract Restraints Were Reasonably Necessary to Achieve the Competitive Benefits [Instruction 16]

If you find that Sabre has offered evidence that the challenged restraints result in competitive benefits, then you must decide whether US Airways has proved by a preponderance of the evidence that either

- the challenged provisions in the 2011 contract between US Airways and Sabre are not reasonably necessary to achieve Sabre's procompetitive justifications, or

- those benefits may be achieved in a manner substantially less restrictive of competition.[72] US Airways has the burden of proof on this issue.

If US Airways proves that the same competitive benefits claimed by Sabre could have been readily achieved by other, reasonably available alternative means that would have created substantially less harm to competition, then Sabre cannot use them to justify the challenged restraints.  US Airways has the burden of proof on this issue.[73]

---

[72]*Amex I*, 838 F.3d at 195; *Geneva Pharm.*, 386 F.3d at 507; *Visa II*, 344 F.3d at 238; Trial Tr. 5630:3-7.
[73] *See* ABA Model Instr. C-8; Trial Tr.5629:14-5630:1.

### 5.    Unreasonable Restraint of Trade: Balancing Benefits and Harm [Instruction 17]

Ultimately, you must weigh the harms and benefits of the challenged behavior.[74]  If the competitive harm substantially outweighs the competitive benefits, then the challenged restraint is unreasonable.  If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraint is not unreasonable.[75]  In conducting this analysis, you must consider the benefits and harm to competition in the relevant market as a whole, *considering* both the airline and travel agent sides of the relevant market.   The overarching standard is whether Sabre's actions diminish overall competition.[76]

What I've just explained to you is how to decide the second element of US Airways' 2011 contract restraints claim -- whether the restraints unreasonably restrained trade in the relevant market.

---

[74] *See Amex I*, 838 F.3d at 195 ("Ultimately, it remains for the factfinder to weigh the harms and benefits of the challenged behavior."); *Visa II*, 344 F.3d at 238 ("The principal question in a rule of reason case is often whether the anticompetitive effects of a restraint are outweighed by some procompetitive justification."); *K.M.B. Warehouse*, 61 F.3d at 128 ("The overarching standard is whether defendants' actions diminish overall competition, and hence consumer welfare." (internal quotation marks and citation omitted)); *Capital Imaging*, 996 F.2d at 543.  *But see Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991) (describing weighing harms and benefits "to determine if behavior is reasonable on balance" as a final step, distinct from the steps of defendant offering procompetitive benefits and plaintiffs offering evidence of competitive harm).
[75] Trial Tr. 5630:2-11.
[76] Trial Tr. 5630:2-11.

## V.      ANTITRUST INJURY AND CAUSATION

### A.      Fourth Element - Antitrust Injury and Causation [Instruction 18]

*If you find that US Airways has proved the other elements of its contractual restraint claim and/or its monopolization claim*, you must also decide whether US Airways has proved by a preponderance of the evidence that it was actually injured as a result of Sabre's alleged unlawful conduct.  This element requires proof of the following three elements of injury and causation[77]:

First, that US Airways was in fact injured as a result of Sabre's violations of of the Sherman Act[78];

Second, that Sabre's illegal conduct was a material cause of US Airways' injury[79]; and

Third, that US Airways' injury is an injury of the type that the antitrust laws were intended to prevent.[80]

Let me explain each of these briefly.  I will discuss separately next what needs to be proven in order to award damages.  The first element of proving antitrust injury is sometimes called "injury in fact."  US Airways must prove that its business actually suffered because of Sabre's alleged violation(s) of the antitrust laws.  Proving the fact of damage does not require US Airways to prove the dollar value of its injuries.  It requires only that US Airways prove that it was in fact injured by Sabre's alleged antitrust violation.[81]

---

[77] *See* Tr. 5630:19–25.
[78] Tr. 5631:1–2.
[79] Tr. 5631:3–4.
[80] Tr. 5631:5–6.
[81] Tr. 5631:7-14.

