UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                        :
US AIRWAYS, INC.,                                       :
                                  Plaintiff,            :
                                                        :          11 Civ. 2725 (LGS)
                  -against-                             :
                                                        :          **<u>AMENDED</u>**
                                                        :          **<u>OPINION AND ORDER</u>**
SABRE HOLDINGS CORP., et al.,                           :
                                  Defendants.  :
-------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

US Airways, Inc., brings antitrust claims against Sabre Holdings Corporation, Sabre Travel International Ltd. and Sabre GLBL Inc. (collectively, "Sabre") under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Sabre moves to exclude certain testimony of US Airways' damages expert Dr. Rosa Abrantes-Metz and for summary judgment on US Airways' sections 1 and 2 claims. For the reasons discussed below, both motions are denied.

A jury previously returned a verdict in favor of US Airways on its § 1 claim following a trial that stretched over three months in 2016. Sabre appealed. In 2019, the Second Circuit vacated the jury award based on the 2018 opinion of the Supreme Court in *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018) ("*Amex II*"), and remanded the case. *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019). The Second Circuit concluded that "based on the evidence that *was* before the jury at the time it rendered its verdict, that under instructions consistent with *Amex II*, the jury could have rendered (not would have been required to render) a proper verdict in favor of US Airways on Count 1," the § 1 claim. *Id.* In the same decision, the Second Circuit reinstated US Airways' § 2 claim, which had been dismissed early in the action. *Id.*

## I.      BACKGROUND

The following facts are drawn from the parties' submissions, including their Local Civil Rule 56.1 statements, are undisputed and provide an overview of the context of the parties' dispute.

Plaintiff US Airways was a legacy airline and one of the largest airlines in the United States in 2012.  It is now a wholly-owned subsidiary of American Airlines Group, Inc.  Sabre operates a global distribution system ("GDS"), which is a computerized platform that connects travel suppliers, including airlines, to travel agents who purchase tickets on behalf of the traveling public.  Two other entities, Travelport and Amadeus, have operated GDSs in the United States for more than three decades.  Airlines use GDSs to distribute flight information, including airfare and flight schedules, to travel agencies.  Travel agencies include traditional travel agencies ("TTAs"), i.e., with agents who work out of brick-and-mortar locations, and online travel agencies.  TTAs include travel management companies, which handle travel needs for large corporations and organizations.

GDSs are two-sided transaction platforms that connect airlines and travel agents for the purchase of airfare in a single transaction over the platform.  GDSs provide a variety of services to travel agencies, such as facilitating comparison shopping and providing access to many flight and fare options.  Between 2006 and 2012, US Airways contracted with Sabre, Travelport and Amadeus for GDS services.  During that period, Sabre held between a forty-nine and fifty-two percent share of TTA bookings through GDSs in the United States.  Travel agencies contract with GDSs for access to their services and can receive incentive payments for their use of a particular provider's GDS.  During the negotiations, travel agencies try to obtain increased incentives and threaten to switch to other GDSs.  GDS incentives paid to travel agencies have increased.

One of US Airways' experts, Professor Joseph Stiglitz, proposes two relevant antitrust markets for US Airways' claims. First, he proposes a market consisting only of Sabre GDS services connecting airlines to TTAs. Second, he proposes a broader market encompassing all GDS services connecting airlines to TTAs.

Airlines, like US Airways, typically pay Sabre a booking fee for each booking made through Sabre's GDS. US Airways challenges two contracts that it entered into with Sabre in 2006 (the "2006 Contract") and 2011 (the "2011 Contract"). US Airways' § 1 claim arises out of the two contracts, and its § 2 claim is based on the contracts and other alleged anticompetitive behavior by Sabre. US Airways challenges terms in the contracts that require US Airways (1) to offer the same content through Sabre's GDS as it offers through other booking channels, (2) to provide content to Sabre at prices not to exceed prices charged on other booking channels, (3) not to steer customers to book on its own website or induce travel agents to bypass Sabre's GDS and (4) not to impose a surcharge on tickets booked through Sabre.

US Airways also challenges alleged monopoly power exercised by Sabre in the GDS market based on the following facts in addition to a litany of disputed facts. No GDS competitor has successfully entered the market in the last thirty years. Sabre has not innovated on technology and uses technology its customers call outdated and calcified. Sabre's economic profits far exceed the economic profits of its comparator firms and main customers. Sabre maintains a net fee that is far above the competitive level. Sabre charges airlines different per-booking fees that are not explained by differences in the cost of providing the service.

