UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

US AIRWAYS, INC., FOR AMERICAN
AIRLINES, INC., AS SUCCESSOR AND
REAL PARTY IN INTEREST,

Plaintiff,

-against-

SABRE HOLDINGS CORPORATION;
SABRE GLBL INC.; and SABRE TRAVEL
INTERNATIONAL LIMITED,

Defendants.

Civ. A. No. 1:11-cv-02725-LGS

**US AIRWAYS' MEMORANDUM OF LAW IN SUPPORT OF ITS RENEWED AND
AMENDED MOTION FOR COSTS, INCLUDING ATTORNEY'S FEES AND
EXPENSES, UNDER 15 U.S.C. § 15**

Andrew J. Frackman
afrackman@omm.com
Anton Metlitsky
ametlitsky@omm.com
Mia N. Gonzalez
mgonzalez@omm.com
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000

Patrick Jones (admitted *pro hac vice*)
pjones@omm.com
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300

Madhu Pocha (admitted *pro hac vice*)
mpocha@omm.com
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 553-6700

R. Paul Yetter (admitted *pro hac vice*)
pyetter@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, TX 77002
Telephone: (713) 632-8000

*Attorneys for Plaintiff US Airways, Inc.,
for American Airlines, Inc., as Successor
and Real Party in Interest*

**TABLE OF CONTENTS**

**Page**

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    US AIRWAYS' REQUEST FOR FEES AND EXPENSES IS REASONABLE............ 5

    A.    US Airways' Legal Team's Hours are Reasonable. ............................... 5

    B.    US Airways' Hourly Rates are Reasonable ........................................ 9

    C.    US Airways is Entitled to Recover Reasonable Attorney's Expenses ................ 10

III.   SABRE CANNOT MEET ITS BURDEN TO ESTABLISH A SUBSTANTIAL
        REDUCTION TO THE LODESTAR AMOUNT .......................................... 12

    A.    The Size of the Jury Award does not Permit a Significant Downward
          Adjustment Under the *Johnson* Factors ............................................. 12

    B.    Sabre's Attempt to Artificially Compartmentalize the Work Related to
          Different Claims Lacks Merit and Should be Rejected ..................................... 15

          1.    All US Airways' Claims are Based on a Common Core of Facts
               and Legal Theories.................................................................... 16

          2.    US Airways' Vertical Restraints Section 1 Claim is Subsumed
               Within its Winning Monopolization Claim ............................ 18

          3.    Voluntary Dismissal of US Airways' Conspiracy to Monopolize
               Claim had no Bearing on the Scope of Work .......................... 21

          4.    The Facts Underlying the Horizontal Conspiracy Claim
               Overlapped with Facts Underlying US Airways' Monopolization
               Claim..................................................................................... 22

          5.    US Airways is Entitled to Recover Fees Related to the Appeal of
               the 2016 Verdict .................................................................... 23

    C.    Any Downward Adjustment Should Be Minimal in Light of US Airways'
          Voluntary 15 Percent Reduction........................................................ 23

IV.   US AIRWAYS IS ENTITLED TO STATUTORY COSTS ............................ 24

V.    CONCLUSION.................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*Abshire v. Walls*,
  830 F.2d 1277 (4th Cir. 1987) ............................................................................................... 18

*Am. Safety Equip. Corp. v. J. P. Maguire & Co.*,
  391 F.2d 821 (2d Cir. 1968) ................................................................................................... 13

*Anderson v. City of N.Y.*,
  132 F. Supp. 2d 239 (S.D.N.Y. 2001) ................................................................................... 25

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
  369 F.3d 91 (2d Cir. 2004) ..................................................................................................... 11

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
  548 U.S. 291 (2006) ................................................................................................................ 25

*Automotive Products, plc v. Tilton Engineering, Inc.*,
  1993 WL 660164 (C.D. Cal. Sept. 16, 1993) ........................................................................ 17

*BD v. DeBuono*,
  177 F. Supp. 2d 201 (S.D.N.Y. 2001) ................................................................................... 11

*Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr.*,
  652 F.3d 277 (2d Cir. 2011) ................................................................................................... 10

*Bingham v. Zolt*,
  66 F.3d 553 (2d Cir. 1995) ..................................................................................................... 24

*Bleecker Charles Co. v. 350 Bleecker St. Apartment Corp.*,
  212 F. Supp. 2d 226 (S.D.N.Y. 2002) ..................................................................................... 9

*Blum v. Stenson*,
  465 U.S. 886 (1984) ................................................................................................................ 10

*Bobrow Palumbo Sales, Inc. v. Broan-Nutone, LLC*,
  549 F. Supp. 2d 274 (E.D.N.Y. 2008) ................................................................................... 11

*Bourgal v. Atlas Transit Mix Corp.*,
  1996 WL 75290 (E.D.N.Y. Feb. 7, 1996) .............................................................................. 11

*Brown v. Green 317 Madison*, LLC,
  2014 WL 1237448 (E.D.N.Y. Feb. 4, 2014) .......................................................................... 25

*Carco Grp., Inc. v. Maconachy*,
  2011 WL 6012426 (E.D.N.Y. Dec. 1, 2011) *rev'd on other grounds*, 718 F.3d 72
  (2d Cir. 2013) .......................................................................................................................... 11

*Carter v. Inc. Vill. of Ocean Beach*,
  759 F.3d 159 (2d Cir. 2014) ................................................................................................... 24

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
    1996 WL 66111 (N.D. Ill. Feb. 13, 1996) ............................................................................ 6

*City of Riverside v. Rivera*,
    477 U.S. 561 (1986) ........................................................................................................ 6

*Close-Up Int'l, Inc. v. Berov*,
    2007 WL 4053682 (E.D.N.Y. Nov. 13, 2007) ................................................................ 11

*Cohen v. Bank of N.Y. Mellon Corp.*,
    2014 WL 1652229 (S.D.N.Y. Apr. 24, 2014) ................................................................ 25

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ........................................................................................................ 8

*Crawford Fitting Co. v. J.T. Gibbons, Inc.*,
    482 U.S. 437 (1987) ...................................................................................................... 24

*Diplomatic Man, Inc. v. Nike, Inc.*,
    2009 WL 935674 (S.D.N.Y. Apr. 7, 2009) .................................................................... 7

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
    62 F.4th 704 (2d Cir. 2023) ............................................................................................ 8

*Gierlinger v. Gleason*,
    160 F.3d 858 (2d Cir. 1998) .......................................................................................... 18

*Grant v. Martinez*,
    973 F.2d 96 (2d Cir. 1992) .............................................................................................. 9

*Gray v. Toyota Motor Sales, U.S.A., Inc.*,
    2013 WL 3766530 (E.D.N.Y. July 16, 2013) ................................................................ 10

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*,
    995 F.2d 414 (3d Cir. 1993) .......................................................................................... 17

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ...................................................................................................... 15

*Home Placement Serv., Inc. v. Providence J. Co.*,
    819 F.2d 1199 (1st Cir. 1987) ...................................................................................... 13

*In re Visa Check/Mastermoney Antitrust Litig.*,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd*, 396 F.3d 96 (2d Cir. 2005) .................... 11

*J.S. Nicol, Inc. v. Peking Handicraft, Inc.*,
    2008 WL 4613752 (S.D.N.Y. Oct. 17, 2008) ................................................................ 11

*Jarvis v. Ford Motor Co.*,
    2003 WL 1484370 (S.D.N.Y. Mar. 21, 2003) .............................................................. 25

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Johnson v. Ga. Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974)................................................................ 12, 13

*Litton Sys. Inc. v. American Tel. & Tel. Co.*,
    613 F. Supp. 824 (S.D.N.Y. 1985)........................................................ 15, 23

*Lunday v. City of Albany*,
    42 F.3d 131 (2d Cir. 1994)........................................................................ 15

*Mercer v. Duke Univ.*,
    401 F.3d 199 (4th Cir. 2005)..................................................................... 14

*Miltland Raleigh-Durham v. Myers*,
    840 F. Supp. 235 (S.D.N.Y. 1993)........................................................... 12

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    105 S. Ct. 3346 (1985) .............................................................................. 13

