UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| US AIRWAYS, INC., FOR AMERICAN AIRLINES, INC., AS SUCCESSOR AND REAL PARTY IN INTEREST,<br><br>Plaintiff,<br><br>-against-<br><br>SABRE HOLDINGS CORPORATION; SABRE GLBL INC.; and SABRE TRAVEL INTERNATIONAL LIMITED,<br><br>Defendants. | Civ. A. No. 1:11-cv-02725-LGS |

**DECLARATION OF ANDREW J. FRACKMAN IN SUPPORT OF US AIRWAYS' RENEWED AND AMENDED MOTION FOR COSTS, INCLUDING ATTORNEY'S FEES AND EXPENSES, UNDER 15 U.S.C. § 15**

I, Andrew J. Frackman, under 28 U.S.C. § 1746, hereby declare as follows:

1.  I am a partner at the law firm of O'Melveny & Myers LLP ("O'Melveny"), which has been counsel for Plaintiff US Airways, Inc. and its successor-in-interest American Airlines ("US Airways") since October 2011. I submit this declaration in support of US Airways' Motion for Costs, Including Attorney's Fees and Expenses, under 15 U.S.C. § 15. The matters stated herein are based on my personal knowledge and, if called upon, I could and would testify competently to them.

2.  The work described below was done at my direction and at the direction of my partners and colleagues at O'Melveny. I am also familiar with the work performed by other law firms retained by US Airways in this lawsuit: Yetter Coleman LLP ("Yetter Coleman"); Cadwalader, Wickersham & Taft LLP ("Cadwalader"); and Trachtenberg, Rodes, and Friedberg LLP ("Trachtenberg").

1

3.   On April 10, 2023, after briefing by both parties on "the threshold issue of whether US Airways is entitled to fees at all in light of the jury's one dollar verdict (and the degree of recovery)," this Court held that "US Airways should be awarded reasonable attorneys' fees, subject to a downward adjustment to be calculated following additional submissions by the parties."  ECF No. 1276 at 16, adopted by ECF No. 1283.  On June 23, 2023, US Airways filed its motion to recover costs, attorneys' fees, and expenses.  ECF No. 1291.  On February 6, 2024, the Court denied US Airways' motion without prejudice to renewal.  ECF No. 1315.  On August 27, 2024, the Court ordered the parties to file a joint status letter apprising the Court of the status of settlement discussions and a projected date for resolution.  ECF No. 1323.  On September 4, 2024, the parties filed a joint letter notifying the Court that they had met and conferred on a briefing schedule and proposed, in the event the parties do not reach a settlement in principle by October 4, 2024, US Airways would renew its motion on that day.  ECF No. 1325. US Airways now renews its motion to recover costs, attorneys' fees, and expenses, and is seeking $139,001,444.76 for work performed through May 31, 2023.[1]  A summary of the recoverable fees, expenses, and costs incurred by US Airways is available at Exhibit A to this declaration, and is also reproduced below:

---

[1] US Airways had previously moved for an award of attorney's fees and costs, following the first trial in this litigation in 2016.  *See* ECF No. 858.  The motion was fully briefed, with US Airways filing a number of supporting declarations and exhibits providing documentation for its request.  *See* ECF Nos. 859–61, 890–92, 900–904, 915, 917.  The Court subsequently denied US Airway's motion without prejudice, for renewal after resolution of the then-pending appeal to the Second Circuit.  ECF No. 919.  US Airways' current Motion for Costs, including Attorney's Fees and Expenses, Under 15 U.S.C. § 15, and the supporting declarations and exhibits, supersede US Airways' submissions made in conjunction with its 2017 motion.  *See* ECF Nos. 859–61, 900–903, 915, 917.  Because US Airways does not seek reimbursement for post-2017 fees charged by Compass Lexecon, US Airways' present motion relies upon the April 17, 2017 Declaration of David Molin, *see* ECF No. 904, and the associated Exhibit 1 for details regarding Compass Lexecon's work on this litigation.

| Exhibit A: Summary of US Airways' Recoverable Costs | | | |
|---|---|---|---|
| Category | Amount Paid by US Airways* | Amount Sought by US Airways | Supporting Exhibits |
| Attorney's Fees | $108,475,434.13 | $92,204,119.01 | Exhibits B-E |
| Attorney's Expenses | $49,496,060.21 | $45,720,825.14 | Exhibits F-K |
| Statutory Costs | $1,076,500.61 | $1,076,500.61 | Exhibits L-M |
| **Total** | $159,047,994.95 | $139,001,444.76 | |
| Reduction | | $20,046,550.19 | |

*Attorneys' fees exclude approximately $4.5 million of charges of legal and consulting timekeepers (e.g., by eliminating fees of timekeepers who billed less than 100 hours, fees for work by Cadwalader before March 2011 and after April 2012, and other work billed and paid but not directly related to the core set of issues on which US Airways prevailed). Attorneys' expenses exclude approximately $4 million in expert fees.*

4.    As part of its regular supervision of outside counsel, US Airways reviewed invoices of counsel and consultants and, after evaluating their appropriateness and reasonableness, paid all of the attorney's fees, attorney's expenses, and statutory costs being sought here.[2]  US Airways and then its successor, American Airlines, preferred block billing for this matter, and that is how we presented our bills, until late 2020 when American Airlines requested that we begin separately billing individual tasks.

5.    US Airways' victory was the culmination of a risky, hard-fought, decade-long battle with Sabre and its sophisticated, tenacious counsel.  The jury's verdict was a groundbreaking result:  the first jury verdict in a two-sided market Section 2 case following the heightened legal requirements imposed by *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018) ("*Amex*").  As Sabre recognized in 2016 following the first trial, this litigation was "a complicated case that involved complex economic theories, intricate technology discussions, and months of

---

[2] This Declaration uses "fees" to refer to US Airways' payments to counsel for time spent on this litigation; "costs" to refer to standard statutory costs recoverable by any prevailing litigant, see 28 U.S.C. § 1920; 28 U.S.C. § 1821, Local Civ. R. 54.1(c); and "expenses" to refer to other expenditures reasonably necessary to prosecute cases with the complexity of this litigation.

testimony."[3]  This case was further complicated by the new challenges imposed by *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018), as well as the Second Circuit's reinstatement of US Airways' Section 2 monopolization claim.  *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019).  The case also presented novel and hotly contested legal and factual issues, including the treatment of antitrust claims in industries involving technology platforms (like Sabre's Global Distribution System ("GDS") platform) and possible methodologies for showing net harm across both sides of a two-sided platform, as required by *Amex*.

6.  US Airways' claims challenged the 30-year status quo in the GDS industry, seeking to end Sabre's stranglehold on airline-ticket distribution in the United States and paving the way for new high-tech, low-cost methods of distribution.  Sabre fought tenaciously to preserve its business model, using numerous topflight law firms.  Sabre retained a varied roster of skilled, sophisticated counsel for this complex decade-long litigation. In the 2016 trial, Sabre was represented by Bartlit Beck Herman Palenchar & Scott LLP ("Bartlit Beck") and Cleary Gottlieb Steen & Hamilton LLP ("Cleary"), both of whom had represented Sabre in prior similar disputes with airlines.[4]  Shortly before the 2016 trial, Sabre added Cravath, Swaine & Moore LLP to its team.  In 2021, Sabre retained Skadden, Arps, Slate, Meagher & Flom LLP, who would serve as Sabre's lead counsel at the re-trial in 2022.  Gibson Dunn & Crutcher LLP and Dallas counsel, Cantey Hanger LLP, also appeared on the docket as counsel of record for Sabre.  And as of earlier this year, another national law firm, Davis Polk & Wardwell LLP, represents Sabre in this litigation.

---

[3] *Sabre statement on US Airways litigation*, SABRE (Dec. 20, 2016), https://www.sabre.com/insights/releases/sabre-statement-on-us-airways-litigation/.