34

For the second element of antitrust injury, US Airways must prove as a matter of fact and with a fair degree of certainty that Sabre's illegal conduct was a "material cause" of US Airways' injury.  This means that US Airways must prove that some actual damage occurred to it as a result of Sabre's alleged antitrust violation, and not some other cause.  US Airways is not required to prove that Sabre's antitrust violation was the sole cause of its injury; nor must it eliminate all other causes of injury.  *US Airways is also not required to confidently reconstruct the hypothetical development of the market in a world absent Sabre's exclusionary conduct.*[82] However, if you find that US Airways' injuries were caused primarily by something other than the alleged antitrust violation, then the second element is not satisfied.[83]

For the third element, US Airways must prove that its injuries are the type of injuries that the antitrust laws were intended to prevent.[84]  Generally, being made to pay higher prices that no longer reflect ordinary market conditions is an injury of the type the antitrust laws were intended to prevent.[85]  On the other hand, if US Airways' injuries were caused by heightened competition, or from contract terms that were the result of the competitive process itself, or by acts that would, on balance, benefit consumers then US Airways' injuries are not antitrust injuries. Antitrust laws were enacted for the protection of competition, not competitors.[86] [87]

---

[82] *U.S. v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001)

[83] Tr. 5631:15–5632:1.

[84] *See generally Atl. Richfield Co. v. USA Petroleum Co*., 495 U.S. 328, 334 (1990) (vertical claim); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

[85] *Gelboim v. Bank of Am. Corp.* 823 F.3d 759, 772 (2d Cir. 2016).  ("Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.") (internal quotation marks omitted).

[86] *Brunswick Corp.*, 429 U.S. at 488.

[87] Tr. 5632:2–12.

For example, US Airways did not suffer an antitrust injury if it paid high booking fees under the parties' 2011 contract that were the result of a bargained for exchange in a competitive market.  On the other hand, if US Airways paid higher fees as the result of an anticompetitive aspect[88] -- meaning competition-reducing aspect or effect -- of Sabre's conduct,[89] US Airways suffered an antitrust injury, *even if it paid for those fees as part of a bargained-for exchange*.[90]  It is irrelevant for the purpose of determining antitrust injury, whether US Airways knew the terms were anticompetitive, agreed to them voluntarily, or used them to obtain other concessions,[91] but such evidence may be relevant for other issues, such as causation or damages.  Under the antitrust laws, a plaintiff is permitted to sign a contract containing anticompetitive terms and then sue for relief from those terms.[92]  If the terms violate the Sherman Act, they are illegal.[93]

---

[88] *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006) (citing *Atl. Richfield Co.*, 495 U.S. at 344.

[89] *Atl. Richfield*, 495 U.S. at 339 ("Antitrust injury does not arise . . . until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct . . . .").

[90] *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968) (plaintiff's "understandable attempts to make the best of a bad situation should not be a ground for completely denying him the right to recover").

[91] *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).

[92] *See e.g. Perma Life*, 392 U.S. at 139-140.

[93] Tr. 5632:13–5633:2.

36

## VI.    ANTITRUST DAMAGES

### A.    Introduction and Purpose [Instruction 19]

I am now going to instruct you on the issue of damages.  The fact that I am giving you these instructions does not mean that I have any opinion about whether US Airways should or should not prevail in this case.  I give you these damages instructions so that you will have them in the event that you find that US Airways has proved either or both of its claims.  If you find that Sabre is not liable on both claims, then you should not consider the issue of damages, and you may disregard the damages instruction I am about to give.

If you find that Sabre violated the antitrust laws -- on the 2011 contract claim, the monopolization claim, or both -- and this violation caused actual injury to US Airways, then you must determine the amount of damages, if any, US Airways is entitled to recover.  The law provides that a plaintiff should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of the conduct that is found unlawful.

Antitrust damages are compensatory, meaning their purpose is to put an injured plaintiff as nearly as possible in the position in which it would have been had the alleged antitrust violation not occurred.  The law does not permit you to award damages to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the future. Also, you are not permitted to award to US Airways an amount for attorneys' fees or the costs of maintaining this lawsuit.

37

US Airways has the burden of proving damages by a preponderance of the evidence.