3

## II.   *DAUBERT* MOTION

Sabre moves to exclude the testimony of Dr. Rosa Abrantes-Metz concerning her estimates of Plaintiff's overcharge and lost profits damages.  For the reasons below, Sabre's motion is denied.

### A. *Daubert* Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if [] (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  District courts play a "'gatekeeping' function" under Rule 702 and are "charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"  *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 122-23 (2d Cir. 2020) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).  A Rule 702 inquiry focuses on three issues: (1) whether a witness is qualified as an expert, (2) whether the witness's "opinion is based upon reliable data and methodology" and (3) whether "the expert's testimony (as to a particular matter) will assist the trier of fact."  *Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005) (internal quotation marks omitted); *accord In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 543 (S.D.N.Y. 2021).  "[A] slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible."  *United States v. Jones*, 965 F.3d 149, 160 (2d Cir. 2020).

The party proffering the expert bears the burden of establishing Rule 702's admissibility requirements by a preponderance of the evidence.  *Id.* at 161.

### B. *Daubert* Analysis

#### 1. Damages Models

Sabre argues that all of the damages models should be excluded because Dr. Abrantes-Metz's calculations do not comport with the but-for world proffered by Professor Stiglitz. Professor Stiglitz opines that a competitive market would not emerge until five years after the purportedly anticompetitive terms in the contract between US Airways and Sabre are removed. Sabre contends that Dr. Abrantes-Metz's damages model should therefore account for the five-year delay in the emergence of a competitive market.  Sabre's argument is incorrect because Dr. Abrantes-Metz's model should be designed to contemplate a world in which there never was any anticompetitive conduct, rather than a point in time when anticompetitive conduct ceased. *See Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 563 (S.D.N.Y. 2017) (noting that "computation of antitrust damages always entails the reconstruction of a hypothetical market absent the unlawful manipulation"); *see also Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) (stating that damages in monopolization under the Sherman Act are calculated "by comparison of profits, prices and values as affected by the [unlawful act], with what they would have been in its absence under freely competitive conditions").

#### 2. Overcharge Estimates

There is no basis for excluding Dr. Abrantes-Metz's overcharge damages estimates. Sabre makes two arguments for excluding Dr. Abrantes-Metz's overcharge estimates:  (1) the estimates do not account for the relative price sensitivity of airlines and travel agents when opining that the travel agent incentives in the but-for world would be significantly lower than in

the actual world and (2) the estimates do not account for how pricing changes in the but-for world would impact demand for Sabre's GDS platform. These arguments are unavailing.

As to price sensitivity, contrary to Sabre's assertions, Dr. Abrantes-Metz analyzed the relative price sensitivities of airlines and travel agents. In her reply report, she explained her basis for concluding that, in the competitive world, airlines would have increased price elasticity for Sabre's services. Dr. Abrantes-Metz further explained at her deposition that travel agents would be more inelastic in comparison to airlines. Sabre expresses the additional concern that Dr. Abrantes-Metz did not quantify the price sensitivities. But Sabre points to no support for its argument that price sensitivities must be quantified, or that quantification is even possible given the information available to Dr. Abrantes-Metz. One of Sabre's experts testified that the quantification of elasticities is something that is "[i]n general . . . very hard to do" and relied on the same style of theoretical discussion of elasticities for which Sabre now challenges Dr. Abrantes-Metz. Sabre further argues that Dr. Abrantes-Metz's opinion contradicts the Supreme Court's opinion in *Amex II*. Sabre plays fast-and-loose with whether they are quoting the Supreme Court's opinion in *Amex II* or academic articles specific to the credit card market quoted by the Supreme Court in that case. To the extent Sabre quotes the legal holdings of *Amex II*, Sabre points to no basis for finding that the sensitivities of the cardholders and merchants on either side of the two-sided market at issue in *Amex II* apply wholesale to the travel agents and airlines on either side of the two-sided market at issue in this case, such that the holdings and findings of *Amex II* all apply to this case. The dispute between the parties about the relative price sensitivities on each side of Sabre's platform is a question best left for the jury.

As to Dr. Abrantes-Metz's failure to account for demand in her overcharge analysis, Sabre does not identify any case law or other support for its argument that overcharge damages

estimates should account for demand.  Sabre argues that failing to account for demand permits

Plaintiff to claim overcharges for bookings that would not have occurred in the but-for world.