*Mugavero v. Arms Acres, Inc.*,
    No. 03 CIV.05724 PGG, 2010 WL 451045 (S.D.N.Y. Feb. 9, 2010) ...................... 9

*Natural Organics, Inc. v. Nutraceutical Corp.*,
    2009 WL 2424188 (S.D.N.Y. Aug. 6, 2009) ............................................ 24

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018) ................................................................................ 2

*Perkins v. Standard Oil Co. of Cal.*,
    399 U.S. 222 (1970)................................................................................... 23

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF*,
    2017 WL 473910 (N.D.N.Y. Feb. 3, 2017) ............................................. 25

*Quaratino v. Tiffany & Co.*,
    166 F.3d 422 (2d Cir. 1997)...................................................................... 12

*Reith v. Allied Interstate, Inc.*,
    2012 WL 5458007 (S.D.N.Y. Nov. 8, 2012) ........................................... 25

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) .................................................................................. 13

*Standard Oil Co. of New Jersey v. United States*,
    221 U.S. 1 (1911) ........................................................................................ 8

*Summit Tech., Inc. v. Nidek Co.*,
    435 F.3d 1371 (Fed. Cir. 2006).................................................................. 25

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*,
    2007 WL 840368 (S.D.N.Y. Mar. 21, 2007) ........................................... 11

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Telenor Mobile Commc'ns AS v. Storm LLC*,
    2009 WL 585968 (S.D.N.Y. Mar. 9, 2009) ................................................................. 5, 6, 7

*TigerCandy Arts, Inc. v. Blairson Corp.*,
    2012 WL 760168 (S.D.N.Y. Feb. 23, 2012) ................................................................. 25

*U.S. Football League v. Nat'l Football League* ("*USFL*"),
    887 F.2d 408 (2d Cir. 1989) ................................................................. passim

*U.S. Football League v. Nat'l Football League*,
    704 F. Supp. 474 (S.D.N.Y. 1989) ................................................................. 11, 15

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ................................................................. 2

*United States v. Merritt Meridian Constr. Corp.*,
    95 F.3d 153 (2d Cir. 1996) ................................................................. 25

*US Airways v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) ................................................................. 23

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ................................................................. 8

*Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*,
    51 F. Supp. 2d 302 (S.D.N.Y. 1999) ................................................................. 11

**Statutes**

15 U.S.C. § 15 ................................................................. 4

28 U.S.C. § 1821 ................................................................. 4, 25

28 U.S.C. § 1920 ................................................................. 4, 25

28 U.S.C. § 1920(1) ................................................................. 25

28 U.S.C. § 1920(2) ................................................................. 25

28 U.S.C. § 1920(3) ................................................................. 25

28 U.S.C. § 1920(5) ................................................................. 25

28 U.S.C. §§ 1920(3)–1920(4) ................................................................. 25

**Other Authorities**

7 Moore et al., Moore's *Federal Practice* § 54.103(3)(c)(i) (3d ed. 2011) ................................. 25

**Rules**

Local Civ. R. 54.1(c) ................................................................. 4

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Local Civ. R. 54.1(c)(10) ............................................................................................ 25

Local Civ. R. 54.1(c)(2) .............................................................................................. 25

## I.     <u>PRELIMINARY STATEMENT</u>

For more than a decade, US Airways and its successor-in-interest, American Airlines,[1] fought to prove that Sabre is a monopolist that used its dominant position to stifle competition in the market for airline ticket distribution, injuring market participants. On May 19, 2022, a jury vindicated those efforts, finding that Sabre's monopolistic, exclusionary conduct violated Section 2 of the Sherman Act, injured competition, and injured US Airways. ECF No. 1208. Sabre would like to pretend that this long, intense, and (inevitably) extraordinarily expensive battle was only about money, thereby hoping to argue the jury's award of nominal damages should dispose of US Airways' statutory right to recover in attorneys' fees. Having presided over two jury trials concerning the strategies that Sabre designed to protect its monopoly position, to punish disruptors, and to eliminate competitive threats, this Court saw the evidence that led the jury to conclude that Sabre's strategies achieved their anticompetitive purposes.

This lawsuit was, first and foremost, about the future of airline distribution, and the parties litigated the matter with those stakes in mind. US Airways spent a huge amount of money in pursuing this litigation because that investment was required to free itself from the shackles of Sabre's anticompetitive practices. Sabre, almost certainly, spent a comparable amount in defending its practices. Although Sabre has not disclosed how much it spent, we know it has retained no less than six different law firms to defend its practices, all of which are among the most capable—and expensive—law firms in the country. We further know that Sabre spent nearly $50 million dollars in just the first six years of the 12 years this case has been litigated. ECF No. 890, at 24. And we know that Sabre requested an award of attorneys' fees and costs of over $6 million for certain work during a short five-month period in 2015 when the parties were

---

[1] For purposes of this motion, "US Airways" refers to both US Airways as well as its successor-in-interest American Airlines.

Case 1:11-cv-02725-LGS    Document 1332    Filed 10/07/24    Page 9 of 33

preparing for a bench trial. ECF No. 371. US Airways' fees during that time period were similar. *See* accompanying declaration of Grant Stiefel ¶ 25.

Proving any monopolization claim under Section 2 of the Sherman Act is difficult and rare. There have been only 15 such Section 2 jury trial plaintiff victories over the last 15 years. Frackman Decl. ¶ 76. But that fact alone greatly understates what US Airways achieved in this case, which centered on novel questions of law that are at the forefront of some of the most important antitrust cases being litigated today.[2] As the first jury verdict in a two-sided market case following *Ohio v. American Express Co.*, 585 U.S. 529 (2018) ("*Amex*"), the outcome was historic. Among many other difficult issues, the parties and their experts litigated the legal framework for contesting conduct by two-sided transaction platforms and standards of proof for competitive harm. Frackman Decl. ¶¶ 5, 57, 60–61, 75. As a result, this case was not just hard fought, it was precedent-setting: This Court's summary judgment and post-trial rulings have been cited by almost two-dozen other courts and in over a hundred briefs and articles; the Court of Appeals' decision has been cited in over 50 court decisions; and US Airways' attack on Sabre's two-sided platform is now a roadmap for other plaintiffs challenging other two-sided platforms. Frackman Decl. ¶¶ 74–75.

As important as this victory was from a legal standpoint, it was even more important for the airline industry and its customers. Antitrust cases are uniquely valuable because they protect the competitiveness of markets, not just the economic well-being of the litigants. *See United States v. Apple, Inc.*, 791 F.3d 290, 332 (2d Cir. 2015) ("It is axiomatic that the antitrust laws were passed for the protection of competition, not competitors."). Without harm to a broader

---

[2] *See, e.g.*, *How Google tried to unravel the DOJ's ad tech case*, THE VERGE, https://www.theverge.com/2024/10/1/24258771/doj-google-ad-tech-antitrust-case-market-definition (describing Google's defense under *Amex*).

2

market, a plaintiff has no viable claim, and it is proving these market-wide effects that makes antitrust litigation highly contentious and expensive. The jury heard the evidence of how Sabre had intentionally harmed competition in the marketplace for well over a decade—all in the hopes of protecting its supracompetitive rates and antiquated technology from any and all competitive threats. That verdict had significant real-world implications, as the jury, no doubt, hoped it would.

Having had its practices and intentions discovered and aired in the trial, and having been branded an abusive monopolist, Sabre, not surprisingly, changed its tactics. Just a few months after this verdict, Sabre and American Airlines, US Airways' successor, entered into a distribution agreement that did not include the anticompetitive provisions that played a central role in US Airways' monopolization claims.[3] American was able to reclaim the freedom to control the distribution of its own content in ways that Sabre foreclosed almost twenty years ago. *See* accompanying Declaration of Neil Geurin ¶¶ 4–6. And, to be clear, the benefits of the verdict go beyond the benefits that have accrued to American. Since the first jury trial in 2016—which, like the 2022 trial, brought out testimony from several current and former executives from airlines such as American, Northwest, United, and Air Canada about how Sabre biased and punished airlines for stepping out of line[4]—Sabre has not brought a similar campaign against any airline, even those that have attempted to challenge Sabre's dominance.[5] Consequently, new

---

[3] *A Modern Retailing Experience: American Airlines Signs New Agreements with All Three Major Global Distribution Systems*, AMERICAN AIRLINES NEWSROOM, Oct. 24, 2022, https://news.aa.com/news-details/2022/A-Modern-Retailing-Experience-American-Airlines-Signs-New-Agreements-With-All-Three-Major-Global-Distribution-Systems-MKG-OTH-10/default.aspx.