[4] Bartlit Beck and Cleary represented Sabre in two antitrust lawsuits in Texas:  *American Airlines, Inc. v. Travelport Ltd., et al.*, Case No. 4:11-cv-00244 (N.D. Tex.) and *American Airlines, Inc. v. Travelport, Inc., et al.*, Case No. 067-249214-10 (Tarrant Cnty. Tex.).  The latter case went to trial in 2012.  In July 2012, for purposes of efficiency, US Airways and Sabre agreed by stipulation to use depositions from either American Airlines case as if they were taken in this case.

7.    Sabre moved to dismiss part or all of US Airways' complaint three different times (ECF Nos. 46, 67, 324) and sought summary judgment three different times.  ECF Nos. 194, 255, 1038.  Across the life of this litigation, Sabre filed 20 *Daubert* motions and motions *in limine*,[5] including multiple potentially dispositive *Daubert* motions to exclude US Airways' liability and damages experts in advance of both the 2016 and 2022 trials.[6]  On the eve of the 2016 trial, Sabre moved for reconsideration of the Court's summary judgment decision, in a last-ditch effort to eliminate US Airways' claims before trial.  ECF No. 547.

8.    The 2016 and 2022 trials were substantial undertakings that drew on an enormous factual record.  The 2016 trial ran for eight weeks.  The 2022 retrial, because it was able to take advantage of the work done and record from the first trial, lasted three weeks.  The discovery record included more than 60 depositions and over 2.5 million documents.

9.    To obtain its victory, US Airways paid more than the $139,001,444.76 it seeks here. We have excluded over $4 million paid to testifying experts, excluding even amounts paid to testifying experts when they were engaged in consultation and strategy, as opposed to preparing for and giving testimony.  We have also excluded over $1.6 million in fees that are recoverable, by excluding from this motion all law firm and expert consultant timekeepers with fewer than 100 hours billed to the case.  In addition, we have excluded over $2.9 million in fees for work billed by Cadwalader, O'Melveny, and Yetter Coleman that was not directly related to the core set of issues on which US Airways prevailed, and by excluding all Cadwalader fees billed before March 2011 and after April 2012.

---

[5] ECF Nos. 336, 338, 340, 342, 401–407, 489–492, 1042, 1084, 1087, 1090, 1092.
[6] ECF Nos. 401, 402, 1042, 1092.

10. In support of our motion, I have attached the following exhibits, providing detailed support for this application, and derived from contemporaneous time records and invoices of the law firms and consultants for whom fees are sought.

11. **Exhibit A**: A table summarizing the total recoverable fees, expenses, and costs US Airways incurred in this litigation, which are detailed in Exhibits B through M, described below.

12. **Exhibit B**: An Excel file containing the time entries submitted to US Airways from O'Melveny, Yetter Coleman, Cadwalader, and Trachtenberg for which US Airways seeks recovery of attorney's fees. US Airways does not waive any applicable attorney-client privilege or work product protection by disclosing the time entry narratives in Exhibit B and provides this information to assist 9the Court in assessing the reasonableness of US Airways' attorney's fees in this litigation.

13. **Exhibit C**: A table summarizing the attorney's fees paid for work performed in each stage of the litigation, which are described in more detail below.

14. **Exhibit D**: A table summarizing details about the individual timekeepers at O'Melveny and Yetter Coleman, including their title, average billing rate (since rates changed over time), total hours billed over the litigation, and total dollar amount billed over the litigation.

15. US Airways' trial teams were led by experienced and highly qualified litigators, including those that have been recognized for their antitrust work:

- *Andrew Frackman*, a 1981 graduate of Columbia Law School, is a senior partner at O'Melveny with over 40 years of litigation experience. His practice encompasses complex commercial litigation, with a specialty in antitrust disputes. He has decades of trial experience, having tried, as lead or co-lead counsel, more than 25 cases or arbitrations through the close of evidence or arbitral award in state and federal courts and before numerous arbitral panels. He has been recognized in Global Competition Review's "Global Elite" for his antitrust expertise, as a leading lawyer by Chambers USA, and a perennial "Super Lawyer," as named by Law & Politics Media Inc. He has been lead counsel for US Airways since O'Melveny was retained in 2011.

- *Charles Diamond*, a 1973 graduate of New York University School of Law and is a former senior partner at O'Melveny with over 40 years of litigation experience. Since 2007, he has been a Fellow of the American College of Trial Lawyers. His practice encompassed a wide variety of antitrust, commercial, and intellectual property disputes, with a focus on complex jury trial work. He was recognized as a top antitrust lawyer by Chambers USA, a "star litigator" by the San Francisco Chronicle, one of the "top 100" lawyers by The Los Angeles Business Journal, and a perennial "Super Lawyer," as named by Law & Politics Media Inc. He was lead counsel for US Airways from when O'Melveny was retained in 2011 through the 2016 trial.

- *R. Paul Yetter*, a 1983 graduate of Columbia Law School, is a named partner at Yetter Coleman with nearly 40 years of litigation experience. His practice encompasses a wide variety of antitrust, commercial, and intellectual property disputes, with a focus on complex jury trial work. He frequently represents plaintiffs as well as defendants, including previously representing a plaintiff airline carrier in a monopolization case. He has been recognized as a top antitrust lawyer by Chambers USA and Best Lawyers in America, a "top ten winning lawyer" by National Law Journal and was Texas Lawyer's 2016 "Texas Attorney of the Year." He was retained for this litigation following the Second Circuit's vacatur order and served as lead trial counsel at the 2022 trial.

- *Ian Simmons*, a 1991 graduate of the University of Pennsylvania Law School, is a senior partner at O'Melveny with over 30 years of litigation experience and is currently Co-Chair of O'Melveny's Antitrust and Competition practice group. He has significant experience representing both plaintiffs and defendants in complicated antitrust litigation, including precedent-setting litigation involving monopolization by technology companies. He is one of the few lawyers listed in both the Commercial Litigation Global Leader and Competition Thought Leader *Who's Who Legal* directories. He was involved in this litigation following the Second Circuit's vacatur order, working closely with the experts to formulate their testimony conforming to the new requirements imposed by *Amex*.

- *Katrina Robson*, a 2003 graduate of Harvard Law School, is a former partner at O'Melveny and with approximately 20 years of litigation experience. She has substantial experience in complex, high-profile antitrust and competition litigation against both government agencies and private parties and counsels companies on complex antitrust issues. In 2022, she was named to the "Top 250 Women in Litigation" list. She was involved in this litigation beginning in 2014 through the 2022 trial.

- *Mia Gonzalez*, a 2008 graduate of Columbia Law School, is a partner at O'Melveny with more than 15 years of litigation experience. She has experience on a wide range of litigation and investigative matters, and routinely represents individuals and companies in high-stakes litigation, including cutting-edge antitrust cases involving the airline industry and technology platforms. She joined

the trial team in 2016 and was a key team member for both the 2016 trial and 2022 re-trial.

- *Madhu Pocha*, a 2008 graduate of Columbia Law School, is a partner at O'Melveny with more than 15 years of litigation experience.  His practice covers a broad range of industries and legal disciplines, on both defense- and plaintiff-side.  He has substantial experience in complex, high-profile antitrust and commercial litigation.  He has been involved in this litigation beginning in 2014 and was a key team member for both the 2016 trial and 2022 re-trial.

16. **Exhibit E**: A table summarizing details about the individual timekeepers at Cadwalader and Trachtenberg, with similar information as Exhibit D.