**B.      Measure of Damages [Instruction 20]**

As I stated, if you determine that Sabre violated the Sherman Act and that the violation caused some injury to US Airways, you must then consider the extent of US Airways' damages. Here, US Airways claims, under both the 2011 contract claim and in its monopolization claim, (1) that it was harmed because it paid Sabre higher GDS fees than it would have paid in the absence of Sabre's alleged violation of the antitrust laws, and (2) that it earned fewer profits than it would have in the absence of Sabre's alleged violation of antitrust laws.  US Airways calls these damages "overcharge damages" and "lost profits damages," respectively.

You are permitted to make just and reasonable estimates in calculating US Airways' damages.  You are not required to calculate damages with mathematical certainty or precision. However, the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates.  Damages may not be based on guesswork or speculation.  US Airways must prove the reasonableness of each of the assumptions upon which the damages calculation is based.

If you find that US Airways has provided a reasonable basis for determining damages, then you may award damages based on a reasonable estimate supported by the evidence.  If you find that US Airways has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages or award nominal damages not to exceed one dollar.[94]

---

[94] ABA Model Instr. B-4; Trial Tr. 5640:8.

There are two claims at issue in this case—the *monopolization claim and the* 2011 contract restraint claim.  For both claims, US Airways alleges that it suffered injury because (1) it paid higher booking fees to Sabre than it would have absent the challenged restraints; and (2) it earned fewer profits than it would have in the absence of Sabre's alleged violation of the antitrust laws.  Sabre denies that US Airways has suffered any recoverable damages.

With respect to the monopolization claim, US Airways *is entitled to recover damages* for *the period* between April 21, 2007 – October 30, 2012. *If you determine that Sabre violated the Sherman Act by wrongfully maintaining its monopoly power, you should proceed to consider the extent of US Airways' damages resulting from that conduct.  In calculating those damages, you should exclude any damages for injuries caused solely by the earlier 2006 contract between the parties that falls outside of this time period.*[95]

With respect to the *unreasonable* restraint claim, *US Airways is entitled to recover damages for the period* between February 23, 2011 – October 30, 2012.  *If you determine that Sabre violated the Sherman Act through unlawful restraints in the parties' 2011 contract, you should proceed to consider whether US Airways suffered damages caused by that contract.*

---

[95] US Airways' proposed instruction is simpler, easier to understand than Sabre's proposal, and is consistent with the Court's summary judgment order. *US Airways v. Sabre*, No. 11 CIV. 2725 (LGS), 2022 WL 874945, at *13 (S.D.N.Y. Mar. 24, 2022) (ECF No. 1129) ("US Airways cannot recover damages from Sabre's alleged conduct to maintain monopoly power if that conduct was merely the performance of the 2006 Contract.").

### C.        Causation and Disaggregation of Damages [Instruction 21]

If you find that Sabre violated the antitrust laws and that US Airways was actually

injured by that violation, US Airways is entitled to recover for those injuries that were the direct

result or likely consequence of Sabre's alleged unlawful acts.  US Airways bears the burden of

showing that its injuries were caused by Sabre's antitrust violation, as opposed to other factors.

If you find that US Airways' alleged injuries were caused in part by Sabre's alleged antitrust

violation and in part by other factors, then you may award damages only for that portion of US

Airway's alleged injuries that was caused by Sabre's alleged antitrust violation.[96]

US Airways bears the burden of proving damages by a preponderance of the evidence,

including apportioning damages between lawful and unlawful causes.  If you find that US

Airways was injured by Sabre's alleged antitrust violation, and there is a reasonable basis to

apportion US Airways' alleged injury between lawful and unlawful causes, then you may award

damages.  If you find that US Airways' alleged injuries were caused by factors other than

Sabre's alleged antitrust violations, then you must return a verdict for Sabre.  If you find that

there is no reasonable basis to apportion US Airways' alleged injury between lawful and

unlawful causes, or that apportionment can only be accomplished through speculation or

guesswork, then you may not award any damages at all.

---

[96] *See* ABA Model Instr. B-4; *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (limiting damages that a plaintiff may recover to those caused by antitrust violations of the defendant).

40

## VII.   CLOSING ARGUMENTS

With these instructions in mind, you will now hear from the lawyers, who will give their closing arguments.  I remind you that arguments by lawyers are not evidence, because the lawyers are not witnesses.  However, what they say to you in their closing arguments is intended to help you understand the evidence and to reach your verdict.  Please pay careful attention to their arguments.