But the point of an overcharge estimate is to account for damages incurred from bookings that

occurred in the actual world based on an estimate of the price difference between the actual world

and the but-for world.  *See Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363,

374 (3d Cir. 2005) (defining overcharge as "the difference between the price paid for goods

actually purchased and the price that would have been paid absent the illegal conduct"); *Tawfilis*

*v. Allergan, Inc.*, No. 15 Civ. 307, 2017 WL 3084275, at *11 (C.D. Cal. June 26, 2017)

("Antitrust law has traditionally not required direct purchasers to determine how much of the

relevant product they would have purchased in the but-for world to establish antitrust impact.").

Had Dr. Abrantes-Metz's overcharge estimate accounted for bookings that did not occur in the

actual world, there would be an issue with the model.

### 3.  Lost Profits Estimates

There is no basis to exclude Dr. Abrantes-Metz's lost profits estimates.  Sabre offers three

reasons for excluding Dr. Abrantes-Metz's lost profits estimates:  (1) like the overcharge

estimates, the lost profits estimates do not account for relative price sensitivities, (2) the model

underlying the lost profits estimates implies increased prices and costs to travel agents and

travelers, but ignores these costs in modeling demand for air travel and (3) the model does not

account for opportunity costs.  These arguments are unavailing.

As stated above, Dr. Abrantes-Metz considered price sensitivities.  Sabre does not make

any independent argument regarding price sensitivities and the lost profits model.  Sabre's price

sensitivities argument is unavailing as to lost profits for the same reason it is unavailing as to

overcharges.

As to demand for air travel, Dr. Abrantes-Metz testified why she believes the several dollar increase to travel agents' costs would not impact demand.  Dr. Abrantes-Metz stated that it would be unlikely that cost would get passed through to customers; and even if it were, (1) the costs are very low compared to the average price of the fare and (2) business customers tend to be price inelastic, so any impact on demand would be trivial.  Ultimately, Sabre's arguments on this issue stem from disagreements about the impact of Dr. Abrantes-Metz's model -- but those concerns go to the weight and not the admissibility of her opinion.

As to opportunity costs, Sabre argues that the lost profits estimates disregard opportunity costs in contravention of Dr. Abrantes-Metz's own stated methodology.  US Airways persuasively argues that Dr. Abrantes-Metz's included opportunity costs in her model.  The issue here is whether Dr. Abrantes-Metz was correct to include opportunity costs as a cost in the profit function or whether, as Sabre contends, she should have treated them as an actual cost subtracted from revenues.  The parties' dispute goes to the weight of the opposing approaches rather than admissibility.  Accordingly, Sabre's motion to exclude Dr. Abrantes-Metz is denied.

## III.    SUMMARY JUDGMENT MOTION

Sabre presents its motion for summary judgment addressing three distinct arguments: (1) the statute of limitations, (2) the allegedly speculative nature of the link between injury and damages and (3) insufficient evidence of monopoly power.  To the extent that Sabre seeks summary judgment based on the exclusion of Dr. Abrantes-Metz report and testimony, that argument is rejected because the report and testimony are not excluded.  For the reasons that follow, Sabre's motion for summary judgment is denied.

### A.  Applicable Law

#### 1.  Summary Judgment

Summary judgment is proper where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Electra v. 59 Murray Enters.*, 987 F.3d 233, 248 (2d Cir. 2021).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Liberty Lobby*, 477 U.S. at 248; *accord Saleem v. Corp. Transp. Grp.*, 854 F.3d 131, 148 (2d Cir. 2017).  Courts must construe the evidence and draw all reasonable inferences in the non-moving party's favor.  *Electra*, 987 F.3d at 248.  When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing to particular parts of materials in the record.  Fed. R. Civ. P. 56(c)(1)(A).

#### 2.  Sherman Act

Section 1 of the Sherman Act provides, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  Restraints of trade are limited to "unreasonable restraints."  *US Airways, Inc.*, 938 F.3d at 54 (citing *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).  Some restraints of trade are per se unreasonable.  *Id.*  If a restraint of trade is not per se unreasonable, then it is analyzed under the rule of reason, which requires, at its first step, the identification of the relevant market.  *Id.* at 55.  "Market definition is ordinarily a deeply fact-intensive inquiry."  *Id.* (internal quotation marks omitted).