[4] *See, e.g.*, ECF No. 1220, 4/26/2022 Trial Tr. 414:19–418:19 (Madeleine Gray, former Sabre technology executive, testifying that, in retaliation for Northwest Airlines implementing a $7.50 GDS surcharge, Sabre applied "penalty points" to artificially push Northwest's flights further down travel agent screens and "zeroed out" inventory on the airline's international flights).

[5] For example, Sabre had in the past engaged in retaliatory biasing against airlines that imposed fees to recover the cost of bookings through Sabre, but since US Airways' victory, Sabre did not engage in that type of biasing against Hawaiian Airways' imposition of the same type of fees. *Sabre Global Technologies Ltd. v. Hawaiian Airlines, Inc.*,

distribution technologies are growing, and Sabre is actively investing in those technologies in ways that it did not before the jury returned its verdict. Geurin Decl. ¶ 6.

Sabre may claim that some or all of this may have happened anyway, but common sense and history suggest otherwise. We applaud Sabre's new approach, and we are looking forward to a healthier and more productive relationship. Indeed, both parties had hoped to resolve this sole remaining issue over attorneys' fees amicably and without the Court's assistance, but it's clear that the parties still disagree as to this litigation's importance and US Airways' statutory right to recover its attorneys' fees.

As this Court has already held, US Airways is entitled to recover attorney's fees, expenses, and costs incurred and paid for during this 12-year battle.[6] 15 U.S.C. § 15; *see* Report & Recommendation of Judge Cott, ECF No. 1276, at 11 (Apr. 10, 2023) ("Report"), (holding that "US Air is thus entitled to reasonable attorneys' fees"), *adopted by*, Opinion and Order on Report & Recommendation, ECF No. 1283, at 2 (June 1, 2023) ("Order"). This Motion renews and amends US Airways' June 23, 2023 motion. ECF 1291. US Airways' fees, expenses, and costs are summarized in Exhibit A to the Frackman Declaration. The amount US Airways seeks—$139,001,444.76—reflects a 15 percent reduction to US Airways' attorney's fees and economic consultants' fees, on top of approximately $4 million in expert fees and $4.5 million in other fees and costs that US Airways paid but is not seeking in this Motion.[7] Although US Airways believes that recovery of the entire $159,047,994.95 would be reasonable, US Airways

---

22-cv-07395 (S.D.N.Y.).

[6] US Airways uses "fees" to refer to US Airways' payments to counsel for time spent on this litigation; "costs" to refer to standard statutory costs recoverable by any prevailing litigant, *see* 28 U.S.C. § 1920; 28 U.S.C. § 1821, Local Civ. R. 54.1(c); and "expenses" to refer to other expenditures reasonably necessary to prosecute cases with the complexity of this litigation.

[7] These amounts reflect expenses incurred through May 31, 2023. US Airways reserves the right to seek fees, expenses, and costs from June 1, 2023 onward as part of its reply in support of US Airways' Motion for Costs, Including Attorney's Fees, under 15 U.S.C. § 15.

implemented this 15 percent discount following the Court's guidance that "US Air should be awarded reasonable attorney's fees, subject to a downward adjustment." Report at 16. This 15 percent reduction is sufficient to account for any supposed deficiencies Sabre may claim.

| Exhibit A: Summary of US Airways' Recoverable Costs | | | |
|---|---|---|---|
| Category | Amount Paid by US Airways* | Amount Sought by US Airways | Supporting Exhibits |
| Attorney's Fees | $108,475,434.13 | $92,204,119.01 | Exhibits B–E |
| Attorney's Expenses | $49,496,060.21 | $45,720,825.14 | Exhibits F–K |
| Statutory Costs | $1,076,500.61 | $1,076,500.61 | Exhibits L–M |
| **Total** | $159,047,994.95 | $139,001,444.76 | |
| | *Reduction* | $20,046,550.19 | |

*Attorneys' fees exclude approximately $4.5 million of charges of legal and consulting timekeepers (e.g., by eliminating fees of timekeepers who billed less than 100 hours, fees for work by Cadwalader before March 2011 and after April 2012, and other work billed and paid but not directly related to the core set of issues on which US Airways prevailed). Attorneys' expenses exclude approximately $4 million in expert fees.*

## II.    US AIRWAYS' REQUEST FOR FEES AND EXPENSES IS REASONABLE

The lodestar amount of US Airways' fees is presumptively reasonable because US Airways is seeking recovery of fees and expenses that it ***actually paid*** to achieve its historic antitrust judgment. *See Telenor Mobile Commc'ns AS v. Storm LLC*, 2009 WL 585968, at *2 (S.D.N.Y. Mar. 9, 2009) ("[H]ighly sophisticated business entity['s] . . . willingness to incur the costs must primarily have been based on what it believed was necessary and proper . . . to prosecute its case"). There is no bona fide question about the reasonableness of O'Melveny's rates, since they are no higher than those of Sabre's own counsel or of comparable firms in this District. Nor should there be a serious issue about the reasonableness of the effort required to prevail in two lengthy jury trials given the vigorous defense of Sabre's counsel, and especially considering the novelty and difficulty of the case and the skill required to obtain a victory.

### A.    US Airways' Legal Team's Hours are Reasonable.

Any suggestion that US Airways' effort and total charges were unreasonably high falls flat in light of Sabre's own hard-fought decade-long defense, which this Court saw firsthand. *See*

5

*Telenor Mobile*, 2009 WL 585968, at *2 (finding "no disparity between the parties in their staffing of the matter"). That Sabre "chose to litigate the case in the same way" as US Airways—indeed, one can say in light of Sabre's retention of six national law firms and filing of many duplicative motions that Sabre did not limit itself in any way—"further attest[s] to the broad reasonableness of [US Airways'] counsel's approach to handling the case, in the context of its significance, complexity and difficulty." *Id.*; *see also City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) (instructing that defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response").

Although we do not have access to all of Sabre's fee information,[8] the information available shows Sabre's attorneys' efforts have been commensurate with US Airways' fees. Through just the first six years of this 12-year case, "[a]fter excluding legally unrecoverable items, Sabre's fees and expenses . . . were $48,819,177.50." ECF No. 890, at 24. But that figure understates the "reasonable fee" because Sabre's then-lead counsel, Bartlit Beck, had the benefit of litigating a prior case (tried in 2012) brought by American Airlines against Sabre, Frackman Decl. ¶ 6 n.4, and also charged a "reduced monthly fee in exchange for the opportunity to earn certain [undisclosed] bonus payments contingent on various events in the case." *See* ECF No. 890, at 23; *see, e.g.*, *id.* (describing one such "bonus of almost $2.7 million that Sabre paid"). Even if Sabre's fees were lower than US Airways' fees, US Airways, as plaintiff, should have higher fees than Sabre. US Airways not only had the burden of prosecuting this complex case, as noted, Sabre previously tried a related case against American Airlines in 2012, and thus was

---

[8] US Airways is concurrently filing a pre-motion conference letter seeking limited discovery of Sabre's own fee records, which "may provide the best available comparable standard to measure the reasonableness of plaintiffs' expenditures in litigating the issues of the case." *Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 1996 WL 66111, at *3 (N.D. Ill. Feb. 13, 1996). If Sabre does not challenge US Airways' attorneys' rates or hours, this discovery will be unnecessary.

familiar with that prior factual record (which was incorporated into the record in this case).

Frackman Decl. ¶ 6, n.4.