17. The rates charged by the law firms retained in this matter are consistent with what they charge other clients and with those of other comparable firms that practice in the Southern District of New York.  Although law firms generally do not publicly divulge their typical rates due to competitive concerns, public filings in bankruptcy cases confirm that the rates charged by US Airways' counsel in this litigation are comparable to, and sometimes lower than, the rates charged by similar firms for complex litigation in the Southern District.  For example, the rates charged by US Airways' counsel in recent years compare favorably with the rates charged by Sabre's counsel in other litigation where their rates are publicly available.  *See, e.g.*, Omnibus Order, *In re Purdue Pharma L.P.*, No. 19-23469 (RDD) (S.D.N.Y. Bankr.), ECF No. 4927 (approving attorney's fees request of up to $1,850/hour rate for partners and up to $1,180 rate for associates, in 2022); Omnibus Order, *In re Trident Holdings Co., LLC*, No. 19-10384 (SHL) (S.D.N.Y. Bankr.), ECF No. 879 (approving attorney's fees request of up to $1,695/hour rate for partners and up to $1,050/hour rate for associates, in 2019); Omnibus Order, *In re Frontier Communications Corp.*, No. 20-22476 (RDD) (S.D.N.Y. Bankr. Nov. 20, 2020), ECF No. 1343 (approving Cravath's attorney's fees request (ECF No. 1280) of up to $1,725/hour rate for partners, and up to $1,210/hour rate for associates, in 2020); Order, *In re LATAM Airlines Group S.A.*, No. 20-11254 (JLG) (S.D.N.Y. Bankr. Feb. 10, 2023), ECF No. 7353 (approving Cleary's

attorney's fees request (ECF No. 7230) of up to $1,785/hour rate for partners, and up to $1,170/hour rate for associates, in 2023); Order, *In re: Grupo Aeroméxico, S.A.B. de C.V., et al.*, No. 20-11563 (SCC) (S.D.N.Y. Bankr. Nov. 30, 2020), ECF. 673 (approving Davis Polk's attorney's fee request (ECF No. 543) of up to $1,685.00/hour rate for partners, and up to $1,095.00/hour rate for associates, in 2020).[7]

18. Other publicly available information on hourly rates of comparable firms during earlier phases of the litigation similarly confirms the reasonableness of US Airways' request. For example, a 2017 survey from the National Law Journal shows that average rates for comparable law firms in that year—when market rates were generally lower than they are now— were higher than the average rates of O'Melveny partners ($1,113 per hour) and associates/counsels ($650 per hour)[8] who worked on this matter over the course of litigation. In other words, O'Melveny's average rates for 2011 to 2023 were lower than comparable firms' rates from early in that period in 2017.

| National Law Journal 2017 Billing Survey | | | | |
|---|---|---|---|---|
| Law Firm | Partner Billing High Rate | Average Partner Billing Rate | Associate Billing High Rate | Average Associate Billing Rate |
| Gibson Dunn & Crutcher | $1,195 | $1,150 | $875 | $685 |
| Paul Weiss Rifkind Wharton Garrison | $1,395 | $1,320 | $1,040 | $820 |
| Simpson Thatcher & Bartlett | $1,360 | $1,350 | $1,080 | $900 |

---

[7] US Airways uses examples from bankruptcy litigation because such matters are similarly complex and recent fee applications are publicly accessible.
[8] These calculations are based on the total amounts charged and hours worked by Partners, Associates, and Counsel at O'Melveny.

| Willkie Farr & Gallagher | $1,425 | $1,350 | $965 | $800 |
|---|---|---|---|---|

19. **Exhibit F**: A table summarizing US Airways' expenses, other than statutory costs, including type of expense, amount billed to and paid, and a description of those expenses. These amounts were derived from contemporaneous invoices and other records. Exhibit F, reproduced below, summarizes more detailed expense information provided in Exhibits G–K.

| Exhibit F: Summary of US Airways' Attorney's Expenses | | | |
|---|---|---|---|
| **Category of Expense** | **Amount Paid by US Airways** | **Amount Sought by US Airways** | **Description** |
| Out-of-Pocket Expenses | $3,157,666.10 | $3,157,666.10 | This includes expenses described in detail in Exhibit G, including meals, airfare, lodging, travel and trial-related costs. |
| Administrative Expenses | $458,707.09 | $458,707.09 | This includes expenses described in detail in Exhibit H, including online research, delivery services, text editing and proofreading, and court fees. |
| Consultants, E-Discovery, and Trial-Related Expenses | $45,195,448.89 | $41,420,213.82 | This includes expenses described in detail in Exhibit I. |
| Attorney Expenses and Costs Incurred by Cadwalader | $678,804.26 | $678,804.26 | This includes both attorney expenses and costs incurred by Cadwalader, which are described in detail in Exhibit J. |
| Attorney Expenses and Costs Incurred by Trachtenberg | $5,433.87 | $5,433.87 | This includes both attorney expenses and costs incurred by Trachtenberg, which are described in detail in Exhibit K. |
| **Total** | $49,496,060.21 | $45,720,825.14 | |

20. **Exhibit G**: An Excel file reflecting records of routine out-of-pocket expenses— including meals, airfare, lodging, and trial-related costs—incurred by O'Melveny and Yetter

Coleman.  Consistent with the Court's guidance on US Airways' motion for fees in 2017, *see* ECF No. 907, Exhibit G includes, where applicable:  (i) the date each expense was incurred, (ii) type of charge, (iii) the payee, (iv) the amount billed (or in some cases, credited) to US Airways, (v) the individuals present, and (vi) the purpose for which the expense was incurred.

21. **Exhibit H**: An Excel file reflecting records of routine administrative expenses— including research fees, internal bindery, delivery services, text editing and proofreading. Consistent with the Court's guidance on US Airways' motion for fees in 2017, *see* ECF No. 907, Exhibit H includes, where applicable:  (i) the date each expense was incurred, (ii) type of charge, (iii) the payee, (iv) the relevant timekeeper, and (v) the amount billed (or in some cases, credited) to US Airways.

22. **Exhibit I**: A summary of amounts paid to consultants, e-discovery services, technology vendors, and other trial-related vendors.  Among the vendors included are economic consultants (Brattle and Compass Lexecon); e-discovery and contract lawyer vendors (Complete Discovery Source, Update Inc., Excelerate Discovery, and Epiq); and trial-related expenses, including our in-court trial technician who was present for the duration of the trial (Legal Media for the 2016 trial and BP Trial Technology Services for the 2022 re-trial), trial graphic artists (RLM, Lucid CGI, and TrialGraphix), renting and outfitting a satellite work space near the courthouse (Chatham Towers), and providing on-site assistance for trial team members and witnesses (Litigation Logistics/Rentals).  These expenses were necessary to ensuring an effective and efficient trial presentation.  US Airways is seeking only the amounts it actually paid that are reflected in contemporaneous invoices.  Plaintiffs are filing via hard drive an Excel version of Exhibit I containing tabs detailing each vendors' invoices and summarizing the amounts US Airways is seeking.  US Airways is providing to Sabre copies of invoices from the vendors listed

in Exhibit I and is prepared to file or lodge them with the Court, if the Court would like to review them.

23. **Exhibit J**: Details about expenses incurred by Cadwalader on behalf of US Airways from March 2011 through April 2012. This exhibit was previously prepared by Cadwalader personnel and provided to O'Melveny in response to the Court's June 9, 2017 Order (ECF No. 907).

24. **Exhibit K**: Details about expenses incurred by Trachtenberg on behalf of US Airways. This exhibit was prepared by Trachtenberg personnel and provided to O'Melveny in response to the Court's June 9, 2017 Order (ECF No. 907).

25. **Exhibit L**: A summary of the standard statutory costs that US Airways is entitled to recover under Federal Rule of Civil Procedure 54, organized by the categories provided by statutes and local rules. *See* 28 U.S.C. § 1920; 28 U.S.C. § 1821; Local Civ. R. 54.1(c). Exhibit L, reproduced below, summarizes more detailed records reflected in Exhibit M.

| Exhibit L: Summary of Statutory Costs | | |
|---|---|---|
| **Cost** | **Sum of Amount** | **Description** |
| Clerk/Marshal Fees | $6,864.75 | This is for fees for serving subpoenas on Sabre and third parties in connection with document discovery and depositions. |
| Copying | $130,797.73 | This is for the cost of materials that were photocopied. |
| Court Hearing Transcripts | $2,222.49 | This includes all transcripts of hearings since February 2013. |
| Credit | -$681.30 | Unattributed credits paid back to US Airways |
| Deposition Transcripts | $189,087.78 | This is for transcripts of depositions of party and third-party witnesses. |
| Depositions | $81,522.96 | This is for the cost of taking depositions (e.g., court reporter and videographer). |
| Printing | $603,750.56 | This is for printing costs, including materials for use at trial. |

| Pro Hac Vice Fees | $2,850.00 | This is for the $200 per person filing fees for each of the fifteen O'Melveny attorneys admitted pro hac vice (ECF 89, 90, 117, 141, 171, 177, 276, 295, 649, 948, 1175, 1176, 1177, 1181, 1182). |
| Scanning | $1,758.30 | This is for the cost of electronic scanning. |
| Trial Transcripts | $58,327.34 | This includes all trial-related transcripts since February 2013. |
| **Total** | $1,076,500.61 | |

26. **Exhibit M**: An Excel file reflecting the records of statutory costs summarized in Exhibit L.  *See* ECF No. 907.