Section 2 of the Sherman Act makes illegal the monopolization or attempt to monopolize "any part of the trade or commerce among the several States." 15 U.S.C. § 2. "To establish a violation of § 2, plaintiffs must prove that defendants possessed monopoly power, and willfully acquired or maintained that power in the relevant market." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004); *accord Charych v. Siriusware, Inc.*, 790 F. App'x 299, 302 (2d Cir. 2019) (summary order).

## B.  Analysis

### 1.  Statute of Limitations

In Count II of the Fifth Amended Complaint, US Airways alleges that Sabre unlawfully maintained monopoly power in violation of § 2 of the Sherman Act, through the contractual constraints that are the subject of Count 1 as well as other anticompetitive conduct. US Airways seeks damages it suffered during the four years preceding the filing of this action, i.e., from April 21, 2007, to the end of 2012. Sabre moves for summary judgment excluding any damages arising out of the 2006 Contract, i.e., those incurred before the 2011 Contract became effective on February 23, 2011. The motion is granted. US Airways' damages arising out of the 2006 Contract are time-barred, but damages arising from other anticompetitive conduct are not precluded.

Under the Sherman Act's statute of limitations, damages are recoverable if a plaintiff files suit within four years after a cause of action accrues. 15 U.S.C. § 15b. "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). But if a defendant is engaged in a continuing antitrust violation, a subsequent "'overt act that is a part of the violation and that injures the plaintiff,' *e.g.*, each sale to the plaintiff, 'starts the statutory

10

period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (quoting 2 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 338b (rev. ed. 1995) [hereinafter "Areeda"]); *US Airways, Inc.*, 938 F.3d at 68.  For example, in *Hanover Shoe*, the Supreme Court treated the defendant's lease-only policy and refusal to sell its shoe-manufacturing machinery as an ongoing act of monopolization and held that the statute of limitations began anew each time the defendant refused to sell.  *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968).  The plaintiff was entitled to recover damages incurred during the four years prior to bringing suit, even though the plaintiff had been subjected to the policy decades earlier.  *Id.*  In *Hanover Shoe*, both the actionable conduct (refusal to sell) and resulting damage were required to have occurred within the limitations period.  The continuing violation doctrine "generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."  *Klehr*, 521 U.S. at 189.

The Second Circuit in *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979), recognized an exception to this general rule requiring conduct within the limitations period, stating:  "We hold, therefore, that a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period."  *Id*. at 296.  The court distinguished between plaintiffs who are competitors and plaintiffs who are purchasers.  "Although the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price."  *Id.* at 295.  The court reasoned that a defendant's ongoing use of its ill-gotten monopoly power forecloses any "claim on the repose that a statute of limitations is

intended to provide" and concluded that "[t]he purchaser's cause of action, therefore, accrues only on the date damages are suffered." *Id.* (internal quotation marks omitted).

Neither *Hanover Shoe* nor *Berkey Photo* involved an anticompetitive contract as the instant case does. In the prior appeal of this case, the Second Circuit, following the Sixth, Eighth and Ninth Circuits, held that a defendant does not commit an overt act restarting the statute of limitations each time a plaintiff pays a defendant a supracompetitive price pursuant to an anticompetitive contract to which they are a party. *US Airways, Inc.*, 938 F.3d at 68-69. Instead, the performance of the contract is merely a "manifestation" of the prior act of making the contract. *Id*. at 69. Accordingly, the Second Circuit expressly held "that each supracompetitive price charged to US Airways by Sabre pursuant to the 2006 contract was not an overt act of its own, but a manifestation of the prior overt act of entering into the 2006 contract. That act, which began the running of the statute of limitations, was performed more than four years prior to the filing of this action." *Id*.