As set forth in the accompanying Frackman Declaration (¶¶ 29–73), US Airways' legal

team engaged in an enormous 12-year effort:

- Reviewed over 2.5 million documents, Frackman Decl. ¶ 8;

- Participated in over 60 party and third-party fact depositions, *id.*;

- Drafted or responded to over 1,000 written discovery requests, *id.* ¶ 38;

- Briefed three motions to dismiss and three motions summary judgment, *id.* ¶ 7;

- Litigated over 20 *Daubert* motions and motions *in limine*, *id.* ¶¶ 7, 51, 66;

- Prepared 16 expert opening and rebuttal reports, *id.* ¶¶ 42, 61–62;

- Took and defended 17 expert depositions, *id.*;

- Prepared for and prosecuted an eight-week jury trial in 2016, which involved more than 40 witnesses via live and deposition testimony, more than 500 exhibits and demonstratives, and extensive briefing and arguments on countless legal and fact issues, *id.* ¶ 55;

- Litigated an appeal in the Second Circuit to address the intervening *Amex* decision and to resuscitate US Airways' improperly dismissed monopolization claim, *id.* ¶¶ 57–59; and

- Tried a second, three-week jury trial in 2022, which—although US Airways leveraged prior work extensively—required presenting a new theory of liability with the aid of several new expert and fact witnesses, *id.* ¶¶ 61–62, 69.

That US Airways and American Airlines have reviewed and paid outside counsel's fees

(Wark Decl. ¶¶ 1–2; Declarations of Paul D. Jones, American's former Senior Vice President

and General Counsel, ECF No. 861, at 2; ECF No. 902, at 2), should dispose of any question of

the reasonableness of the hours expended on the case, *see Telenor Mobile*, 2009 WL 585968, at

*2; *Diplomatic Man, Inc. v. Nike, Inc.*, 2009 WL 935674, at *6 (S.D.N.Y. Apr. 7, 2009) ("[T]he

fact that Nike, a highly sophisticated business client, has paid these bills, presumably after

careful review by its general counsel or other senior business executives, is prima facie evidence of the reasonableness of the amount as a whole . . . , since Nike could not have assumed that it would be reimbursed in full, or even in part."); *Bleecker Charles Co. v. 350 Bleecker St. Apartment Corp.*, 212 F. Supp. 2d 226, 230 (S.D.N.Y. 2002) ("As numerous courts have recognized, negotiation and payment of fees by sophisticated clients are solid evidence of their reasonableness in the market."); *see* Stiefel Decl. ¶¶ 9–10.

US Airways' fees are consistent with those of plaintiffs in other lengthy, complex antitrust cases. For example, the Court of Appeals affirmed the approximately $523 million fee award to plaintiffs' counsel in the *Merchant Interchange Cases. See Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 712 (2d Cir. 2023). "Federal antitrust cases are complicated, lengthy, and bitterly fought," *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005), especially monopolization cases in which plaintiffs must be "given the full benefit of their proof," *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962), and the evidence can include "a vast amount of confusing and conflicting testimony relating to innumerable, complex, and varied business transactions, extending over [many] years," *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 30–31 (1911). That is why Congress included a mandatory fee provision in the Clayton Act.

Although the fact that US Airways paid the fees establishes their presumptive reasonableness, to expedite resolution of this application, US Airways has provided the actual time entries for which it is seeking compensation.[9] Frackman Decl. Ex. B. In addition, US Airways has included summaries of the work performed and amount paid during each stage of the litigation, Frackman Decl. ¶¶ 29–73, Ex. C, and the names of each timekeeper, their average

---

[9] By submitting outside counsel's time entries, US Airways is not waiving its attorney-client and work product privileges as to the underlying communications and work reflected in the time entries.

billing rates, hours expended, and total amounts billed, in addition to descriptions of each

timekeeper from O'Melveny and Yetter Coleman, *see id.* Exs. D–E. US Airways' requested

hours—though considerable—are reasonable given the length, complexity, and difficulty of the

litigation. *See Mugavero v. Arms Acres, Inc.*, 2010 WL 451045, at *6 (S.D.N.Y. Feb. 9, 2010)

("Courts base the hours inquiry not on what appears necessary in hindsight, but on whether 'at

the time the work was performed, a reasonable attorney would have engaged in similar time

expenditures.'" (quoting *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992)); Stiefel Decl. ¶¶ 16–

20. To further ensure reasonableness, US Airways has excluded charges of timekeepers who

billed fewer than 100 hours over the life of the case—eliminating over $1.6 million in charges

actually paid by US Airways. Frackman Decl. ¶ 9. US Airways also excluded over $2.9 million

in fees for all Cadwalader work before March 2011, when this action was filed, and after April

2012, when O'Melveny took over, and other work billed and paid but not directly related to the

core set of issues on which US Airways prevailed. *Id.*

      **B.**    <u>**US Airways' Hourly Rates are Reasonable**</u>

      There is no serious question that the rates charged by O'Melveny and US Airways' other

attorneys are reasonable given the complexity of the case, sophistication of opposing counsel,

and lengthy and complicated proceedings. Stiefel Decl. ¶¶ 11–15; *see Arbor Hill Concerned*

*Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 190 (2d Cir. 2008) ("[I]n

setting a reasonable hourly rate," a district court should "bear in mind all of the case-specific

variables"); *Bleecker Charles Co.*, 212 F. Supp. 2d at 230  (finding rate reasonable where "courts

in this District have frequently awarded comparable rates to firms of comparable size and

reputation"). After all, O'Melveny's rates are no more than the rates charged by Sabre's own

many law firms—Davis Polk, Skadden, Cravath, and Cleary, among others—and those of peer

firms in this District. Stiefel Decl. ¶ 12; *Bergerson v. N.Y. State Office of Mental Health, Cent.*

*N.Y. Psychiatric Ctr.*, 652 F.3d 277, 290 (2d Cir. 2011) (stating the relevant community is "the district in which the reviewing court sits"). Moreover, the "skill, experience, and reputation" of US Airways' counsel is consistent with the rates charged. *See Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *see also* Frackman Decl. ¶ 15, Exs. D–E (providing details on each attorney and legal staff member for which US Airways seeks fees).

## C.    US Airways is Entitled to Recover Reasonable Attorney's Expenses

US Airways' request includes certain recoverable out-of-pocket, administrative and consulting expenses (in addition to customary statutory costs, which are detailed in Section IV below). Those expenses are detailed in the accompanying Frackman Declaration and Exhibits F through K, as well as accompanying declarations and exhibits from US Airways' principal economic consultants, The Brattle Group and Compass Lexecon. *See* Michael Cragg Decl. in Supp. Of Mot. Under 15 U.S.C. § 15 (Oct. 1, 2024) ("Brattle Decl."); David Molin's Decl. in Supp. Of Mot. Under 15 U.S.C. § 15 (ECF No. 904) ("Compass Decl.").

"[A]ttorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *U.S. Football League v. Nat'l Football League* ("*USFL*"), 887 F.2d 408, 416 (2d Cir. 1989). Here, these include discovery costs, lodging, travel, and meals; data hosting; phone and internet services; online research; and other miscellaneous expenses. *See* Frackman ¶¶ 20–22, Decl. Ex. F. O'Melveny and Yetter Coleman incurred $3,157,666.10 in out-of-pocket expenses and $458,707.09 in administrative expenses, *see* Frackman Decl. Exs. F–H, and Cadwalader and Trachtenberg incurred an additional $678,804.26 and $5,443.87 in expenses, respectively, *see id.* Exs. J–K. These expenses are common, unavoidable, and regularly awarded.[10]

---

[10] *See Gray v. Toyota Motor Sales, U.S.A., Inc.*, 2013 WL 3766530, at *6 (E.D.N.Y. July 16, 2013) (awarding discovery vendor costs); *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 2007 WL 840368, at *5, 7 (S.D.N.Y. Mar.