27. To prepare these exhibits, to ensure their accuracy and that they reflect fees and expenses incurred in connection with this litigation and paid by US Airways, a team of lawyers, paralegals, and O'Melveny and Yetter Coleman accounting personnel, and personnel at US Airways' successor in interest, American Airlines, reviewed thousands of pages of over a decade of invoices, detailing expenses from over a dozen vendors and four law firms, thousands of accounting entries showing expenses by date and invoice number, and tens of thousands of contemporaneous time entries.  The team reviewed these records to assist in the preparation of the quantification summarized in this declaration.

28. To assist the Court, I also provide below a narrative summary of the work done at each stage of the case.  For each stage, US Airways has included a rough timeframe for when that stage began and ended, along with the portion of US Airways' requested attorney's fees that were billed during that period.  The timeframe cutoffs and the associated attorney's fees are not precise given the overlap between the work performed in different stages, but US Airways believes these markers provide a sense for the quantum of attorney's fees associated with the various stages of litigation.

## NARRATIVE SUMMARY OF WORK PERFORMED

### EARLY STAGES OF THE LITIGATION:  COMPLAINT AND MOTION TO DISMISS

### (March 2011 through November 2011)

**Recoverable attorney's fees incurred during this period:  $3,227,367.02**

29. This action was commenced on April 21, 2011.  *See* ECF No. 1.

30. In pertinent part, US Airways alleged that:

    a. Sabre operates a GDS, which provides travel agents with information on schedules and fares and the ability to book tickets offered by participating airlines.  *Id.* ¶ 2.

    b. Sabre has power over airlines because it is the largest GDS in the United States and, as a result of Sabre's anticompetitive agreements with travel agents and other technology companies, travel agents use one GDS per corporate customer for virtually all of the airfares they book, so airlines must participate in every GDS to reach the travel agents' lucrative corporate travelers.  *Id.* ¶¶ 2–6, 40–45.

    c. Sabre uses its power to extract supracompetitive booking fees from airlines and to force airlines to enter into "full content" agreements preventing airlines from providing any content through other distribution channels unless that content is also provided to Sabre.  *Id.* ¶ 8.

    d. When airlines challenged Sabre's business model and contractual restraints, Sabre retaliated against them through a variety of exclusionary conduct, including engaging in display bias to hide airline content from travel agents.  *Id.* ¶¶ 50–55.

31. US Airways alleged four related Sherman Act violations:

a. **Count I**: Sabre's contracts with airlines and travel agents unreasonably restrained competition, in violation of Section 1, *id.* ¶¶ 153–159 ("vertical restraints claim");

b. **Count II**: Sabre's agreements with airlines, agreements with travel agents, and other exclusionary conduct willfully maintained Sabre's monopoly power, in violation of Section 2, *id.* ¶¶ 160–164 ("monopolization claim");

c. **Count III**: Sabre, Sabre subscribers, and others conspired to preserve Sabre's monopoly power, in violation of Section 2, *id.* ¶¶ 165–168 ("conspiracy to monopolize claim"); and

d. **Count IV:** Sabre and the two other GDSs entered into a horizontal conspiracy intended to entrench each GDS's dominance and impede competition on the merits, in violation of Section 1, *id.* ¶¶ 169–173 ("horizontal conspiracy claim").

32. Cadwalader represented US Airways alone until US Airways retained O'Melveny in October 2011. Cadwalader continued to assist in this litigation until April 30, 2014. *See* ECF No. 214. US Airways is not seeking to recover any Cadwalader's fees beyond that date.

33. In addition to O'Melveny and Cadwalader, US Airways retained Trachtenberg in February 2012 to handle discovery from several third parties where O'Melveny had potential conflicts, including negotiating with the third parties, collecting and reviewing third-party documents, and taking the deposition of one third-party witness. Trachtenberg served in this role until June 2014.

34. On June 30, 2011, Sabre moved to dismiss the complaint.[9]  *See* ECF No. 39.  On September 12, 2011, the Court dismissed both of US Airways' Section 2 claims and ordered US Airways to file an amended complaint.  US Airways filed its First Amended Complaint on September 22, 2011.[10]  On October 6, 2011, Sabre again moved to dismiss US Airways' Section 1 horizontal conspiracy claim.  *See* ECF No. 67.  The Court denied Sabre's motion on November 21, 2011.

35. On July 1, 2011, Sabre moved to transfer this action to the Northern District of Texas and consolidate it with American Airlines' then-pending antitrust lawsuit against Sabre.  *See In Re GDS Antitrust Litig.*, MDL No. 2281, ECF No. 1.  On October 6, 2011, the Judicial Panel on Multidistrict Litigation denied Sabre's motion to transfer and consolidate this case.  *See* ECF No. 72.

## FACT DISCOVERY

### (December 2011 through August 2013)

### Recoverable attorney's fees incurred during this period:  $34,067,892.56

**I.    Document Discovery**

36. Document discovery in this case was extensive.  US Airways collected and reviewed voluminous documents, producing approximately 688,000 documents—totaling more than 3.2 million pages.  Sabre produced more than 1.4 million documents totaling more than 7.4 million pages.  US Airways served subpoenas on more than a dozen third parties,[11] which combined produced more than 480,000 documents totaling over 3.1 million pages.  All told, US Airways' document vendors hosted more than 1.6 terabytes of documents and data.

---

[9] Sabre withdrew its motion to dismiss on July 15, 2011 pursuant to agreement of the parties, but re-filed substantially the same motion on August 11, 2011.  *See* ECF Nos. 39, 44.

[10] US Airways filed a First Amended Complaint by letter on September 22, 2011, but it was not docketed.

[11]  The third parties included other airlines, other GDSs, travel agents, and other industry participants.

37. To reduce cost and ensure efficiency, US Airways utilized more than 100 contract lawyers, who worked for months in Los Angeles, New York, and Washington, D.C.  Cadwalader assisted in the document review and supervised the review team in Washington, D.C.  Counsel for US Airways also spent thousands of hours reviewing US Airways' documents for responsiveness and preparing them for production, including preparation of privilege logs totaling more than 40,000 entries.  The fees of the contract lawyers—employed by Complete Discovery Source, Epiq Document Review, Encore Discovery Solutions, Excelerate Discovery, and Update, Inc.—totaled $18,297,370.58 and are included as expenses in Exhibit I.

## II.    Written Discovery

38. US Airways propounded 22 interrogatories and more than 200 requests for admission. US Airways responded to 24 interrogatories and over 800 requests for admission from Sabre.

## III.    Fact Witness Depositions

39. On July 13, 2012, the parties agreed to a discovery "standstill" until the earlier of January 1, 2013 or the date judgment was entered in the *American Airlines v. Sabre* case that was pending in Tarrant County, Texas and slated for an October 2012 trial.[12]  Depositions began in January 2013, promptly after the expiration of the standstill.  US Airways deposed 32 fact witnesses, including 17 Sabre witnesses and 15 third-party witnesses, and defended 15 depositions of US Airways personnel whom Sabre deposed.  The depositions, which included the parties' most senior executives and other major players in the travel industry, took place all over the United States (including in Arizona, California, Florida, Georgia, Illinois, Minnesota, Massachusetts, New York, North Carolina, Texas, Washington State, and Washington, D.C.). O'Melveny also took two third-party depositions of a key travel management company's

---

[12] The parties entered into a stipulation memorializing the standstill and submitted it to the Court, but it was never entered by the Court.

employees in London.  In addition to the depositions in which US Airways participated, US Airways' counsel mastered over 50 relevant depositions of Sabre and third-party witnesses that were taken in the prior *American Airlines* cases, many of which were used directly or indirectly (in the case of impeachment of testifying witnesses) at trial.[13]

## IV.    Sabre's Attempted Counterclaim

40. On January 18, 2013, in the midst of fact discovery, Sabre moved for leave to amend its answer to add a counterclaim against US Airways, alleging an airline conspiracy.  *See* ECF 124.  On April 5, 2013, the Court denied Sabre's motion.  *See* ECF 140.