That holding, which affirmed the limitation on damages US Airways can recover on its § 1 claim, is equally applicable to the § 2 monopoly claim. Although the Second Circuit did not mention *Berkey Photo* or the § 2 claim in its statute of limitations analysis, nothing in the Court's analysis or holding placed any significance on the difference between the two Sherman Act provisions. To the contrary, the Second Circuit's basis for distinguishing *Hanover Shoe* was not that it involved an ongoing monopoly, but rather that its claims did not arise out of a contract to which Plaintiff and Defendant were parties. *Id*. at 68. This interpretation -- that each contractual payment by US Airways was not an overt act for purposes of restarting the statute of limitations -- is also in line with the law of other courts. *See* Areeda, ¶ 320c4 (rev. ed. 2022) (collecting cases and stating, "[t]he courts consistently hold that if the monopoly is created by a single

identifiable act and is not perpetuated by an ongoing policy, the statute of limitation runs from the time of commission of that act, notwithstanding that high prices may last indefinitely into the future."). Accordingly, US Airways cannot recover damages from Sabre's alleged conduct to maintain monopoly power if that conduct was merely the performance of the 2006 Contract.

US Airways can seek § 2 claim damages arising from other monopolizing conduct, provided that the resulting injury occurred during the four years preceding the filing of the lawsuit. *See Berkey Photo*, 603 F.2d at 295-96. US Airways contends that Sabre engaged in such anticompetitive conduct beginning in or about 2004 to 2012, including imposing retaliatory costs on airlines that attempted to circumvent Sabre's GDS, entering into exclusionary contracts with travel agents and thwarting potential competitors' entry into the GDS market. This conduct is in addition to and independent of the 2006 Contract. Plaintiff argues that if Sabre had not engaged in this conduct, then US Airways would have been able to move its bookings to alternative distribution channels. To the extent US Airways can prove that (1) Sabre engaged in willful conduct to acquire or maintain monopoly power independent of the 2006 Contract, (2) Sabre had monopoly power at the time of the conduct and (3) the conduct resulted in damages within the four-year statutory period, then US Airways can recover those damages under § 2 of the Sherman Act consistent with its statute of limitations.

### 2.  Nature of Injury and Damages Estimate

Sabre argues that the causal link between Sabre's conduct and US Airways' injury and damages is impermissibly speculative warranting summary judgment in Sabre's favor. This argument is unavailing.

Sabre's speculation argument is based on a mischaracterization of Professor Stiglitz's report and testimony. Professor Stiglitz discussed many possible changes to the market that

13

would emerge in the absence of the alleged anticompetitive conduct by Sabre. Sabre's memorandum of law in support of its motion for summary judgment cherry-picks aspects of Professor Stiglitz's expert opinion to construct a purported causal chain proposed by US Airways, then attacks that construction as speculative. That causal chain is a creation of Sabre, not US Airways. Instead, Professor Stiglitz testifies to multiple ways that a competitive market would result from the termination of Sabre's allegedly anticompetitive conduct, with different changes by Sabre leading to different changes by the other actors in the two-sided market. The jury can credit any of the potential pathways to market change hypothesized by Professor Stiglitz to find that a more competitive market could emerge in the absence of Sabre's purportedly anticompetitive conduct. As before, "[t]he expert [report and] testimony of Professor Stiglitz . . . is evidence from which a reasonable jury could conclude that[,] but for [the alleged anticompetitive conduct], price competition would be unrestricted, and the Sabre fee would decrease as a result of market forces." *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 287 (S.D.N.Y. 2015).

Sabre's argument that the causal link is too speculative because it involves the conduct of third parties is unsupported. The third parties are all direct participants in the two-sided market. There is no reason to believe that US Airways could model changes to the market without hypothesizing about those third parties' conduct. Because this case concerns a two-sided market, it is well within reason for considerations of market players to involve more third parties than a typical antitrust case. Further, the hypotheses are not wholly unfounded here where Plaintiff has proffered evidence that at least some third parties (such as Air Canada and American Airlines) took action to circumvent or challenge Sabre's allegedly anticompetitive contractual terms, and

that other third parties (such as G2 and Farelogix) attempted to compete with Sabre and were allegedly thwarted by Sabre.

### 3. Proof of Monopoly Power

#### a. Sabre-Only Product Market

Based on the evidence, a reasonable jury could find that there is a Sabre-only product market. Sabre argues no Sabre-only market exists because there are other GDSs, all GDSs provide interchangeable transactions to airlines on one side of the market and all GDSs compete for travel agency customers on services and price on the other side of the market. For the reasons below, Sabre's arguments are unpersuasive.