US Airways' request also includes payments to third-party consultants and vendors for trial preparation services.[11] In complex antitrust cases, it is "common practice" to allow recovery for a broad spectrum of "consultants [and] litigation and trial support services[.]" *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 525 (E.D.N.Y. 2003), *aff'd*, 396 F.3d 96 (2d Cir. 2005).[12] Inclusion of these consultant expenses is particularly appropriate given the complexity and novelty of the issues here. Summaries of the work performed by the consultants listed in Exhibit I to the Frackman Declaration and explained in more detail in the Brattle and Compass Declarations and Exhibits. Working at the direction of counsel, US Airways' consultants provided key assistance, support, and specialized knowledge necessary to build and present effectively US Airways' claims to the jury. Frackman Decl. ¶ 43; Brattle Decl. ¶¶ 6–11; Compass Decl. ¶¶ 3, 5. Because these consultants worked at lower hourly rates than the attorneys, they helped US Airways prosecute its case more efficiently and cost effectively. *See U.S. Football League v. Nat'l Football League*, 704 F. Supp. 474, 483 (S.D.N.Y. 1989) ("As a simple matter of economics, it is desirable to reduce the cost of litigation by encouraging the utilization of less expensive non-lawyer personnel where possible.").

21, 2007) (use of contract attorneys); *Bobrow Palumbo Sales, Inc. v. Broan-Nutone, LLC*, 549 F. Supp. 2d 274, 287 (E.D.N.Y. 2008) ("[E]xpenses relating to travel, including transportation and meals, are routinely recoverable."); *id.* at 285–86 ("[E]xpenditures for photocopies, telephone calls, postage, court fees, facsimiles, transcripts, messenger services, process servers and outside vendor services are routinely recoverable"); *Bourgal v. Atlas Transit Mix Corp.*, 1996 WL 75290, at *6 (E.D.N.Y. Feb. 7, 1996) (non-lawyer proofreading, collating, faxing, copying and serving documents recoverable); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 369 F.3d 91, 98 (2d Cir. 2004) ("[O]nline research may properly be included in a fee award."). Cost of physical storage of litigation-related documents and media is also "properly reimbursable." *See Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 51 F. Supp. 2d 302, 308 (S.D.N.Y. 1999) ("the cost of storage of documents"); *Close-Up Int'l, Inc. v. Berov*, 2007 WL 4053682, at *7 (E.D.N.Y. Nov. 13, 2007) (similar). By analogy, data-hosting expenses are recoverable.

[11] US Airways is not seeking any testimonial or non-testimonial fees for its expert witnesses, which totaled over $4 million. Frackman Decl. ¶ 9.

[12] *See also BD v. DeBuono*, 177 F. Supp. 2d 201, 204 (S.D.N.Y. 2001) ("[L]itigation consulting services fall properly under the rubric of attorneys' fees."); *J.S. Nicol, Inc. v. Peking Handicraft, Inc.*, 2008 WL 4613752, at *16 (S.D.N.Y. Oct. 17, 2008) ("Lawyers often use litigation support specialists and receive reimbursement for such services when awarded attorneys' fees."); *Carco Grp., Inc. v. Maconachy*, 2011 WL 6012426, at *6 (E.D.N.Y. Dec. 1, 2011) (finding consultants to be properly considered "the equivalent of additional litigation support staff"), *rev'd on other grounds*, 718 F.3d 72 (2d Cir. 2013).

### III.    SABRE CANNOT MEET ITS BURDEN TO ESTABLISH A SUBSTANTIAL REDUCTION TO THE LODESTAR AMOUNT

In this Circuit, US Airways is entitled to fees, expenses, and costs for all the work that contributed to its monopolization claim victory—regardless of the amount of the jury's damages award—including work on its other closely related claims. *See USFL*, 887 F.2d at 414 ("[B]ecause the USFL was successful in proving an antitrust injury, all that is required under section 4 of the Clayton Act, it is entitled to attorney's fees for all work done in relation to the common core of facts that resulted in that injury."). Sabre advanced two arguments in its prior fee-related opposition briefs that we expect Sabre to renew. *See* ECF No. 890, at 7–10; ECF No. 1268, at 18–24. First, Sabre argued that the lodestar amount should be reduced by an order of magnitude because of the size of the jury verdict. This Court has already, correctly, observed "that reasoning holds little weight." Report at 13. Second, Sabre argued that the lodestar amount should be reduced, again by an order of magnitude, because US Airways did not prevail on all of its claims. But Sabre will not be able to sustain its burden of showing that the work touching on the other claims was not "inextricably intertwined" with US Airways' successful monopolization claim because all the claims arose from a common nucleus of facts. *See Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1997).

#### A.    The Size of the Jury Award does not Permit a Significant Downward Adjustment Under the *Johnson* Factors

Courts in this Circuit review the reasonableness of a fee application by applying the *Johnson* factors. Report at 12 (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)). As this Court noted, "'many of the [*Johnson*] factors are usually subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate.'" Report at 13 (quoting *Miltland Raleigh-Durham v. Myers*, 840 F. Supp. 235, 239 (S.D.N.Y. 1993)). Sabre's argument about the size of the award relates solely to *Johnson* factor eight, just one of the twelve

factors.[13] And it is fundamentally wrong.

     ***First***, success in an antitrust case is not merely about the recovery of damages because an antitrust case is about harm to the ***market as a whole***. An antitrust plaintiff is serving as a private attorney general, not just to protect itself, but to protect all consumers from the impact of a distorted, inefficient market.[14] It is thus different from a normal tort claim. When a monopolist distorts the proper functioning of the market, all market participants are harmed, as is society as a whole. *See Am. Safety Equip. Corp. v. J. P. Maguire & Co.*, 391 F.2d 821, 826 (2d Cir. 1968) ("Antitrust violations can affect hundreds of thousands—perhaps millions—of people and inflict staggering economic damage."). And all benefit from cessation of the unlawful conduct. The mandatory fee provision of Section 15 of the Clayton Act recognizes this fact and is designed to incentivize private attorneys general to make the substantial investment needed to rectify market-wide misconduct, as US Airways did here. *See Home Placement Serv., Inc. v. Providence J. Co.*, 819 F.2d 1199, 1210 (1st Cir. 1987) ("In all successful antitrust cases, the award of reasonable attorney's fees as part of costs is mandatory in order to encourage private prosecution of antitrust violations"); *see also* Order at 6 ("Because of the importance of the policy of encouraging private parties to bring antitrust actions, recovery of their reasonable attorney's fees must be sustained regardless of the amount of damages awarded." (citing *USFL*, 887 F.2d at 412)).

---

[13] *See Arbor Hill*, 522 F.3d at 186 n.3 ("The twelve *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." (citing *Johnson*, 488 F.2d at 717–19)).

[14] *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 635 (1985) ("A claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public's interest."); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself . . . against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest.").

***Second***, US Airways' victory has served a significant public purpose in protecting market-wide competition by disciplining a monopolist's conduct. The size of the damages award bears little on this market-wide success. The record of Sabre's exclusionary conduct (detailed in numerous pleadings, two published summary judgment orders, and a published decision by the Second Circuit) leading to the verdict puts similarly situated monopolists—and Sabre itself—on notice of unlawful conduct under *Amex*. *Cf. Mercer v. Duke Univ.*, 401 F.3d 199, 206–09 (4th Cir. 2005) (granting fees despite nominal damages award "[b]ecause [the plaintiff]'s case was the first of its kind, [the appellate decision] and the jury's verdict will serve as guidance to other[s] facing similar issues"). From the beginning to the end, the litigation and trials were closely tracked in the trade press. As detailed in the Declaration of Neil Geurin and above, Sabre's conduct and relationships with airlines have changed since the verdict. Geurin Decl. ¶¶ 5–6; *supra* notes 3, 5.

***Third***, damages were always a secondary consideration in the prosecution of this case, which is why US Airways offered to forgo them in pursuit of a bench trial in 2015. *See* Frackman Decl. ¶ 47 n.15. The parties would have proceeded with a bench trial and injunctive relief (and thus the issue of the damages award would have been moot), but for the 2012 merger of US Airways with American Airlines, which this Court held barred any prospective relief. *See* ECF No. 350. So, to maintain a justiciable controversy, US Airways reinstated its damages claim. *See* ECF Nos. 350, 378; Frackman Decl. ¶ 47 n.15.