### EXPERT DISCOVERY AND DEPOSITIONS

### (September 2013[14] through February 2014)
### Recoverable attorney's fees incurred during this period:  $8,369,073.19

41. Expert discovery was extensive, as is common in antitrust cases.

42. In advance of the first trial, US Airways retained six experts to present testimony: Joseph Stiglitz (economics), Daniel McFadden (damages), Jerold Zimmerman (accounting), Andrew Menkes (industry), Daniel Kasper (regulatory history), and Steve Reynolds (technology).  Each was deposed and testified at trial on case-determinative issues, including: market definition, market power, technological innovation, pro- and anti-competitive effects, causation, and damages.  O'Melveny attorneys spent thousands of hours working with our experts and our supporting consultants to formulate our case strategy; draft 10 different reports (initial and rebuttal); prepare to defend and take Sabre's experts' depositions (there were 10 total expert depositions before the 2016 trial); and prepare for expert trial testimony.

---

[13] The parties' "standstill" agreement also provided that the parties could use the deposition transcripts of witnesses in the *American Airlines* Texas lawsuits as if they were taken in this case.  *See supra* notes 4 and 13.

[14] US Airways served its expert reports on September 13, 2013, but O'Melveny's work with experts began months earlier.

43. O'Melveny also retained the economic consulting firms, Brattle and Compass Lexecon, to provide support in prosecuting the case. Brattle served as O'Melveny's principal economic consultant—performing extensive quantitative analysis; developing factual arguments and economic theories; advising on briefs, expert reports, demonstratives, and case strategy; and helping to shape the cross examination of Sabre's experts at their depositions and at trial. Compass Lexecon assisted O'Melveny in developing factual arguments regarding the history of government regulation that helped to create Sabre's market power, and like Brattle, provided comments and guidance on briefs, expert reports, and case strategy.

### SUMMARY JUDGMENT

### (March 2014 through March 2015)

### Recoverable attorney's fees incurred during this period: $9,499,956.50

44. Work dedicated to Sabre's anticipated summary judgment motion began in earnest in January of 2014. In April 2014, Sabre filed three motions for summary judgment, seeking to dismiss the entirety of US Airways' case. *See* ECF Nos. 194–96. The summary judgment record was extensive, totaling nearly 1,200 pages, including briefs, Rule 56.1 statements, declarations, and exhibits. Argument on the motion occurred on October 14, 2014. *See* ECF 236.

45. On January 6, 2015, the Court denied Sabre's motion for summary judgment on either of US Airways' Section 1 claims. *See* ECF 242. Sabre succeeded only in narrowing US Airways' damages to the period of February 24, 2011 through October 30, 2012, when American Airlines settled its lawsuits with Sabre, and eliminating damages claims relating to Travelocity booking fee overcharges and Sabre's refusal to implement Choice Seats. US Airways' principal damages claim—for booking fee overcharges incurred under the 2011 contract—remained intact. On January 12, 2015, US Airways moved for reconsideration of the parts of the Court's

summary judgment order relating to the statute of limitations and US Airways' Choice Seats damages claim. That motion was denied.

46. Sabre's summary judgment motion required months of time-consuming work related to Sabre's and third parties' confidentiality claims, including participating in lengthy negotiations regarding confidentiality, submitting a letter brief to the Court (*see* ECF No. 241), and making extensive redactions in response to confidentiality claims of these parties and to conform to the Court's order regarding redactions. *See* ECF No. 250. The parties' redacted summary judgment papers were filed on March 12, 2015. *See* ECF Nos. 255–268.

## FIRST TRIAL PREPARATION & PRE-TRIAL MOTIONS

### (April 2015 through October 23, 2016)

### Recoverable attorney's fees incurred during this period: $19,576,989.39

47. Following Sabre's unsuccessful motion for summary judgment, the parties began preparing for trial. Initially, pursuant to the Court's June 19, 2015 scheduling order (ECF No. 307), the parties began preparing for an October 2015 bench trial, while the parties briefed issues relating to US Airways' effort to obtain a bench trial.[15] Consistent with the Court's June 19, 2015 scheduling order, we prepared: (i) written direct trial testimony for all six of US Airways' testifying experts, (ii) a 117-page proposed findings of fact, (iii) a 36-page proposed conclusions

---

[15] In April 2015, US Airways raised the possibility of waiving its damages in order to proceed on a quicker schedule with a bench trial on its equitable claims rather than a jury trial. Sabre opposed. After engaging in letter writing and conferences with the Court on this issue, US Airways filed a motion to affect this relief, *see* ECF No. 298, as well as a Second Amended Complaint, *see* ECF Nos. 309, 311. Sabre subsequently moved for entry of judgment on the grounds that US Airways was moot, and that the Court should enter judgment pursuant to the terms of a Rule 68 offer. *See* ECF No. 325. The Court granted Sabre's motion to dismiss US Airways' claim for declaratory relief, and permitted US Airways to amend again to add back its damages claim. *See* ECF No. 350. Sabre subsequently requested over $6.4 million for certain work completed between May 2015 and September 2015 relating to US Airways' efforts to obtain a bench trial, ECF No. 371, more than US Airways' fees (approximately $5.5 million) over the same period. The Court ultimately awarded Sabre roughly $6 million in attorney's fees for their work during this period, which US Airways paid. In granting Sabre's motion to dismiss US Airways' claim for declaratory relief, the Court also vacated the operative case schedule, which included a bench trial beginning on October 26, 2015. *See* ECF No. 350. The trial was subsequently rescheduled to begin on October 24, 2016, in front of a jury. *See* ECF No. 384.

of law, (iv) two proposed motions *in limine,* (v) drafts in opposition to Sabre's four motions *in limine,* and (vi) reviewed, analyzed, and prepared to rebut Sabre's pretrial submissions.

48. During this time, extensive effort was spent on the typical pretrial tasks of a complicated civil case, including:  reviewing thousands of documents, data, and dozens of deposition transcripts to prepare direct-examination outlines for fact witnesses and cross-examination outlines for Sabre's experts and anticipated fact witnesses; identifying potential trial exhibits; reviewing and designating deposition transcripts; conducting jury research; working on an opening statement; and exploring trial consultants and other trial accommodations.

49. The work we undertook preparing for a bench trial in 2015 was ultimately repurposed for the 2016 and 2022 jury trials, and was not redundant or superfluous.  The proposed conclusions of law, proposed findings of fact, and written direct testimony laid the groundwork for our factual presentation and legal arguments during the jury trial.  Similarly, the culling of exhibits and deposition testimony done in 2015 in anticipation of a bench trial served as the starting point for preparing for the eventual jury trials.

50. Following the filing of our Third Amended Complaint on March 9, 2016, our team resumed its trial preparation for the imminent jury trial, which in April the Court set for October 24, 2016.  *See* ECF No. 384.

51. On May 13, 2016, the parties filed 13 *Daubert* motions and preliminary motions *in limine*.  Briefing on these motions continued through late June.  In August 2016, US Airways filed an additional motion *in limine*, and Sabre filed four additional motions.  Briefing on the additional motions *in limine* continued through August 26, 2016.  Even with the Court's page limitations, US Airways filed over 300 pages of *Daubert* and motion *in limine* briefs, not including declarations and exhibits.

52. During this same period, the parties prepared the various labor-intensive pretrial submissions required under the Court's April 20, 2016 scheduling order, including designation, counter-designation, and objections to over 100 hours of testimony of 95 deponents (Sabre designated 39 transcripts and US Airways 56). Testimony from 36 of the designated transcripts was played at trial.