"'[A] single brand of a product or service' may 'be a relevant market under the Sherman Act' if no substitute exists for that brand's products or services." *US Airways, Inc.*, 938 F.3d at 66. The question is whether the Sabre platform is interchangeable with other booking alternatives, including the other GDSs. *Id.*

Here, US Airways presents evidence that, from the airlines' perspectives, Sabre's platform is not interchangeable. Part of that evidence is based on the "single-homing" activity on the travel agent side of the market. A reasonable jury could conclude that Sabre maintained a lock on the travel agent side of the market and that, from the perspective of US Airways and other providers, the services of the GDS platforms were not reasonably interchangeable because a contract with another GDS would not provide access to the market of Sabre travel agent purchasers locked in on the other side of the Sabre GDS platform. This view is supported by the analysis of Professor Stiglitz, which shows that airlines would not switch to a different GDS in response to a slight GDS price increase.

US Airways similarly presents evidence that on the travel agent side of the market, Sabre's product was not interchangeable.  First, Professor Stiglitz conducted an analysis of the cross-elasticities of demand, which showed that there would be insufficient substitution to GDS or non-GDS alternatives if Sabre imposed a significant non-transitory increase in price of 5%. Sabre attempts to discredit Professor Stiglitz's opinion by pointing to deposition testimony that travel agents were "willing to switch."  That travel agents were willing to switch is disputed, despite Sabre's averment to the contrary.  US Airways presents evidence that the average length of a relationship between a travel management company and a GDS is nineteen years, that Sabre's renewal rates were 98.9% and 99.9% in 2010 and 2011 respectively and that despite threats to switch, travel agent switching rarely occurred.

Second, US Airways also presents evidence that there are "no viable substitutes available to the travel agents who use Sabre's services [because] travel agents are locked into the Sabre platform because of the prohibitively high costs of switching to alternative booking channels and incentive payment structures."  *US Airways, Inc.*, 938 F.3d at 66.  For example, US Airways presents evidence that TTA locations use only one GDS and rarely switch and that many factors impede travel agent switching, including long-term contracts, non-linear incentive structures and user-unfriendly interfaces.  Sabre does not contest this evidence, but instead deems it immaterial because there is evidence of competition between GDSs for multi-year contracts.

Third, Sabre's assertion that there is undisputed evidence of competition on the travel agent side is ill-founded.  Sabre contends that, because incentives for travel agents increased, there was competition in the GDS services market, and therefore any other evidence that there was no competition is immaterial.  Professor Stiglitz disputes that the increase of incentives is

16

evidence of competition.  As a result, the existence of competition in the travel agent side of the market is in dispute, and it is up to a jury to weigh the evidence.

Sabre's reliance on *In re American Express Anti-Steering Rules Antitrust Litigation*, 361 F. Supp. 3d 324 (E.D.N.Y. 2019) ("*Amex Anti-Steering*"), is misplaced.  In *Amex Anti-Steering*, the District Court granted partial summary judgment and rejected a market limited to a single platform because, on one side of the market, cardholders treated American Express's credit cards interchangeably with other credit cards; and the only reason merchants on the other side of the market could not do the same was because of contracts they voluntarily entered with American Express.  *Id*. at 345-47.  The merchant plaintiffs did "not ma[k]e a legally permissible allegation that Amex possessed pre-contract market power that compelled [the merchants'] acceptance" of the contracts.  *Id*. at 347.  Here, in contrast, Plaintiff offers evidence from which a reasonable jury could conclude that Sabre had sufficient market power to force US Airways to accept the anticompetitive contracts.

### b.  GDS Services Market

US Airways offers significant evidence from which a reasonable jury could find that Sabre exercised monopoly power in the GDS market, precluding Sabre's request for summary judgment on this issue.  This evidence includes (i) net pricing that has approached double the competitive level, (ii) excessive profits, (iii) a flow of payments from GDSs to travel agents that would not exist in a competitive market, (iv) ability to price discriminate by charging airlines different fees, (v) maintenance of a high, stable market share while selling obsolete technology, (vi) retaliatory conduct against airlines that promote innovation, (vii) structural barriers to entry, (viii) artificial barriers to entry, (ix) the failure of even one GDS competitor to emerge within the last thirty years and (x) that Sabre had between a forty-nine and fifty-two percent share of TTA

17

bookings through GDSs in the United States from 2006 to 2012. *See generally Geneva Pharms. Tech. Corp.*, 386 F.3d at 500 ("Monopoly power is 'the power to control prices or exclude competition'" and can be proven "directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market."); *FTC v. Shkreli*, No. 20 Civ. 706, 2022 WL 135026, at *32 (S.D.N.Y. Jan. 14, 2022) (same).