***Fourth***, the most potent and important part of US Airways' claim is the one it prevailed on—monopolization. A finding that Sabre possesses monopoly power and abused it over the course of many years is far more significant for the industry and market as a whole than a mere finding that the 2011 contract between US Airways and Sabre was anticompetitive. This is also

14

why US Airways' success on appeal in getting its Section 2 claim reinstated deserves full credit.

Given that US Airways did not prioritize damages and prevailed on its most important claim for

relief, a substantial fee award is even more reasonable than in *USFL*, where the court reduced the

fee award by 20 percent due to lack of success (following a "voluntary" 20 percent reduction)

because the plaintiff "did not succeed on the heart of its case." 704 F. Supp. at 485.

  **B.**  **Sabre's Attempt to Artificially Compartmentalize the Work Related to Different Claims Lacks Merit and Should be Rejected**

  Binding law provides that US Airways is entitled to fees for work done on claims that US

Airways dropped or did not prevail on because the work overlapped with the work supporting its

successful Section 2 claim. The Court of Appeals has repeatedly held that "[a]ttorney's fees may

be awarded for unsuccessful claims as well as successful ones . . . where they are inextricably

intertwined and involve a common core of facts or are based on related legal theories."

*Quaratino*, 166 F.3d at 425; *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994) (per

curiam) (no reduction so long as the unsuccessful claims were not "wholly unrelated to the

plaintiff's successful claims" (quotations omitted)); *see also Hensley v. Eckerhart*, 461 U.S. 424,

435 (1983) ("[T]he fee award should not be reduced simply because the plaintiff failed to prevail

on every contention raised in the lawsuit . . . The result is what matters."). Relying on these

precedents, courts in this District have rejected an "issue-by-issue analysis . . . in favor of a more

straightforward 'bottom line' approach" in various types of cases, including antitrust. *Litton Sys.*

*Inc. v. American Tel. & Tel. Co.*, 613 F. Supp. 824, 830 (S.D.N.Y. 1985). When claims are not

"severable," courts need not engage in any "hair-splitting" to allocate time spent in connection

with successful and unsuccessful claims. *Quaratino*, 166 F.3d at 427 n.8. And a prevailing

plaintiff like US Airways need not "identify which hours were spent on issues it clearly won and

which hours were spent on issues it did not clearly win." *Litton*, 613 F. Supp. at 830.

Here, this Court having heard the evidence on all of the claims during two lengthy trials knows that the claims were inextricably intertwined, and the same common core of facts and legal theories supported both the Section 1 and Section 2 claims. Although Sabre bears the burden of justifying a reduction in fees based on an argument that US Airways' claims are not intertwined, *USFL*, 887 F.2d at 413–14, in the interest of expediting resolution of this motion, we address the issue here, at least at a high level.

    1.    **All US Airways' Claims are Based on a Common Core of Facts and Legal Theories**

US Airways' claims—(1) monopolization, (2) conspiracy to monopolize, (3) vertical restraints, and (4) horizontal conspiracy, *see* Frackman Decl. ¶ 31—had slightly different legal elements, but all arose from the same facts, summarized in the table below, including Sabre's power to compel US Airways and other airlines to agree to its terms; the presence (or lack thereof) of alternatives to Sabre; and how Sabre's anticompetitive conduct stifled innovation and prevented airlines and travel agents from pursuing other, better distribution methods.

| Issue | Monopolization, § 2 | Conspiracy to Monopolize, § 2 | Vertical Restraints, § 1 | Horizontal Conspiracy, § 1 |
|---|---|---|---|---|
| **"Full content" contracts** | Component of Sabre's suite of exclusionary conduct | Conspiracy forced US Airways to sign anticompetitive deal with Sabre | Core challenged conduct | GDS sought same scope of "full content" from legacy airlines |
| **Contracts with travel agents** | Component of Sabre's suite of exclusionary conduct | Core challenged conduct | Core challenged conduct | GDSs had virtually identical provisions in contracts with travel agents |
| **Retaliation against airlines** | Component of Sabre's suite of exclusionary conduct | Probative of monopoly power | Probative of market power | Engaged in joint retaliation against airlines |

| Issue | Monopolization, § 2 | Conspiracy to Monopolize, § 2 | Vertical Restraints, § 1 | Horizontal Conspiracy, § 1 |
|---|---|---|---|---|
| **Lack of alternative channels** | Probative of monopoly power / anticompetitive effects | Probative of monopoly power | Probative of market power | Probative of GDSs' market power and anticompetitive effects |
| **Travel Agent Lock-in** | Probative of monopoly power / anticompetitive effects | Probative of monopoly power / anticompetitive effects | Probative of monopoly power / anticompetitive effects | Probative of GDSs' monopoly power and anticompetitive effects |
| **Excessive prices and profits** | Probative of monopoly power / anticompetitive effects | Probative of monopoly power / anticompetitive effects | Probative of monopoly power / anticompetitive effects | Probative of lack of competition between GDSs |
| **Sabre's antiquated technology** | Probative of monopoly power / anticompetitive effects | Probative of monopoly power / anticompetitive effects | Probative of monopoly power / anticompetitive effects | Probative of lack of competition between GDSs |

Sabre's contention that the case proceeded in "distinct phases," permitting disaggregation of work (ECF No. 1268 at 21–22), is imagined and plainly wrong. There were no "distinct phases" to this case. Sabre relies on *Automotive Products, plc v. Tilton Engineering, Inc.*, 1993 WL 660164 (C.D. Cal. Sept. 16, 1993). But in that case, the court segregated fees for "the first phase of the trial which was purely directed towards . . . patent issues . . . separate from and independent from [the] antitrust claims." *Id.* at *6. Here, ***all*** of US Airways' claims sound in antitrust law and share common issues, so no such distinction exists.

Even if the case had proceeded in "distinct phases," work done in connection with different phases—or even different proceedings—is "properly . . . included in the calculation of a reasonable attorney's fee" where "the work was useful and of a type ordinarily necessary to secure the final result obtained from the litigation." *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 414, 420 (3d Cir. 1993) (awarding fees for work incurred in separate

proceeding since otherwise a party "would have had to duplicate at least some of th[e] work"). For instance, the Second Circuit held in *Gierlinger v. Gleason* that it was appropriate to award fees in connection with **three** separate trials where the first trial verdict was reversed and remanded, the second trial ended in a mistrial, and the plaintiff ultimately prevailed in the third trial because the "time spent . . . in pretrial discovery and preparation" was "reasonable and necessary" to the ultimate victory. 160 F.3d 858, 877–81 (2d Cir. 1998).

As explained in more detail as to each claim below, the same is true for the work developing US Airways' secondary claims. US Airways is entitled to fees related to the development of these claims because they are based on the same factual record—and work by outside counsel developing that record—as its primary, successful monopolization claim. *See Abshire v. Walls*, 830 F.2d 1277, 1282–83 (4th Cir. 1987) (holding that claims based on different legal theories were, nonetheless, based on a "common core of facts" since the successful claims required "developing and presenting the facts surrounding the entire sequence of events").

### 2. US Airways' Vertical Restraints Section 1 Claim is Subsumed Within its Winning Monopolization Claim

As this Court already stated back in 2022, US Airways' successful monopolization claim is broader than, and subsumes, US Airways' Section 1 vertical restraints claim. ECF No. 1171, at 3 ("US Airways' § 1 claim arises out of the two contracts, and its § 2 claim is based *on the contracts and other alleged anticompetitive behavior by Sabre*.") (emphasis added).

Sabre itself has acknowledged (well before this fee dispute) that the Section 1 claims presented in 2016 and Section 2 claim presented in 2022 are based on the same evidentiary support. In 2019, when Sabre opposed additional discovery on the reinstated Section 2 claims, it argued to this Court that US Airways "took discovery on a Section 2 case" and "tried a Section 2 case" in 2016, including with testimony from US Airways' economic expert (who also testified

in the second trial) that "Sabre is a monopolist, has monopoly power, is guilty of monopolization, has taken monopoly activities, monopoly rents." ECF No. 945, 11/20/2019 Conf. Tr., at 25. The reason little additional fact discovery was needed in advance of the 2022 trial for the reinstated Section 2 claim was because that discovery had already been conducted as part of the work preceding the 2016 trial on the Section 1 claims. *See* Frackman Decl. ¶ 64.[15] The principal additional work for the monopolization claim was the portion of the economic experts' work to prove that Sabre possessed "monopoly" power, in addition to "market power" needed for the Section 1 claim, and that the "net" Sabre booking fee was anticompetitive, as required by *Amex*. Frackman Decl. ¶¶ 60–61. US Airways also had to replace its technology expert, but the parties agreed that the scope of the opinions would be no different from those offered by the technology expert at the 2016 trial. *See* Frackman Decl. ¶ 63.

The record confirms that there was substantial overlap in the evidence presented in support of both the Section 1 and Section 2 claims. For example:

- The vast majority of evidence proffered in support of US Airways' 2022 victory was also proffered at the first trial: 31 of the 44 witnesses who testified in 2016 testified again in 2022, and 72 percent of the exhibits admitted in 2022 were admitted in 2016. Frackman Decl. ¶ 68. This degree of overlap is especially noteworthy given that the parties narrowed and focused their trial presentations for the time-limited 13-day trial in 2022 (*see* ECF No. 1086) compared with the 26-day trial in 2016.

- Both of the witnesses who testified in 2016 and 2022 about US Airways' agreements with Sabre—John Gustafson, one of the lead negotiators of the 2011 agreement, and Scott Kirby, former President of US Airways and one of the lead negotiators of the 2006 agreement—testified to a variety of issues relevant to both the Section 1 and Section 2 claims, including: (1) the nature of the restraints in the distribution agreements and Sabre's insistence on them; (2) US Airways' reliance upon the corporate travel agent business coming through Sabre, giving Sabre leverage over US Airways; and (3) benefits to US Airways and consumers of removing full content contract provisions. Frackman Decl. ¶ 68, n.17–19.

---

[15] The only fact witness deposed after the 2016 trial was an Air Canada executive who replaced another Air Canada witness deposed previously. Frackman Decl. ¶ 64.

- In both 2016 and 2022, US Airways marshalled testimony from executives from other airlines regarding Sabre's retaliation against those airlines and the necessity of doing business with Sabre regardless of how odious the offered terms were. Frackman Decl. ¶ 68, n.20. This testimony established Sabre's market power over the airlines and the economic harm that would come to US Airways from failure to reach a deal with Sabre, critical elements of both the Section 1 and Section 2 claims, and evidence of exclusionary conduct Sabre engaged in to preserve its monopoly power, a critical element of a Section 2 claim.

Since the claims are intertwined, any attempt to isolate the work done in support of the Section 1 claim from that supporting the Section 2 claim would be artificial; the work cannot be separated. This is true even though US Airways' ultimately successful Section 2 claim was dismissed for much of the litigation. For example, although US Airways did not try its Section 2 claim in 2016, US Airways is entitled to the fees relating to the 2016 trial because that work was intertwined with and contributed to US Airways' ultimate 2022 victory. As reflected in Exhibit C to the Frackman Declaration, US Airways' attorneys' fees for the period leading up to the 2016 trial were approximately $19.5 million. During the analogous time period before the 2022 trial, US Airways' fees were only approximately $7.6 million. It is not surprising that, despite inflation, US Airways spent less to prepare to try its case in 2022 than 2016 because, as discussed above, much of the evidence presented at the 2016 was presented again in 2022.

The Court of Appeals' opinion in *USFL* is instructive on this point. In *USFL*, the NFL claimed the USFL was not entitled to fees, because the only evidence of harm the USFL had presented was related to its unsuccessful "television-related Section 1 claims," rather than its winning Section 2 claim. 887 F.2d at 412–13. But "the jury's rejection of plaintiffs' television-related Section 1 claims d[id] not mean that the jury could not have properly considered some of the NFL's television-related conduct to have been anticompetitive." *Id.* Fees related to the television-related evidence were warranted because it could not "be said that the television evidence was completely distinct, either factually or legally, from the broad monopolization

20

claim that plaintiff prevailed upon." *Id*. The same is true here. Sabre cannot show that evidence about US Airways' contracts was "completely distinct" from the broad monopolization claim US Airways prevailed upon because the evidence of Sabre's imposition of the contractual restraints on numerous airlines, including US Airways in 2011, was evidence of Sabre's exclusionary conduct relevant to the Section 2 claim. Because the Section 1 and Section 2 claims are not "severable," this Court need not attempt any "hair-splitting" to allocate time spent in connection with one or the other. *See Quaratino*, 166 F.3d at 427 n.8.

3. **Voluntary Dismissal of US Airways' Conspiracy to Monopolize Claim had no Bearing on the Scope of Work**

US Airways alleged that Sabre conspired to preserve Sabre's monopoly power by entering into agreements that "lock[ed] travel agents into Sabre and disincentiviz[ed] their use of other distribution channels." ECF No. 952, ¶ 68.[16] Although US Airways ultimately agreed to dismiss its "conspiracy to monopolize" theory before the 2022 trial, Sabre's relationships and agreements with travel agents remained one of the core categories of exclusionary conduct US Airways challenged in the 2022 trial.[17] As with the contractual restraints claim, because the factual and legal bases of the monopolization and conspiracy to monopolize claims were the same, the claims are not "severable" and this Court need not engage in any "hair-splitting" to allocate time spent in connection with one or the other. *See Quaratino*, 166 F.3d at 427 n.8. There was no work performed to support the conspiracy to monopolize claim that was not equally relevant to US Airways' successful monopolization claim.

---

[16] After US Airways' conspiracy to monopolize claim was reinstated by the Second Circuit, US Airways added new allegations to its Fourth Amended Complaint that "Sabre and the travel agents have entered into oral agreements to discourage airlines' challenges to Sabre's market dominance." ECF No. 952, at ¶ 69. But no additional discovery was taken related to the new allegations and, as noted above, US Airways subsequently agreed to dismiss the conspiracy to monopolize claim.
[17] *See, e.g.*, ECF No. 1226, 5/2/2022 Trial Tr. 987:3–11, 988:6–997:3 (Professor Stiglitz' testimony about exclusionary travel agent contracts).

4.    **The Facts Underlying the Horizontal Conspiracy Claim Overlapped with Facts Underlying US Airways' Monopolization Claim**

US Airways alleged that Sabre entered into a conspiracy with its GDS rivals to "entrench the dominance of each GDS and to impede competition on the merits." ECF No. 1, ¶ 170. The 2016 jury rejected that claim, and US Airways did not pursue it thereafter. But the relevant underlying evidence was admitted and played an important role in the 2022 trial. In both trials, US Airways introduced evidence concerning Project Cervantes—a content-sharing agreement between Sabre and Amadeus, another GDS. Although Sabre objected to the introduction of this evidence in the 2022 trial on the grounds that "the GDS conspiracy claim . . . is no longer in US Air's complaint in this case," the Court overrode that objection in light of US Airways' explanation that the content-sharing agreement showed that Sabre did not need to reach an agreement with airlines in order to maintain access their content. *See* ECF No. 1220, 4/26/2022 Trial Tr. 338:9–340:11. In 2022, US Airways' witnesses testified that the content-sharing agreement eliminated the risk to Sabre of not reaching an agreement with US Airways and other airlines, thereby reinforcing its monopoly and negotiating power, because even if Sabre failed to come to terms with a given airline, Sabre's travel agents could still access the airlines' information by way of the content sharing agreement and had no reason to switch to using another GDS or use multiple GDSs.[18] Like the evidence of Sabre's "full content" agreements and agreements with travel agents, this was part of the overall presentation of Sabre's monopoly power and exclusionary conduct that led the jury to find that Sabre violated Section 2, and thus recoverable. *See USFL*, 887 F.2d at 412–13.

---

[18] *See, e.g.*, ECF No. 1220, 4/26/2022 Trial Tr. 435:9–23 (Madeleine Gray, a former Sabre executive, testifying that the content sharing agreement "meant that . . . if Sabre didn't have a participating contract, a contract with that airline to participate in the Sabre system, well, there was not going to be any leverage there."); ECF No. 1224, 4/28/2022 Trial Tr. 799:12–800:10 (Gustafson testifying that the content sharing agreement between Amadeus and Sabre "meant that there was very little risk in Sabre's not having an agreement with a particular airline because they could go get the content from Amadeus . . . So it was very low risk for Sabre, but it was very high risk for the airlines.").

5.     **US Airways is Entitled to Recover Fees Related to the Appeal of the 2016 Verdict**

Any attempt by Sabre to deprive US Airways of its fees on appeal should also be rejected since US Airways won on the biggest issue—the reversal of the dismissal of its Section 2 claim, which was the basis for its ultimate victory. *US Airways Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 61 (2d Cir. 2019). Moreover, while Sabre got the reversal of the Section 1 judgment that it sought in light of *Amex*, Sabre lost its gambit for entry of judgment, and the Court of Appeals remanded for retrial. *Id.* 60–63, 69. This mixed outcome cannot justify deprivation of US Airways' fees on appeal because it was a successful party in that appeal and in this case. *See Perkins v. Standard Oil Co. of Cal.*, 399 U.S. 222, 223 (1970) ("Both the language and purpose" of Section 4 of the Clayton Act "authorize the award of counsel fees for legal services performed at the appellate stages of a successfully prosecuted private antitrust action."). And for all the reasons discussed above, the intertwined issues and common legal theories between US Airways' Section 1 and 2 claims also entitles US Airways to recover for its appellate work. *See Litton*, 613 F. Supp. at 831 ("[S]ince the arguments presented were so interrelated, . . . that [plaintiff] prevailed on one . . . justifies an award of the reasonable costs and attorney's fees incurred in litigating both. . . .").

**C.     Any Downward Adjustment Should Be Minimal in Light of US Airways' Voluntary 15 Percent Reduction**

As noted above, US Airways has already excluded $4 million in expert fees and $4.5 million in fees for legal and consulting timekeepers—eliminating fees of timekeepers who billed fewer than 100 hours, fees for work by Cadwalader before March 2011 and after April 2012, and other work billed and paid but not directly related to the core set of issues on which US Airways prevailed. Frackman Decl. ¶ 9. In light of the considerations above, US Airways believes these discounts are sufficient and its fee request is reasonable.

23

Nonetheless, in light of the Court's observations (Report at 15), US Airways has reduced its attorney's and economic consultants' fees by an additional 15 percent. A 15 percent reduction, when combined with the cuts already made by US Airways, would amount to approximately $24.5 million in reductions to the recoverable fees and expenses actually paid by US Airways in litigating this lawsuit. *See* Frackman Decl., Ex. A. This 15 percent reduction is appropriate and sufficient to account for any supposed deficiencies Sabre may claim, such as block billing or inefficiencies. Stiefel Decl. ¶¶ 21–23, 27. Moreover, this voluntary 15 percent reduction mirrors the 15 percent reduction imposed in *Bingham v. Zolt*, 66 F.3d 553 (2d Cir. 1995), a case this Court has already found "particularly instructive." Report at 14. In *Bingham*, the plaintiff won "only a small part of the damages sought," "did not prevail on all of its claims," and "prevailed against only three of eight defendants." 66 F.3d at 565. Nonetheless, the Court of Appeals rejected the argument that the 15% reduction was too low because "the plaintiff obtained a jury verdict and a judgment against defendants. It won the case. . . . "Th[at] result is what matters." *Id.* at 565–66.

So too here. US Airways spent significant resources and shouldered considerable risk to hold Sabre to account. And it prevailed—to the benefit of the entire market. US Airways obtained the result it sought from the beginning: "a jury verdict and a judgment against defendants. It won the case." *See Bingham*, 66 F.3d at 566.

## IV. US AIRWAYS IS ENTITLED TO STATUTORY COSTS

US Airways is also entitled to recover those costs that "fall within an allowable category of taxable costs." *See Natural Organics, Inc. v. Nutraceutical Corp.*, 2009 WL 2424188, at *2 (S.D.N.Y. Aug. 6, 2009); *see also Carter v. Inc. Vill. of Ocean Beach*, 759 F.3d 159, 163 (2d Cir. 2014). Recoverable costs are set forth in 28 U.S.C. § 1920, *see also Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441 (1987), and are described with greater specificity in Local Civil

24

Rule 54.1(c). Covered costs include fees paid to the court clerk and marshal;[19] photocopying, printing and scanning;[20] depositions and transcripts;[21] docket fees;[22] and witness fees.[23] Here, US Airways is entitled to recover $1,076,500.61 in costs. *See* Frackman Decl. ¶ 3, Exs. L–M.

## V.    **CONCLUSION**

For the foregoing reasons, the Court should grant US Airways' motion and award it $139,001,444.76.

---

[19] *See* 28 U.S.C. § 1920(1); *TigerCandy Arts, Inc. v. Blairson Corp.*, 2012 WL 760168, at *11 (S.D.N.Y. Feb. 23, 2012); *see also* Local Civ. R. 54.1(c)(10) (reimbursing "the reasonable and actual fees of the Clerk" and permitting recovery for process servers); *United States v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 172 (2d Cir. 1996) (includes reimbursement of service of process fees up to the amount charged by the Marshals Service).

[20] *See* 28 U.S.C. §§ 1920(3)–1920(4); *Summit Tech., Inc. v. Nidek Co.*, 435 F.3d 1371, 1380 (Fed. Cir. 2006) ("section 1920(4) does not demand page-by-page precision;" only an amount "reasonably accurate under the circumstances."); *PPC Broadband, Inc. v. Corning Optical Commc'ns RF*, 2017 WL 473910, at *4 (N.D.N.Y. Feb. 3, 2017) (party cannot be expected to track each page when 100,000 copies were required in complex case).

[21] *See* 28 U.S.C. § 1920(2); 7 Moore et al., Moore's *Federal Practice* § 54.103(3)(c)(i) (3d ed. 2011) ("[Section] 1920 . . . permit[s] the awarding of the routine expenses incurred in taking depositions."); Local Civ. R. 54.1(c)(2) (cost of a deposition plus one copy is recoverable if the deposition was used at trial."); *Anderson v. City of N.Y.*, 132 F. Supp. 2d 239, 246 (S.D.N.Y. 2001) (allowing deposition transcripts to be taxed as costs under § 1920); *Cohen v. Bank of N.Y. Mellon Corp.*, 2014 WL 1652229, at *2 (S.D.N.Y. Apr. 24, 2014) (awarding costs for daily trial transcripts when the trial lasted 8 days); *Jarvis v. Ford Motor Co.*, 2003 WL 1484370, at *1 (S.D.N.Y. Mar. 21, 2003) (pretrial transcripts recoverable if obtained for use in case).

[22] *See* 28 U.S.C. § 1920(5); *Reith v. Allied Interstate, Inc.*, 2012 WL 5458007, at *3 (S.D.N.Y. Nov. 8, 2012) (finding costs, which included fees for admission pro hac vice, to be reasonable; *Brown v. Green 317 Madison, LLC*, 2014 WL 1237448, at *14 (E.D.N.Y. Feb. 4, 2014) (finding "pro hac vice fees to be reasonable").

[23] *See* 28 U.S.C. § 1920(3); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 292 (2006) (28 U.S.C. § 1821 details the allowable per diem, mileage, and subsistence costs for witnesses).

Dated: October 7, 2024
New York, New York

By: */s/ Andrew J. Frackman*

Andrew J. Frackman
afrackman@omm.com
Anton Metlitsky
ametlitsky@omm.com
Mia N. Gonzalez
mgonzalez@omm.com
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Patrick Jones (admitted *pro hac vice*)
pjones@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

Madhu Pocha (admitted *pro hac vice*)
mpocha@omm.com
1999 Avenue of the Stars
O'MELVENY & MYERS LLP
Los Angeles, CA 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

R. Paul Yetter (admitted *pro hac vice*)
pyetter@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, TX 77002
Phone: (713) 632-8000
Facsimile: (713) 632-8002

*Attorneys for Plaintiff US Airways, Inc., for
American Airlines, Inc., as Successor and
Real Party in Interest*