53. US Airways also updated and revised the preliminary exhibit list that we had prepared in 2015. Both parties' exhibit lists (containing hundreds of exhibits each) went through numerous iterations, and we and Sabre met-and-conferred about objections over the course of several weeks. And the parties prepared proposed jury instructions, a jury questionnaire, and verdict form. Given the complexity of the case and the novelty of some of the issues, preparing the proposed instructions and verdict form was a time-consuming effort that included exchanges of drafts, preparation of a side-by-side submission to the Court, and briefing in support of our respective proposals. Concurrent with these other trial preparation tasks, our team drafted witness outlines and demonstratives; met with the 13 witnesses that we anticipated calling at trial; and worked with trial vendors, including graphic artists, trial technicians, and jury and witness consultants.

54. The trial preparation also included work dealing with Sabre's last-minute motion, filed on October 3, 2016, for reconsideration of the Court's order denying summary judgment following the Second Circuit's recent decision in *United States v. American Express*, 838 F.3d 179 (2d Cir. 2016). *See* ECF No. 547. The Court denied Sabre's motion on October 10, 2016. *See* ECF No. 579. On October 11, 2016, Sabre again sought to put off trial by requesting renewed *Daubert* briefing in light of *Amex*, which the Court denied on October 18, 2016. *See* ECF No. 596. Sabre raised *Amex*-related issues again during trial, this time in connection with

jury instructions, requiring US Airways to respond on the same issue twice more. *See, e.g.*, ECF Nos. 689, 693.

## FIRST TRIAL

### (October 24, 2016 through December 20, 2016)

### Recoverable attorney's fees incurred during this period:  $8,035,543.47

55. The eight-week trial commenced on October 24, closing arguments occurred on December 14, and the jury returned its verdict for US Airways on December 20, 2016.  During the trial, in-house counsel for US Airways' successor in interest, American Airlines, regularly attended trial, witness and other preparation sessions, and team meetings, directly observing (and contributing to) the work we did.  During trial, our team:

- prepared 13 witnesses for direct examination, which spanned 14 trial days;

- conducted nine cross examinations (and prepared to cross-examine several other witnesses who did not testify);

- reviewed designations for over 90 trial or deposition transcripts (36 of which were played or read at trial);

- marshaled over 500 exhibits and demonstratives in support of US Airways' case and cross-examination;

- engaged in near-daily meet-and-confers with Sabre's counsel regarding exhibits, demonstratives, and deposition designations;

- drafted letters on key trial issues, including: preclusion of "sign-and-sue" evidence, damages calculations, expert testimony, availability of Sabre's *in pari delicto* defense, jury instructions, third-party confidentiality, and rebuttal witnesses;

- prepared three mini-summations and closing arguments;

- prepared extensive revisions of the jury instructions and the jury verdict form;

- managed confidentiality requests and concerns of numerous third parties; and

- prepared for numerous arguments regarding admissibility of evidence, expert opinions, third-party confidentiality, Sabre's Rule 50 motion, Sabre's evidentiary proffer, jury instructions, and verdict form.

## POST-TRIAL WORK

### (December 21, 2016 through April 2017)

### Recoverable attorney's fees incurred during this period:  $2,433,034.50

56. Following the favorable jury verdict, Sabre moved unsuccessfully for judgment as a matter of law or a new trial under Rule 50 and Rule 59; and US Airways moved unsuccessfully for reconsideration of the Court's September 2015 opinion and order dismissing US Airways' declaratory relief claim.  We also prepared a motion for fees, which the Court ultimately deferred until after resolution of the parties' appeals.  The work we did to prepare that motion is the foundation for the current fees motion.

## APPEAL

### (May 2017 through September 2019)

### Recoverable attorney's fees incurred during this period:  $1,901,852.50

57. After the Court denied Sabre's assorted post-trial motions seeking to undo the jury's verdict in favor of US Airways, Sabre filed a Notice of Appeal in April 2017, seeking reversal of the jury's verdict and entry in favor of Sabre.  *See* ECF No. 893.  US Airways opposed and cross-appealed, arguing that its monopolization and conspiracy to monopolize claims should be reinstated.  Briefing was complicated (including on the novel question of the proper legal standard for two-sided platforms) and extensive.  Oral argument did not occur until December 2018.

58. After briefing on Sabre's appeal and US Airways' cross-appeal concluded, on June 25, 2018, the Supreme Court issued its decision in *Amex*.  The parties then submitted supplemental briefing to the Court of Appeals addressing effect of *Amex.*

59. On September 11, 2019, the Second Circuit vacated the jury's verdict in light of the Supreme Court's decision in *Amex*, denied Sabre's request for judgment as a matter of law, reinstated US Airways' monopolization claims, and remanded for further proceedings.

### POST-REMAND EXPERT AND FACT DISCOVERY

### (October 2019 through August 2021)

### Recoverable attorney's fees incurred during this period: $7,566,403.25

60. Both the Second Circuit's opinion and *Amex*—with its new requirements for proving anticompetitive conduct involving a two-sided transaction platform—required significant reworking of US Airways' theories of liability, anticompetitive conduct, and damages. The Second Circuit's decision reinstated US Airways' monopolization claim, which allowed US Airways to rely upon additional anticompetitive conduct and to seek new categories of damages resulting from Sabre's exclusionary conduct. And because of *Amex*, US Airways now would have to show *net* harm across the Sabre platform instead of just demonstrating harm to US Airways and other airline carriers on one side of the platform. *See, e.g.*, *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 53–54 (2d Cir. 2019) (for a two-sided market "the effects of a challenged restraint on a market are to be judged by the net impact on customers on both sides, not either side, of a market.").

61. Although little additional factual discovery was needed, the parties engaged in a new round of expert discovery to address the new legal and economic requirements of *Amex* and to address expert unavailability resulting from the passage of so many years. US Airways retained a new economic expert, Dr. Rosa Abrantes-Metz, who had considerable expertise on two-sided markets, to replace Jerold Zimmerman and Darren McFadden. US Airways also retained a new technology expert, Timothy O'Neil-Dunne, to replace Steve Reynolds, who was unavailable. Dr. Abrantes-Metz and Mr. O'Neil-Dunne submitted new expert reports, as did US Airways'

liability expert Professor Joseph Stiglitz. Dr. Abrantes-Metz and Professor Stiglitz also provided reply reports responding to new rebuttal reports submitted by Sabre's damages and liability experts. US Airways also retained a new accounting expert, Louis Dudney, to replace certain opinions of Jerold Zimmerman.

62. Sabre also presented a new cast of experts. Sabre added a new accounting expert, Mark Zmijewski and a second economic expert, Robert Topel. Sabre's liability expert, Kevin Murphy, provided new opening and rebuttal reports. All of these experts were then deposed.

63. In preparing its revised case, US Airways relied on work already done prior to the appeal and remand. For example, although Professor Stiglitz now provided opinions about how Sabre exercised monopoly power, as well as market power, and maintained its power through various types of exclusionary conduct, his report built on his prior report and his prior work showing that Sabre's market power allowed it to enter into anticompetitive agreements with airlines and travel agents. In order to comply with *Amex*'s new requirements, US Airways' new damages expert, Dr. Abrantes-Metz, calculated the net per-booking fee that US Airways would have paid to Sabre by first finding the "net" fee that Sabre would have charged in a competitive market, and then estimating how Sabre would allocate that net fee between airlines such as US Airways on one side of the platform and travel agencies on the other. For the first step of her calculations, Dr. Abrantes-Metz's relied largely on the work of Mr. Zimmerman, who had similarly calculated the per-booking fee that Sabre would charge in a competitive market. Mr. O'Neil-Dunne's opinions were, by stipulation, within the scope of the opinions previously proffered by US Airways' original technology expert, Mr. Steve Reynolds.

64. In addition to the considerable expert work, both parties also served and responded to additional discovery requests; both Sabre and US Airways served additional interrogatories after

remand, and US Airways served its Seventh Set of Requests for Production.  Sabre also deposed

one third-party fact witness, Keith Wallis of Air Canada, who replaced a prior Air Canada

witness, Graham Wareham, who had been deposed in American Airlines' case against Sabre.

Additional fact discovery was limited, since US Airways had already taken discovery on the

central elements of a monopolization claim—such as the existence of monopoly power, barriers

to entry, and the anticompetitive effects of Sabre's conduct—in building its vertical restraints

claim for the 2016 trial.

### SUMMARY JUDGMENT AND *DAUBERT* BRIEFING

### (September 2021 through October 2021)

### Recoverable attorney's fees incurred during this period:  $896,384.50

65. On September 17, 2021, Sabre filed another motion for summary judgment (ECF No.

1038–41) and a *Daubert* motion seeking to exclude the testimony of US Airways' damages

expert (ECF No. 1042–45).  As with Sabre's previous summary judgment motions, these

motions were major efforts as they were case-dispositive.  The summary judgment record totaled

nearly 1,200 pages, including briefs, Rule 56.1 statements, declarations, and exhibits.  On March

24, 2022, the Court denied both of Sabre's motions.  ECF No. 1129.  On April 15, 2022, the

Court issued an Amended Opinion and Order.  ECF No. 1171.

### SECOND TRIAL PREPARATION & PRE-TRIAL MOTIONS

### (November 2021 through April 21, 2022)

### Recoverable attorney's fees incurred during this period:  $7,644,611.35

66. The parties then turned their focus to preparing for the new trial.  US Airways filed

five motions *in limine*, and Sabre filed four of its own; the parties also agreed not to relitigate

certain motions *in limine* that had been decided in advance of the 2016 trial.  *See* ECF No. 1094.

The Court granted all five of US Airways' motions *in limine* at least in part (and some in full),

*see* ECF No. 1132, 1149–51, and denied all four of Sabre's motions *in limine*, *see* ECF No. 1143, 1148, 1155, except to the extent one motion sought to exclude certain statements consistent with the Court's rulings.  Sabre would subsequently unsuccessfully relitigate rulings on critical evidence and the admissibility of US Airways' expert's damages opinions.  ECF No. 1136, 1191.

67. In addition to litigating these motions *in limine*, US Airways engaged in extensive trial preparation, including:

- Preparing extensive pretrial filings;

- Preparing for direct and cross examinations;

- Reviewing the evidentiary record to identify potential exhibits, demonstratives, and material for testimony;

- Preparing deposition designations, counter designations, and counter-counter designations, as well as preparing objections to Sabre's designations and counter-designations;

- Drafting new and revised demonstratives from 2016;

- Drafting an opening statement;

- Preparing an updated exhibit list and revised deposition designations, principally to reflect certain categories of evidence that had been excluded from the 2016 trial but which were not excluded from the 2022 trial;

- Managing third-party confidentiality issues;

- Drafting jury instructions, *voir dire*, a juror questionnaire, and a verdict form;

- Performing jury testing; and

- Engaging in extensive meet and confers with Sabre regarding the pretrial submissions and evidentiary objections.

68. The work to prepare to try and ultimately try US Airways' reinstated Section 2 claim was reduced significantly by the overlap in evidence supporting both the Section 1 and Section 2 claims.  For example:

- 31 of 44 witnesses[16] in the 2016 trial also testified in the 2022 trial, typically providing testimony analogous—and sometimes identical—to their testimony at the 2016 trial.

- US Airways' key witnesses on US Airways' agreements with Sabre—John Gustafson, one of the lead negotiators of the 2011 agreement, and Scott Kirby, former President of US Airways and one of the lead negotiators of the 2006 agreement—testified to a variety of issues that were relevant to both the Section 1 and Section 2 claims, such as: (1) the nature of the restraints in the distribution agreements and Sabre's insistence on them; (2) US Airways' reliance upon the corporate travel agent business coming through Sabre,[17] giving Sabre leverage over US Airways;[18] and (3) benefits to US Airways and consumers of removing full content contract provisions.[19]  Because Mr. Gustafson and Mr. Kirby had already testified as to these topics in the 2016 trial as part of US Airways' Section 1 presentation, both witnesses were again able to cover these topics—which were necessary to US Airways' Section 2 claim—with relatively minimal prep work.

- In both 2016 and 2022, US Airways marshalled testimony from executives from other airlines regarding Sabre's retaliation against those airlines and the necessity of doing business with Sabre regardless of how unpalatable the offered terms were.[20]  During the 2022 trial, US Airways was able to reuse significant work

---

[16]Including fact witnesses that appeared live and by deposition (or prior trial testimony) and expert witnesses.

[17] ECF No. 1222, 4/27/2022 Trial Tr. 744:4–19 (Kirby testifying that "half of our revenues are coming through travel agencies, so it doesn't take much of a boycott to have severe implications.  Remember, in 2005, US Airways, we had just come out of bankruptcy."); ECF No. 1224, 4/28/2022 Trial Tr. 845:23–846:6 (Gustafson testifying that travel agents booking through "Sabre at the time was roughly 40 percent of US Airways' total revenue.  It was the equivalent of $4 billion annually that was booked through Sabre, and if we did not have US Airways available for sale in Sabre, losing $4 billion of revenue would be catastrophic.").

[18] ECF No. 1222, 4/27/2022 Trial Tr. 735:1–19 (Kirby testifying that "at US Airways, we were going to have to toe the line and abide by the full content rules that Sabre was going to insist upon."); id. 737:17–738:19 (Kirby testifying that full content was "nonnegotiable.  We could either be in Sabre with full content or we could be out of Sabre" and that "kicking US Airways out of Sabre, I think, would have put us out of business."); id. (Kirby testifying that "If Sabre turned us off, it meant the airline shut down, because they had that much leverage."); ECF No. 1224, 4/28/2022 Trial Tr. 827:15–828:2 (Gustafson testifying that US Airways was in a "weak position" in negotiation because "we really didn't have any alternatives to the GDS."); id. 847:5–15 (Gustafson testifying that removal from the Sabre GDS "was effectively a death sentence because, in our case, there is no way that we replace $4 billion of revenue.").

[19] ECF No. 1222, 4/27/2022 Trial Tr. 752:3–753:7 (Kirby testifying that without Sabre's full content restraints, "lower distribution costs would act just like oil prices.  We would have more flights than we otherwise have, and fares would have gone down."); ECF No. 1224, 4/28/2022 Trial Tr. 794:15–795:6 (Gustafson testifying that in the absence of full content "if we were able to and [sic] provide customers with a discount for booking through a preferred or lower cost distribution channel, that would be something that would be very attractive to customers.").

[20] See, e.g., ECF No. 1226, 5/2/2022 Trial Tr. 1056:11–1057:18 (Keith Wallis, a former Air Canada executive, testifying that Sabre "biased" against Air Canada by "chang[ing] the Sabre system so that regardless if Air Canada

29

product and preparatory materials from the 2016 trial relating to those witnesses, such as questioning outlines and identification of the critical exhibits.

- The entire 2016 record of 338 admitted exhibits were deemed admitted for the 2022 trial (comprising 72% of the admitted exhibits in the 2022 trial) (ECF 1140).

- The parties agreed that 6 motion *in limine* rulings from the 2016 trial would apply in the 2022 trial.

**SECOND TRIAL**

**(April 22, 2022 through May 2022)**

**Recoverable attorney's fees incurred during this period:  $4,372,712.40**

69. Trial commenced on April 22, 2022, with closing arguments on May 12.  Like during the 2016 trial, American Airlines in-house counsel regularly attended trial, witness and other preparation sessions, and team meetings, directly observing (and contributing to) the work we did.  During trial, US Airways' counsel:

- Prepared over a dozen witnesses for direct examination;

- Conducted nine cross examinations;

- Reviewed designations for over 50 trial or deposition transcripts (17 of which were played or read at trial);

- Marshaled over 400 exhibits and demonstratives in support of US Airways' case and cross-examination (including 190 exhibits admitted in the 2016 trial);

- Reviewed over 400 Sabre exhibits (including 148 that were admitted in 2016);

- Engaged in near-daily meet-and-confers with Sabre's counsel regarding exhibits, demonstratives, and deposition designations;

---

had the best option or not, Air Canada would appear at the very bottom of the results . . . making it more difficult for travel agents to find us as an option."); ECF No. 1224, 4/28/2022 Trial Tr. 910:3–25 (Gavin Molloy, one of United Airlines' lead negotiators for their 2006 agreement with Sabre, testifying that "We could sign up to a full content agreement, which was not essentially what we wanted to do, or we could be in a situation where a huge portion of our revenues were at risk, and we would essentially lose control of how our own inventory was displayed in the Sabre system," and that Sabre had communicated that in the absence of an agreement "there was the possibility of bias[ing]" against United); ECF No. 789, 12/12/2016 Trial Tr. 5199:3–13 (Al Lenza, a former Northwest Airlines executive, testifying that Sabre biased against Northwest such that "flights in [the airline's] most important markets that used to show up first, because were non-stops and had the best service, were now in the ninth or tenth display [page] which essentially made it impossible for travel agents to find."); *id*. 5153:3–24 (Malloy testifying that a Sabre distribution deal without full content was not a serious option because it would "put [United's] revenue at risk by allowing a third party like Sabre to essentially manage the revenue on [United's] behalf, through biasing").

- Drafted letters and prepared for argument on key trial issues, some of which were in response to Sabre's repeated motions on certain issues; and

- Prepared a closing argument.

70. On May 19, 2022, the jury returned its verdict for US Airways on its Section 2 claim for relief, finding that Sabre had willfully maintained monopoly power through exclusionary conduct and hard harmed US Airways.  *See* ECF No. 1208.  The jury returned a verdict for Sabre on US Airways' Section 1 claim.

## POST-TRIAL WORK

### (June 2022 through May 31, 2023)

### Recoverable attorney's fees incurred during this period:  $883,613.50

71. Although Sabre had previously indicated to the Court that it would be filing a Rule 50 motion, ECF No. 1203, Sabre did not.  Nor did Sabre appeal the verdict.

72. The parties engaged in a court-ordered mediation to try to resolve US Airways' claim for attorneys' fees and costs.  The mediation was unsuccessful.

73. The work to prepare this motion for fees was substantial, as described above, totaling $883,613.50 through May 31, 2023 and includes preparation for a September 2022 mediation session and of the bifurcated fees-related briefing.  All amounts have been paid by US Airways or have been approved for payment.  US Airways reserves the right to seek fees, expenses, and costs from June 1, 2023 onwards, and will include any such fees, expenses and costs, as part of its reply in support of US Airways' Motion for Costs, Including Attorney's Fees and Expenses, under 15 U.S.C. § 15.

## THE SIGNIFICANCE OF US AIRWAYS' VICTORY

74. According to statistics compiled by Westlaw, as of October 1, 2024, the following opinions of this Court and the Court of Appeals have been cited as follows:

a. *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265 (S.D.N.Y.

2015), *aff'd,* 938 F.3d 43 (2d Cir. 2019) (summary judgment)

    i.  Total cites: 128

    ii.  Case cites: 15

    iii.  Secondary sources: 31

    iv.  Appellate Court and Trial Court Documents: 82

b. *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 CIV. 2725 (LGS), 2017

WL 1064709, at *1 (S.D.N.Y. Mar. 21, 2017), *vacated and remanded,* 938

F.3d 43 (2d Cir. 2019) (motion for judgment as a matter of law under

50(b) or in the alternative motion for new trial under Rules 50 and 59).

    i.  Total cites: 38

    ii.  Case cites: 6

    iii.  Secondary sources: 14

    iv.  Appellate Court and Trial Court Documents: 17

c. *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019)

    i.  Total cites: 346

    ii.  Case cites: 51

    iii.  Secondary sources: 117

    iv.  Appellate Court and Trial Court Documents: 169

d. *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 CIV. 2725 (LGS), 2022

WL 874945, at *1 (S.D.N.Y. Mar. 24, 2022) (summary judgment)

    i.  Total cites: 9

    ii.  Secondary sources: 2

iii. Trial Court Documents: 7

75. After the Court of Appeals' held that US Airways presented sufficient evidence of net anticompetitive effects across the two-sided GDS market, other cases against two-sided transaction platform operators filed by private plaintiffs and government enforcers have followed a similar analytical approach. For example, in the Justice Department's recent case against Visa, the United States has alleged that Visa used its dominant position to "penalize those who would switch to a different debit network or to companies that could develop alternative debit products" and made "extra payments to entice potential competitors to partner instead of innovate," which "slowed innovation" and allowed it to and "collect[] a higher fraction of each debit transaction than it would if it faced competition." Complaint, *United States v. Visa, Inc.*, 1:24-cv-07214, (S.D.N.Y. Sep. 24, 2024), ECF No. 1, at 4-5. *Compare* Sixth Amended Complaint, *US Airways, Inc. v. Sabre Holdings Co. et al.*, 1:11-cv-2725(LGS) (S.D.N.Y. Sep. 17, 2021), ECF No. 1037, at ¶¶ 14, 118 (Sabre imposed "unreasonable switching costs" and engaged in "retaliatory actions against airlines that dared to challenge Sabre's anticompetitive model," which "reduced innovation" and allowed Sabre to "impose and profitably maintain a supracompetitive net fee by charging its airline customers an amount that sustains Sabre's competitively excessive profit").

76. According to statistics compiled by LexisNexis's Lex Machina (last accessed on September 30, 2024), between January 1, 2009, and September 30, 2024, only fifteen (15)

plaintiffs have prevailed in a federal monopolization trial that resulted in a court finding and judgment.

| Antitrust Findings by Judgment Event | | | | | | | |
|---|---|---|---|---|---|---|---|
| Findings | Default Judgment | Consent Judgment | Judgment on the Pleadings | Summary Judgment | Judgment as a Matter of Law | Trial | Any Judgment Event |
| Sherman Act § 1 Violation (Restraint of Trade) | 2 | 7 | 1 | 4 | 21 | 0 | 35 |
| No Sherman Act § 1 Violation (Restraint of Trade) | 0 | 10 | 485 | 176 | 27 | 5 | 686 |
| Sherman Act § 2 Violation (Monopolization) | 1 | 0 | 3 | 1 | 15 | 0 | 20 |
| No Sherman Act § 2 Violation (Monopolization) | 1 | 9 | 378 | 156 | 22 | 7 | 553 |
| Sherman Act § 1 / Clayton Act § 3 Violation (Tying) | 0 | 0 | 0 | 1 | 6 | 0 | 7 |
| No Sherman Act § 1 / Clayton Act § 3 Violation (Tying) | 0 | 0 | 42 | 17 | 3 | 2 | 62 |
| Clayton Act § 7 Violation (Mergers) | 0 | 4 | 0 | 0 | 9 | 0 | 13 |
| No Clayton Act § 7 Violation (Mergers) | 0 | 0 | 27 | 7 | 8 | 0 | 42 |
| Robinson-Patman Act Violation (Price Discrimination) | 0 | 0 | 1 | 2 | 1 | 0 | 4 |
| No Robinson-Patman Act Violation (Price Discrimination) | 0 | 2 | 43 | 20 | 6 | 2 | 71 |
| Other Federal Antitrust Violation | 1 | 5 | 3 | 3 | 0 | 0 | 12 |
| No Other Federal Antitrust Violation | 0 | 3 | 63 | 23 | 6 | 2 | 96 |
| Antitrust Exemption Defense | 0 | 0 | 120 | 28 | 1 | 22 | 170 |
| No Antitrust Exemption Defense | 0 | 0 | 4 | 14 | 1 | 4 | 22 |
| Rule of Reason Defense | 0 | 0 | 12 | 7 | 1 | 0 | 20 |
| No Rule of Reason Defense | 0 | 0 | 1 | 2 | 2 | 0 | 5 |
| No Antitrust Injury | 0 | 0 | 234 | 72 | 5 | 2 | 312 |

## **CONCLUSION**

77. In sum, US Airways seeks recovery of $139,001,444.76 as set forth in Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:    October 7, 2024
          New York, New York

*/s/ Andrew J. Frackman*
_____

Andrew J. Frackman