US Airways also points to evidence that Sabre controls between forty-nine and fifty-two percent of the market for TTA bookings through GDSs in the United States. This is enough to support a finding of monopoly power when combined with other evidence. *See Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981) ("Sometimes, but not inevitably, it will be useful to suggest that a market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power."); *Hayden Publ'g Co., Inc. v. Cox Broad. Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984) ("[A] party may have monopoly power in a particular market, even though its market share is less than 50%."); *Sitts v. Dairy Farmers of Am., Inc.*, 417 F. Supp. 3d 433, 477 (D. Vt. 2019) ("[M]arket share in the range of 50% is evidence of monopsony power . . . .").

Sabre responds that US Airways does not have evidence that Sabre has the power to exclude "all competition generally" because two of Sabre's competitors still maintain a share of the market. Sabre erects too high a bar. Direct evidence of monopoly power does not require evidence of the exclusion of all competition. Sabre argues that US Airways lacks the "rare" and "unambiguous" direct evidence of monopoly power, but the case Sabre cites holds that control of less than 50% of the market "would not automatically preclude a finding of monopoly power by a

jury entitled to assess monopoly power on the record as a whole." *Broadway Delivery Corp.*, 651 F.2d at 130; *see also Epic Games, Inc. v. Apple Inc.*, No. 20 Civ. 5640, 2021 WL 4128925, at *95 (N.D. Cal. Sept. 10, 2021) ("A share between 52 and 57 percent . . . is enough to permit the Court to evaluate the state and durability of the market."); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 400 (E.D.N.Y. 2008) ("[A] finding that MasterCard's market share is less than 30 percent would not, in any event, foreclose the possibility that the Individual Plaintiffs may succeed on their Section 2 claims.").

Sabre may be correct that at least some of the evidence Plaintiff claims to be direct evidence is indirect.  But the distinction between direct and indirect evidence is unimportant here given the volume of evidence Plaintiff has identified combined with evidence of Sabre's market share, all of which could support a jury's finding that Sabre exercised monopoly power.  US Airways has satisfied its burden of producing evidence that Sabre controlled prices or excluded competition.  *See Shkreli*, 2022 WL 135026, at *32 ("A plaintiff can establish a defendant's monopoly power either 'directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market.'").  Whether the control or exclusion is as Sabre states, "at most" because the GDS services market is an oligopoly controlled by Sabre, Travelport and Amadeus, or because of illegal monopolistic conduct by Sabre, is a matter left for the jury.  *See Geneva Pharms. Tech. Corp.*, 386 F.3d at 500-01 (holding that whether circumstances were a substantial impediment to competition "is a matter left for a jury").

Sabre argues that US Airways' monopolization claim against Sabre fails because US Airways alleges that Sabre's two competitors also have monopoly power.  This argument is unavailing.  Sabre does not identify any controlling case law to suggest that an entity cannot be

liable under § 2 for exercising the power to control prices or exclude competition in a market because some other entity also exercises the same power in that market.  An "antitrust defendant's unlawful conduct need not be the *sole* cause of the plaintiffs' alleged injuries," so long as the conduct was a "substantial or materially contributing factor in producing that injury." *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 66 (2d Cir. 2012) (internal quotation marks omitted).  *In re Inclusive Access Course Materials Antitrust Litigation*, No. 20 Civ. 6339, 2021 WL 2419528, at *14 (S.D.N.Y. June 14, 2021), does not support Sabre's argument because that case involved § 2 claims against three defendants and allegations of monopoly power based on the three defendants' shared control of the market.  *Id.*  Here, US Airways' § 2 claim is not based on multiple entities' shared control of the market.  US Airways has proffered sufficient evidence for a reasonable jury to conclude that Sabre had monopoly power.

## IV.    CONCLUSION

For the reasons stated above, Sabre's *Daubert* motion is DENIED, and Sabre's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Sabre's request to exclude any damages arising out of the 2006 Contract, i.e., those incurred before the 2011 Contract became effective on February 23, 2011, is GRANTED, but damages arising from other anticompetitive conduct are not precluded.  The motion for summary judgment is otherwise DENIED.  Sabre's request for oral argument is DENIED AS MOOT.

The Clerk of Court is respectfully directed to strike the Opinion at Dkt. No. 1129.

Dated: April 15, 2022
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE